UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X

UNITED STATES OF AMERICA, : 23-CR-82(EK)

-against- : United States Courthouse
Brooklyn, New York

CARLOS WATSON and OZY MEDIA, INC., : July 8, 2024
12:30 p.m.

Defendants.

- - - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR HEARING
BEFORE THE HONORABLE ERIC KOMITEE
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

For the Government: BREON PEACE, ESQ.
United States Attorney
Eastern District of New York
271-A Cadman Plaza East
Brooklyn, New York 11201
BY: JONATHAN SIEGEL, ESQ.
DAVID PITLUCK, ESQ.
Assistant United States Attorneys

For the Defendant Carlos Watson: RONALD SULLIVAN LAW FIRM PLLC
1300 I Street NW, Suite 400E
Washington, D.C. 20005
BY: RONALD S. SULLIVAN, ESQ.
JANINE I. GILBERT, ESQ.

For the Defendant OZY Media, Inc.: SHANNON FRISON, ESQ.
75 State Street, Suite 100
Boston, Massachusetts 02109

REPORTED BY:
Jamie Ann Stanton, RMR, CRR, RPR
Official Court Reporter
jamiestanton.edny@gmail.com

Proceedings recorded by computerized stenography. Transcript produced by Computer-Aided Transcription.

(In open court.)

THE COURT: So there's 3500 material, does that mean we are hearing from a witness?

MR. SIEGEL: Your Honor, we were planning to proceed by proffer, as is standard in bail proceedings, but just in the interest of making sure that we are disclosing the information we have, we have the notes from the interview of the CSO, which Mr. Jackson was kind enough to make copies that we are going to be handing to the defense as soon as we get them.

THE COURT: Okay. I think we should be contemplating two legal questions here today. One is the status of Mr. Watson's pretrial release; the other is the possibility of contempt, given what I think is the clarity of my prior order on this subject.

Mr. Sullivan, do we have a disputed fact about the basic question that Mr. Watson attempted to bring in one or more phones again today?

MR. SULLIVAN: There's no dispute of fact that two phones were in Mr. Watson's bag today. There's a dispute of fact whether he intended to bring them into the Court.

THE COURT: What does that mean? That he brought them in unknowingly?

MR. SULLIVAN: Yeah. Didn't realize that they were still in his bag. These were the two phones that we

discussed before that we use in preparation for defense, it's easy access to the e-mails and texts that have been part of this case. And in preparation over the long weekend, going through and looking at them, et cetera, and Mr. Watson didn't realize they were in his bag. That's one. And when asked about it, he just checked them. So that's point one. So in terms of attempting to bring them in or smuggling or anything like that, I don't think that's -- that's accurate.

Two, as -- over the break, I looked at the Court's Order, transcript page 2289, starting line 4, where the Court said: For the sake of clarity, Mr. Watson is not allowed to have any electronic devices in the courtroom. And then a little bit later, same page, lines 15 through 19, the Court said it's going to ask all non-lawyers to check their phone downstairs as well.

And there's more, but that's the sine qua non. So I'm not sure, when the Court clarified its order that Mr. Watson's not allowed to have electronic devices in the courtroom, he certainly didn't bring them into the courtroom. It doesn't appear that Your Honor's order said he couldn't bring it into the courthouse.

THE COURT: How does it work downstairs? I don't have to check a phone, so I don't know this.

MR. SULLIVAN: If you have a phone, you put it on

the -- like the airport bowl that goes through the security bin and it has to go through the security bin.

THE COURT: Right.

MR. SULLIVAN: Lawyers are allowed to do that. And everyone else checks it when you come in. And Mr. Watson didn't realize -- he just hadn't been bringing those devices. Those are the two dead devices, just to refresh the Court's memory. All you can do on there is pull up texts and those sorts of things, but there's no line out, telephone line in there, associated with the phone and any longer -- with those phones any longer --

THE COURT: But you were instructed to remove any cellular phones from a bag before it goes through the x-ray machine; is that correct?

MR. SULLIVAN: Yes.

MS. GILBERT: No, we don't have to remove it from a bag. You can put your bag through with your phone in your bag. The only thing you have to remove is a computer.

MR. SULLIVAN: I stand corrected.

THE COURT: I can't read the handwriting here. Let's have a proffer from the Government so that I can understand at least what the allegations are.

MR. SIEGEL: Your Honor, with the Court's permission, another colleague from our office handled the interview, and they're going to come up and handle that if

that's all right?

THE COURT: Yes, yes.

MR. SIEGEL: So it's AUSA David Pitluck, for the court reporter.

THE COURT: Mr. Pitluck.

MR. PITLUCK: Your Honor, where would you like me to?

THE COURT: Anywhere you are on a microphone.

MR. PITLUCK: Good afternoon, Your Honor.

THE COURT: Good afternoon.

MR. PITLUCK: The team was tied up today, so myself and one of the officers, investigators, Marty Sullivan, went over and spoke with the CSOs.

Judge, I have no background other than what I learned this morning. I just wanted to make sure the Court was aware of it.

According to the -- we spoke to two CSOs, the supervisor and the individual who interacted with Mr. Watson. He said that -- they said that they advised that the procedure is that if you have a phone and you are not a lawyer, you put it, and you check it in with the CSOs and you are given a ticket for it before you go through security. I don't have to check my phone either, but I think you have seen those bins that are there. And then after you have checked your phone, you put your bag through

and you go through security and then you are admitted into the courthouse.

Today, Mr. Watson passed his bag through --

THE COURT: Just pause there for a moment?

MR. PITLUCK: Yes, Your Honor.

THE COURT: So that was consistent with what Mr. Sullivan was saying a moment ago, but inconsistent with what Ms. Gilbert corrected Mr. Sullivan to say.

Ms. Gilbert, are you talking about lawyers or are you talking about nonlawyer parties?

MS. GILBERT: I was referring to lawyers.

THE COURT: That's not the issue here, though, right? Mr. Watson is not a lawyer for this purpose. I have been crystal clear about that.

MR. SULLIVAN: You said the opposite in court.

THE COURT: No. I said he could have reasonably believed himself to be a lawyer the first time, but I clarified that Mr. Watson is not allowed -- he is not getting the privileges that are accorded to lawyers in this courtroom full stop.

MR. SULLIVAN: Courtroom, agreed, yes.

THE COURT: Or this courthouse.

MR. SULLIVAN: I don't think that was in the transcript.

THE COURT: Either way, the representation from

Ms. Gilbert, we will not be proceeding under that set of facts.

MS. GILBERT: I have also actually seen civilians go through that way too and then they have checked the phones after going through the magnetometer with the phones in their bag.

THE COURT: Okay. Do we know, Mr. Pitluck, whether Mr. Watson was asked whether he wanted to check a phone today?

MR. PITLUCK: I don't know that, Your Honor. It's a different CSO who mans the phone, so I don't know if he was asked specifically today whether or not he needed to check a phone and said no, I don't know that.

THE COURT: Okay. But your understanding of the setup is what?

MR. PITLUCK: My understanding of the setup is the CSOs advised Agent Sullivan and I that when you enter in the courthouse, you check a phone, there were CSOs -- I saw this there, there are CSOs with bins. You check your phones. They give you a tag, it's actually a little wooden block with a number on it, and then you proceed to put your bags through the magnetometer. And if they're clear, you proceed into the courthouse. That's what they advised me is the procedure at least today. And I think, Your Honor, they made that seem like that was standard practice.

Mr. Watson put his bag through the magnetometer, the x-ray machine. They detected -- in the first instance, the CSO detected a phone. He pulled out the phone. Mr. Watson informed him that the phone was not working, it was broken. And the CSO said it doesn't matter, you have to go check it.

THE COURT: You said not working or broken?

MR. PITLUCK: I just want to pull my notes. Said the phone was not working -- sorry, Agent Sullivan's notes, said the phone was not working.

THE COURT: I think we've heard from the defense team that these phones are not attached to a valid cellular contract. That's a different thing, obviously, from saying that the phones don't work at all, since as we all know, cellular phones in the smart phone era can do lots of things apart from making phone calls.

Moving on, Mr. Pitluck.

MR. PITLUCK: Yes, Your Honor.

So the CSO said it doesn't matter if it's not working, you need to go check it. The Defendant, without any incident, went over, checked the phone, came back with the block. The CSO reran the bag through the magnetometer, the x-ray machine -- I am using those terms imprecisely, but the machine that's in lobby, and identified something else that was in the bag. According to the CSO, Mr. Watson said

that's a phone charger. When the CSO went in to pull it out, there was a phone and it was the second phone that was not -- at no point mentioned before that. The CSO again said you have to check this one. He went back, checked it under the same number. The two phones are together, the same number, actually, number 400. I saw the phones. I didn't touch them. They just showed me where they were stored. And then, again, without incident, the CSO then passed it again through. There was nothing in there. Mr. Watson was admitted to the courthouse. The CSOs told me that they -- the CSO who I spoke to said he advised the supervisor of what had happened and the supervisor, he said, advised a member of the courtroom staff.

THE COURT: Okay. Where is these phones now?

MR. PITLUCK: They are stored in the lobby with the CSOs.

THE COURT: So is there anything else I should know about what transpired today?

MR. PITLUCK: No. I think they advised us a little bit of the procedure and then they explained to Agent Sullivan and I a little bit about the past history of what had happened with the phones. We weren't privy to that information. We listened and documented it, but --

THE COURT: What did they say was the past history?

MR. PITLUCK: They said that there was a prior incident where he had represented himself to be a lawyer and then the phones had come -- they had caught the phones that had come through, he didn't have his bar card.

That was all secondhand. We didn't directly address that.

THE COURT: Okay. All right.

Can I have the order that says that there should be no phones?

Mr. Sullivan, the Court Order that you read is only part of the story, here, of course. There was also the incident, I don't know what day this is, but it's memorialized at pages 2642 and 2643 of the transcript, when a cellular phone rang at the counsel table that Mr. Sullivan is sitting at to my right and Mr. Watson is sitting at to my left, and I observed for the record that the phone was on Mr. Watson to my left, to Mr. Watson's right side, so clearly in front of Mr. Watson and not the attorney. I observed that at this point we had already talked about the Court rules regarding phones. And my order was, I said, I don't want a phone in anyone's possession at that table that Mr. Sullivan and Mr. Watson are sitting at, either attorney or client.

And so that's the prior discussion on this issue.

There have been a series of incidents here that

violate either Court orders if true or even federal law. The Government alleged at a status conference well before trial that Mr. Watson had used one or more documents that were subject to a protective order issued by this Court in a manner that contravened the protective order. The Government asked at that point for Mr. Watson's bail to be revoked. I denied that application to revoke bail, but attempted at that time to impress upon Mr. Watson the importance of complying with Court orders.

We also had the incident reported by Mr. Siegel in which it was alleged that Mr. Watson yelled in the presence of jurors in the hallway exiting the courthouse for lunch his views about the fairness of these proceedings.

Mr. Sullivan, tell me again, I think we had an answer from you, but I just want to make sure it's a comprehensive answer, what is your position on what Mr. Watson said, how loudly he said it, and who was in the vicinity at that point?

MR. SULLIVAN: I was there and his family members were around me and some of the defense team. And he said something to the effect that this doesn't have anything to do with race. As I stated before, I did not see any jurors there, but, you know, that's an empirical question. We can question the jurors. I did not see any jurors present. And if they were somewhere, I would not have thought it was --

it would have been loud enough for anyone to hear it, but the people who were standing right there.

THE COURT: Who did you understand Mr. Watson to be addressing?

MR. SULLIVAN: The people standing around him, that would be me, people from the defense team, and several of his family members.

THE COURT: Mr. Siegel, what's your recollection there?

MR. SIEGEL: Your Honor, we'd been -- we'd been standing in two different groups while the jurors were leaving. And then he turned around and looked directly at us and said the statement in a much louder tone of voice than any of us had been talking. I mean, he looked at us. He turned around -- he turned around, he looked at us, and he said it.

THE COURT: How far were you from Mr. Watson?

MR. SIEGEL: We were standing in the hallway right outside the court, so as wide as that hallway is, we were -- I think we were standing pretty close to the court door and they were on the other side of the hallway. So it's not that many feet.

THE COURT: Sorry, and the jurors were where in relation to you?

MR. SIEGEL: The jurors had been walking out and

they rounded towards where the elevator is.

THE COURT: So in between you and Mr. Watson or?

MR. SIEGEL: They had been passing between us, but at this point, they were around the corner where the elevators were.

THE COURT: Approximately how many feet away would you estimate that is? Or you can come up with a more precise estimate, if you want to.

MR. SIEGEL: It's about the distance from the court door to where there is the turn there. I'm bad at feet and I tell witnesses to never estimate feet.

THE COURT: I'm troubled, I am just going to say this now, by the repeated violations of Court rules and orders. Number one, the facts underlying the Government's application to revoke bail in connection with the protective order. Number two, this incident that occurred in the courthouse hallway. Number three, and I think the defense legal team is more responsible for this, perhaps, than Mr. Watson, himself, but the incident in which I invited the defense legal team to do a walkthrough of the courtroom technology setup before trial and the defense sent Mr. Watson personally and Mr. Watson then proceeded personally to ask a series of questions of the Court's deputy concerning pending motions. Obviously, inappropriate behavior. We talked about that, as well. And now these

repeated incidents with Mr. Watson both attempting to bring phones into the courthouse and giving less than fully truthful answers to the CSOs in response. So if the CSOs this morning identified one phone that Mr. Watson had purportedly forgotten about and that was all there was to it, it would be a lot easier, obviously, to believe that Mr. Watson had forgotten about the phone and that any violation attempted was unintentional. But when the CSOs identify a phone, Mr. Watson checks that phone, and then he still neglects to identify the second phone in his bag, I think it's obvious to everybody that it's a lot harder to believe that he forgot about that second phone right after the first phone had been identified.

I am telling you right now, Mr. Watson, this is my final warning. Any other violation of this Court's orders, of any rules that prevail in this courthouse, or anything that looks like -- that would suggest even a hint of jury tampering, and we will be having a very different conversation than we're having now. I am not going to revoke bail at this point, but I am as close to that point as I can possibly be without actually crossing that line. That's point one.

Point two, given the frequency and number of these violations, I do think it's possible that some contempt sanction is required. I don't know if we have -- I think I

am obligated, tell me if I am wrong, to consider Mr. Watson's ability to pay before I impose any civil sanction here, where that civil or criminal sanction would be designed either to ensure that this Court's orders are complied with in the future or to punish Mr. Watson for the violations that have occurred to date.

Do we have a financial affidavit for Mr. Watson? I imagine one was submitted at the bail stage of this case.

Do you have the Pretrial Service Report?

THE CLERK: I have the bail transcript.

THE COURT: Can we order that from Pretrial Services?

We are going to get a copy of the Pretrial Services Report here. If it doesn't already have one, and I am going to be considering contempt sanctions, I think I might need to know more about what Mr. Watson's financial picture looks like. If the defense believes that, no, I don't need to know that because it's irrelevant to any consideration of contempt sanctions, tell me that, and I'll reconsider any request, but otherwise, I would like Mr. Watson to submit a financial affidavit, a current financial affidavit. Obviously, he's spent a lot on legal fees since the date of his initial appearance. We would like an up-to-date financial affidavit to be submitted by 11:00 a.m. tomorrow. And when I say I would like that, I

mean I am ordering that Mr. Watson should submit a financial affidavit by 11:00 a.m. I am interested in the defense view about whether -- what should I do, here, in your view, to make sure this doesn't recur? One option I have is simply to have the CSOs downstairs or the marshal service or whomever hold on to these phones until the end of trial.

Is the material on these phones material that does not exist anywhere else and that is somehow essential to the defense case here? Or is that material also located in other places and can be loaded on a lawyer's laptop?

MR. SULLIVAN: It's located in other places, but it is extraordinarily helpful to us, because it's easy to get to and doesn't cost us anything if we're using -- moving it around, that sort of thing. The convenience factor is extraordinarily helpful.

THE COURT: So why does it cost you money to the extent you are searching --

MR. SULLIVAN: Sometimes we can do searches by ourselves rather than asking the company that we use --

THE COURT: Why can't you do that on a laptop?

MR. SULLIVAN: I'm sorry?

THE COURT: Why can't you do that on a laptop rather than a cellular device that can be smuggled into the courthouse and has been attempted to be on a number of occasions now?

MR. SULLIVAN: My sense is it's easier on the telephone. And I certainly stand by the representation that Mr. Watson didn't realize those were in his bag after the long weekend.

THE COURT: Two failures of recollection in rapid sequence, seconds apart from each other, that's your position?

MR. SULLIVAN: No. My position is he didn't realize that either were in there, so when one was there, he just didn't realize that they were in his bag, either one or both.

THE COURT: Have Mr. Watson put in an affidavit of his own to that effect, if you would. I don't want to take a lawyer's proffer for this, given how hard it has been to pin down Mr. Watson's position on these questions. There is a CSO in the courtroom with us. I am going to direct that the phones in question stay with the CSOs overnight until we finish this issue tomorrow with the benefit of anything the defense wants to say between now and then and the financial affidavit that's going to be forthcoming, but nobody should check those phones out today. Those phones should remain in the custody of the Court Security Officers until we get to the bottom of that. Understood?

MR. SULLIVAN: Understood. I ask that the Court direct no one to look in the phones because there may be

attorney-client protected information in the text messages, so no Government official should look at the phones, look in the phones.

THE COURT: I can assure you that no one will attempt to access the contents of those phones.

Mr. Watson, do you understand my instructions now?

THE DEFENDANT: I do.

THE COURT: All right. We are going to regroup.

Anything else from the Government's side?

MR. SIEGEL: Your Honor, just one thing that we noticed as we were preparing for this hearing.

You know, there have also been the issues about the public statements and the gag order and we did take a look to see about if those public statements were up.

There is a website that we understand, at least, has been run by the defense team called tooblackforbusiness.org. It's all one word. It's been up for several months. And we just checked and there is still a post on it called Three White Brooklyn Prosecutors Target Black-Owned and California-Based OZY that does list the names of the AUSAs on this case and talks about the injustice of this case.

THE COURT: Who runs that website?

MR. SULLIVAN: I have no idea.

THE COURT: You have no idea? Ask your client who

runs that website.

Let's put Mr. Watson under oath, here.

MR. SIEGEL: And Your Honor, I will just note that there are several posts in this website written in the first person from Mr. Watson's perspective.

THE COURT: Okay.

Mr. Sullivan, tell me whether you can truthfully advise the Court or not that your client has had no input into the launch, design, contents or anything else relating to this website. Is that your position?

MR. SULLIVAN: I don't have enough information at this point, Your Honor, so I have no representations.

THE COURT: So that sounds like a prima facie case that there is an ongoing violation of Rule 23.1 by the defense team, which, again, is all the more extraordinary given that the defense team was, itself, affirmatively litigating what they believe to be Rule 23.1 violations by the Government and which I responded to rather forcefully, again, the notion that the defense, all the while, has been engaging in this conduct itself is rather extraordinary.

What does the Government propose -- let's say it's not the lawyers, but Mr. Watson personally? Obviously, Rule 23.1 applies to him, but at the same time, he has a Fifth Amendment privilege on the subject that his lawyers might not have. I don't know if this is really a valid

Fifth Amendment assertion or not, but how does the Government want to proceed with respect to the potential ongoing 23.1 violation?

MR. SIEGEL: Your Honor, at this point what we would ask is just for a specific order to take this and everything else down. We've previously asked for it and Your Honor has said that your order speaks for itself and I think it may.

THE COURT: I think so, too.

Mr. Watson, for the avoidance of any doubt, to the extent that anything about this website or any other communications made in public are within your control, you are ordered to take those websites down, make sure that those communications are not being repeated every time somebody's web browser calls for a connection to that website. That's a new violation every time something happens. I would like you to comply with that order in full, that you are already ordered to comply with that order in full, but I am going to ask you tomorrow what you have done to make sure that your compliance with that Court Order is complete.

Anything else from the Government side today?

MR. SIEGEL: We would just reserve the right to think about it. I think contempt, there is a lot of novel legal issues that don't come up every day, so we just want

to think about it.

THE COURT: Yes, I would invite the Government to think about those issues and I will do so myself. Again, the pattern here is what it is.

All right. Let's take a 15-minute break and then we will regroup with the jury.

(Matter concluded.)