UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - X

UNITED STATES OF AMERICA, : 23-CR-82(EK)

-against- : United States Courthouse
Brooklyn, New York

CARLOS WATSON and OZY MEDIA, INC., : July 8, 2024
9:00 a.m.

Defendants.

- - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
BEFORE THE HONORABLE ERIC KOMITEE
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

For the Government: BREON PEACE, ESQ.
United States Attorney
Eastern District of New York
271-A Cadman Plaza East
Brooklyn, New York 11201
BY: JONATHAN SIEGEL, ESQ.
GILLIAN KASSNER, ESQ.
DYLAN A. STERN, ESQ.
Assistant United States Attorneys

For the Defendant Carlos Watson: RONALD SULLIVAN LAW FIRM PLLC
1300 I Street NW, Suite 400E
Washington, D.C. 20005
BY: RONALD S. SULLIVAN, ESQ.
JANINE I. GILBERT, ESQ.

For the Defendant OZY Media, Inc.: SHANNON FRISON, ESQ.
75 State Street, Suite 100
Boston, Massachusetts 02109

REPORTED BY:

Jamie Ann Stanton, RMR, CRR, RPR
Official Court Reporter
jamiestanton.edny@gmail.com

Proceedings recorded by computerized stenography. Transcript produced by Computer-Aided Transcription.

* * * * *

(In open court; jury not present.)

THE COURT: Please be seated.

I'm advised this morning, again, that notwithstanding all the conversation we've had about non-lawyers in this case being permitted to bring cell phones into the courtroom, that Mr. Watson, again, attempted to smuggle, I'll say, given that that's the accusation, two cell phones through security.

I don't know what to say. This is just the latest example of the defense team treating so many, not only noticing disclosure obligations, but rules of the Court as optional.

I would like the Government to be in touch with the CSOs downstairs to understand what happened and we are going to have a bail hearing at lunch.

MR. SIEGEL: Your Honor, would you like us to be in touch with the CSOs before lunch?

THE COURT: Yes. I think you might need to put another Assistant U.S. Attorney on this and I will give you

five minutes, if you want to tee that up. Obviously, the three of you have a day job that you don't want to be taken away from for this purpose.

I said the last time, as a matter of absolutely full disclosure to the defense, that any continued problems in this vein would implicate potentially Mr. Watson's release and yet, here we are.

So take five minutes --

MR. SIEGEL: Thank you, Your Honor.

THE COURT: -- and set that up.

(Recess taken.)

MR. SIEGEL: Thank you, Your Honor.

THE COURT: We are going to bring in the jury when we are ready.

MR. SULLIVAN: Should he take the stand?

THE COURT: Yes, please.

(Witness takes the stand.)

THE COURT: And Ms. Frison, you saw my order of yesterday on the subject of timing here?

MS. FRISON: Two hours?

THE COURT: Yes.

MS. FRISON: Yes, Your Honor.

THE COURT: And obviously, what we are talking about at lunch is cumulative, not just today's incident, but the prior one, the yelling in the hallway back to the

beginning of the case.

(Jury enters.)

THE COURT: Please be seated, everyone.

Ladies and gentlemen, good morning.

THE JURY: Good morning.

THE COURT: I hope you all had a long and restful weekend.

We will continue this morning with the direct examination of Mr. Watson.

Ms. Frison?

MS. FRISON: Thank you.

**CARLOS WATSON**,

called as a witness, having been previously sworn/affirmed, was further examined and testified as follows:

CONTINUED DIRECT EXAMINATION

BY MS. FRISON:

Q Good morning, Mr. Watson.

A Good morning.

MS. FRISON: Good morning, everyone.

THE JURY: Good morning.

Q Mr. Watson, before we broke for the 4th of July, we were discussing some of OZY's contracts. I would like to direct your attention back to that topic.

In 2017, we discussed a grant from the Ford

Foundation; do you recall that?
A I do. I do.
Q And do you recall the amount of that grant?
A I believe the net amount was three-quarters of a million dollars.
Q So 750,000?
A 750,000.
Q And we also discussed a contract with PBS for 2017.
Do you recall the amount of that contract?
A Yeah. I believe that was $3 million.

MS. FRISON: I am going to ask that the witness be shown Defense Exhibit 37, the witness only.

THE COURTROOM DEPUTY: Try it again?

Your Honor, it appears -- oh, hold on.

Judge, we may have a tech issue again.

THE COURT: I'm sorry?

THE COURTROOM DEPUTY: We may have a tech issue.

THE COURT: What's happening?

THE COURTROOM DEPUTY: The exhibit keeps blinking in and out.

THE COURT: Can we call IT? Let's try shutting the system down and rebooting it, but we'll call IT as well.

THE COURTROOM DEPUTY: Yes, sir.

THE COURT: The MacBook Pro is not a court device, right? Just somebody's plugged in?

THE COURTROOM DEPUTY: That's right.

THE COURT: Let's continue. As long as the witness can see the document and I could see it a moment ago, let's at least move this along.

THE COURTROOM DEPUTY: The connection, Your Honor, it keeps flicking off, that's why.

THE COURT: Okay. I can see it.

THE WITNESS: I see it.

THE COURT: The witness sees it. Ms. Frison will continue while we wait for IT.

THE WITNESS: It just disappeared. It's back again.

THE COURTROOM DEPUTY: It's a connection issue.

MR. SIEGEL: Your Honor, would it make sense to use the ELMO while we wait for IT?

THE COURT: If that will work, then yes, just to keep us moving.

THE COURTROOM DEPUTY: Do you have a physical copy, Ms. Frison?

MS. FRISON: Sorry?

THE COURTROOM DEPUTY: Do you have a physical copy of the document to show?

MS. FRISON: I do.

THE COURT: The ELMO appears to be up and running. Let's proceed.

BY MS. FRISON:

Q Mr. Watson, are you able to see that document?

A I am, yes.

Q I am going to attempt to physically go through the pages so that you can see them.

A Okay.

MS. FRISON: Your Honor, may I give Mr. Watson a physical copy of the whole document?

THE COURT: You may. Please approach.

THE COURTROOM DEPUTY: Thank you, Counsel.

Here you are, sir.

THE WITNESS: Thank you so much.

Q And if you will look through that document, please.

A Okay.

Q Do you recognize it?

A I do.

Q How are you familiar with that document?

A Well, we looked at it a bit last week and -- and I believe I've seen it before, so yes.

Q Did you see it before this trial began?

A I did, yes.

Q And did you see it around the time it was created?

A I did, yes.

MS. FRISON: I would like to offer Defense Exhibit 37 into evidence.

MR. SIEGEL: No objection.

THE COURT: Received.

(Defense Exhibit 37 received in evidence.)

Q Mr. Watson, if you will look at page 5 of that document.

A Okay.

(Exhibit published.)

Q What is the --

Let me go back.

Is this a contract?

A It is a contract.

Q With who?

A With JPMorgan Chase.

Q And was this for 2017?

A Yes. It was signed in 2017.

Q Did you actually negotiate this deal with JPMorgan?

A I did. With their Chief Marketing Officer, Kristin Lemkau.

Q And what did this contract call for JPMorgan to pay OZY Media?

A They really liked a program -- our newsletter --

MR. SIEGEL: Objection.

THE COURT: Sustained.

Q What was the amount that JPMorgan was to pay OZY Media per this contract?

A The net amount was 2 million.
Q And what was OZY to do in performance for that 2 million?
A Weekly customized newsletters.
Q In 2017, how many total fully executed contracts did OZY have?
A Somewhere in the neighborhood of -- we had -- we had 30 -- we had 30 to 40 clients, and across those clients, I think we had north of a hundred contracts. So many of our clients had multiple contracts, whether it was Amazon or Spotify or Volvo.
Q Did you say north of 40?
A We probably had somewhere between 30 and 40 clients. I think probably closer to 40. And -- and each of them had, as Ms. Lightfoot had said earlier, one to four contracts. So we would have over a hundred contracts just for that year alone.
Q So the Ford Foundation, PBS, and the JPMorgan contracts that we've gone over for 2017, were those three of 30 to 40 contracts total, for that year?
A They were three of a hundred contracts.
Q Did the almost 6 million that those three represented inform your belief that for 2017, OZY generated well over $7 million in revenue?
A Yes.

MS. FRISON: Thank you.

And are we up on the digital?

THE COURTROOM DEPUTY: Could you try it again? We have the tech person here from IT. Can you just connect it once more?

Q Mr. Watson --

MS. FRISON: I'm sorry, Your Honor, did you want me to pause while we do this?

THE COURT: No, you can continue.

Q Mr. Watson, I am going to direct you to the year 2020.

A Sure.

MS. FRISON: And we have Defense Exhibit 102 in the hard copy, perhaps?

May I approach?

THE COURT: Yes, please.

Q Mr. Watson, I am going to hand you a document and ask you to review it.

A Okay.

THE COURTROOM DEPUTY: Ms. Frison, are you using the ELMO for this?

MS. FRISON: I believe we are back up, so I will do the screen, thank you.

THE COURTROOM DEPUTY: Yes, ma'am.

Q Do you recognize that document?

A I do, yes.

Q How are you familiar with it?
A This is one of our -- one of our signature clients, they're part of the same family that we just talked about, JPMorgan Chase.
Q And did you --
Is this for 2020?
A This is, correct.
Q Did you also negotiate this deal with JPMorgan?
A I did.
Q Have you seen this prior to today?
A Yes, I believe so.
Q Do you remember seeing it around the time it was created?
A Yes.
MS. FRISON: I am offering Defense Exhibit 102 into evidence.
MR. SIEGEL: No objection.
THE COURT: Received.
(Defense Exhibit 102 received in evidence.)
(Exhibit published.)
MS. FRISON: And if you can scroll, please.
Q Mr. Watson, was this the same type of agreement that JPMorgan had with OZY in 2017?
A Yes.
Q And what is the amount of money that JPMorgan was

paying per this contract?
A This individual contract looks like $871,890.99, so a little bit under a million dollars.
Q And is this contract executed by both parties?
A Correct, yes.
Q Where do you see that?
A The execution -- this is a long contract, it's 58 pages, so if you go down to page 58, it has digital signatures on the contract.
MS. FRISON: Thank you.
And if you may show the witness Defense Exhibit 103.
Q And Mr. Watson, if you can review that document to yourself.
A Okay.
Q Do you recognize it?
A Do -- can you scroll -- is that the very end?
Yes, I recognize it.
Q How are you familiar with it?
A It was with one of our key partners, General Motors.
Q Did you negotiate this deal with General Motors?
A Yes. Both with their Chief Marketing Officer, Deb, and with their CEO, I spoke with Mary Barra, the CEO of General Motors.
Q Did you see this contract before today?

A Yes.
Q Did you see it around the time it was executed?
A Yes.
MS. FRISON: The defense is offering Defense Exhibit 103 into evidence.
MR. SIEGEL: No objection.
THE COURT: Received.
(Defense Exhibit 103 received in evidence.)
(Exhibit published.)
Q And Mr. Watson, if you will just look at the top of the first page with us, is General Motors the other party?
A It's a combination, like with JPMorgan, they had an ad agency, in this case, their ad agency is referred to as -- they pronounce it "Cara," even though it's spelled C-A-R-A-T, they pronounce it "Cara." And you see that in the upper left-hand corner. And this is in particular for Chevy or Chevrolet as it's known.
Q And is this for the year 2020?
A It is.
Q What is it that OZY did for Chevy and/or General Motors with this contract?
A They were sponsors of one of our TV shows, The Carlos Watson Show, they were a big sponsor of The Carlos Watson Show.
MS. FRISON: Thank you. You can take that down.

And if you will show the witness Defense Exhibit 113.

THE WITNESS: Sorry, would you scroll right back just for a second, like page 22?

Okay, all right. Okay.

Q Sir, do you recognize that document?

A I do.

Q How are you familiar with it?

A This is also -- this is one of about 20 contracts that we had with General Motors through Carat. They broke up their deals and many individual contracts. This is -- this is just one of them.

Q And is this also for the year 2020?

A It is.

Q How much was General Motors to pay OZY per this contract?

A Just for this one individual contract of about 20 is about half a million dollars.

Q And was it the same type of deal that the Chevy contract was for?

A The nice thing is that they wanted -- we did newsletters for them. So if you look at this, they had spent on TV, on the other contract we just saw, and on this one, they are now expanding the relationship and spending on newsletters. So they purchased OZY TV shows, OZY

newsletters, OZY podcasts, OZY Festivals and OZY Genius Awards. They purchased a full suite of OZY products.

MS. FRISON: Thank you. You may take that down.

Please show the witness Defense Exhibit 115.

Q Are you familiar with that document --

MR. SIEGEL: Your Honor, I'm not sure that that last exhibit was admitted.

THE COURT: Ms. Frison?

MS. FRISON: 113.

THE COURT: Are we talking about 113?

MR. SIEGEL: Yes.

MS. FRISON: If not, I am offering 113 into evidence.

THE COURT: Any objection?

MR. SIEGEL: No objection.

THE COURT: It's received.

(Defense Exhibit 113 received in evidence.)

MS. FRISON: Thank you for that.

Q Mr. Watson, as to the document in front of you, do you recognize it?

A I do.

Q How are you familiar with it?

A Hulu was a good core partner. We did a signature TV show which still airs today called Defining Moments with Hulu, and this is one of three contracts -- this is one of

three contracts, I believe, three contracts that we had with Hulu.

Q And how much money was Hulu to pay OZY per this contract?

A In this particular one, it says the net amount is $200,000, but this is a good example of a barter agreement built on top of this --

MR. SIEGEL: Your Honor, objection.

THE COURT: Sustained.

Q Did you actually negotiate this deal with Hulu?

A I did, with the equivalent of their Chief Marketing Officer who signed this named Nick Tran. And I also spoke with their CEO, Randy Freer. I went through this with Randy.

MS. FRISON: Thank you. You may take that down.

And please show the witness Defense Exhibit 117.

And while you are looking at that, Your Honor, I offer defense 115 to evidence.

MR. SIEGEL: No objection. And we would just ask that they admit them before he starts talking about them.

THE COURT: Yes. And received.

(Defense Exhibit 115 received in evidence.)

MS. FRISON: Thank you.

Q Do you recognize Defense Exhibit 117?

A Yes. This may be the same one.

Actually, I apologize. I might have gotten this wrong. Sorry, my apologies. A different one. As I said, we had multiple contracts with -- with Hulu.

MR. SIEGEL: Your Honor, can we have a sidebar?

THE COURT: Yes.

(Sidebar.)

(Sidebar conference held on the record out of the hearing of the jury.)

MR. SIEGEL: Your Honor, unless I am missing something, Mr. Watson is correct, 115 and 117 are the same contract and admitting two of the same contract to suggest that there are multiple contracts, we would submit, is misleading.

MS. FRISON: I believe that they are different contracts, two Hulu --

THE COURT: Can you find out?

MS. FRISON: With him on the stand or you mean separately from questioning him?

MR. SIEGEL: They're both $200,000 contracts signed by Nick Tran on March 4, 2020.

THE COURT: You should know this already.

MR. SIEGEL: So if there is some difference somewhere, that's fine, but just looking at it, as he testified when he looked at it, it appears the same.

MS. FRISON: I will ask him and if it is, I will move on.

(Sidebar conference ends.)

(Continued on following page.)

(In open court.)

BY MS. FRISON:

Q Mr. Watson, is this the same contract as Exhibit 115 or is it different?

A Can you put 115 back up just for a brief moment, please?

Yes, I think it's the same.

MS. FRISON: Thank you. Let's take that down.

Please show the witness Defense Exhibit 134.

Q Mr. Watson, if you will review that document.

A Okay.

Q Are you familiar with it?

A Yes, I am.

Q How so?

A I negotiated it.

Q Did you see this document before today?

A Yes.

Q And did you see it around the time that it was created?

A Yes.

MS. FRISON: I offer Defense Exhibit 134 into evidence.

MR. SIEGEL: No objection.

THE COURT: Received.

(Defense Exhibit 134 received in evidence.)

Q What is this document, Mr. Watson?

A It's a million-dollar deal with Discover for one month worth of work.
Q What was the work that OZY was to do for Discover?
A In -- they were use -- we were promoting their -- both their credit cards, which are core, and also their student loans and we were using our newsletters, TV shows and podcasts to do that. So we were using multiple OZY offerings to -- to promote that during the holiday season. Holiday season's a big season for advertisers.
Q And for that promotion, Discover was to pay OZY $1 million?
A For one month, correct.
Q In 2020?
A In 2020, for one month of work, yeah.
MS. FRISON: Thank you. You may take that down.
Q Mr. Watson, for the year 2020, how many, approximately, contracts did OZY execute with others?
A OZY had 40 to 50 clients and, again, if each client had on average three to four contracts, OZY probably had around 150 direct contracts with big clients. And then in addition to that, I mentioned that we worked with hundreds of advertisers who could buy us indirectly.
And so -- so 150 main contracts and then there were probably hundreds of -- of individual contracts, if Target or Walgreens wants to buy a small amount of OZY for a

certain day, they can go through third parties who we have a relationship with and buy us that way.

Q So the 150 that you referenced for 2020, were those the more major deals?

A Yes. With GM, JPMorgan, Discover, TikTok, Airbnb.

Q The 2020 contracts we just discussed, JPMorgan, Chevy, General Motors, and Hulu, were those just four of those 150 or so?

A Correct.

Q And did contracts for those four clients inform your belief that OZY generated more than $11 million in 2020?

A Easily, yes.

Q I am going to 2021.

MS. FRISON: If you will show the witness Defense Exhibit 126.

THE WITNESS: Okay.

Q Do you recognize that document?

A I do, yes.

Q How are you familiar with it?

A I -- I negotiated it.

Q Did you see this document before today?

A I did.

Q Did you see it around the time it was created?

A I did.

MS. FRISON: I offer Defense Exhibit 126 into

evidence.

MR. SIEGEL: No objection.

THE COURT: Received.

(Defense Exhibit 126 received in evidence.)

(Exhibit published.)

Q Mr. Watson, what is this contract?

A This is one of about 20 contracts that we had with General Motors. And this one is for three-and-a-half -- or just under three-and-a-half million dollars.

Q And was this for work with Chevy, as well?

A This was for work with Chevy, correct.

Q And what was it that OZY was doing for Chevy for $3.4 million?

A This one includes a number of things. They became, as you can see here, fans of the OZY Genius Awards.

MR. SIEGEL: Objection.

THE COURT: Sustained.

THE WITNESS: Sorry.

A You can see here, if you pull that down just a little bit, you can see there's another box here that -- yeah, that box there, that says -- so they -- they not only were advertising in The Carlos Watson Show, but they also sponsored the OZY Genius Awards, they sponsored OZY Fest. And I believe -- not in this contract, but they also sponsored --

MR. SIEGEL: Objection.

THE COURT: Sustained.

Q So just keep it to this contract --

A Sure.

Q -- that OZY was doing for Chevy and General Motors.

A This contract for $3.426 million covers The Carlos Watson Show, OZY Genius Awards, and OZY Fest.

Q And was this for the year 2021?

A Yes.

MS. FRISON: Thank you. You may take that down.

And please show the witness Defense Exhibit 136.

And if you can just scroll through that document for the witness?

Q Do you recognize that document?

A I do.

Q How so?

A I helped negotiate our overall relationship with Facebook.

Q And did you see this document before today?

A I did.

Q Did you see it around the time it was created?

A I did.

MS. FRISON: I offer Defense Exhibit 136 into evidence.

MR. SIEGEL: No objection.

THE COURT: Received.

(Defense Exhibit 136 received in evidence.)

(Exhibit published.)

Q Mr. Watson, who is this contract with?

A With Facebook and with their -- with their related ad agency, which, in this case, they called Dentsu X.

Q And what was it that OZY was doing for Dentsu and Facebook per this contract?

A Per this contract, we were doing two things with them: We were integrating them into The Carlos Watson Show, and we were also integrating them into our newsletters. So they were advertising on The Carlos Watson Show, and they were advertising on our newsletters.

Q And how much money was Dentsu paying OZY for that?

A Or Facebook was paying us $150,000. And this -- sorry, this was one of about five contracts with them.

Q One of five contracts with Dentsu?

A With Facebook.

Q And was this contract for the year 2021?

A It was, yes.

MS. FRISON: Thank you. You may take that down.

Please show the witness Defense Exhibit 129.

Q Mr. Watson, if you will review that document.

MS. FRISON: Please scroll for the witness.

THE WITNESS: Do you mind -- do you mind going

back up to the top, please? And will you scroll just -- just one or 2 pages. Okay, wait, there it is, sorry.
A Okay.
Q Do you recognize that document?
A I do.
Q How do you recognize it?
A I helped negotiate this relationship with Coca-Cola.
Q Did you see this document before today?
A I did.
Q Did you see it around the time that it was created?
A I did.
MS. FRISON: The Defense is offering Defense Exhibit 129 into evidence.
MR. SIEGEL: No objection.
THE COURT: Received.
(Defense Exhibit 129 received in evidence.)
(Exhibit published.)
Q What is this document, Mr. Watson?
A This is one of about a half dozen contracts we have with Coca-Cola.
Q Is this for the year 2021?
A It is.
Q And what is it that OZY was doing for Coca-Cola per this contract?
A In this one, Smart Water, you can see that in the

bottom right-hand corner, which is obviously one of their many brands, Smart Water was going to advertise both in -- in OZY TV shows and also in OZY newsletters.

Q And how much was Coca-Cola paying OZY for that per this contract?

A Just in this one alone is a half a million dollars.

MS. FRISON: Thank you. You may take that down.

Please show the witness Defense Exhibit 142.

Q Mr. Watson, if you will review that document.

A Okay.

Q Do I recognize this document?

A I do.

Q How do you --

How are you familiar with it?

A I helped negotiate our relationship with the Ford Motor Company.

Q Did you see this document before today?

A I did.

Q Did you see it around the time it was created?

A I did.

MS. FRISON: I offer Defense Exhibit 142 into evidence.

MR. SIEGEL: No objection.

THE COURT: Received.

(Defense Exhibit 142 received in evidence.)

(Exhibit published.)

Q Mr. Watson, what is this document?

A This is one of seven or eight contracts we had with the Ford Motor Company. And in this one, they are -- they are going to become the main sponsor of one of our new TV shows called The Katty Kay Show.

Q Is this for the year 2021?

A It is.

Q And how much money was Ford to pay OZY for that?

A This one alone is $1.4 million, but like I said, it's one of about seven or eight. And that, again, is the net number, not the gross number.

Q So Mr. Watson --

MS. FRISON: Thank you. You may take that down.

Q For the year 2021, you have now reviewed a deal -- contracts with Chevy, Dentsu, Coca-Cola and Ford.

Do those contracts alone total just about $6 million?

A They do.

Q How many contracts did OZY have in 2021?

A Over 200, probably close to 250.

Q These four contracts were four out of that number?

A Correct, yes.

Q Was your knowledge of these contracts and the rest of the 250 or so part of your belief that OZY generated more

than $36 million in 2021?
A Way more.
Q Mr. Watson, can you describe OZY's relationship with Omnicon?
A Yes. Omnicon is a publicly-traded ad agency, one of the largest in the world, and we worked with them for a number of years and ultimately signed our largest agreement with them, which was -- which was our largest agreement.
Q When did you first start working with Omnicon, what year?
A 2016.
Q And how long did that relationship last?
A Through -- through last year. We were still actively working with them last year. We had just reached agreement with them on a large new contract with them last year.
Q What was the largest deal that you negotiated with Omnicon?
A It was -- well, it was three years, 75 million --
MR. SIEGEL: Objection.
THE COURT: Come to the sidebar, briefly.
(Sidebar.)
(Continued on the following page.)

(Sidebar conference held on the record out of the hearing of the jury.)

THE COURT: What's the objection?

MR. SIEGEL: He's describing a contract that's not in evidence.

THE COURT: Oh, yet again.

MS. FRISON: Is the -- my plan is to ask him about three deals, I'll call them, Omnicon being one of them, that encompasses many contracts.

So instead of putting all of the small contracts in, my plan is to ask him what the overall deal structure was and amount and leave it at that.

MR. SIEGEL: That's not how it works.

THE COURT: You can call a summary witness for that purpose if you wanted, but otherwise, we are going to have to ask him about the contracts with the contracts in front of him.

MS. FRISON: Okay.

(Sidebar conference ends.)

(Continued on following page.)

(Sidebar concluded; proceedings resumed in open court.)

THE COURT: The objection is sustained.

EXAMINATION CONTINUES

BY MS. FRISON:

Q Mr. Watson, I'm going to direct your attention to OZY's investors.

Can you tell the jury how many investors OZY had in total before closing?

A Roughly 75.

Q Of those 75, were there returning investors who invested more than once?

A Yes.

Q About how many of those?

A Most.

Q And how many clients and partners did OZY have before closing?

A And I see us as paused, not as closing, but, you know, calling it 230 direct clients and then another 500 clients, as I said, who could buy us through a third-party.

Q And how many of those partners were multiple-year partners for OZY?

A Most. Most of the -- most of the core clients were repeat clients like Goldman, like JP Morgan, like Discover, like Airbnb, like General Motors, like TikTok.

Q With regard to fully executed contracts that OZY had, did OZY lose money on those contracts after or any of those contracts after the Ben Smith article in The New York Times?
A Yes. We had at least 19 major contracts worth tens of millions of dollars that got canceled; Coca-Cola, Target, Walmart.
Q And were those contracts that were already executed by both parties?
A Already executed, signed. In many cases we had already filmed their commercials. We had created their designs. In some cases, we had begun running them.
Q I'm going to switch topics a little bit to the closes for fundraising that OZY completed.
A Sure.
Q We've discussed a Series C --
A Yep.
Q -- to -- to an extent so far.
I want to ask you about the seed Series A and Series B. So starting with the seed series, is that the first fundraising round?
A That was.
Q Was that what we've been calling a rolling close?
A Yes, yes.
Q And can you remind us what that means?
MR. SIEGEL: Your Honor, objection.

THE COURT: Is that asked and answered?

MR. SIEGEL: Yes.

THE COURT: Sustained.

BY MS. FRISON:

Q How many closing dates did the seed series have?

A About five.

Q And five closing dates?

A Five closing dates.

Q And over what period of time did those happen in?

A A little over a year.

Q And Series A, how many closing dates did the Series A round have?

A I think about eight.

Q And over the course of how many years?

A One to two years.

Q And as to Series B, how many closing dates was Series B before completion?

A I also believe eight.

Q And over what period of time were those closing dates?

A About two years, I believe.

Q I'm going to turn your attention to Series D, D as in dog, fundraising round.

When was that Series D round, when did it begin?

A Primarily in 2021.

Q At that time, what was OZY's relationship with the Oprah

Winfrey Network?
A We had -- well, I guess it was four-part. They'd offered to invest. They had worked with us on a TV show, and we were discussing several others. They'd worked with us on a podcast. And they had also worked with us, to an extent, on our -- our festival, on -- on OZY Fest.
Q For the Series D fundraising round, did you work with Mr. Rao to create language about the Oprah Winfrey Network or Oprah Winfrey's involvement in OZY?
A I believe I did, yes.
Q And during this trial we've seen and heard the phrase "doubling her commitment."
A Yes.
Q Is that a phrase that you worked with Mr. Rao to create?
A I think he created it, but I said that that was accurate, that reflected what -- what happened.
Q What did you mean by that?
A That we'd gone from one TV show to two, and we'd gone -- Season 1 to Season 2, and we'd gone from four episodes in Season 1 to eight episodes in Season 2.
Q And so, other than the TV shows, Ms. Winfrey or her network was not directly investing money, correct?
A In that particular phrase, the way it was originally used was doubling their commitment in conjunction with our Series D. So that meant that when you raise money, you often

want to do big signature projects, and so we were highlighting the fact that -- that we were getting Season 2 of Black Women OWN The Conversation.

Q Was that Season 2 one of the big signature projects that you were promoting for a Series D?

A Very much so. You want to have a really clear win or set of wins for people when you talk about it, whether it's festival moving to Miami or whether it's a new slate of podcasts or whether it's a new strategic relationship. And so, that was a big signature win.

Just like when we had the Series C, we talked about moving to The Great Lawn in Central Park as being, you know, a big signature achievement that coincided with -- with Series C.

MS. FRISON: May you please show the witness Defense Exhibit 349.

THE WITNESS: And I misspoke a little bit earlier when you asked me about Series D, I think our first conversation --

THE COURT: Sorry. Please wait for a question.

BY MS. FRISON:

Q If you can turn to what is on your screen.

A Yes.

Q And review that.

A Okay.

MS. FRISON: Please scroll for it for the witness.

(Scrolling.)

BY MS. FRISON:

Q Do you recognize that document?

A I do.

Q How are you familiar with it?

A It was one of our Board decks for our roughly quarterly Board meetings.

Q Did you see this document at a Board meeting?

A I did.

MS. FRISON: I offer Defense Exhibit 349 into evidence.

MR. SIEGEL: Your Honor, could we have a sidebar for a moment?

THE COURT: Sure.

You know what, ladies and gentlemen, let's take our first break of the morning. We will see you shortly.

(Jury exits.)

THE COURT: What's the question, or do you want --

MR. SIEGEL: Well, Your Honor, I think it may actually be moot.

I think this may be one of the -- this may be one of the late-produced exhibits, so I just wanted a chance to look at it before I made my objection or not. But I think with the five-minute break, I'll be able to have a chance to read it

and understand it.

THE COURT: Okay. I'll see you all shortly.

(Recess taken.)

(Witness steps down.)

(In open court; jury not present.)

(Judge ERIC R. KOMITEE entered the courtroom.)

(Witness resumed the stand.)

THE COURT: I know this will take a while, but who is the next defense witness, please?

MS. FRISON: Kosmo Kalliarekos.

THE COURT: Okay.

(Pause.)

THE COURTROOM DEPUTY: All rise.

(Jury enters.)

THE COURT: Please be seated.

Ms. Frison.

MS. FRISON: Thank you.

BY MS. FRISON:

Q Mr. Watson, I believe you have up in front of you Defense Exhibit 349.

Are you able to see that?

A I don't have it -- now I can, yes.

Q If you can review that, please.

A Okay.

Would you mind doing just a quick scroll of it,

please?

Okay, thank you.

Q All right. Do you know what that is?

A I do.

Q How are you familiar with it?

A It's a Board deck that we used at -- at one of our quarterly Board meetings.

Q Did you see this deck actually at a Board meeting?

A Yes, I did.

MS. FRISON: I am offering Defense Exhibit 349 into evidence.

MR. SIEGEL: No objection.

THE COURT: Received.

(Defense Exhibit 349 was received in evidence.)

(Exhibit published.)

MS. FRISON: And if you'll go to page 15, please.

BY MS. FRISON:

Q Mr. Watson, while we're getting there, how often did your Board meet?

A Roughly quarterly. We had kind of weekly meetings with Board members, but our formal meetings were roughly quarterly.

Q So every few months?

A Every few months, yes.

Q Were they in person?

A At the beginning, but -- but they became remote as the

years went along. For the most part, most of them were remote.
Q This PowerPoint deck, Exhibit 349, did you have decks similar to this at every meeting?
MR. SIEGEL: Objection.
THE COURT: Sustained.
BY MS. FRISON:
Q Do you know who created this deck?
A I do.
Q And who was that?
A Samir Rao.
Q The meeting that you saw it at, was it actually discussed at the Board?
A Yes.
Q And if you'll look with me at page 15 that is displayed --
THE COURT: Which meeting is this? Is there a date?
THE WITNESS: Yeah, it's May of 2020.
THE COURT: Okay.
MS. FRISON: Thank you.
Q So this was from May of 2020, a meeting on that day, is it --
A Correct, yes.
Q May 21st?
A Correct, yes.

Q And on page 15 under the Financials tab, what is being described on this -- on this page, this slide?
A Looking at the first three months of -- of 2020, which -- which we would call Q1, and it's comparing what the projection was across television, live events like OZY Fest, and then he put together a podcast and kind of newsletter revenue. And then -- and then it looks at the related expenses for those.
Q At this meeting, did the Board discuss each of these slides?
A Yes.
Q And for Slide 15, is the -- is it correct that within the first quarter of that year, 2020, OZY had generated $6 million in revenue?
A Close to 7 million, yes, that was -- that was all of our understanding.
Q And both you and Mr. Rao were on the Board at the time, correct?
A Correct, yes.
Q At your Board meetings, did the members also discuss hiring, personnel changes?
A Always, yes.
MS. FRISON: And if you'll go to page 3, Executive Summary.
(Exhibit published.)
Q Now, Mr. Watson, on number 2 of this slide, you discuss

strategic partnerships with certain companies. On this slide, Hulu is noted.

Can you tell us if that is -- that partnership is related to the contract that we discussed earlier?

A It is, yes.

Q And what do you -- what did you mean by strategic partnership?

A By it, we meant probably three things. One is that it was large. Two, is that it somehow was impactful, whether we were getting to move into TV or getting to work with a new partner. And then three, it usually meant that we did multiple things, usually including barter relationship with that partner.

Q Did you have a barter relationship with Hulu?

A We did, yes.

Q And what did that encompass?

MR. SIEGEL: Objection.

THE COURT: Sustained.

BY MS. FRISON:

Q Were the other strategic partnerships on this slide with A&E, Oprah Winfrey and iHeart, were those also barter relationships?

A A mix, yeah. They -- they involved both cash and in-kind.

Q Thank you.

MS. FRISON: You can take that down.
Q Mr. Watson, I am going to ask you about four additional documents before I sit down.
MS. FRISON: If you will show the witness Defense Exhibit 133. And scroll through it.
(Scrolling.)
BY MS. FRISON:
Q Mr. Watson, do you recognize that document?
A I do.
Q How are you familiar with it?
A I -- I negotiated the relationship.
Q Did you see this document before today?
A I did.
Q Did you see it around the time that it was created?
A I did.
MS. FRISON: Your Honor, I'm offering Defense Exhibit 133 into evidence.
MR. SIEGEL: Objection, relevance.
THE COURT: Come to the sidebar briefly.
(Sidebar held.)

(Continued on the following page.)

(Sidebar conference held on the record in the presence of the Court and counsel, out of the hearing of the jury.)

MR. SIEGEL: So, two things, Your Honor.

One this is -- I'm not sure what kind of contract it is, but it explicitly says there's no money changing hands. It's just, we're going to work together.

So I'm not sure how it relates to anything we've been talking about.

Second of all, you know, again I don't know, I've seen Mr. Watson writing on a piece of paper and looking down at a piece of paper. To the extent he has any kind of notes in front of him, we would like a copy of that.

THE COURT: Okay. Let's let the jury go for a minute and we'll take up that first question.

(Sidebar discussion concluded; proceedings continued.)

(Continued on the following page.)

(In open court; jury present.)

THE COURT: Ladies and gentlemen, we are going to excuse you for a few moments here. We'll come back for you as soon as we're ready.

(Jury exits.)

THE COURT: All right. So, Mr. Watson, the Government has indicated that they see you writing.

Can you tell us what that is?

THE WITNESS: (Displaying.)

THE COURT: Can you hand the pen to your attorneys so we don't have this issue continue to occur.

Thank you.

And then if everybody could return to the sidebar.

I'll just note what Mr. Watson held up was doodling on the exhibit. But, again, we are going to relieve him of the writing utensil so that we don't have these questions continue to arise.

(Sidebar held.)

(Continued on the following page.)

(Sidebar conference held on the record in the presence of the Court and counsel, out of the hearing of the jury.)

THE COURT: What is the relevance of this?

MS. FRISON: Defense Exhibit 133 is a cooperation agreement attempting to show one of the agreements that are not for money, but exchange of services.

MR. SIEGEL: So I didn't understand that. I'm sorry. We would withdraw our objection.

MS. GILBERT: He just withdrew the objection.

THE COURT: Were there services exchanged?

MS. FRISON: Yes.

THE COURT: And there is going to be a valuation offered for those services?

MS. GILBERT: And it's in the contract.

THE COURT: The valuation is in the contract?

MS. GILBERT: Yes.

MR. SIEGEL: Where is that in the contract?

MS. GILBERT: I believe it's on the first page.

Sorry, hold on.

(Pause.)

MS. GILBERT: I might be wrong. My apology.

MS. FRISON: I would ask him that question.

THE COURT: Is there an exhibit number on this?

MS. GILBERT: Yes.

MS. FRISON: 133.

THE COURT: Okay. Is the objection --

MR. SIEGEL: Yes, we'll withdraw our objection.

THE COURT: Withdrawn. Okay.

MR. SIEGEL: Thank you.

THE COURT: Let's get the jury.

(Sidebar discussion concluded; proceedings continued.)

(Continued on the following page.)

(In open court - jury not present.)

THE COURTROOM DEPUTY: All rise.

(Jury enters.)

THE COURT: Following some discussion, the objection has been withdrawn.

Please be seated, everyone.

Ms. Frison, you may continue.

MS. FRISON: Thank you.

CROSS-EXAMINATION (Continues)

BY MS. FRISON:

Q Mr. Watson --

MS. FRISON: Before that, Your Honor, I'm offering Exhibit 133 into evidence.

MR. SIEGEL: No objection.

THE COURT: Received.

(Defense Exhibit 133 was received in evidence.)

(Exhibit published.)

Q Mr. Watson, what type of agreement is this?

A This is a three-year agreement with Dentsu, who also uses the name Amplify.

Q And what was the -- what was the substance of this agreement?

A To work with their clients, to allow them to advertise in our newsletters and our TV shows and our podcasts and our festivals across our award programs.

Q Were you -- was OZY being paid money by Dentsu per this agreement?
A We were, yes.
Q Is that stated in the agreement?
A It is, yes.
Q And can you show us where that is?
MS. FRISON: Can you scroll for the witness.
(Scrolling.)
THE WITNESS: Sorry, go back. Go back up to the top.
A It's captured in number two -- in number one and number two.
Q And so what was Dentsu giving OZY per this agreement?
A Cash in exchange for media advertising, marketing and communications.
Q Is this for the year 2021?
A Correct.
Q What was the amount of money that Dentsu was to pay OZY?
A 36 million over three years.
Q Beginning in 2021, correct?
A Correct.
Q Thank you.
MS. FRISON: You may take that down.
Please show the witness, Exhibit, Defense Exhibit 155.

Q Mr. Watson, if you can review that document.
A Okay.
(Pause.)
A Yes, I recognize it.
Q How do you recognize it?
A I helped negotiate it.
Q And have you seen this document before today?
A Yes, I have.
Q Did you see it around the time it was created?
A I did.
MS. FRISON: Your Honor, I offer Defense Exhibit 155 into evidence.
MR. SIEGEL: No objection.
THE COURT: Received.
(Defense Exhibit 155 was received in evidence.)
(Exhibit published.)
BY MS. FRISON:
Q Mr. Watson, is this the Omnicom contract that you discussed earlier?
A Yes, it is.
Q What was OZY doing for Omnicom and its affiliates?
A Allowing them to advertize in our newsletters and our TV shows and our podcasts and our festivals across our award programs.
Q And how long of an agreement, how long of a period did

this contract cover?
A It was three years, plus an additional option for a fourth year. So you could think about it as three years, you could think about it as four years.
Q And for three years, how much was Omnicom to pay OZY?
A $75 million.
Q And was this also for the year 2021?
A Correct, yes.
Q And just to be clear, for the first year, 2021, Omnicom was to pay OZY $25 million?
A Correct, yes.
Q Thank you.
MS. FRISON: You may take that down.
Please show the witness Defense Exhibit 590.
BY MS. FRISON:
Q Mr. Watson, if you will review that document.
A Uh-hum.
Q Do you recognize it?
A I do, yes.
Q How do you recognize it?
A I helped negotiate it.
Q Did you see this document before today?
A I did.
Q Did you see it around the time it was created?
A I did.

MS. FRISON: Your Honor, I offer Defense Exhibit 590 into evidence.

MR. SIEGEL: No objection.

THE COURT: Received.

(Defense Exhibit 590 was received in evidence.)

(Exhibit published.)

BY MS. FRISON:

Q Mr. Watson, who is this contract with?

A It's with the WPP, who is the largest ad agency in the world. They're -- they have a -- they sometimes use the name GroupM.

Q So GroupM is WPP?

A Is WPP, it's one and the same.

Q And what was the agreement between OZY and WPP per this contract?

A $20 million over two years.

Q And what was OZY to do for that money?

A To allow them -- well, I guess two things -- or three things.

One is to allow them to advertize in our newsletters and our TV shows and our podcasts and our festivals and our award programs.

Second, you can see number four, we actually were partnering on an innovative consumer research program together. So when we speak about in-kind, that's the in-kind,

a meaningful and important in-kind relationship.

And then if you scroll down a little bit, just a little bit more. Sorry, go back the other way. Apologies. Sorry.

Number three, we had to give them substantial discounts. So, the 20 million was after discounts. We probably were giving them close to 40 million dollars' worth of gross value.

Q And you, yourself, negotiated that, those discounts?
A With the -- with the CEO of -- of the group, yes.
Q And when you say this was $20 million over two years, was that beginning in 2021?
A It was.
Q And was it to be for $10 million in each year?
A In each year, correct; yes.
Q Thank you.

MS. FRISON: You may take that down.

Please show the witness Defense Exhibit 596.

Q Mr. Watson, if you will review that document.

Do you recognize it?

A I do.
Q How do you recognize it?
A I helped negotiate it.
Q Did you see this document before today?
A I did.

Q Did you see it around the time it was created?
A I did.
MS. FRISON: Your Honor, I offer Defense Exhibit 596 into evidence.
MR. SIEGEL: No objection.
THE COURT: Received.
(Defense Exhibit 596 was received in evidence.)
(Exhibit published.)
BY MS. FRISON:
Q Mr. Watson, who is this agreement for -- who is it with?
A It's with General Motors, and they're using their agency, which again they pronounce it *KAIR/ah*, even though it's spelled like it looks like Carat, but they pronounce it *KAIR/ah*.
Q And was this contract for 2021 or for a longer period?
A For a longer period.
Q How long?
A For three years.
Q And how much money was General Motors paying OZY across these three years?
A About $25 million.
Q And what was OZY doing for General Motors?
A We were -- this was just for Chevy. So we had separate deals that we were working on for their other brands. This was just for Chevy.

And this was gonna involve TV, podcasts, festivals, newsletters, and the OZY Genius awards. This is just for Chevy.

Q And if you will look at the first page, that first box that has 2022, 2023 and 2024, the total spend amounts at the bottom of that, was that the amount either Carat or General Motors was paying OZY each of those years?

A After discounts, yeah. Yes.

Q So for 2022, just over 8 million, is that correct?

A Correct. And by that, they meant their fiscal year, which technically --

MR. SIEGEL: Objection.

THE COURT: Sustained.

Q Did you negotiate the contract in 2021?

A I did, in 2021, correct.

Q So in that year, 2021, if we're looking at the General Motors contract in Exhibit 596, and --

MS. FRISON: Oh, I'm sorry, let me go back to exhibit -- you may take that down -- Exhibits 155 and 590 about WPP and Omnicom.

BY MS. FRISON:

Q For 2021 alone, were those two contracts representing about $35 million?

A Yes.

Q Thank you.

MS. FRISON: I have nothing further.
THE COURT: Cross-examination?
MR. SIEGEL: Just a moment to get set up, Your Honor.
THE COURT: Take your time.
CROSS-EXAMINATION
BY MR. SIEGEL:
Q Good morning, Mr. Watson.
A Good morning.
Q We're going to start with, basically, where we started -- where we ended, excuse me, with Defense Exhibit 596, as soon as we get the tech set up.
MR. SIEGEL: Mr. Jackson, we are going to switch to the prosecution table.
THE COURTROOM DEPUTY: It's ready to go.
(Exhibit published.)
Q All right. Do you see it there?
A I do.
Q Okay. So, Mr. Watson, throughout this trial there's been some discussion about this $25 million GM contract.
Do you recall testimony about that?
A I do.
Q And I just want to make sure I understand.
So, this says the three-year net minimum committed by dollars by calendar year, and there's calendar years listed

for 2022, 2023 and 2024.

Am I reading that right?

A You are, yes.

Q So just to understand how time works here, this has nothing to do with 2017 revenues?

A Correct.

Q Nothing to do with 2018 revenues?

A Correct.

Q Nothing to do with 2019 revenues?

A Correct.

Q Nothing to do with 2020 revenues?

A Correct.

Q Nothing to do with profit from those years?

A Correct.

Q This one doesn't even have to do with 2021?

A Incorrect.

Q This has revenue for 2021?

A It does.

Q Okay.

MR. SIEGEL: Let's go to 590.

(Exhibit published.)

Q This is another 2021 contract?

A Correct.

Q And so, again, nothing to do with 2017, 2018, 2019, 2020?

A Correct.

Q Would you mind reading paragraph 2 slowly?
A Sure.
THE WITNESS: Your Honor, you're good with me reading there?
THE COURT: If it's in evidence, yes.
THE WITNESS: Okay.
A 2021 Endeavor: GroupM will endeavor to spend on behalf of its clients the amount of $10 million across OZY media offerings and services (the "Spend") during the Term. The Spend shall be considered an endeavor by GroupM and not a commitment and, as such, no penalties will be incurred by GroupM should it fail to meet the Spend during the Term.
Q So this is not a commitment to actually spend $10 million?
A It is a commitment. Incorrect, it is a commitment.
Q The language written in it, does it say literally the words "not a commitment"?
A Yes, it says those words.
Q Okay. And there are no penalties if they don't actually meet the Spend?
A No penalties listed in this.
Q Well, it says: No penalties will be incurred by GroupM should it fail to meet the Spend; is that what it says?
A It does, but you understand this is one of several documents.

Q Well, I'm only talking about the documents in evidence, Mr. Watson, and this document in particular.

So this document says that no penalties will be incurred by GroupM should it fail to meet the Spend?

A Correct.

Q All right, let's look at the signature date on this.

Who signed for GroupM?

A A woman named Susan Shiekofer.

Q And who signed for OZY Media?

A Samir Rao.

Q And what was his title?

A Chief operating officer.

Q And was that his title?

A One of his titles.

Q That was one of his titles?

A Yes.

Q And what date is this from?

A March 1st.

Q Was Samir Rao on a leave of absence on March 1st, 2021?

A No, I believe it had just ended.

Q About when did it end?

A I think a few days before that.

Q So, February is short. So that's what, February 25th? 24th?

A I'm not sure of the exact date. He had to meet with

Board members. So whatever date he met with the Board members to get re-approval.

Q So was it two weeks before this, one week, a couple days?

A If you wanted me to estimate, I would say it was probably a week before that, somewhere in the week, in the week prior.

Q Okay.

MR. SIEGEL: Let's look at Defense Exhibit 133, please.

(Exhibit published.)

Q All right. Now this is the deal with Amplify, which you said is also Dentsu?

A Correct.

Q And you said under this agreement there is an agreement that they are going to pay OZY?

A Correct.

Q And you said $36 million?

A Correct.

Q Could you tell us where that is?

A There's an attachment to this agreement.

Q I'm looking at a three-page document that your attorneys just admitted.

Where is the 36 million that you said is in this contract?

A There's an attachment to this that lays out.

Q So that's not something that you've admitted in evidence?

A I'd have to let the attorneys speak to that, I think.
Q Okay. So you were asked about paragraphs one and two in this?
A Yes.
Q Could you read paragraph 3, which your attorneys didn't ask you about?
THE WITNESS: Your Honor, are you good with me reading this?
THE COURT: If a document is in evidence, you can read from the document. It's only documents that have not been admitted yet that we can't have people reading from.
A So, Fees, Expenses and Costs.
No fees will be charged by either party in connection with this agreement and each party shall bear its own costs and expenses.
Q Slowly, Mr. Watson. People tend to go fast when they read, but slowly, please.
A No problem.
Fees, Expenses and Costs.
No fees will be charged by either party in connection with this agreement and each party shall bear its own costs and expenses that it may incur in the course of their cooperation, except as otherwise agreed under Section 2 above.
Q Okay. So except as otherwise agreed under Section 2,

there are no fees charged under this, correct?
A No additional fees, correct.
Q Well, it doesn't say no additional fees, it says except as agreed under Section 2, no fees will be charged?
A My understanding is that --
Q I'm asking what it says, Mr. Watson.
This agreement that is signed, what does it say?
A This one says no fees.
Q Okay.
And then Section 2, could you just point us to the language in Section 2 where it says what fees there will be?
A It's in the attached, it's not in this one.
Q So in this contract, we're agreed there is nothing about $36 million?
A In the body of the pages we're reading. It's in the attachment.
Q In the exhibit that's in evidence, there's nothing about 36 million?
A Nothing that I see in this one says the number 36 million, correct.
Q Okay.
And, in fact, in this document in evidence, it says that there will be no fees?
A I see the words "no fees."
Q Okay. Let's look at the signature date on this.

THE COURT: Where does it say "no fees"? Can I see that?

MR. SIEGEL: Paragraph 3. That's what he read out loud.

(Exhibit published.)

THE COURT: Okay. Thank you.

BY MR. SIEGEL:

Q So, who signed for this one?

A Samir Rao.

Q And that's his title, COO or one of his titles, COO?

A Correct.

Q And what's the date on that?

A February 16, 2021.

Q And that's about 14 days after the Alex Piper call?

A Correct.

Q And he's not on leave at this point?

A I'm not sure, but I believe he is on leave at that point.

Q But signing this deal that you testified is a $36 million deal?

A Correct.

Q Okay.

MR. SIEGEL: And let's go to Defense Exhibit 155, please.

(Exhibit published.)

Q And this is the Omnicom deal that we've heard about at

this trial?
A Correct.
Q And this was signed August of 2021?
A Yes.
Q And so, again, this has nothing to do with 2017, '18, '19 or '20?
A Correct.
Q And nothing to do with 2021 before August of 2021?
A Incorrect.
Q Well, does this generate revenue back in time?
A It does. We had begun the relationship before and, as you often do, we only codified it --
Q Does this contract --
MR. SULLIVAN: Objection. Objection. Interrupting.
Q Does this contract --
MR. SULLIVAN: Objection. Interrupting the witness.
THE COURT: You can finish that sentence. You only codified it on --
A Yes, but in good faith we'd begun work with Eli Lily, with Apple, with Clorox.
THE COURT: We are just talking about this contract.
Let's have another question.
BY MR. SIEGEL:
Q With this contract, does this contract retroactively create revenue, that's your testimony?

A No, I don't think that's what I said.
Q Okay. So this contract creates revenue going forward?
A Not only.
Q Okay. So in the contract it talks about the term of the contract.
Could you read the first sentence under "Term and Termination"?
A Sure.
This agreement shall be effective from August 1st, 2021 until July 31st, 2024 (the "Term") unless terminated earlier as set forth herein.
Q Okay, thank you.
MR. SIEGEL: Your Honor, just one moment, I just want to switch the computer we're using.

(Continued on the following page.)

CROSS-EXAMINATION

BY MR. SIEGEL: (Continuing)

MR. SIEGEL: Can you put it in presentation mode.

Q Okay. So, Mr. Watson, the testimony that you gave today and for three days last week, that was all scripted; isn't that right?

A No.

Q You were reading from a script as if you were still on television; isn't that right?

A No.

Q For some of your testimony, you literally had a script in front of you?

A No.

MR. SIEGEL: Okay. I'm going to show the witness what's been marked as Court Exigit 3500-1.

Q Mr. Watson, this is a document that you had in front of you for part of your testimony last week?

A Correct.

MR. SIEGEL: Your Honor, I move to admit Court Exigit 3500-1.

THE COURT: Mr. Sullivan.

MR. SULLIVAN: It's not my witness, Your Honor.

Ms. Frison.

THE COURT: Come to the sidebar.

(Sidebar.) (Continued on next page.)

(The following sidebar took place outside the hearing of the jury.)

THE COURT: I thought --

MR. SULLIVAN: I guess this reference is when I did the direct.

THE COURT: Yes.

MR. SULLIVAN: Okay. That's my mistake.

THE COURT: So any objection?

MR. SULLIVAN: No objection.

THE COURT: Okay.

(Sidebar ends.)

(Continued on next page.)

(In open court.)

THE COURT: There is no objection and the document, without objection, is received in evidence.

(Court Exhibit 3500-1 received in evidence.)

BY MR. SIEGEL:

Q So just to refresh, this is a document you had in front of you when you were testifying for part of last week?

A Yes. Or notes, yes.

Q So this was your script for when you and Mr. Sullivan and Ms. Gilbert were making that whiteboard with your supposed numbers for OZY's revenue; right?

A No.

MR. SIEGEL: Your Honor, is it okay if we set up the whiteboard?

THE COURT: Yes.

Q Mr. Watson, are you able to see that?

A I am, yes.

Q Okay. So at the very beginning of your testimony to make this whiteboard, you had these -- you had this script in front of you?

A Again, I think we may be using different words. I don't see it as a script. So, was a piece of paper in front of me? It was.

Q You had this piece of paper with words written for you to read from in front of you when you were beginning your

testimony?

MR. SULLIVAN: Objection. Written for you. Misstates the testimony.

Q I'm sorry. All right. That you wrote?

A Yes.

Q And then we had a sidebar where the Court asked for those notes to make a copy?

A Yes.

Q And, so, for 2016 and 2017, you had to do those without your script?

MR. SULLIVAN: Objection.

THE COURT: You can answer the question.

Overruled.

Did you have to do those without your script?

THE WITNESS: I didn't have a script.

Q What word do you want to use for this, Mr. Watson?

THE COURT: Actually, let's move on to another question. I think I understand.

MR. SIEGEL: Well, if the objection is the word script, I will use a different word.

THE COURT: No, I think it was something different. Come to the sidebar.

(Sidebar held outside of the hearing of the jury.)

(Continued on next page.)

(The following sidebar took place outside the hearing of the jury.)

THE COURT: I think the problem we are getting to is advise you counsel, that he could have had the script but his lawyer told him not to.

MR. SIEGEL: I wasn't going to ask him.

THE COURT: But you said you had to do it without the script.

MR. SIEGEL: I will rephrase. I will say you did 2016 and 2017.

THE COURT: Yes. Okay.

(End of sidebar conference.)

(Continued on next page.)

(In open court.)

THE COURT: So that objection is sustained. We are going to reframe the question.

BY MR. SIEGEL:

Q So when you testified about 2016 and 2017 -- excuse me, you did not have -- and I'm sorry, Mr. Watson, just so we are not going back and forth, what word do you want to use for this, this document?

A Notes.

Q Okay. For 2016 and 2017, when you testified, you didn't have your notes in front of you?

A I -- I, frankly, can't remember. I -- I can't remember whether or not I did.

Q Okay. Well, then when we got to 2018, the numbers you started testifying were different from the notes; correct?

A I'm not sure.

Q Well, we then had a lunch break. Your counsel asked for a lunch break. Do you recall that?

MR. SULLIVAN: Objection.

THE COURT: Overruled.

A I remember that we had a lunch break. Yes, I do.

Q And then during the lunch break, you waited after everybody left to get your notes back from the Court?

A That's not accurate. As I was leaving and as Mr. Jackson walked past me and had it with him, I asked him for it.

Q So you got your notes back?
A Correct. Yes.
Q You had it over the lunch break?
A Correct.
Q And you studied it over the lunch break?
A Not that I remember, no.
Q And then, when you came back on the stand, you brought your notes with you back to the stand?
A I don't know if I did. I don't remember having those, no.
Q You don't recall there was a colloquy with the judge where the judge said do you have your notes again and you said I'll put them in my pocket?
A Yes, I do. Yes, I do. Yeah.
Q Okay.
A I think they were covered over and they were here in the corner, and yes.
Q And then, after the lunch break, you fixed the mistake for 2018 to make it match your notes?
A Definitely not. No.
Q Do you recall Ms. Gilbert had written 10 million for festivals before lunch, then we came back from lunch, she had to erase the 10 million and put $5 million for festivals and $5 million for barter?
A That was because I had verbally said during my testimony

prior to lunch that festivals included barter and I was asked after lunch to not roll that into one number and break it into two. I think that's what the transcript will show.
Q I'm sorry. I think you answered a different question.
My question was a yes-or-no question.
After lunch, Ms. Gilbert erased what had been a 10 and replaced it with a 5 and added 5 for barter. Is that yes or no?
A She did do that, yes.
Q And after she did that, now it matched your notes?
A I'm not sure. But okay.
Q Okay. Well, we can see it.
2018, it says 6, 5, 7, 2, 5. And on the board, am I right, it says 6, 5, 7, 2, 5?
A Yep.
Q After lunch, when Ms. Gilbert erased and fixed it, now it matched your notes? Yes or no?
A Yes. That matches what's on the board there. Correct.
Q And then, after that, you tried to stick to your notes; correct?
A No, not correct.
Q But until you got to 2021, you made another mistake; correct?
A Not that I know of, incorrect.
Q Well, let's look at your notes.

For 2021, you were supposed to say 5 for festivals, and then when you testified in court, you said 10 for festivals; right?
A Why do you say "supposed to say"?
Q Because you had a script in front of you, Mr. Watson.
MR. SULLIVAN: Objection.
THE COURT: Sustained.
Q So your notes had said 5, but you put them in your pocket at this point; right?
A Correct.
Q And you ended up saying 10; right?
A Correct.
Q And then, as you got to the bottom, you realized you had a math problem because it was supposed to add to 80; right?
A Incorrect.
Q And, so, your notes had said 20 for barter, but then on the board you had to change it to 15 to barter so it would still add up to 80?
A Is that a question?
Q Yeah. Question mark.
A Incorrect.
Q Well, which is right, the notes that you brought to the stand or what you testified?
A What I testified to.
Q And by the way, all the times that you were on the stand

when you said well, I don't know, call it 3 million or I think it was around 5, that was an act, because you had the notes that you had already written it out?

MR. SULLIVAN: Objection. Compound. Mischaracterizes the testimony.

THE COURT: Do you want to ask him about a specific statement he made on his direct?

Q For podcasts, for 2019 --

A Okay.

Q -- your testimony -- the words you used was about a million dollars per podcast and let's call it 4 million; right?

A I don't have the transcript, so I don't know if those were my words.

Q And when you were adding the numbers up on the stand, you would say like 20 plus 15, carry the one, that was an act?

MR. SULLIVAN: Objection. There is no testimony about carrying a one.

THE COURT: Sustained.

Q Forget the carrying the one.

When you were on the stand saying -- when you were on the stand trying to add these numbers up on the stand, that was an act?

A No, definitely not.

Q Because you already knew what they added up to, it was in

your notes?
A Is there a question?
Q Question mark.
A I want to make sure I answer the question.
Q Question mark.
A What is the question, please?
Q Because you already knew what they were going to add up to?
A That is the question? Because you already knew what they were going to add up to? What is that question?

THE COURT: Come to the sidebar, please.

(Sidebar held outside of the hearing of the jury.)

(Continued on next page.)

(The following sidebar took place outside the hearing of the jury.)

THE COURT: I gave this instruction to the defense and I'm going to give it to the Government now.

I know it might sounds overly formalistic, but it is important when we are engaging in witness questioning to actually frame it as a question.

MR. SIEGEL: That's fine, Your Honor.

THE COURT: Point one.

Point two, there is a transcript for this, right?

MR. SIEGEL: Uh-hum.

THE COURT: And, so, I think we can probably avoid what are going to be a lot of objections about mischaracterizing the testimony if you were working off the transcript instead of your own recollection of what he said. But I'm not going prejudge objections that haven't been made yet.

MR. SIEGEL: So, Your Honor, for the transcript, what is the right way to show him the transcript? Should I put it on the ELMO and cover the lines that I am not referring to?

THE COURT: Or just read him the --

MR. SIEGEL: Just say I'm reading from the transcript?

THE COURT: Yes. Is there any objection to that?

MR. SULLIVAN: As long as it is not improper impeachment. You can't just start reading from the transcript. There has to be something inconsistent with the transcript.

THE COURT: Right. That presumes -- yes.

MR. SIEGEL: Okay.

(End of sidebar conference.)

(Continued on next page.)

(In open court.)

BY MR. SIEGEL:

Q Okay. So, Mr. Watson, because you already knew what those numbers were going to add up to, right?

MR. SULLIVAN: Objection. Vague, ambiguous.

THE COURT: Overruled. You can answer the question.

THE WITNESS: I'm not sure what the question is, Your Honor. It's fragmented.

THE COURT: Can you repeat the question.

Q So you knew what these numbers would add up to before you testified; right?

A I had a sense, yes.

Q You had notes with it written down; right?

A Yes.

Q And you were just reading your lines; right?

A Incorrect.

Q It was important for you to stick to the numbers in your notes because you needed to make sure that every number you testified about was a little bit above the pitch decks; right?

A Incorrect.

Q Well, your pitch decks -- in this case, we have seen pitch decks that say 6 million for 2016; is that right?

A I believe so, yes.

Q So you had to get to $9 million; right?

A Incorrect.

Q Well, let's compare a pitch deck. I'm going to show Government Exhibit 6497-A.
And this is one that you went over with Mr. Sullivan last week; is that right?
A I'd have to see it first to confirm.
Q Well, this is in evidence.
A Can we go back to the first page, please.
Q You may. Take all the time you need.
A Okay. Thank you.
Q Just tell me when you are ready.
THE COURT: Just so everybody knows, I have another case that I have to attend to for a few moments. So we are going to break for lunch a few minutes early, either at 12 or shortly thereafter.
A Okay. Thank you. Yep.
Q This is a document you went over with Mr. Sullivan last week?
A Yes.
Q Right?
A Yes. Yes. Correct.
Q All right. So let's go to page 15.
So this pitch deck has 11 million in revenue for 2017; correct?
A Correct.
Q And you need your notes to get to 14 million for 2017?

A Incorrect.
Q This deck says 22 million for 2018; right?
A Correct.
Q And you need to make sure with your notes that you got to 25 million for 2018; right?
A Incorrect.
Q This deck had 33 million for 2019, and you needed your notes to get to 35 million; right?
A Incorrect.
Did you recall I walked through backup for that?
Q It's just a yes-or-no question.
MR. SULLIVAN: Objection. Objection. Interrupting the witness.
THE COURT: The question was a yes-or-no question. Your lawyer will have an opportunity on redirect to clarify anything you think needs to be clarified. Right now you should answer the Government's questions.
THE WITNESS: And if, for whatever it's --
THE COURT: If you can't answer a question yes or no, you can say I can't --
THE WITNESS: I can say that. Okay. Okay.
Q And then for 2020, this pitch deck said 46 million, and so you needed your notes to make sure you got to 50 million; right?
A Incorrect.

Q Now, by the way, between this pitch deck and what you testified from your notes, it's only the total numbers that are close; isn't that right?
A Incorrect. I did not testify from my notes.
Q Well, but it's only the total numbers that are close to the pitch deck; right?
A I'm not sure. I'd have to -- let's see. I'd have to look.
Q Well, let's give some examples.
A Sure.
Q For 2018, you testified that television was 6 million; correct?
A Correct.
Q And this deck says 4 million? Yes?
A Correct. Some of the television revenue --
Q Sir --
A -- may have been captured.
Q Mr. Watson, yes or no?
A It's not a yes-or-no question. So, my apologies.
Q Does this deck say 4 million, yes or no?
A Yes, the deck says 4 million.
Q Okay. By the way, that 6 million, you said that was Breaking Big and Take Back America?
A No.
Q What were those TV shows in 2018?

A Breaking Big and Take on America.
Q I see. I'm sorry.
A Yeah.
Q Those were 2018 show?
A Those were 2018 shows.
Q Weren't they 2017 shows?
A No. They were 2018 shows.
Q Okay. So the deck says 13 million for digital in 2018; correct?
A It says digital/e-commerce.
Q For newsletters, on the board, you put 7 million?
A Those are not one and the same.
Q What is digital?
A Digital is newsletters, it's website. At a certain point, it's podcasts. Sometimes it becomes supportive of festivals as well.

So, as you saw in some of the contracts, someone like General Motors might support the OZY Genius Award, and if they do it on our website or newsletter, we might count it as digital. So, it can be a broad category.
Q Well, here you have newsletters and podcasts?
A Uh-hum.
Q That is $9 million on the board; right?
A Which year, sorry, are you pointing towards?
Q 2018.

A Newsletter, podcast, yep. I see that, seven plus two in this particular case is nine. Yep.
Q And then for digital, in 2018, it says 13 million?
A Correct. It says 13 million there.
Are you including barter or are you not including any barter?
Q Well, that's a great question.
This whiteboard has barter; right?
A Correct.
Q There's no line for barter here; correct?
And my question is: There's no line for barter here?
MR. SULLIVAN: Objection. Where's here?
MR. SIEGEL: In the pitch deck.
THE COURT: Overruled.
A Barter is built into each of the lines.
Q So there is no line that shows what's barter?
A We did not break it out, it looks like, in this line, in this one.
Q Okay. Let's talk about 2019.
In the pitch deck it says -- I'm sorry in the pitch deck it says 8 million? For TV in 2019?
A I think -- does it say e-mailing for TV and podcasts; is that right?
Q Yeah. That's a good point.

So is podcast for a TV podcast or is podcast part of digital?

A At various times, it was part of different ones.

Q So, as it's presented here, do these numbers show podcasts lumped in with TV or does it show them lumped in with digital?

A I suspect that it shows up in both places.

Q So podcasts are listed twice?

A I suspect that a portion of podcast is listed in TV/podcast and a portion of podcast is listed in digital/e-commerce.

We had -- as I mentioned before, we had multiple kinds of podcast deals. So there were podcast deals where Spotify, iHeart, A & E, BBC would pay us to create a podcast. They are separate deals.

Where Walgreens, Kohl's, AT&T advertises on our podcasts. So it's possible that he counted the creation of podcasts from what we were getting licensed for on one line and he created -- he counted advertising on our podcast in a separate bucket. That's possible.

Q So, for 2019, there's -- in the pitch deck, 6497-A, it lists 17 million; correct?

A For digital and e-commerce, yes.

Q And on the board, for newsletters, it's $9 million; correct?

A Correct.

But you're not suggesting that newsletter and digital e-Commerce are one and the same, are you?

Q Well, Mr. Watson, I have no idea what these numbers are. You're the one who made this board?

A Okay.

MR. SULLIVAN: Objection. Objection.

THE COURT: Sustained.

THE WITNESS: Okay. All right.

THE COURT: Let me intervene here a little bit.

Let the Government ask the questions. Either answers the questions, if you can. Or say you can't answer them. Don't ask the Government questions in response.

If your lawyers want to object, your lawyers will object.

Let's have another question.

BY MR. SIEGEL:

Q 2019, on the board, for festivals, it says $6 million?

A Correct.

Q In the pitch deck, it has $8 million? Yes or no?

A Correct. Yes.

Q Mr. Watson, there was no OZY Fest in 2019; isn't that right?

A Correct. It got cancelled the day before. Correct.

Q Mr. Watson, you're on the audit committee of a company;

correct?
A No. Not at the moment.
Q You had been?
A I have been in the past, yes.
Q You've worked as a banker at Goldman Sachs?
A Correct.
Q And isn't it right that revenue is recognized when a company performs the service?
A Incorrect.
Q When is revenue recognized?
A There are multiple different ways to do it. There are at least three major ways to do it.
Q Under the accrual method, revenue is recognized when the service is performed; correct?
A In one of the two versions of accrual. There are at least two major versions of accrual.
Q What are the two major versions of accrual?
A So, one is that you spread it out. So if you had 10 TV shows, you would do it when each TV show ran.

In another case, you might say we signed this deal with Hulu or whomever and we're going to recognize, for whatever reason, half of it now and the other half of it will be broken up into pieces.

So that's typical with large deals, that you'll recognize a substantial portion of it up front and then you'll

break the remainder of it alongside of the pieces, because you've got to do a lot of work in order to get the TV show ready. And once the episodes start to run, then you recognize the remaining portions.

So there are multiple ways to do it.

Within accrual, there are at least two significant ways, one would be I just described, breaking it into 10, the other would be taking a chunk up front or at the end and spreading the other part out throughout it.

THE COURT: Do those two accrual methods have names?

THE WITNESS: They have lots of names. But, you know, probably would refer to one of them as hybrid and one of them as, you know, regular garden-variety accrual.

Q Which are you using for this board?

A Probably more of a hybrid for this one.

Q And the example you gave, let's say you sign a contract for a festival and then that festival never happens, how do you account for that revenue for that festival that never happened?

A It depends on -- let's say it's Warner Brothers and let's say Warner Brothers is promoting a new movie. And, let's say, Warner Brothers has agreed to pay you half a million dollars for this new movie and they wanted to do it at the festival. Well, the truth of the matter is they weren't only doing it on that day or two. That day or two is usually the culmination

of about a two-month advertising.

So they would advertise in your newsletters. They would advertise TV shows and they would advertise in your podcasts for the two months leading up to that. And, so, the festival itself would almost be like the exclamation point on it. But it wasn't the only thing it had. If you were Volvo, JP Morgan or TikTok, even though you were disappointed that those two days didn't happen, for two months leading up to that you saw your ads running in various parts of OZY.

So it's true that those two days didn't happen, but it's not true that you didn't receive the revenue because most of the services had been delivered way before those two days had happened.

Those two days were the explanation point on an overall longer relationship.

Q And you said those would be in things like the podcasts, the newsletters, and TV shows?

A Correct.

Q But for here, instead of putting it with podcasts and newsletters or TV shows, you put it in the festival bucket?

A Correct.

There are many ways to categorize things. And if it's tied primarily to festivals, you want to represent that for people so that they understand that this isn't something that started in the newsletter and then moved to the festival.

Rather, this is something that's tied to the festival and works backwards. So you want to give people as much transparency and as much clarity as you can.

Q Let's talk about transparency and clarity.

It says 10 million of barter in your whiteboard?

A Sure, yes.

THE COURT: We are looking for a moment to break, Mr. Siegel.

MR. SIEGEL: Yes. Just another minute or two.

THE COURT: Sure.

Q Where in the pitch deck does it say that $10 million of your revenue is barter?

A I believe I've answered this before, which is that in our decks we integrated barter, as most people do, into the overall numbers.

It's unusual to break it out. We broke it out on the board in order to give people here more clarity. But normally you wouldn't do that. It's an unusual thing to do that.

Q Is there anything in this deck that says that this includes barter somewhere?

A Sure. It uses the phrase strategic partnerships. I think it uses it at least four times.

Q And you understood any time it says you have a strategic partnership that means that these revenue numbers include

barter?

A Often. Maybe not every time, but often, yes.

MR. SIEGEL: And just one more thing, Your Honor, or just one tiny subtopic.

Q That 10 million for 2019, that came from the Oprah commercial and the Oprah tweet?

A Correct. In breaking it down in that way, correct.

Q And that's part of your television business?

A There's more barter elsewhere.

Sorry. Just to compete the prior answer.

I think, as I said, to Mr. Sullivan when we spoke, to the extent he wanted me to break out barter, I was only going to break out one or two of the biggest barter deals. But to be very clear, there is barter baked in to every one of these pieces, be it TV, festival, newsletter, podcast.

Q So if you include barter, revenue for 2019 was 16 million?

A That would be one way to represent it, yes.

Q And that's not what you say in the pitch deck? In the pitch deck you said 8 million for TV?

A Again, as I said, it's one way to do it.

We may have rolled it into digital and e-commerce because, again, as I said, most of our customers --

Q If you rolled into digital and e-commerce, 10 plus 9 would be 19.

A Okay.
Q It says 13 million in the pitch deck.
A Sorry. I apologize.
Are you assuming that the pitch deck and this are supposed to be exactly the same thing?
Q Well, I'm trying to understand. And yeah. But I'm trying to understand, Mr. Watson.
A Yeah.
MR. SIEGEL: This would be a good time for a break.
THE COURT: Let's have a break now.
Ladies and gentlemen, the lunch break will be, of necessity, a little bit longer today because I have some unrelated work to do.
Let me ask you to be back by 1:15 and we will endeavor to get started as quickly as we can.
Thank you.
(Jury exits the courtroom.)
THE COURT: All right. The conference at noon is going to be in here. It is a criminal case, to the extent that's relevant. And it is going to be relatively brief. Maybe the parties to this case can be back here by, let's call it 25 minutes after the hour.
MR. SIEGEL: 25 minutes afternoon?
THE COURT: 25 minutes afternoon.
MS. GILBERT: In 20 minutes.

THE COURT: Anybody who's going to be participating in the conversation about what happened this morning at the security checkpoint downstairs and the history of other developments related to those questions.

You can step down. Thanks.

(Witness steps down.)

(Luncheon recess taken.)

AFTERNOON SESSION

(In open court; jury not present.)

THE COURT: I think we are ready for the jury.

MS. GILBERT: Can we get the defendant.

THE COURT: I'm sorry, we are waiting on defense counsel and defendant.

MR. SIEGEL: I have one very short application.

THE COURT: Okay.

MR. SIEGEL: Your Honor, in *Perry versus Leeke*, and that's P-E-R-R-Y, L-E-E-K-E, which is 488 U.S. 272, in that case the Supreme Court held that federal courts have authority to forbid defense witnesses -- a defendant, when testifying, from speaking to their counsel during short breaks during the trial day, although not overnight.

We would request an order that for the afternoon breaks today Mr. Watson not be allowed to talk to his attorneys or anybody else.

THE COURT: Mr. Sullivan.

MR. SULLIVAN: I just can't believe the Supreme Court said a defendant cannot talk to his lawyer. I'm sure the ruling must be narrower than that. That makes no sense.

THE COURT: Can the Government read the operative holding on this point?

MR. SIEGEL: Your Honor, it's summarized in the syllabus. I'm going to read from the syllabus.

The Federal Constitution does not compel a trial judge to allow a criminal defendant to confer with his attorney during a brief break in his testimony. It is an empirical predicate of our system of justice that, quite apart from any question of unethical coaching cross-examination of an uncounseled witness, whether a defendant or non-defendant following direct examination is more likely to lead to the discovery of truth than cross-examination of a witness given time to pause and consult with his lawyer. Thus, although it may be appropriate to permit such consultation in individual cases, the trial judge must nevertheless be allowed the discretion to maintain the status quo during a brief recess in which there is a virtual certainty that any conversation between the witness and his lawyer would relate exclusively to his ongoing testimony. The long interruption in *Geders*, G-E-D-E-R-S -- I am just going to pause.

*Geders* is a prior Supreme Court case that says a Court can't forbid discussions overnight between trial days was of a different character because the normal consultation between attorney and client that occurs during an overnight recess would encompass matters that the defendant does have a constitutional right to discuss with his lawyer, such as the availability of other witnesses, trial tactics, or even the possibility of negotiating a plea bargain --and the fact that such discussions will inevitably include some consideration of

the defendant's ongoing testimony does not compromise that basic right in that instance.

THE COURT: It sounds fairly straightforward to me, Mr. Sullivan.

MR. SULLIVAN: Not to me. The notion that I can't talk my client at all about anything seems foreign. In fact, the Court just made two orders that I talk to my client about. So, no. I would like a hearing on that. That invades the province of attorney-client privilege. That undermines everything I know about the Sixth Amendment.

I'm sorry. My mic is not on. So, I definitely would like to read the cases and be heard on that.

THE COURT: That order is in effect -- is granted and is in effect until Mr. Sullivan can come back to me with a case citation to the contrary.

MR. SULLIVAN: What is the order? I can't talk to Mr. Watson?

THE COURT: Correct. During breaks today until the close of the trial day.

MR. SULLIVAN: I can't say -- okay. So, just a minute ago, the Court was on the bench. I went out in the hall to get him. Under this order, I can't say hey, Judge, is on the bench.

THE COURT: You can send a paralegal. You know, we can come up with a million --

MR. SULLIVAN: Everyone works for me.

THE COURT: -- horribles.

Mr. Sullivan, listen to me. This is not a debate stage. You understand what is proper argument and what is not, surely, having been around as long as you have.

You're entitled to a ruling from me, which you have now gotten, and you're entitled to the explanation of basis for that ruling, which you have now gotten.

This conversation is now over.

MR. SULLIVAN: I'm asking for a hearing --

THE COURT: We're going to bring in the jury. And if you want to be heard on this further, you can bring it up at the next break with a case citation. Thank you.

MR. SIEGEL: Thank you, Your Honor.

MS. GILBERT: Your Honor, you also could limit it to --

MR. SULLIVAN: Don't worry about it.

THE COURTROOM DEPUTY: All rise.

(Jury enters.)

THE COURT: Welcome back, ladies and gentlemen.

Mr. Siegel, you may continue.

BY MR. SIEGEL:

Q All right. Good afternoon, Mr. Watson.

A Good afternoon.

MR. SIEGEL: And good afternoon to the ladies and gentlemen of the jury.

THE JURY: Good afternoon.

Q Okay. So, Mr. Watson, you would agree, yes or no, that the numbers in the pitch deck that we've been looking at, 6497-A, are different from the numbers that you testified about and your attorneys put up on that whiteboard?

A Correct.

Q And you agree they are different from what was in the notes that brought up to you on the witness stand?

A Perhaps. I'd have to see it again.

Q Okay. Your testimony -- am I correct that your testimony is that the numbers that you testified about, that those are the numbers that you believed were the true numbers at the time?

A Correct. Generally. Not down to the penny. But, yes, that represented my mindset at the time based on the TV shows.

Q Just a yes or no, Mr. Watson.

A Yeah.

MR. SIEGEL: Okay. If we could look at Defense Exhibit 349, which is in evidence. I'm going to have to do a quick computer change. You don't need to do anything, Mr. Jackson.

Q Mr. Watson, this is the board deck that you talked about earlier today; is that right?

A I believe so, yes.

MR. SIEGEL: I'm trying to go to page 16, but it's a

little frozen.

Here we go.

Q All right. So, now, this is something -- this is a document that was provided to OZY's board of in 2020; correct?

A Correct.

Q And you were there when this was -- during the board meeting where this was the deck?

A Correct.

Q And Mr. Watson, isn't it correct that the revenue here is yet another set of different numbers?

A I'm not sure what you mean by that, yet another set.

Are you saying that -- are you saying that numbers vary as you get more information?

THE COURT: Sir, if you are not sure what the question is, you can say you're not sure what the question is, but it is not a dialogue.

THE WITNESS: Okay.

THE COURT: You can leave it there.

Q So in your testimony before this jury, you said that the 2017 revenue was 14 million; correct?

A No. I said that my recollection is that it was in the neighborhood of 14 million.

Q Okay. And then, in the pitch deck that we looked at a moment ago, it said 11 million for 2017; correct?

A I'd have to look at it again, but I think that's right.

MR. SIEGEL: Mr. Menz, would you switch us back, just switch computers.
Q So here is 6497-A, so this has 11 million for 2017; correct?
A Correct. Yes.
Q This deck has 22 million for 2018; correct?
A Correct.
MR. SIEGEL: And if we could just switch computers. This is just Mr. Menz switching back to Defense Exhibit 349.
Q This has 18 and a half million?
A Correct. That's what it says there.
Q And both of those are different from the 25 million that you testified about to this jury?
A Correct.
Q Okay. And then for 2019, the board deck says 30 million; correct?
A Correct.
Q And the pitch deck said 33 million; correct?
A I need to see that again.
Q Sure.
MR. SIEGEL: Let's switch back to....
Q 6497-A for 2019, this says 33 million?
A Correct.
Q The information to the board said 30 million; correct?
A Correct. Yep. The board that did.

Q And you've testified that what you've always believed was, in fact, 35?

A Again, that generally speaking I thought it was in the neighborhood --

Q Just yes or no.

MR. SULLIVAN: Objection.

A It's not a yes-or-no question.

Q Then just say it's not a yes or no.

MR. SULLIVAN: Objection.

THE COURT: Let's have another question.

(Continued on next page.)

BY MR. SIEGEL: (continuing)
Q Mr. Watson, is it correct that at this trial, we've looked at a number of pitch decks?
A Yes, that's correct.
Q Isn't it correct that there is not one pitch deck that has 9 million for 2016?
A You're saying of the 1211 pitch decks, that there's not one?
Q No, that's in evidence.
A No, I couldn't speak to that.
Q Well, you've been at this trial?
A I have been at this trial for six weeks, yes.
Q You have seen all the witnesses?
A I have.
Q You've seen all the evidence?
A I believe I have, yes.
Q And isn't it true that of all the pitch decks we've looked at, there is not one pitch deck, from the time that this was actually happening, that says 9 million in revenue for 2016?
A I think that is right, I believe that that is right, yes.
Q And isn't it true that there is not one pitch deck from 2018 to 2021 that says 14 million in revenue for 2017?
A Again, I couldn't say that for sure, but if you're saying of the handful that we've looked at, of the 1211, that those

don't reflect that in the 10 or 12 we've looked at, I think you are right.
Q Mr. Watson, all of my questions are about the evidence at trial.
A Okay.
Q Do you understand that?
A Sure, yeah, you bet.
Q And of all the pitch decks that are in evidence at this trial, including defense exhibits, there is not one that lists 25 million in revenue for 2018?
A I don't know that to be true --
Q All right.
A -- but I understand you are saying that.
Q I am asking you, are you aware of any exhibit, either a Government Exhibit or a Defense Exhibit that has revenue numbers for 2018 that match what you testified to?
MR. SULLIVAN: Objection. Asked and answered.
THE COURT: Overruled.
You can answer the question.
THE WITNESS: Sorry, what is the question?
THE COURT: The question is: Are you aware of any exhibit, either a Government Exhibit or a Defense Exhibit that has revenue numbers for 2018 that match what you testified to?
A No.

THE COURT: Okay.

Q And so your testimony, am I correct, is that although you believed the revenue was 9 million, in many pitch decks and all the ones we've seen at this trial, for 2016, you said 6 million?

A The deck said 6 million. The decks that Samir put together said 6 million, correct.

Q Well, there are also some decks that you sent; isn't that right?

A I didn't put decks together.

Q There are also e-mails that you sent that state the revenue; isn't that right?

A Not that I prepared. Samir drafted the e-mails and then forwarded them to me and I cut and pasted them if I did send them. I wouldn't send those kind of e-mails.

Q Mr. Watson, did you send an e-mail saying that 2016 revenue was $6 million; yes or no?

A You'd have to show it to me.

Q Well, I'm asking you: Did you?

A I'm telling you I'm not sure. But I suspect the answer is yes, but I'm telling you I'm not sure.

Q So even though you believed, this is your testimony, even though you believed the number was 9 million, you may have sent an e-mail where you said 6 million?

A I believe that we were consistently undercounting our

revenue and I didn't make a big deal out of it because I didn't think it was the most important thing to sophisticated investors in startups. They cared about our product.

THE COURT: Sir, you have to listen to the questions that are asked and answer the questions that are asked. Again, your lawyers will have a fulsome opportunity to clear whatever they think needs to be cleared up on redirect, but right now, listen to the questions and please answer those.

THE WITNESS: Sure, sure.

Q Mr. Watson, isn't it true that you sent e-mails, you sent e-mails, where you said the 2017 revenue was 12 million?

A I can't speak to that.

Q Is that an I don't know?

A That's true, that's an I don't know.

MR. SIEGEL: Let's look at Government Exhibit 5007.

(Exhibit published.)

MR. SIEGEL: Mr. Jackson, can you just take that down until we confirm that this is in evidence? I believe that it is, but I just want to be sure.

Okay, it's in evidence. Thank you.

(Exhibit published.)

Q So this is an e-mail from you?
A Yes.
Q And paragraph 2 --
THE COURT: Sorry, can I just see the header information?
MR. SIEGEL: Sure.
THE COURT: I missed that. Okay.
Q This is an e-mail from you, yes?
A Yes.
Q And it's to Don Gogel, correct?
A Correct.
Q And you blind copied Mr. Rao?
A Correct, yes.
Q And in paragraph 2, in the second -- in the third sentence, excuse me, you said that your results for 2018 are ahead of last year's 12 million full year total, correct?
A Correct.
Q You did not say 14 million?
A Correct.
Q Now, these numbers from what you testified about, they're not in your tax returns, correct?
A Correct.
Q I am showing you Government Exhibit 1009.
THE COURTROOM DEPUTY: In evidence, Counsel?
MR. SIEGEL: Yes, thank you.

(Exhibit published.)
Q Mr. Watson, that is your signature, correct?
A Correct, yes.
Q And this is a 2016 tax return --
A It is.
Q -- correct?
A Yup, correct.
Q All right. So I am directing you to line 1A, where it says: Gross receipts or sales.

And can you just read that number?
A 6,350,674.
Q Mr. Watson, you said that you never looked at the NetSuite numbers, correct?
A Correct.
Q Isn't it true that this number is to the dollar, the 2016 revenue in NetSuite?

MR. SULLIVAN: Objection.

THE COURT: If you know the answer, you can answer.
A I mean, I -- I testified that I've never looked in it, but you're telling me that I need to tell you whether or not that's in it? How would I know that if I haven't looked at it?
Q All right. Well let's look at an exhibit. I am showing you Government Exhibit 5033D.

(Exhibit published.)
Q I am going to the tab marked income statement.
And do you recall that Ms. Poutre testified about this document?
A I don't recall, but --
Q Okay. So for 2016, under total income, could you read what it says in this document?
A Yeah. It says $6,350,673.96.
Q I am just going to go back to Government Exhibit 1009.
(Exhibit published.)
Q With the rounding of ninety- -- was it $0.96 or $0.94?
A We can go back and look at it.
Q Yes, let's do that.
THE COURT: I think it rounds the same way either way.
Q Well, except for the rounding of $0.96 to a dollar, the number in Government Exhibit 5033-D is in the tax return that you signed, correct?
A Yes. These numbers seem to be the same subject to rounding.
Q So this number in the tax return you signed is identical to the numbers that you say you never saw?
A Correct. I -- I've said repeatedly --
Q Okay.
A -- that I did not look in NetSuite.

Q So let's talk about --
And by the way, this amount is -- this is 2016, that's about two-and-a-half, $3 million less than you testified as what you actually thought at the time?
A Correct.
Q Even though you signed a tax return with this number?
A Correct.
Q Okay. I am showing you Government Exhibit 1010.
(Exhibit published.)
Q I am just zooming in on the signature.
You signed this document?
A Yes, it looks like my signature.
Q And this is the 2017 tax return?
A Correct, yes.
Q And I am zooming in at 1A, the line for gross receipts or sales.
Could you read that number?
A $6,961,061.
Q Mr. Watson, that's the approximate 7 million that is in NetSuite, correct?
MR. SULLIVAN: Objection.
THE COURT: Again, if you know, you can answer.
A I mean, unfortunately, I can't answer. I didn't spend any time in NetSuite.
Q All right, but the tax return that you signed is

different from what you are saying you believed?
A Correct.
Q So you are saying you believed that OZY had $14 million of revenue in 2017?
A In the range of 14 million, correct.
Q But you signed a tax return with less than 7 million?
A That's what it appears, yes.
Q Mr. Watson, we talked about tax returns, we talked about pitch decks, we talked about e-mails. There are also a variety of spreadsheets in evidence.
Do you recall seeing those?
A If you show me, I'm sure I will.
Q I'm just asking: Do you recall that there are spreadsheets in evidence?
A I'm not sure which ones you're referring to.
Q Do you recall that there are sheets in evidence?
A Why don't you show it to me so I can see?
Q I don't understand. Is your recollection that you don't know if there are any sheets in evidence?
A Yeah, I don't know --
MR. SULLIVAN: Objection, asked and answered three times.
THE COURT: Let's move on to another question.
Q Am I correct that you can't identify a single exhibit, either a Defense Exhibit or a Government Exhibit, whether

it's a pitch deck, whether it's an e-mail, whether it's a tax return, whether it's a spreadsheet, anything, that shows the numbers that you claim are what you believed at the time?
A Would you repeat that, please?
MR. SIEGEL: I'm sorry, Madam Court Reporter, would you read that back?
(Record read.)
A Incorrect.
Q So you can identify that?
A I can, yes.
Q What is the exhibit number?
A You put it up before, the Court exhibit, you put it up right before the break.
Q I see.
A If you can put it up again?
Q Oh, yeah. I am putting up Court Exhibit 3500-1, this is the document that matches your testimony?
A Or is closer to, yes.
Q But other than this, anything else?
A Again, because we've asked a series of questions, I want to make sure that I'm being responsive.
If you are asking is there any that matches exactly that, I think the answer's no. I don't think Samir kept very good records. If you are asking if there are

records that are very close, the answer is yes, there's a lot that's very close.

Q And Mr. Watson, isn't it true that the reason that the numbers you testified that you believed at the time don't appear in any documents, whether it's a pitch deck, an e-mail, a spreadsheet, a tax return, or anything else, other than your script, is that you made them up for this trial to show to this jury?

MR. SULLIVAN: Objection. Two basis: One, mischaracterizes the testimony.

THE COURT: The objection is sustained.

Q Let's not beat around the bush and let's talk about --

MR. SULLIVAN: Objection to all the commentary, Your Honor.

THE COURT: Sustained.

Can I just ask a question about Court's Exhibit 1? When was this document created, just so I understand?

THE WITNESS: Probably minutes before I -- I think I did it while I was sitting here with you.

THE COURT: Okay.

THE WITNESS: Yeah.

THE COURT: Please.

Q So let's talk about the Goldman call, okay?

A Sure.

Q And I'd like to ask you about your version of events,

okay?
A About the truth, yes.
Q Sure. That call was on February 2nd, 2021, correct?
A Correct.
Q Your day started early that day?
A It did.
Q You woke up at 4:00?
A I think in that realm, yes.
Q And you got to the office at 5:00?
A I believe so.
Q O'clock?
A Yes, yes.
Q And the office we're talking about is in Mountain View, California; is that right?
A Correct. I live and OZY's based in Mountain View, not in Brooklyn.
Q Okay. And the reason you were up early is because you were interviewing Priyanka Chopra?
A Correct.
Q And she was based in London, correct?
A She was in London at that point. I don't think she's based there, but yes, she was in London.
Q And that interview started about 6 o'clock?
A I believe so. Might have started a little bit later than that, but I think in that realm. 6:00 to 6:30,

probably.
Q And it lasted about an hour and a half?
A I think so, yes.
Q So it ended, that would be around 7:30, maybe a little later?
A Yes. Might have been closer to eight, but yeah.
Q And then after the interview, you went back to your office to do some work?
A First, I went and took off my wardrobe and makeup and then I went to the office, yes.
Q About how long did it take you to take off your wardrobe and makeup?
A Probably five or 10 minutes. We usually had a conversation with the crew about what they thought about the interview. So sometimes it could run a little bit longer depending on how excited people were about the interview that just happened.
Q So five, maybe 10?
A Could be a little bit more.
Q Okay. And then you said you went to your office and did some work?
A I did, yes.
Q And for about how long were you working in your office?
A You know, I don't know. Probably not that -- not that long. Probably just a couple of minutes, probably.

Q Less than 15, do you think?
A Probably, but I'm not sure.
Q And then you went to the bathroom, you said?
A Correct.
Q And then you went -- and then it was on the way back from the bathroom that you saw Mr. Rao, correct?
A That I poked my head in the doorway, yes.
Q Mr. Watson, isn't it true that you worked for over an hour before you went to see Mr. Rao?
A Not that I know of, no.
Q How confident are you of that?
A I'm not sure.
Q And when you poked your head into Mr. Rao's office, about what time was that?
A My guess is probably somewhere in the kind of 8:15 range.
Q And you said this was early in the morning?
A It was.
Q And there weren't a lot of people around?
A I don't think there were, but after a filming, you can't be sure.
Q Just a yes or no, Mr. Watson.
A Then unfortunately, I can't give a yes or no.
Q Okay.
What time did the workday start at OZY, generally?

A This was COVID, so it varied. So are you asking for an answer pre-COVID, during COVID or after COVID?
Q At this time, like most people, I know you had your studio for this interview.
A I would say it started anywhere between 6:00 and 9:00, and that because it was COVID, not that many people were coming in the office, so there wasn't -- there wasn't the kind of consistent that you would have pre-COVID or post-COVID.
Q Mr. Watson, isn't it true that you actually went into Mr. Rao's office at 7:45 a.m.?
A No, not that I know of.
Q Are you sure about that?
A Yeah.
Q What time do you say you went in?
A I think it was in the 8:15 range.
Q All right. So you've offered a pretty detailed description of that morning before the call.
How do you remember all those details?
A Because we're here.
Q What do you mean by that?
A I was living in California, running a business, and all of a sudden, prosecutors in Brooklyn prosecuted me, so I'm paying close attention as to why this really unusual thing has happened to me.

Q And as part of paying close attention, that's paying close attention to the time you got into the office that day?
A I've got to pay attention to that, that's in the indictment. I've got to pay attention to questions around revenue. Yes, anything that was listed in the indictment, I'm making sure that I'm being thoughtful about.
Q Okay. You said the call ended about 15 minutes after you arrived?
A I don't -- I don't -- no, I don't think that's the case. My recollection is that it was maybe seven or eight minutes, not -- I don't think it was -- it certainly wasn't 15 minutes. It was seven or eight minutes.
Q And so seven or eight minutes, so before 8:30, the call was over; is that right?
A I don't remember exactly. I know that I've seen that on the things you've showed, that Samir looked at the --
Q You don't remember, that's okay.
A -- said 8:30.
Q If you don't remember, that's okay.
A Yeah.
Q I am just trying to do the math. So you said it lasted about seven or eight minutes, just to round, let's call that 10.
What time did you walk in?

A No, let's not round. I'm saying that I was in there for seven to eight. I think he was in there, who knows how long before I got there.
Q Sure. And so let's -- fine, we'll do seven or eight.
What time did you walk in?
A I think I said before somewhere around 8:15, maybe a little bit later.
Q So that's 8:22, 8:23 about?
A Again, it could be a few minutes later. So if I walked in at 8:19, then it might be 8:26. If I walked in at 8:18, it could be 8:25, so.
Q What time did you start calling investors?
A I think sometime in the next hour after that. I think I reached out to Marc Lasry first and then to Michael Moe and then to a gentleman named Jens Mueffelman.
Q About what time do you think you called Marc Lasry?
A You know, sometime in the next hour. I probably both called and texted and may have reached out to -- to other people, like his assistants. He had two assistants.
Q Isn't it true that you did not speak to Marc Lasry before noon that day?
A No, I don't think that's correct.
Q Do you think you spoke to him before noon?
A I think so, yeah. Are you saying noon Pacific or noon Eastern?

Q Pacific. This is all Pacific.
A Yeah, yeah, no, I don't think that's the case.
Q Because you were in California, correct?
A Correct, I was in California.
Q California is by the Pacific Coast?
A Last I saw --
THE COURT: Sustained.
A -- yeah, hopefully we haven't fallen off.
Q Where were you when you were calling the board?
A I was in different places. At times I was in the office. At times I -- I took a walk. There's a cafe down the street that I know I was in for part.
Q Did you send Samir home after the call, or did he stay at the office with you?
A I believe he both left -- I think he left twice. He left twice, I think. And there were points in which I summoned him back. I think I summoned him back for the emergency board meeting in case people wanted to talk to him. And I think that I summoned him back at one point to -- to potentially talk to -- to some of our lawyers.
Q Did you do any normal work that day, like calls with clients?
A I'm sure I did, yeah, it was a busy day.
Q Did Samir join you for those calls?
A I don't think we joined together. I think there was

supposed to be call that he was supposed to be on that I think I checked to make sure that he was not on.
Q I'm sorry, Mr. Watson, so you said you stuck your head in Mr. Rao's office after you went to the bathroom?
A Correct, yes.
Q And that was around 8:15?
MR. SULLIVAN: Objection. Asked and answered.
Q Yeah, okay. So your testimony is that the Goldman call occurred around 8:00 a.m.?
MR. SULLIVAN: Objection. Asked and answered.
MR. SIEGEL: No, I asked about what time he walked in.
THE COURT: Overruled.
What time did the Goldman call happen?
THE WITNESS: I'm not sure. I wasn't there. But I think what I had seen from Allison's texts and Hillel's texts, it sounds like they started at eight.
Q And, sorry, we talked about Pacific and Eastern time.
So 8:00 a.m. Pacific is 11 o'clock Eastern?
A Correct, yes.
Q Mr. Watson, isn't it true that the call actually occurred hours later than you have been testifying?
A No, not to my knowledge.
Q Isn't it true that the call was at 11 o'clock Pacific and 2:00 p.m. Eastern?

A I don't think that's the case, no.
Q All right. I am going to show you Government Exhibit 3546.
THE COURT: This is in evidence or not?
MR. SIEGEL: Yes.
THE COURT: Okay.
(Exhibit published.)
Q This is that dupe calendar invite, correct?
A It looks like that's what that is, yeah, for duplicate, yeah.
Q And it has start time, 11:00 a.m. UTC-8, correct?
A Yes.
Q UTC-8 is Pacific time?
A It may be. I'm not sure that that's the case.
Q All right. Let's look at the texts. I am showing you Government Exhibit 3545. Going to page 4. And this is a text that you sent to Mr. Rao saying: I am a big fan of Carlos, Samir and the show.
And what time is that text?
A Looks like it's 11:19 or 11:21.
MR. SIEGEL: And now let's look at Government Exhibit 3545 -- excuse me, Government Exhibit 5104.
(Exhibit published.)
MR. SIEGEL: I am going to refer you -- well, this is -- just to orient everyone, this is the e-mail from a

fake Alex Piper to Allison Berardo, it says sent at 2:11 p.m.

And I am referring you to the January 30, 2021, e-mail, where Ms. Berardo writes: Tuesday, 2:00 p.m. ET works well.

2:00 p.m. ET is 2:00 p.m. Eastern Time, correct?
A Correct.
Q Which is 11:00 Pacific Time?
A Correct, that would be 11 Pacific Time.
Q So every time that you testified that you walked in at 8:15, maybe five times today, again last week, that wasn't true?
A That's not my recollection.
Q Mr. Watson, isn't it true that you have been practicing this story for a year-and-a-half since you have been indicted?
A No.
Q Mr. Watson, you said that you remember this because it's in the indictment, right?
A No, that's not what I said.
Q You didn't say that like five minutes ago?
A No, that's not what I said.
Q Well, Mr. Watson, you've read the indictment in this case, correct?
A I have, yes.

Q And isn't it true that the indictment has a typo and the indictment says 11:00 a.m. Eastern Time?
A You're saying that the prosecution made a mistake, you're saying?
Q I'm asking you: Isn't it true that the indictment has a typo and says 11 o'clock Eastern?
A I'm not sure, but if you are telling me that the prosecution made a mistake, okay.
MR. SIEGEL: Can we switch to the ELMO?
Your Honor, can I show the indictment?
MR. SULLIVAN: Objection.
THE COURT: Come to the sidebar, briefly.
(Sidebar.)
(Continued on the following page.)

(Sidebar conference held on the record out of the hearing of the jury.)

MR. SULLIVAN: It's not in evidence.

THE COURT: We're going to send it back to the jury room.

MR. SULLIVAN: It's still not in evidence.

THE COURT: You want to offer it through him?

MR. SIEGEL: I mean, look, the indictment is not evidence, but it is evidence of what the indictment says.

THE COURT: It's utterly relevant, obviously. It's not in evidence, that's correct.

MR. SIEGEL: Do you want to mark it as Court Exhibit 2?

THE COURT: Government Exhibit whatever, right?

MR. SIEGEL: Sure. I'll just mark it as -- I will see if we have stickers.

THE COURT: We can mark it as a Court exhibit, that's fine.

THE COURTROOM DEPUTY: We have eight Court exhibits, Judge.

THE COURT: So this will be 9?

THE COURTROOM DEPUTY: It will be 9.

THE COURT: Okay.

(Sidebar conference ends.)

(Continued on following page.)

(In open court.)

MR. SULLIVAN: Can we approach one more time, Your Honor?

THE COURT: Yes.

(Sidebar.)

(Continued on the following page.)

(Sidebar conference held on the record out of the hearing of the jury.)

MR. SULLIVAN: So it appears that the Government suggested that there is a material misstatement on the indictment, so we move for a mistrial on that basis.

THE COURT: There is a jury instruction that all times and dates are approximate. There is no way this is a material misstatement.

MR. SIEGEL: Just to make sure the record is clear, we made a disclosure about this as potential *Brady* about a year ago I think.

THE COURT: Offer it. It's not in evidence.

MR. SULLIVAN: It still has to be in evidence.

THE COURT: Correct, we are not going to hear questions about it in evidence.

MS. GILBERT: So is it going to be shown on the ELMO to the jury?

THE COURT: It's going to be shown to the witness.

MR. SIEGEL: Your Honor, if he says he doesn't recognize it, I am going to ask the Court to take judicial notice of it.

THE COURT: It is a judicial fact that the indictment says what it says. I don't think we will have a real issue here, but we will take it one step at a time.

(Sidebar conference ends.)

(In open court.)

MR. SIEGEL: Can we switch to the ELMO, please?

THE COURTROOM DEPUTY: Yes, sir.

BY MR. SIEGEL:

Q Mr. Watson, I am showing you what's been marked as Court Exhibit 8.

Do you recognize this as the indictment in this case?

A I do.

MR. SIEGEL: Your Honor --

THE COURT: You are putting it in evidence?

MR. SIEGEL: -- I move to admit Court Exhibit 8.

MR. SULLIVAN: Objection. Subject to -- well, I don't want to do a speaking objection.

THE COURT: Is it -- you've already given me the basis for the objection, right?

MR. SULLIVAN: Part of it.

THE COURT: Do you want to come back to the sidebar?

MR. SULLIVAN: Please. Okay.

(Sidebar.)

(Continued on the following page.)

(Sidebar conference held on the record out of the hearing of the jury.)

THE COURT: All right.

MR. SULLIVAN: So in addition, there are unresolved motions with respect to whether an indictment goes back to the jury, so we filed in effect a motion *in limine* or a motion to exclude parts of the speaking indictment.

THE COURT: I thought I responded to that explicitly, but if not, I certainly did implicitly by including it in my proposed jury instructions that I am going to send the indictment back to the jury. We are going to send the indictment back to the jury and so the objection on that basis is overruled.

MR. SIEGEL: Your Honor, we would just ask that the Court give an instruction that you are going to cover this in your instructions, but that the indictment is not evidence, you can't take what it says as evidence, but it's only being admitted to show what the indictment says.

THE COURT: Having overruled that objection, I am going to receive the document in evidence, then give the limiting instruction, then you can proceed with your examination.

MR. SIEGEL: Thank you.

MR. SULLIVAN: Before you guys leave, both sides

just responded to the Court's proposed jury instructions. Are we to assume that nothing is up for debate?

THE COURT: Oh, no. Look, so this portion of the document is obviously utterly relevant at this point, both for substantive and impeachment reasons. If you want to be heard on some other paragraph that you think is so severely prejudicial that you think it should be redacted, we can still have that conversation.

MR. SIEGEL: I am only going to show two paragraphs.

(Sidebar conference ends.)

(Continued on following page.)

(In open court.)

THE COURT: Have you offered the exhibit?

MR. SIEGEL: The Government offers Court Exhibit 8.

THE COURT: The objection is overruled. The exhibit is received in evidence.

(Court Exhibit 8 received in evidence.)

THE COURT: Ladies and gentlemen, you will hear me say this, again, when I give you my more fulsome instructions at the end of this trial and I think I may have even said it to you at the outset when I gave you my preliminary instructions.

The indictment is not evidence, generally speaking. We are admitting a portion of the indictment here for purposes of this cross-examination, but we are not admitting the indictment for the truth of the matter that the Government is going to either read about or inquire about from this document now. It is simply admitted for the fact that the indictment said what the indictment said, given the testimony that you have heard here. And that fact that the indictment says what it says is like any other fact here in the sense that you can give it whatever weight you believe it deserves, but, again, it is not being admitted for the truth of the sentence that we are about to discuss. It's just being admitted for the fact that the indictment

says what the indictment says in the passage that you are about to hear about.

MR. SIEGEL: Can we publish this?

(Exhibit published.)

Q So I am showing you the bottom of paragraph 67. And at the end, it says that they scheduled a call for February 2, 2021, at 11:00 a.m. EST.

THE COURT: I think the question is -- what is the question?

Q Is that what it says?

A That is what it says, yes.

Q And then paragraph 69, it also repeatedly talks about it being around 11 o'clock Eastern Time?

A 11:19, 11:26, yes.

Q And that would be around 8:00 a.m. Pacific, correct?

A Correct.

Q So Mr. Watson, isn't it true that the reason you have repeatedly sworn under oath, both last week and today, that this call was around 8:00 a.m., is because you were responding to the indictment and not actually talking about what happened?

A That's not the case, no.

MR. SIEGEL: We can turn this off, Mr. Jackson, thank you.

Q So let's talk about BuzzFeed for a moment.

Is it correct, sir, that on November 20, 2019, BuzzFeed sent OZY an indication of interest to potentially buy OZY for $225 million in stock?

A Yes. Sorry, I believe stock and cash.

Q All right. Well, let's look at Government Exhibit 6088.

MR. SIEGEL: Can we switch back to the laptop?

THE COURTROOM DEPUTY: Yes, it switched.

MR. SIEGEL: This is in evidence.

THE COURTROOM DEPUTY: You're connected?

MR. SIEGEL: The prosecution, not the podium.

THE COURTROOM DEPUTY: Yeah, the prosecution.

MR. STERN: HDMI?

THE COURTROOM DEPUTY: HDMI number 2.

MR. SIEGEL: Have you tried unplugging it and plugging it back in? Could we try switching to the ELMO and then back?

So this is Government Exhibit 6088 and we can publish it.

THE COURTROOM DEPUTY: It's published.

(Exhibit published.)

Q Just to make sure we are talking about the same thing, this is the November 20th, 2019, e-mail with a BF IOI?

A Yes.

Q And that's the BuzzFeed Indication of Interest,

correct?
A Correct, yes.
Q And let's look at the attachment, which is in evidence, Government Exhibit 6088-A.
(Exhibit published.)
Q And this says that the purchase price would be $225 million on a debt-free, cash-free basis, payable as follows. And then it has $170 million of BuzzFeed stock and an additional 55 million of BuzzFeed stock, correct?
A Correct. Sorry, yes, that's what it says there. I remembered the subsequent conversations where that moved to cash, but correct, this, as written, says stock and stock.
Q Well, as of November 20th, all stock?
A All stock, correct.
Q I think, is this the one that you said you talked about with your family at Thanksgiving?
A Then or around there, I probably had multiple conversations, yeah.
Q And then you said that -- you testified that BuzzFeed made a bigger offer around Christmas, correct?
A Two more offers.
Q Well, let's just take it one at a time.
A Yeah.
Q When was the next offer?
A In and around Christmas.

Q And how much was that for?
A About 250.
Q When you say in or around Christmas, is that like between Christmas and New Years?
A I think it was originally slightly before it, slightly before Christmas.
Q And just to put aero bars on that, what range are you talking about?
A I think probably in the -- the CEO -- we had multiple conversations about this higher offer that started the -- actually started the end of November, because he asked me to come and interview with his top deputy. So I spent, I think from late November to mid-December meeting with about 12 of his top deputies, and so we discussed it across that and -- and it got, I think, further crystalized in -- in the last two weeks of December.
Q So the 250 crystalized this last two weeks of December?
A Percolates through, you know, where will we go beyond 225, is the conversation. And I think, you know, 250 is the next landing point and I think we have conversations about that at the first half of December. And I think it begins to crystalize in the second half.
Q And then you said there was another offer?
A Correct.
Q And, sorry, that -- the 250, that's an oral offer?

A Correct.
Q There's nothing in writing about that?
A I believe there is something in writing. I think there's a shared deck between us. You had the name here, Project Stingray. I think there's a shared deck, one of those pro forma decks, that I think includes it in that deck.
Q Do you recall the exhibit number for that?
A I'm not sure whether or not I've actually seen it here. I know that we have it, but I'm not sure whether or not I've seen it here.
Q When you say "seen it here," you mean seen it at trial?
A Seen it at trial, yeah.
Q So it's something you have, but is not at trial?
A I know that it's in -- I believe it's in evidence. I believe that we have an exhibit number for it.
Q Okay, but you don't know the exhibit number?
A I don't know the -- you're saying of the 800 exhibits do I know exactly which one is the BuzzFeed one?
Q I'm just trying to figure out what you are talking about.
A No, I don't.
Q All right. Then you said there was another offer, correct?
A Correct.

Q And when was that?
A In January.
Q And what's the timeline for that?
A Again, I think with most of these offers, they're not -- and I think this is true generally about startups, whether it's rolling close or what have you, there's rarely one moment that usually happens across a series of conversations and across a series of time.

So I would say in January, I think I met with Jonah, I either met or spoke with Jonah at least four times. So I'm sure that we discussed it in part throughout each of those four.
Q Is that over the month of January?
A Over the month of January.
Q And is it at the last one that it crystallized?
A I think it crystalized before, but he asked me to come to New York, which I think I did, and I think I met with him at a hotel and it was at that hotel where I said thank you very much, I appreciate it, we are not going to move forward with this and don't want to falsely give you a sense of we're going to move forward even if you raise it beyond this.

(Continued on following page.)

CROSS-EXAMINATION (Continuing)

BY MR. SIEGEL:

Q So when was the 300-million-dollar offer?

A The 300-million-dollar offer came in January, and my rejection of it came at the end of January.

Q And about when in January did the 300-million offer come?

A Apologize, I thought I said that clearly.

It's -- it's -- the offer doesn't come just at one point. You have a conversation where someone says: I know we've got 250 on the table or what if it was 300 or what if it was 275 --

Q Let's stop there. When does that happen?

A It happened repeatedly throughout January. We had at least four conversations. So, I'm sure it happened the first week, the second week, the third week, the fourth week.

Q Okay. And these were all also oral offers?

A Correct, yes.

Q And there is a no document for that 300-million-dollar offer?

A I could go back and look, but I don't think so. We didn't ask him to document it because we weren't gonna take it.

Q Okay. So I just want to make sure we have the timeline.

So there's November 20th at 225. Then you start percolating 250, that crystallizes at the end of December 250,

and then in January 300?

A Slight edit to that.

So there were two offers before that. His first offer came in October for 125 in writing. Then he sent another offer about a week later, maybe two weeks later for 170. Then he sent a third offer in November, which was for two-and-a-quarter. Then he said: Please come meet my management team, I really want to do this. What if we increased it? What about 250? And so we had that conversation through December. And I believe we put it in the shared deck that we had.

And then I said: I appreciate it. We're not gonna move forward with that.

He said: Let's keep the conversation going. And in January, he said: What if we did 300?

We had multiple conversations around that.

So, the first conversation starts with Ben Smith pursuing us in August, and then the first offer comes in October. Second offer comes in October. Third offer in November. Fourth offer comes in December. Fifth offer comes in January.

Q And so, but the only one that's in evidence , and tell me if I'm wrong, is this 225-million-dollar offer?

A I don't know that to be true. I actually -- I suspect that among our 800 exhibits that several of these are in

evidence. And I know that the Government has produced back to us, you three have produced back to us some of these other offers. So I know they have your stamp on them.

So I know the 125 has your stamp. The 170 has your stamp. I believe the joint December agreement has your stamp. I'm happy to find it during the break.

Q Okay, great.

So, you talked about from August to January. So, let me just pick a date.

First week of December, what offer is on the table?

A First week of December -- well, good question.

So right now we're only talking about cash and stock. So he added other elements to it. And in December, in particular, he offered two additional elements. He's -- I guess -- I guess he first offered it in November. So he said: Not only will we offer you this, but we'd like you to be president of the company. And then he subsequently said: And I'd like you to take a seat on our board. We will have you replace some of our existing Board members. And you can have not one seat, but you can have two seats.

And so that was, that was part of the conversation in November and December as they were seeking to -- to acquire OZY and acquire our, you know, our momentum in TV and podcasts and festivals.

Q But so they were offering those sweeteners, but you were

still at the 225?
A No, I think it had moved. I think the conversation was -- was in the 250 realm.
Q Okay. I am going to show you Government Exhibit 3512, which is in evidence.
(Exhibit published.)
Q So I'm going to zoom in on the text, and my question is just, what is the date of this text?
A The date is December 7th, 2019.
Q Okay. And could you read the text?
A FYI — told Abbas that BuzzFeed offered 300 million to buy us. Helped to justify the 350 million pre-valuation.
Q So, Mr. Watson, maybe that 300-million-dollar offer was not in January like you said, it was before December 7th?
A I think it was more clearly in January, but I assume I was rounding up here. I assume that I was -- I was saying 250 and I knew that he would go higher given that he was putting things like president of the company and one board seat and then two board seats on the table. It was clear that this was -- this was something that was gonna -- gonna move.
Q Well, because it was oral you can say whatever you need to say, right?
A You're saying they didn't make three written offers to me prior to this?
Q I'm saying an oral offer you can tell this jury it's

whatever you need it to be?

A So, I'm saying to this jury that they came very aggressively for us. They didn't make one offer, they didn't make two. They made five. They were the most sophisticated players in the space. They knew all about our business. They put more than a dozen people on the diligence team to try and figure this out and they didn't stop at one offer.

And if OZY wasn't something that was incredibly valuable, they wouldn't have made five offers. They wouldn't have spent this much time. And even after I turned them down for the fifth time, they wrote back again in March: Do you want to restart the conversation? In July: Do you want to restart the conversation? And in 2021.

Q Were those in writing?

A Those weren't, but I did get a written e-mail from them saying: Do you want to re-engage? Do you want to have a conversation?

Q What's the exhibit number for that?

A Are you saying that we have exhibit numbers for all 1 million of my e-mails?

Q I'm trying to understand if there's any evidence for what you're saying, Mr. Watson.

A You mean other than me saying that and other than that we were putting it up here?

I'm sure there is, is the short answer.

Q Okay. So just to be clear, as of December 7th, 2019, BuzzFeed had not offered $300 million to buy you?
A As of December 7th, 2019, the offer was 250 and I knew that it could go higher from there.
Q Okay.
I am going to show you Government Exhibit 6051-C, which is in evidence.
(Exhibit published.)
MS. GILBERT: What exhibit?
MR. SIEGEL: 6051-C.
MS. GILBERT: Thank you.
Q I'm focusing on the first tab.
Do you recall discussing this document with Mr. Sullivan last week?
A I believe so, yes.
Q And specifically, you talked about the claim that Alex Rodriguez, and this is in Row 17 --
THE COURT: Sorry, let's take a break here if we're changing subjects.
MR. SIEGEL: Okay.
THE COURT: We'll have the jury step out.
(Jury exits.)
THE COURT: All right. We are going to be about ten minutes here.
(Witness entered and resumed the stand.)

THE COURT: I'll just note for the record, Mr. Sullivan, it's been about an hour since the last break when we had the discussion about what I think the Government said is the Perry case out of the Supreme Court.

Perry, P-E-R-R-Y?

MR. SIEGEL: That's right.

THE COURT: Has the defense located any authority to the contrary?

MR. SULLIVAN: Yes. Before the jury comes back I can look at it.

THE COURT: Okay. All right, the order stands until contradicted.

MR. SIEGEL: And Your Honor, just to clarify, it's not just his attorneys, you know, he has several people who we've already reported were the defense team, so we had --

THE COURT: It's the defense team, correct. So, I'll see everybody back here in about five minutes.

MS. ROBINSON: Is his family allowed to speak to him?

THE COURT: Yes, I don't see why family would be covered by that order. Although, we have this confusion over whether there is a family member who is also a lawyer to him. So, I'll leave it at that.

MS. GILBERT: She's not on the defense team.

(Recess taken.)

(In open court - jury not present.)

(Judge ERIC R. KOMITEE entered the courtroom.)

THE COURT: All right. I think we are all back.

We are waiting for the jury for another couple minutes, but, Mr. Sullivan, was there a case you wanted to bring to my attention?

MR. SULLIVAN: Yeah, I'll look at the -- I'll just state that the long-standing Supreme Court precedent, and its represented in cases like Geders, G-E-D-E-R-S, that an order by a trial court directing defendant not to consult with his attorney during an overnight recess violated the Sixth Amendment. And issues here --

THE COURT: You understand that I'm not ordering that, right?

MR. SULLIVAN: I understand.

THE COURT: Okay.

MR. SULLIVAN: This was just context.

The issue here in the case the Government cited Perry was for a 15-minute recess, the Court ruled that that order, in and of itself, did not violate the Sixth Amendment, but it also stressed that the Court was not required to order it.

And in this case there was evidence offered, in Perry, that the defendant was, and I will use the language of the case as they described it at the time, mildly retarded and

easily, quote, easily influenced by others. And on that basis the Court said for this short period of time, that I'll order no contact.

This case just strikes me as -- as different. Mr. Watson is -- does not have intellectual impairments nor is he easily influenced. And if the Court wants to order me on a break not to talk about the case, that's fine, we're not talking about it anyway. But to have no contact with my client about anything seems overbroad, and it's certainly not required by the case.

So they did not, Perry did not overrule Geders. It was -- there is a strong dissent in the case and the concluding paragraph reads: "Our conclusion does not mean that the trial judges must forbid consultation between a defendant and his counsel during such brief recesses. As a matter of discretion in individual cases or of practice for individual trial judges or, indeed, as a matter of law in some states, it may well be appropriate to permit such consultation.

We merely hold, the Supreme Court says, that the federal Constitution does not compel every trial judge to allow the defendant to consult with his lawyer while his testimony is in progress.

THE COURT: All right.

MR. SULLIVAN: So it's discretionary, and I just --

just to have no contact just strikes me as overbroad and unnecessary and outside the scope of -- of the very case that the Government cited Perry.

THE COURT: Right. All right, so here is where we are.

My order stands, but to the extent there is something you need to talk to your client about during the breaks while he is -- during the intraday breaks while he is on the stand in cross-examination, let me know and I'll reconsider, if appropriate.

MR. SULLIVAN: You want me to tell you about the topics of attorney-client privileged information?

THE COURT: I want you to tell me whatever you can tell me.

I mean the example you gave me earlier was what if I need to go get my client from the bathroom. That would not be, that would not disclose any privileged information. I'm having a hard time imagining at this point what would, but we'll cross that bridge when we get there.

(Pause.)

THE COURTROOM DEPUTY: All rise.

(Jury enters.)

THE COURT: Please be seated, everyone.

Mr. Siegel.

MR. SIEGEL: Thank you, Your Honor.

CROSS-EXAMINATION (Continuing)
BY MR. SIEGEL:
Q So, Mr. Watson, do you recall testifying about the claim here that Alex Rodriguez and Jennifer Lopez were investing a million dollars?
A I do.
MR. SIEGEL: And I am going to put up Defense Exhibit 525, which is in evidence.
(Exhibit published.)
Q And, Mr. Watson, you testified that this was the agreement that you were basing that claim on?
A Correct, yes.
Q This and an addendum to that agreement?
A And the conversations around it, yes.
Q Okay. And under this agreement there is the OZY commitment, do you see that?
A I do.
Q And it says that OZY will commit to share 25 percent of the profits from OZY Fest 2019 with A-Rod Corp., with 50 percent of such profits conveyed in cash and the other 50 percent to be issued as shares of common stock of OZY valued at a price per share of $5.42.
Is that right?
A Yes.
Q And the minimum commitment, in no case will OZY's

commitment total less than $500,000 in cash and $500,000 in common stock.

Is that -- did I read that right?

A Yes, you did.

Q And there is also An A-Rod commitment where Mr. Rodriguez, on behalf of A-Rod Corp. will commit to co-host and attend the festival, and join a fireside chat with JP Morgan Chase on a date to be determined in October 2019?

A Yes, that's part of it, yeah.

Q So the flow of money in this agreement, the flow of cash in this agreement, am I correct it is from OZY to A-Rod?

A Not only.

Q Well, the cash that's discussed in this agreement, the dollars, cash, those go from OZY to A-Rod, correct?

A Correct. I apologize. It's not a yes or no, it's correct with an asterisk.

Q Okay.

And then in this agreement, I'm just talking about this agreement, there is nothing in this agreement that has cash go from Mr. Rodriguez to OZY?

A It doesn't require it, but there was an understanding that there would be.

Q But under this agreement there is nothing about cash going from Mr. Rodriguez to OZY?

A Again, that's -- that's not correct.

Q So you're saying this agreement does require cash to go from Mr. Rodriguez to OZY?
A It doesn't require, but Alex and I discussed and his expectation is that he --
Q So let me just ask my question again, Mr. Watson.
In this agreement, in this agreement, in this agreement, is there anything in this agreement about cash from Mr. Rodriguez to OZY?
A Not that requires him to do it, no.
Q Now, there was also an addendum to this agreement, correct?
A Correct.
Q So I am going to show you Defense Exhibit 523, which is in evidence.
(Exhibit published.)
Q You testified that the purpose of this addendum was to make sure Alex Rodriguez got his stock, correct?
A Correct, or that was one of them. I think -- I think he had two purposes in doing it.
Q Let's read the terms.
Is it correct that paragraph one says: Stock compensation: Notwithstanding anything to the contrary set forth in the Agreement, any consideration under the Agreement from OZY, or its affiliates to AROD, which is payable in the form of stock of OZY, shall be paid to AROD OZY.

Is that right?
A Yes, that's what it says.
Q And then the second paragraph says: Except as modified herein, all other terms of the Agreement remain in full force and effect.
Correct?
A That's what the first sentence says of -- of about five or six, yeah.
Q So other than changing the entity involved, this addendum changes nothing, is that correct?
A That the -- the key is -- is -- is -- is this entity, and the other pieces between --
Q If it's incorrect, you can just say "incorrect."
MR. SULLIVAN: Objection.
THE COURT: If you can answer the question yes or no, please answer the question yes or no.
Did anything else change in this contract?
THE WITNESS: Yes.
Q Okay. Can you point us to the language in the contract that says something changes other than the AROD entity?
A Will you scroll, please?
THE COURT: Or just expand, maybe we can see more.
MR. SIEGEL: Yes. I'm going to start at the top. Let me know when I can go down.
THE WITNESS: The second "whereas" there.

Whereas, OZY, A-Rod and AROD OZY wish to further clarify and memorialize their, plural, agreements -- it didn't say agreement, agreements, plural -- with respect to the party which shall receive the consideration in the form of stock set forth in the Agreement.

Meaning --

Q No, I didn't ask what it meant. I just asked what it said.

A Yep.

MR. SULLIVAN: Objection, that's not what he asked. The witness was answering the question.

THE COURT: The question was: Let me know when I can go down.

Let's have another question.

MR. SIEGEL: Okay.

Q So this says that this is clarifying and memorializing their agreements with respect to the party which shall receive the consideration in the form of stock, that's what it says?

A That's part of what it says.

I think I read the other part, too. It says: To further clarify and memorialize their, and it purposefully having used sophisticated lawyers, uses the word agreements, plural. It does not say agreement. It says agreements, plural.

Q So, in the prior agreement the flow of cash under the

agreement that we looked for was from OZY to A-Rod, correct?
A That was the baseline in that one written document, correct.
Q And in this, all that changes is the party that receives stock as compensation, correct?
A No. Respectfully, I've now answered that three times.
I understand the point you're trying to make, but it's incorrect. But I'll keep saying incorrect if you keep asking me it.
Q Okay. Can you point to language in this agreement --
A I just did. I read it, but I'll read it again.
Q No, Mr. Watson, please. I'm sorry.
Could you you just point to language in this agreement --
MR. SULLIVAN: Objection, asked and answered.
THE COURT: Well, we haven't heard the full question yet. Let's hear the question.
Q -- that changes anything about cash and which direction it goes?
A Let's see. I told you before. It's embedded in the second "whereas" there.
Q You're referring to where it says: Whereas, OZY, A-Rod and AROD OZY wish to further clarify and memorialize their agreements, with respect to the party which shall receive the consideration in the form of stock set forth in the agreement.

That's the provision that changes the deal as to cash, that's your testimony?

A Yes. My testimony is that after working with Alex on this for nine months, we signed the agreement in March.

Subsequent to that, OZY Fest got moved from the edge of Central Park, which is Summer Stage. As many of you know, it got moved to The Great Lawn. That was a big deal. Once that happened, Alex wanted to get even more involved with us. Hence, we had a series of conversations about how to supersize this deal.

And so, the simplest thing to do was to create AROD OZY because he expected not only to work with us on this one deal, but on multiple deals. So, he was creating a special corporation to house his stock in it. And so, that second "whereas" is meant to capture the fact that not only are there agreements in writing, but there are understandings orally about what he expected to come out of this and what I expected to come out of this.

And, again, what was in the first agreement in his mind was the minimum commitment.

MR. SIEGEL: I am going to object to that. I am going to object to all of that actually and move to strike it.

MR. SULLIVAN: Objection. His question.

THE COURT: Let's take that up at the next break.

Well, come to the sidebar briefly.

(Sidebar conference held on the record in the presence of the Court and counsel, out of the hearing of the jury.)

THE COURT: What's the objection?

MR. SIEGEL: All right. I had asked a yes-or-no question and he answered a long-form narrative where he started talking about what Alex Rodriguez believed.

THE COURT: So, speaking to the operation of another person's mind?

MR. SIEGEL: And the fact that as Your Honor has pointed out repeatedly, using every opportunity to just try and --

THE COURT: Right.

MR. SIEGEL: -- answer questions that aren't answered -- and speechify.

MR. SULLIVAN: The question, as I remember, was point me to the language where it stands for a certain proposition.

THE COURT: Right.

MR. SULLIVAN: And that's what Mr. Watson did.

If the Court rules to strike what's in Alex Rodriguez's mind I don't object to that, but he kept -- he asked him and asked him again and again, and Mr. Watson fully answered the question.

THE COURT: He's saying the fact that this says

agreements, plural, suggested there was an oral agreement out there. Do we have the agreement that this modifies?

MR. SIEGEL: Yes.

THE COURT: Okay. Does that --

MR. SIEGEL: No.

Again, the question is can he point me to the language that Mr. Sullivan just said? And he went off on: Well, Alex Rodriguez had a number of conversations that he wanted to expand OZY Fest and, therefore, we had all these oral conversations.

THE COURT: Remind me of the elements of the underlying testimony that you're trying to impeach now.

He said that there was revenue due from AROD OZY?

MR. SIEGEL: He said there was investment via A-Rod for a million dollars.

THE COURT: Okay.

MR. SIEGEL: And he said that this, and the underlying agreement.

THE COURT: But did the investment materialize or not materialize?

MR. SIEGEL: Well, it's an agreement to pay AROD by OZY. It doesn't make sense because it doesn't make sense.

MR. SULLIVAN: No, no. It's an investment they paid in stock and Mr. Rodriguez hosts the -- the OZY Fest, the emcee. And Mr. Watson testified during my direct that if he

had paid Rodriguez to do that, they would have been well over a million dollars. And it's the same sort of barter-type strategic partnership relationship that he's testified before.

THE COURT: Oh, I see.

MR. SULLIVAN: You know, so he'd still have to pay that out, so it's still in their coffers.

THE COURT: Is the underlying contract a contract or a term sheet?

MR. SIEGEL: There's a signed term sheet.

THE COURT: Okay.

MR. SIEGEL: But I guess we're getting a little far afield. The point is I asked a yes or no question and he went off on a long narrative.

THE COURT: I'll strike the stuff which you don't to be to me striking about the operation of Mr. Rodriguez's mind.

MR. SULLIVAN: And not the rest because it wasn't a yes or no. He kept inviting him to point him to the language and then didn't like the answer.

MR. SIEGEL: Pointing him to the language is not an invitation to tell me the story of your relationship with Mr. Rodriguez.

THE COURT: So you moved to strike it as nonresponsive, basically?

MR. SIEGEL: Yes.

THE COURT: Okay. Hold on. (Sidebar concluded.)

(In open court - jury present.)

MR. SIEGEL: Your Honor.

THE COURT: Hold on one second.

MR. SIEGEL: Yes.

(Pause.)

All right. I am going to reserve judgment on the objection we just had.

Let's have another question.

MR. SIEGEL: Okay.

BY MR. SIEGEL:

Q Let's go back to Defense Exhibit 525, which is in evidence.

(Exhibit published.)

Q Mr. Watson, under this agreement, if OZY Fest is canceled because of severe weather, then both parties are released from the agreement, correct?

A I don't think that's the case. I think that there is a look-back window in which -- in which there is kind of like a make-good window, I believe.

Q Okay. I am zooming in on page 2 where there is a bold bullet that says: Force majeure, M-A-J-E-U-R-E.

A Uh-huh.

Q Does this language say neither party shall be liable for any failure --

MR. SULLIVAN: Objection.

May we approach?

THE COURT: No.

You may continue with the question.

BY MR. SIEGEL:

Q Neither party shall be liable for any failure or delay hereunder to the extent caused by an act of God, act of governmental authority, war, riot, act of public enemy, flood, civil commotion, insurrection, severe weather conditions, or any other cause beyond its reasonable control. In the case of such an event, both parties will be released of their commitment.

Is that what that says?

MR. SULLIVAN: Objection, under the rule of this case.

THE COURT: The question is, is that what it says?

MR. SULLIVAN: Objection.

THE COURT: Can you answer that question yes or no?

The objection is overruled.

Is that what that says?

THE WITNESS: This one particular part of the overall agreement, that's what that says, yes.

Q And OZY Fest was canceled in 2019 by order of a governmental authority because of a heat wave, correct?

A Correct.

Q By the way, you've testified a lot about OZY on The Great

Lawn, correct?
A Correct.
Q Isn't it true that OZY Fest never happened on The Great Lawn?
A It ultimately did not, correct.
Q Because OZY Fest was canceled in 2019?
A Correct.
Q And the last in-person OZY Fest ever was 2018?
A Correct.
Q All right. So let's go back to Government Exhibit --
A Sorry, apologize. Just one small correction.
As I said before, we think of OZY Fest as a couple-month rolling event that leads up to that. And so, for many of our advertisers and partners, whether it's JP Morgan Chase, Allied Bank, TikTok, Airbnb, OZY Fest 2019 did happen.
The final two days didn't happen, but they would tell you that the buildup to it happened. They would tell you the special VIP party on Park Avenue happened.
MR. SIEGEL: Your Honor, I am going to object again.
THE COURT: Yes. You can't say what another party would say. I'm sorry.
THE WITNESS: Can I say what I would say?
THE COURT: The objection is sustained.
No.
Let's have another question.

MR. SIEGEL: Okay.
BY MR. SIEGEL:
Q I am going to go back to Government Exhibit 6051-C.
(Exhibit published.)
MR. SIEGEL: Sorry, Government Exhibit 6051-C.
(Exhibit published.)
Q All right. So this is a million dollars that's listed as coming from Alex Rodriguez.
It's not the result of that contract we looked at, correct?
A Incorrect.
Q The agreement we looked at said nothing about any cash coming from Alex Rodriguez, correct?
A I previously testified that iHeart and others did barter investments. And so, there are multiple ways to get investment. You can send us cash. You can also send us services. And we had at least three significant investors, Alchemy Media, iHeart, and Alex Rodriguez all of whom did --
Q Mr. Watson, that was a yes-or-no question.
A And I apologize. You know what, I apologize. I should have said, unfortunately I can't give you a yes-or-no answer. My apologies. I should have said that clearly up front.
Q Good.
So you're saying --
MR. SULLIVAN: Objection. Objection to the

Government commenting on the witness's answer.

THE COURT: All right, let's have another question.

But, yes, let's keep the reactions to answers --

Q So you talked about barter investments?

A Correct, yes.

Q So I just want to ask about cash for a second. Not barter, cash. Okay? Do you understand that?

A Sure, yeah.

Q The agreement that we looked at says nothing about cash from Mr. Rodriguez?

A That's incorrect. We looked at two agreements and I pointed you, I think three times, to where it does, but we seem to be misaligned on that, even though I'm the one who negotiated it.

Q Well, I was asking about 526 and you said it was that "whereas."

Let's do the where is the language in 525.

What in 525, and I'm just asking to point us to the language, says that cash will come from Alex Rodriguez?

MR. SULLIVAN: Objection, asked and answered again.

MR. SIEGEL: We asked about 526.

THE COURT: Can you answer yes or no, is there anything in 525 that calls for cash to be paid by Alex Rodriguez to OZY?

THE WITNESS: Respectfully, Your Honor, I -- I've

answered this like five times, but I'll answer it a sixth.

If we're talking about the first one, in writing, it is not there.

In the second one --

MR. SIEGEL: That's all my question --

THE WITNESS: -- it says very clearly that we're memorializing agreements which include conversations I had with Alex and his lawyer, which include conversations I had with his CFO, and which includes a very detailed e-mail trail between all of us that makes it clear.

So I'm not sure why we were trying to pretend that Alex didn't have every intention to do this. But okay, let's keep going.

BY MR. SIEGEL:

Q In 2019, there was no cash that came in from Alex Rodriguez?

A I don't know that to be true, but I -- but I suspect that you're right, that he ultimately did not wire in cash.

Q And it says also here Interlock Partners for 10 million.

Interlock in 2019 never sent $10 million?

A Correct.

Q They sent 2?

A Correct.

Q And Marc Lasry Group, Marc Lasry sent $1 million in 2019 in cash?

A Right, but those are two different situations.

Marc as a person is one million. Marc and the other people who he invited to his home and to his office and encouraged to invest, including the person you just put up earlier, Don Gogel, who was someone who came to Marc Lasry's home and his office and as a result of that invested. When you add all of those up, it does add up to that, so....

Q So who are the people who add up?

A There are a whole series of people, including Don Gogel.

THE WITNESS: Are you guys changing that document? Is that what's happening?

Can I count on that document?

THE COURT: Let's have the jury step out.

(Jury exits.)

THE COURT: Please be seated, everyone.

Mr. Watson, I know you understand how this works. I know your lawyers have explained it to you. I understand this is -- Mr. Sullivan, you can return to your seat.

MR. SULLIVAN: I'm not going to allow the Court to question my client without me --

THE COURT: Mr. Sullivan, you can return to your seat.

MR. SULLIVAN: Then can he come to the seat?

THE COURT: No. I'm talking to the witness now. I am not asking him any questions.

MR. SULLIVAN: I am instructing my client not to answer any questions without me present.

THE COURT: Okay. I am not going to ask him any questions.

MR. SULLIVAN: I am instructing Mr. Watson not to answer anything without me present or without my permission.

THE COURT: Okay.

Mr. Watson, this is not a two-way symmetric street. The lawyer who is doing the examination is going to ask questions. You are going to answer those questions as best you can. And if you can't answer them yes or no, just say "I can't answer that question yes or no." There's been some of that already.

You are not, you are not going to ask any more questions of the government's lawyers, number one.

And number two, you are going to confine your responses to the questions that are asked.

That is all.

Let's bring the jury back.

MR. SULLIVAN: Don't answer.

THE COURT: And if there is any violation of the instructions I just gave, we are going to be, again, contemplating contempt.

MR. SULLIVAN: Also, I'd like to make a record that the Government --

THE COURT: There is no record being made. Let's bring the jury in.

MR. SULLIVAN: This is about something else, Your Honor.

THE COURT: Sit down. And you may make your record after the trial day is over.

Let's bring the jury back in. Thank you.

MR. SULLIVAN: Can I be heard?

THE COURT: You may be heard after the trial day is over. Please sit down.

(Pause.)

THE COURTROOM DEPUTY: All rise.

(Jury enters.)

THE COURT: Thank you, ladies and gentlemen, for bearing with us.

Mr. Siegel, you may continue.

BY MR. SIEGEL:

Q So talking about that 5 million for the Marc Lasry Group that was listed.

You agree that Marc Lasry only invested a million dollars?

A Yes, I do.

Q And you said that other 4 million was from other people that you said Marc Lasry brought in?

A That was my understanding, yes.

Q In 2019?
A In 2019. It might have been even prior to that. Some folks might have put money in in 2018 as a result of him.
Q Okay. One of the people you said was Don Gogel?
A Don Gogel, yes.
Q Any other names you remember?
A Not at the moment, no.
Q Just Don Gogel?
A For now, yeah.
Q All right. I am going to show you Government Exhibit 19-A.

MR. SIEGEL: Mr. Menz, would you mind plugging the computer back in.

Q So this is the summary of the wires that we looked at before?

(Exhibit published.)

Q So I am going down to where it says Donald J. Gogel.
Do you see that?
A I do.
Q It's little hard to see the numbers, but you can see there is only one cell that has an entry for him, correct?
A I think so. If we can make it slightly bigger, that would be a good thing.
Q There is one cell for a hundred-thousand dollars?
A That's what it says there.

Q And that hundred-thousand dollars, I'm just going to go up, is from 2020?

A Yeah, that's what it looks like it says there in this particular thing.

Q Not 2018 or '19?

A It does not appear that that's what it says there.

Q Okay. Let's talk about Oprah, and I am going to show you Defense Exhibit 627.

(Exhibit published.)

Q You recall testifying that you believed that Oprah was going to invest 20 -- $10 million in 2019, correct?

A Or that she could, that she could consider that, yes.

(Continued on the following page.)

BY MR. SIEGEL: (Continuing)
Q Well, so, and I want to understand, is it that she could or she had committed to do so?
A That she considered, yes. That she considered again. That she considered in 2017 and that they were considering again, yes.
Q But not committed?
A Not committed, no.
Q So you agree that there was no commitment from Oprah to invest in 2019?
A No commitment is too strong, so I wouldn't say that.
Q So, was there a commitment?
A Again, if we're in a world of yes-and-no answers, I'm forced to say it's complicated and I can't give a yes-or-no answer. I don't want to -- I don't want to overstep. So my apologies. It's complicated.
I wish it was as simple as yes or no, but it's not.
THE COURT: All right. Let's have another question.
Q Okay. And you talked about how part of the reason that you thought Oprah would invest in 2019 was this document, Defense Exhibit 627?
MR. SULLIVAN: Objection. Mischaracterizes his testimony or misstates his testimony.
THE COURT: Ladies and gentlemen, I will remind you that questions from the lawyers are not evidence.

Mr. Siegel, you can ask the question again.

MR. SIEGEL: Madam court reporter, would you mind reading it back.

MR. SULLIVAN: Same objection.

THE COURT: Overruled.

(Record read.)

A And my apologies. We mean -- you said 6207. But do we mean 6747, just so we are on the same page?

Q It is 627?

A It's 627. I'm sorry. Okay. I was seeing the number on top that says 6747.

Yes.

Q This term sheet is from 2017?

A Yes.

Q I'm zooming in on the first paragraph. And in this paragraph it says, "The completion of transaction contemplated in this memorandum will be subject to a prior contemporaneous closing by the Company of the purchase of the Essence communications business from Time, Inc."; correct?

A Yes.

Q And that never happened? OZY never bought Essence; correct?

A We wanted to buy Essence magazine, but we did not buy it. We were the runner-up.

Q And there are investors listed in the section investors

and proceeds; correct?
A Correct. Yes.
Q And those investors are Andreessen Horowitz?
MR. SIEGEL: Which is A-N-D-R-E-E-S-S-E-N. And Horowitz is H-O-R-O-W-I-T-Z.
Q That's one of the listed investors?
A Correct. Yes.
Q And Google is one of the listed investors; correct?
A Yes. Correct.
Q And Discovery Communications, LLC is one of the listed investors; correct?
A Correct. Yes.
Q Discovery Communications is now part of Warner Brothers Discovery; correct?
A Correct, yes.
Q Before that, they were an independent media company?
A Publicly traded.
Q Publicly-traded media company?
A Yes.
Q And they owned the Discovery Channel?
A Among other things.
Q For example, Food Network and TLC?
A Eventually, they acquired those, yes.
Q Am I correct -- I'm just asking about this agreement -- the word Oprah is nowhere in this agreement?

A I don't know about the rest of it, but in terms of this particular paragraph that you are focusing in on, it doesn't say Oprah. It says her partner Discovery.
Q So let's stroll through and you can tell me if you see the word Oprah in this agreement?
A Sorry. One second, please.
Q It's all right. We are stopping at page 6. You said you think you saw her name?
A Keep going. I just want to make sure I'm reading this. Okay. Keep going.
Q So we are at page 13, which is the end.
A Yes. Helpful.
Q Was the word Oprah anywhere in that agreement?
A No. It uses the word Discovery --
Q And --
A -- who owned the Oprah Winfrey Network.
Q So, yeah. Let's talk about that.
Discovery and Oprah, they have a partnership where they create the Oprah Winfrey Network; correct?
A Right. Correct.
Q Discovery is not owned by Oprah; correct?
A Correct.
Q They're a publicly-traded corporation or they were?
A Correct. Today they are, yeah.
Q So you have Discovery, that's a company?

A Yeah.
Q And you have Oprah, that's a person. And then they have a partnership where they make the Oprah Winfrey Network, which is OWN?
A Correct. Yep.
Q By the way, this agreement in addition to it being for a deal that didn't happen, it's also unsigned; correct?
A Correct.
Q It's also a draft; correct?
A As are most of our term sheets. Correct.
Q Okay. So let's talk about 2019.

In 2019, you were talking to Dan Fox and Bruce Campbell about an investment?
A And others as well. People on her business team.
Q Do Dan Fox and Bruce Campbell work for Oprah?
A Work with her I think is probably the way they would categorize it.
Q Do they work for her?
A I probably shouldn't get in the middle of how they describe that. Something tells me they probably would say that they work with her. So I probably shouldn't get in the middle of that.
Q They work for Discovery; correct?
A I think those two have particular roles in business development. I'm sure that there are times in which they

would say that they did work for Ms. Winfrey, and I'm sure that there are times in which they would more generally say that they -- that they work with. But I, you know, I probably can't speak on behalf of them and how they would describe themselves.

MR. SIEGEL: Madam Court Reporter, could you repeat the question, please.

(Record read.)

A It sounds like the right answer is I'm not sure.

Q Okay. So you don't know who they work for?

A I'm not sure how they would characterize it, as I have said before, and I continue to say now.

Q Did Dan Fox and Bruce Campbell commit to a 10-million-dollar investment in 2019?

A No.

Q Did they commit to leading the Series D in 2019?

A Not to my knowledge, no.

Q Did they discuss leading the Series D on behalf of Oprah with you?

A I don't think that that's the language that they would have used.

Q Did they discuss an investment on behalf of Oprah with you?

A As it relates to Discovery and the Oprah Winfrey Network.

Q I'm sorry. Did Dan Fox and Bruce Campbell discuss an

investment on behalf of Oprah in 2019?

THE COURT: You're talking about a personal investment? Can you be more precise?

Q A personal investment by Oprah.

A No. We have said over and over again that my understanding is that Ms. Winfrey invests in multiple different ways. We had the person from her personal office. That's not what we are talking about.

We are talking about Discovery slash the Oprah Winfrey Network. That's what I said from the beginning. That's what I'm continuing to say now.

Q So, did they agree to an investment by Discovery in 2019 for $10 million?

A They did not agree, no, not to my knowledge.

Q What about an investment by OWN?

A No. We -- I don't believe we had an agreement.

Q And, so, there was no investment by Discovery in OZY; correct?

A Ultimately, they did not invest, correct.

Q And there was no in investment by Oprah?

A Ultimately, no, there was none.

Q And there was no investment by the Oprah Winfrey Network; correct?

A Ultimately, correct.

Q All right. Let's talk about Live Nation.

You said last week that you thought Live Nation was going to invest in OZY?
A Yes.
Q Did Live Nation commit to investing $10 million in OZY?
A Again --
Q I will rephrase it. Did they agree to invest $10 million in OZY?
A We didn't reach agreement on a specific number, but my expectation was that that's where we would end up.
We were in the midsts of negotiations with them, including their general counsel, and led by a guy named Allen Ozfeld. And sorry, I apologize. Ultimately, led by the CEO, Michael Rapino. But he had deputized Allen to lead it.
Q Did they agree to lead the Series D?
A They certainly were going to be an anchor on it. And I think if we had gone through with them, I think we could have fairly categorized them as leading it.
MR. SIEGEL: So let's show Defense Exhibit 626.
Q You said this -- when you testified about this last week, you said this was your term sheet with Live Nation?
A Yes.
Q Under this agreement, Live Nation was only a consultant to OZY?
A That's not true.
Q Okay. I'm going to refer you to paragraph 2F.

2-F says Live Nation's participation in the festivals shall be that of a consultant only and company shall not identify Live Nation to third-parties as a participant in the festivals, including, without limitation, in advertising, promotions, and social media.

Did I read that right?

A You read that particular section right. Correct.

Q And this agreement, in fact, was to hire Live Nation as a contractor for OZY Fest; correct?

A No. Not correct. Michael Rapino wouldn't meet with me just to do that.

Q Well, I'm going to read you paragraph 2. Tell me if this is what it says:

"Company," and in this paragraph, company is OZY; is that right?

A Do you mind going back to the top? I just want to make sure if I say yes then I'm doing that having looked at the top.

Yes. Yes.

Q So, "Company hereby retains and engages Live Nation as an independent contractor to provide certain services in collaboration with the Company for the festivals as follows."

Did I read that right?

A Yes, you did.

Q And under this agreement, OZY has to pay Live Nation for

each OZY Fest; correct?
A That's not correct.
Your Honor, my instinct would be to give more explanation. Do you want me to leave it at yes, no, correct, incorrect?
THE COURT: Yes. It's a yes-or-no question.
THE WITNESS: Okay. I'll just leave it at that.
So, incorrect.
Q Paragraph 4, Subsection A, "In consideration for the services to be rendered by Live Nation in connection with this agreement, company hereby agrees" -- and company is OZY; correct?
A Yes. Correct.
Q -- "to pay Live Nation a non-refundable consulting fee in the amount of $100,000, the fee, for each festival year, being $300,000 total, during the term, and, two, reimburse Live Nation for expenses. For certainty, Company's obligation to pay Live Nation the fee will not contingent on a minimum number of festivals performed, if any, during a festival year."
Did I read that part right?
A Of the 11-page document, what you just read is a paragraph in the 11-page document.
Q So in this 11-page document, and I'm just asking about this 11-page document, just the 11 pages, is there a provision

in this document that says that Live Nation will invest in OZY?

A Yes.

Q Okay. I'll scroll through and you tell me where it is.

A Can I actually -- can someone hand me a physical copy? Something tells me given how small it is and it's a little --

THE COURT: Yes, we're going to hand you a physical copy.

THE WITNESS: I might be able to do a better job if I do that.

MR. SIEGEL: This is Defense Exhibit 626.

Your Honor, we don't have it in the binder from defense counsel.

THE COURT: Do you want to take it from the binder that I have up here?

MR. SIEGEL: Thank you, Your Honor.

THE COURT: Going forward. Anybody who's going to ask the witness to look through the entirety of a multi-page contract, please have a physical copy here.

MR. STERN: May I approach?

THE COURT: You may.

Q I'm just asking, to repeat the question, in this document, where it says that Live Nation will invest in OZY?

Just refer to the paragraph and the page.

THE COURT: Give the witness a few moments.

MR. SIEGEL: Okay.
A Great. Yeah. If we could go to page 5, the phrase actually is there. It's underlined investment offer, page 5.
Q Which paragraph are you talking about?
A Page 5, No. 11, equity option negotiation and match right. There, on page 5, it says investment offer, and it's underlined.
Q Okay. So during the term of this agreement -- this is 11-A?
A Correct.
Q During the term of this agreement and for six months following the expiration and/or termination thereof, in accordance with the provision of Section 7 above, other than a termination by Live Nation pursuant to section 7-B or D above, the exclusive negotiation period, the Company agrees to grant Live Nation a right of first negotiation to acquire sole ownership of the mark and equity interest in the Company's live entertainment business and related securities and/or assets and investment offer.
That's what you are referring to?
A Yeah. There's a lot more text beyond there, but, yes.
Q Well, so could you refer to the text where it actually talks about Live Nation agreeing to put money into OZY?
A It's interesting that we keep coming back to this. And I apologize, I'm not explaining well.

There are at least two ways in which strategic investors can invest. One is they can wire you cash --

Q If the answer is --

MR. SULLIVAN: Objection. Objection?

THE COURT: The objection is overruled. Everybody is going to take a minute.

Let me make sure I understand the question. The question is could you refer to the text, the text. The question is could you refer to the text where it talks about Live Nation agreeing to put money into OZY.

If there is text that you think is responsive to that question, you can point us to it. If you don't think so, you can tell us that.

If there are matters that you want to expand on on redirect, you will have that opportunity.

THE WITNESS: And, Your Honor, apologies just for guidance --

THE COURT: I'm not able to give -- let's ask the jury to step out for a moment.

(Jury exits the courtroom.)

THE COURT: All right.

Once again, Mr. Sullivan, I'm going to be providing instructions to the witness, not asking the witness at this point, out of earshot from the jury, any questions.

MR. SULLIVAN: Once again, I'm instructing my client

not to respond.

THE COURT: So the question was about the text of the agreement. Right. Can you point us to a place in this agreement where it says X and you brought our attention to this paragraph about a six-month right of negotiation. There was a follow-up question about whether the text says anything about the payment of money.

The answer is in the text or it's not. It's either yes, that shows up in the text, or no, it doesn't. It is not an opportunity to make a long speech about oral conversations that happened separate and apart from this document.

If your lawyers believe that those oral conversations are important, they're going to bring them out on cross-examination.

This is the last time that I am going to give what I think are these very clear instructions. You need to answer the questions that are asked. If you can't answer them, you can say that. But you can't answer the question you wish you were asked rather than the question you were actually asked.

All right. Let's bring the jury back in.

MS. GILBERT: Actually, can we have a brief bio break, please?

THE COURT: A brief what?

MS. GILBERT: A brief bio break.

THE COURT: We're going to go until about 4:10 and

then we will break. Let's bring in the jury. It's about 18 minutes from now.

MS. GILBERT: Judge, it's freezing over here.

THE COURT: We've had a number of questions about the thermostat. If you want to step out, you can.

MS. GILBERT: I have to go to the restroom.

THE COURT: You may step out, but we are continuing with the testimony.

MS. GILBERT: Okay.

THE COURT: All right. The jury needs more time, which means we are going to break here for five minutes. We will see you all shortly.

MR. STERN: Judge.

THE COURT: I will just observe for the record that Mr. Sullivan is disregarding my order not speak to his client.

Mr. Sullivan, I just watched you put your arm around your client and speak into his ear, correct?

MR. SULLIVAN: No. I put my arm around him. I didn't say a word to him.

THE COURT: I saw you speaking to him.

MR. SULLIVAN: I absolutely did not. I will go under oath right now.

THE COURT: I'm going to ask if anybody who was closer to what happened is -- I see the Government has a number of people in the audience. We will take this up at the

end of the day.

MR. SULLIVAN: Make up stuff now.

THE COURT: But for the sake of the record, I saw what I saw.

MR. SULLIVAN: And for the sake of the record, I did what I did. I put my arm around him. I said not a word to him. I went to the bathroom. I said not a word to him.

Does the Court want to know what I did in the bathroom?

THE COURT: I do not.

MR. SULLIVAN: Not a word to him.

THE COURT: Let's have the witness return to the witness stand.

( Witness takes stand.)

THE COURTROOM DEPUTY: All rise.

(Jury enters.)

THE COURT: Please be seated, everyone.

Mr. Siegel, you may continue.

MR. STERN: Your Honor, if I may, before we proceed, I believe counsel for OZY is still not back.

THE COURT: We are waiting on one more lawyer. I'm sorry, who has just joined us, Mr. Siegel.

MR. SIEGEL: Thank you, Your Honor.

BY MR. SIEGEL:

Q Mr. Watson, am I correct that you normally worked until

midnight or later when you were at OZY?
A Yes. I think then, yes.
Q So at 10:00 p.m. you would still be working?
A Yes. Yes. In general, yes.
MR. SIEGEL: I'm showing the witness and everybody, it's in evidence, Government Exhibit 5091.
Q Mr. Watson, do you recall being asked about this document with Mr. Sullivan?
A I do.
Q And this is a draft of an e-mail; is that right?
A I believe it is.
Q I'm going to show you 5092, which is also in evidence.
This is the final version of that e-mail?
A I believe it may be, yes.
Q You testified that you did not have time to review the draft because the draft was sent at 12:40 a.m. and the final was sent at 1:16 a.m.; correct?
A Incorrect.
MR. SIEGEL: Mr. Menz, would you hand me the transcript, page 3306.
Could we switch to the Elmo just for the Court and counsel for the moment and the witness.
THE COURTROOM DEPUTY: Can you see?
MR. SIEGEL: Your Honor, am I supposed to show the jury line 16 to 18 of page 3306 of the transcript?

MR. SULLIVAN: Objection.

THE COURT: You said objection or no objection?

MR. SULLIVAN: Objection.

MS. GILBERT: Objection.

THE COURT: Come to the sidebar.

(Sidebar held outside of the hearing of the jury.)

(Continued on next page.)

(The following sidebar took place outside the hearing of the jury.)

THE COURT: I'm going to start calling for objections that are one-word objections: Hearsay, no foundation. You can give me the number of the rule so we don't have to have all these sidebars.

MR. SULLIVAN: Improper impeachment. The question was about the e-mail. He is impeaching about the attachment to the e-mail. Different question.

MR. SIEGEL: No, I'm not.

THE COURT: The objection is overruled.

(End of sidebar conference.)

(Continued on next page.)

(In open court.)

THE COURT: Can we ask the -- now that it has been long enough time, I forgot what it was -- the prior question before.

MR. SIEGEL: Sure.

BY MR. SIEGEL:

Q You testified that you did not have time to review Government Exhibit 5091 before the final was sent because the draft was sent at 12:40 a.m. in the morning and the final was sent at 1:16 in the morning.

A Incorrect.

MR. SIEGEL: This is all. So, Your Honor, I ask to publish this to the jury.

THE COURT: You may.

Q All right. So I'm reading lines 16 through 18 of the transcript, 3306.

Between 12:40 a.m. in the morning and 1:16, did you have time to review the attachment on this thing?

Answer: I did not.

That was your testimony?

A Yes, I believe that was.

Q Okay.

MR. SIEGEL: We can turn off the ELMO. Thank you, Mr. Jackson.

THE COURTROOM DEPUTY: Yes, sir.

Q Mr. Watson, do you live in Brooklyn?
A Not at all.
Q You live in California; correct?
A All the way through.
Q And we have talked about this before. California is Pacific Time; correct?
A Correct.
Q And Pacific Time is three hours earlier in Eastern Time?
A Correct.
Q So let's go back to Government Exhibit 5091. All right. So you testified about this being 12:40 a.m.
Can you read the three letters after 12:40 a.m.?
A EDT.
Q And EDT is Eastern Daylight Time?
A I believe so, yes.
Q So where you were in California, this was actually 9:40 p.m.?
A Why are you assuming I was in California?
Q Well, you lived in California.
A But I travel. I'm in the Million Mile Club on United. I told you that even during the pandemic I traveled three to four times a week. I traveled to D.C. I traveled to Atlanta to L.A., to Miami.
Why are you assuming that I'm here?
Q That's a fair question.

Do you know where you were on September 15, 2020?
A I don't.
Q In California, on September 15, 2020, this would have been sent at 9:40 p.m.?
A I believe that's correct, yes.
Q And the 1:16, that would be 10:16 p.m.?
A Correct. California time. Correct.
Q And those are times that you would still be working?
A On many, many different things, yes.
Q And the subject for Government Exhibit 5091, it says, Please review draft at the beginning; correct?
A Correct.
Q And that's in all caps; correct?
A It is correct.
Q Are you claiming that Mr. Rao was trying to hide this from you?
A Did I say that?
Q I'm asking you if you're saying that?
A I don't remember saying that.
Q No. I'm asking if you're saying that right now? Is that your view?
A No, I'm not saying that.
Q All right. Now, you've talked a lot about OZY's successes, and I would like to discuss OZY's performance in the period 2018 to 2021. You talked about OZY having an

interview with Bill Clinton; is that right?
A Yes.
Q And that was before --
A And apologies. Can you just repeat that last thing? I just missed it for a second.
Will you start over again, just start --
Q You testified about OZY having an interview with Bill Clinton?
A Even before that. Sorry. You just gave a timeframe. I want to make sure I'm speaking to the timeframe.
Q I'm going to ask about 20 -- well, I'm trying to understand 2018 to 2021.
A Okay. All right.
Q So you testified about OZY having an interview with Bill Clinton?
A Prior to that.
Q That was prior to 2018?
A Yes, it was.
Q And you talked about Bill Gates being involved in the newsletter?
A Yes.
Q That was also prior to 2018?
A It began prior to it and I think he continued after that.
Q You claimed that OZY introduced Simone Biles, the Olympic gymnast, to the world?

A I don't think I would use that language. I think I would say that we profiled here before she was a household name.
Q But that was before 2018?
A I don't remember, with regard to her, exactly when, but -- but I feel like it may have been before 2018, yes.
Q Isn't it right That Ms. Biles won Olympic gold in 2016?
A I don't remember for sure.
Q You claimed that OZY introduced Trevor Noah, the former host of the Daily Show. To the world?
A I have to say incorrect, because that's not what I said, and that's not the formulation that I have used or would use.
Q Well, when OZY first profiled Mr. Noah, that was before 2018?
A I'm sure it was, yeah.
Q And Amanda Gorman, when OZY wrote with Amanda Gorman for the first time, that was also 2018?
A I think so. I think Amanda was an OZY Genius award-winner in 2017, I believe. I believe she was a freshman. She was a freshman in college, I think.
Q And you talked about profiling Aaron Judge before he was a household name?
A Correct.
Q That was also before 2018?
A I apologize. I don't mean to be slow on this, but you know we did over 10,000 profiles. So -- but, yes, I assume it

was before 2018.
Q And you talked about OZY Fest; correct?
A I love OZY Fest, yes.
Q As we talked about before, the last in-person OZY Fest was 2018?
A Correct. Of a full OZY Fest.
As I mentioned before, there's the run-up to 2019 and then we obviously did the virtual festival in 2021, and we were planning on one for 2023 before this thing happened.
MR. SIEGEL: I'm sorry. Madam Court Reporter, would you repeat my question.
(Record read.)
Q So, in person OZY Fest.
A Yes. Full in-person OZY Fest.
Q At the beginning of 2018, OZY was on the verge of not being able to make payroll; correct?
A At the beginning of when?
Q 2018.
A Several times, yes.
Q OZY often could not pay its vendors?
A That's a complex answer. So, yes, to 95 percent. No to 5 percent.
Q So, yes to 95 percent, you sometimes could not pay your vendors?
A No. The opposite. 95 percent of the vendors we

regularly paid without any hiccups or issues. Probably over 5 percent of our vendors who we might be slow on one way or another.

Q Vendors would call Janeen Poutre to scream at her about OZY's non-payment?

A No. I don't -- I don't -- I would be surprised if any of our vendors actually screamed. That would be disappointing if that was true. I doubt that they did that.

Q OZY sometimes could not pay its rent?

A No. That's not true. Okay.

MR. SIEGEL: All right. I'm going to show just the witness, please, Government Exhibit 5011.

Q Mr. Watson, who is this e-mail from?

A It looks like it is from Janeen.

Q To whom?

A To me, copying Samir.

MR. SIEGEL: Your Honor, I move to admit Government Exhibit 5011.

MR. SULLIVAN: Objection.

Hearsay.

THE COURT: Overruled.

THE COURTROOM DEPUTY: Admitted, Your Honor.

THE COURT: It's admitted.

THE COURTROOM DEPUTY: Okay.

(Government's Exhibit 5011 received in evidence.)

Q And the subject here is urgent pay OGA winners. OGA is the OZY Genius Awards; correct?
A Correct. It's our students.
Q And at the bottom, you write JP. That's Janeen Poutre?
A Yes.
Q "Please pay the OGA winners tomorrow. We are going to have too much drama if we do not. My understanding is that adds up to 10, 15,000, correct?"
And then my question is did I read that right?
A Very well. You read it right.
Q Then Ms. Poutre responds, and you respond again. And number two, you say, "Please do not pay boredom therapy. Why in the world are we paying them?"
Is that correct?
A Yes, that is correct.
Q And then number three, you say, "Please pay freelancers instead or at least the key ones"; correct?
A Yes, I want to prioritize paying our team.
Q Number four, FastPay, what more can we get from them this week, question, exclamation point.
Did I read that right?
A You did.
Q And FastPay, that was a lender; correct?
A They were kind of a hybrid, but, yes, I think part of what they did was lend; correct.

Q By October of 2019, OZY was paying tens of thousands of dollars of interest to lenders, yes or no?
A I don't know.
Q You don't know whether each day OZY was paying tens of thousands of dollars --
A I significantly doubt that. That doesn't sound accurate.
MR. SIEGEL: All right. I'm going to show just the witness Government Exhibit 6076.
THE COURT: I'm sorry. Was the question finished, whether OZY was paying tens of thousands of dollars to lenders?
MR. SIEGEL: Uh-hum. Yes.
THE COURT: Okay. Yeah. You can continue.
MR. SIEGEL: I'm showing just the witness, please, Government Exhibit 6076.
Q Mr. Watson, who is this from?
A This is from Tripti Thakur to Samir and myself.
MR. SIEGEL: Your Honor, I move to admit 6076.
MR. SULLIVAN: Objection, hearsay.
THE COURT: Overruled.
MR. SIEGEL: Your Honor, is this admitted?
THE COURT: It is admitted.
MR. SIEGEL: Thank you.
(Government's Exhibit 6076 received in evidence.)
Q All right. And in this e-mail from Ms. Thakur, she has a

list of outbound cash; correct?
A Yes, that's what it looks like.
Q And that includes $51,000 of interest; correct?
A In this one particular note, yes.
Q And it says, "Remaining expected outbound includes another $132,000 of interest"?
A Yes, in this one particular note. Yes.
Q And that continued into 2020 when OZY still sometimes had some -- excuse me. That continued into early 2021 when OZY was still paying tens of thousands of dollars each day to lenders?
A I don't know that to be true, but I hear you saying that, but I don't know that to be true.
Q Well, Mr. Watson, isn't it true that you received daily e-mails about OZY's cash position?
A You're saying across the ten years that OZY existed or what period? Just so I'm responsive to your question.
Q In the early 2020, late 2019 period.
A I'm not sure. I doubt that I received daily.
I suspect that I received at least one to two a week. And I'm sure that I had a conversation on critical days. So, like, on the days that payroll was due, just making sure that we were good and we were set on that, that there wasn't going to be an issue, I'm sure I probably dug deeper just to make sure there were no hiccups.

Q And in the e-mails you received, you were told about all the interest OZY was paying?
A I apologize. I just said that I don't think that I got daily e-mails. And I mentioned before that I had 301,000 unread e-mails, which basically means that one out of three or one out of two of my e-mails were unread.
MR. SIEGEL: Okay. So Government Exhibit 6119, which is in evidence, just zooming in for the jury.
Q This is February 10, 2020. And it lists outbound on February 11th. And below that it says daily interest $78,000.
Did I read that right?
A I believe you're reading it correctly, yes.
Q And in this period, OZY sometimes only had enough cash to survive for a few weeks?
A I apologize. Which period are you referring to? In early 2020?
Q Yeah. Late 2019, early 2020.
A I think that's right. I think our cash crunch -- sorry. I think it depends on how you estimate it and what you chose to pay. But it is true that we frequently had less than $2 million or even $5 million in cash. So we had to be very thoughtful about who we were going to pay first and how.
Q You just talked about having less than 2 million. At this point, on February 10th, you actually had less than half a million?

A Again, in -- not trying to be difficult at all, but understand that often --
Q It is a yes-or-no question, Mr. Watson.
A This is incomplete. This does not reflect all of our bank accounts and this doesn't reflect all of the cash we had.
Q In 2018, you had two shows on PBS; is that right?
A Yes.
Q After 2018, is it right that you never sold another show to PBS?
A No. That is not the case.
Q What show did you sell to PBS?
A I believe we sold a show called Around the World, which we ultimately did not move forward with them on.
Q When you say you sold a show, this is a show that never happened?
A Correct. So, they are windows in which --
Q I'm just asking yes or no. It never happened?
A So, no, it did not air.
Q Okay. In 2019, you sold a show to Hulu?
A We did.
Q And that was Defining Moments?
A Defining Moments with OZY.
Q And there was never another show with Hulu after that?
A Not that got completed. Correct.

(Continued on next page.)

BY MR. SIEGEL: (continuing.)
Q And Defining Moments never got a second season?
A We had discussions and absent some of the --
Q I'm sorry, Mr. Watson. My question was --
MR. SULLIVAN: Objection. He is cutting off the witness.
THE COURT: The question is did Defining Moments ever get a second season.
Can you answer that yes or no?
THE WITNESS: I believe that we had an oral agreement for a second season, I think, for a combination of reasons.
Q Was there a second season? Did it happen?
A Sorry, there was not a second season.
MR. SULLIVAN: Objection to cutting off the witness.
THE COURT: The objection is sustained. I think we have some -- we may be talking past each other.
Are you asking whether there was contract for the show or whether the show got made?
MR. SIEGEL: I'm asking, did it happen, was there a second season?
THE COURT: Did what happen, though? Did the contract happen or did the show happen.
Q Was there a show for a second season of Defining

Moments?
A There was not -- there was not -- so, there was not a second season -- I believe that there was an agreement, but I believe we ultimately did not make a second season --
Q Was there a show?
MR. SULLIVAN: Objection. He keeps cutting off the witness.
THE COURT: The objection is overruled.
The witness should please answer the question that's asked. The question was about whether a show got made.
A No.
THE COURT: Okay. Next question.
Q In 2019, you had one show with the Oprah Winfrey Network?
A Yes, correct.
Q And that was Black Women OWN the Conversation?
A Yes, it was.
Q And other than Black Women OWN the Conversation, there was never another show that got made with the Oprah Winfrey Network?
A Are you counting season two, or you're not counting season two?
Q Other than Black Women OWN the Conversation, not asking about additional seasons, was there another show, other than

Black Women OWN the Conversation, that got made with the Oprah Winfrey Network?
A Yes. After we won the Emmy, we did a special together during COVID.
Q What was that called?
A I think they called it OWN Spotlight.
Q And so that was 2020?
A That was 2020. It was during COVID. I remember that we had a number of women from the New Jersey area, including one woman who was -- COVID had been very difficult for her.
Q The original contract for Black Women OWN the Conversation said that if there was a second season, OWN would may for 75 percent, correct?
A Perhaps, I don't remember the exact numbers, but perhaps.
MR. SIEGEL: Let's look at Government Exhibit 2001.
(Exhibit published.)
Q And on page 2, paragraph 4, it says: OWN shall have two consecutive exclusive options, each an option, exercised on OWN's sole discretion to order additional episodes of the talk series, exercisable six months from the initial exhibition of the final episode of the immediately preceding episode order. In the event a first option is exercised, OWN shall pay 75 percent of the OWN-approved production

budget. And Company shall be responsible for the remaining 25 percent of the OWN-approved budget project.

Did I read that right?

A That looks right.

Q And so this first option, that's the second season, correct?

A I probably candidly would have to spend more time at this because we are moving swiftly through things, but happy to take your word for it and assume that that's the case.

Q And OWN originally, in this first agreement, says that they'll pay 75 percent, correct?

A You're saying in this agreement that you and I are looking at together right now, it says that OWN will pay 75 percent?

Q For that first option.

A Yes, that's -- that is what it says.

Q And OZY would only have to pay 25 percent, correct?

A Correct, that is what it says.

And do you mind if I look at -- can you go -- can you go back to the whole thing and let me look at the top? I just want to make sure that I'm -- I'm properly capturing this. Okay. Fantastic.

THE COURT: You can blow up the title and the first paragraph.

THE WITNESS: Okay. I just wanted to make sure

I'm being responsive, okay.

Q When you had the contract for the second season, that had to be renegotiated so that OWN would only have to pay 65 percent and OZY would have to pay more of 35 percent.

A I would have to look at that. If I remember correctly, it was different by year, but that might have been true for season two and I think that that agreement contemplated a season two, a season three, and maybe even a season four. And I think it had different figures depending on the season.

MR. SIEGEL: Okay. Let's look at Government Exhibit 2015.

(Exhibit published.)

A I think this is only a piece of it. I don't think this is the whole thing. I think this is -- my apologies, I think this is only a piece of it.

THE COURT: Do we have a question? Let's wait for a question.

MR. SIEGEL: Just a second, I'm sorry.

Q All right. 5042-A, I'm sorry, this is what you are talking about where they're exercising the multiple options and laying out the payments?

A I'm not sure. Again, I'd have to -- I just -- I'd have to spend some time with it, but my recollection was that either the first agreement from '29 (sic) or the second

agreement from 2020, contemplated multiple seasons and I thought that the numbers shifted. But with OWN in particular, there was a lot of e-mail traffic and so a lot of the modifications happened not just in the agreement, but happened in real-time with a note. And so they might say this is what we agreed to in the agreement, but I want to shift filming to start here instead of there, or I know we said eight episodes, but I really want ten, or I know we said this, but I want that. So there was -- they were very, even more so than most, they were very active with e-mail modification.

Q Mr. Watson, when you were testifying on direct, you were shown a number of contracts from 2017, 2018, correct?

A I believe so, yes.

Q And you were able to recognize those?

A I was, yes.

Q And yet for Oprah, the Oprah Winfrey Network, one of your most important contracts, you're not sure what the contract is?

A I don't -- I don't believe that's what I just said. Is that how -- I don't believe that's what I just said.

Q What I am trying to figure out, is this the contract, 5042-A, which has this multiple options, as you described --

MR. SULLIVAN: Objection, Your Honor.

Q -- or is it 2015?

MR. SULLIVAN: The witness said he had to spend some time with it.

THE COURT: The objection is sustained, but not for the reasons articulated.

Let's have another question, and I'll bring you to the sidebar if necessary.

Q Focusing on Government Exhibit 2015 for a moment, this says that -- and just reading the first paragraph: OWN, the Oprah Winfrey Network, is pleased to provide you with this official notice that is exercising its first option to engage the services of OZY Media, Inc., ("Producer,") to produce eight additional episodes of the talk series entitled Black Women OWN the Conversation, pursuant to paragraph 4 of the deal memo dated as of April 26, 2019, ("Deal Memo,") between OWN and producer agreement.

Did I read that right?

A I believe you did, yes.

Q This will also serve as an amendment of paragraph 4 of the deal memo such that Producer agrees to make a one-time additional cash contribution of $300,000 to the production budget. Consequently, this contribution shall change the overall split of the production budget resulting in a contribution from Producer of 35 percent and a contribution from OWN of 65 percent.

Did I read that right?

A Yes, I believe you did.
Q So under the first agreement we looked at, under the first option, it was going to be 75/25, correct?
A Correct, yes.
Q And then when they actually exercised the option, you have to renegotiate it to make it 65/35, correct?
A Or said differently, we chose to renegotiate it, but yes.
Q You chose to pay OWN an additional $300,000?
A Apologies, we're not paying OWN. We're putting money into the budget for a show that we believe in that we think's important that these stories be told and we want them told sooner rather than later. So if that means we've got to put more money behind black women, then that's what we're going to do.
Q And there was never a season three of Black Women OWN the Conversation?
A There was a season three.
Q When was season three?
A Season three, I believe, was in 2022, I think.
Q Was that on OWN?
A It was on OWN, yeah. It's online now and it's on HBO Max.
Q When Oprah Tweeted about Black Women OWN the Conversation, you said that was a big deal for OZY?

A Yeah. It was -- it was a good moment. I was grateful.
Q And you said that that Tweet in combination with commercial, you thought was worth over $50 million?
A Based on the Weight Watchers and some of the other analysis we went through, yeah.
Q So I am going to show you Government Exhibit 6121-A.
(Exhibit published.)
Q This is the Oprah Tweet you are referring to on the first page?
A Yes, it is.
Q And am I right that this Tweet was liked by 1,131 people?
A At this moment. I have a feeling that this got taken like right upfront. I don't know what it would be today or what it was an hour after that, but in the immediate aftermath, yeah, it had 1100 right out of the gate.
Q And it was re-Tweeted by 118 people?
A Yeah, right out of the gate, yup.
MR. SIEGEL: Mr. Menz, I'm sorry, can you just confirm if 6121 is in evidence?
Q I am going to show you Government Exhibit 6121.
(Exhibit published.)
Q This is an e-mail that that was attached to. This is from February 2020, correct?
A It looks so, yeah. I'm -- yeah, it looks so, yeah.

February 11, 2020.
Q So that's five months after the Tweet?
A Yes.
Q The commercial that you talked about by Ms. Winfrey, that's an 82-second-long commercial?
A That's a great way to say it, yeah, I like that, it sound good, yeah, 82 seconds, 1 minute and 22 seconds.
Q And so that's, at $50 million, that's about $600,000 a second?
A I'm not sure on the math of that, but I'm willing to stipulate that that -- that sounds -- that sounds right.

MR. SIEGEL: Could we take this, unpublish for one second? I want to pull up an exhibit.

Can we publish this with audio?

THE COURTROOM DEPUTY: In evidence?

MR. SIEGEL: It's in evidence. This is Defense Exhibit 552.

(Exhibit published.)

MR. SIEGEL: I am going to hit play.

(Video played; video paused.)

MR. SIEGEL: So I'm pausing at five seconds.

Q So that was about $3 million worth of commercial?
A Are you saying you don't value Oprah Winfrey's validation? You don't think that's -- that's almost priceless? Like?

Q Are you asking me to testify, Mr. Watson?
A Yeah, I think I would happily have paid that or more to have Oprah Winfrey not only celebrate our work together, but also highlight Take on America, Breaking Big, and several other shows. That was a good -- that was a good moment for us. That was worth a lot.
MR. SIEGEL: So let's watch the rest of it.
(Video played; video paused.)
Q You've talked about what you've called a barter, and that commercial was the most valuable of your so-called barter transactions?
MR. SULLIVAN: Objection to "so-called."
Q What you've called barter?
THE COURT: So let's have another question.
Q So you've talked about what you have called barter, correct?
A As a board, we agreed that barter was important and I've talked about our barter or in kind relationships. I think the IRS calls it barter, but sometimes people call it in kind.
Q During your testimony, you talked about that barter or in kind?
A I believe I did, yes.
Q And that commercial that we just watched was the most valuable of the in kind?

A I'd say it was in the big three. I'd say iHeart and BBC also were game changers, but the truth of the matter is nothing's going to compare to Ms. Winfrey saying OZY and OWN together are doing that. That's just a show stopper.
Q Was there a contract where this was made in payment for something, the commercial?
A No. There was not a contract for this. There was a contract for Black Women OWN the Conversation.
Q And as a result, Ms. Winfrey made this commercial?
A Correct.
Q In 2020, you started The Carlos Watson Show?
A We did, yes.
Q And you published that yourself on YouTube?
A Initially, on YouTube and ultimately, on Amazon Prime, as well, yes.
Q And Mr. Watson --
A And apologies, we also syndicated it on iHeart. I forgot about that. We actually gave radio excerpts so you could listen to it on iHeart.
Q Is there a contract for that?
A There is, yes.
Q Is that admitted in evidence?
A I'd be happy to spend time afterwards together and find out where it is. I'm sure it's there.

(Continued on following page.)

CROSS-EXAMINATION (Continuing.)

BY MR. SIEGEL:

Q Okay. Mr. Watson, is it your belief that OZY's failure was put in motion by Ben Smith's article?

A I don't believe that OZY's failed. I believe it -- that what's happened has been transparent and has been unfair. I think if folks in Brooklyn were prosecuted by prosecutors in California, they'd probably feel like I feel.

I hope to build OZY back. I'm grateful that not a day goes by that I don't get e-mails from readers asking when we're coming back. And I am hopeful that on the other side of this, if there is another side of this, and I don't take that for granted, I'm hoping that OZY will be around for a long time, but with a different kind of spirit and soul. And I'm hoping for a lot of people that have been up against it, OZY will be that safer harbor. OZY will be that person who will tell the truth no matter what.

Q And you talked about "this."

"This" being this case?

A This being the prosecutors in Brooklyn prosecuting --

THE COURT: Objection, sustained. Let's have another question.

Q Is it your belief that that was set in motion by --

THE COURT: What's "that"?

MR. SIEGEL: I'm sorry?

THE COURT: Is it your belief that that was set in motion. What is "that"?

MR. SIEGEL: The disruption to OZY.

A I believe that Ben Smith, who lives in Brooklyn and who tried to buy me five times and who didn't -- who wasn't successful in that, and who had $23.5 million worth of stock options in play in late 2021, knew that if he knocked me out by smearing me and smearing my name with seven front-page stories in The New York Times in seven days that BuzzFeed, who was about to die, would be able to do a backdoor IPO. And they did that.

And as soon as he collected his $23.5 million, he promptly did what? Started a company that sounds an awful lot like OZY. The newsletters he said he never liked, now all of a sudden he has newsletters. The TV shows he thought were just a sideshow, now he's pursuing TV.

Q I think we are going a little far field here, Mr. Watson.

You think Ben Smith did something wrong?

A No, I know. That's why we're suing him for $2 billion in federal court.

Q And you don't think that's fair?

THE COURT: Sustained.

Q You don't think what Ben Smith did was fair?

A I think The New York Times has ethical guidelines and it specifically mentions that media reporters should not be

allowed to report on companies that are also a competitor to something they hold an interest in.

He literally breached their main example. Like literally, not like casually or metaphorically, he literally did the thing that they use as their one example for the whole company that you cannot do.

Yes, I think he did it knowingly. I think he did it intentionally. And I've seen e-mails subsequent to that, that shows that he and Jonah Peretti were hoping that people wouldn't notice and that I wouldn't talk about it.

Q But when Ben Smith wrote that Samir Rao impersonated Alex Piper, that was true?

A That was true, and I confirmed to him that it was true, yes. But that's not all that he wrote.

Q That really happened, correct?

A That a hundred percent happened, correct.

Q And that really was a fraud, correct?

A I don't know that that was a fraud, but I know that Samir impersonated someone and should not have.

Q You don't think it was a fraud for Samir to impersonate someone on a call with Goldman Sachs as part of an investment deal?

A I don't believe it was part of an investment deal. I believe, as I said before, it was a reference call. And I believed at the time, although he subsequently said different,

I believed at the time what he told me was true, which was that he was having a significant mental health issue.

THE COURT: Sorry, a reference call for what?

THE WITNESS: A reference call for our deal with them, for our investment deal with them. We'd signed -- we'd signed the term sheet on January 18th. We'd gone through eight other reference calls that had all gone fine that they had sent me notes on. They had hired E&Y to go through stuff. They hired lawyers to go through stuff.

THE COURT: You've answered my question.

THE WITNESS: Yeah.

THE COURT: You can ask another question, please.

BY MR. SIEGEL:

Q So there's been a lot of discussion about revenue in this case, and I want to talk again about revenue.

We took the board down, but the numbers you had on the board, that had a breakout for barter, correct?

A For some major barter deals. I didn't put all barter in there, but, yes for some major deals.

Q And the totals that you got to, that included barter?

A Correct, it did, yes.

Q And those were also all labeled gross revenue, correct?

A Correct, they were.

Q And that means it does not consider discounts, correct?

A It means it's -- correct. It's before discounts are

applied, correct.
Q So, for example, if you have -- if you offer to sell something for 4 million, the other side and you negotiate, you sell it for 2 million, that would be 2 million of net, 4 million of gross?
A Correct, kind of sticker price and kind of walk-away price, yep.
Q So, gross revenue can be much bigger than actual money coming in, correct?
A It typically is for startups, yes.
Q So, for the PBS contract we looked at, Defense Exhibit 25, you said that was $3 million gross and 600-thousand dollars net. Correct?
A Correct. A little more than 3 million, but yes, roughly correct.
Q And so the actual money coming in from PBS was only about one-fifth of that 3 million, correct?
A Correct. We were taking a significant discount in order to get in business with PBS, correct.
Q What was OZY's 2017 revenue if you only consider what customers actually agreed to pay OZY in money? So not barter, not gross, but actually adding up the money that customers were agreeing to pay, what would the revenue be for 2017?
A I don't know. It's -- I don't know, but I'd be happy to spend some more time on that.

That's not the way I've thought about it before and that's not the way our investors think about it. But if that would be a helpful exercise, you know, I'd be happy to spend some time on it.

Q Well, I am going to put up Government Exhibit 1010.

(Exhibit published.)

Q And this is the 2017 tax return.

For tax returns you have to know how much you actually make in money, correct?

A I think tax returns tend -- tax returns and management accounting, whether for OZY or for Apple, are not the same thing.

So --

Q Mr. Watson, let me repeat my question.

For tax returns you actually have to have an understanding of how much money is coming in, correct?

A For a portion of it. Tax numbers, as I understand it, are consistently different than management accounting. And so you both have to understand what the tax numbers are because sometimes they want even more information and sometimes they want less.

So, they are apples and oranges, not just for OZY, but for every company, private or public.

Q And when it says gross receipts or sales, that's asking for the total of all the receipts coming in --

A I actually --
Q -- or sales?
A I apologize, I spoke over you. Sorry.
Would you say that again? I apologize.
Q When it's asking for the gross receipts or sales in this first line of your tax return, it's asking for the total amount of the business's receipts or its sales?
THE COURT: Sustained.
Q All right. Well, so let's move past 2017. Let's talk about 2018.
If you only consider what customers actually paid in cash, money, what was OZY's revenue for 2018?
A I'm not sure. But, again, I'm happy to do that, and I'm sure it's not that hard and I'm sure I could figure it out. But we wouldn't do that and investors wouldn't do that.
Q You're not sure, you're not sure.
2019, actual money that customers were agreeing to pay OZY in money?
A In money, just so I'm clear, in money you are saying cash? Is that what you're saying when you keep saying "money," meaning that you don't consider in-kind to be --
Q Exactly.
A -- a value?
Q Exactly.
A Okay.

Q Money.
A That's a different world. I haven't spent time in that world. What my board asked me about consistently --
Q If you don't know, the answer is you don't know.
A Yes, that was not something that we as a Board --
Q If you don't know, you can just say you don't know.
THE COURT: Objection. We can't have everybody talking over each other.
Let's have another question, please.
BY MR. SIEGEL:
Q 2020, if you only consider money that customers are actually agreeing to pay you, what would the revenue be?
A Again, that's like saying if Apple only considers computers and not phones and watches, like that's not a real way to think about Apple. Apple thinks comprehensively. OZY thinks comprehensively. We think about people who are --
THE COURT: Sir, if you don't know the answer to the question that's been asked, you can just say "I don't know" and we'll have another question.
A Yes, I don't -- I don't know at the moment.
Q Mr. Watson, you were the CEO of OZY?
A I was, yes. I was and am, yes.
Q And in 2018 to 2021 you needed to run OZY's business, correct?
A Yes, in concert with the Board and our lawyers and our

investment bankers and our team, yes.

Q And you, as part of that, need to make sure that bills are paid, correct?

A Ultimately, yes. There's some divide-and-conquer and that wasn't how I spent the bulk of my days, but ultimately I needed to make sure that people got paid, correct.

Q And you're talking about money versus barter in the world you lived in, but in the world you lived in you got to pay your bills in money, correct?

A Incorrect. I paid many of my bills in barter, as I've said before. And I'd be happy to give you a list of 20 or 25 off the top of my head.

Q You had to pay rent in money?

A At times, that's a great example. We actually paid some of our rent in barter. I think we probably paid two years' worth of rent in barter.

But keep going, yeah. That was a good example for where we paid with barter.

Q So, you got an Oprah commercial as barter, correct?

A Part of that was cash, part of that was barter, correct.

Q Could you go to your landlord and say: I can't pay, but here I'll give you this Oprah commercial?

A Or you could say --

Q I'm asking my question.

A That was not the barter deal that we struck, but I'd be

happy to give you more color on the barter deal that we struck with --
Q Could you go to your landlord and say: Times are tough, here's an Oprah tweet, I'll pay you with an Oprah tweet?
MR. SULLIVAN: Objection. Objection.
THE COURT: Sustained.
THE WITNESS: Okay. All right.
Q Well, I want to understand this, Mr. Watson.
If I want to sell you my pen and I say: My pen is $5. And you say: I will give you a dollar for that pen. And I say: You got yourself a deal. I give you a pen, you give me a dollar.
Can I go tell investors that I just made $5?
A Yes, if you were Walmart or Amazon --
Q Yes or no.
A Yes.
Q Okay.
A If you were Walmart or Amazon you'd say you'd book $5 for gross --
Q Mr. Watson, yes or no.
A -- and a dollar in net.
Q Mr. Watson. Mr. Watson, just yes or no.
If I say I want to sell you my pen for $50 million, and you say: I will give you a dollar. And I say: You got yourself a deal. I give you a pen, you give me a dollar.

Can I go tell investors that I just made $50 million?
A I doubt it. I doubt it.
Q Now, I want to understand how profit works with this discount concept.
So, let's say I buy a pen for $5. I offer to sell it to you for $10. We agree that I'm going --
A Sorry, I apologize. Would you start again? I just want to make sure.
Q I buy a pen for $5.
A Okay.
Q I offer to sell it to you for $10.
A Okay.
Q You say no, but we agree that you'll buy it for one dollar.
A Okay.
Q We do that deal. So I have $4 less than I started, correct?
A Sounds like it, yep.
Q But I have ten dollars of revenue?
A Remind me again how you got there?
Q Yes. I offered to sell you the pen for $10.
A Right.
Q You say no. But I say okay, I'll give it to you for a dollar. And now we've -- I've given you a pen, you've given

me a dollar. I've lost $4, but I have $10 of gross revenue.

A That's wrong.

But, again, you've got to give me guidance as to how much color you want me to give here. But that's clearly wrong.

Q So when I had the example at the beginning --

THE COURT: Come to the sidebar for a moment.

Let's have the jury step out for about five minutes, or as short as possible.

(Jury exits.)

(Sidebar held.)

(Continued on the following page.)

(Sidebar conference held on the record in the presence of the Court and counsel, out of the hearing of the jury.)

THE COURT: You and the witness are about to get into an argument about what the word "revenue" means.

MR. SIEGEL: Well, he's testified about what he understands revenue means.

THE COURT: Right.

MR. SIEGEL: And what he told investors it means. So --

THE COURT: So frame the question by reference to that. If --

MR. SIEGEL: But he's saying this is the concept he believed in.

THE COURT: Right.

MR. SIEGEL: And I think I'm entitled to point out that the concept is absurd.

THE COURT: What is the concept? How did he describe the concept in your recollection of the testimony?

MR. SIEGEL: That if you sell something for -- if you offer something for 5 --

THE COURT: Oh, that there's a difference between gross and net revenue before you even get to the concept of profit?

MR. SIEGEL: Yes.

THE COURT: And gross revenue is whatever the pre-discounted price was.

MR. SIEGEL: And he said yes, you can say your revenue is $5.

THE COURT: Okay. I'm not sure that's coming through all that clearly. I didn't understand it.

I'll let you pursue this road, but you might want to do it by reference to whatever actual answer he gave, like frame that answer from the transcript.

MR. SIEGEL: Sure.

THE COURT: And then we can have a conversation that I think we are all on the same page as to.

MR. SULLIVAN: I would just add if he's going to use hypotheticals like that --

THE COURT: Right.

MR. SULLIVAN: -- the witness has to have some leeway to explain it. That's where they're --

THE COURT: I think Mr. Sullivan and I are making a similar point here.

All right.

MR. SIEGEL: Okay.

(Sidebar discussion concluded; proceedings continued.)

(Continued on the following page.)

(In open court; jury not present.)

THE COURT: As soon as the jury is ready, we are going to be back here. I am guessing that is going to be a five-minute process, but we are going to kick off by 5 o'clock.

(Pause.)

THE COURTROOM DEPUTY: All rise.

(Jury enters.)

THE COURT: Please be seated, everyone.

Mr. Siegel, you may continue.

MR. SIEGEL: Thank you, Your Honor.

BY MR. SIEGEL:

Q So I'd like to ask about barter a little bit, and specifically that Oprah Winfrey commercial and tweet.

You said that there wasn't a contract that required her to do that, correct?

A In -- incorrect.

Q So there was a contract that required her to do that?

A Yes. There was a contract for Black Women OWN The Conversation, and this was built on top of it.

Q I am showing you Government Exhibit 2001, which is in evidence, as the contract for Black Women OWN The Conversation.

(Exhibit published.)

Q Is it in this contract?

A No. I just said it was built on top of it.
Q So there's a different contract?
A So, often you have a written agreement and then you have either another written or oral agreement on top of it. So you agree with CNBC or The Financial Times or OWN to do X thing, and then you agree together that on top of X there will be, sometimes we call it added value.
So, like in the JP Morgan contract that we showed, if you looked in some of the rows on the thing, you'll see the phrase "added value." So sometimes it says it, but sometimes it does not.
Q So, let me focus you on this example.
A Sure.
Q Is there a contract for that Oprah commercial?
A No, it's on top of it. It was a special thing that was on top of it.
Q And so when you say "it's on top of it," is there a contract for that?
A Sorry. Yes, I believe that there are oral contracts, and this is a written contract. So I believe that this is a written contract for the TV show, and I believe that there was an oral contract on top of that.
THE COURT: An oral contract for the commercial that we saw?
THE WITNESS: For the commercial, right.

BY MR. SIEGEL:
Q And for the tweet?
A No. The -- the tweet was -- again, one of the things that I've described is that often, particularly with in-kind relationships, it starts with --
Q Mr. Watson, I just asked was there a contract for the tweet?
A There was an expanded, if you will, oral agreement is the way I think of it.
Q So there was an oral agreement that Oprah would make a tweet about you?
A No, that she would continue to promote. And she surprised us to the degree that she was generous and willing to go way above and beyond what we could have expected.

(Continued on the following page.)

CROSS-EXAMINATION

BY MR. SIEGEL: (Continuing)

Q Just to go back to just barter and revenue. Let's talk about a simple product for a second.

If I have a cow --

A You have a what?

Q I have a cow. Let's say I have a cow.

A A cow is coming to Brooklyn. Okay.

Q I sell that cow for $100 --

A Right.

Q -- am I correct that I have earned $100 of revenue?

A In one form or another yes.

Q Okay. So, let's say, instead of selling that cow for cash, I sell my cow for magic beans, and I think my magic beans are worth $15 million. Can I make a pitch deck to investors and say that I have made $15 million of revenue from selling my cow?

A I mean, that sounds really wildly implausible.

Q Agreed, Mr. Watson. But can I?

A Sure. As long as -- as long as everybody involved with things that make sense, sure, you could. And you could argue that that's what's happening with artificial intelligence right now.

Q So you say as long as everyone knows what's happening, as long as I disclose that?

A Or discuss it, yeah. Yes.
Q Okay. You talked about contracts with Ms. Frison with the Ford Foundation and PBS; correct?
A Among others, yes.
Q And those were both for Breaking Big?
A I believe those -- yes, I believe we looked at 2:00 of them, yes.
Q And those were contracts that were signed in 2017?
A Correct.
Q But Breaking Big as a show was 2018; correct?
A That's when it aired, correct.
Q So the revenue from those contracts was 2018?
A Incorrect.
Q Well --
A The hybrid accrual that we discussed earlier. Sometimes when you do a deal you do a lot of the work leading up to it, so you recognize that revenue when you do the work. And then when the shows air, you may recognize the remaining portion of it.
Q When you did the whiteboard with Mr. Sullivan and Mr. Gilbert, you only talked about Breaking Big for 2018, isn't that right?
MS. GILBERT: Mr.
A No, I'm not sure. I think I may have talked about the shows when they aired, but that doesn't mean that that revenue

wasn't recognized in other periods.
Q Well, you were adding up revenue, that was the point of the big board, wasn't it?
A It was, yes.
Q So, was the revenue for Breaking Big in 2018, in 2017, or a mix of both?
A A mix of both.
Q How much in each year, percentage-wise?
A You know, I don't know.
Q Well, to give the estimate for Mr. Sullivan, you had to have a sense of the revenue; right? Because it was 100 percent in 2017. You couldn't include it in 2018; right?
A Again, you could include it in both places, and I'm sure I did. And I hope that I was really careful and thoughtful in saying to Professor Sullivan that I see it as big picture and I was laying it out as simply and clearly as I could. But I think I repeated to him over and over again that there obviously were nuances. Some things cut across multiple years. Some things actually might have been worth even more. But in order to keep things simple and clear, I was going product by product, TV shows, podcast, festivals, newsletters, awards. And I was trying to be really clear with those.

I said to him I'm probably even leaving stuff out, which I believe that I probably was.

THE COURT: I'm sorry, sir. The question was, what

year? In that chart -- if you remember, if you don't, that's fine -- what year did you include the revenue from the Oprah Winfrey commercial?

THE WITNESS: I suspect both. I suspect I included it in both 2017 and 2018.

Q Did you double count it or did you split it up?

A I certainly didn't double count it.

Q So you split it up?

A I'm sure I did, yeah.

Q So, some was in 2018?

A Yep.

Q Some was in 2017?

A Yep.

Q But you don't know what percentage?

A Not at the moment no.

Q And you didn't know the percentage when you were talking to Mr. Sullivan?

A And -- yes. And --

Q My next question is you didn't know the percentage when you were talking to Ms. Frison?

A I'm sorry. Would you start your question over? I want to make sure that I'm responsive to it. Would you start your question from fresh, please?

Q You didn't know what percentage of Breaking Big revenue was 2017 or 2018 when you were talking about the contracts

with Ms. Frison?
A That's fair. That's not unfair. That's fair.
MR. SIEGEL: Okay. Your Honor, just one moment. All right. We're going to pull up Defense Exhibit 37, and we are going to have to switch computers. But, Mr. Jackson, you don't have to do anything. We are just switching between our two computers.
Q All right. So this is Defense Exhibit 237 -- or -- sorry. 37. It's Defense Exhibit 37. I apologize.
And with Ms. Frison, you said this was 2017 revenue; correct?
A I probably said it was signed in 2017 and represented 2017 and 2018 revenue.
Q And this advertising deal is entirely in 2018; correct? It's from January 1, 2018 to December 31, 2018, correct?
A No. Incorrect.
Q So where it says flight 2018 01/01 to 2018 12/31?
A I keep trying to explain to you that my experience with over 200 contracts is that the contracts tend to both exist on paper in this form that are signed and there tend to be modifications around it. But I realize that you don't want to hear that, so I'm answering yes or no.
Q All I can ask about is the documents, Mr. Watson. The document --
MR. SULLIVAN: Objection.

MS. GILBERT: Objection.

THE COURT: Sustained.

Q Under the document, throughout this document, it's talking about 2018; correct?

A Correct. But for a big client like this and for other clients, they expect me, and I will begin to do work even before that. So, in effect, they're asking for -- you might call it free work. And we do that as part of a larger commitment, whether it's for General Motors, for TikTok, or Discover, or GM.

So, yes, I believe we began this work before 2018. And, so, I believe that some of that revenue properly would have been captured in 2017 when we did the work and in 2018 when we did more of the work.

Q You said it was free work, right?

A Free work might be the wrong word. But I said you might refer to it as. It's not really free work. We obviously had to pay a lot of people to do the work. So it's not free.

Q Well, it's not free for you?

A It's not free for us.

Q But it's free for JP Morgan?

A I wouldn't say free, but they clearly are getting more value from a scrappy young company at this stage than they would down the road when we have more experience and more leverage and more power.

Q Talking about this contract, this is a $2 million contract?
A This particular contract, which, again, is about one of the dozen contracts we had with them.
Q So this particular contract is for about $2 million?
A Correct. Yes.
Q And the period for this particular contract that those $2 million are paid for is January 1, 2018 to December 31, 2018?
A That's not true. But you've asked me that now three or four times and I've explained it. But I know I'm instructed to say yes or no. So it is not true that that -- it is true that the period that is written here is January 1st to December 31, 2018.
It is not true that that is the only window in which under this contract we delivered services.
And it is not true that that is the only window in which we recognized revenue.
Q So was this contract recognized entirely in 2017?
A No. I said before that I believe it was recognized both in 2017 and in 2018.
Q So a part of that 2 million, you're saying is 2017 and a part is 2018?
A As is the case with many of our contracts, yes.
Q What is the percentage breakdown?
A I couldn't give you that answer. Again, depending on how

you do the hybrid method, and it may speak to why Samir struggled with this, because it is complicated, is that do you recognize half of it up front because you've been working on this for six months and then the delivery is, frankly, easier than all of the work that went in to coming up with the idea and getting everyone to sign off and getting everything set up, or do you break it up and divide it by 12 or by 14?

So that's why you actually do want a skilled media CFO who knows how to answer these questions and especially when you have hundreds of contracts like this, that you have to think through. And, so, probably why he took shortcuts, because it's not simple.

Q And when you were testifying with Mr. Sullivan and Ms. Gilbert with the board about OZY's revenue, this 2 million of it, you don't know if it was all in 2017, all in 2018 or what that mix was?

A When I testified with Professor Sullivan earlier, I made judgments and -- as best I could. And, again, it's my best effort in a simple, clear way to give people my best sense at the time of what I thought was truth.

I knew I had this many TV shows sold to whoever I had sold them to. I knew I had this many podcasts. I knew I had this many newsletters. I knew I had this festival was in days, two days. I knew I had this in terms of barter relationships.

And, so, that's my best estimate when you see the board.

Q And when you talked about it with Ms. Frison, you didn't know this contract, whether it belongs all in 2017, all in 2018, or what breakdown between them?

A I'm not really sure what the question is.

THE COURT: The question is we went through on the whiteboard year-by-year revenue and now we're talking about --

THE WITNESS: If he's asking if I double counted.

THE COURT: It's not a question about whether you double counted. The question is: Do you know what year you included this revenue in or years?

THE WITNESS: I'm not sure. And probably the more specific answer is, as I said, we had a dozen --

THE COURT: If you don't know, you can just say you don't know.

THE WITNESS: Well, I have a sense, because we had multiple $2 million deals multiple years in a row with JP Morgan. And, so, I'm sure what I did was count a 2 million in 2017. I'm sure I counted a 2 million in 2018. I'm sure I counted a 2 million in 2019. I'm sure I counted a 2 million then.

And, so, even if in reality they were blended, I assigned one per year. That would be the more reasonable, more conservative thing to do.

Q In this contract, though, you don't know whether it was the 2 million you put in 2017 or the 2 million you put in 2018?
A This particular one I'm not sure whether I put it in one or the other, correct.
Q All right. I am going to ask -- I'm going to try to ask some pretty tight questions where I'm going to ask correct or incorrect. And like we have been doing, if it's complicated or you don't know, just say I don't know. Okay?
So correct or incorrect, your name is Carlos Watson?
MR. SULLIVAN: Objection.
THE COURT: Sustained.
Q Okay. Correct or incorrect, you went to Harvard for college?
MR. SULLIVAN: Objection.
MS. GILBERT: Objection.
THE COURT: Where did the second objection come from?
MS. GILBERT: Me.
THE COURT: One lawyer for a given client per examination. But the objection is sustained.
MR. SIEGEL: Sustained or overruled.
THE COURT: I'm sorry. Overruled, as to where he went to college.
Q Correct or incorrect, you went to Harvard?

A Yes.
Q Am I correct or am I incorrect, you went to Stanford for law school?
A Yes.
Q Correct or incorrect, you are an attorney?
A Yes.
Q You are a member of the bar?
A I don't know if I am a current active member of the bar. I know my grandmother made me take the bar and I know I passed the bar, so.
Q Correct or incorrect, you later worked for McKenzie?
A Yes.
Q Correct or incorrect, for many years you worked in television?
A Yes.
Q Correct or incorrect, you were a news anchor?
A Yes.
Q Am I correct or am I incorrect, you were a host for a news program?
A Yes.
Q Correct or incorrect, part of your job was to perform for an audience?
A I'm not quite sure how to answer that.
Q Am I correct or am I incorrect, when you worked in television, part of your job was to read from a script?

A Incorrect.
Q Correct or incorrect, you sometimes would read from a Teleprompter?
A Yes, correct.
Q Am I correct or am I incorrect you later worked for Goldman Sachs?
A Yes.
Q Am I correct or am I incorrect that you were a managing director at Goldman?
A Yes.
Q Am I correct or am I incorrect you founded a company called OZY?
A Yes. With other people, yes.
Q And is it correct or is it incorrect you were OZY's CEO?
A Was and am, yes.
Q And is it correct that you were on OZY's board of directors?
A Yes.
Q Is it correct that until 2021 you were the chairman of OZY's board of directors?
A Not continuously through that time. There were other chairs at various points.
Q In 2019, you were the chair of OZY's board of directors?
A For most of 2019.
Q And for 2020, you were the chair of OZY's board of

directors?
A That one's a little complicated.
Q One of the people who worked with you at OZY was Samir Rao?
A Correct.
Q Samir Rao was, for a time, OZY's chief operating officer?
A Yes.
Q In 2019, Samir Rao was on OZY's board of directors?
A Yes. I believe so, yes.
Q In 2020, Samir Rao was on OZY's board of directors?
A Yes, I believe so.
Q Am I correct that one of the people who worked with you at OZY was Suzee Han?
A Yes.
Q Am I correct that you told Samir Rao and Suzee Han that they should do exactly what you ask?
A No, not correct.
Q I'm going to show you Government Exhibit 3542.

(Exhibit published.)

MR. SIEGEL: Switching computers.

Q At page 43, at the top of the page, could you just read that text, please?
A Sure. And I apologize in advance for some of the bleeps here. So, I apologize.

I need you and Suzee to do exactly what I ask and

stop doing other shit, you know, get our f'ing cash from Chevy and others and stop making — I should have said me — ask you.
Q You have phones with your texts with Samir and Suzee saved on them; correct?
A Sorry. Say that again.
Q You have phones with your texts with Samir and Suzee saved on them?
A I'm not sure, but probably some of them, yeah.
Q You have two devices with texts with other witnesses saved on them; correct?
A I'm not sure, but perhaps, yeah.
Q You are not allowed to bring phones to court, correct?
MR. SULLIVAN: Objection.
MS. GILBERT: Objection.
THE COURT: Sustained, for the moment. Let's have another question and we will take that up after the evening break, which is going to be in about six or seven minutes.
MR. SIEGEL: Okay.
Q Am I correct or incorrect that Samir Rao lied to investors at OZY?
A I don't know.
Q Am I correct or am I incorrect Suzee Han lied to investors at OZY?
A I don't know.
Q Am I correct or am I incorrect Samir Rao lied to

investors about OZY's revenue?

MR. SULLIVAN: Objection. Asked and answered.

THE COURT: Overruled.

A I don't think so, but I don't know. I can't speak for everything he did. I was not -- obviously, he didn't copy me on lots of stuff, so maybe he did.

Q Well, correct or incorrect, Samir Rao told investors that OZY made $12 million of revenue in 2017?

A Yes, that's what we went through with our board and that's what he went through in detail with our largest investors, yes.

Q Well, the board doesn't say 12 million, does it?

A I believe -- I believe some versions of it do, yes.

Q Some versions of the whiteboard?

A Of the board deck, yeah.

Q Well, let's look at your notes.

THE COURT: I think you two people are talking about two different things. One of you might be talking about a whiteboard, and one of you is talking about a slide deck given to a board, as in a board or directors.

Q Yes, I'm talking about the white board.

A My belief is that he consistently under-counted our revenue and that, because that wasn't material to startup investors, I didn't spend the time trying to get it corrected. That I spent the time on what I understood my investors cared

about, which was our content, our team, and our vision. That's what I needed to spend the time on. Winning an Emmy, submitting things for Pulitzers, getting Top 10 podcasts. That's what made OZY more valuable, that's what made them want to buy OZY.

THE COURT: Let's have another question.

Q Well, am I correct that you knew that Samir Rao was telling investors that OZY made $12 million of revenue in 2017?

A Yes, that is correct that --

Q Correct or incorrect?

MR. SULLIVAN: Objection.

A My apologies. That's -- that's correct.

Q Okay. You told investors that OZY made $12 million of revenue in 2017?

A Based on our board meetings and based on --

Q Am I correct, you told --

MR. SULLIVAN: Objection to interrupting.

THE COURT: Overruled.

Q You told investors that OZY made $12 million in revenue in 2017?

MR. SULLIVAN: Objection, interrupting the witness.

THE COURT: All right. If you can answer whether that's correct or incorrect, please do. If you can't, please say so and then, either way, we will have another question.

A There is not a simple answer, so....

THE COURT: The question was: You told investors that OZY made 12 million in revenue in 2017.

THE WITNESS: Yes, that was his question.

THE COURT: Let's have another question.

Q I'm going to show you Government Exhibit 5002.

(Exhibit published.)

Q This is an e-mail from you; correct?

A It is, yes. Correct.

Q And these people who it's to, these include investors?

A They do, yeah.

Q And in this e-mail you wrote: We are on track to grow revenue 80 percent from 12 million in 2017 to 22 million in 2018.

Is that what you wrote?

A Yes. Yes, that is correct.

(Continued on next page.)

BY MR. SIEGEL: (continuing)
Q So is it correct that you told investors?
A Or, sorry, my apologies. In the e-mail that I sent, that Samir drafted, Samir drafted these. I would never draft something with that level of specificity. But yes, Samir drafted this and then sent it to me and I'm sure if we look, a few minutes before I sent it, I am sure we will see that he had sent me this draft to send, and I'm sure that I then cut and pasted it and literally sent it with no changes.
Q So you sent e-mails to investors claiming that OZY made $12 million of revenue in 2017? Is it correct that you sent this e-mail?
A It is correct that I sent this e-mail, yes.
Q Correct or incorrect, according to OZY's internal orders, OZY made less than $7 million in revenue in 2017?
A Wildly incorrect.
Q I am going to show you Government Exhibit 5033-D.
(Exhibit published.)
Q I am going to the income statement for 2017.
Where it says total income in row 18, column N, could you read the amount?
A This says $6,744,699.12.
Q Correct or incorrect, OZY's tax return for 2017 lists less than $7 million in gross sales?

A Yes, correct.
Q And you signed that tax return?
A Yes, correct.
Q And even after you signed that tax return --
A Which is a different number, by the way, than this 6.744, right, the tax return doesn't say 6.744. Just so we're clear. It doesn't -- it's not the same number, right? It's not the same number. It's a different number. What is here in 18 is a different number than is in the tax return, yes?
Q Okay.
A Okay.
Q Even after you filed OZY's taxes, you continued to tell investors that OZY made $12 million in 2017?
A Those don't go together, so the way you're formulating that compound question, I apologize, I can't answer, because I don't think that's an accurate combination.
Q Is it correct that after you filed the tax return for 2017, you told investors that OZY had made $12 million?
A I'm not sure a tax return ties to financial accounting, those are two separate things.
Q I'm asking, is that correct or incorrect?
MR. SULLIVAN: Objection.
THE COURT: Overruled.
MR. SULLIVAN: Asked and answered twice.

THE COURT: Overruled.
Q Is it correct --
Let's do it slower.
MR. SIEGEL: Mr. Jackson, if we could just take it down for a second? I don't want to shift stuff.
THE COURTROOM DEPUTY: Yes, we can.
Q Let's look at the tax return.
(Exhibit published.)
Q Mr. Watson, this tax return was received by the IRS on October 23rd, 2018, correct?
A Correct.
MR. SULLIVAN: Objection.
Q After October 23rd, 2018, you told investors that OZY made $12 million in 2017?
MR. SULLIVAN: Objection. Asked and answered four times now.
THE COURT: Overruled.
A I think the thing you showed me, the e-mail, was from February of 2018, and I think this thing you're showing me here is from October of 2018. So technically, you've got the timeframe reversed.
Q I'm not asking about those documents. I'm asking you a question.
Is it correct --
A I think I can only speak to what I actually saw. The

thing you showed me said February of 2018.
Q Mr. Watson?
A Yes.
Q Is it correct --
MR. SULLIVAN: Objection. Objection. He is in the middle of an answer.
THE COURT: Overruled. Let's have the question be asked without interruption, please.
Q Is it correct or incorrect that after October 23rd, 2018, you told investors that OZY made $12 million of revenue in 2017?
MR. SULLIVAN: Objection. Asked and answered --
THE COURT: Overruled.
MR. SULLIVAN: -- five times.
THE COURT: Overruled.
You can answer the question.
A Yes, in our board meeting and in our various decks, Samir laid out the $12 million in revenue.
Q Mr. Watson --
MR. SULLIVAN: Objection.
THE COURT: Your objection is overruled.
The question is, let me just read the question: Is it correct or incorrect that after October 23, 2018, you told investors that OZY made $12 million of revenue in 2017?
Can you say whether that is correct or incorrect?

THE WITNESS: Not in -- not with that kind of -- I apologize, I'm -- I'm genuinely not trying to be difficult.

THE COURT: If you can't say it's correct or incorrect, that's fine.

THE WITNESS: Yeah, that's too simplistic to say that.

THE COURT: Let's have another question.

MR. SIEGEL: Okay.

Q I am showing you Government Exhibit 5015.

(Exhibit published.)

Q Am I correct that this is an e-mail from you?

A That Samir drafted.

Q Am I correct, Mr. Watson, that this is an e-mail from you?

A That it says from me to Maurice and that I suspect if I look at my e-mail 10 minutes before, Samir had sent me the draft for this and said please forward this.

Q Mr. Watson, Mr. Watson, I don't want to --

My question is: Is it correct or is it incorrect that this is an e-mail from you?

MR. SULLIVAN: Objection. He's answered that twice.

THE COURT: Overruled.

Can you say who the sender of this e-mail was? Can you tell?

MR. SULLIVAN: That's a different question, Your Honor.

THE COURT: If that's an objection, it's overruled.

MR. SULLIVAN: Yes, it is an objection.

THE COURT: What is the answer?

THE WITNESS: It's -- it's from me. It's to Maurice Werdegar.

THE COURT: Next question.

Q The date of this e-mail, am I correct or am I incorrect, the date of this e-mail is December 27th, 2018?

A Yes, that's correct.

Q Am I correct or am I incorrect that this e-mail is from after October of 2018?

A Yes, that would seem to be, yes.

THE COURT: Is this a good place to break?

MR. SIEGEL: After we finish this e-mail.

THE COURT: Yes.

Q Paragraph 2, in the first sentence of this e-mail from you, it says: With a lean team of just about 60, OZY has made substantial progress in 2018, growing revenue from 12 million to 22 million.

Is that the words in this e-mail?

A Yes, those are the words in the e-mail.

Q And so is it correct that after October 2018, you sent

an e-mail that claimed that OZY had $12 million of revenue --
A Yes.
Q -- in 2017?
A Yup, yup.

MR. SIEGEL: That's a good place to break, Your Honor.

THE COURT: All right. Ladies and gentlemen, thank you for your careful attention today and for bearing with us during some of the breaks. We will look forward to seeing you again at 9:15 tomorrow morning. Rest up. Usual rules are in effect. We'll see you tomorrow.

(Jury exits.)

THE COURT: Everybody can please be seated. And the witness may step down.

(Witness steps down.)

THE COURT: While it's still relatively fresh in memory, what is the objection to the question about phones being allowed to be brought into the courthouse?

MR. SULLIVAN: What's the objection to what?

THE COURT: There was a question about whether Mr. Watson's allowed to bring phones into the courthouse and then there was an objection to that question and I said I sustained it. I thought that we would take it up at the break.

MR. SULLIVAN: It's a matter wholly outside the province of the jury; it's a matter that was purposefully taken up, it's collateral to the trial and whether there's a rule that Mr. Watson can bring a phone into the courtroom has absolutely nothing to do with any material issue in this case.

THE COURT: Does it go to credibility?

MR. SULLIVAN: No.

THE COURT: Why not?

MR. SULLIVAN: Because it has nothing to do with revenue or OZY. It has to do with an interpretation of -- of a rule, you know, whether he's a lawyer or not, by virtue of -- for the purposes of bringing a phone into -- into court, I don't see how that relates or is relevant to any material issue. So that --

THE COURT: I think we would only be talking about the instance that occurred after I had instructed Mr. Watson that even though he may be a lawyer, he is not entitled to this lawyers' privilege in this courthouse. And the issue, you know, I understand under Rule 608, you can't have extrinsic evidence come in, but I don't understand why, to the extent these are questions that go to a witness's truthfulness or untruthfulness, they can't be asked.

MR. SULLIVAN: Then it would be 403, would be extraordinarily prejudicial and turn into a third trial

because even the second part that Your Honor read from earlier in the transcript still said at this table; it didn't say anything about the courthouse. So I mean, we'd have to litigate all of that.

THE COURT: It's not a question --

MR. SULLIVAN: The part I read --

THE COURT: Well, we've got to hear exactly what the questions would be. I don't expect the Government to ask did you violate a Court Order. I understood the Government to be asking, simply, did you tell the CSOs you had no phones in your bag, when in truth, in fact.

MR. SULLIVAN: And no, even according to this 302, he didn't tell him, I didn't have phones in the bag. It went through the -- it's hard to read, but as I recall the testimony, it went through the machine and he said, hey, there's a phone in there. And that's how it -- and then he turned it over.

THE COURT: I mean, so again, put aside the question of whether this is a violation of a Court Order or not, there are two instances that I'm aware of in which Mr. Watson may or may not have been asked -- and I'm purposely being understated here -- may or may not have been asked whether he had a phone in his bag, and two occasions on which he answered that question or may have answered that question.

Let's have letters from both sides on this topic tonight, and I'll give you a decision before we kick off in the morning. Let's consider that issue fully aired for today's purpose.

Mr. Sullivan, I told you I would give you the opportunity to raise any legal issues you wanted to either get a ruling from me on or make a record on after the trial day. The floor is yours.

MR. SULLIVAN: I wanted to make a record that while the Court disallowed testimony on -- for the defense on a contract in evidence with a legal term in it, which had to do with sophisticated investors, that investors signed --

THE COURT: I can stop you right there. It didn't have to do with sophisticated investors, that's the problem. You were using it in a way that was blatantly misleading. It's not just that it's a legal conclusion. It's that what you were trying to say -- I happen to know a little bit about, just giving my background, the accredited investor --

MR. SULLIVAN: Is the Court going to let me make a record?

THE COURT: I will, but if the record had to do with sophisticated investors, that's already not correct. But yes, please make a record.

MR. SULLIVAN: And today, the Government was permitted to read from a contract already in evidence with

the legal term force majeure in there, that, from my reading, didn't closely comport with New York's -- the way New York State defines force majeure. I see the situations as quite analogous. You know, the Government has been allowed to read freely from anything in evidence and we have something in evidence that these billionaires or people with hundreds of millions of dollars read and signed and the Court stopped me from doing it and I think it's unfair, it's a dis-equity, and it treats Mr. Watson differently than the Government.

THE COURT: Mr. Sullivan, what was the accredited investor definition for individuals in 2019?

MR. SULLIVAN: I'm -- what was it?

THE COURT: Yes.

MR. SULLIVAN: That was not my question. My question was what the investor signed in the contract.

THE COURT: Right. And we were talking about the paragraph that was titled Accredited Investor, in which the investor represented that they were an accredited investor.

MR. SULLIVAN: Right.

THE COURT: What was an accredited investor at the time?

MR. SULLIVAN: For purposes of the signatory, that individual signed the contract, presumably read it, and if the signer believed the definition of accredited investor to

be what was in the contract, that's why it's relevant. It is not -- they're not lawyers. They're signing something and if he believes that to be the case, and they agreed to it, that's the limited purpose for which I was eliciting that testimony. I was not treating that person as an expert witness on securities law.

THE COURT: Okay. So I understand your objection and you've made your record.

As to what happened today, if we were going to have an extended debate about what is force majeure and what is not, I would not have permitted that. I think the provision the Government relied on was pretty clear. It was if there's a governmental order, then "x," and I don't think there's a lot of confusion about whether there was a governmental order.

Anything else from the defense?

MR. SULLIVAN: That's all.

THE COURT: Okay. Anything else from the Government before we adjourn for the day?

MR. SIEGEL: Can we just talk about schedule? I don't -- I don't have a lot of questions left in my script, candidly, some of the questions are taking a little bit longer than I anticipated, but I'm certainly not going to go all day tomorrow.

THE COURT: Okay. I think we're going to hear

from the witness whose name I hesitate to pronounce that begins with a K.

MR. SIEGEL: Mr. Kalliarekos.

THE COURT: Thank you.

Is he up next? I know that there may be a live motion to exclude his testimony, but what is defense position? Is he your next witness? I think somebody said today he was the next witness.

MR. SULLIVAN: He's our next witness at this point.

THE COURT: Okay.

MR. SIEGEL: And then if the only witnesses left after that -- I think the only witness left after that who you haven't precluded is Mr. Zahralddin, and I apologize for butchering that, and there is a pending motion to exclude him.

THE COURT: Yes.

What -- is there a pending motion to exclude Mr. K?

MR. SIEGEL: Your Honor --

THE COURT: You've had the --

MR. SIEGEL: -- we've made the motion. Obviously things exist on a spectrum. Mr. Kalliarekos is probably the least offensive from our view. We're still moving to preclude him for all the reasons we've put in our letters,

but I don't want to -- I don't want to say it's the same as Ms. Watson or Mr. Zahralddin, which is pretty extreme.

THE COURT: Right, understood.

As to Mr. Kalliarekos, are there obvious categories that you would expect to have seen in the 26.2 arena, like an investment contract that you don't have?

MR. SIEGEL: At this point, we haven't.

THE COURT: Okay.

MR. SIEGEL: And that's why I said it's one in the spectrum.

THE COURT: You've had, like the delay here played to, I don't know if it's your advantage or the defense advantage, but it gave you more time to digest what would otherwise have been eleventh hour --

MR. SIEGEL: That's why I'm putting him in a different category.

THE COURT: All right. We're going to have Mr. Kalliarekos's testimony on that basis.

He'll be ready to go tomorrow?

MR. SULLIVAN: That's -- that's our plan. I have not spoken with him since this morning.

THE COURT: Okay.

MR. SULLIVAN: He was here this morning, so I will -- I will reach out to him again tonight.

THE COURT: Okay. It sounds like we have a plan

for tomorrow, at least.

MR. SIEGEL: We also just need a -- we will need a ruling on Mr. Zahralddin in part because we do anticipate a brief rebuttal case and we just want to figure out if we need to have our rebuttal witnesses here tomorrow.

THE COURT: I am going to rule on Mr. Zahralddin -- if I'm pronouncing that correctly -- at or before lunchtime tomorrow.

MR. SIEGEL: Thank you, Your Honor.

THE COURT: All right. Does the Government have a rough estimate of how long its rebuttal case might take?

MR. SIEGEL: Very short.

THE COURT: Like one day? Like three days?

MR. SIEGEL: Like less than 40 minutes of direct testimony.

THE COURT: For the whole rebuttal case?

MR. SIEGEL: The whole thing.

THE COURT: That's more like one day than it is like three days.

MR. SIEGEL: And then we need the charge conference, as well.

THE COURT: Yeah, that we should do soon. It sounds like it's possible we actually will not use the entire trial day tomorrow for trial testimony, so we may have a charge conference as soon as tomorrow afternoon, if

not, it will probably be on Wednesday. I saw that letters came in very recently from both sides and I still need to digest those letters, but I will be ready as of tomorrow.

MR. SIEGEL: And then, Your Honor, if we have the charge conference, for example, Wednesday morning, should we plan to go straight into closings Wednesday afternoon?

THE COURT: Yes.

MR. SIEGEL: Thank you.

THE COURT: Yes, if it looks tomorrow we are going to have a charge conference on Wednesday morning, I think we will just tell the jury to be here later on Wednesday than they would otherwise, right, so that they're not sitting around while we're debating jury charges, but we can make that assessment tomorrow.

MR. SIEGEL: Thank you, Your Honor.

THE COURT: All right. Thank you all. I'll see you tomorrow, 9:15.

I said letters from both sides on the 608 issue.

MR. SIEGEL: Yes, thank you, Your Honor.

THE COURT: One other question from the court reporter.

So there was a moment when we were talking about my order on what I'll call the *Perry* question, P-E-R-R-Y, in which Ms. Robinson asked a question on the record. It was captured by the court reporter. I answered it. The court

reporter, obviously, is not used to having questions from either the audience or people who haven't entered appearances here. And the question was, should I keep this on the record.

I don't have a particular, you know, strong view on that one way or the other. But I suppose, you know, in the interest of capturing more rather than less, we'll just leave it in. But in the future, obviously, questions to the Court should come from the lawyers who have entered appearances.

MR. SIEGEL: Your Honor, actually, thank you for raising that, because that's something I have been meaning to talk about. There have been a number of occasions where, after Your Honor's made a ruling, or in response to something going on in court, including while the jury is here, we've heard Ms. Robinson laughing or making noises, disapproving of the Court's ruling.

And it's one thing when the jury's not here, but it's happened many times when the jury is here, and we would just ask the Court to make very clear that that's not appropriate and needs to stop.

THE COURT: Yes, I have seen that as well.

And I will just admonish not only Ms. Robinson, but every member of the audience to refrain from visible reactions to court orders or otherwise, especially while the

jury is in the room, but at all other times, as well, really.

MR. SIEGEL: Thank you.

THE COURT: All right. I will see everybody tomorrow.

(Matter adjourned to Tuesday, July 9, 2024, 9:15 a.m.)

* * * *

**I N D E X**

**WITNESS** **PAGE**

**CARLOS WATSON**

DIRECT EXAMINATION BY MS. FRISON 3525

CROSS-EXAMINATION BY MR. SIEGEL 3575

**E X H I B I T S**


| | |
|---|---|
| Defense Exhibit 37 | 3529 |
| Defense Exhibit 102 | 3532 |
| Defense Exhibit 103 | 3534 |
| Defense Exhibit 113 | 3536 |
| Defense Exhibit 115 | 3537 |
| Defense Exhibit 134 | 3540 |
| Defense Exhibit 126 | 3543 |
| Defense Exhibit 136 | 3545 |
| Defense Exhibit 129 | 3546 |
| Defense Exhibit 142 | 3547 |
| Defense Exhibit 349 | 3558 |
| Defense Exhibit 133 | 3567 |
| Defense Exhibit 155 | 3569 |
| Defense Exhibit 590 | 3571 |
| Defense Exhibit 596 | 3573 |
| Court Exhibit 3500-1 | 3587 |
| Court Exhibit 8 | 3649 |
| Government's Exhibit 5011 | 3712 |
| Government's Exhibit 6076 | 3714 |