UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------x

23-CR-82(EK)

UNITED STATES OF AMERICA,

United States Courthouse
Brooklyn, New York

-versus-

May 29, 2024
9:30 a.m.

CARLOS WATSON AND OZY MEDIA,

Defendants.
-------------------------------x

TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
BEFORE THE HONORABLE ERIC R. KOMITEE
UNITED STATES DISTRICT JUDGE
BEFORE A JURY

APPEARANCES

For the Government: UNITED STATES ATTORNEY'S OFFICE
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201
BY: JONATHAN SIEGEL, ESQ.
GILLIAN KASSNER, ESQ.
DYLAN STERN, ESQ.
Assistant United States Attorneys

For Defendant Watson: RONALD SULLIVAN LAW PLLC
1300 I Street NW
Washington, DC 20005
BY: RONALD S. SULLIVAN, ESQ.
JANINE M. GILBERT, ESQ.

For Defendant Ozy Media: FRISON LAW FIRM PC
74 State Street
Boston, MA 02109
BY: SHANNON FRISON, ESQ.

Court Reporter: Rivka Teich, CSR, RPR, RMR, FCRR
Phone: 718-613-2268
Email: RivkaTeich@gmail.com

Proceedings recorded by mechanical stenography. Transcript produced by computer-aided transcription.

(In open court.)

THE COURT: We're going to get started at 9:30 sharp with the jury assuming we have all the jurors here.

Is there anything the Government wants to take up in the preliminary fashion before we begin?

MS. KASSNER: We're waiting for one attorney who stepped outside, if you can indulge us for one second.

Thank you, your Honor.

MR. SIEGEL: Thank you, your Honor.

THE COURTROOM DEPUTY: Criminal cause for trial, docket 23-CR-82, United States vs. Watson, et al.

State your appearances beginning with the Government.

MR. SIEGEL: Good morning, your Honor. Jonathan Siegel, Gillian Kassner and Dylan Stern. Also behind us is paralegal specialist Jake Menz and Gurdeep Singh.

MR. SULLIVAN: Ronald Sullivan on behalf of Carlos Watson, who is present. With me for my firm are attorney Janine Gilbert and paralegals Jalon Fowler, Victoria Torres, and Amaya Ronczyk.

THE COURT: Good morning.

MS. FRISON: Shannon Frison for Ozy Media.

THE COURT: Is that everybody?

MS. FRISON: That is.

THE COURT: Good morning.

I have a letter, which I have not read yet, from the Government that came in very late last night which deals with slides the defense wants to use during its opening statement. Why don't I hear from the Government on that subject.

MR. SIEGEL: Thank you, your Honor. Last night, a little after eight, the defense sent us their proposed slides for the opening. I should say the defense, it was from Shannon, from Ms. Frison on behalf of Ozy.

So our objection to the slides is that they contain exhibits or photographs not evidence, that not only at this point are not in evidence but appears will never be in evidence. They are photographs that are not exhibits, either defense exhibits are Government exhibits. There are charts that appear to be based on the accounting analysis that your Honor has precluded. There are some bizarrely candidly false statements that I honestly were suspected made by AI as opposed by a human. Things like referring to someone name names Mike as Nike, and Laurene as Laurence. A person named Jens Mueffelman as Daniel Gallego, who is not a person in this case as far as I know. It says that the prosecutors in this case are friends with Ben Smith, which in addition to being not true, none of us know Mr. Smith.

THE COURT: Where does it say that?

MR. SIEGEL: On the third to last slide, the slide labeled Ben Smith timeline.

The bottom right entry, it gives a timeline or purported timeline about Ben Smith. Last one it says: Carlos Watson and Ozy indicted by prosecutors in Brooklyn, friends of Ben Smith.

So in addition to that being baseless, your Honor already made clear that Ben Smith really doesn't have to do with this trial.

THE COURT: Mr. Sullivan.

MR. SULLIVAN: This is on behalf of Ozy.

THE COURT: This is Ozy, all right.

MS. FRISON: Your Honor, as to Ben Smith in particular, Buzzfeed is actually a named victim in the Indictments. So I know that Ben Smith and the topic of his involvement with Ozy goes well beyond the Indictment.

THE COURT: We're not talking about relevance here. We're talking about whether this material is admissible, whether it was turned over in discovery. This goes beyond demonstratives. This is testimonial, essentially you're making assertions of fact. And it is not relevant. At least the relevance hasn't been explained to me yet; what is the relevance of Ben Smith to this trial?

MS. FRISON: The relevance of Ben Smith is that the catalyst for the investigation was the New York Times article that he wrote.

THE COURT: The catalyst for the investigation is

not relevant. We talked about this in motions in limine. Right. The reason why this Indictment happened is not going to be part of the trial.

The trial is about whether the defendants -- whether the Government can prove beyond a reasonable doubt that the defendants actually committed every element of every charged crime or not. But people's motivations for bringing the case, I don't think I could have been clearer in connection with the motions in limine, that was for the selective prosecution motion. That's been resolved.

MS. FRISON: However, the allegation with regard to Buzzfeed is that Ozy gave it false financial information. The only reason they were interacting around financials was because Buzzfeed was attempting to buy Ozy. So I am not sure how that allegation and the charge in the Indictment cannot be discussed at trial.

THE COURT: Let's look at -- these slides are not labeled with any numbers, it's hard to call people's attention to a particular one. The slide Ben Smith jealous competitor fall 2019, what is the Government's objection?

MR. SIEGEL: It has absolutely no relevance to the case.

THE COURT: Ben Smith is not a victim, Buzzfeed is a victim.

MR. SIEGEL: Buzzfeed is a victim. He was a

Buzzfeed employee. He no longer worked at Buzzfeed at the time he wrote the New York Times article.

THE COURT: Is he testifying in this case?

MR. SIEGEL: Not for the Government. The defense just handed us a witness list, which is another issue to raise.

THE COURT: We'll take that up at lunch time.

MR. SIEGEL: In this 40-person witness list they just handed us, the defense has listed Ben Smith. But other than being an employee at Buzzfeed and being mentioned as the person who wrote the New York Times article, he's not going to be a part of this case; nor would there be any relevance to him being part of the case. His motives for writing that article or his alleged motives are irrelevant. The article happened. I don't think there is any dispute that this article happened and that that precipitated the collapse of Ozy. Why he wrote the article is irrelevant.

THE COURT: Turning back to Ozy. What is the relevance of Mr. Smith's -- first of all, this slide says that Mr. Smith attempted to purchase Ozy. Did he personally try to purchase Ozy or are you talking about Buzzfeed?

MS. FRISON: Buzzfeed improper. Mr. Smith was the person doing the negotiating with Ozy.

MR. SIEGEL: Your Honor, we expect the evidence is going to show that's not true. The person who was handling

the negotiations was the CEO Janeen Poutre, who is going to be a witness.

MS. FRISON: There are email communications that say otherwise.

THE COURT: Is this photograph of Mr. Smith in the discovery? Is it marked as an exhibit?

MS. FRISON: The photograph, yes, your Honor.

THE COURT: What is the exhibit number?

MR. SIEGEL: Your Honor, as far as the Government is aware, not a single photograph is an exhibit for any party.

THE COURT: What is the exhibit number?

MS. FRISON: We'll have to find that, your Honor. We have them.

THE COURT: You don't know your own exhibits?

MS. FRISON: I don't know the base number. You mean the marked exhibit number?

THE COURT: The defense exhibit number, yes.

MS. FRISON: There are a lot of them, so.

THE COURT: I think you just told me though, affirmatively, this is marked as a defense exhibit. Are you confident that answer was correct?

MS. FRISON: We're looking now, but I believe it is.

THE COURT: You believe it is.

MS. FRISON: Yes.

THE COURT: All right. Let me know what the exhibit

number is on this photograph.

MS. FRISON: Yes, your Honor.

THE COURT: And you're looking for all the photographs that are in this slide deck.

(Brief pause.)

THE COURT: I'll note for the record that we've been waiting several minutes now for the defense to identify the exhibit number, so far unsuccessfully.

Point one, the defense needs to be familiar with its exhibits so we're not keeping the jury waiting while you search through stacks of information during this trial.

Point two, the ear of unfair surprise from the defense in this trial should be over now. I don't want to come into these emergency fire drills every morning because the defense has sprung some surprise on the Government that has to be the subject of evidentiary argument. This is the point of motions in limine, is that we're supposed to resolve these issues in advance of the trial so as not to waste the jurors time cooling their heels in the jury room while we resolve these issues. And I am meaningfully intent on using the jurors' time as respectfully and efficiently as we possibly can here.

If the defense can't tell me what exhibit number this is in the next minute or two and when it was produced in discovery, I'm going to exclude this slide, and we'll move on

to preliminary.

MS. GILBERT: Your Honor, we have a set of the exhibits for the Court per your rules as well as for the Government --

THE COURT: Thank you.

MS. GILBERT: -- a list. And the witness list that we provided this morning we also provided to the Court, the court reporter, your clerk, as well as the Government. Per your rules, we provided it today. The names on the list, many of the names are certainly Ben Smith's name, was on the Government's list that they provided for jury selection. We have yet to receive an actual witness list from them of the witnesses they intend to call for trial. As your Honor is aware, we received last night the name of the witnesses out of the 200 names that they gave us on their list from jury selection, the names last night of two witnesses that they intend to call today, one of them being Janeen Poutre the other one being Samir Rao.

THE COURT: Okay. Do you have a question about that or an application? Or you're just telling me for my information.

MS. GILBERT: I just want your Honor to understand that -- I have actually, I'm in the process of responding to the Government's letter from last night, and also correcting an error that was in the letter that we filed on Friday

afternoon with respect to the number of exhibits that they provided. They provided 1400 exhibits, not 2500. However, in the 1400 exhibits, there were 2500 documents. I think it's important since it is within --

THE COURT: Is this something we need to take up before we talk to the jury? I want to get the jury in here and get started. If we are discussing random -- not random, other housekeeping matters, I'm happy to do it at the lunch break.

MS. GILBERT: It's relevant whether your Honor is going to preclude all of our exhibits or not.

THE COURT: I'm not precluding any of your exhibits. We're talking about the slide deck and the use of it in opening statements. Since another five minutes have passed and you've been looking for these exhibits for ten minutes now -- I see a member of the defense table shaking their head in the negative that you don't believe these were exhibits, which would mean that Ms. -- can you pronounce your name.

MS. FRISON: Frison.

THE COURT: Thank you. Ms. Frison, I asked are these photographs marked as defense exhibits. Ms. Frison said yes. The answer now appears to be no.

We're going to exclude the slide deck and begin with trial this morning.

MR. SIEGEL: Your Honor, in addition to the slide

deck, it appears the defense has a number of demonstratives like, I think we saw Mr. Watson brought his ME. We would object to any demonstratives being shown to the jury during the opening.

THE COURT: On what basis?

MR. SIEGEL: One, we've never seen it, we don't know what it is. Not knowing what they are --

THE COURT: It seems like we've got some laughter, somewhat inexplicably, coming from the gallery. If that continues we're going to ask people to step out, possibly permanently.

Please continue.

MR. SIEGEL: We've never seen it, but whatever it is, we don't think they've been marked as exhibits.

THE COURT: Has the defense shared these demonstratives with the Government? Who is it that is using the demonstratives?

MS. FRISON: Your Honor, I think both Mr. Sullivan and I have demonstratives. The ones that I have are the same as on the slide deck.

THE COURT: So that we dealt with.

What else are we talking about here?

MS. FRISON: I believe they --

THE COURT: Mr. Sullivan, do you have demonstratives?

MR. SULLIVAN: I don't know what the Government is talking about.

THE COURT: Do you have demonstratives?

MR. SULLIVAN: No. I'm ready to start the case. No demonstratives.

THE COURT: No slides in opening statements, just speech.

MR. SULLIVAN: No.

MR. SIEGEL: Then we're satisfied.

Your Honor, the only final thing is in addition to the photographs and stuff on the slides there were number of topics that your Honor previously said is not part of this trial or opening, including references to the involvement of lawyers, race. I have never objected during an opening, and I do not want to object during this opening, but we are relying on the Court's order and the representations from counsel that they are not going to be talking about race, or Ben Smith, or lawyers, or selected prosecution.

THE COURT: Everyone will comply with all of the decisions that we've come to in this case. We have full confidence of that all around. Okay.

As soon as the Court's deputy and the jurors are ready we're going to get started.

MS. GILBERT: One application. That the Government be directed to provide us with a witness list of the witnesses

they intend to call at trial, as opposed to the 200-some-odd names.

THE COURT: We've had letters on this topic, right, last week. And I issued a ruling on this topic last week. And what the letters said was you want the list of not only the witnesses but the exact dates and what exhibits are coming in through them. And that letter, as I pointed out, cited literally no authority apart from the, quote/unquote, "Sixth Amendment right to a fair trial". And there is a practice in this district, there is a typical practice, I think, which is that the parties provide the identities of their witnesses a day in advance. If there is something you think you're entitled to as a matter of law, tell me what the law is that you're invoking in support of this.

MS. GILBERT: Your Honor, your Court rules require that both parties provide a witness list.

THE COURT: Which rule?

MS. GILBERT: I have your rules, just a moment.

MR. SIEGEL: We would ask that we deal with this during lunch and --

THE COURT: Let's take this up at the lunch break.

MR. SIEGEL: Before the jury comes in, if we can test the lapel mics for the openings.

MS. GILBERT: Just to clarify, your Honor, I didn't ask for all the witnesses and when they were going to testify,

I asked for the witnesses for this week, that was it.

THE COURT: Okay.

MS. GILBERT: E2. In answer to your question about your Court rules, V-E2, Roman numeral five, E2: No later than the first day of trial. All parties are to provide the Court with tabbed binders containing copies of all exhibits. The binders should include an exhibit list and a witness list.

That's why we provided the witness list today.

THE COURT: Has the Government provided a witness list?

MR. SIEGEL: This is part of why I wanted to deal with this at lunch.

THE COURT: Let's take this up at lunch.

MS. GILBERT: The answer is no.

(Continued on next page.)

(Continuing.)

MR. SIEGEL: Are we testing lapel mics?

MR. STERN: I think when Andrew gets back.

THE COURT: Oh, you need Drew for that purpose?

MR. STERN: Your clerk suggested, yes.

THE COURT: Okay. We are looking at standing room only here, apparently.

(Pause.)

THE COURTROOM DEPUTY: They tested them.

THE COURT: It's all tested?

THE COURTROOM DEPUTY: Yes.

THE COURT: Let's do it.

(Pause.)

THE COURTROOM DEPUTY: All rise.

(Jury enters.)

THE COURTROOM DEPUTY: Your Honor, all the jurors are present.

THE COURT: Thank you.

Ladies and gentlemen, please be seated. Good morning.

All right. We are here this morning for trial in United States of America against Carl Watson and Ozy Media, Inc.

Beginning with the Government, are counsel ready to proceed this morning?

MR. SIEGEL: Yes, Your Honor.

We just want to confirm that the jury has been sworn?

THE COURT: We are about to do that.

MR. SIEGEL: Great.

Then yes. Thank you.

THE COURT: Mr. Sullivan, is the defense ready?

MR. SULLIVAN: We are. The defense is ready, Your Honor.

THE COURT: And, Ms. Frison?

MS. FRISON: Yes, Your Honor.

THE COURT: Yes. Would the courtroom deputy please now swear in the jury.

THE COURTROOM DEPUTY: Will the jurors please all stand and raise your right hands.

Do you, and each of you, solemnly swear or affirm that you will well and truly try this case before you and a true verdict render, according to the evidence and law?

THE JURY: I do. (Collectively.)

THE COURT: Please be seated.

Let me know if this is too loud or too soft. I'm not sure I need a microphone for you all to hear me, but we need the court reporter to hear me clearly as well.

So, ladies and gentlemen of the jury, first of all, good morning and thank you for being with us here today.

We will stand, all of us, for you when you come in. That's out of respect for the jury and its role in our jury system. When you come in the room you can take your seats, and we all will sit only after you have done so.

So, now that you have been sworn, my job as the judge is to give you some preliminary instructions to guide your participation in this trial.

My name is Eric Komittee. I am an United States District Judge here in the Eastern District of New York. I did not preside over jury selection, as you know, but I will be presiding here at trial. And I'll give you some more fulsome instructions on the governing law in this case at the end of the trial. I will repeat some of the instructions I am about to give you right now before you begin deliberating, as well, but I want to give you some important preliminary considerations now, just so that you know what to expect.

Ladies and gentlemen of the jury, we are about to begin the trial of this criminal case. You have already learned something about the case during jury selection. Before the trial begins, however, there are certain things I want, and maybe need, to tell you to help you understand what will be presented and how you all and we all should and will conduct ourselves during this trial.

So to begin with, as you know already, you are here to administer justice in this case according to the law and

the evidence. You are to perform this task with complete fairness and impartiality and without bias, prejudice or sympathy, for or against the Government or the defendant.

This case is important to the defendants, Mr. Watson and Ozy Media, the company. They are charged with committing certain crimes and they have the constitutional right to receive a fair trial.

The case is also important to the Government, since the enforcement of the criminal laws is important.

This case is based on an Indictment. During jury selection, Magistrate Judge Henry briefly summarized the charges in the Indictment for you. I instruct you now that an Indictment is simply the document by which a criminal action is begun or commenced. It is merely an accusation, a charge. It is not evidence of any defendant's guilt.

Because the defendants have pleaded not guilty, the Government, which is at this table (indicating), the prosecution, has the burden of proving each of the essential elements of each crime charged in the Indictment beyond a reasonable doubt. This trial is to determine whether the Government has met its burden.

The defendants at the far side (indicating), and with defense counsel, are not required to prove their innocence. On the contrary, both defendants are presumed to be innocent of the accusations contained in the Indictment.

As you've already heard, the Indictment in this case contains three counts. I will define each of these crimes and their elements for you in later instructions. So after trial concludes, I will give you much more fulsome instructions, including a definition of each of the crimes charged in this case, and a list of the elements of those crimes. But for now, in the most general terms, Count One charges both defendants with conspiring to commit securities fraud. Count Two charges both defendants with conspiring to commit wire fraud. And Count Three charges defendant Watson, but not Ozy, with aggravated identity theft.

I will now give you a preview of the stages through which this case will proceed.

Trial will proceed through six potential stages, roughly speaking, in the following order:

First, the parties will have the opportunity to make opening statements. The Government will make an opening statement, and the defendants may do so. The defendants are not, however, obliged to make opening statements. Indeed, the defendants have no obligation to do anything in the course of this trial. What is said in opening statements is not evidence, rather the attorneys will be attempting to give you an introduction to or an overview of the evidence that they expect will be produced in the course of this trial. That's the first phase, opening statements.

Second, after opening statements, the Government, which bears the burden of proof, will put on its case. The Government will introduce evidence in support of the charges contained in the Indictment. This evidence may come in the form of testimony from witnesses or it may be physical items or documents that are offered in evidence. After each witness testifies on direct examination, a witness may be cross-examined. So, the Government lawyer will do the direct examination; and the defense lawyer, if they choose, will do a cross-examination asking questions of the government witness. That's cross. After cross, there may be some redirect examination, which is an opportunity for the Government to follow up on certain points that may have been covered on the cross. And then, perhaps, the defense will do some recross- examination, following up on just the points that were covered in the redirect. But each successive examination can only respond to the examination that came immediately before it, and so each one should get successfully shorter and smaller.

Speaking of evidence, generally speaking, there are two broad types of evidence, direct evidence and circumstantial evidence. Direct evidence is direct proof of a fact, such as by the testimony of an eyewitness who says, I saw X, Y, Z, happen. Circumstantial evidence is proof of facts from which you may infer or deduce that other facts

exist.

So, I'll give you the classic example of circumstantial evidence that we often use in federal district court, which is suppose you came into the courthouse today and the sun was shining and it was a nice day, but the courtroom blinds behind you were drawn and you could not see outside. Then sometime later as you were sitting here, someone walked into the courtroom with a dripping wet umbrella. And soon after that, somebody else walked in with a dripping raincoat. On our assumed facts, you cannot look outside the courtroom yourself and see directly whether or not it is raining, so you have no direct evidence of that fact. But on the combination of the facts about the wet umbrella and the raincoat, it would be reasonable for you to infer that it had begun to rain.

Again, I'll give you further instructions on these, as well as other matters, at the end of the case, but keep in mind for now that you may freely consider both direct and circumstantial evidence.

During the course of the trial, exhibits will be received into evidence. Those exhibits will have exhibit numbers. You will be able to review those exhibits in the jury room during your deliberations at the end of the case if you need them. I will also give you a copy of my instructions at the end of the case, so you will have those during your deliberations as well.

If an item is received in evidence, the attorneys may choose to have you look at it here in court right after it is received. Whether they do this or not, however, you will have ample opportunity to examine the exhibits you wish to see in the jury room.

You may also hear from time to time the lawyers agreed or "stipulated" to certain facts or to certain testimony. You should accept those stipulated facts as true and you should accept that stipulated testimony as what a witness would have said. But you, the jurors, must still then decide what weight to give to those stipulated facts or to that stipulated testimony.

It may happen at some point that I instruct you that an item of evidence is being offered for a limited purpose only. You must, of course, follow that instruction. If I strike a witness's answer from the record or if I instruct you to disregard an answer, then you should disregard that testimony. It is not evidence and it should not be considered by you as evidence.

Anything you see or hear outside of this courtroom is not evidence and must be disregarded because your verdict must be based solely, solely on the evidence that is introduced and presented here in this courtroom. So that's the second phase of trial where the Government is putting in its evidence in what we call its case-in- chief.

Third phase of trial. When the Government has concluded putting in its evidence, the defendants may present evidence, may, but they are not required to do so. The law never imposes on a defendant in a criminal case the burden of calling any witnesses or introducing any evidence.

Fourth, if one or both defendants puts on any evidence, the Government then may or may not wish to put further evidence on in a rebuttal case to rebut what the defense or to attempt to rebut what the defense has set forth.

Fifth, once all of the evidence has been presented, all parties will have the opportunity to present closing arguments, which we sometimes call summations, to you. As with opening statements, what is said in these arguments is not evidence. Each party is simply presenting to you its view of what the evidence has shown and suggesting to you the inferences or conclusions that you all should draw from that evidence. You may find an argument sound and persuasive, or you may not. Because the Government has the burden of proof in this case, it has the right to give a closing argument first, followed by defense closing arguments, if they choose, after which the Government may give a rebuttal summation.

Sixth, after you have heard closing arguments, I will then instruct you on the applicable law and you will then retire to consider your verdict. Your verdict must be unanimous.

Let me talk now about the duty of the jury. You have a tremendously important task as jurors, it is to determine the facts. Our Constitution gives every criminal defendant a right to have you, who are members of the community, find those facts. As judges of the facts, you must determine which of the witnesses you believe, what portion of their testimony you accept, and what weight you will attach to it, if any. You, not the Court, or me, are the sole judge of the facts. You are the sole judge of the facts.

I shall try to preside impartially and not to express any opinion concerning the facts. If at any time I should make any comment with respect to the facts, you may disregard it. It is your judgment as to the facts, not mine, which controls.

In the course of the trial, the attorneys for all sides may from time to time stand and say that they object to a certain question or to certain evidence. They are asking me to make a ruling of law as to whether that evidence is admissible or not under the Rules of Evidence in this trial. There are many rules that apply to the receipt of evidence in trials. If I sustain an objection, it means I think the law does not permit the evidence in question to be considered and you are to disregard the question that has been asked. You are not to speculate about how that question might have been answered, you simply have no evidence before you on that

subject one way or the other. If I sustain an objection after an answer has been given, I will strike the answer, meaning that you are not to consider that answer at all in your deliberations. You are to act as though the answer had never been given. On the other hand, if I overrule an objection, that means that I find that no legal reason exists to preclude the evidence from coming before you. You should not, however, attach any special weight to evidence that comes in over objection. Simply consider it together with all other evidence.

No statement, ruling, remark or comment that I may make during the course of this trial is intended to indicate any opinion as to how you should decide the case or to influence you in any way in your determination of the facts. At times, I may ask questions of witnesses. I do so simply to bring out matters that I think should be brought out and not in any way to indicate an opinion about the facts or the weight that you should give the testimony of the particular witness.

If your recollection of the evidence differs from what you hear from the lawyers in opening statements, in closing statements, in their questions, it is always your recollection that controls. What the lawyers say is not evidence. You will watch the evidence and your recollection of what the evidence is is what controls.

One very, very important thing to note is that you must not be influenced by anything you may have seen or heard outside this courtroom. This case must be decided by jurors who base their decision solely on the witnesses's testimony and the other evidence introduced at this trial. That means that until the end of trial, you must not conduct any independent research about this case. Absolutely no independent research about the case, the matters involved in the case, or the individuals involved in this case. In other words, you should not consult dictionaries or encyclopedias or other reference materials. You should not search the internet for anything relating in any way to this case, or use any other tools to obtain information about this case or to help you in your decision as jurors. Do not try to visit any of the places mentioned in this trial, whether they are physical places or places on the internet. You should also not Google the lawyers, the parties, or me. Do not blog about this case, if any of you have blogs. Don't tweet about this case, if any of you have Twitter or X accounts. None of that during the trial. It is a clear violation, it would be a clear violation of the juror's oath.

It is very important that your decision here be made solely on the basis of the evidence presented in this case and that you not seek information from any source outside of this courtroom. Every once in a while we will actually read about

how a whole trial had to be redone because a juror did not follow this instruction and it tainted the entire outcome. So, please take this obligation extremely seriously.

Also, if at any point you recognize somebody who comes into the courtroom, please let the courtroom deputy, Mr. Jackson, know that somebody has walked into the courtroom who you know. There is absolutely nothing wrong with that happening. This is a public courtroom and anybody can come in and watch if they want, and if there is room. But if it's someone close to you who comes into the courtroom, I will want to know, and your communications should be, in the first instance, with Mr. Jackson.

Conduct during recesses.

There are several important rules which should govern your conduct during any recess or break that we take in this trial.

First, please do not discuss the case with anyone else, anyone else during any recess, even as among yourselves. You see, it is extremely important that each of you keep an open mind. Reaching your conclusion only during your final deliberations and only after all of the evidence is in and you have heard the parties' summations and my instructions on the law, my final instructions on the law, only then will you begin to exchange views among yourselves and reach your verdict.

Now, the instruction I have just given you is counterintuitive. It's almost contrary to human nature. Serving on a jury is a unique experience. It may be an interesting experience, and it is an experience that many people have only once or twice in a lifetime. And so for all those reasons, it is something you would naturally want to share with friends or family or even to discuss with each other as the trial goes on. But you cannot do that. The problem is that as you begin discussing the case with others, they may begin giving you their opinion of what they think about the case, even though they have not been here, even though they have not heard any of the evidence, even though they have not heard the arguments of counsel or my instructions on the law, and it fundamentally deprives all the parties of a verdict that is based solely on the determination of jurors who have heard all of what I have just referred to and nothing else.

As I mentioned, the same is true, ladies and gentlemen, even with respect to discussing the case among yourselves. That, too, is counterintuitive and contrary to human nature. After all, the thing that brings all of you here together is this trial, so you would think you would be talking with each other about the trial. But what is wrong with beginning your discussion of the case before you retire to deliberate is that if you begin talking amongst yourselves

about the case, you would begin to come to tentative opinions and conclusions that might close your eyes and close your mind to other evidence, to the arguments by counsel, or even to my instructions on the law. Here, again, when I say do not talk about the case, what I'm telling you is a common sense rule. When I say do not talk about the case even amongst yourselves, I am talking about the evidence that you hear in the courtroom and whether the defendant is guilty or not guilty, what kind of job the lawyers or even the judge are doing, all of that is off limits.

But this is a common sense rule and if I wear a tie one day that you all particularly like or don't like, it's fine for you to discuss that amongst yourselves, even though it technically happened in the trial.

But let me just give you a brief example of this.

When I first started here years ago as a judge, in my first month or so in the job I was walking through the lobby of this courthouse and I ran into someone I knew and I said hello to the person, asked them what they were doing here. This person was not a lawyer, and he said that he'd been selected for a jury in front of another judge in this courthouse. And I said to this person, who was at least an acquaintance and maybe a friend of mine, Oh, is it a civil case or a criminal case? And the person said back to me, I'm sorry, I can't discuss the case with you. And that was the

right answer. It seems like it violates social norms to say to somebody, I'm sorry, I can't answer that question, but he was taking his obligations as a juror seriously and I respected it. And I probably should not even have asked that question of a juror, but brand new judges occasionally make mistakes.

So, you should not permit any other person to discuss this case with you or even in your presence. If anyone should approach you in an effort to discuss the case, you must report that fact to me immediately. If anyone, the lawyers, the parties, anybody from the outside world, a reporter, attempts in any way to discuss the case with you, you must report that fact to me. Again, through Mr. Jackson. I don't expect that that will happen, but if it did, you would let me know immediately. And your response to the person who tried to initiate a discussion with you would be exactly what my acquaintance said to me, I'm sorry, I can't discuss the case with you at all.

If that happens, and again I don't expect it to, you should not discuss with your fellow jurors that you had been approached. And that is true of any other fact you may feel necessary to bring to my attention. The reason is that if something occurs that might affect the ability of one juror to continue to serve fairly and impartially and that juror communicates whatever happened to other jurors, then we risk

having more than one of you affected. And we want to make sure we contain whatever the effect is as best as possible. So come straight to Mr. Jackson, not to your fellow jurors.

Discussions with the parties.

Although it is usually normal to talk with those with whom we are thrown into day-to-day contact, please do not. Please do not while you are serving as jurors in this case have any conversation, even about the weather, any conversation with the parties, the attorneys, or any witnesses in this case. It doesn't matter whether that is in the courtroom, in the hallways, in the elevators, outside at lunch or anywhere else. And by this, again, I mean not only that you cannot talk about the case, I mean when it comes to the parties, the lawyers and the witnesses, you cannot talk to them at all, even to pass the time of day, even about the weather. The reason is that somebody seeing a juror in conversation with a party, a lawyer or a witness, might think, might think rightly or wrongly that something improper was being discussed. And so, to avoid even the appearance, the appearance of impropriety, we ask you to studiously avoid all of those types of conversations. The lawyers, as officers of court, are particularly sensitive to this. So, I can tell you that when they pass you in the hallways and they don't even acknowledge your presence, don't even nod or smile or waive, they don't mean to be rude. If you and a lawyer are waiting

for an elevator at the same time, you should take separate elevators. Again, I expect you will inform me if you become aware of any violation of these instructions, whether it relates to you or a different juror, any violations of these instructions, let Mr. Jackson know. A juror who violates these instructions would jeopardize the fairness of these proceedings and a mistrial could result, which could require the trial process to start over.

Notetaking. And I am coming to the end here.

You have all been given a note pad. Is that true or not true? You all will be given a note pad. These are for the use of each individual juror during the course of the trial. Let me caution you about a couple of things in connection with taking notes, and we'll bring you pens as well so that you can take notes if you choose.

But your notes are not a substitute for the official court record. We have a court reporter here with us. She, and people she works with, will be making a transcript of these proceedings. That is the official court record. They will take down everything the witnesses say and that testimony will be available to you. It will be available to you should you need at any point or want your recollection refreshed about what a witness has said. The purpose of the note pad is simply that some people feel they can listen better if they are taking notes, or, for example, let's say, you see an

exhibit that is particularly interesting to you, you may want to just jot down the exhibit number. But please do not let any notetaking distract you from listening to the witness and evaluating the witness's credibility. Don't let it interfere with your listening to the testimony. You are not to rely on your notes in place of the official record.

Moreover, your notes will just be for your individual use. You may not share them with other jurors. You must leave your note pad in the jury room at the end of each day, and you can rest assured that the notebooks will be shredded after the case is over for your privacy.

Alternates. Those of who have been selected as alternate jurors should listen, obviously, just as carefully and conscientiously as all of the jurors. You may very well be called upon prior to the conclusion of this case to take the place of one of the jurors and then you, too, will have to render a verdict. So, please pay strict attention at all times.

Schedule. I intend to start trial every day at 9 :30 sharp, or sometimes even a little bit earlier. Please be on time in the jury room by 9:15 sharp every day, and allow yourself enough time to pass through security downstairs, which I think means you need to be in the building by 9:00 a.m.

When you arrive, please assemble in the jury room,

and Mr. Jackson will make sure you're familiar with which room is the jury room and how to get there, if you're not already. We'll typically stop for a lunch break, which will be 45 minutes to an hour, usually around 12:30 p.m. Lunch will be provided to you in the jury room after trial while you're deliberating, but not during the trial, itself. We will also, also take short breaks in the morning and the afternoon, and we will try to end each day by 5:30 p.m., or, perhaps, a little earlier than that.

So just to summarize the order of events here: The trial will begin with the opening statements, and then with testimony. When the testimony is complete, the lawyers will address you in their closing arguments. I will then give you my final instructions, and then you will deliberate and reach a verdict.

With that by way of introduction, let's take a five-minute break here, and then we will begin with the prosecution's opening statement.

(Jury exits.)

(Recess taken.)

(Continued on next page.)

THE COURT: How long does the Government expect its opening to be?

MR. STERN: Probably 15 minutes.

THE COURT: We'll reconvene in five minutes.

(Brief recess.)

(Jury enters the courtroom.)

THE COURT: Please be seated.

The Government is ready, you may proceed.

MR. STERN: Thank you, your Honor.

This is a case about lies. Lies to get rich, lies to get famous, lies by the defendant, Carlos Watson. Watson told his lies as the CEO and public face of Ozy Media, a news and entertainment company.

Over the course of this trial you'll learn that Watson's mission was to make Ozy and himself the next big thing. But to make that happen, Ozy needed money; money Ozy did not have and could not earn. So Watson and his inner circles of employees decided is to lie, over and over again. To deceive investors into putting their money into his company. The lies they told went to the heart of Ozy's business. They invented financial figures, fabricated investor lists, forged contracts, and even went so far as to impersonate executives from other companies. And on the back of these lies, Watson and his accomplices defrauded their victims out of tens of millions of dollars. That is why we're

here today.

My name is Dylan Stern, I'm an Assistant United States attorney here in the Eastern District of New York. With me at counsel table are Assistant United States Attorneys Jonathan Siegel and Gillian Kassner, paralegal specialist Jake Menz and FBI Special Agent Gurdeep Singh. Together we represent the United States.

The story of Ozy Media begins in 2012 when Watson founded the company as a website and digital newsletter. Overtime Watson's plans for Ozy grew, and he expanded the company into television production, podcasts, and live events. As he tried to grow the company, Watson made himself the star. He was the host of Ozy's TV shows and the voice of its podcasts. He even put his face on Ozy's advertisements. And inside the company, Watson was involved in everything. Micro-managing his employees across the business. At its core Watson was Ozy Media.

By 2018, the evidence will show that Ozy wasn't making enough money to survive, let alone become the next media sensation. So Watson turned to his most loyal employees at the company, his second in command, Samir Rao and his chief of staff Suzee Han. Watson, Rao and Han formed a secret inner circle at Ozy, with Watson at the center calling the shots. Together the three of them agreed to lie about Ozy Media's finances, its investors, and its contracts.

First, there were the lies about Ozy's finances. The evidence will show that Watson and his co-conspirators repeatedly lied to investors about how much money Ozy was bringing in. This is called revenue. They also lied about Ozy's bottom line or its profit, claiming that Ozy was profitable when it was actually losing millions of dollars a year. The reason behind these lies was simple, if they had told the truth, many investors wouldn't be interested in buying Ozy stock. And as is often is the case, these lies snowballed overtime.

Watson and his accomplices went from doubling real revenue numbers one year to tripling them the next. The gap between Ozy's fake profits and its true losses grew wider and wider.

And the evidence will show that while Watson was telling investors about Ozy's financial strength, the company was spiraling, owing vendors and lenders hundreds of thousands of dollars a week, and often on the verge of being unable to pay its own staff. And the true state of affairs at Ozy was something Watson new well, as the evidence will show. He insisted on being updated about Ozy's finances every single day.

Next, there were the lies about Ozy's investors. The evidence will show that Watson and his co-conspirators lied about who had agreed to invest in Ozy and how much. You

will hear that this is because people like to invest alongside others who are well-known in the industry. And they take comfort when they are buying the same company stock as other successful prominent individuals. Watson exploited this fact, going so far as to claim that Oprah Winfrey, arguably the biggest name in media, was leading an Ozy investment round for millions of dollars. That was a lie. The truth was, she wasn't investing a penny.

Then there were the lies about Ozy's contracts. The evidence will show that Watson and his accomplices lied to investors about the television deals that Ozy Media had secured for its shows, telling them that they had negotiated favorable and lucrative terms, terms that would align with the fake financial numbers they already provided. But when investors asked to see the contracts, that put Watson in a bind. Because the real terms of the deals didn't come close to what Watson had shared. So Watson and his co-conspirators agreed to create fake contracts. The evidence will show that they took the real contracts they had, deleted the terms they didn't like, added what they needed to match the lies, and then forged signatures of their business partners to make the fake contracts seem real. The evidence will show that they even took some of these doctored contracts and ran them through a scanner multiple times to make them look older and more real.

And the evidence will show that to help them cover their tracks, Watson's second in command, Samir Rao, created an email account that he used to impersonate a real executive from one of the companies whose contracts they forged. This is how Watson's lies snowballed. Each lie had to back up the one before.

In 2021, after lying for years to keep the business afloat, Watson and his co-conspirators thought they hit the jackpot. A potential investment by Goldman Sachs, the prominent investment bank. You'll hear that this was Watson's dream. Goldman was a prestigious partner, Ozy would finally be flush with cash. And Watson personally stood to make millions of dollars from the deal. In fact, Watson used to be a senior Goldman Sachs banker himself; so he knew first-hand about the power, the money, and the access that came with the Goldman brand.

So to close the deal, Watson and his accomplices did what they'd been doing for years, they sent Goldman inflated financials. They made Ozy Media seem like a thriving business. The evidence will show that Goldman was impressed with the numbers but they wanted more detail on the revenue. And one of the details that Watson provided in response was that YouTube had paid Ozy millions of dollars for the rights to the Carlos Watson Show, a talk show named after and hosted by the defendant himself. But YouTube hadn't paid Ozy at all.

That was a lie.

So when Goldman made the simple request to speak to YouTube to verify the numbers, this put the whole deal in jeopardy. But rather than come clean, Watson chose to double-down to cover one lie, lie again. The evidence will show that for this next lie Watson and his second in command, Samir Rao, devised a plan to impersonate a real executive at YouTube and then tell Goldman that YouTube really did pay millions of dollars for the Carlos Watson show.

To pull it off, Watson and Rao agreed that Rao would register a fake email address in this executive's name, just like he'd done before but for a different executive, then schedule a call with Goldman. And they decided that on the call itself, Rao would use voice alteration software to disguise the sound of his voice. The evidence will show that during the call itself, Watson was in the room with Rao instructing Rao exactly what to say, trying to close the deal and secure their massive pay day, all while impersonating a man who had no clue his identity had been stolen.

But despite all this planning and all this choreography, Goldman figured out they were being lied to and the deal collapsed.

But this failure did not stop Watson's pattern of deceit. When the Goldman deal fell through, Watson found another victim and lured them into investing $20 million into

Ozy by telling them that the CEO of Google himself had offered to purchase Ozy for hundreds of millions of dollars. That was a lie. But Watson did not let the truth stand in his way. In fact, the evidence will show that when news of the Goldman call started to leak, Watson and Rao agreed that they needed to lie to cover it up. And most importantly, they needed to lie to protect Carlos Watson, so they decided to say that Rao acted alone. That was a lie. And they decided to say that Rao did it, because of a made-up mental health crisis, that was a lie too. One brazen lie on top of another.

Ultimately though, after defrauding investors out of tens of millions of dollars the lies caught up to Carlos Watson and his decision was uncovered. That brings us to today.

For his actions, Watson is charged with three crimes. For agreeing to lie to people to get them to buy Ozy stock, Watson is charged with conspiracy to commit securities fraud. For agreeing to lie to people to get them to give Ozy money and using phone calls and emails to do it, Watson is charged with conspiracy to commit wire fraud. And for stealing the identities of real people to commit wire fraud, Watson is charged with aggravated identity theft.

The company, Ozy Media, is also a defendant in this case. That's because Watson and his co-conspirators took their actions to benefit Ozy. And when they lied to

investors, they did so on Ozy's behalf.

We will prove to you that the defendants are guilty beyond a reasonable doubt using several different types of evidence. First, you'll hear from Watson's former co-conspirators, from his second in command, Samir Rao, and from his chief of staff, Suzee Han. They will take you inside the conspiracy. And we expect them to testify about the lies they told, from the invented financial figures to the fake investor lists, from the forged contracts to the multiple impersonations. And they will testify about how Watson participated with them and directed them throughout the conspiracy.

These witnesses have both admitted to their roles in the charged crimes. They have pleaded guilty, accepted responsibility for what they did, and have agreed with the Government to testify at this trial because they hope that the judge will take their cooperation into consideration when they are sentenced for their crimes.

Carefully scrutinize their testimony. When you do, you'll see that it's backed up by the other evidence in this case, including emails, text messages, and the testimony of other witnesses.

For example, you'll see draft emails that Rao and Han sent to Watson for his sign-off before going to investors. Documents that contained lie after lie about Ozy's business

that Watson approved before they went out the door.

You'll also see messages in which Watson, Rao and Han reminded one another about which lies were told to which investor, and planned what to tell people to keep their story straight.

And you'll see Watson texting his former accomplices his instructions and his demands consistent with his role as the leader of this conspiracy. These include the texts that Watson sent while he was silently overseeing the Goldman called when Rao impersonated the YouTube executive using the voice alteration app. You'll see Watson texting Rao just what to say to keep their cover and land them a multi-million dollar deal.

In addition to Watson's former co-conspirators, you'll hear from former employees at Ozy Media who were not involved in the scheme. We expect that they will testify that Ozy was hemorrhaging money and Watson knew it, just like he knew every detail of his business.

You'll see internal documents that capture the true state of affairs at Ozy, the real historical revenues, the actual investor lists, the true contracts, documents the victims did not get a chance to see. When you see these documents, you'll learn just how far the statements of Watson and his accomplices were from the truth.

You'll also hear from many of Ozy's investors and

lenders, the victims of this fraud. We expect that they will testify that the representations that Watson and his co-conspirators made to them about Ozy's finances, investors and contracts were important to their decision of whether to invest and how much. The evidence will show that these victims did not invest their money in the successful profitable business that Watson told them about; instead, they invested in a lie.

Finally you'll hear from the identity theft victims, the innocent individuals who had no idea that their very identities were stolen and used in a fraudulent scheme.

Members of the jury, the evidence will show how Carlos Watson deceived his investors for years. Stealing millions of dollars and attempting to steal millions more based on repeated an out-right lies. At the end of this case, after you've seen the evidence and heard all of the testimony we will come back to speak with you again at that time, we will ask you to return the only verdict supported by the evidence, guilty on all counts. Thank you.

THE COURT: Mr. Sullivan.

MR. SULLIVAN: Thank you, your Honor. Ozy Media is going to go first.

THE COURT: Okay.

MS. FRISON: Members of the jury, good morning again. My name is Shannon Frison. I have the pleasure of

representing Ozy Media Incorporated.

Ozy Media, as you know, is a company. And because it's not a person it cannot sit here with us at these tables, so please allow me to tell you a little bit about the company.

Ozy Media was not just a startup, you'll hear the Government perhaps and witnesses refer to it as a startup. It's not just a startup and it's not just a media company. Ozy Media was really revolutionary in what it did and how it did it.

You'll hear in this trial that Ozy Media reached and pulled from voices that we don't usually hear in media and hosted conversations that most mainstream media do not tackle.

Ozy was also about family. As a company, it literally was created in Ms. Rose Watson's kitchen, Carlos Watson's mom, with he and her drawing on a white board coming up with what Ozy would be and of how it would interact with the world. This was in Mountain View, California; a concept born at home. And Ms. Rose and Carlos Watson himself and his sisters, Beverly and Carolyn, poured their heart, sweat, tears, effort, time, and money into Ozy.

And yes, the evidence will show that like most startups, and most new companies, at times it did struggle for money. But Watson's family itself, you'll find out, invested about $20 million of their pooled moneys to keep it afloat, to pay payroll, to make it happen. After all, that's what

families do, support each other, go into business together, sacrifice, make it work. That's what the Watsons did.

You'll also see at trial the type of company that Ozy was. It was not average, in any sense. It had real offices, a real Board of Directors, and over a thousand employees in the United States and all over the world. Ozy's employees were 90 percent people of color and women, 90 percent. Almost unheard of, especially in Silicon Valley.

Under Mr. Watson's direction, Ozy Media grew exponentially in the years that it operated. Eventually it grew to have a multi-platform presentation for viewers and listers, including 14 television shows. Ozy also produced ten captivating podcasts. It produced six premium newsletters. And pulled off four Ozy Fest festivals, all of which were in Central Park except the one during COVID, which was virtual. Under the direction of Mr. Watson, Ozy eventually did grow to have over 200 clients and partners, many of which are household names that you will recognize. And eventually, before it had to close its, doors it was booking almost $449 million in revenue.

I'll ask you to pay close attention in this trial to the folks and entities that the Government calls victims. Ozy Media is no one's accomplice. Ozy Media conspired with no one. Ozy Media did not defraud its investors or anyone else.

In fact, Ozy Media did more with less. Instead of

just offering the newsletters that it began with, it expanded its offerings to the world.

When I ask you to look at the folks and the entities that the Government is calling victims, I'll ask you to look and read and listen to how many of them continued to invest in Ozy until its doors closed. So its investors were not folks who were just looking for something to throw money into and ran across Ozy Media. You'll learn in this trial that many of Ozy's investors, like Mr. Harry Hawks who is one of its earliest investors, they've known Mr. Watson for years and years before Ozy was even created.

As a matter of fact, the evidence will show that this was not a fly by night media company something that just came to Mr. Watson. Mr. Watson was 40-years-old by the time he created Ozy. And you'll learn that he created companies before that. And that many of those investors invested in him before, in successful companies in the education field, that Mr. Watson sold before starting in media.

You'll also hear from folks, or hear about folks, like Mr. Marc Lasry, again an investor, and again someone who knew Mr. Watson for a very long time. Those folks, as you'll learn in this trial, were investing not just in the concept of Ozy but in the leadership of Ozy. They were investing in someone who was a known quantity to them, who they knew for his hard work and work ethic, for his honesty and leadership

at the helm of a business.

We'll be talking about startups, how they do accounting and how they deal with their finances in this trial. And one thing that you'll learn, or maybe you already know, is that startup finance is not like the finance of major publicly-traded corporations. If you've ever seen Shark Tank or an episode of it, you'll know why. I think the evidence will show that most startups fail, fail miserably, fail dramatically. But in the case of Ozy Media, Ozy Media was actually out-performing its counterparts, out-performing its competitors on behalf of its investors. By 2021 Ozy had over 75 investors. But as the saying goes, tall trees catch much wind. And Ozy was a tall tree, a giant.

We do agree with one thing that the Government said in its opening, that it's a case about lies. But it's not the lies of Ozy Media or Carlos Watson. They are the lies of Samir Rao.

Ozy Media will be asking you to separate the conduct of Mr. Rao from the company itself. There is no "they" in the conduct that Mr. Rao took.

One thing you will have in evidence, and I'll ask you to pay very close attention to, is a confession letter by Mr. Rao. Before anyone was arrested, long before, before anyone was indicted, Mr. Rao sat down and put pen to paper and wrote a confession letter to the world and to Carlos Watson

for his actions. I should say, you'll see three letters, three versions of the same confession letter. Two of which, the evidence will show, Mr. Rao wrote; one of which was edited by his wife, his brother, and his father. And you'll note, and I'll ask you to pay very close attention, only in that last version does Mr. Rao share blame or take the blame off of himself.

You'll also note the evolution of the lies that Mr. Rao told. With each interview in this matter you'll see that he ramps up his accusations against Mr. Watson, including him in what was his own conduct that he's already admitted to and already pleaded guilty to, as you just heard. In that letter, Mr. Rao states that he's apologizing to his co-founder, Mr. Watson. And that he's sorry for what happened. And that he didn't share his struggles sooner. You'll read that those struggles had to do with mental health, depression, and bipolar disorder.

In addition to his lies, you'll find that Mr. Rao was incompetent for the role that he was serving. He was the chief operating officer, but he handled the financials of Ozy Media. Mr. Rao handled all of the financials, the presentations to investors, he was in the background with the numbers. You won't see him on any of the shows the Government mentioned, or that I mentioned. You won't see him hosting a television show. You won't see him at Ozy Fest. You won't

see photos of him or listen to him on podcasts, that's just not what he did for Ozy. By the same token, the evidence will show that that is what Mr. Watson did for Ozy. So in the program on the computer in which Ozy's financials live and have lived for the entire time it's been in existence, called NetSuite, you'll note that Mr. Watson entered NetSuite not one time, never logging in, because that was not what he did for Ozy.

Mr. Rao's incompetence at the job did mean that he made some crucial mistakes that the Government is now pointing out as somehow a conspiracy. Please be listening to the mistakes as they came out in trial.

You will hear that in Ozy's books Mr. Rao simply left out many of its partners and deals. He left out some of the most major deals from the financials, meaning that that revenue, those bookings, were not accounted for and Ozy did not get credit for. You'll also note that Mr. Rao left out what we call in kind or barter revenue when Ozy was trading, say, advertisement in their product for advertisement in this another company's product and no money is exchanging hands. You'll learn very early in this trial how that was an accounting mistake and was not captured in Ozy's financials under Mr. Rao's direction. You'll also note that he mixed cash accounting and accrual accounting. And you'll note that he did not accurately account for gross revenue versus net

revenue. Those mistakes were huge and made for huge difference in the numbers, and are a part of the reason that Ozy's books were a mess.

You'll note in this trial the Government has as victims entities and people who I ask you to decide if they are victims or not. One of those victims named is Buzzfeed, a competitor of Ozy Media.

What you'll learn in trial is that Buzzfeed tried five attempts to purchase Ozy Media. And only after Mr. Watson finally said no for the final time were there any complaints about Ozy's books, which were shared with Buzzfeed.

Ozy was winning each year. It was booking more and more revenue. In 2016 it went from booking about $8 million in revenue to 2021 in which -- 2020, sorry, in which it was booking almost $325 million in revenue. It simply outgrew Mr. Rao's skills and abilities. It became a very different company growing that quickly.

And despite troubles with cash flow, despite Mr. Rao's incompetence, and even despite his lies that he told specifically, Ozy Media still accomplished its goals of giving out genius awards to students each year, money awards to students who deserved it. It still hired summer interns. Ozy still created content, more and more and richer content like black-women-only conversations, a television show with partner Oprah Winfrey and the Oprah Winfrey Network, for which they

won an Emmy. It still created a voice for Sneaker Fiends, one of their new television shows. And pulled off its Ozy Fests in Central Park, which as you'll hear, were rousing successes by everyone involved and everyone in attendance.

Most importantly, Ozy Media was poised and well on its way to being the first black unicorn in Silicon Valley. A unicorn may be described as a startup that is so special that it's valued over a billion dollars, valued over a billion dollars. There are much in our world today, products and items, that probably we can't do without now. Ozy was uniquely positioned to be just that until it was snatched out of the game.

This criminal Indictment of Ozy is a tragedy. At the end of this trial I'm going to ask you to find that Ozy Media is not a conspirator of anyone, not an accomplice of anyone. And I'm going to ask you to find the company not guilty of both fraud charges. Thank you.

THE COURT: Mr. Sullivan.

MR. SULLIVAN: Thank you, your Honor.

Do you mind if I move the podium?

THE COURT: Where are you going to move it?

MR. SULLIVAN: Just off to the side.

THE COURT: Sure.

MR. SULLIVAN: Ladies and gentlemen, this is a case about a crooked co-founder named Samir Rao who lied, who

undermined, and who betrayed Carlos Watson. It is really a simple case. Samir Rao lied. He undermined and he betrayed.

Ladies and gentlemen, Samir Rao has already been arrested for his crimes. He's already pled guilty for his crimes. And the evidence will show that Samir Rao got a sweet-heart deal with the Government, and he's going to say whatever it takes to try to get a benefit from the Government. The evidence will show that the Government is the sole entity that gets to decide whether Samir Rao cooperated appropriately. Their decision. And because it's their decision, the evidence will show that Samir Rao lied and kept lying on Carlos Watson in order to save himself.

Carlos Watson, ladies and gentlemen, is innocent. He did not commit wire fraud. He did not commit securities fraud. He did not commit aggravated identity theft.

I'm going to come back to Samir Rao, but before I do, I'd like to introduce you to Carlos Watson.

Stand up, Carlos. It is, ladies and gentlemen, my honor and my privilege to represent Carlos Watson.

Carlos Watson, you will learn, came from very humble beginnings. Born in Miami to a family of modest means, Jamaican immigrants, in fact, came to Miami. Four brothers and sisters. And even though they didn't have a lot of money, you'll learn there was a lot of love in that family. And they worked hard, good values, they worked really hard.

And Carlos, though he had, some might say, inauspicious start, got kicked out of kindergarten, his family worked with him, turned him around early on, learned he was a smart kid, and through the grace of scholarships and loans Carlos Watson went off to Harvard and got his undergraduate degree, then to Stanford law school. It was there in California, Stanford is in California, that Carlos Watson got this bug this, entrepreneurial bug. He wanted to be an entrepreneur Silicon Valley.

If you remember those days, 20, 30 years ago, Silicon Valley was where all of these great entrepreneurs came from, all of these ideas, all of these things we enjoy now and take for granted started up in Silicon Valley. Carlos Watson wanted to be a part of that.

So he spent a couple of years to get some experience at a firm called McKinsey, a big accounting firm. He did that, but you'll learn that Carlos Watson started building companies. Very shortly after he got out of law school. And he built one called Achieva, Achieva. This is a company that was designed to do college prep. And Achieva achieved, forgive the pun, Achieva did well. Achieva did so well that a company called Kaplan, I'm sure you heard about Kaplan, bought it because it was producing, did well. He also formed another company with Laurene Powell Jobs that helped the kids in East Palo Alto, a poor section over in the shadow of Stanford.

So very early on Carlos Watson became an entrepreneur. He did a stint at Goldman Sachs, as the Government said, are learned his trade. They brought him on as a senior educational adviser at Goldman Sachs because he had this experience in the education space. And then Carlos Watson had to go home.

You're going to learn that unfortunately his mother was diagnosed with cancer he had to go home. So Carlos Watson went home to care for his mother. Right. Actually, brought his mother out to California to care for his mother, brought his mother out there, took her to appointments and so forth. And because of this family and the way this family sticks together and the values of this family, mom, Ms. Rose, said to Carlos, you can't sit here taking care of me, you got to do something. While she was literally dying of cancer, she and Carlos went up to the white board and were mapping out what was to become Ozy Media. That's how Ozy Media started. That's how it started. This idea germinated when he and his mom were having discussions. Ms. Frison said before me, it grew into a very, very real company that did great things including Ozy Fest, right in the middle of Central Park.

That's the sort of thing that Ozy did. That's the sort of thing that Mr. Watson, himself, did. I'll say more about the specifics of Ozy later.

But let me return to Samir Rao, that's their star

witness. That's the felon who lies about everything. What you're going to note, and it's impossible for you to pay attention to it at the time because you didn't have context, the Government kept saying they, they did this, they did that. No. No. Samir Rao did this and that. Samir Rao did this and that.

The Government didn't even mention Samir Rao's confession. I'll start right there. I know Ms. Frison mentioned it, I want to highlight.

Samir Rao wrote a letter to himself and presumably his lawyers because it has attorney-client privilege on the top of it. He wrote a letter where he apologized to Mr. Watson. The Government tells you they planned it. So what is he apologizing for? He wrote a letter apologizing to Mr. Watson. And in that letter he said it was absurd, it was a stupid thing to do -- you'll see the letter -- instead he consulted no one else. No one else. That's their witness's words. He said: I did it all alone. That's what he said to -- it's like writing in your diary writing a lie to yourself in your diary. Samir Rao said this: I did it alone.

So as Ms. Frison said, there were a couple of versions of this. He ended up consulting his wife, a high-powered consultant at McKinsey. His brother, his high-powered criminal defense lawyer at one of these mega firms in New York of international law firms in New York. And

he wrote two more versions, basically the same thing outlining his plan, his, Samir's plan, to impersonate a YouTube executive.

Now Judge already told you, Judge Komitee already told you, it's not the words that the lawyers say it's what you hear on this witness stand. What you'll hear on the witness stand is that in order to pull off this identity theft, somebody had to buy a domain name. Some of you might have done this on your personal life, go on Go Daddy, buy a domain name that looks like it's from YouTube. Somebody had to do that. That somebody was Samir Rao.

In order to purchase it, somebody had to use a credit card, type it it, online you have to pay for these things. Whose credit card was used? Samir Rao's, not Mr. Watson.

Somebody had to create emails, turns out to be a fake email, somebody did that. You know who that somebody was? Yes, right. Samir Rao, that's who it was. That's who did it.

So the Government says they. No, they. Mr. Rao. Mr. Rao did all of those things. He wrote a letter to himself apologizing saying it was all him.

Now, the Government says that there are some text messages that show Mr. Watson's involvement. There are some text messages. But what the Government didn't tell you is

that Mr. Watson came in on the call after this call was going on for several minutes. Mr. Watson comes in -- Mr. Rao puts on Mr. Watson's calendar "conference." He did didn't know what kind of conference call it was. He walks in the office. It's clear that, oh, my goodness something really, really weird is going on here. There is this voice changing software that the Government mentioned. They said they, guess who purchased the software? Samir Rao. Guess whose computer the software was on? Samir Rao's computer. Guess whose credit card paid for it? Samir Rao. Any number of questions all lead back to Samir Rao.

This case is about a crooked co-founder. The Government kept saying employee. He's a co-founder with two Harvard degrees, Samir Rao. Two of them. He's a co-founder, not some idle employee, a co-founder.

So he comes into this conversation says, oh, my goodness. It's like a live train wreck or something going on. Mr. Watson comes in, the evidence will show, doing the cross-the-neck-thing stop, stop. Right. There is a unfortunately no big -- remember the Staples red button you push. There is no button on the table to stop the call. Rao is crouched over on his computer. You have to probably manipulate, if you've been on zoom, your curser to something to leave the call or end the call. All of this Samir Rao.

So Mr. Watson walks in and he's like oh, my

goodness, what is going on here. Rao keeps going. Several minutes into the call before Mr. Watson sends his text messages in an attempt just to end this thing, just to get the call ended. And in fact, one of the texts -- Government says they planned everything, one of the texts says: Who is this. Who is this? Mr. Watson planned it, but asked who is this? Makes zero sense. No sense, ladies and gentlemen. Who is this. If he planned it, he knew who it was.

So, you're going to learn that Mr. Watson simply attempted to stop the call, to get out of it. Should he have gone and ripped the cord out of the wall, I don't know. But what you will learn is that Mr. Watson didn't commit identity theft, only Rao.

This becomes a theme of the Government. Mr. Rao does all sorts of bad things and in order to get the sweet-heart deal from the Government, they just say Rao says -- Carlos knew about it. You're not going to see evidence to that affect. All we're asking is when you hear those witnesses in the box, just wait a minute and think about what Mr. Sullivan is going to ask on cross-examination before you make up your minds.

Because you're going to see that, one, there is always another side to this. And two, you're going to learn that there are two Mr. Rao's. Not twins. But there are two Samir Rao's. There is one Samir Rao before he thought he was

going to get in trouble, before he thought he was in trouble and the things he said and did then. Then there is another Mr. Rao, after he realizes that he's in trouble. His story -- what is the word -- evolves, his story evolves overtime. Keeps getting juicier and juicier over time as he realizes he's in trouble and that he might need to give the Government some fresh meat in order to implicate Mr. Watson.

Mr. Watson the Government claims that he lied to get rich. That's what they said in their opening. That the case is about lies and he lied to get rich.

What you are going to see is that Mr. Watson didn't buy a new fancy house. Lies to get rich. He didn't buy a Ferrari car or a Lamborghini, one of those fancy sports cars, didn't do that. Not going to hear any testimony about Mr. Watson on a yacht out sailing on the French Riviera where rich people go. Never going to hear that, even though his company had hundreds of millions of dollars in it. You're not going to hear that.

In fact, you're going to hear the opposite, that Mr. Watson continued to live in his modest home in California. He continued to do community service for poor kids of color by his home in California. He continued to do all these things, even though he was a founder of a company.

Excuse my paper, I want to get this right. So you'll learn this person the Government says lies to get rich,

you'll learn that Mr. Watson turned down an offer from his Board of Directors for $5 million secondary stock sale. Turned it down. Said, no, I want Ozy to grow. No, I want make sure all my employees get paid. That's one.

You'll learn that he did it again, a second time, turned down another $5 million secondary stock sale. Turned it down. Turned it down. Said no.

In addition you're probably going to expect evidence -- they say it's a fraud, that Ozy was a fraud so you might expect evidence for fraudsters that they take money out of the entity. That's what frauds do, take money out. But you're going to learn that Mr. Watson put in an additional $5 million of his personal cash. He's not bleeding the company like a fraudster would do. He's putting money in the company.

You're going to learn that they offered him, his Board -- Government wants to say this is all Carlos Watson, he had a very distinguished Board of Directors, lawyers accountants, lot of advisers -- the Board offered him $6 million in salaries owed to him.

(Continued on next page.)

(Continuing.)

MR. SULLIVAN: You think he took it? A fraudster would.

Mr. Watson did not. He did not. Left it on the table. Reinvested it in the company.

When all this started, all of his family members had 401(k)s. They liquidated them, put it in the company. If you're a fraudster, you're not putting your family's money in there. Remember, the purpose of a fraud is to take it out.

It's gone now because the Government came in and shut Ozy down. It would have still been making money today the evidence will show.

When this started, his sister had no mortgage on her home. Now they got two, investing in her little brother, investing in Ozy. Carlos had worked hard when he was in the private sector to pay off his mortgage. Now, of course, he's got one. Investing in the company, not pulling it out of the company. All in all, Carlos and his family, ladies and gentlemen, put in around $20 million into Ozy, 2-0 million, into it. They did not raid this company.

Okay. I want you to go back to the Government's star witness, Mr. Venturapalli. So, I talked about Mr. Venturapalli, but some of you look confused. I'm sorry, Mr. Rao. Mr. Venturapalli is one of the fake names that Mr. Rao used in order to get loans. He signed it Samir

Venturapalli. Left off his last name, right. You might be thinking, well, isn't that some kind of fraud? Isn't that some kind of bank fraud? Yeah. But he got a sweetheart deal. The Government said we're not gonna -- right, Mr. Stern said, We're not going to prosecute you for that Samir Venturapalli. The reason is that he was taking the same collateral and using it for different loans, right.

So, you know, let's say I'm putting up this computer for collateral and it's worth 50 bucks. And the bank says, Okay, if you don't pay, we'll repossess this and get our 50 bucks back. Well, you know, Samir put up the same thing with multiple banks. You can't do that.

No evidence that Mr. Rao -- I'm sorry, no evidence that Mr. Watson did it.

The Government talked about scanning things and copying them to make them look older.

Yeah, that happened. Guess who did it? Samir Rao, the co-founder, unbeknownst to Mr. Watson.

So there were, there were a lot of things that Mr. Rao, Mr. Venturapalli or whatever he wants to call himself, did that -- that were improper.

So, in trial you're gonna learn all about the loans and lies of Samir Rao. The loans and lies of Samir Rao. He took out these really predatory high-interest loans in order to fill some gaps. Right. Didn't tell anybody about the

details of these things, but Rao did a lot of things, took them out, and attempted to cover up what he had done.

Now, there are other things that Mr. Rao did, fake e-mails and fake websites. So, I mentioned the one about the YouTube exec. Everything, everything that happened was Samir Rao. Every transaction Samir Rao. Everything. But you know what, that wasn't his first time. Documents, evidence in this case will show that he, and he alone, practiced. And he was making up all kinds of e-mails, right. There's documents of him making up an e-mail for a senior executive at the Oprah Winfrey Network. And the e-mail address looked something similar to what Oprah's company's address looked like, but it wasn't the real one. And Samir Rao was doing this just practicing. In fact, you'll learn that he if he spent more time actually taking care of the real contracts than making up stuff, then we wouldn't be in this position in the first place. But he didn't, he wanted to take shortcuts, take the easy way out.

So, you'll see these e-mails that he's doing, and it -- this bears repeating, right. The Government said something to the effect that the deal with Oprah, he hadn't thought to lie, the deal with Oprah Winfrey. When their witnesses get up there and say that, and we can sit here all day, I guess, pulling up on YouTube and show them Black Women Own the Conversation, OWN, O -W-N, Oprah Winfrey Network.

It's a play on words.

So, if there's any doubt they had a partnership, there's a whole, what they call a library of TV shows, Black Women Own the Conversation. So, Ozy was real. They lied about that. Ms. Frison told you that that one actually won an emmy. You know, a big statue, an emmy, won it.

So, yeah, there was a deal with Oprah Winfrey. So fake e-mails, fake websites, Samir Rao did a lot of it, practiced it, became somewhat of an expert at doing it.

Now, you will hear the evidence largely from their witnesses that characterize Samir Rao as Mr. Inside and Carlos Watson as Mr. Outside. Watson was the one going -- going, reaching out to prospective clients. Watson was the one who was on the television programs. The Government tried to intimate that that's something bad, you know, The Carlos Watson Show. Yeah, it was his idea, it was his show, you know. Oprah Winfrey Show he didn't do yet, okay. That's -- nothing is odd about that. And Mr. Rao was the inside man. Mr. Rao was the one inputting all the data into this system that's called NetSuites. That was their accounting system. It's called NetSuites. Rao was the one that was doing that.

They will show you no evidence that Mr. Watson ever, ever accessed NetSuites. Never logged into NetSuites. Yeah, Mr. Watson was really available in the company. He wanted to know what was going on. He's one person. He couldn't do

everything. And that was one thing he didn't do. That was Mr. Rao's job, to go into NetSuites and make sure the books were set.

What happened, though, what the Government did not tell you is that while Mr. Rao was busy on GoDaddy or wherever doing fake e-mails and whatnot, Mr. Rao actually missed, simply did not add valid contracts onto NetSuites . Just didn't do it.

So the Government sits here and says, Well, they had, you know, over-represented their revenue. No, not at all. Mr. Watson told the truth. He was the one out there negotiating the contracts, right. He knew and -- and signing them. He knew if he signed either by hand or electronically by consent of the parties, that if he signed five contracts for ten dollars, he knew that's 50 bucks. He was never on logging into NetSuites , trying to track whether or not Samir had put it in. He assumed he'd want to put it in.

Now, I'm not suggesting this was intentional deception, this one thing by Mr. Rao. You will learn that Ozy Media grew from $8 million in revenue to about 325 million in revenue in only five years. The things that Mr. Rao was competent to do for an eight- million-dollar company -- the company just outgrew him. He didn't know how to do the financials for a three-hundred- twenty-five-million-dollar company. And if he's honest with you he'll admit that on the

stand. He certainly told other people that.

And, in fact, it became obvious because some of Mr. Watson 's funders said, Hey, we're gonna give you some more money, but you got to get rid of Mr. Rao as the bookkeeper. Right.

So, Mr. Rao -- terrible thing to be talked to death, so I'm not going to go through everything, but I am just going to give you an example of some of the evidence that you are going to hear in this case. Right.

So, for example, 2016, Ozy got a $250,000 contract from the Ford Foundation, big foundation. Is it anywhere in NetSuites? No. For whatever reason, I don't know why, Mr. Rao never put it in there.

2018, Paramount. You've all heard of Paramount, big company. Gave Ozy a $75,000 infusion. Mr. Rao just didn't put it in. Carlos knew it was there. Carlos knew that they had a signed contract and assumed it would add up, so when Carlos is telling investors, Yeah, we've got such and such in revenue, he was confident of that because he negotiated these contracts and he could add. He could do simple addition. Right.

2018, Budweiser, a beer company. Almost a half-a-million dollars, $414 million. Mr. Rao is out there making the fake e-mails and just did not put it in the system. If he had put it in the system, the numbers would be what

Mr. Watson said they were. And Mr. Watson assumed they were in the system. Why wouldn't he? Someone gave you half-a-million dollars, yeah, you want credit for it.

Another in 2018, JPMorgan Chase. JP Morgan Chase, the bank, big investment company. JP Morgan Chase. $2 million. Million. Did Mr. Rao put it into NetSuites? Nope. Nope.

You start adding these things up, as Mr. Watson roughly did in his head, you're going to come to the numbers that Mr. Watson was giving his investors just by simple, simple math.

I'm going to talk just briefly and let you go in just a second, about the investors. Right.

So, you saw some of them, Budweiser, Paramount, JPMorgan Chase, Goldman Sachs. Right? These aren't some, you know, little country folks that just don't know what they're doing. These are big entities. And you will learn that they had access to something called a data room where they could just go in and look at Mr. Watson's data. They didn't just -- you know, big companies like Goldman Sachs, you will learn, didn't just say, Oh, well, Carlos said we got this much money, ha, ha, ha, let's give him money. No, no, that's not how it works. You know that. They do their own due diligence. That's what you're gonna learn. And if they went into the data room and that they liked what they see -- what

they saw, you will learn that Goldman Sachs in its own investment memo said that, Look, it's a startup company. Mr. Watson didn't know they were saying this at the time, this was their private investment memos. Right. This is their memos where they are talking to each other to decide whether they're gonna invest in the company. They say, Look, for startups because, as Ms. Frison said, you know, you never know with a startup, a lot of them fail, et cetera, we're gonna discount or cut what we think it's worth by about 40 percent. Right. So, if we think it's worth a hundred dollars, we're gonna offer $40. Because of the high risk for these sort of startup companies.

You're gonna learn that Goldman Sachs valued Ozy at $270 million. That's after taking off the 40 percent.

Oh, Ozy was very real and Ozy was doing very well.

And furthermore, while we're talking about Goldman Sachs. The Government didn't tell you the whole story there. So, yet Goldman Sachs was Ozy's biggest investor. And even after Samir Rao's shenanigans with the fake call. Right. And all it was was a reference call. It was they were checking off boxes at that point. They had already written the term sheet, Goldman Sachs. So they're checking off boxes, reference did you do this, did you do this, did you do that. Even after that, Goldman Sachs still invested. They weren't bothered by it. They still invested. Carlos is calling them,

called his board. The Government didn't tell you that, right? Told them what happened. Put Mr. Rao on leave. Oh, the Government didn't mention that. The story gets a little more interesting, a little more complicated, thicker. So, Goldman Sachs still invested, still invested. It didn't bother them.

Ladies and gentlemen, Carlos Watson did not make misrepresentations to investors. He represented what he thought in good faith the revenue of his company was. And had their star witness, with the sweetheart deal, put the stuff in there, then we wouldn't be sitting here today. But, Mr. Rao, the little puppet for the Government, just, you know, says things that the Government wants to hear and, you know, says things and forgets that, well, we've got a bunch of contracts, Mr. Rao. You didn't put this in NetSuite, did you? So that wasn't on the total. Right?

Altered financials, that's the last thing I'll say about Mr. Rao.

So, sometimes Mr. Rao would make little changes in contracts. This is another thing where the Government said "they." No, no, no, that was Mr. Rao. And they're gonna ask you to believe Mr. Rao that Carlos knew, but the evidence is gonna show that you shouldn't believe Mr. Rao because he is a liar, and the evidence will show that he is.

And, in fact, the evidence is gonna show that Mr. Rao doesn't even abide by his own bail conditions. All

right. I told you Mr. Rao got arrested, pled guilty, was put on bail. You can see he's out, out in public. And there are certain conditions to bail when you're out in public. And one condition is that he not talk to potential witnesses in this case, right. He signed a paper, Judge, and Probation said, Can't talk to these people.

What does Mr. Rao do? One guess.

What does Mr. Rao do? Just one guess.

Goes and talks to people in this case.

You might think that he's in jail and come out that door (pointing). Nope. Sweetheart deal. He did it and the Government did nothing.

So, Mr. Rao would go in and alter these contracts, right. Some of these contracts you'll see are like 50 pages apiece. You know, it's the stuff that people like me, lawyers, will do and read. But he can easily change something here or there and nobody will notice because nobody is going back after you've negotiated the terms and reading 50 pages of a contract. Ozy had over 290-something contracts. 290-something. I think 299 is the total number. A lot of contracts. Mr. Outside, Mr. Watson, would negotiate the general terms: You do this for me, you do that for me, you know, we do this, you pay me $2 million. And then, you know, the lawyers and Mr. Rao would do the details, Mr. Inside. And if Mr. Rao was going back changing some things, right, where's

the beef?

Show me the conversation where he told Mr. Watson, Oh, I'm in this contract changing things.

Show me the e-mail where he says, Hey, let's -- let's -- let's defraud Goldman Sachs. I'm going to pretend to be a YouTube exec. Show me that e-mail.

You won't see it because it doesn't exist.

The next-to-last thing I want to tell you. I've told you a lot and I've said a lot because it's quite amazing that we are here in the first place, but we, as the Judge said, don't have to prove anything. The Judge said it right here to you. The Judge will say it again that the burden of proof is right here (pointing), stays at this table the entire trial. Never moves from this table. The burden of proof stays right here. Entire case.

Mr. Watson doesn't have to open his mouth, doesn't have to put on evidence. The Government must prove beyond a reasonable doubt to each and every one of you that they have proved its case. We certainly submit that the Government cannot do that.

The very last thing I want to say, ladies and gentlemen, and I very much appreciate your time, is you will hear evidence -- excuse my paper again, I want to get this right -- that over the years Mr. Watson turned down lucrative opportunities. If this were a fraud, that's what you do, you

come and you get the money. That movie, Show Me the Money, right. That's what fraudsters do. So let's march through this period of Ozy.

2013, Goldman Sachs, the president of Goldman Sachs engaged Carlos in conversations about coming back, he had already worked there, as partner at Goldman Sachs. It would have been roughly $5 million, worth $5 million. He declined.

2014, Jeff Zucker, CNN, asked Carlos to consider coming back as a -- coming -- well, back to CNN. I didn't mention this, but Carlos had a show on CNN. He was a guest commentator on CNN and MSNBC and Fox News constantly. But to come to CNN as co-anchor for The Morning Show. They never got to a salary offer there because Carlos said, Not interested.

So what did Carlos do? He negotiated something for Ozy, the company he loved, to do a segment on -- on CNN instead.

2019 --

THE COURT: Mr. Sullivan, how much longer do you have?

MR. SULLIVAN: Just a couple minutes.

Number -- 2019, BuzzFeed, one of Mr. Watson's competitors, offered to make Mr. Watson its president. The financial package, which you'll see, was worth up to 50, 5-0, million dollars in stock, and that came with around a two-million-dollar per year salary. Perfect time to get out,

take advantage of the fraud. No. He said, No. He believed in Ozy, in good faith believed in Ozy and wanted Ozy to work.

2021, Google. All right, the Government mentioned Google in its case. They offered Mr. Watson to be president of Google News. President of Google News. And they had to get approval from the Board of Directors, and there was a three -year deal on the table worth anywhere between 20 and $50 million in salary and stock, with the salary portion being $7 million per year.

So, for them to say Mr. Watson did this to get rich, he had plenty of opportunities, ladies and gentlemen, to get rich. He didn't do that. He believed in Ozy. He believed every number that he gave every investor.

And at the end of this case, I am going to stand up here in front of you and ask you to do the only fair, the only equitable, the only reasonable thing that the evidence in this case allows for, and that, ladies and gentlemen, is a verdict of not guilty on each and every count in this case.

I thank you very, very much for your time.

THE COURT: All right.

We are going to take a literal five-minute break here. We will be back here with the Government's first witness before 12:05.

(Jury exits.)

(Recess taken.)

THE COURTROOM DEPUTY: All rise.

(Jury enters.)

THE COURT: Please be seated. All right.

The Government may call its first witness.

MS. KASSNER: Thank you, Your Honor.

The Government calls Janeen Poutre to the stand.

(The witness entered the courtroom.)

THE COURTROOM DEPUTY: Please come forward. Come forward. Just come forward, ma'am. Step up. Raise your right hand. I am going to swear you in.

Take your time. Step up. Take your time. Take your time. Please raise your right hand.

You do solemnly swear or affirm that the answers and testimony you are about to give to the Court will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: Yes.

(Witness sworn.)

THE COURTROOM DEPUTY: Okay. Please have a seat. Take your time.

Please state your name for the record and spell your first and last name for the court reporter.

THE WITNESS: Sure.

My name is Janeen Poutre, J-A-N-E-E-N, P-O-U-T-R-E.

MS. KASSNER: Your Honor, may I begin?

THE COURT: Yes.

MS. KASSNER: Thank you.

**JANEEN POUTRE**, called as a witness, having been first duly sworn/affirmed, was examined and testified as follows:

DIRECT EXAMINATION

DIRECT EXAMINATION

BY MS. KASSNER:

Q Good afternoon, Ms. Poutre.
A Good afternoon.
Q Could you briefly describe your educational and professional background for the jury?
A Sure.
I went to college at California State University at Bakersfield, and I worked in -- I majored in business with accounting as a concentration. And I worked in finance and accounting throughout my entire career, and I obtained my CPA license.
Q What is a CPA license?
A It's a Certified Public Accountant. After college, you take a test, an exam, and you do certain hours, required hours under the supervision of a CPA. And then you're able to get your CPA license.
Q Are you familiar with a company known as Ozy Media, Inc.?
A Yes.
Q Is it also commonly known as Ozy?
A Yes.
Q How are you familiar with Ozy?

A I used to work there.
Q What years did you work at Ozy?
A Starting in 2016 and ending employment in 2019, but then I went back early 2020 as a contractor for a few weeks.
Q And from 2016 to 2019, what was your official title at Ozy?
A Vice president finance.
Q How did you first come to learn about Ozy?
A I was working with a recruiting firm who called me and told me about the role at Ozy.
Q What kind of company is Ozy?
A It's a digital media entertainment company.
Q Where is Ozy based?
A Mountain View, California.
Q Approximately how old was the company when you started working there?
A About three years old.
Q Who founded Ozy?
A Carlos Watson and Samir Rao.
Q Who was the primary person in charge of Ozy while you were working there?
A The CEO was Carlos.
Q Do you see Carlos Watson in the courtroom today?
And if you need to, you can stand up.
A I do.

Q Can you identify him by an article of clothing that he's wearing?
A He's wearing a white shirt and a blue tie.
MS. KASSNER: Let the record reflect that Ms. Poutre has identified the defendant.
Q What kinds of products did Ozy offer during the time that you worked there?
A Ozy had a digital magazine online, so a magazine online, pretty much. And Ozy had television shows and festivals and podcasts.
Q So, let's start with television shows.
Can you give an examples of some of Ozy's television programs?
A Sure. There was a show called Contenders, 16 for 16. There was a show called Black Women Own the Conversation. There was a show called Breaking Big.
Q So you mentioned Black Women Own the Conversation.
On what network did that show air?
A OWN.
Q Who was the host of the show?
A Carlos Watson.
Q Why was Carlos Watson the host of a show called Black Women Own the Conversation?
A Carlos Watson was the head of Ozy, and he was pretty much in front of the -- all of -- in front of the audience most of

the time.

Q Are you familiar with a show called The Carlos Watson Show?

A Yes.

Q What was The Carlos Watson Show?

A I believe it was a show that -- where Carlos interviewed people.

Q Where did that show air?

A I believe that was YouTube.

Q You also mentioned live events.

What kind -- and festivals, I think you said, is that right?

A Correct.

Q What kinds of festivals did Ozy host?

A The main one was a festival called Ozy Fest.

Q Who was on the stage interviewing people during Ozy Fest?

A Mostly Carlos, and then sometimes other journalists.

Q You also mentioned a digital, I think you called it a digital magazine?

A Uh-hum.

Q Was that on a website?

A Uh-hum, correct.

Q And what kinds of content did Ozy publish on its website?

A Most of the content was news and articles, interesting information in articles that you wouldn't find in mainstream

news.
Q You also mentioned podcasts.
What kinds of podcasts did Ozy offer?
A Same sort of, just anything that would be of interest to millennials that wasn't really carried in mainstream news.
Q Generally speaking, who hosted Ozy's podcasts?
A I didn't really listen to the podcast, to be honest, so....
Q Do you know if Carlos Watson hosted any of the podcasts?
MR. SULLIVAN: Objection, leading.
THE COURT: Overruled.
If you know.
A At this time, I can't remember.
Q What, if anything, differentiated Ozy from other digital media startup companies?
MR. SULLIVAN: Objection, foundation.
THE COURT: Can you repeat the question?
Q What, if anything, differentiated Ozy from other digital media startup companies?
THE COURT: You can answer that question.
Overruled.
A It just wasn't mainstream. It was different type of content and -- and meant for, like, millennials.
Q You mentioned that you began working at Ozy as the vice president of finance in 2016.

Who hired you?
A Carlos Watson and Samir Rao.
Q Why did you decide to join Ozy?
A Most of my career I worked in high tech for very technical companies, and at this point, the latter part of my career, I wanted to do something different and Ozy was definitely different than anything that I had ever done before. I thought it was interesting, you know.
Q Approximately how many employees were there at Ozy at that time?
A Employees and full-time contractors, I would say between 35 and 50.
Q And that's including full-time contractors?
A Uh-hum.
THE COURT: Sorry, what year is this?
THE WITNESS: 2016.
THE COURT: 2016.
THE WITNESS: Uh-hum.
BY MS. KASSNER:
Q Did you work in a physical office?
A Yes.
Q Where was that office located?
A In Mountain View, California.
Q What was the work environment like at Ozy?
A I would say the work environment was pretty stressful.

We, um, hired -- the company hired a lot of young talent fresh out of school without a lot of experience, very smart. And so, a lot was expected out of them.

Q I think you mentioned earlier an individual named Samir Rao.

What was his official title at Ozy?

A VP operations, I believe.

Q And are you familiar with an individual named Suzee Han?

A Yes.

Q What was her role at Ozy?

A She was the chief of staff.

Q At a high level, what was your role as the vice president of finance at Ozy?

A So, I was responsible for all things finance related. So, recording transactions -- my team; balancing books, reconciliations, forecasting, managing cash. Those type of things.

Q Approximately how many people were in the finance department?

A At any given time, between two and five.

Q Are you familiar with someone named Claire Lightfoot?

A Yes.

Q Who was Claire Lightfoot?

A Claire Lightfoot was the senior accountant, and then she became the accounting supervisor.

Q Did Ozy have a dedicated sales team?
A Yes.
Q How did Ozy's finance team interact with its sales team?
A We would have to record certain transactions, like their travel expenses. We'd pay the payroll, including commissions. We invoiced based on contracts that they closed with customers. And we would also have them help us to collect money when we needed help collecting from agencies or other customers.
Q Who oversaw the sales team?
A At different -- sometimes it was Carlos, sometimes it was Samir.
Q And who oversaw the finance department at Ozy?
A Samir.
Q How involved was Samir on the day-to-day operations of Ozy's business?
A Very, very involved.
Q How involved was Carlos Watson in the day-to-day operations of Ozy's business?
A Very involved.
Q Can you describe Carlos Watson's management style?
A It was tough. He demanded a lot. He was always asking for more.
Q Was Carlos Watson aware of the money that came into Ozy?
A Yes.

MR. SULLIVAN: Objection -- objection to form.

THE COURT: Overruled.

Q You can answer the question.

THE COURT: Well, let's lay a little bit more of a foundation here.

MS. KASSNER: Okay.

THE COURT: Can you elicit how they worked together in this regard?

BY MS. KASSNER:

Q So as the vice president of finance at Ozy, did you regularly work with Carlos Watson?

A Yes.

Q Was -- did you communicate with Carlos Watson on a regular basis?

A Yes.

Q How did you communicate with Carlos Watson?

A In person, e-mail, sometimes text.

Q And you mentioned that you had an office at Ozy.

Where was Carlos Watson's office located in proximity to yours?

A One door down. There was one office between ours.

Q And who was in that office?

A Samir.

Q And how many times per week would you say you communicated with Carlos Watson?

A It varied. Sometimes a lot. He traveled also a lot, so sometimes not that much, but often.
Q So based on your communications with Carlos Watson, to your knowledge was he aware of the money that was coming into Ozy?
A Yes.
Q How do you know that?
A Because I would do cash reports, management updates, and I would put in there lots of details and information about cash coming in, what came in, what we expected to come in. Collections was very important.
Q When Carlos Watson told you that money would be coming in, did it always come in?
A No.
Q Why do you say that?
A Excuse me?
Q Why do you say that?
A Oh, we were always light on cash, and so we would anxiously await funding from any source so we can, you know, pay our obligations. And so, sometimes we would -- we would hear that money's coming in. We would expect it, but it wouldn't come in, didn't come in.
Q And when you say "we" expected it, who are you referring to there?
A My team and myself.

Q The finance department team members?
A Yes.
Q Based on your discussions with Carlos Watson, was he aware of money going out of the company?
A Yes.
Q How do you know that?
A Same, because I -- I prepared cash updates and reports and we discussed it.
Q As part of your role as the vice president of finance, did you keep track of Ozy's annual revenue?
A Yes.
Q What is revenue?
A Revenue is money, income that you earn from customers selling your goods and services.
Q Is revenue an important metric for a business?
A Yes.
Q Why?
A Because revenue gives you -- it's how -- I mean it's a measurement of your success. It's -- it's the -- it's the point of being in business, that you can make money to pay your bills and exist.
Q Are you familiar with the terms historic revenue and projected revenue?
A Yes.
Q What is historic revenue?

A Generally, historic revenue is revenue that you have earned, that you performed a good or service for.
Q What is projected revenue?
A Projected revenue is revenue that you want to earn, think you can earn in the future.
Q Are you familiar with a program called NetSuite?
A Yes.
Q What is NetSuite?
A NetSuite is a system that is designed to house your financial transactions.
Q Did Ozy use NetSuite?
A Yes.
Q What did it use it for?
A To record transactions, financial transactions.
Q At Ozy who was responsible for inputting transactions into NetSuite?
A Mostly my team.
Q And your team meaning who?
A My senior accountant, my director of finance, my accounting manager.
Q Was every dollar of revenue that Ozy earned accounted for in NetSuite?
A Yes.
Q How do you know that?
A Because when we recorded revenue, we invoiced customers.

So, we were always working closely with the sales team on deals that were closed and monitoring the terms of the deal in order to book revenue and invoice customers. And that was done in NetSuite.

Q Can you explain for the jury the process after a contract is signed, of how funds are later input into NetSuite?

A Funds or the transaction?

Q Whatever is actually input into NetSuite. So starting from a contract, ending with the input in NetSuite.

A Uh-hum. Okay. So, the sales team would work with the customer and agree upon whatever they were buying from NetSuite. If it's -- if it was a digital order, we called them insertion orders, Ozy would run certain advertisements on the website. And when the advertisements were run, we would invoice the customer and input that invoice, the customer information and the dollar amount, into NetSuite. So, we always knew who owed us money and....

Q So is it -- so at what point after a contract is signed are there actual entries in the program?

A In NetSuite? After we invoiced the customer.

(Continued on the following page.)

(Continued on next page.)

BY MS. KASSNER:

Q When a contract is signed does that necessarily mean that there will be an entry in NetSuite?

A The only time a contract -- no. You put it in NetSuite when there is an action, when there is a financial transaction. So if you, if the customer wanted to pay you in advance, then you could put it in NetSuite and you would defer the revenue. But generally customers don't like to pay in advance, they want you to pay after you've done whatever you've contracted to do. And so at that point you would put it in NetSuite. We tracked insertion orders and other contracts in Excel so then we knew what campaigns were coming up. It helped to forecast and it helped for my team to know when it invoiced the customers.

Q If Ozy had a contract for $100,000 and half of it is going to be performed tomorrow and the other half is going to be performed next year when would the entry be made in NetSuite and for how much?

A It would be made tomorrow for half. And then the following year for the other half.

Q Who is responsible for regularly updating NetSuite?

A My team.

Q Did you update and maintain data in this NetSuite in the ordinary course of business at Ozy?

A Me or my team?

Q And you and your team.
A My team, yes, yes, uh-huh.
Q Did you and your team export spreadsheets from NetSuite in the ordinary course of business?
A Yes.
Q Did you also share spreadsheets from NetSuite with tax accountants in connection with Ozy's annual tax filings?
A Yes.
MS. KASSNER: Your Honor, at this time I'd ask to show the witness what is previously marked as Government Exhibit 5033.
THE COURT: Please.
MS. KASSNER: If we can blow up the top portion.
BY MS. KASSNER:
Q Do you recognize Government Exhibit 5033?
A Yes.
Q Do you see it on your screen?
A Yes.
Q What is Government Exhibit 5033?
A An email from me to our tax accountants dated October 11, 2019, with the subject 2018 tax return information request.
MS. KASSNER: Permission to show the witness what is previously marked Government Exhibit 5033D?
THE COURT: Yes, permission granted.
Q Do you recognize Government 5033D?

A Yes.
Q Is it an attachment to Government Exhibit 5033? Is it an attachment to the email we just looked at?
A Yes.

MS. KASSNER: At this time I move to admit Government Exhibit 5033 and 5033D into evidence and publish them to the jury.

MR. SULLIVAN: Without objection.

THE COURT: Without objection they are admitted. You may publish.

(Government Exhibit 5033 & 5033D, were received in evidence.)

Q Starting with the email 5033. Who did you send this email to?
A To our tax accountants with Samir CCed.
Q If we can blow up the whole email. What, if anything, did you attach to the email?
A The information that you see in letters A through H.
Q If we could now publish to the jury Government Exhibit 5033D. Turn to the tab titled income statement, show the full picture. What is an income statement?
A Income statement is the statement of the revenue that you have earned and the expenses that you have incurred to your profit or loss.
Q Is an income statement meant to represent the complete

accounting of Ozy's finances during the years shown in the spreadsheet?
A Yes.
Q If we could blow up the right-hand portion so everyone can see it. What was Ozy's revenue for 2016?
A $6,350,673.96.
Q In what row and -- the rows aren't shown here. If we could just go to the left. What row and column does that appear in?
A M18.
Q What was Ozy's revenue for 2017?
A $6,744,699.12.
Q What row and column does that appear under?
A N18.
Q And finally, what was Ozy's revenue in 2018?
A $10,011,569.78.
Q What row and column is that under?
A O18.
Q To your knowledge, were these revenue figures accurate for the years 2016, 2017, and 2018?
A Yes.
Q I'm looking at the spreadsheet, I see it says FY next to the years. What does that mean?
A Fiscal year.
Q What fiscal year did Ozy use?

A We had the calendar fiscal year, December 31.
Q Were these annual revenue figures shared with Carlos Watson?
A Yes.
Q How did you share these figures with Carlos Watson?
A Various reports.
Q Did Carlos Watson ever say that the revenue numbers contained in this income statement were not accurate?
A Yes.
Q What, if anything, did he say was missing?
A In kind revenue.
Q How did you respond when he said that to you?
A That it really isn't GAAP revenue that I could record.
Q So you said GAAP revenue. Can you explain to the jury what GAAP is and what you meant by that?
A Sure. General accounting principles is what GAAP is. And it is the rules in which accountants are to follow to record transactions and report upon.
Q Are these accounting principles standard across various industries?
A Yes.
Q You mentioned something called in kind revenue. What is your understanding of what in kind revenue is?
A In kind revenue is basically exchange something other than monetary compensation. So, I'll do a service for you and

you do a service for me in return.
Q Based on your training, is including this in kind revenue consistent with what you call GAAP?
A No. It's very difficult to record in kind revenue and have an auditor sign off on it.
Q Why is it difficult to report in kind revenue?
A One of the principles to recognizing revenue is you have to invoice the customer. And many times with in kind, the ones that I saw, heard about here, there was no way to invoice anyone, that's requirement for revenue.
Q When you say there was no way to invoice anyone, is that because there was no cash being given to Ozy?
A Yes. There wasn't a payment due, there wasn't a -- there wasn't anybody to invoice. There wasn't a dollar amount that you could calculate. So yes, there really wasn't a way to invoice.
MS. KASSNER: I'm going to pause here, your Honor. I'm not sure, this might be a good time to take lunch.
THE COURT: If this is a natural stopping time, we can break for lunch now.
Ladies and gentlemen of the jury, enjoy your lunch break. Do not discuss the case, even amongst each other. Don't speak with anybody who is involved in this case, the lawyers, or the parties, or me.
Enjoy your lunch break. We'll see you back here at

1:45.

(Jury exits the courtroom.)

THE COURT: The witness can step down.

(Whereupon, the witness steps down.)

Let me talk to the lawyers at the sidebar for a moment.

(Continued on the next page.)

(Sidebar conference.)

THE COURT: My monitor is not either working, we'll work on it at the lunch break to make sure that your evidence monitor is working and mine is.

I was advised this morning that for the walk through of the technology in the courtroom the defense sent Mr. Watson himself, not a lawyer or paralegal. I was further advised that Mr. Watson -- you'll tell me if this is not correct -- but that Mr. Watson was firing questions at the courtroom deputy about the status of the motions in this case and other substantive matters.

That should not happen. Mr. Watson is not your tech person; send a paralegal or a lawyer, not the defendant himself. And please caution your client that he should not having substantive discussions about the case with the court under any circumstances. Nothing was communicated that I was concerned about, but this should never have happened in the format that it did. We're in federal court. Here we're going to abide by formalities. I trust that nothing like this will recur.

MR. SULLIVAN: Okay.

THE COURT: Why is he doing tech?

MR. SULLIVAN: He was here with two paralegals.

THE COURT: He's not an IT guy, don't send him.

MR. SULLIVAN: You asked me what he was here for.

THE COURT: He's a lawyer so therefore?

MR. SULLIVAN: And a tech guy who ran a media company, your Honor; but, understood. I won't send him.

THE COURT: I feel like I'm getting news like this on an almost daily basis, that something the defense did is the deviating for how things are done in federal court. I'm sending a broader message here as well, I would like that pattern to stop. Whether it's with the exhibits, or whether it's with all of these conversations we're having.

In terms of witness lists, the Government should provide a witness list.

MR. SIEGEL: I have an answer on that.

On April 12 as part of our 3500 disclosure, we disclosed 60 witnesses who we anticipate calling for the trial. The 200-person list Ms. Gilbert is referring to is the list of names and entities for voir dire, which is broader.

THE COURT: Did you give something that we call an exhibit list?

MR. SIEGEL: We also provided an exhibit list.

THE COURT: Sorry, witness list.

MR. SIEGEL: We provided an index, these are the individuals and the 3500.

I should say, it was 60 people on it April 12. On May 17 we of added one additional witness for which we provided 3500 for and added to our list.

THE COURT: That sounds like a witness list to me.

MR. SIEGEL: To be clear, that's not to say we're going to call every person on that; just like I assume the 40-person list from defense, not everyone will be called.

MS. GILBERT: They provided 413,979 documents on April 13. I just want to be clear that that is.

THE COURT: One of them was a witness list.

MS. GILBERT: As you know, I joined the case two weeks ago, I'm getting up to speed. But I just want to say we received in the last several, last month almost 460,000 documents.

THE COURT: Nevertheless, if you're going to come to court and represent you haven't gotten a witness list when in truth you have, you need to at least have made a good faith effort to make sure that what you're saying to the Court is correct.

Ms. Frison, this morning I asked you if the photographs in your slide deck had been marked as exhibits, you said yes. It turned out, I think, that the answer was no.

MS. FRISON: They actually are. We were having trouble finding the number. But we did find the number to the PowerPoint DX522.

THE COURT: I don't want to belabor this. Things that the parties represent to the Court should be accurate. If the answer is you don't know, you should feel free to say I

don't know. But I think we need to be able to rely on what people are telling me happened when.

MS. GILBERT: What is the number?

MR. SIEGEL: The 3500 index that we sent you every time we add new 3500.

MS. GILBERT: So that is your exhibit list -- your witness list, the 3500 material?

MR. SIEGEL: It's the material organized by witness. If you want it in different format or bullet point --

THE COURT: I think we're done here. Have a great lunch.

(Continued on next page.)

A F T E R N O O N   S E S S I O N

(In open court; jury not present.)

THE COURT: Please be seated.

We'll go back on the record at this point.

MR. SIEGEL: Your Honor, would you like the witness on the witness stand, or should we call her in once the jury's in?

THE COURT: You can put her in the witness box.

(Witness resumes the stand.)

THE COURTROOM DEPUTY: All rise.

(Jury enters.)

THE COURT: Please be seated.

I will remind the witness that you are still under oath, and the Government may please continue.

MS. KASSNER: Thank you, Your Honor.

**JANEEN POUTRE**, called as a witness, having been previously first duly sworn/affirmed, was examined and testified further as follows:

DIRECT EXAMINATION (Cont'd)

BY MS. KASSNER:

Q Ms. Poutre, I want to focus on your experience working for Ozy in 2018.

Generally speaking, how would you describe Ozy's financial condition at that time?

A It was very stressful.

Q Why do you say that?
A Because we did not have enough cash to pay our bills, and that was very stressful.
Q You mentioned that one of your responsibilities was managing Ozy's cash. Practically speaking, what did it mean to manage Ozy's cash?
A That meant to know what was coming in and knowing what we needed to pay and to try to meet our obligations as best as we could, to collect money as fast as we could, and try to satisfy as many of our bills as we could.
Q Can you give examples of some of Ozy's biggest sources of revenue in 2018?
A Digital, the online property, and then we had some earnings from the television show. But mostly digital.
Q And when you say "digital," what do you mean by that?
A The online magazine.
Q And was that advertisements on the magazine?
A Yes.
Q What were some of Ozy's biggest expenses in 2018 \?
A 2018 would have been OZY Fest, producing television shows, payroll. People are expensive.
Q What if any challenges did you face in managing Ozy's cash flow?
A We didn't have enough cash to pay our bills when they were due.

MS. KASSNER: At this time, I'd like permission to show the witness what's been previously marked as Government Exhibit 5001.

If we could blow up, sir, the entirety of the text for the whole exhibit just so Ms. Poutre could see it.

Q Ms. Poutre, do you recognize Government Exhibit 5001?

A Yes.

Q What is it?

A This is an email from me to Carlos and Samir on January 22, 2018, with the subject of Cash Update.

MS. KASSNER: Your Honor, at this time I move to admit Government Exhibit 5001 into evidence and publish it to the jury.

MR. SULLIVAN: Without objection.

THE COURT: With no objection, Exhibit 5001 is received. And yes, you may publish.

(Government Exhibit 5001, was received in evidence.)

(Exhibit published.)

MS. KASSNER: And if we could blow up again the whole email just so we could see what it's about.

BY MS. KASSNER:

Q The subject line of the email says Cash Update. What's a cash update?

A Cash update is an update on our cash position at a particular time when I was sending the email.

Q How often did you send cash updates to Carlos Watson and Samir Rao?
A Weekly; sometimes more often.
Q In the bottom half of what we're looking at here, there's a section that says Urgent/Critical.
MS. KASSNER: If we could just blow up that portion so we can see the text a little clearer.
Q Under this section, in the second paragraph, you note: "Most importantly, we are not able to make payroll on Monday without cash coming in this week."
Can you explain what you meant by that?
A So we used a company to -- we processed our payroll through a company, and once we processed payroll, the company would go into our bank account and take money out of our bank account and transfer it to employees.
Q What is payroll?
A Payroll is the compensation you give your employees.
Q Was being able to make payroll significant to Ozy?
A Yes.
Q Why?
A Because if you can't make payroll, your employees would know that you are having cash problems. It will signal panic and a lot of other not great things throughout the organization.
Q How often was Ozy unable to make payroll during your

tenure at the company?
A Many times.
Q Were there any times when Ozy, in fact, didn't make payroll?
A Yes.
Q What happened then?
A Then we had to calculate it as if we're going to run it, but pull it and actually send the net payment to employees by a wire transfer.
Q Were employees, to your knowledge, aware that Ozy hadn't made payroll?
A Yeah.
Q How were they aware of that?
A Because -- I wouldn't say all of the employees knew, but some of them knew. The deposit into their account looked different. Instead of a deposit from ADP, it would be a wire transfer from Ozy, and some employees knew -- some banks charge a fee, nominal, like 15, 20 , whatever, to receive a wire transfer in their bank account, whereas a payroll transfer is free. So some of the employees asked to be reimbursed for the fee that their bank charged them.
Q Did you discuss Ozy's inability to make payroll with Carlos Watson?
A Yes.
Q What, if anything, do you recall saying to him?

A Just like this email, I just updated saying, you know, we may not be able to make payroll because our cash was too low, so there wouldn't be enough for the payroll company to deduct from our account.
Q And what, if anything, do you recall Carlos Watson saying in response?
A Mostly pressure to try to collect as much as we could, or he would say some money's coming in. He would ask how much is needed, and then some money would come in to make payroll.
Q How involved was Carlos Watson in managing Ozy's cash flow?
A In that regard, very -- very involved.
Q Was he aware that Ozy was constrained in terms of its finances?
A Yes.
Q How do you know that?
A Because I would send them an update on a weekly, sometimes more-often basis telling them we are having many phone calls from our vendors. These are the vendors that are upset, this is the amount that we need to pay, this is the amount that we have, there's a shortfall. So yeah, I would update them so they were aware.
MS. KASSNER: Permission to show the witness what was previously marked as Government Exhibit 6005.
Q Do you recognize Government Exhibit 6005? And we'll take

a minute to sort of show you the top of it. We'll also just zoom in on the whole thing so you can make sure you recognize it.

Do you recognize this exhibit?

A Yes.

Q What is it?

A This is an email sent from me to Carlos and Samir March 30 , 2018, with the subject Cash Update as of March 29, 2018.

MS. KASSNER: At this time I move to admit Government Exhibit 6005 into evidence and publish it to the jury.

MR. SULLIVAN: Without objection.

THE COURT: With no objection, it is admitted and you may publish.

(Government Exhibit 6005, was received in evidence.)

(Exhibit published.)

Q So at the top of the subject line is Cash Update as of March 29, 2018. Is this another one of those cash updates you mentioned earlier?

A Yes.

Q And scrolling to the bottom of page 1, there's a section highlighted that says "Details of Cash Needs." Do you see that?

A Yes.

Q Can you walk us through some of the things listed here and what they mean?
A Sure.
So for payroll, I was saying that payroll was due on the 28th. And then we have to pay commissions to our sales team. Commission was -- we can pay -- we needed to pay it as soon as possible. Sometimes we could push it out. So I was saying that we can push it to next week if we absolutely have to. And then the amounts -- there are the sales team and the amount of commission that they -- that we needed to pay them. And then also taxes, employee taxes.
MS. KASSNER: If we could zoom back out and scroll down.
Q There's a section at the bottom, the last bullet point, and it says: "55K vendors who are screaming who we should try and pay."
Can you explain to the jury what you meant by that statement?
A That means those were the vendors who were contacting my team and myself and getting more and more aggressive and upset and demanding that we pay their invoice.
Q In the parentheses there's also a statement: "There are many others." Why did you say that?
A Because our whole accounts payable was much larger than that number. These are just the ones that were constantly

calling looking for answers and demanding their money.

Q How common was it for Ozy to delay paying vendors?

A Constant; very common.

Q Why?

A Because we were always cash constrained. And so we paid our vendors as slowly as possible.

Q Were there any instances where Ozy didn't pay its vendors at all?

A I can't recall off the top of my head. I know that we only paid the ones we absolutely had to pay. But if we didn't pay anybody at all, like, I can't recall off the top of my head right now.

Q Was Carlos Watson aware that Ozy often delayed paying vendors?

A Yes.

Q Did you discuss that with him?

A Yes.

Q In general, based on your knowledge and your experience at Ozy, were other employees at Ozy aware that Ozy wasn't paying its vendors?

A Some were, yeah.

Q Was everyone aware of that?

A I'm not sure.

Q Who had ultimate decision-making authority about which vendors would be paid?

A The way it worked was vendors would contact mostly my team, sometimes myself, sometimes even Carlos and Samir, asking for payment. We would come up with a proposal on who we wanted to pay. And then sometimes they would agree, Carlos and Samir, and then sometimes they would not agree. So ultimately the decision, I could have been overruled on what I thought we should say.

THE COURT: Sorry. Sometimes who would agree? I didn't hear what you said about who would agree or not agree.

THE WITNESS: Oh, Carlos and Samir, sometimes they would agree on this is the list that we need to pay and this is when we need to pay it, and sometimes they would not agree, or change the amount or just whatever. So it could be overruled. I didn't have the final say, like, I am going to pay these people on Friday with these funds. There was always a discussion -- not always, but it was open for me not being able to.

BY MS. KASSNER:

Q If Carlos and Samir, among the two of them, disagreed about payments to vendors, who ultimately -- whose decision would rule the day?

A Carlos.

MS. KASSNER: At this time, I'd like to show the witness what's been previously marked as Government Exhibit 6015.

Q Do you recognize -- and we're just going to scroll down so you can see the whole thing. Do you recognize Government Exhibit 6015?

MS. KASSNER: We can scroll back all the way to the top.

A Yes.

Q What is Government Exhibit 6015?

A This is an email to me from Carlos, cc'ing Samir, dated July 8, 2018, with the subject Recap + Next Steps.

MS. KASSNER: At this time I move to admit Government Exhibit 6015 into evidence and publish it to the jury.

MR. SULLIVAN: Without objection.

THE COURT: Without objection, it's received.

(Government Exhibit 6015, was received in evidence.)

(Exhibit published.)

MS. KASSNER: If we could just scroll all the way to the bottom and start at the last -- the first email in the chain, but the bottom of the exhibit.

Thank you.

BY MS. KASSNER:

Q Do you see an email that's at the bottom of the page that we're looking at? At the top, it says "Saturday, July 7, 2018, at 6:09 p.m. , Carlos Watson wrote." Do you see that?

A Yes.

Q Is that an email that Carlos Watson sent to you?
A Yes.
Q If we scroll up, there's a response on Sunday, July 8, 2018, at 3:45 p.m. Is that a response that came from you back to Carlos?
A Yes.
Q There's writing that's highlighted in green. Whose writing is that?
A Mine.
Q And then there's writing that doesn't have any highlighting. Whose words are those?
A Carlos.
Q So the first section is titled Budget. What if any challenges did you face in managing Ozy's budget?
A The main challenging -- the main challenge was that our sales numbers were behind and our expenses were not, so just always having to re-forecast and try to manage the budget based on what we thought we were going to get in.
Q In your view, was Ozy operating within its financial means in 2018?
A No.

THE COURT: Sorry. When you say that your numbers were behind, behind what?

THE WITNESS: A budget. So we would have a forecast, a budget of what we thought we would earn from

various revenue streams, and so if we were to make that number, then we would be on target. But if we were lagging behind, if we're not closing deals or, you know -- then we would not -- we would be behind our budget, our target, what we wanted to earn.

THE COURT: Thank you.

BY MS. KASSNER:

Q And how involved was Carlos Watson in setting those goals?

A Very much so.

Q In this email, the writing -- Carlos Watson says: "Do not let this drag out. As you get this done, please continue to identify opportunities to accelerate revenue and decrease spend to get us to 22," I think "M over negative 4M."

First of all, what is the M?

A Million.

Q What did you understand Carlos Watson to be saying here?

A He's saying that he wants revenue to be $22 million and he wants expenses to be $26 million, so we have a loss of $4 million.

Q Was there any accounting reason for that number that you're aware of?

A The 22 million or the 4 loss?

Q Both numbers.

A No, it was a budgeted forecast. It's targets.

Q Does that essentially mean a goal?
A Yeah.
Q Who set that goal?
A Carlos, here.
Q And you respond: "I will not have a problem getting to 22 million in revenue for management reporting by adding in-kind."
First of all, what does "for management reporting" mean?
A Management reporting is different from financial reporting because you have more flexibility to present numbers that is useful for management. So you don't have the constraints of a gap. Management reporting, you can report highlights, low lights on whatever financial part of your business that you want to discuss.
Q And are numbers that are for management reporting, are they intended to be shared with outside investors?
A Generally, no.
Q Why not?
A Because usually there should be a lot of context and inside knowledge around management reporting, and it's not really applied in a way that somebody who didn't explain how you came up with those numbers -- if they didn't understand how you came up with those numbers, then, you know, it could be misleading.

Q And in this section, you say: "I won't have a problem getting to 22 million by adding in-kind."
Is that "in-kind" the same thing that we have been talking about earlier, in-kind revenue?
A Correct, yes.
Q And then you write: "Let's plan on Sharon stretching to bring in a true 22 million, or at least bookings, and the in-kind will just serve to put us in an even better position."
First of all, who is Sharon?
A Sharon was the head of sales.
Q And why do you say "let's plan on Sharon stretching to bring in a true 22 million"?
A Because that's what the goals were. That's what a true -- that's what she -- for her to go to close deals, get contracts and real revenue that we can deliver and bill against and collect and use the cash back in the business like real revenue.
Q In your view, is this $22 million figure legitimate?
A It was a goal.
Q And was it Ozy's reality?
A It did not work out to be $22 million, no.
MS. KASSNER: Permission to show the witness what's been previously marked as Government Exhibit 6018 .
THE COURT: You can show the witness.
Q If you could just look at the document and then we'll

blow up the top portion.
A Okay.
Q Do you recognize Government Exhibit 6018?
A Yes.
Q What is it?
A This is an email from me to Carlos dated August 18, 2018, cc Samir, and the subject is 2018 through 2019 Cash Forecast.
MS. KASSNER: At this time I move to admit Government Exhibit 6018 into evidence and publish it to the jury.
MR. SULLIVAN: Without objection.
THE COURT: Without objection, it is admitted and you may publish.
(Government Exhibit 6018, was received in evidence.)
(Exhibit published.)
MS. KASSNER: If we could blow up the section of the text that you sent starting with "Hello Carlos and Samir" just through the bottom.
BY MS. KASSNER:
Q Generally speaking, can you just explain what this email is about?
A The 2018, 2019 cash forecast? Giving them a Google sheet and I'm telling them how it works, and in the top section I'm saying it represents a fully-loaded forecast, and then I'm telling them that it has everything included in 2018, and then

I'm telling them what's in the bottom section, and then I gave a summary.
Q If we could go to the bottom of page 1 , there's a section called Concerns and Assumptions.
A Uh-huh.
Q We're going to blow up a paragraph within that that says: "I have reduced 2018 revenue from 22 million to 12.7 million across all channels; TV, Digital, Events."
What did you mean by that?
A That means at this time I'm changing the forecast from 22 million to 12.7 million across all the lines of revenue that Ozy had.
Q Why did you change the forecast in August of 2018?
A It was a number that I thought more likely to be a forecast and a number that we could reach.
Q Did you think you could reach the $22 million figure as of then?
A At this time? No. I reduced the forecast.
MS. KASSNER: Permission to show the witness what's been previously marked as Government Exhibit 6020.
THE COURT: You may show the witness.
Q Do you recognize Government Exhibit 6020?
A Yes.
Q What is it?
A It's an email from me to Carlos, cc'ing Samir, sent on

September 14, 2018 with the subject Cash Update, Friday, September 14, 2018.

MS. KASSNER: At this time I move to admit Government Exhibit 6020 into evidence and publish it.

MR. SULLIVAN: Without objection.

THE COURT: Without objection, it's admitted and you may publish.

You can publish everything that is admitted, assuming you're publishing it on the screen.

MS. KASSNER: Thank you, Your Honor.

(Government Exhibit 6020, was received in evidence.)

(Exhibit published.)

MS. KASSNER: If we could blow up the first portion of the email.

Thank you.

BY MS. KASSNER:

Q There's a section called Additional Payments. Does this section include questions asked by Carlos and responses provided by you?

A Yes.

Q So starting with number 1, Laura Beck, within there it says: "We owe her 16K, but I'll try and get away with paying 12K."

Who wrote those words?

A Me.

Q And what did you mean by that?
A Her invoices totalled 16,000, but I thought maybe we could make her happy and to stop screaming with only paying 12,000 and paying the rest later.
Q And then number 3 on the list is Rent. Someone asked: "How long can you safely wait?" Who wrote that?
A Carlos.
Q And what was the response that you gave?
A "Maybe another week."
Q How often did Ozy not pay its rent?
A Toward the end, end of my tenure there, quite often. We'd pay it late all the time.
Q And then number 5 --
THE COURT: Sorry. Remind me, what is the end of your tenure at Ozy, approximately?
THE WITNESS: Sure. I left, it was September, October- ish of 2019, and then I went back for a few weeks in 2020.
THE COURT: Thank you.
BY MS. KASSNER:
Q And then number 5, it says Expense Report, and then someone asked: "Which ones are urgent?"
Who asked that question?
A Carlos.
Q And then what was your response?

A "Sharon's alone are over 12,000. She's been asking. The plus another 10,000 for employees who've been asking. The true total is over 60,000."

MS. KASSNER: And if we could scroll down in this message to a section that says "We borrowed against all AR."

Q So it says here: "We've borrowed against all AR, so collections coming in will go to FastPay."

Are those your words?

A Yes.

Q What did you mean by that?

A We factored our receivables. We -- yeah, we factored our receivables, and what happens is when your customer -- when your customer pays you, they need to pay the company that factored your receivables instead of yourself.

Q Okay. So let's just break that down for a second.

What does AR stand for?

A Accounts receivable.

Q And you said "we factored our receivables." Does that mean to borrow against accounts receivable?

A Correct.

Q And what, in practical terms, does that mean?

A So that means we used our accounts receivable as collateral for debt or loan. So it just means if I have -- someone owes me $100,000, I can give it to a company and the company will give me, say, $ 80,000 so I have cash available

right now, and then that customer pays the factor company, and then the factor company will take their interest and then give me the balance. They keep a little reserve.
Q And was one of those factor companies FastPay?
A Yes.
Q Who negotiated Ozy's loan with FastPay?
A Samir.
Q Why did Ozy borrow money from FastPay?
A Because we needed cash immediately. We couldn't -- we were not in a position where we could wait, you know, to get paid. We needed it as soon as possible.
Q Generally speaking, how do the terms of FastPay loans compare to loans that you might just get from a regular bank?
A They were more expensive. It's expensive debt.
Q Under the terms of Ozy's agreement with FastPay, how were Ozy's vendors supposed to pay the money that they owed to Ozy?
A The customers were supposed to pay FastPay directly.
Q In reality, did some of the vendors continue to send their payments directly to Ozy's accounts?
A Yes.
Q Did Ozy alert these vendors that they should direct their payments to FastPay instead?
A Yes. It was a condition of FastPay, yes, a condition of the loan.
Q In addition to FastPay, did Ozy borrow money from any

other companies?
A Yes.
Q Were these loans also expensive?
A Yes.
Q How did the interest rates of these other lenders compare to market interest rates?
A They were much higher.
Q Practically speaking, what was the effect of taking on such expensive debt on Ozy's financial bottom line?
A It's just a further strain. You're going to get less of what you are owed. So it's just -- it's costly. It's just another strain on the company.
Q Was Carlos Watson aware of the effect of these loans on Ozy's business?
A Yes.
Q How do you know that?
A Because he would always ask us to try to find -- or is there cheaper debt, is there better terms, get better terms, you know. So he knew the terms were not favorable because he would always push us to try to get better terms if we could.
Q When you say that Carlos Watson told us to try to get better terms, who is the "us"?
A Samir and myself.
Q Did the pressure on Ozy's finances increase, decrease, or remain the same during your time at the company?

THE COURT: Just hold up on that for one second, I'm sorry.

"Get better terms" I take to mean try to borrow money at lower interest rates. Is that fair to say?

THE WITNESS: Yes.

THE COURT: When they said "get better terms," who made the decision about who to negotiate with for these terms?

THE WITNESS: Who found the other fact companies besides FastPay?

THE COURT: Well, even prior to that, if you know, why deal with -- like if a bank would lend money at a lower rate than a factoring company would, do you know why Ozy didn't just borrow money from the bank at a better rate?

THE WITNESS: Yes. We did borrow money from the bank first, and we did use our receivables to collateralize it. But the bank had certain ratios that we needed to make from our balance sheet, like assets to liabilities, and when your number -- when your ratio gets to be a number where the bank is uncomfortable with, they will not loan you any more money. So our balance sheet was not strong enough for the bank to loan us money against our receivables.

THE COURT: So that's the factoring?

THE WITNESS: Uh-huh.

THE COURT: I'm sorry. Please continue.

MS. KASSNER: Thank you, Your Honor.

BY MR. KASSNER:

Q Did the pressure on Ozy's finances increase, decrease, or remain the same during your time at the company?

A Increased.

Q Are you familiar with the term capitalization table?

A Yes.

Q What is a capitalization table?

A It is a table that tells you the percent of ownership of various investors and employees and whoever owns a part of your company.

Q Did Ozy have a capitalization table?

A Yup, yes.

Q Were you involved in changing and maintaining and updating that capitalization table?

A I was not.

Q Who was involved in that?

A I believe it was Samir. I don't know. I mean...

Q Based on your experience in the industry, is the finance department typically involved in updating capitalization tables?

A Yes. The finance department and outside counsel keeps the cap table, yes.

Q Based on your awareness of the contents of Ozy's capitalization table, was there anything about it that stood out to you?

A Just things to where we didn't issue stock options to employees on a regular basis, we didn't get evaluation on a regular basis, we didn't keep track of when employees left and put it back in the pool. Like it just wasn't something that was maintained the way that I have seen it with the same scrutiny as I have seen it in the past. It was kind of like a work in progress, I guess you would say.
Q Shifting ahead to your experience working for Ozy in 2019.
In 2019 , how did Ozy's cash flow issues compare to 2018 ?
A When I -- when I went back, it was still the same. It was still managing who to pay.
Q Did Ozy continue to have issues making payroll in 2019?
A Yeah. It was just we were not able to pay, yeah, what was due, payroll and vendors and -- it was a process and we have this much money and we're going to have to select who to pay, including payroll.
Q In 2019, did Ozy continue to have issues paying rent?
A I don't remember rent off the top of my head. Again, I was only there for six -- oh, 2019?
Q 2019.
A Oh, yeah, yes, yes, yes, yes.
Q And in 2019, did Ozy continue to borrow from lenders like FastPay?

A Yes.
Q What was the effect of those loans on Ozy's business in 2019?
A The same. It was just -- it was a strain. It was very expensive. We had to make, on top of paying vendors and payroll and rent and everything else, we also had to pay, you know, interest and it was just -- it was very expensive and hard to keep up.
Q In 2019 -- or at its peak, how much was Ozy paying in interest to all of these lenders in a given week?
A I don't remember. A lot. I mean, for the amount of cash that we had and the amount of payments that we had, I mean, it was -- it was a lot. It was thousands. I mean, tens of thousands, tens of -- it was a lot. I don't know the exact amount.
Q In 2019, how does Ozy's performance, financial performance compare to its financial projections?
A We missed revenue, top line revenue.
Q Did you ever give Carlos Watson advice as to how to improve Ozy's financial condition?
A Yeah, I tried.
Q What advice did you give him?
A Well, I mean, I would say things like television shows are very expensive, we don't make money off of them, it costs us more money to produce it than it is what they're paying us

per episode, perhaps maybe we should wait until after we raise money so we can invest it back in this or maybe we can get them to pay more per episode. But it just doesn't make sense to produce something and only are paid for, you know, a fraction of that.

And then also I thought that OZY Fest was really expensive, so if there was a way to make it, you know, a little bit more, like, less expensive, but instead we'd make it bigger, multiple days. So it was just trying to be conservative was not in alignment with the grand ideas that Ozy had for the company.

Q And when you say "that Ozy had for the company," are you --

A Sorry. Carlos.

Q Did Carlos Watson follow your advice?

A Seldom. No.

Q During the time you worked for Ozy, was Ozy ever profitable?

A No.

Q Did you, at the time, believe Ozy would be profitable in the near future?

A No.

Q In your mind, did Ozy have any realistic path towards profitability?

A I mean, Ozy was doing really big things. So at some

point if people were able -- companies were willing to pay more, lots, lots, lots more for content that came out of Ozy, then yeah, sure, you know, at some point it's possible for revenue to grow larger than expenses.

But we were so far away from that. There wasn't really a way to forecast it or see it because it just wasn't something that had reasonable assumptions that you can put into a model to see, you know, a horizon within, I don't know, one year, 18 months, 24 months -- I don't know, however long you do a forecast -- of how that would happen. I kind of thought Ozy needed to raise a big round and then use that money to pay for the big endeavors that it wanted to do. I don't think profitability was going to pay for the big endeavors that it wanted to undertake.

Q While you worked at Ozy, did you feel that Carlos Watson was always honest about Ozy's revenue?

A Not in the way I defined it, no.

Q And why do you say that?

A Because he included things that I didn't -- he included things that I didn't know -- because I don't know where his numbers came from. I know where my numbers came from, but I didn't -- he didn't reconcile his numbers to me. He didn't answer to me.

Q Did Carlos Watson discuss Ozy's revenue at all-hands meetings?

A He discussed Ozy's forecast and Ozy's, like -- what Ozy was marching towards, yes.
Q Did he ever share with Ozy's employees at all-hands meetings the numbers that you and the finance department were keeping about Ozy's revenue?
A Not really, no.
Q When did you --
You mentioned that you left Ozy in 2019. Why didn't you stay at the company?
A I -- I had a baby March 1st of 2019 and I was gone most of the year of 2019. And while I was there, during my first pregnancy and my second pregnancy, it was very stressful, it's really hard not being able to meet your financial obligations.
THE COURT: Do you mean personal financial obligations or the company's?
If you need a minute or want to a water, let us know.
Q Can you explain what you mean by that?
A I felt like I spent a lot of my time and energy and, like, a pressure cooker, like, trying to, like, solve for something that just wasn't there, like, you know, trying to -- you see all these great, wonderful outcomes, like all these great products, but just the financial strength wasn't there. So all the time, every day you go into work, you just have more questions than answers, like how am I going to pay these

bills, I'm wasting my time doing this forecast, how can I - - I can't even close the books because I'm missing a lot of information. It just felt messy, it felt -- it didn't feel great, it didn't feel -- it was stressful. And so I left because I kept waiting for funding, kept waiting for funding, it's going to be great, it's going to make sense, it's all going to come together, we're going to, you know, get to the next level, you know. I'm doing the budget for a television show and I'm like in the back of my mind, it's like this is driving my crazy, why would we do this, there's not much income potential here, at least not now, and maybe the next time and just --

So it was very hard for me, and so, I mean, in 2019, I had a baby March 1st, and I went back, I think it was maybe July or August of 2019 I went back, and I told Samir you've got to find someone else, I can't do this anymore. I just couldn't. I just -- I couldn't do it. And then he brought in the next person and I left, like, before she even started. So I wasn't there that long.

So it took me a long time to leave. I don't know if I answered your question. It was just hard to work there. It was very, very hard for a finance person to work there. So much just didn't make sense.

Q Who took over your role following your departure?

A A CFO named Tripti.

Q Do you recall her last name?
A Thakur. I hope I'm saying that right.
Q Did there come a time when you later returned to work for Ozy?
A I did, yeah.
Q When --
A As a contractor. I refused to be put back on payroll.
Q Why did you refuse to be put back on payroll?
A I didn't want that in my head. I didn't want that in anyone's head. I wanted to be clear I am here for a few weeks just to help out with these few things. So it's not like I'm stepping back in my role where it's like, okay, let's try to figure this out, let's, you know -- like I'm just here as a contractor to do 8 to 5 these few things. So that was very important to me for Samir and Carlos to know and also for the company to know and myself to know.
Q What year was that?
A That was 2020.
Q At that point, was Tripti Thakur still there?
A No.
Q Did Carlos or Samir ever explain what happened with Tripti Thakur?
A No.
MS. KASSNER: Just one moment.
(Pause in proceedings.)

MS. KASSNER: Thank you. No further questions at this time.

CROSS-EXAMINATION

CROSS-EXAMINATION

BY MR. SULLIVAN:

Q So, Ms. Poutre, just a couple questions. Did I pronounce that name correctly, Poutre?

A Yes.

Q So just a couple questions for you.

In terms of some of the other jobs you had, you worked a something called Anki, a company called Anki?

A Correct.

Q That's not a media startup company, right?

A It's a startup -- it was a startup, yes, very much so. But it was not media, yes, correct.

Q My question, it was not a media startup company? The answer to that is yes, right?

A Correct.

Q And Eventbrite, you worked there?

A Yes.

Q Not a media startup company?

A That is correct.

Q You worked at Google?

A Correct.

Q And at the time you worked at Google, that was not a

media startup company?
A That's correct.
Q Right? And now you're in real estate?
A Yes.
Q And you are a real estate agent?
A Yes.
Q And you're with Codwell Banker (phonetic)?
A Coldwell, yes.
Q Sorry, I mispronounced that. Coldwell Banker?
A Yes.
Q And it's fair to say Coldwell is not a media startup company?
A Correct.
Q You talked to us about gap insurance -- I'm sorry, about GAAP accounting.
Do you remember that testimony?
A Yes.
Q Now, you're aware, aren't you, that when Apple was a startup, it did not use GAAP, correct?
MS. KASSNER: Objection, Your Honor.
THE COURT: Sustained.
Q You're aware that when Amazon was a startup --
THE COURT: Sustained.
Q -- it did not use GAAP, aren't you?
THE COURT: Sustained. We're going to move on to

another line of questions.
Q You had some objection about using GAAP , right?
MS. KASSNER: Objection, Your Honor.
THE COURT: Do we have a little more of a foundation for the question?
Q In your direct, you had some objection about Ozy not using GAAP.
A I don't - - I'm sorry, I don't understand. What do you mean I had objection to Ozy not using GAAP?
Q If you don't, that's fine.
You agree that startup companies don't need to use GAAP --
MS. KASSNER: Objection, Your Honor.
THE COURT: Overruled.
What was the --
THE WITNESS: We recorded transactions in NetSuite using GAAP, yes.
BY MR. SULLIVAN:
Q But you do realize that startups do not have to use GAAP, don't you?
MS. KASSNER: Objection, Your Honor.
THE COURT: You can answer that question.
THE WITNESS: Sure.
A So for every startup that I have worked at, in the financial statements that I produced for board meetings or

management, it was always using GAAP. I would put on the financial statements whether or not the financials were audited or not. Sometimes I would say audited or unaudited. So on the face of the financial statement, I explained what it was.

I also, when I worked for other startup companies, produced management reports which were not financial statements.

(Continued on the following page.)

BY MR. SULLIVAN:

Q I only asked about by financial statements at this point. So you said the companies, startup companies you worked for, you used GAAP. Is that what you said?

A Yes.

Q And you didn't work for Apple when it was a startup?

THE COURT: Again, we're talking about -- we're not talking about Apple or Amazon, we're talking about Ozy. That line of questioning has been objected to and the objection is sustained.

MR. SULLIVAN: Well, the witness raised other companies she worked for, let's strike that testimony. The witness said for every company they worked for, they didn't use --

THE COURT: That was in response to your question that I allowed. We can talk about striking them at the next break.

BY MR. SULLIVAN:

Q Let's talk about in-kind. Let's talk about in-kind. You're aware that recording in-kind revenue in books for a company is appropriate, yes?

A I know that -- is it appropriate? I'm, I don't know -- that's a very loaded question. I know that in-kind revenue is a concept and there are very strict rules that govern how you can book in-kind revenue, very restrict. Even then, it's

really, really hard to get an auditor to sign off on in-kind.
Q So you're aware of in-kind?
A I've heard of the concept in-kind, yes.
Q And you are aware that there are mechanics to record it, all the conditions that you gave, but there is a mechanism to record it on books?
A I can tell you there is a type of revenue called in-kind, that's what I can tell you.
Q Now, you said on direct just a few minutes ago that Ozy had great products. You still agree with that, right?
A Uh-huh.
Q You have to say yes for the court reporter.
A Yes, yes.
Q It was a new media company, right?
A Yes.
Q It did things in a different sort of way?
THE COURT: Can you rephrase that question. Different sort of way from whom?
Q From other media companies, right?
A I don't know what you mean by things.
Q It had podcasts, yes?
A Yes.
Q TV shows?
A Yes.
Q Newsletters?

A Yes.
Q It produced all of these things?
A Yes.
Q Sent the newsletters to a lot of people?
A Yes.
Q I'm going to talk to you about investors. You were not involved with communicating with investors?
A No.
Q You would get your information from others who did communicate with investors?
THE COURT: What information?
MR. SULLIVAN: If she understands the question.
A Others?
Q From other people at Ozy.
MS. KASSNER: Objection.
THE COURT: Can you rephrase the question to be specific as to what type of information?
MR. SULLIVAN: Well, your Honor, can the witness answer the question, if she can?
THE COURT: If I can't understand the question I don't think she can understand the question. I'm sustaining my own objection. I would like you to rephrase the question, please.
BY MR. SULLIVAN:
Q You are not involved with communicating with investors?

A Correct.
Q Anything you learn about communication with investors comes from someone else or came from someone else at Ozy; is that a fair statement?
A A fair statement is I did not communicate with investors.
Q At some point you had learned that an investor made a commitment to Ozy?
A I had been told many times, on many occasions, that investors were making commitments to Ozy, many, many times.
Q And that was not a function of a direct communication between you and the investor?
A That is correct.
Q That was somebody else telling you about an investor making -- an investor making a commitment, right?
A That was someone saying cash was coming in, sometimes it was by an investor, sometimes it was by someone else; but yes, I was told from Carlos that money was coming in from investor many, many, many, many times, yes.
Q When you record investments that come into Ozy, you told us you put those on NetSuites (sic)?
A I put those in NetSuite, yes, yes. When cash -- I can tell you this, when cash came in, we recorded the transaction the best we could in NetSuite.
Q NetSuites is the accounting platform that Ozy used?
A Yes.

Q And you understand me to mean that it is the computer program that keeps Ozy's books?
A Uh-huh, yes.
Q You put in NetSuites, you told us, the cash?
A The best we could, we recorded cash from investors, yes.
Q And you would get the amounts of the cash from say an insertion order, for example?
A From investors?
Q Well, from anyone. You would have to put the number that you got from some document into NetSuite, correct?
A So if you're talking about money coming from a customer, that's one way we put it in, which would be a transaction called accounts receivable. But if you're talking about money coming from a bank account, a wire transfer, someone other than a customer, that would be a journal entry. We couldn't create invoices for that. It just -- I don't want to answer your question incorrectly. I don't quite understand when you say insertion order, you're talking about customers when, but you're talking about investors. I have nothing to do with insertions as all.
Q You mentioned insertion orders on direct. You would get those and put them in NetSuites?
A We didn't put insertion orders in NetSuite. What happened is we would get insertion orders signed, the operations department would run and ad, or whatever else we

had to deliver. My team would check to make sure that we delivered whatever was on the insertion order. Then we would invoice the customer. Weekly -- monthly, sometimes they let us invoice them when a campaign ended. Every insertion order had different billing instructions. We couldn't invoice until we ran an ad. We didn't put anything in NetSuite upon receipt of insertion order.

Q At some point you have to recognize that revenue, yes?

A Yes.

Q And you put that revenue in NetSuites?

A Yes.

Q And you put that revenue in NetSuites based upon some piece of paper, now we're talking about an insertion order, but some piece of paper that indicates that you've got some amount of money coming into Ozy, right?

A I'm really sorry. Can you say that again?

Q So in order for you to put revenue in NetSuites, we'll keep it at insertion orders for now, you have to get some information that tells you to put X number of dollars of revenue in the books?

A Yes.

Q Yes. When you're talking about investors --

A Yes.

Q -- on the other hand --

A Yes.

Q -- you didn't deal with investors, right?
A I didn't, no, I did not deal.
Q You had no communication with --
A No.
Q -- with investors?
A No.
Q You have to rely on someone else to provide you information about the amount of money that investors invested in Ozy?
A I shouldn't. At Ozy I had to rely on, here is some money in our bank account, generally I would have a contract. I would have terms behind the money that is coming in, so we would know how to record it. Is it debt, is it equity, what is the cost of this equity, is it netted out with something else, who is it, what series is it. There is lots of information that finance gets when there is investing in a company that we didn't have.
When I say I recorded them, to the best of my ability. It was literally dollar amount. I was told it was an investment with no other details. I asked for the details many, many times. And I never got them. So we just put them, we just recorded them because we got the cash we have to balance the bank account, record it the best I can with no documents.
Q Let's focus on your saying about no documents.

A Yes.
Q If you did not have the document --
A Yes.
Q -- then you would not know all of these terms that you just described?
A Of any of the terms that we would need to properly book that transaction or to properly record a round of funding.
Q If you received no document at all and no oral representation --
A Uh-huh.
Q -- about an investment, then you would have no basis to put anything in NetSuites?
A We would only be able to see what the bank included as description in the actual transaction. Normally we would just ask Carlos, hey, is this an investment? Is it a debt? Do we owe somebody back? Can we get a sheet or contract? Can we get any information on this? They're like, it's coming, it's coming. We never got it. We would record what we got on the bank and confirm with those guys as best we could.
Q If you don't have the contract and Samir or Carlos is not telling you about a particular investment, then at this point you have no basis to put something in NetSuites, you don't have any information about that contract; is that a fair statement?
A I don't have the contract is fair. We have a transaction

on our bank statement with information on there, so it would say, hey, Carlos, we got a million dollars from John Doe, what is this. He would say, oh, it's whatever, an investment. Great, can we have documentation? Yep, the round is still open, we'll give it to you later. It's from somebody's 401K, or whatever. He would just give us information verbally and we would record it the best we could with what we had.

Q Perfect. Let's talk about that.

I want to take you back to 2016. It is true you were working there at 2016, yes?

A I started middle of 2016, yes.

Q It is true that a $250,000 Ford Foundation contract for Ozy Fest is not recorded at all in NetSuites.

A I can't say that's true. I don't know what you're talking about.

Q If you don't know, say I don't know.

A I don't know what you're talking about.

Q It is true that a $250,000 Hewlett Foundation investment for the Contenders on PBS is not reflected anywhere on NetSuites?

A We definitely had grant money; those would be grant dollars that you're talking about.

Q I'm talking about a specific grant, $250,000 in 2016 from the Hewlett Foundation. It is true that is no where recorded in NetSuites?

A While I was at NetSuite all the money that came in from grants was recorded in NetSuite. We didn't get any grants that I saw coming in any bank account with Ozy's name on it that didn't get recorded. It would be impossible. We balanced our bank statement. So if they gave Ozy $250,000 or $50,000, I know there were different grant amounts, it would have been recorded in the system.

Q You have no recollection as you sit here now of $250,000 for the Hewlett Foundation for the Contenders on PBS being in NetSuites. You have no specific recollection.

A We definitely got money from PBS and whomever else, Hewlett, I don't remember the year. But we definitely recorded some. I don't know what you're talking about. I haven't seen anything that you're talking about. But I know that we definitely had grants recorded in NetSuite. I can't sit here and tell you I know exactly the date the money came in the bank, or exactly if it's for what you're -- your question is very tough to answer. I can tell you that we did --

Q So you don't know?

A I don't know what you're talking about.

Q 2016, $50,000 for the digital website by Pivot. That is no where recorded in NetSuites.

If you don't know, tell me you don't know.

MS. KASSNER: Objection, your Honor, to form. It's

not a question.

THE COURT: Have you heard of a company called Pivot or an entity called Pivot?

THE WITNESS: Yes.

Q Do you recall?

THE COURT: Do you remember money coming from that company or entity?

THE WITNESS: No, I don't remember. But I do remember the other ones, but Pivot I don't remember.

BY MR. SULLIVAN:

Q Still in 2016 -- let's move to 2017.

There is a $20,000 investment from Intuit that is not in not recorded in NetSuite.

THE COURT: Sustained. That's a compound question. We need to break these things down piece by piece.

Q In 2016 is there a $20,000 investment recorded in NetSuites?

A All I can say is all the money that came to Ozy in a bank account in 2016 was recorded in Ozy. Our bank account was balanced. It was reconciled. If money came in to our bank account, it was recorded in NetSuite.

Q You have no recollection of that particular $20,000 investment being recorded in NetSuite, do you?

A That would be true probably 99 percent of what is in there.

Q I'm not asking about 99 percent, I'm asking about Intuit. You have no specific recollection of $20,000 investment from Intuit in 2017 being recorded in NetSuite, do you?
A Huh-uh.
Q You have to say no for the court reporter.
A I have no -- can you say -- you're asking me if I specifically recall if $20,000 was recorded in NetSuite in 2016?
Q 2017.
A 2017. I'm going to have to say I don't recall.
Q You have no specific recollection of a $2 million investment from Discover being recorded in NetSuite.
A If that's your line -- it can be anything. I don't know how -- I don't know how to answer these questions. I don't know why you're asking me the question.
THE COURT: Investment in what? Let's have the question be broken down and made clearer. You're talking about an investment in Ozy stock? Mr. Sullivan, are you asking about whether somebody was purchasing equity or contracting to do business with Ozy? I'm not following either. If you can clarify that I think it will be helpful.
BY MR. SULLIVAN:
Q I'm asking if there is a record of a $2 million investment.
THE COURT: Investment in what?

MR. SULLIVAN: In Ozy.

THE COURT: In Ozy's equity?

BY MR. SULLIVAN:

Q $2 million investment in Ozy, for any purpose, recorded in NetSuite by Discover?

THE COURT: So debt, credit, anything.

MR. SULLIVAN: Anything.

Q Is it there? Is it recorded?

A We recorded many, many, many transactions, well above $2 million.

Q I'm not asking about many, many transactions. I'm asking about $2 million Discover transaction. Do you have a specific recollection of whether it is recorded in NetSuite?

A I'm sorry, I don't know how to answer that question.

Q 2018, Budweiser, $414,000. Do you have a specific recollection of a $414,000 Budweiser transaction being recorded in NetSuite?

THE COURT: You said transaction fee or transaction being recorded? I didn't hear the question.

Q Any recollection of $414,000 from Budweiser being recorded from your booking in NetSuite for any purpose whatsoever, is it there? Do you have a specific recollection whether it's there?

A No. I don't follow your questioning. I'm sorry.

Q JP Morgan Chase, $2 million. Any recollection of a

$2 million transaction from JP Morgan going on your books in 2018?

MS. KASSNER: Objection, your Honor. If we could have a sidebar?

THE COURT: Sidebar.

(Continued on the next page.)

(Sidebar conference.)

MS. KASSNER: Your Honor, this made witness made clear she doesn't recall specific entries in NetSuite for these years. If the questions are going to be, does she have a specific recollection, I believe it's been asked and answered.

THE COURT: I don't have a problem with asking a series of questions that relate to different outside entities. What I don't understand is what you're asking about these transactions.

There was attached to one of the experts belated submissions a Discover contract that I looked at, that I thought said it was a master services agreement of some kind. But didn't provide for any revenue, that I could discern reading the contract now. You're asking about a Discover investment or an investment by -- do you have a good faith basis to believe that Discover invested money in the cap structure of Ozy?

MR. SULLIVAN: If the hang up is with investment, I'm asking if there was a $2 million transaction that was --

THE COURT: That's what you asked --

MR. SULLIVAN: If it's not there -- I can tell you, I can represent, it's not there, it's not in NetSuite. Samir never gave it to her.

THE COURT: I understand. You have to some good

faith belief that you're eliciting relevant information and --

MR. SULLIVAN: It's relevant, it goes to revenue.

MS. KASSNER: Your Honor, her recollection of if it's in there is not relevant.

THE COURT: We don't have the NetSuite accounting files in this Court? Someone, presumably, can have a witness go through it and say it's in there or not in there. Lay more of a foundation.

MR. SULLIVAN: We can do that.

THE COURT: Make sure she understand and you understand, frankly, what kind of transactions you're asking her about. Because right now, as to every single one of these, I have no idea, and I think the witness has no idea. If you can be specific about the kind of transaction you're asking about and not just say, do you remember this amount from this party, I'm going to allow this to continue. If it's just more of the same, we'll move on to the next topic.

(End of sidebar conference.)

(Continued on the next page.)

(In open court.)

THE COURT: We're going to break in about five or ten minutes, whenever you find a natural stopping point you'll let us know.

MR. SULLIVAN: Very well.

BY MR. SULLIVAN:

Q I think I was on 2018 when we went up.

If I give you the printouts from NetSuites for the years that you worked there, are you able to show me where a transaction is recorded on NetSuite?

A A printout of every transaction in NetSuite from 2016 to 2019?

Q Yes. The time that you worked there and parts of 2020?

A How much time do I have? It's going to be lots, lots of rows of transactions.

Q That's fine. We definitely will make time for you.

A It would be easier if I could have access to it and I can search.

Q So if you had the copy of NetSuite then I could ask you to look at it and you can tell me, for example, that oh, it's not there, or it is there?

A I don't believe I could do that looking through paper definitively not knowing the way NetSuite works.

Q The way what works?

A NetSuite.

Q Even if I gave you the NetSuite, you may not be able to tell me whether something was properly recorded in NetSuite as --

A Not without taking a long time. It would take a long time for me to definitively look through every transaction. It would be hundreds and hundreds and hundreds of transactions that I have to look at to definitively tell you whether or not -- some transactions are lumped together, some transactions are booked by itself. Transactions are booked in many different ways, journal entry, ledgers.

So I -- no, if you gave me a stack of papers in any reasonable amount of time I wouldn't be able to tell you within three years of transactions if something is there definitively and feel good about that answer.

Q Okay. So let me ask this then -- maybe it's time to break.

I am going to give you the NetSuite printout and ask about revenue. So let me, I'll be more specific. I'll ask this question as we are breaking.

In 2018 Ozy has a signed contract with Budweiser to create bi-weekly newsletters --

THE COURT: Objection. Sustained. Are we testifying from the stand or are we asking questions?

MR. SULLIVAN: Asking questions.

Q -- contract to create bi-weekly newsletters focused on

upcoming trends --

MS. KASSNER: Objection.

Q -- rising stars, et cetera.

THE COURT: Sustained. That's not -- do you have a question whether there was such a contract? Or we presuming there was such a contract? If the latter, the objection is sustained.

BY MR. SULLIVAN:

Q Did you record the contract that I'm just describing in NetSuites?

A Are you talking about Modello?

MR. SULLIVAN: It's a good time to break. I'll give you the NetSuite and we can go through it and see whether or not it was actually recorded.

Before I leave, I wanted to --

MS. KASSNER: Objection.

THE COURT: We're taking a break now.

The witness may step down for the moment. Thank you. You're still under oath.

Let's have the jury come back at 3:20, then we'll push through as late as we can.

(Jury exits the courtroom.)

THE COURT: Let's have the witness please step out. The parties will stay here.

(Whereupon, the witness steps down.)

THE COURT: Mr. Sullivan, what I understood the last question to be was, a fairly long testimonial statement from you about the existence of a contract that is not in evidence leading up to a question about whether she has a specific recollection of that contract being recorded in NetSuite. She already testified that she has no specific recollection at the individual entry level in NetSuite, really about any contract. And so for me, the question becomes, do you have an exhibit on your exhibit list which is whatever contract you want to show her and ask her if she remembers or recognizes the contract. And then if you want to ask her again if she remembers it being recorded in NetSuite or not, that's fine.

But if the only connection that gives rise to the relevance of your question is the presumptive existence of the contract, just show her the contract.

MR. SULLIVAN: I appreciate your Honor's assistance. I think it's relevant that she doesn't recognize the contract or can't point to it in NetSuite.

THE COURT: Is there a contract?

MR. SULLIVAN: Of course there is.

THE COURT: Why don't you show her the contract.

MR. SULLIVAN: I'm cross-examining her. The jury has a right to see --

THE COURT: Then it's been asked and answered. If it's just -- if the only question you're asking is: Do you

remember individual entries in the NetSuite system. She has already testified that there are an enormous number of entries in the NetSuite system and she doesn't have a specific recollection from 2016. So the objection to the question was asked and answered, which we had at sidebar, is sustained.

MR. SULLIVAN: May I be heard?

THE COURT: Yes.

MR. SULLIVAN: That's about my question.

My question -- and I've got a Sixth Amendment right to ask questions -- has to do with --

THE COURT: To the extent that you offer admissible testimony.

MR. SULLIVAN: -- has to do with a group of contracts that the Government has ignored in its revenue generation that Samir Rao --

THE COURT: You want to ask her about --

MR. SULLIVAN: -- put in there.

So I got a right to go through each of these and show the jury that she didn't know what is going on in NetSuite. That's point one.

Point two. I want to make a general objection on the Fifth Amendment, for the Court's overly interventionist attitude with this witness. This is a completely capable Government team, they are grown ups, they can object for themselves. But when the Court is always intervening, that

violates Mr. Watson's Fifth Amendment right for due process and Sixth Amendment right to a fair trial.

THE COURT: We've been through this particular drill before on a number of occasions now. If you're going to be successful with an objection to a general practice by the Court, to a general practice by the Government with respect to witness lists, you're probably in the course of that successful objection, going to be citing something more specific than a constitutional amendment adopted in 1787.

MR. SULLIVAN: Still applies.

THE COURT: If you have a case, I'd like to see the case.

MR. SULLIVAN: The Sixth Amendment and Fifth Amendment applies in 2024.

THE COURT: Let's not waste anybody's time here. I'm imminently aware that the Constitution is still in force in this country.

There's been a lot of case law decided about exactly what are the limits of testimony and cross-examination. And again, if you have something specific you want me to look at, I'm happy to.

MR. SULLIVAN: I'd like to put on the record that I do not consider advocating for my client's Fifth and Sixth Amendment rights a, quote, waste of time.

THE COURT: We're just going over the same ground

here. There was an objection at the sidebar, not from me but from the Government, that your questions on the subject have been asked and answered. And if the only question is, if all we're getting to at the root of your questions about the specific contracts, is the ultimate question of whether she has a specific recollection of them from 2016 or not, I think she has answered that question.

If you want to show her a specific contract and ask her whether she's seen that contract, that might be a new question. And I would allow it.

MR. SULLIVAN: Very well.

THE COURT: If we're going down this route, the objection is sustained.

I'll be back at 3:30 and we'll resume with the witness at that point.

(Brief break.)

(Continuing.)

(Judge ERIC KOMITTEE entered the courtroom.)

THE COURT: Let's bring in the jury when we can, but let's, if we're ready to go back on the record, have the parties come to sidebar, please.

(Sidebar conference held on the record in the presence of the Court and counsel, out of the hearing of the jury.)

THE COURT: So three quick things, which are one, we're all guests in this courtroom, including me because this courtroom is Brian Cogan's, and I think the rule is you can have, the lawyers and parties can have waters in the courtroom, but no other food and beverages.

And so, if you could communicate that to your clients, that be would helpful.

Two, the Government has got 60 witnesses on its list and the defense has 40.

MR. SULLIVAN: Forty, I believe.

THE COURT: I understand we may not hear from all hundred of those witnesses, but this trial has got to move faster than it's moving so far.

And so, how long do you think you have left with this witness?

MR. SULLIVAN: 10, 15 minutes , if that. I'm going to show her NetSuites and see if she recognizes the contracts.

MS. KASSNER: We have a problem with that.

THE COURT: What are you going to show her exactly?

MR. SULLIVAN: The customer spreadsheet for, like, 2016 spreadsheet for NetSuite.

MR. SIEGEL: We've never seen this before.

MS. KASSNER: We've never received it.

THE COURT: Then it's excluded.

MR. SULLIVAN: It's on their servers. We got it from -- I mean they seized it.

THE COURT: There's a reason we turn over exhibits, and this is not pure impeachment to try and cite the cases. The Second Circuit has been very clear that when you're working on your theory of the elements of the Government's case, that's not impeachment material, that's your exhibits.

MR. SULLIVAN: Isn't it in our exhibits?

MS. GILBERT: Yes.

MS. FRISON: Yes.

THE COURT: What exhibit number?

MR. SULLIVAN: 521. That's the one I was about to show her.

MR. SIEGEL: Judge, they gave us 250 unmarked exhibits on Sunday.

THE COURT: Unmarked?

MS. KASSNER: Unmarked.

MR. SIEGEL: Unmarked.

MS. KASSNER: We've never seen those numbers.

THE COURT: I've got marked exhibits.

MS. KASSNER: We don't.

THE COURT: All right.

For that reason, it's excluded. Give it to the Government tonight. Let them have a chance to look at it. We'll see if you can put it -- there are going to be other witnesses who are familiar with NetSuite, presumably, and who you can show this to, but at the moment, if this has never been produced to the Government as a premarked exhibit, it's excluded for now.

MR. SULLIVAN: Was it produced marked?

MS. GILBERT: It is part of the production. It was e-mailed to them is my understanding.

THE COURT: But not marked.

MS. GILBERT: It is marked as well.

THE COURT: Was it marked when it was produced?

MS. GILBERT: It was marked today. I don't know about the other day.

THE COURT: Since it wasn't produced as a premarked exhibit consistent with my rules and on subsequent orders on the subject, it is not going to come in now. Give it to the Government, give them a chance to understand what they're looking at. See whether there's an objection to it. We'll argue the objections outside of the jury.

Can you get the jury when they're ready?

THE COURTROOM DEPUTY: Yes. Should I get them now, Judge?

THE COURT: Yes, as soon as they're ready.

You'll argue any evidentiary issues while we're not keeping the jury waiting, but in the meantime we'll wrap up in the next 15 minutes.

MR. SIEGEL: For this witness?

THE COURT: With this examination of this witness.

If you have redirect, then they'll be recross, but we are going to get through that. And yes, there may be --

MR. SIEGEL: Judge. Your Honor has already admonished the audience, but there continues to be laughing and comments during the witness's testimony and during argument.

THE COURT: So, from whom? I wasn't hearing that.

MR. SIEGEL: My back is to them.

THE COURT: We'll exclude whoever we need to exclude.

I'll look for it, but have a case agent or somebody identify a particular person and bring that person to my attention and we'll deal with it appropriately, if necessary.

MR. SIEGEL: Thank you.

MS. GILBERT: We'll also go talk to people there to make sure. We'll talk to the people who are here to support

Carlos to ensure that they are not doing that.

THE COURT: Yes. The woman who made a little bit of a scene this morning appears not to be here anymore.

MS. GILBERT: I don't believe she was here with us.

THE COURT: I could be wrong.

MR. SULLIVAN: That's not our person, for whatever it's worth. I don't know who that is.

THE COURT: Yes. Either way, she seems to have made her way somewhere else.

MR. SIEGEL: And then, Judge, I just wanted to put it on your radar, we had submitted a letter. And I know there have been a lot of late-coming letters, but all these contracts that they're referring to were produced to us for the first time on Sunday, and we have serious authenticity concerns about it.

THE COURT: I mean I think that when you were talking about the discovery or Discover investment, I took you, I could be wrong, to be talking about the Discover contract that was attached to one of the expert's disclosures.

MR. SIEGEL: They produced 185 contracts with new Bates numbers that we're not aware of. So, we do have a pending motion to exclude all of those.

MR. SULLIVAN: All of those were on Ozy e-mails that they gave back to us.

MR. SIEGEL: But they don't have any Bates numbers.

MR. SULLIVAN: They can't pick and choose contracts that they like. These are contracts that are available to them.

THE COURT: But there are rules of discovery and there are rules of requiring the parties to exchange their exhibits to, A, avoid unfair surprise and, B, allow the Court to make intelligent decisions about what should come in and what should be excluded in a way that doesn't keep the jury sitting in the jury room for hours at a time.

MR. SULLIVAN: Perhaps not Bates marked, but we've given them to them and now it's marked pursuant to your one-day rule.

THE COURT: How many exhibits do you have total?

MS. GILBERT: 500-something, 520-something.

MS. KASSNER: Your Honor, you limited them to 250.

THE COURT: No, I said produce the top 250 and assume that anything outside of that is going to be excluded. They produced 500. They did not premark them.

MR. SIEGEL: They did not produce 500. I just want to be clear, they did not produce 500, not to us.

MS. GILBERT: We have. We have boxes of material for you. We've actually --

THE COURT: We're getting the jury.

MS. GILBERT: We've actually printed them for you. We've actually e-mailed them to you digitally.

MR. SIEGEL: When?

(Pause.)

MR. SULLIVAN: So, in here we're talking about nine contracts, and these nine contracts have been the subject of experts and all for a while, but the bottom line is everything is marked now.

THE COURT: They're not coming in during the next 15 minutes. We'll take it up after.

MR. SULLIVAN: That's fine.

THE COURT: After the trial ends.

MS. GILBERT: Okay.

(Sidebar concluded; proceedings resumed.)

(Continued on the following page.)

(In open court.)

(Jury enters.)

THE COURT: All right. The witness is still under oath.

Mr. Sullivan , you may continue.

MR. SULLIVAN: Thank you, Your Honor.

Just a brief indulgence for my notes.

CROSS-EXAMINATION (Continues)

BY MR. SULLIVAN:

Q So, just to pick off [sic] where we left off when you were here, if you had a NetSuite printout of customers for a particular year, would you be able to tell whether a customer contract was included in NetSuite?

A Possibly.

Q You mentioned on direct that your understanding is that Samir Rao was in charge of finance, correct?

A Uh-hum.

Q I'm sorry. You have to say yes or no for the court reporter.

A I'm sorry. Yes.

MR. SULLIVAN: Can we pull up Government 5033, which has already been admitted.

(Exhibit published.)

MR. SULLIVAN: All right.

Q Can you see that on your screen?
A It's very small.
MR. SULLIVAN: Can you -- thank you.
THE WITNESS: Okay.
Q So you remember the Government showed you this exhibit?
A Uh-hum.
Q I'm sorry. You have to say yes.
A Yes, yes.
Q And there was an attachment to it?
A Yes.
Q All right. I want to draw your attention to the "to" line there. It's -- you wrote this to Gloria Su, correct?
A Correct.
Q And you cc'd Jon Widdowson?
A Correct.
Q And you bcc'd Samir@Ozy.
I take it that's Samir Rao?
A Correct.
Q You did not include Carlos on that e-mail?
A Not on this one, no.
Q All right. Thank you.
MR. SULLIVAN: You can take that one down.
Q You talked about on direct cash to make payroll, and that there were significant troubles with making payroll over the years that you worked at Ozy?

A Yes.
Q Do you remember that testimony?
A Yes.
Q And you are aware that there were many occasions that Carlos Watson put up his own money in order to make payroll?
A Yes.
Q Eighteen times in 2018 alone, does that sound like a fair number?
A I don't know.
Q It doesn't sound like a wildly outrageous number, right, he did it often?
A I don't know. It sounds like a lot of numbers, but I don't know.
Q But you know he did sometimes?
A Yes.
Q You mentioned that rent was late?
A Yes.
Q You never got evicted?
A No.
Q So it ultimately got paid?
A Yes.
Q You recognize that there is a difference between cash and revenue, right?
A Yes.
Q Cash on hand is what you were talking about in terms of

the -- I think you used the term cash crunch, right?
A Cash on hand, I -- I may have used it cash -- cash on hand, yeah.
Q That is a different consideration than the revenue that a company generates over a period?
A That is correct.
MR. SULLIVAN: Can you pull up 20 -- I'm sorry, Government 6015 that's already in evidence.
(Exhibit published.)
BY MR. SULLIVAN:
Q All right. You see 6015, right?
A Yes.
Q All right. Drawing your attention to number 1, Budget, and that's where you -- what you wrote is in highlighted in green?
A Yes.
Q Now, this budget has to do with the use of in-kind as a -- as part of Ozy's revenue, is that correct?
A I did not budget in-kind revenue. It was -- the budget was revenue, real revenue. We were -- we were behind on revenue and so, that's why this e-mail was -- the second half was to re-forecast the rest of the year.
Q And you wrote that you will not have a problem getting to 22 million in revenue for management reporting by adding in-kind.

Those are your words, right?
A Those are my words.
Q And you put in parentheses, BBC, iHeart, DoSomething, McClatchy, TRO, BB revenue from FB and others, that's what you wrote?
A That's what I wrote, yes.
Q And these inside the parenthesis companies, BBC, that's British Broadcasting Company?
A Yes.
Q And iHeartRadio, for example?
A Yes.
Q These are companies that -- from which Ozy derived in-kind revenue, correct?
A I was -- I can't -- I can't say yes. I cannot say yes.
Q But those are the companies that you --
A Those are the --
Q I did read that correctly, these companies that you put in the parentheses?
A So, there are a lot of other conversations behind these e-mails, and those were the companies that Carlos said were in-kind revenue.
Q Okay.
A Not me.
Q Okay.
A So I'm just saying, yeah, if I add all of these things

that you think is in-kind, then I can get to the sky. I can get to any number.
Q So --
A Whatever you want me put in there, I can't put it in-kind. And I said, but we need to get to real revenue.
Q And you also said I do not have a problem getting to 22 million?
A I said I will not have a problem.
Q Right, you will not have a problem. That's what -- those are your words?
A Yep.
Q And BBC, iHeart, DoSomething, you're not saying that Carlos wrote that, are you?
A No. If it's highlighted in green, I wrote it, yes.
Q You wrote that, okay.
And you mentioned with respect to this exhibit that there is a difference between management reporting and financial reporting, correct?
A Yes.
Q So you do agree that there are differences in reporting for different purposes, that's a fair statement?
A Sure, yeah. Yes.
Q Okay.
MR. SULLIVAN: Can we pull up 6018.
(Exhibit published.)

MR. SULLIVAN: It's already in evidence.

BY MR. SULLIVAN:

Q Do you recognize this document?

This is -- you remember the Government showing you this document?

A Yes.

Q And in this document you are suggesting to reduce -- a reduced forecast from 22 million to 12 million.

Do you remember that testimony?

A Yes.

Q Based, in part, on your view that you did not think Ozy could raise more money, so your forecast was for 12 million?

A The forecast was a revenue number, not a raise number. What -- raise is an investment.

Are you talking about revenue or investments?

Q I'm talking about your -- you reduced the forecast from 22 to 12 million. This is -- these are -- these are revenue numbers?

A Yes. I reduced the revenue forecast from 22 million to 12, yes.

Q Now, do you know that after this e-mail Ozy, in fact, raised more money, are you aware of that?

A Revenue or investments?

Q Revenue, more revenue.

A Than 12 million?

MS. KASSNER: Objection, Your Honor, to form.

THE COURT: We are, to me, regularly conflating the concepts of capital raising versus revenue.

MR. SULLIVAN: Revenue.

THE COURT: We are talking about revenue.

And your question, I'm sorry, again, was what?

MR. SULLIVAN: Additional revenue after this e-mail.

THE COURT: Did Ozy earn additional revenue after this e-mail?

MR. SULLIVAN: Yes.

BY MR. SULLIVAN:

Q Are you aware that?

A Yes, yes, yes.

Q And you are also aware that there was even another round of financing after this e-mail was written?

A Are we talking revenue or are we talking about funding?

Q So, first question was revenue. You answered that.

A Yes.

Q You are aware that Ozy did earn more revenue after you wrote this e-mail?

A Not more than this number here, the 12 million that I reduced it to. This was a forecast in the middle of the year -- well, in August.

So, I'm saying we had a certain amount of revenue

that was less than $12.7 million. And I said based on the trajectory of where we are today and what we've earned to date and where we should be at the end of the year, I'm saying that should be $12.7 million. So, if we stretch -- we work as hard as we can, we can earn more money and, hopefully, get to 12.7.

So, yes, the sales team was still working from August to December and they made more than whatever number. That's much less than the 12.7 figure we were at on this date.

Q Okay, so --

THE COURT: Mr. Sullivan, your 15-minute mark is five minutes out, just for your information.

MR. SULLIVAN: Thank you.

Q So, that's a yes to my question, I just want to be sure you are aware that --

MS. KASSNER: Objection.

Q -- that Ozy earned more revenue --

MR. SULLIVAN: I haven't asked the question yet.

A I am aware --

Q Let me finish my question, please. I'm sorry, because the court reporter can't hear both of us talking at the same time.

A I'm sorry. I apologize.

Q No, no, I apologize. I want just want to be sure we have a clear record.

So my question was that you are aware that after this August 18th e-mail, Ozy, in fact, earned more revenue?

A I'm -- I'm getting a little hung up on the word "more."

What I'm -- what I can say yes to is that from August 17, 2018 to December 31st, 2018, Ozy earned revenue.

Q Okay. Now, the next part of that question was were you aware that after this 8/18/2018 e-mail there was another round of financing?

A I don't remember. Possibly, I don't remember.

Q Fair enough.

All right, I want to ask you about the loans, the factoring loans.

These are the high-interest loans that Ozy took out, right?

A Yes, the factoring.

Q Now, so I'm going to focus your attention on Fast Pay.

Samir Rao negotiated the Fast Pay loans?

A Yes.

Q Not Carlos?

A Carlos was involved in everything we did.

Q Carlos didn't negotiate these loans, Samir did, right?

A Carlos dictated terms, like in what was acceptable. So, Samir -- both of us executed it the best that we could, yes.

Q So you testified on direct that Samir negotiated the Fast Pay loans?

A Yes, yes.
Q You stand by that?
A Yes.
Q With respect to the other loans from other companies, it is also true that Samir was the person negotiating those loans?
A I really wasn't that involved with the terms and negotiations in contracts and what got them comfortable with loaning money. So, I -- I can assume it was Samir, but I wasn't - - I -- I can't --
Q And you assume it was Samir because it was your experience that, in terms of what Samir did, that was his area?
A That's correct.
Q And that's finance?
A Correct.
Q You mentioned on direct that Samir and outside lawyers were involved in the negotiation of some of these loans?
MS. KASSNER: Objection, Your Honor.
THE COURT: Let's hear the question.
MR. SULLIVAN: That was it. You mentioned on direct --
THE COURT: Well, is the objection that it misstates the testimony?
MS. KASSNER: The objection is to the reference to

lawyers and what it's asking her to state.

THE COURT: Come to the sidebar.

(Sidebar held.)

(Sidebar conference held on the record in the presence of the Court and counsel, out of the hearing of the jury.)

MS. KASSNER: Your Honor, we've repeatedly raised that we're concerned that they may be raising an advice-of -counsel defense.

THE COURT: Advice of whose counsel defense?

MS. KASSNER: Well, Your Honor, at several points we've pointed out that on their exhibit list --

THE COURT: Oh, I see.

MS. KASSNER: -- they included documents that we've never been allowed, they've maintained were privileged even through when they shared them with us.

THE COURT: Right.

So let me just remind myself of the procedural history here.

MS. KASSNER: Yes.

THE COURT: You made a motion to exclude evidence that would go to an imperfect reliance on counsel defense, correct?

MR. SIEGEL: And we asked that the Court order that they provide notice if they're going to do that, about what that advice would be, and which Your Honor said there would.

THE COURT: And since then there have been no further --

MS. KASSNER: No further disclosures.

THE COURT: -- disclosure or any response to the motion in limine from the defense?

MR. SIEGEL: Correct.

MR. SULLIVAN: And I am not making an advice-of-counsel defense.

She testified on direct that Samir and outside lawyers, I'm only making the point that it's not Carlos. It's these other people. It could be outside lawn people, I don't care.

It's not -- it's not an advice-of-counsel defense. Advice of counsel is that I relied on the advice of counsel.

THE COURT: But she's already said it was Samir and the lawyers. By definition, that excludes Carlos. You're now at the 15-minute mark.

MR. SULLIVAN: Well, part of it is a sidebar.

THE COURT: The sidebar took one minute.

I am going to give you ten more minutes, and then you're telling me --

MR. SULLIVAN: All right.

So this is not advice of counsel. I asked her, established that she said -- attempting to establish that she said something on direct.

THE COURT: If she said it, it's already in the transcript, so you don't need to re-establish that she said

something on direct.

Let's move on to the next question.

MR. SULLIVAN: It's in the transcript.

(Sidebar concluded; proceedings resumed.)

(Continued on the following page.)

(In open court; jury present.)

THE COURT: Ladies and gentlemen, I want to assure you that the parties and I are doing our level best to avoid the need for these breaks where we gather at the sidebar and talk about evidentiary issues.

We have worked very hard before trial and will continue to work hard, you know, nights and weekends during trial to minimize the extent to which you are otherwise not using your talents for their intended purpose here. But sometimes it is unavoidable, and so you'll forgive me.

Mr. Sullivan, you may continue.

MR. SULLIVAN: Thank you.

CROSS-EXAMINATION (Resumed)

BY MR. SULLIVAN:

Q So I was asking you about Samir and others who, to your knowledge, were the principals in negotiating these loans.

That's your recollection, that Samir, with others, that didn't include Carlos, were the principal negotiators?

A It wasn't me. I don't know who it included. I assumed it was --

Q But don't tell me what you assume, only what you know.

A Okay. I can only tell you it was not me.

Q Okay. That is fair enough.

And the last thing that I want to ask you about is, the Government asked you why did Ozy borrow from companies

like Fast Pay.

Do you remember that line of questioning?

A Yes.

Q Right. So, you told us that at some point they had, Ozy had done all it could do with traditional banks, in terms of getting additional loans, right?

A Yes.

Q Now, Samir turned down a $10 million loan from an investor, are you aware of that?

A No. I do not recall that.

Q Well, let's be sure. So you don't recall.

Do you recall --

MR. SULLIVAN: I'm sorry, you can take that exhibit down.

Q Do you recall Samir turning down a big loan from someone?

A No. No.

Q You don't recall any of it?

A I do not recall Samir turning down loans.

Q Okay.

MR. SULLIVAN: No further questions.

THE COURT: Ms. Frison.

CROSS-EXAMINATION

CROSS-EXAMINATION

BY MS. FRISON:

Q Ms. Poutre, good afternoon.

A Good afternoon.
Q I'll try not to be repetitive. I just want to ask you about the in-kind revenue that you've been discussing.
Is that the same as barter, are those interchangeable, in-kind revenue and barter revenue?
A Could be, I suppose. I'm not the authority on those.
Q Would you - - is it fair to say that in-kind revenue were deals in which advertising might be exchanged between Ozy and another company, so they advertise on Ozy's products and the same, vice verse?
A That is possible. If you're asking me is that possible, I suppose.
Q I think my question is: Was that the typical type of in-kind agreement that Ozy had?
A I can't say that it was.
Q You discussed the difficulty of recording in- kind revenue?
A Correct.
Q So, was it your job to record in-kind revenue?
A No -- well, I mean if we had in-kind revenue that was measurable and that I had evidence for and that I could meet the requirements according to GAAP, then yes, it would have been my job if those were the -- the circumstances.
Q So, any in-kind revenue that could not be GAAP compliant, you just did not record it anywhere, is that fair to say?

A I'm sorry. I don't know how to answer that question.
Q Were there any in- kind agreements with Ozy and other companies that were not recorded in the financials at all?
A If you want to call iHeartRadio an investment or an in-kind, I'm not sure how you would call that. It was a very -- it wasn't a typical sort of agreement.
And so, are you talking about iHeart?
Q iHeart may be an example. You can use that example.
A I'll use iHeart as an example.
So, iHeart was virtually impossible to record anything because iHeart wouldn't commit to anything. You know, like it wasn't -- they wouldn't say here definitively, you can do A and I will value it as B. So then it's like great, it was always just discussions. It was open. It was like -- it was just open discussions as far as I -- I knew.
It wasn't -- iHeart didn't come to us and say, Here is $10 million that I will spend with you over X amount of time in X amount of way. So then if you deliver that, then I'm obligated to give you X. All the terms that you will look into for, you have an obligation, I have an obligation. If we meet these, then you do X and I do Y. That was not in that contract.
So, no, I didn't record it. There was no way to record. I would have just been making up stuff.
Q So with that example of iHeart, you did have a contract

that you reviewed?
A There was a document -- there was an iHeart -- there was an iHeart document, yes.
Q There was a relationship between iHeart and Ozy?
A There was a signed iHeart document and there were many -- I won't say many, but there were meetings between Ozy and iHeart to try to figure out what this document mean, like what they wanted to offer and what was okay with them and what was okay with them. So, it wasn't -- it wasn't many terms behind it, it was a document. I don't --
Q So that would have been a business that you did not record as having transactions with Ozy?
A There were no transactions to record.
Q Was anyone else in charge of recording in-kind revenue other than your team?
A No. No, no, no.
Q Did you have discussions with Samir Rao about how to account for in-kind revenue?
A I had discussions with both Carlos and Samir about in-kind revenue, and we went -- yeah, so I had discussions with them and....
Q You've been discussing conversations with both Mr. Watson and Mr. Rao?
A Correct.
Q Is it fair to say that you dealt much more with Mr. Rao

on the financials?

A I dealt with both of them a lot. I dealt with -- with -- with them about different things, but I dealt with both of them a lot.

Q And it sounded like from your direct exam your main concern at Ozy when you worked there was paying the bills and making payroll, is that right?

A My main concern was that it was hard to forecast because we were constantly fundraising. So, we didn't have anything to forecast because we didn't have the capital to invest in the company. And we were continually investing in big endeavors that we couldn't afford. We didn't know how we were gonna pay for them. So, it was very stressful.

So, I didn't know how to forecast a long-term forecast because after a while you start -- just don't believe it. It was like 10 million is coming in next week or 2 million is coming in or -- it was piecemeal. And so, it just kind of felt like an academic exercise. It was a waste of time.

So that was very frustrating. It was very hard. And then it was very stressful and difficult in not being able to pay bills, always figuring out -- trying to figure out how we're going to pay payroll, delaying rent, one month, two months, three months until people yelled at us. Me and my team, we were always yelled at and got all these awful e-mails

because we constantly made promises on commitments that we would make and we would break them constantly. That was very hard. So, yes.
Q You told us that you worked for startups in the past?
A Yes.
Q Before Ozy?
A Yes, I have.
Q And did any of those startups have cash flow problems?
A Not to this degree, not even close.
Q Did they have cash flow problems at all?
A Not like this.
Q Did you -- when you said that you were using GAAP standards at Ozy, is that something that Samir Rao told you to use, or did you just come in using GAAP from your background?
A From my background, from my background.
Q Are there any other methods of accounting that you're aware of that are acceptable for startups?
A No.
Q Did Mr. Watson ever direct you to do anything in NetSuite that you thought was illegal?
A Not that I recall.
Q Did Mr. Rao ever direct you to do anything in NetSuite that you thought was illegal?
A Not that I recall.
Q Ultimately, who was responsible for updating NetSuite?

A Updating, so my -- ultimately, who was responsible?

I would say -- what do you mean by updating?

Do you mean making sure -- making sure it's accurate? Making sure transactions are recorded? Making sure that the books are closed?

Q All of that.

A It would be - - the head of finance would be -- I mean.

Q Was that you?

A Yeah, that would be. I suppose, yeah, you could say that.

Q So if something is wrong in NetSuite, that was ultimately your responsibility that it was wrong?

A Sure. I guess you could say that, if that's what -- sure.

(Continued on the following page.)

(Continuing.)

BY MS. FRISON:

Q And the emails that have been shown to you today, is it fair to say you don't have an independent memory of those emails?

A What do you mean?

Q Meaning, do you remember sending them or do you just see that your name is on the from there?

A I've seen those emails before today.

Q You stated to the prosecutor that Ozy was not profitable during the time period that you worked there. Was that right?

A Correct.

Q And that meant that by the time you left, Ozy was still a startup.

A Yeah.

MS. FRISON: Thank you. No further questions.

MS. KASSNER: Nothing from the Government. Thank you, Your Honor.

THE COURT: The witness may step down. Thank you.

(Witness is excused.)

THE COURT: The Government can call its next witness.

MR. SIEGEL: Your Honor, the Government calls Samir Rao.

(Witness takes the stand.)

THE COURTROOM DEPUTY: Good afternoon, sir. Step forward. Raise your right hand.

(Witness sworn.)

THE COURTROOM DEPUTY: Have a seat. State your first and last name for the record and spell your first and last name for the court reporter.

THE WITNESS: Samir Rao. First name S-A-M-I-R, last name R-A-O.

**SAMIR RAO**, called as a witness, having been first duly sworn/affirmed, was examined and testified as follows:

DIRECT EXAMINATION

DIRECT EXAMINATION

BY MR. SIEGEL:

Q Good afternoon, Mr. Rao.
A Good afternoon.
Q Are you familiar with a company called Ozy Media?
A Yes, I am.
Q How are you familiar with Ozy Media?
A I worked at Ozy Media for several years.
Q What was your role at Ozy Media?
A I had several roles during my time there.

When I first joined, I was the director of strategic operations. In time, I was named the vice president of operations. At a later point I was named the chief operating officer. And for a portion of time I was a director on the

board of the company.
Q Approximately how many years did you work at Ozy Media?
A I worked at Ozy Media from 2012 to 2021, so about nine years.
Q Have you been charged with any crimes relating to your time at Ozy Media?
A Yes, I have.
Q What crimes?
A I've been charged with three crimes. Conspiracy to commit securities fraud; conspiracy to commit wire fraud; and aggravated identity theft.
Q Did you, in fact, commit those crimes?
A Regrettably, yes, I did.
Q Have you pleaded guilty to those crimes?
A Yes, I have.
Q Where did you plead guilty?
A In the Eastern District of New York.
Q In this courthouse?
A Yes.
Q Did you commit those crimes by yourself?
A No, I did not.
Q Who did you commit those crimes with?
A I committed those crimes with two people, Suzee Han and Carlos Watson.
Q Mr. Rao, would you please stand up for a moment? Would

you look around the courtroom and tell us if you see either of the people you committed those crimes with in the courtroom today?
A Yes, I do.
Q Who do you see?
A I see Carlos Watson.
Q Could you describe Carlos Watson by an article of clothing that he is wearing?
A He's wearing a dark suit, a white shirt, glasses, a gray tie with turquoise stripes.
MR. SIEGEL: Your Honor, could the record reflect that the witness has identified the defendant, Carlos Watson?
THE COURT: Yes.
Q At a high level, could you explain what it is that you, Carlos, and Suzee did?
A Yes.
At a high level, over a period of time stretching primarily from 2018 to 2021, Suzee, Carlos and I lied to investors, a number of them, providing them false information with the intent of getting them to invest money in our company.
Q What kinds of lies?
A We told them a number of lies, or a number of kinds of lies. We told them lies about the amount of money that we were earning, so our revenue. We told them lies about how

much money we ultimately earned, our profit. So, in general, lies about our financial performance. We also told them lies at various points about our audience and special other elements of our business's operations.

Q Why did you lie about those things?

A Well, we lied about those things because we wanted to give those investors a sense that our company was doing better than it actually was and that it was a more valuable company than it actually was and that it, therefore, was more deserving of their investment. We did that because we needed their investment because we were running out of cash and we didn't have enough cash to continue to operate the company successfully.

So in a bid to secure that cash, we told these investor lies -- these investors lies with the hope that they would invest money in the company.

Q Did you yourself think that investors would give Ozy money if you told them the truth?

A No.

Q Why not?

A Because while the company had made progress at various points, my belief that was it had not made enough progress to earn investment from any of these investors on the truthful basis of its performance. And in particular, my belief and understanding was that most, if not all, investors would be

resistant to investing in a company that was running out of cash, that a company running out of cash on its face and in and of itself would likely not make for a good investment.

And so my belief, our belief was that we needed to paint a false but better picture of the company in order to convince investors that we were a good investment for their money and worth their money.

Q Do you have an understanding of whether Carlos thought investors would invest if you told them the truth?

A I do.

Q What is your understanding?

A My understanding is that he shared the belief that I just expressed, that if we did not give investors a false and enhanced picture of our performance, that they would not invest.

Q What was Carlos' role in this scheme?

A Well, Carlos was the CEO of the company. He was my boss, he was the chairman of the board, and so he understood the company fully and well.

But in the scheme, he was the person that I committed these crimes with. He was the one who either suggested or in other cases approved the actions that we took, and he's the person that I did these crimes with, along with Suzee Han.

Q Were there parts of the scheme that Carlos did not know

about?
A There may have been specific elements of how the scheme was undertaken that he did not have full and detailed knowledge of. But all the elements of the scheme were ultimately taken -- undertaken either with him directly or with his approval and general knowledge.
Q Did you talk to Carlos about the scheme in person?
A Yes.
Q Did you email about the scheme with Carlos?
A Yes.
Q Were some of those emails saved in your Ozy email account?
A Yes, they were.
Q Did you authorize your attorneys to get your Ozy emails?
A Yes.
Q Did you authorize your attorneys to share some of those emails with the Government?
A Yes, I did.
Q Did you text about the scheme with Carlos?
A I did.
Q Were some of those texts saved on your phone?
A They were.
Q Did you provide your phones to your attorneys?
A Yes.
Q Did you authorize your attorneys to share your texts with

Carlos with the Government?
A I did.
Q You also mentioned Suzee Han. What was her role in the scheme?
A Suzee Han joined the company in roughly 2019. From shortly after the time she joined the company through my time there, she collaborated with Carlos and myself on the preparation of materials that contained significant false information for investors. She worked for me and Carlos, but her role was largely to collaborate and me and us on the creation of those materials.
Q Were there parts of the scheme that Suzee Han did not know about?
A Yes.
Q You said that one of the crimes you pleaded guilty to was aggravated identity theft. What did you do that makes you guilty of aggravated identity theft?
A Regrettably, I did two different things that make me guilty of aggravated identity theft.
The first was, during a period of diligence in which one of our prospective investors, Goldman Sachs, was evaluating an investment in Ozy, I faked a reference call by impersonating an executive at YouTube and pretending to be that person on a call with Goldman to try and give them -- Goldman Sachs, to give them a positive and false reference for

the company.

Incrementally, at another time I created a fake email address for an executive -- or an employee, I should say, at the Oprah Winfrey Network and used that email to communicate with other parties about a potential financing transaction where we were trying to borrow money from a bank. But in that case, also representing myself as somebody that I was not.

Q Did Carlos know about these impersonations?

A He did.

Q Did he agree with you that you should do those things?

A He did.

Q Did Suzee Han know about those impersonations?

A No, she did not.

Q Did you get caught doing either of those impersonations?

A Yes, I did.

Q Which one?

A I got caught for impersonating the YouTube executive on a reference call with Goldman Sachs.

Q After you got caught doing that, did you and Carlos decide whether to keep lying to investors?

A We did.

Q And what did you decide?

A We continued to do so.

Q Why?

A Principally because we continued to need money, and ideally a significant amount of money from investors to operate the business that we were building and try and make it successful, which is why we were trying to raise money from investors.

Q Let me take a step back.

You've said that you did these things because the company needed money. But why did that matter?

A Well, that mattered because -- it mattered for two reasons.

The first is that Carlos and I believed deeply in the company that we were building, and in order for it to be -- in order for it in many cases to survive, much less to be successful, we needed to have enough cash to run the business, to grow it, to have a chance to earn more revenue, to have a chance to make it profitable.

But I guess correspondingly, our hope was that if Ozy was successful, if the company was successful, that would lead to success for us in a number of ways, but ideally, also including financial success for us.

Q When you say "in a number of ways," including financial success, what are the ways in which you and Carlos would be successful if the company was successful?

A Well, as I said, you know, if the company were successful and were able to achieve a certain or significant value and

was able to realize that value by either becoming a public company that's traded or perhaps a company that's bought by an acquirer, that that would have resulted in financial success for us given that we had stakes in the company and that we were set to profit from the company earning money.

But beyond that, I think we both believed that -- or at least I believed that there was reputational value to having built a successful company, one that would allow us to pursue any number of additional opportunities at a future point in our career, maybe a wider set of opportunities.

And even beyond the benefits that I think we envisioned for ourselves, for what it's worth, I think we both also felt that a company like Ozy being successful would have meant that Carlos and I would have made an impact on the space of media by creating a place for a more diverse set of voices, a diverse audience to consume hopefully a different, more meaningful kind of content, and that was something we would have been proud of.

Q In the end, did Ozy succeed?
A No, unfortunately it did not.
Q What happened?
A Well, in the end, Ozy folded. It -- it was worth nothing. And part of that was because the embarrassing and fraudulent actions that I had taken became widely known.
Q How did they become known?

A In September of 2021, an article was published in The New York Times recounting the details of the call in which - - in which I impersonated a YouTube executive, Alex Piper. The article wasn't only about that. It also contained a number of other details about the ways in which we were misrepresenting our performances, our reach, our impact to investors and others. But headlined by the focus on my own conduct impersonating the YouTube executive, the article precipitated rapid downfall for the company, in some ways for obvious reasons.
Q Do you have a sense for how much money investors put into Ozy before it fell apart?
A My best estimate -- my best estimate at this time is that investors put 75 to $100 million in Ozy over the course of its entire life.
Q Do you have an understanding of what ended up happening to those investments?
A My understanding is they became worthless, worth nothing.
Q Mr. Rao, after Ozy felt apart, did you eventually agree to cooperate with the Government?
A Yes, I did.
Q As part of that agreement, what is the primary thing that you agreed to do?
A The primary thing that I agreed to do was testify truthfully.

Q Are you testifying here today pursuant to that agreement?
A Yes, I am.
MR. SIEGEL: Your Honor, if we could -- if I could show the witness Government Exhibit 1001.
Q Do you see that, Mr. Rao?
A Yes, I do.
Q Do you recognize Government Exhibit 1001 ?
A Would you mind scrolling, please?
Yes, I do.
Q What is Government Exhibit 1001?
A It's a copy of my cooperation agreement.
Q I'm just going to the last page. Is that your signature on this agreement?
A Yes.
MR. SIEGEL: Your Honor, I move to admit Government Exhibit 1001.
MR. SULLIVAN: Without objection.
THE COURT: Let's take as short a break as we can take here for anybody that needs go to the bathroom to be able to do that. Hopefully regroup by 20 of.
And the parties can maybe come to sidebar for a moment before any break by the lawyers.
(Sidebar conference.)
(Continued on the following page.)

(Sidebar conference held outside the presence of the jury.)

THE COURT: My recollection of this could be woefully out of date, but I think it used to be a rule in the Second Circuit that the cooperation agreement didn't come in on direct because it would be bolstering --

MR. SIEGEL: I apologize. The exception to that is when the defense opens on the witness's credibility, which was certainly the case here.

THE COURT: So between that and no objection, I think we're fine.

So it's admitted without objection.

(Government Exhibit 1001, was received in evidence.)

MR. SULLIVAN: Without objection, correct.

THE COURT: Okay. All right. We'll press forward.

MR. SIEGEL: And, Your Honor, just to orient people, Mr. Rao is going to be on the stand for the next couple of days.

THE COURT: So your witness list for tomorrow is one witness?

MR. SIEGEL: Mr. Rao. That's our witness list for Friday too.

THE COURT: I do want, just to be serious about this for a minute, the party that is presenting its case to each night provide the list of all witnesses who even conceivably

could be on the stand the following day in writing. So if somebody can print it out for me and I can have it on the bench, and for that list to say a word or two about who this person is, like former CFO or something.

MR. SIEGEL: That's fine.

THE COURT: I spent a minute today wondering if the prior witness was going to be the one who had sent the resignation email and I think we figured out --

MR. SIEGEL: She is not.

THE COURT: -- that she is not. But that kind of thing would help me think through the motions in limine when they might come up.

MR. SIEGEL: Understood.

MS. GILBERT: And I need to correct one thing. I misunderstood CBS. They produced the documents, the physical documents, and they are now sending me the link to send to the People - - sorry, the Government; wrong court.

THE COURT: They're people.

MS. GILBERT: Yes.

THE COURT: Not the People, but some people.

MS. GILBERT: I'm used to the People.

To the Government so that they could have the electronic documents. So when I said they were produced this morning, they were produced this morning, but they were produced physically which we have for them the documents in

terms of our exhibits.

THE COURT: Okay. So at least as of today you're saying the Government has a physical copy of all your --

MS. GILBERT: It's all right here.

MR. SIEGEL: I think what she's saying is we will. They haven't given it to us yet.

MS. GILBERT: Well, they're available.

THE COURT: They're going to be exchanged after the trial day today, it sounds like.

MS. GILBERT: Correct.

MR. SIEGEL: Your Honor, to the extent you're focused on the email with the CFO, that will come through Mr. Rao. Not today, but he's going to testify about receiving that email and worrying about am I going to go to jail.

THE COURT: I think we should talk about that a bit.

MR. SIEGEL: That's fine. We're available after court today.

THE COURT: I said the name of a Second Circuit case that seemed to me to have at least something to say about that, about one of the various bases on which you argue the admissibility of that email.

MR. SIEGEL: That's right. We're happy to talk about that.

THE COURT: I'm interested in understanding better the specifics of the timeline.

MR. SIEGEL: Sure.

THE COURT: How long after the event that creates the excitement is this excited utterance --

MR. SIEGEL: So, I mean, just to give the timeline.

THE COURT: -- uttered.

MR. SIEGEL: Mr. Rao sends the email -- Mr. Rao sends an email with a fake contract to a bank, copying the CFO. Later that same day the CFO --

THE COURT: How much later, is the question.

MR. SIEGEL: I think something like 12 hours. We're not saying it's a present-sense impression.

THE COURT: You're saying she was excited about it.

MR. SIEGEL: Her testimony will be she was extraordinarily excited.

THE COURT: I'd like you to preview that for me, as well.

MR. SIEGEL: Later that day she writes an email saying, I resign. But largely that gets to hearsay issues, the admissibility of the effect on a listener. This is an email to Carlos Watson saying what just happened here --

THE COURT: I understand. But there's still a 403 balancing issue and it could -- I'm not saying I've landed on a decision about this one way or the other, but one could worry that the CFO's statements about the legality of this conduct are better reserved -- effectively constitutes fact

witness testimony on the law. You've got to sort through this, and one question is, would it make sense or would it possibly make things worse to redact the sentences in which the CFO's saying this is fraud, this is illegal, we're all going to go to jail. I'm not sure whether the defense even wants that.

MR. SIEGEL: Again, we're happy to talk about it now or after court.

THE COURT: After. Use the break wisely. We're going to be here with the jury in three minutes.

MR. SIEGEL: Understood. Thank you, Your Honor.

(Sidebar ends.)

(Continued on the following page.)

(Jury enters the courtroom.)

THE COURT: Please be seated.

The witness remains under oath and the Government may continue.

MR. SIEGEL: Thank you, your Honor.

BY MR. SIEGEL:

MR. SIEGEL: I move to admit the cooperation agreement Government's Exhibit 1001.

THE COURT: Without objection it is admitted.

(Government Exhibit 1001, was received in evidence.)

MR. SIEGEL: Thank you.

BY MR. SIEGEL:

Q Mr. Rao, as part of this agreement did you plead guilty to the crimes you discussed earlier?

A Yes, I did.

Q Have you been sentenced for those crimes?

A No, I have not.

Q As a result of your guilty plea, how much time are you potentially facing in prison?

A I'm facing up to 37 years in prison.

Q Is there a mandatory minimum sentence that you face?

A Yes, there is.

Q What is that?

A Two years.

Q Is it your understanding that under your charges as it

currently stands you are guaranteed to go to jail?
A Yes, that is my understanding.
Q Mr. Rao, do you know what sentencing guidelines are?
A Yes, I have a general understanding.
Q What is your understanding of what sentencing guidelines are?
A That they are a range or a reference that may be used to determine a sentence appropriate for my actions and based on my actions.
Q Do you have an understanding of what the sentencing guidelines for you are?
A Yes.
Q What is your understanding of the sentencing guidelines that you face?
A My understanding is that the sentencing guidelines have me facing about 140 to 175 months in prison, so roughly 12 to 15 years.
Q Do you have an understanding of what will happen if you live up to your end of the agreement and testify truthfully?
A Yes, I think I do.
Q What is your understanding of what will happen?
A My understanding is that if I testify truthfully that the Government will submit a 5K letter to the Court.
Q What is your understanding of what a 5K letter is?
A Well, my understanding is that a 5K letter basically

allows the judge to determine or arrive at a sentence that may be less than any mandatory minimum that I'm facing.

Q Do you have an understanding of what is contained in the 5K letter?

A I do.

Q What is your understanding?

A My understanding is that the 5K letter is a pretty thorough account of the full extent of my actions while I was at Ozy, including and maybe especially, the fraudulent ones. And then further it includes a summary of the extent of my cooperation. So the full record of both my crimes and my cooperation.

Q I'm going to page six of the cooperation agreement and paragraph seven, zooming in on that. Are you able to read that text?

A Yes, I am. Thank you.

Q Does this paragraph explain how that 5K letter works?

A Yes.

Q So you began to discuss it before, but what is your understanding for how, if at all, the 5K letter will affect your sentence?

A Again, my understanding is basically reflected in the sentence that starts with the word "such." It says: Such a motion will permit the Court in its discretion to impose a sentence below any applicable mandatory minimum sentence.

Q I'm just highlighting that sentence for everyone to read more clearly. So what do you understand that to mean?
A That the judge has the ability to sentence me to something in this case less than two years, since that's the mandatory minimum I'm facing.
Q If the Government writes a 5K letter, who decides what your sentence will be?
A My understanding is the judge decides what my sentence will be.
Q What is the highest sentence the judge could give you if the Government writes a 5K letter?
A The highest sentence is still 37 years; it's in the judge's discretion.
Q Will the Government recommend a sentence to the judge?
A My understanding is they will not recommend a sentence.
Q If the Government writes you a 5K letter, does the judge have to give you a lower sentence?
A No.
Q Could the judge still sentence you to 12 years?
A Yes.
Q Or 20?
A Yes.
Q Or 37?
A Yes.
Q Has anyone promised you a lower sentence?

A No.
Q Do you know what your sentence will be?
A No, I do not.
Q Do you believe that you will get a 5K letter if you lie today?
A No, I do not.
Q Per your agreement, does it matter whether Mr. Watson or Ozy are convicted at this trial?
A No, it does not matter.
Q If you tell the truth, but both defendants are acquitted and found not guilty, do you expect that you'll get a 5K letter?
A I do.
Q Why?
A Because my obligation under the cooperation agreement is to testify truthfully, it's not connected to the outcome of this trial.
Q If you lie, if you lie on the stand, and Mr. Watson and Ozy are found guilty, do you expect that you'll get a 5K letter?
A No, I do not.
Q Why not?
A Because again, the core obligation I have under the agreement is to testify truthfully. And that's it.
Q What do you think will happen to your agreement if you

lie today about anything?
A I expect it will be withdrawn and torn up.
Q If that agreement is torn up, can you take back your guilty plea?
A No, I cannot.
Q What are you hoping will happen if you tell the truth during your testimony?
A Well, I hope two things are true. I hope first that I will have successfully satisfied my obligations under the cooperation agreement and the Government will therefore submit a 5K letter that may permit the judge to offer a different sentence.
But, more fundamentally, the lies that I told to people that I hurt, the mistakes I made over the last several years of my time at Ozy represented the most difficult and darkest chapter of my life so far. And my hope is that being here, telling the truth, taking responsibility for those mistakes, apologizing, will allow me to start the process of moving past this and into a new chapter of my life in which I can be more productive and more proud of who I am and what I am doing.
Q Mr. Rao, what do you think will happen to you if you lie today?
A I think my cooperation agreement will be withdrawn. I think I will be charged with perjury. And I think I will go

to jail.
Q So let's step back a little bit. Mr. Rao let's talk a little bit you.
I'm showing you Government Exhibit 3, just for the witness. Do you recognize Government Exhibit 3?
A Yes, I do.
Q What is Government Exhibit 3?
A A picture of me.
Q Is this a fair and accurate depiction of you?
A Yes, it is.
MR. SIEGEL: Your Honor, I move to admit Government Exhibit 3.
MR. SULLIVAN: No objection.
THE COURT: Received.
(Government Exhibit 3, was received in evidence.)
BY MR. SIEGEL:
Q Sir, where are you from?
A I'm from Farmington Hills, Michigan.
Q Did you go to college?
A Yes, I did.
Q Where did you go to college?
A I went to Harvard University.
Q What did you study at Harvard?
A I studied applied mathematics, applied math, and some economics. That was my undergrad degree.

Q Did you graduate?
A Yes.
Q When was that?
A I graduated in 2008.
Q What did you do after college?
A After college I was fortunate to accept a job as an investment banking analyst and then associate at Goldman Sachs, a financial firm on Wall Street.
Q Why do you say that you were fortunate to accept a job at Goldman Sachs?
A For two reasons. One, Goldman was, and is still, revered as one of the top places to work if you work in the finance industry, a great place to get trained to learn. It's deeply associated with success, and one of the reasons I was fortunate.

The other reason was that the fall of 2008, the summer and fall of 2008, when I graduated, were exceptionally challenging timing in the market and in the job market overall. You may remember the stock crash around Lehman Brothers and jobs were hard to find. I felt lucky to have one.
Q Is Goldman Sachs sometimes known as just Goldman?
A Yes, they are.
Q Is it also sometimes known as GS?
A Yes, that's right.

Q How long did you work at Goldman Sachs?
A For about four years, 2008 to 2012.
Q What happened then?
A Well, a number of positive changes in my life. Summer of 2012 I got married to my college sweetheart. I got to move to the West Coast and spent my career, first four years of my career in New York City, but moved to the West Coast so my then-wife and I could be together. She was doing her grad work in the Bay area. So I kind of left Goldman, finished my time there, got married and moved out West.
Q What as your plan for when you moved out West?
A I don't know that I had a very defined plan at that time. But one of the things that I was hoping for by moving out West and having a chance to possibly take a next step in my career, was to work more closely on operating an actual business. One of the things that I felt and experienced at my time during my time at Goldman was that we were primarily -- I was a junior person to start there -- and we were primarily working on advising companies on what to do and advising them largely about just the financial aspects of their business, when they should raise money, whether they should buy or sell other companies. And I always felt like I was getting part of the picture of how that company worked that we were working with or advising, but not the full thing. I felt an interest and a desire to learn maybe more fully, more closely, more in my

bones how a young company worked.

So I had the general idea that when I moved out West I wouldn't just consider other opportunities in the finance space, but I would try to look for an opportunity at a young company, maybe a startup, which the Bay area was known for.

Q What happened when you arrived in the Bay area?

A Well, the week of my wedding I was running errands with my mom in the Bay area in a town called Mountain View, California, probably best known for where Google is. In what at the time felt like something almost serendipitous or fortunate or a sign worth listening to, I was grabbing lunch with my mom, walking into a Chipotle in Mountain View. And out of that same Chipotle came walking Carlos Watson, which was really exciting for me for a couple of reasons.

Q If I could show to just the witness, please, Government's Exhibit 1. Do you recognize Government's Exhibit 1?

A Yes, I do.

Q What is Government's Exhibit 1?

A A picture of Carlos.

Q Is this a fair and accurate picture of Carlos?

A It is.

MR. SIEGEL: Your Honor, I move to admit Government's Exhibit 1.

MR. SULLIVAN: Objection.

THE COURT: Objection or no objection?

MR. SULLIVAN: Objection.

THE COURT: Come to the side.

(Continued on the next page.)

(Sidebar conference.)

THE COURT: I think I know what the objection is, but I couldn't hear it in court without revealing the exhibit. 403?

MR. SULLIVAN: Exactly.

THE COURT: Why do you need it?

MR. SIEGEL: So we can show other witnesses, have them identify the defendant without every time --

THE COURT: Identification is not an issue. There is no identification defense here. It's excluded. I don't think you need to have every witness identify the defendant, even in person.

MR. SIEGEL: I was hoping not to.

THE COURT: I don't think there is any dispute that these people know who he is. And that the conversations they are going to describe with him they were having with him, rather than someone looking like him.

If there is something I'm missing we'll take it up later; otherwise, it's excluded for the moment.

(End of sidebar conference.)

(Continued on the next page.)

(In open court.)

THE COURT: For the record, the objection is sustained. The Government can continue.

MR. SIEGEL: Thank you, your Honor.

BY MR. SIEGEL:

Q Did you know Carlos before this?

A Yes, I did a little bit.

Q How did you know Carlos?

A Well, Carlos had worked at Goldman Sachs for part of the time that I was there. I remember meeting him there for the first time. He was an interesting and unusual hire for Goldman Sachs because he had come to Goldman most recently from television where he was an anchor at various places, CNN, MSNBC. I recognized him from his time as an anchor.

I met him for the first time at Goldman. I remember him coming around to the various groups in investment banking and introducing himself. Then I had the opportunity to work with him a couple of times during our time there together, not extremely closely and not super often, but a couple of times. I remember finding him warm and smart, thoughtful, and I guess somebody whose next steps I wanted to pay attention to.

Q What was his role as Goldman?

A He was what was called a managing director in the company's tech and media practice. So it was among the most senior roles in investment banking. But basically what it

meant was that he was advising companies in the tech and media, and in his case education space, around how to be more successful financially and the kind of business of what Goldman did.

I know that beyond normal folks in that kind of role in investment banking at Goldman, Carlos had an affect and impact and reach that was broader because of his background in communications and his entrepreneurial spirits. He was involved with a few of the conferences that Goldman put on. I think he developed one of them, other things like that. He was a senior member of the senior banking franchise and tech and media, as they called it.

Q How did his role compare to your role?

A There were three or four tiers of seniority between Carlos as me. I started as analyst then became an associate, kind of the next job. Most people spend a long time as vice president at Goldman Sachs. Third tear after that is managing director, and various levels of seniority. So I met Carlos first when I was an analyst then worked with him a little bit when I was an associate and he was a managing director. So we were a couple of tiers and several years of experience apart.

Q You said before you were excited when you ran into him. Why were you excited to see him?

A When I ran into him in Mountain View?

Q That's right.

A Well, as I said, my interactions with him -- several reasons. But one, my interactions with him during my time at Goldman had left me admiring him. I appreciated his warmth, the way he was accessible even to junior people, his thoughtfulness, what felt like passion for success.

The second was I had a lifelong interest in media myself, not as a practitioner really. But for what it was worth, I was a kid who always cared who the anchors were on TV, dreamt of being a sports broadcaster. I paid attention to that kind of stuff, I admired it, I appreciated it. I knew that Carlos had been a successful anchor previously, and I found that the agility, the skill, the ability to transition from being in that role to being successful in Goldman Sachs was interesting, worthy. I appreciated that I was excited about that.

But maybe, like most specifically, about the time that I met him in Mountain View, just a couple months prior he had sent out a note to various folks, which is not uncommon. At that time he sent a note to various folks at the company saying he was leaving and he was moving back to California to work on a new venture. I remember receiving that note and kind of filing it in my back pocket, or the back pocket of my mind, thinking, when I get out there I should shoot Carlos a note, I should reach out to him. He was someone interesting, someone special, and this coincidence of him moving out around

the same time that I was getting married to move out to the West Coast felt like something worth following up on. And without my having ever done anything, without any extra effort, here I was in front of him; albeit, at a Chipotle in Mountain View.

And he greeted me with the same warmth, even though I only interacted with him a handful of times. He greeted me like he remembered me. I remembered feeling impressed, maybe even touched by that.

I was excited to see him. I thought that I'd been coming out to the West Coast looking for something different, maybe it was walking right up to me.

Q How old were you at the time?

A I just turned 26.

Q So what happened when you ran into Carlos?

A Well, we exchanged pleasantries and made plans to reconnect. I was obviously busy with my wedding and planning on going on my honeymoon, and so we decided that we would reconnect when I came back. And that's what we did.

Q What happened when you reconnected when you came back from your honeymoon?

A We had a really nice first meeting at a coffee shop in Mountain View. He asked me about myself, about my time at Goldman, who I worked with, what I learned.

Then he proceeded to tell me about the new company

that he was starting, which would become Ozy. That's kind of where my journey with Ozy began.

Q About when was this meeting at the coffee shop in Mountain View?

A Best recollection is September 2012, maybe end of August beginning September 2012.

Q So what did he tell you about Ozy?

A Well, he told me a number of things. He said that he had a strong belief that the world needed a new kind of news and information. And that he believed Ozy could be it. He said that he believed that too many people were tired of getting their news from the same places and seeing the same five or ten articles or headlines screaming breaking news at you. And that for curious, globally minded -- the phrase he liked to use was edgy but educated people -- there was an opportunity to create a new kind of news that wasn't just the same old stories day after day, but fresh, interesting, new profiles on people, places, trends and ideas that deserve to be told but weren't being told.

He also told me that he had started to organize a group of investors to back him and back this idea. And I remember finding the entire thing totally compelling and interesting; and in someways, it had the ring of truth in my gut.

Q What was the outcome of that meeting?

A The immediate outcome of the meeting was that he shared a version of the business plan that he had written up for the company with me, or after the meeting. He asked me to review it and meet with him again to discuss what I thought about it. My ideas my reactions, maybe how I thought it could be different or better.

And then after that second meeting, he asked me basically would you be interested in working on this, to paraphrase, those weren't his exact words. We decided to try to figure out, was this a good opportunity for me to partner or work with him and get some the experience that I was looking for.

We agreed that I would do a small project for him for about a month or so, almost like a consulting assignment to help build out a financial model and financial plan for the company. And in so doing, we get a chance to work with each other a little bit more closely and figure out in someways if we were a good fit.

Q Did there come a time that you became a full-time employee for Ozy?

A Yes.

THE COURT: We're looking for a natural stopping point in the next five or so minutes, I would say.

MR. SIEGEL: Great.

THE COURT: This could be it?

MR. SIEGEL: I think in the next five or so minutes we'll get there.

(Continued on next page.)

DIRECT EXAMINATION (Continuing)

BY MR. SIEGEL:

Q When you became a full-time employee of Ozy, did Ozy have any other employees?

A No, I was, I guess, second with Carlos.

Q And what was your role when you started?

A Oh, my role was -- it was wide ranging. I was the director of strategic operations, but that meant a really wide range of things.

I'd spend a bunch of hours of my day trying to find writers and editors to recruit to our team who were producing interesting work in other places that we thought would be perfect members of our team. I'd be on the hunt for office space in Mountain View for the two of us to start building the company, would buy and build Ikea furniture, opened a bank account, tried to acquire the domain name for Ozy.com and Ozy Media was when we decided that would be our name.

So, it was a real mix of things. I mean one of the things I learned was that being that early in a new venture in a new company meant you were doing everything you could to nurture it, build it up.

MR. SIEGEL: Okay. I think this would be a good place, Your Honor.

THE COURT: All right.

Ladies and gentlemen of the jury, thank you for your

careful attention today. I will remind you, as you'll hear me do many, many times throughout this trial, not to discuss the case with anybody, not to do any outside research, but otherwise to have a very nice evening. And we will see you tomorrow morning at 9:15 sharp in the jury room.

Thank you.

(Jury exits.)

(In open court.)

THE COURT: Okay. Let's have the witness be excused and taken out of the room, please.

You can step down.

(Witness steps down and exits the courtroom.)

THE COURT: All right. I've got a few items on my agenda that I want to take up quickly before we all depart for the evening. And then I'm happy to hear what the parties want to talk about, as well.

All right. So, four things on my agenda from the -- we'll start with the ridiculous and, hopefully, make our way to the sublime.

Maybe the party calling a witness can let them know in advance that ideally they want to be about six inches from these microphones, six to twelve, just so that the jury can hear them well and we don't need to interrupt testimony to make that point.

The second item on my agenda is we've had some

testimony elicited by both sides that, I would say, has been sort of heavy on the witness's synopsis of what happened, but light on the more specific questions of who said what to whom and when.

And one example I would give is Mr. Rao today saying that after the due diligence call or meeting with Google, we decided, Mr. Watson and he decided to continue the fraud rather than aborting it. And I understand that was background. This was all by way of introduction, but when we get into the nitty-gritty, I hope the witnesses are devoting more of their time on the stand to those questions of who said what, when, rather than their own highlightable assessment of what happened.

Item 3 is the length of testimony. I understand this witness is important to both sides and, therefore, the prediction he is going to be on the stand until Friday doesn't sound crazy to me. But, again, we've got a lot of witnesses from both sides on the trial witness list here, and I do want to try to push forward as much as possible.

So, everybody should look at their direct and cross-examinations with an eye towards thinking about what really matters and what, on the other hand, can be excised in the interest of efficiency.

I would hope that his testimony on direct could conclude before lunch on Friday, but are you saying you expect

his direct testimony to go through Friday?

MR. SIEGEL: I am saying that I would love for his direct to end tomorrow. Unfortunately, given his role in this conspiracy, I think that it's possible that his direct will conclude on Monday.

THE COURT: His direct?

MR. SIEGEL: Yes.

Now, I say there is no other witness who comes even close. So we share your desire to move through the testimony efficiently, but -- but Mr. Rao is just a different -- a different beast than any other witness.

THE COURT: Yes. We are sitting for relatively long trial days. We are trying to be efficient about getting the jury in and out as quickly as we can to maximize the testimony.

I would hope that the next two full days would be enough to conclude his direct. I was thinking lunchtime on Friday. Obviously, you know more about the context than I do, but give the outline of his direct a hard look with that guidance in mind, and we'll revisit this question after lunch at some point tomorrow.

The last item on my agenda is this question of barter revenue. I am getting the sense from the cross-examination of the first witness that we are going to spend a lot of time talking about whether Ozy should have

recognized the quote/unquote barter revenue, from whom those revenues would have come, in what periods, and exactly what the barter looked like, who was trading what for what, as well as whether that's a proper practice under the accounting rules.

I am confused, let's put it that way. And I assume if I am confused that the jury is probably confused as well, what it is that all these questions about barter revenue are designed to elicit. And I am thinking about the question of whether a proffer of the factual predicate for the relevance of all of these questions is appropriate.

Can the defense proffer or be in a position tomorrow before the start of testimony to proffer what the relevance of this barter revenue would be?

I think we were all hoping to get it from the disclosures by the accounting expert. That person did not explain what they meant by barter revenue in any meaningful way, and certainly did not establish a factual predicate for that testimony.

Who was bartering what with whom?

Mr. Sullivan is holding a big stack of contracts or a big stack of folders from what I can see at the podium, obviously, intending to suggest to the witness and the jury that there are contracts in there that are properly a basis for recognizing some barter revenue. But we still have no

idea what those contracts are. Again, who's agreeing to exchange what with whom.

The questioning of the Government's first witness on that subject was, therefore, extremely confusing. I think to her, but certainly to me. And so, that's something I am going to be thinking about more and I am going to need some more information from the defense before we continue down that path.

I'll just say as an aside, apropos, let me say of nothing, that there was a prosecution in this district in the otts in which executives from a publicly traded company were prosecuted for what the Grand Jury in that case called a fraudulent "revenue swap." I am trying to find this.

And, again, I don't say that this maps on to the facts of this case at all, but I don't suggest the opposite either. I simply don't know, and that's where some of my confusion comes from.

In this Indictment that I'm looking at, it's from the case of U.S. versus Sanjay Kumar. The company was going to miss its consensus earnings estimate and so, they went out and found another company and agreed that Computer Associates would purchase the software program from the other company and the other company would purchase the software program from Computer Associates, and both companies would get the revenue bump associated with that trade, even though in that case

neither company used or sold the software that it licensed or purchased from the other.

I'm looking for the phrase revenue swap, but I'm actually not seeing it here.

In any event, if that's what this is -- and, again, I'm not suggesting what this is -- but if the barter revenue that everybody is talking about would itself have been fraudulent had it been recognized, that would not be a valid factual predicate for the solicitation of testimony from witnesses.

And so, until we know something about who was bartering what with whom for what and when, the relevance of all this remains mysterious to me.

And I understand I'm raising this question sua sponte, I'm doing it because my inference, which may or may not be correct, is that we are going to be hearing a lot about this subject and at some point we may or may not have relevance objections.

I would like to discuss it tomorrow morning, just to understand better where all this is going so that I'm prepared to take up those questions, if and when they arise.

Anything else today from the defense perspective?

MR. SULLIVAN: Nothing, Your Honor.

MS. GILBERT: Just one thing.

THE COURT: Yes.

MS. GILBERT: My understanding is that you -- this relates to the exhibits.

My understanding is that you don't want a set of binders yourself, despite what your rules say?

THE COURT: If I am going to see everything the same way the witnesses, on the screens, if you have a set of binders for me, then yes, we'll take them and put them here.

MS. GILBERT: We do. Okay.

THE COURT: And if they don't show up well on the screen, I'll look through the physical versions. So yes, you can hand them to my law clerk.

MS. GILBERT: Okay.

THE COURT: Anything else from the Government before we adjourn today?

MR. SIEGEL: Yes, Your Honor, two things.

First of all, and this is laid out in the letter that we filed to preclude the defense exhibits that were filed on Sunday.

These contracts that the defense keeps saying are from the discovery, they all have Bates numbers, but they're Bates numbers that aren't from our discovery and they're Bates numbers that we've never seen before.

So as we laid out in that letter, we -- until Sunday night, we'd never seen those contracts. Now, that's a problem standing alone, but, again, as we laid out in the letter, in

the exhibit list they provided it included metadata for these contracts, many of which are from 2016, 2017, 2018. Many, but not all of the contracts, have a created date of this weekend. And it's not all of them, so it's not just a generalized this is when the exhibits were created. But given the fact that this is a case largely about --

THE COURT: Are you sure that that's just not when the PDF was saved or when something was photocopied?

MR. SIEGEL: For many of the contracts, if it's a 2016 contract, it has a 2016 creation date. But then there's a big group of them that has a created date of this weekend.

Now, again, I don't know. It may be that that's when they were saved, but --

THE COURT: This is why it's important for everybody to live up to the rules of discovery and the rules about exchange of exhibits.

MR. SULLIVAN: We keep going back and forth on this, Your Honor. It was sent to them by previous counsel in 2022 with the Google documents. They've had it for -- where are we, '24 -- two years now.

THE COURT: Mr. Sullivan, I issued an order that talks about the importance, not just of exchanging discovery, but also of marking and identifying exhibits that you expect to come in at trial. And the reason is, at the risk of stating the obvious, if an opposing party is going to object

to the authenticity of a document, for example, or to the relevance of a document, if they get eight terabytes of the documents in discovery, 80 million documents or whatever it is, they are not going to be reasonably expected to file pretrial motions in limine about the authenticity or the relevance of 80 million documents.

That's why parties have to put exhibit numbers on documents and exchange them, so as to notify the other side of what it is we're going to actually be seeing come in at trial.

Discovery, you know, production of discovery is a very different thing. And I think we're thinking about the same thing from a series of angles here.

The Government just raised questions about your compliance with my orders and questions about, perhaps, the authenticity of some of these documents or the reliability of them. And I'm raising a question about relevance.

I think we are at a point now after the first full day of trial where the defense has finally provided its premarked exhibits. Right? That happened, if I understood the sidebar correctly, or maybe it still hasn't happened.

MS. GILBERT: It has happened.

MR. SULLIVAN: Yes. There are marked, there are marks on those exhibits that they've had for two years now. So they're marked. They have them.

THE COURT: Marked with exhibit stickers?

MR. SULLIVAN: Yes, they're marked now. They're in the boxes.

THE COURT: Okay. So let me make sure I understand the facts.

The first time the Government received exhibits actually premarked as such is today, following the close of trial, correct?

MR. SULLIVAN: The ones with exhibit numbers. They've received these, particularly the ones I've been using, since we've been talking about the experts. It's these contracts that are not included in the revenue statements.

Their case is that Mr. Watson fraudulently overestimated the revenue. And we're saying, no, he didn't. We have contracts here that show that there was additional revenue that their witness simply did not put into the accounting system.

THE COURT: Right.

MR. SULLIVAN: If they want to -- if they want to say that they're, you know, create -- I don't know what Mr. Siegel is suggesting, but these are contracts from big companies. And if they want, you know, our case will come up and we'll call the people who signed these contracts in to authenticate them, but they've had these things since 2022.

You can't cherry-pick the contracts and say, Oh, well, we're only going to use these because they add up to the

numbers that we like. No, you have to use the entire universe of contracts.

THE COURT: Okay. So one of the documents, I keep returning to this one because the first one I looked at, I think was with JP Morgan, what you called a contract. It didn't look like any lawyer-drafted contract that I've seen. It looked like a bunch of fields in some data entry machine-readable format.

The second contract I looked at was the Discover agreement. And I'm putting contract in quotes here.

The Discover agreement was a master services agreement, as I understand it, that provided, at least as far as I could tell, and I'm a hundred percent prepared to be educated on facts that I don't know, but that's the point here, as I saw in my relatively quick reading of the Discover agreement it looked like a master service contract that provided for the payment of no money by anybody to anyone else.

All it said was we, the parties, may agree to perform services for each other and to pay for those services in the future. And if we do, there will be further written contracts yet to be executed on that subject. And until and unless that happens, nobody owes anybody anything.

So, I don't understand as a matter of relevance how that Discover agreement could possibly show anybody's

entitlement to revenue from anybody else, and I'm asking you for a proffer on that subject.

MR. SULLIVAN: Right.

So, the first thing you said computer-generated contract. As I understand the law of contracts, a contract is offer, acceptance and consideration. So, it doesn't have to be a lawyer-drafted contract as such.

THE COURT: But you have to agree to the material terms of the contract, and that page did not describe any material terms to anything.

MR. SULLIVAN: Well, now you're conflating two things.

The first -- so the second -- the Discover contract, there are terms to it.

THE COURT: Sorry, keep going.

MR. SULLIVAN: So, when I cross-examined Mr. Rao on the contract, we will go over the addenda to the contract that specify what monies will change hands.

THE COURT: Were those addenda attached to the expert's reports?

MR. SULLIVAN: I'm sure it was.

THE COURT: I don't think so.

MR. SULLIVAN: I --

THE COURT: Does the Government have an answer to that question?

I assume if you understood what it is that I don't understand you would tell me.

MR. SIEGEL: So, Your Honor, on the JP Morgan one that looks unlike like a normal contract, that is what a lot of these advertising contracts look like. So, while it does look strange, and whether that one is authentic or not, but that is --

THE COURT: No, but can you read that document and see who is supposed to pay what to whom and when?

MR. SIEGEL: For the JP Morgan one?

THE COURT: Yes.

MR. SIEGEL: Well, what that gets you, as Ms. Poutre explained, we're going to do an ad campaign with this many ads at this price. And then when the ads are done an invoice is sent out.

So, there's sort of a larger issue. They're talking about how the contracts weren't in NetSuite, but as Ms. Poutre explained, you don't put the contract in NetSuite, you put the invoice in NetSuite, or the invoice is generated from NetSuite when the work is done, and then you bill someone and you get a payment and the cash goes in NetSuite.

So --

THE COURT: This company was recognizing revenue on an accrual or accounting basis?

I can't remember.

MR. SIEGEL: Accrual.

THE COURT: Okay. So maybe you don't have to wait for an invoice then.

MR. SIEGEL: You have to -- you don't have to wait until you're paid, that would be a cash basis, but you can't -- you can't count it as revenue until you've done the work. So, you do the work. At the time you do the work, you issue the invoice, and that's when it goes in NetSuite and that's what Ms. Poutre testified to.

THE COURT: Okay.

And as to the Discover contract?

MR. SIEGEL: As to the Discover contract, we have no idea.

THE COURT: Okay. So let's look stick with Discover since that seems to be the biggest collective mystery.

You are saying there are addenda?

MR. SULLIVAN: Absolutely.

THE COURT: Have you put exhibit numbers on them and given them to the Government?

Because I've never seen them.

MR. SULLIVAN: I'll bring it in -- I'll be sure to bring it in tomorrow, Your Honor. It's --

MR. SIEGEL: Judge, what are we doing with this?

MR. SULLIVAN: It's a typical contract in that industry.

THE COURT: If you're down to 500 exhibits, you need to know what your 500 exhibits are.

MR. SULLIVAN: I know it's there. I know -- I know it's a valid contract.

THE COURT: Tell me the number of this addenda. What's the exhibit number of these addenda?

MR. SULLIVAN: And while she's looking, there are eight others. Eight others in addition to.

THE COURT: I don't want to talk about anything else. I want to drill down on this one issue before we change the subject.

Somebody is going to hand my law clerk the binders that show the exhibits, the defense exhibits. And somebody is going tell me the number, so I can look at these addenda and understand whether this mystery can be solved or not solved.

MR. SIEGEL: And, Judge, I just want to be clear.

Mr. Sullivan keeps saying we've had these for two years and that they were produced two years ago.

THE COURT: I understand.

MR. SIEGEL: But the Bates numbers they gave us are not Bates numbers we've ever seen before. So, unless they've re -- unless they've re-stamped documents we've had before with different numbers and not told us the correspondence, we have no idea.

MR. SULLIVAN: Well, that's a problem if the

Government indicts people and don't even have an idea of the contracts that the company used. I mean these are valid contracts.

THE COURT: Mr. Sullivan, we are only talking about one thing right now, one thing and absolutely nothing else, which is tell me what the exhibit number of the addenda for the Discover services agreement are.

MR. SULLIVAN: Okay. So, Mr. Siegel gets to talk about different things.

THE COURT: I'm not interested in what he has to say either. I'm going back to my subject.

MR. SULLIVAN: 518 is the Discover contract.

THE COURT: 518.

(Pause.)

THE COURT: All right. I'm looking at Defense Exhibit 518.

Mr. Sullivan, can you point me to the payment term?

MR. SULLIVAN: I see the signature, Samir Rao and Nicole Straub.

THE COURT: I'm not looking for a signature. I'm looking for --

MR. SULLIVAN: I'm looking, I'm looking.

THE COURT: I think this is the same thing that was attached to the accountant's report.

MR. SULLIVAN: Oh, there is.

THE COURT: i.e. a Master Services Agreement.

MR. SULLIVAN: Okay. They appear to be in the insertion orders, which the witness did say she would get.

The first one June 1, 2017 to May 31st, 2018, for an amount of $372,539.

THE COURT: Are you looking at the same exhibit?

Everybody is looking at Exhibit 518. Let me walk us through this.

I would like everybody, please, if you can just answer my questions because it will take a lot less time.

I'm looking for the place where the parties agreed on a price as to some services that one was going to provide to the other.

So, Mr. Sullivan, just humor me for a second and look at Section 8 of this agreement, which is titled Price, Billing and Payment. And then more specifically, subsection 8 .1, which says Fees. No fees will be due or owed with respect to any services unless and until, A, the parties execute a task order covering such services; B, Discover accepts the relevant services; and C, Discover receives an invoice.

So, I think your factual predicate for the relevance of this contract, if it has something to do with barter revenue is, at least, twofold. You need to show me a task order covering such services and you need to show me the invoice that Discover you say received.

Do you have exhibit numbers for those two things?

MR. SULLIVAN: So, I do have a task order. I don't know if we assigned a an exhibit number attached to it.

THE COURT: If there is no exhibit number attached to it, then it's excluded. You can't --

MR. SULLIVAN: Okay.

THE COURT: -- sandbag. We are in federal district court here.

MR. SULLIVAN: It's not a sandbag.

THE COURT: It absolutely is.

MR. SULLIVAN: Their witness has it.

THE COURT: Okay.

MR. SULLIVAN: I mean their witness did it.

THE COURT: There is a reason why --

MR. SULLIVAN: You can get to suborn perjury, basically. Their witness, I'm looking at a task form.

THE COURT: Hand me a copy of it just so I can see what it says. Hand me the task order, please. We'll put a Government's exhibit sticker on it.

MS. KASSNER: Your Honor, it's on the defendant's computer. There's no printed anything.

THE COURT: So, you are saying you don't even have a physical copy of this task order here?

MR. SULLIVAN: I do not have a physical copy of the task order.

THE COURT: Read it to me. What is the date of the task order that you're looking at?

MR. SULLIVAN: The date of the task order is June 1 -- well, it's June 1, 2017 to May 31st, 2018.

THE COURT: Okay. And it's signed by both parties you say?

MR. SULLIVAN: Yes. It has the -- it has everything in the task order called for in the -- in --

THE COURT: Who signed it for Discover?

MR. SULLIVAN: -- in this agreement.

Nicole Straub, S-T-R-A-U-B, senior vice president Discovery Products, Inc. And it has an Ozy, Samir Rao, the Government's witness, Task Order Number 1 associated with this section that Your Honor read, 8 .1.

THE COURT: Okay.

And what is the amount of fees that that task order calls for?

MR. SULLIVAN: $372,539.

THE COURT: In exchange for what services?

MR. SULLIVAN: The services, website design and development, original content ideation, production and publishing , development of e-mail/outreach, creation of marketing/business development, key tools/performance measurement, content innovation and project management.

THE COURT: Okay. It sounds to me like a core part

of the defense theory of the case is this barter revenue assertion and --

MR. SULLIVAN: Well, this is not barter. This is for services. This is monies. This is hard money.

THE COURT: For cash, okay.

Well, either way, a core part of the defense theory of the case is that there were meaningful revenues that Ozy was entitled to claim or recognize, but that for whatever reason were not recorded in Ozy's books and records.

And the defense exhibits were due on May 10th, as were the Government's, and it sounds like even now as we sit here on May 29th, so almost three weeks later, now in the midst of trial, there is still no exhibit sticker on this document and we have no way of knowing that the Government has any reason to have expected that this was going to come in at trial.

MR. SULLIVAN: It's their witness negotiated and signed it. Their lead witness --

THE COURT: Is that your position, just so I understand?

MR. SULLIVAN: Yes.

THE COURT: For the life of me -- no, I'm talking right now. I'm sorry. I'm talking right now.

I think it's your position that every document that Mr. Rao has touched or Rao has touched is something you didn't

need to put an exhibit sticker on, you had no discovery obligations as to, the Government just presumed to have to have expected that you would admit that document.

MR. SULLIVAN: It is my position --

THE COURT: I don't know how things work in other courts you've litigated in. I don't think that anything works that way within a hundred miles of here.

MR. SULLIVAN: It is my position that the Government cannot elicit false testimony from its star witness that the revenue is a certain number --

THE COURT: Okay.

MR. SULLIVAN: -- when its own witness signed documents and has a bunch of other revenue that he, for whatever reason, did not put into the system.

THE COURT: All right.

MR. SULLIVAN: They were on notice. The previous counsel sent them everything. You just can't ignore, turn a blind eye to the functions of this organization. When their theory is that --

THE COURT: Mr. Sullivan, you and I are in very broad agreement that the Government has to comport with its ethical obligations. I think the Government probably agrees as well.

Give them a copy of that document as soon as you can get it off Mr. Watson's computer. And to the extent it

reveals to them that any testimony they had otherwise intended to elicit may be false, I have every confidence that the Government will revise its outline for a direct examination.

But as to whether you are going to be able to put that document in in your case, that question is still very much open.

I do want to think about everything holistically.

I understand that the Government is very much focused on what are the obvious and relatively egregious discovery violations we've seen in this case.

I also want to understand issues of relevance and the extent to which there would be real prejudice to the Government were we to allow this document to come in at this point. And I will render a final decision once I understand all of that holistically.

MR. SULLIVAN: Very well.

THE COURT: So, I thought, Mr. Sullivan, that we were finally, finally at a point where we were no longer going to be talking about potential defense exhibits as to which there was no exhibit number, and the document had not been exchanged with the Government. But apparently, now that we're talking about a document on Mr. Watson's laptop, that is not the case.

When will we, make a prediction for me, when we will reach the point that we are no longer talking about documents

that you want to put in you, but that you did not put exhibit stickers on or exchange with the Government, when we will finally hit that point?

(Continued on the following page.)

(Continuing.)

MR. SULLIVAN: I think we're done. I'll get them this document. And just for the record, this is my laptop sitting in front of Mr. Watson. I don't know if that's relevant.

I think we're done. I'll get them the task orders for this so that there's no mistakes. But again, it's been in their possession since 2022. You know, it's not a random document. It is a document --

THE COURT: Who produced that in 2022?

MR. SULLIVAN: Whoever was previous counsel in 2022. Ford O'Brien.

THE COURT: Ford O'Brien. Thank you.

What was the Bates number on that document when it was produced by Ford O'Brien to the Government?

MR. SULLIVAN: I can tell you that in a letter tonight or tomorrow. I don't have that in front of me.

THE COURT: Tell me in a letter tonight before 9 p. m.

MR. SULLIVAN: Very well.

MR. SIEGEL: If they can do that for all of their exhibits, that would greatly simplify our task of reviewing these.

THE COURT: I mean, I'm done --

MR. SULLIVAN: It's 229 contracts that they had. I

think the Government has an obligation to look at all of them. 229; it's not that much. The Government has an affirmative obligation to look at the 229. They can't say, oh, geez, we're going to show the jury 220 and ignore the other nine. That's fundamentally not fair. Substantive due process not fair.

THE COURT: Substantive due process.

MR. SULLIVAN: Only 229 contracts.

THE COURT: Okay.

MR. SIEGEL: Your Honor, on the relevance point, and I know we all want to be done with this, even with the task order, and I think Your Honor was alluding to this, the Master Service Agreement says there has to be the task order --

THE COURT: And an invoice.

MR. SIEGEL: -- and an invoice.

THE COURT: That's what I'm trying to drill down on.

MR. SIEGEL: The invoice is generated through NetSuite. So the idea --

THE COURT: If there was an invoice, you would know it, you're saying.

MR. SIEGEL: If it's not in NetSuite, then there was no invoice because NetSuite was the software that creates the invoices.

THE COURT: Mr. Sullivan, what's the response to that?

MR. SULLIVAN: That is the problem, that the people who were running NetSuite, Mr. Rao, their witness, the first witness on the stand, simply did not do it correctly. If they had done it correctly, that would be captured somewhere, and it's captured nowhere on NetSuite and that is a problem.

MR. SIEGEL: If the work was done. But if the argument is that there was never an invoice, and therefore I assume they were never paid because there was no invoice, then there was no revenue.

MR. SULLIVAN: And that's just wrong, absolutely wrong.

THE COURT: On an accrual base, but not the cash basis, right?

MR. SIEGEL: But if you're never actually doing the work and actually invoicing the clients --

THE COURT: Okay. But I think what Mr. Watson means to say is that even if there was no revenue, he reasonably believed in good faith that there was because whatever the predicate is, we still don't have anything remotely resembling --

MR. SIEGEL: So that's what we need a predicate for.

THE COURT: Yes.

So, Mr. Sullivan, I feel like I'm just repeating myself here, but tonight you're going to tell me -- so there was a task order, it's on Mr. Watson's computer, and you say

it was produced two years ago to the Government by Ford and O'Brien, whatever the prior law firm is called. You're going to tell the Government precisely what date that document was produced and what Bates number was stamped on it at the time. And this letter is not just going to go to the Government. It's going to be filed so that I can see it also.

I need you to lay a factual predicate for why this document is relevant to your theory of unrecognized revenue. And at a minimum, that should contain a statement of precisely what services were performed, by whom, when, and how that evidence will come in at trial, how that evidence will come in at trial. So if somebody -- Discover is a, what, a credit card company, and Mr. Watson was going to put Ozy's content on Discover's website? That doesn't make any sense to me. But again, maybe I may be missing something about how the credit card business works; I don't know. Who was going to do what for whom that was going to lead to a real legal obligation on the part of Discover, the credit card company, to pay 300-and-however-many thousand dollars to Ozy.

Is that clear enough?

MR. SULLIVAN: I will give the letter, submit the letter. I'm not sure why the Court continues to transfer ownership of my computer to my Watson. I don't know if that's relevant or not.

THE COURT: Possession is 9/10ths of the law.

MR. SULLIVAN: But it's my computer, so I will say that for the record.

THE COURT: Can you just tell me what the general nature of the services are? Is it that Ozy's content was going to be on Discover's website?

MR. SULLIVAN: I can read you exactly what the services were. But they advertise on -- they, Discover, advertise on Ozy's website, and that has --

THE COURT: Discover was going to pay for advertising on Ozy's website? They were going to advertise their credit cards?

MR. SULLIVAN: On Ozy's website. So again, milestones --

THE COURT: Okay. So then we need to know, I think, did those ads actually run?

MR. SULLIVAN: The ads ran.

THE COURT: When did the ads run and what documents reflect that, if anything?

MR. SULLIVAN: If you want me to point that out in the letter, I can. I have to go back and look at when the ads actually ran.

THE COURT: Yes, that's why I'm trying to drill down on this ail little bit now, is to inform the letter so it's actually of some use. When did the ads run? How do we know that they ran on those dates? Whatever the factual predicate

demands, that's what you should put in.

All right. Anything else on the Government's side before we adjourn today?

MR. SIEGEL: You still want to talk about the CFO email? I just have a minute on that.

THE COURT: I do want to talk about the CFO email a little bit. Is there any risk that that's going to be introduced tomorrow, or are you saying that's a Friday thing?

MR. SIEGEL: I think - - look, tomorrow will be our first full day, so I'll get a real sense of how fast -- our first full day with Mr. Rao . And I apologize, today was certainly a full day. I think there's a chance. Probably -- no, I think there's a chance it comes in tomorrow.

THE COURT: Okay.

MR. SIEGEL: Your Honor, what I would just say is the defense opening described the Goldman call, which was in February of 2021\, and said Mr. Watson walked in and this was happening, and I'll paraphrase, but, you know, oh, my god, I can't believe Mr. Rao is doing this. Here we have an email from a year earlier where it is specifically called to Mr. Watson's attention, an email to him saying what is going on here and what Mr. Rao is doing is a crime and I quit.

So the probative value is incredibly strong because it is direct evidence that Mr. Watson knew what was going on, and it's going to be accompanied by testimony by Mr. Rao that,

A, the fake contract he sent that generated this was something that he and Mr. Watson agreed to send beforehand. And by testimony from Mr. Rao that will be corroborated by other documents that when that email was received by Mr. Watson, he and Mr. Rao got on the phone to talk about a plan about how to make sure that this wasn't reported. So there's very strong probative value.

As to the prejudice, I've looked at the email and taken seriously Your Honor's consideration of redacting. But it's not -- I don't think it's really possible to redact the email without substantially changing the meaning of it. But also the prejudice from the email, the CFO is going to testify at this trial that I quit, and the reason I quit is because I thought this was illegal and I wanted nothing to do with it.

THE COURT: So if you'll go back to the hearsay question for a minute, let's set aside the question of whether it's within the scope of employment, set aside even the excited utterance question. You're saying it is admitted not for its truth, but rather to show its effect on the listener.

MR. SIEGEL: That's right. Any of the statements of this is illegal, why would you do this, how could you do this, I quit, none of that is admitted for the truth. It's that this is what she said and here's what the result of that was.

THE COURT: Okay.

Mr. Sullivan?

MR. SULLIVAN: The effect on the listener argument rings hollow. The way to do that is you have this witness, you see this letter. Result of this letter, what did you do? That's how you get around the hearsay for effect of the listener. What is really happening is that the Government wants the jury to hear what is 403, what is prejudicial, what is talking about laws being broken and that sort of thing.

The Government also said it's relevant to the Goldman call. I suppose the logic there is that the claim that she said Rao was making fake contracts therefore means that he's impersonating people. I don't see that as a necessary logical conclusion that would warrant admission of a letter from a year earlier.

I'll point out that that letter was informing Mr. Watson of what Mr. Rao was doing. Of course Mr. Rao is going to say that Mr. Watson knew, but there's nothing else that suggested.

THE COURT: Mr. Watson's on the email.

MR. SULLIVAN: No, knew prior to. In other words, he's describing something that she found out that Mr. Rao had made this fake contract. Mr. Watson's response was that what are you doing, the real one is ready to go, why are you doing this. And they got the real one the next day.

So this is pure 403. It should be admitted against Mr. Rao were he in trial, but not against Mr. Watson.

THE COURT: Can you government be more specific about the effect on the listener? Tell me again, what do you allege or what do you expect the testimony will show Mr. Watson did in response?

MR. SIEGEL: That he called Mr. Rao -- or they spoke that night and then spent the whole next day together discussing how do we prevent the CFO from talking about this. And he takes no disciplinary action against Mr. Rao, which undermines the argument that Mr. Rao was doing this all without telling Mr. Watson and is strongly corroborative of Mr. Rao's testimony.

I mean, Mr. Sullivan just made the argument that Mr. Rao's going to say that he agreed with Mr. Watson, and we're going to say that's not true. Evidence that Mr. Watson was informed about this and then took no action about it is strongly corroborative of Mr. Rao. And the prejudice that Your Honor has identified is the risk that there's going to be this lay testimony that this was illegal.

But there's really no dispute that this was illegal. The opening was Mr. Rao committed all these crimes, and Mr. Rao said I did commit a crime, this was illegal and I pleaded guilty to it. What's at issue is did Mr. Watson know about it; was he in on it. The statement this is illegal, this is a fraud, is not prejudicial. It's undisputed at this trial. What Mr. Rao did was illegal and it is a fraud. But

it's strongly corroborative that Mr. Watson knew what he was doing and he took no action because he was in on it. That's our argument. That's an argument that we are absolutely permitted to make to the jury, and this is evidence for that.

So this is very high probative value, and the only prejudice that's been identified is the statement, that this is illegal, which everyone agrees.

THE COURT: Okay. Can you put everything you just said in a letter, and also proffer in that letter what you said at sidebar about what you expect the testimony to be from this witness about her, I think, still excited state at the time that the email gets drafted, and submit that, if you would, tonight as well.

Mr. Sullivan, would you want -- let's assume this email's coming in. Do you want a limiting instruction by which I remind the jury that it's not coming in as any sort of expert testimony on what is or is not illegal? I don't know whether that helps or doesn't help, but if you want it, tell me, please, in your letter of tonight exactly what you would want that limiting instruction to say.

MR. SIEGEL: And we don't oppose such an instruction, just so that's clear.

THE COURT: You want to propose one as well?

MR. SIEGEL: The first question, as Your Honor pointed out, is if the defense wants it. If the defense wants

it, we don't oppose it. If they don't want it, we don't think it's necessary.

THE COURT: Well, we still have to figure out what it says. Maybe we can do that on the fly. I'd rather have it printed out on a piece of paper when we come in today so we don't have to waste the jury's time hashing out the language.

MR. SULLIVAN: And just on the excited utterance, I think I didn't speak at sidebar, but 12 hours is what the Government represented, a lapse of time, is far too long for someone to be still operating under the excitement of an event such that their deliberative faculties have not -- does not enable them to fabricate, which is the basis for the excited utterance, that it chose the deliberative faculties. That's 12 hours of being in an excited state. I don't even know if that's --

THE COURT: Why is that too long?

MR. SULLIVAN: -- physically possible. That's half a day. That's from --

MR. SIEGEL: Your Honor, we have case law on this that we can provide in our letter.

THE COURT: The Tocco case and one of the OC cases; I forgot which one.

MR. SULLIVAN: If that were the case, then - -

THE COURT: The question of whether it's possible for somebody to remain in an excited emotional state for

12 hours is more of a question for psychologists, I think, than us lawyers to figure out. It does seem to me as a matter of common sense that the likelihood of somebody's excited emotional state persisting for that long is obviously a function of what it is giving rise to the excitement.

And for a CFO who has thrown in their lot in life with a company that now they believe is engaged -- rightly or wrongly, they believe is engaged in felonious and fraudulent conduct, as a matter of common sense, it seems to me that could give rise to some sustained excitement, point one.

Point two, the cases the Government has already cited I think do say that some number of hours are, I forget exactly how many, is not too long for the excited utterance exception to apply.

MR. SULLIVAN: It is not necessarily too long, those cases say. But if there is extrinsic evidence that the weight of whatever happened has quelled, then that's not an appropriate objection to hearsay. So I would think that the Government would need to put on more evidence that would suggest that that witness was still operating under the power of that particular revelation. So if the witness had gone, for example, and gotten a massage or something earlier before writing the letter, then -- we just -- there's not enough information for the Court to make a determination on that basis, and it might be that the witness has to -- they would

have to lay a proper foundation for them to do so.

The last thing I would point out is, again, the alleged felonious activity was activity of Mr. Rao, and that's the prejudice, that it might -- that the jury might think that this has to do with Mr. Watson. This was Mr. Rao's doing.

THE COURT: The defense is that Mr. Rao, even a year later, was committing fraudulent activity on this diligence call with Goldman and that your client was shocked to learn that. And here we have an email on which your client is either addressed or copied saying, by the way, your deputy's committing some fraud here.

(Continued on the following page.)

MR. SULLIVAN: I see that. I don't see the relationship between the two. I guess I'm stuck at the, "therefore." Someone says that Mr. Rao committed fraud, therefore, a year later he's buying voice machines and whatnot. It strikes me as something that people don't, will not, anticipate.

THE COURT: There does seem to be a very close logical linkage to me. The use of the fake voice software is to create the impression that the company is about to earn revenue from YouTube that the Government alleges it was not really in a position to earn. And the email of the year earlier is about, if not the exact same subject then the exact same category, which is false revenue. Right. A fake contract instead of a fake due diligence call; but it's all to the same end.

MR. SULLIVAN: Not really. In the sense that this contract was actually on the way and was in fact signed by the proper person. Why their witness did that, I don't know, we'll have to ask Mr. Rao. But there was the actual contract that came right after.

So I think that the logical linkage, as your Honor put it, is tenuious at best.

And to the extent there is a logical linkage, the prejudice far outweighs the probative value given that the jury is going to think that this is talking about Mr. Watson

having done something.

THE COURT: That's the prejudice you see? Is that the email implies Mr. Watson's involvement in this?

MR. SULLIVAN: That the jury might think that, yes, Mr. Watson was somehow involved when the Government is saying their theory is he was put on notice of Mr. Rao's felonious activity. I think the risk of prejudice is too great.

THE COURT: Okay. I have everything I need on this subject line. I think that is our final subject for the evening. I look forward to the letters from both parties tonight. And we'll be ready to go.

If all of you could be here tomorrow at nine so we can hash out some the stuff before we start with the jury at 9:20 or 30, I think that will help keep us on track.

Thank you. With that we'll be adjourned.

(Proceedings adjourned at 6:20 p.m. to resume on May 30, 2024 at 9:00 a.m.)

I N D E X


| WITNESS | | PAGE |
|---|---|---|
| **JANEEN POUTRE** | | |
| DIRECT EXAMINATION | BY MS. KASSNER | 77 |
| CROSS-EXAMINATION | BY MR. SULLIVAN | 132 |
| CROSS-EXAMINATION | BY MS. FRISON | 182 |
| **SAMIR RAO** | | |
| DIRECT EXAMINATION | BY MR. SIEGEL | 190 |

E X H I B I T S

| GOVERNMENT | PAGE |
|---|---|
| 5033 & 5033D | 92 |
| 5001 | 103 |
| 6005 | 107 |
| 6015 | 111 |
| 6018 | 116 |
| 6020 | 118 |
| 1001 | 202 |
| 1001 | 207 |
| 3 | 213 |