# RONALD SULLIVAN LAW, PLLC

Ronald S. Sullivan Jr.

July 23, 2024

**VIA ECF**

The Honorable Eric R. Komitee
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 112011

Re:   United States v. Carlos Watson and OZY Media, Inc. Criminal Docket No. 23-82 (EK): Bail Pending Sentencing

Dear Judge Komitee:

    Undersigned counsel respectfully request that the Court set bail conditions that would allow for Mr. Watson's release pending sentencing. Described in detail further below is an updated bail package that responds to the government's July 16 application to remand Mr. Watson and that includes a stringent set of conditions that will reasonably assure Mr. Watson's presence at sentencing and ensure the safety of others and the community. In sum, the proposed package includes:

- A $2 million bond to be co-signed by three financially responsible persons with significant moral suasion;
- The bond to be secured by approximately $1 million in assets from close family and friends;
- Strict Pretrial supervision with home detention and electronic monitoring;
- Continued surrender of all travel documents, travel restrictions, and other standard conditions; and
- If the Court found it necessary, private security to be provided by the defense and approved by the Court and the government to assure compliance with all conditions.

    The value of the bond would be double the initial pretrial bond, with an added co-signer, and secured by greater assets. And the release conditions would be far stricter than those before trial. In remanding Mr. Watson following the verdict, the Court indicated that:

> If the defense wants to come back with a meaningfully strengthened bail package, I would be willing to consider that, of course. I'm not suggesting that it will carry the day or that it won't, but I would have expected that people would at least be thinking about

RONALD SULLIVAN LAW, PLLC

Ronald S. Sullivan Jr.

that possibility and that plans be at least in the works to see what additional sureties, maybe independent third-party sureties, I don't know, might have something to add.

Tr. 4645, Ln 1 – 4646 Ln 1-7.

We respectfully submit that the newly proposed conditions "meaningfully strengthen[]" the bail package and meet Mr. Watson's burden to show by clear and convincing evidence that he is not a risk of flight or a danger to others or the community. And releasing Mr. Watson pending sentencing would avoid incarcerating him at the Metropolitan Detention Center ("MDC") where conditions are far more brutal and inhumane as compared to a BOP facility where he might ultimately be designated.

## Legal Standard

As the Court is aware, in cases like the instant matter, that do not concern crimes involving violence, drugs, potential life sentences, repeat offenders, or minor victims:

> [T]he judicial officer shall order that a person who has been found guilty of an offense and who is awaiting imposition or execution of sentence . . . be detained, *unless the judicial officer finds by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released* under [18 U.S.C. §] 3142(b) or (c). If the judicial officer makes such a finding, such judicial officer *shall* order the release of the person in accordance with section 3142(b) or (c).

18 U.S.C. § 3143(a)(1) (emphases added); *see also* Fed. R. Crim. P. 46(c) ("The provisions of [Section] 3143 govern release pending sentencing or appeal. The burden of establishing that the defendant will not flee or pose a danger to any other person or to the community rests with the defendant.").

"While this burden is plainly substantial, if a defendant can make the required evidentiary showing, the statute establishes a *right to liberty* that is not simply discretionary but *mandatory*[.]" United *States v. Abuhamra*, 389 F.3d 309, 319 (2d Cir. 2004) (emphases added). Under the statute, a defendant can meet that burden of clear and convincing evidence shows that there is a "least restrictive [nonpenal] condition, or combination of conditions," that "will reasonably assure [his] appearance [at sentencing] as required and the safety of any other person and the community." 18 U.S.C. § 3142(c)(1)(B) (cited in Section 3143(a)(1)); *see also, e.g.*, *United States v. Chansley*, No. 21 Cr. 3 (RCL), 2021 WL 4133655, at *2 (D.D.C. Sept. 10, 2021) ("[Section] 3143(a)(1) requires the Court to conduct the same analyses of flight risk and dangerousness used in the pre-trial context, but with the burden shifted."). The Court therefore must consider, among other nonpenal alternatives: location monitoring, travel restrictions, and the imposition of a substantial financial bond or other security. *See* 18 U.S.C. § 3142(c)(1)(B).

(202) 313-8313

rsullivan@ronaldsullivanlaw.com

2

1300 I Street NW, Suite 400E

Washington, DC 20005

RONALD SULLIVAN LAW, PLLC

Ronald S. Sullivan Jr.

**EDNY Precedent Supports Bail Pending Sentencing and Self-Surrender**

Courts in this district routinely permit release pending sentencing and self-surrender following sentencing. There are numerous examples in the EDNY of judges continuing bail conditions following convictions at trial, even in fraud cases involving extremely high loss amounts and other aggravating circumstances. *See, e.g., United States v. Ng Chong Hwa*, 18 Cr. 538 (MKB) (Chief Judge Brodie permitted a foreign national defendant to remain on bail and to self-surrender after sentencing last year following a trial conviction in the highly publicized Malaysian government/Goldman Sachs fraud case in which the loss amount totaled in the billions, described by the government as the largest fraud in the history of the EDNY, and where the sentence was 10 years imprisonment); *United States v. Sean Novis, et. al.* 20 Cr. 335 (JMA) (Judge Azrack allowed defendants to remain free on bail pending sentencing and permitted self-surrender to the Bureau of Prisons after sentencing following trial conviction for a mass mail fraud conspiracy in which she found the loss amount to be $92.7 million); *United States v. Mathew James*, 19 Cr. 382 (JS) (Judge Seybert continued bail conditions and allowed self-surrender after sentencing following a fraud conviction at trial in which the government argued for a loss amount of $756 million); *United States v. Jon Won*, 18 Cr 184 (RJD) (Judge Dearie continued bail conditions and allowed self-surrender following trial conviction for securities fraud, wire fraud, and money laundering in a case involving millions of dollars in loss and targeting of vulnerable immigrant communities); *United States v. DiScala*, 14 Cr 399 (ENV) (Judge Vitaliano allowed several defendants in a securities fraud case to remain on bail, including one after a trial whose sentence was enhanced for obstruction of justice, where the loss amount was in the tens of millions); *United States v. Korchevsky*, 15 Cr. 381 (RJD) (Judge Dearie permitted continued release on bond and self-surrender following sentencing in a securities fraud, wire fraud, and money laundering conviction after trial with a loss amount of approximately $20 million). *United States v. Greebel*, 15 Cr. 637 (KAM) (Judge Matsumoto continued bail and allowed self-surrender after trial conviction for wire and securities fraud with a loss amount of greater than $10 million).

There are also two prominent examples in just the past two weeks in the Southern District of New York. *See United States v. Sung Kook Hwang,* 22 Cr. 240 (AKH) (SDNY) (Judge Hellerstein continued bail after the trial in the Archegos case concluded last week where the defendant Bill Hwang is accused of orchestrating a multi-billion dollar fraud); *United States v. Pukke*, 23 Cr. 168 (JPO) (SDNY) (Judge Oetken continued bail after trial conviction for fraud with an alleged $120 million loss where defendant had two priors, one for fraud and one for obstructing justice).

RONALD SULLIVAN LAW, PLLC

Ronald S. Sullivan Jr.

**Proposed Updated Bail Package**

Mr. Watson was arrested in February 2023 and released on a $1 million bond co-signed by two peopled and secured by his home in California.  He was not on home detention and remained on release status until he was remanded post-conviction on July 16, 2024.

For well over a year, Mr. Watson did not attempt to flee, nor did he engage in any conduct that posed a danger to the community, financial or otherwise.  In seeking remand after the verdict, the government pointed to the offense of conviction, pre-indictment conduct relating to discovery disputes, and post-indictment conduct relating to possession of phones in the courthouse, public statements about the case, and additional claims about discovery violations. None of the conduct cited by the government suggests that Mr. Watson is a flight risk or a danger to the community. And with this highly restrictive bail proposal, Mr. Watson meets the clear and convincing burden sufficient for a finding that the conditions will reasonably ensure his presence at sentencing and the safety of others and the community.

Specifically, people very close to Mr. Watson who exert considerable moral suasion are willing to sign a substantial bond and to secure it with significant (and personally meaningful) assets. In addition to their willingness to sign a $2 million bond, Mr. Watson's family has raised approximately $1 million of property and cash to secure Mr. Watson's bail. This includes cash raised by the family; his sister, Ms. Beverly Watson's condominium; his cousin, Ms. Annye Watson's 403b account; the equity in the home of a family friend, Ms. Allison Wallace; and, most notably, seven members of Mr. Watson's family have agreed to tender 42 acres of family land, currently used for forestry, as collateral. This land has been in the Watson family since the mid-19th Century – first acquired by their runaway enslaved ancestor. It has been passed down through the generations and now held by these seven family members. This land, over and above its conservative value of $750,000 holds special meaning to the Watson family. The owners of the property, each of whom has signed off on the security, are Lois Blacksher (95 years old), Mildred Chaney (91 years old), Suzie Thomas (87 years old), Jennette Shegog (83 years old), James Around-Thomas (80 years old), Beverly Watson (51 years old), and Gary Thomas (55 years old).

**RONALD SULLIVAN LAW, PLLC**

Ronald S. Sullivan Jr.

Below is a grid that outlines Mr. Watson's proposal:

| No | Name | Assest | Description | Value |
|---|---|---|---|---|
| 1 | Beverly Watson | Condo | 1831 Belmont Rd, NW, Washington, DC 20009 | $ 102,000 |
| 2 | Annye Watson | 403b | One America | $ 100,000 |
| 3 | Family VA land with | Undeveloped land owned for over 150 years by Thomas Family (Mother's side) * see below | Gloucester County, Virginia: Tract # GLO94027; East Chestnut Fork Rd. and Horseshoe Lane; Total Acres = 42.3 Used for Forestry | $ 750,000 |
| 4 | Allison Wallace Estes & GL Estes Wallace | Home | 520 Main Street, Hatfield, MA 01038 | $ 50,000 |
|  |  |  |  |  |

Beverly Watson is Mr. Watson's sister, who relocated from California and was present for the entire trial. She was a surety for Mr. Watson in his pre-trial bail package, but now offers the equity in her home as security for Mr. Watson. Michelle Watson is Mr. Watson's first cousin. She is the daughter of Mr. Watson's father's brother, and she and Mr. Watson are very close. Allison Wallace is a very close, long-time friend of Mr. Watson. Ms. Wallace has been friends with Ms. Beverly Watson since kindergarten and has known Mr. Watson for about 45 years. She and her spouse, GL Wallace, have agreed offer to offer the equity in their home as additional security.

Mr. Watson also proposes electronic monitoring; house arrest at his primary residence at 435 Kent Drive, Mountain View, CA 94043 (with availability to visit counsel, go to medical appointments, and visit his 90-year-old ailing father at the Court's discretion); reporting requirements at a frequency decided by the Court; and any other conditions that the Court may impose.

### Private Security Firm

While the defense submits that the above conditions are more than sufficient to assuage any concerns about Mr. Watson's appearance in court and the safety of the community, should the Court require additional assurances, the defense is prepared to engage a private security firm, to be approved by the government and the Court, to monitor Mr. Watson at his residence at all times to verify and assure his compliance with all bail conditions. Mr. Watson's friends and supporters will fully fund any such private security firm.

### Conditions at the MDC Support Bail Pending Sentencing

In addition to the above, the conditions at the Metropolitan Detention Center ("MDC"), where Mr. Watson is currently housed, independently support his request for home detention pending sentencing. The MDC is extremely dangerous – and demonstrably so. A mere two days

# RONALD SULLIVAN LAW, PLLC

Ronald S. Sullivan Jr.

after Mr. Watson was remanded to MDC, a detainee was killed just a few cells away from Mr. Watson, marking the second violent death at the facility within a two-month span.[1] Reports received by counsel allege that the victim was stabbed 137 times. In response, the institution has suspended all visitation privileges, strongly suggesting the implementation of future draconian lockdown measures previous deployed by MDC and described more fully below.[2]

Recently, in a case where the standard for maintaining bail pending sentencing was far more rigorous "exceptional reasons" test, Judge Furman in the Southern District of New York concluded "the conditions at the MDC are themselves "exceptional reasons" why … detention pending sentencing would not be appropriate." United States v. Chavez, No. 22-CR-303 (JMF), 2024 WL 5023 (S.D.N.Y. Jan. 4, 2024) (cataloguing the many failings at the institution, including lack of medical care, violence, extreme periods of lock down, and a complete failure to provide sanitary and hygienic conditions). Additionally, as of Ms. Gilbert's last visit to MDC on July 20, 2024, Mr. Watson had yet to receive his daily prescribed cholesterol medicine, notwithstanding that Ms. Gilbert advised BOP of this requirement on the date Mr. Watson was remanded.

The litany of problems identified by Judge Furman (and many other judges) continue to this day. Detainees at the MDC are still subjected to excessive periods of lockdown, during which they are confined to their cells and barred from accessing visits, phone calls, hygiene facilities, educational programs, or physical activity. Id. As recently as June 24, 2024, following a homicide at the facility, detainees were subjected to a stringent lockdown. One detainee reported, "we come out of our cell every three days for a 15-minute shower."[3] Both the Chavez Court and the Supreme Court have emphasized that confining inmates to their cells is … tantamount to solitary or near-solitary confinement, a practice that is increasingly viewed as inhumane. Id. See Johnson v. Prentice, 144 S. Ct. 11, 12 (2023) (Jackson, J., dissenting from denial of certiorari) ("As Members of this Court have recognized, the practice of solitary confinement 'exact[s] a terrible price.'" (quoting Davis v. Ayala, 576 U.S. 257, 289 (2015) (Kennedy, J., concurring)). Disturbingly, it has also been reported that the emergency call buttons in the MDC are often not working — even though those buttons are the only way (other than yelling and banging) to call an officer in emergency situations during a lockdown.[4]

The most alarming and dangerous problem facing the facility is its severe understaffing. Operating at a mere 55% of required correctional officer staffing over the past year, the institution faces a perilous scenario where a single officer is responsible for monitoring ten

---

[1] Courtney Gross, *Exclusive: Inmates Decry Conditions Inside Brooklyn Jail*, NY1 (June 24, 2024, 7:30 PM), https://ny1.com/nyc/all-boroughs/politics/2024/06/24/brooklyn-federal-jail-murder-conditions.

[2] https://www.bop.gov/locations/institutions/bro/ (last visited July 18, 2024).

[3] Gross, supra note 1.

[4] Letter from Loretta E. Lynch at 4, *Fed. Defenders of N.Y., Inc. v. Fed. Bureau of Prisons*, No. 19-CV-660 (MKB) (E.D.N.Y. Nov. 30, 2023), ECF No. 403.

prisoners—a ratio that severely compromises safety and security. Chavez at *14. According to a recent memo by the president of the local union that represents MDC's correctional officers, "[o]n a daily basis housing units . . . are left . . . unmanned by staff and locked down, with the expectation . . . that a single [] Officer is to make rounds, feed, and perform additional correctional duties" on three units during a single shift. United States v. Irizarry, 23-CR-60 (JMF), ECF No. 47-3 (S.D.N.Y. Oct. 30, 2023) at 1-2. The frequency of lockdowns "angers the inmates and heightens the inherent danger for staff," but "[c]overage is so minimal that at times there are only 6 staff members available to respond to body alarms, staff assists, and [/] or inmate medical emergencies." and there is "no reason to believe that the staffing side of the equation will change any time soon." Id. And it is for this reason the Chavez court urged that the "only option is to reduce – or at least not add unnecessarily to – the prisoner population." Chavez at *15. For the aforementioned reasons, the Chavez Court held that the conditions at the MDC constitute "exceptional reasons" why detention of most defendants who do not pose a risk of flight or danger to the community "would not be appropriate." 18 U.S.C. § 3145(c). See United States v. Arias, No. 22-CR-495 (PAE), slip op. at 33 (S.D.N.Y. May 5, 2023) (continuing defendant's bail pursuant to § 3145(c) due to MDC's "unacceptable," "inhospitable, [and] terrible" conditions, despite the fact that "[t]he pandemic is now on the wane").

### Conclusion

Permitting Mr. Watson to be confined in home detention with electronic monitoring will avoid unnecessarily subjecting him to the inhumane conditions of the MDC. Bail pending sentencing would also be in keeping with the routine practice of judges in this district even in cases with far more aggravating circumstances than those present here. The above-proposed package is more than sufficient to ensure Mr. Watson's presence at trial and the safety of the community. Because Mr. Watson is currently detained, we respectfully request that the Court enter a bail order with the proposed conditions on an expedited basis.

Respectfully submitted,

/s/

Ronald S. Sullivan Jr.
Janine Gilbert, Esq.
RONALD SULLIVAN LAW, PLLC
1300 I Street NW, Suite 400 E
Washington, DC 20005
202-313-8313