UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - X
UNITED STATES OF AMERICA, : 23-CR-00082(EK)

-against- : United States Courthouse
: Brooklyn, New York

: Monday, July 1, 2024
WATSON, et al., : 8:45 a.m.

Defendants.
- - - - - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
BEFORE THE HONORABLE ERIC R. KOMITEE
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

For the Government: BREON PEACE, ESQ.
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201
BY: JONATHAN SIEGEL, ESQ.
GILLIAN KASSNER, ESQ.
DYLAN STERN, ESQ.
Assistant United States Attorneys

For the Defendant: Carlos Watson
RONALD SULLIVAN LAW, PLLC
1300 I Street, NW
Suite 400E
Washington, DC 20005
BY: RONALD S. SULLIVAN, ESQ.
JANINE M. GILBERT, ESQ.

For the Defendant: OZY Media, Inc.
FRISON LAW FIRM, P.C.
75 State Street
Suite 100
Boston, Massachusetts 02109
BY: SHANNON FRISON, ESQ.

(In open court - jury not present.)

THE COURTROOM DEPUTY: All rise.

THE COURT: Good morning, everybody, please be seated.

So I believe where we left off on Thursday was that Ms. Lightfoot, I'll call her, although I realize her name may have changed, was testifying about the amendments, let's call them, to OZY Media's accounting, and we had an objection that she was offering hearsay testimony, statements she had heard from Mr. Watson himself, offered for their truth. Mr. Sullivan had advised me that those were admissible as statements of a party-opponent, and I had reacted, let's say, with some surprise to that notion.

Do you, Mr. Sullivan, continue to believe what would otherwise be hearsay statements by Mr. Watson are admissible when offered by you?

MR. SULLIVAN: No, I don't think they're hearsay statements.

THE COURT: And why is that?

MR. SULLIVAN: Because I don't believe that they are offered for the truth of the matter asserted.

THE COURT: So, this is --

MR. SULLIVAN: The notes are in dispute. That's the point. Only offered to show that this thing was done.

THE COURT: Okay. But you're backing away from the

party opponent basis for admission, I assume?

MR. SULLIVAN: Yes, that was garbled. That's not the point I was attempting to make, but, yes.

THE COURT: I'm sorry. They would be admitted not for their truth but for what alternative purpose?

MR. SULLIVAN: It's to show that this work was done. Ultimately, we are going to ask the jury to draw an inference about what was in Mr. Watson's mind at the time.

THE COURT: Okay. The hearsay objection is sustained. We are not going to have Ms. Lightfoot testify to what Mr. Watson was thinking or saying to the extent those subjects are disputed and therefore offered clearly for their truth.

I think that raises the question of whether it's going to be productive to continue with Ms. Lightfoot's testimony. To the extent that her changes to the accounting systems are predicated on assertions of fact made to her by the defendant, it's all going to be excluded. I leave it to you whether you want to continue with her. But I think that's where we are at the moment.

MR. SULLIVAN: It's Ms. Frison's witness, Your Honor.

THE COURT: Okay, Ms. Frison.

MS. FRISON: So, Judge, your last question to me on Thursday was how Ms. Lightfoot got the information that she

used in trying to account for barter revenue in this project, as she described it. And the project itself, I believe, was her and other people, and she received information from the outside accountants that she then used to --

THE COURT: Can you give me an example of this information?

MS. FRISON: So, contracts that gave discounts or state that the fee for services is zero but that some services will be rendered.

THE COURT: I mean, how is that anything but classic hearsay?

We also have relevance hurdles to surmount here, but this is --

MS. FRISON: My basic question to her around this topic is whether or not she eventually learned a way to account for barter exchanges.

THE COURT: Right, but whether a contract exists or not, I assume is a predicate for recognizing revenue from that contract, whether it is written, oral and/or otherwise, or even if there's not a valid contract maybe, whether money actually came in for a given purpose. But if she only knows any of what I have just described because she heard it from other people, you know, it should be obvious where we are going to come out at that point. So I leave it to you.

I'm not advised at this point that Ms. Lightfoot has

any firsthand knowledge about the existence or validity of contracts that would give rise to this quote/unquote barter revenue. And if she doesn't have that firsthand knowledge and the only testimony she would offer on the subject is hearsay testimony, then this is going to be brief. But I leave it to you to decide whether you want to continue accordingly.

MS. FRISON: I think what she has testified to already in terms of her job inputting data, essentially, all of which comes from other departments because she is not involved in the dealmaking or negotiating contracts --

THE COURT: Then it's hearsay. All right. Do you want to continue with Ms. Lightfoot --

MS. FRISON: Yes.

THE COURT: -- given that?

All right. I will expect you to ask questions in ways that comport with the ruling I have just issued and not to seek to elicit hearsay testimony as to which no exception has even been proffered, let alone accepted. But if you are comfortable with that understanding, then we can proceed.

MS. FRISON: Yes, Your Honor. Please note our objection to that topic being banned.

THE COURT: What's the objection? That it's not hearsay because --

MS. FRISON: I am actually asking her about her work and not about what she saw in the contracts. I'm asking her

actually what she did as part of the project.

THE COURT: Okay. But that's only relevant to the extent that -- well, proffer the relevance of that to me.

Absent some predicate showing that there was a proper basis for what she did, what is the relevance of her making after-the-fact changes to the accounting systems?

MS. FRISON: The relevance is that the premise -- the Government's premise is that the revenue from OZY was essentially from wire transfers and no witness has been able to testify to how barter agreements or in-kind agreements were accounted for at all. So the fact that that work was done at some point I think is relevant to our contention that that's another aspect of revenue that has not been accounted for.

THE COURT: Okay. You have your objection.

It's noted for the record but it is -- well, the hearsay objection from the Government that we had on Thursday is sustained.

All right. Let's bring in the jury and if the defense --

MR. SIEGEL: Your Honor, as you noted, Ms. Lightfoot may end up being a fairly short witness and it's not clear who the next witness is going to be, there are a number of observation objections to all of the other witnesses that the defense has offered. Again, we can take a break after Ms. Lightfoot testified.

THE COURT: Let me ask, who is the next witness?

MR. SULLIVAN: Mr. Watson.

MR. SIEGEL: Then that's fine.

THE COURT: We will get the jury, thank you.

MS. FRISON: Judge, would you like Ms. Lightfoot back on the stand?

THE COURT: Yes, please.

(Witness takes stand.)

THE COURT: I will remind the witness, as I do all the time after a break, that you remain under oath despite the intervening weekend.

THE WITNESS: Thank you.

(Jury enters.)

THE COURT: Good morning, ladies and gentlemen.

THE JURY: Good morning.

THE COURT: Please be seated, everyone.

All right. We will be continuing with the testimony this morning.

Ms. Frison.

**JOAN CLAIRE RUDY**,

called as a witness, having been previously duly sworn/affirmed, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. FRISON:

Q Good morning, everyone.

Good morning, Ms. Lightfoot.
A Good morning.
Q I am going to attempt to pick up where we left off on Thursday.
To refresh the jury, you are or were, I'm sorry, an accountant for OZY; is that right?
A Yes.
Q Let's discuss cash flow at OZY Media.
Were you in charge of cash?
A Yes.
Q And what did that mean in terms of your responsibilities?
A So, I would record any cash transaction that would go through the business during that month and by the end of the month.
Q And were you the only person dealing with cash?
A No, there was a direct report who would sometimes book some of the entries depending on what it was.
Q But otherwise it was just the two of you?
A Yes.
Q How would you describe OZY's cash flow during your tenure there?
A So, it was kind of up and down. There was -- when I first got there in 2017, I wasn't doing any of the cash transactions at that time, but I was connected to our cash flow in terms of just open conversations that the team would

have. And it was okay. There wasn't a lot of struggle at that time.

And over the next five years or so, it kind of went up and down depending on the contracts that we got and how much work that we had to do.

Q And when you say it went up and down, was there a point at which there were struggles in terms of cash flow?

A Yes.

Q Did that impact your ability to pay OZY's bills?

A Sometimes.

Q How did you handle that?

A It was a lot of open conversation and really just coming up with different types of strategies and plans with our vendors or people that we owed money to in order to come up with a plan to get it all paid or paid off.

Q Was there ever a time that OZY's cash was so low that you thought the company would have to shut down because of it?

A There was times that there was definitely some thoughts of cash flow being a struggle, but I always had the confidence that we were going to continue just from the leadership really.

Q From 2018 until 2023, when you left, were you dealing with cash that entire time?

A In the very beginning, it was more of just making sure all the transactions were recorded appropriately that had to

do with cash.

Towards the end, I was actually processing any of vendor bills or receiving any of the cash that came in.

Q Were you in charge of payroll?

A Yes.

Q And for what period during your tenure were you in charge of payroll?

A The entire time I was there.

Q What did that mean in terms of your responsibility?

A So any kind of onboarding and offboarding that I would have to do for employees or administering payroll on a monthly schedule to get people paid.

Q When you say onboarding and offboarding, do you mean people being hired and people leaving the company?

A Yes.

Q And were you in charge of paying employees each payday?

A Yes.

Q How much employees were you required to pay?

A On our payroll, W-2 payroll, it was about -- around -- by the time that the article came out, it was around 30ish, maybe almost 40. That was full-time W-2'ed employees. And we also had contracted employees. Those were ones that didn't reside in the United States mostly. And those were also full-time, about 30ish or so.

Q How often was OZY paying its employees?

A For the W-2ed payroll employees, it was on a semi-monthly schedule, which means on the 15th and last day of the month.

For the contracted employees, most of the time they were paid once a month at the beginning of the month once they submitted an invoice from the previous month.

Q When you say there were roughly 40 employees that you were responsible for paying, was that the case over the whole time that you worked there or did those numbers change during your tenure?

A Yeah, when I started, it was about 20ish.

By the time the article came out, it was somewhere between 30 and 40ish.

Q When you say the article, what article are you referring to?

A The one that came out in the *New York Times*.

Q And was that an article in September of 2021?

A Yes, ma'am.

Q Were there any points at which OZY struggled to make payroll?

A There was one or two times that I can remember where it was up to the deadline that we didn't have the cash in there to be able to make payroll, but we made it.

Q And how did you -- at those times, how did you make payroll?

A Most of the time it was either a loan or some kind of

investor that, you know, closed a deal or we happened to get paid just simultaneously from a contract deal.

Q During those points, were there any employees who went without pay?

A There was two employees that went without pay multiple times.

Q Who were they?

A Samir Rao and Carlos Watson.

Q Were they the only two employees who went without pay?

A Yes.

Q And for how long a period would you say that happened?

A I mean, if I had to add up all of the pay periods that they weren't paid, it was probably over a year that they weren't paid, maybe even longer.

THE COURT: Who owned the equity of the company? Other than the outside shareholders, who were the inside owners?

THE WITNESS: I'm unsure of that answer.

THE COURT: Okay.

Q Did you have any other responsibilities at OZY other than payroll, cash, and accounts payable?

A Yes. I had accounts receivable and any kind of financials that would have to be put in the general ledger in order to get the financials in place.

Q I may have asked you this on Thursday. Are you familiar

with the term insertion orders?
A Yes.
Q And what are those?
A It's just another name for contract.
Q Did you actually deal with insertion orders?
A Yes.
Q How so?
A Any time that we would have an executed contract or an insertion order, I would be pretty much the final person to receive it after it's all signed so that I could bill the customer.
Q And did you actually maintain the insertion order, a physical copies somewhere?
A Yes.
Q How did you maintain them?
A We had a finance folder that we kept everything that went through finance. It was a drive dedicated only to finance. And, so, I would store any of the files I got there. In addition to that, we would store them on the Google Drive that we had there.
Q Do you know about how many insertion orders you stored on that drive?
A There was a lot of insertion orders per year, so I really don't.
Q Can you say whether it was in the hundreds or less than

100?
A Probably less than the hundreds. We'd probably have per year somewhere between 20ish, maybe 20 to 30 customers depending how small or big they were. If they renewed, and this is customers only, not insertion orders or contracts, so sometimes, you know, one of those can go three months, one can go six months and then they renew again. One customer could have one to four contracts in one year.
Q And did you maintain those for the whole time you worked at OZY?
A Yes.
Q You also told the jury some of the ways in which investors paid money to OZY.
Are you familiar with the term ACH?
A Yes.
Q What does that stand for?
A You're testing my knowledge here.
I'm not sure what exactly it stands for at this time, but it is to be able to process a payment through a transfer between banks that usually processes between one to two business days.
Q Does automated clearing house sound like what the letters stand for?
A Yes.
Q Is that different -- is that type of transfer different

from what you described as a wire transfer?
A They act as the same. The fees are just a little bit different and they may look a little bit different on a bank statement, but would always say the word transfer probably.
Q Did OZY Media receive ACH transfers?
A Yes.
Q And was that also something that you handled in terms of recording?
A Yes.
Q Did the COVID-19 pandemic affect OZY Media in 2020?
A Oh, yeah.
Q Can you describe how so?
A So, really a lot of the business was facing. You know, you have a lot of people that you would have to get together with. We had a TV show at the time where that was obviously people facing and we had to get into the office a couple times a week in order to produce that show. And so, there was all of the kind of protocol that needed to be done in order to be able to have that show there, that we had to be in compliance with.

Also, we had to work from home. Everybody got shifted to work from home. And we did that pretty early on. Carlos was mindful of everybody's health and wanted everybody to --

MR. STERN: Objection.

THE COURT: I'm sorry. Was there an objection?

MR. STERN: I objected, yes, Your Honor. Hearsay.

THE COURT: Sustained.

The last sentence will be stricken from the record. You can ask her another question, please.

Q Did OZY employees switch to remote work during the pandemic?

A Yes.

Q Were you also working remotely during the pandemic?

A Yes.

Q Were there any times per week that employees came together in the office?

A There was a couple times per week, based off of the TV show that we were filming at the time, that they would film in office. We had to move it to an in-office setting, and I would go in to be able to collect checks and mail.

Q Was the show The Carlos Watson Show?

A Yes.

Q Did Mr. Watson work remotely during COVID?

A Yes, but he was in the office any time I was.

Q Was Mr. Rao working remotely during COVID?

A Yes. I did see him sometimes during that time too.

Q And how about Ms. Han, was she also working remotely?

A Yes. I also, as well, would see her in the office sometimes.

Q Were there any other effects on the business that the pandemic had on OZY?
A Not that I can think of at this time.
Q If we can fast forward to September of 2021. Were you working at that time? Were you actually coming into the office at that time?
A Yes.
Q Did you take a maternity leave while you were at OZY Media?
A Yes.
Q What were the dates of your leave?
A February of -- I'm sorry, January of 2021 until June of 2021.
Q And when did you return to work after that leave?
A June 1, 2021.
Q So, in September, were you coming into the office at the time that the article you mentioned in the *New York Times* was published?
A I remember being home at that time actually. I don't think we were coming into the office physically any longer. We were -- we did physically have an office, but a lot of people were working from home.
Q And how is it that you found out about that article?
A I found out about the article in a team meeting that was gathered that day.

Q What -- did things change at OZY Media in terms of your responsibilities after that article came out?
A Yes.
Q And how did your responsibilities change?
A A lot of people did not stay after that article came out, so I had to take on a lot of different peoples' jobs in order to help the business continue to function.
Q How many people remained at OZY after September of 2021?
A About ten or so. Maybe a little bit more than that if you include some contractors.
Q Were the additional functions that you took on accounting functions?
A Yes.
Q And were you -- were there other accountants still working at OZY at that point?
A One other.
Q And who was that?
A Mercedes West.
Q And was that someone reporting to you?
A Yes.
Q Was there a term that you called what happened in September of 2021?
MR. STERN: Objection. Relevance.
THE COURT: Sustained.
Q From the point that your responsibilities were increased

in 2021, did you stay with OZY for another two years?
A Yes.
Q And were there ever any other accountants hired by OZY from September of 2021 forward?
MR. STERN: Objection. Relevance.
THE COURT: Overruled.
A Yes. There was a consultant and interim CFO that was hired.
Q And were you reporting to those people?
A Yes.
Q And what were their names?
THE COURT: All right. I'm going to sustain the objection now.
Well, sustained. Let's gather at the sidebar for just a moment.
(Sidebar.)
(Continued on next page.)

(The following occurred at sidebar.)

MS. GILBERT: It's just going to be us.

THE COURT: Okay. It seems to me like we might be getting into the re-statement project about which I raised the foundational questions that I had before the witness took the stand.

MS. FRISON: That is not what I was going into. I just wanted to clarify that it was just her and her direct report for the rest of the time while she was there. I was not going into anything else.

THE COURT: Okay.

(Sidebar concluded.)

(Continued on the following page.)

DIRECT EXAMINATION
BY MS. FRISON: (Continuing)
Q Ms. Lightfoot, did you invest in OZY Media personally?
A No.
Q Did you loan any money to OZY Media personally?
A Yes.
Q What year did you do that?
A I did that -- I believe -- it could have been the end of 2022, but it might have been the beginning of 2023.
Q How much money did you loan OZY Media?
A I can't remember the exact dollar, but it was over 100k.
Q Is that over $100,000?
A Yes.
Q Was that in one loan?
A Yes.
Q Why did you loan OZY money?
A Particularly, this is one of the moments that we mentioned earlier that we were trying to make a payroll, and it was in a transition timing where we had sales deals closed and receiving funds, but the work wasn't quite finished, so I felt confident in order to do that.
Q Where did you get the 100,000 or so dollars from?
MR. STERN: Objection.
THE COURT: Sustained.
Q Did you actually partake in any OZY products before

making that loan?
A I'm unsure of the question.
Q Did you look at any of the shows? Did you go to any of the festivals were you a consumer of any OZY products before making your loan?
MR. STERN: Objection.
THE COURT: Sustained.
Q Were you familiar with the products that OZY made before you made a loan?
MR. STERN: Objection.
THE COURT: Sustained.
Q Did you get your money back from OZY Media?
A Yes.
Q How soon after you loaned it did you get it back?
A It definitely was in -- within a few months. I am unsure of the actual timing because it depends on whenever I loaned it in the first place.
Q And was that your only time loaning OZY money?
A Yes.
Q At some point in time during your tenure at OZY, were you interviewed by the FBI and prosecutors?
A Yes.
Q When was that?
A I want to say it was within a couple months of the first of 2022, I believe.

Q How many times did you meet with them?
A Basically, that was one time. Over the phone, probably three to seven times maybe.
Q Were you subpoenaed by the prosecutors to testify at this trial?
A Yes.
Q Were you called by the Government to testify at trial?
A Yes.
Q Are you sure that you were called by the Government?
A If the Government means the Department of Justice. I'm unsure if that's what that actually means. I'm sorry.
Q So you received a subpoena from the prosecution; correct?
A Yes.
Q Were you actually called as a witness by them?
A I'm unsure of the question. I'm sorry.
Q So the prosecution sent you a subpoena. Are you here testifying under that subpoena?
A No.
Q At some point when you were with OZY, did you have occasion to assist Mr. Watson personally with money?
A No.
Q At any point during your tenure at the company, did you at any time loan Mr. Watson money?
A No.
Q What was your last month or last day, if you know, at OZY

Media?
A I believe it was February 28, 2023.
Q When you left OZY, was it your decision to leave at that time?
A Originally I did let Carlos know I was going to be leaving at the end of February due to a transition that I was moving on to a new company, and the company ended up shutting down by the end of the month any way, so everybody left at the same time.
Q Thank you.
MS. FRISON: I have nothing further.
THE WITNESS: Thank you.
THE COURT: I forget where we are.
Mr. Sullivan, have you had an opportunity to question this witness?
MR. SULLIVAN: No, Your Honor. Brief indulgence.
THE COURT: Yes.
MR. SULLIVAN: No questions.
THE COURT: Cross-examination?
MR. STERN: Thank you, Your Honor.
CROSS-EXAMINATION
BY MR. STERN:
Q Good morning, Ms. Rudy.
A Good morning.
MR. STERN: Good morning, members of the jury.

THE JURY: Good morning.
Q So, Ms. Rudy, you always had a good relationship with Carlos Watson; isn't that right?
A Yes.
Q You stayed at the company for how many years?
A Almost six.
Q And after the *New York Times* article, as you just testified, you were only one of a handful of employees who stayed with OZY; correct?
A Yes.
Q And that's, in part, because you felt a personal closeness to Carlos Watson; right?
A I would say maybe in part, but it also had to do with the responsibility I felt for the employees at the time in order to make sure that everybody was taken care of as well.
Q Fair enough. But it's also fair to say that the two of you had a close relationship; right?
A A work relationship, yes.
Q A close work relationship?
A I mean, we worked together because he was my boss, yes.
Q But in terms of the relationship, you've described it as close, haven't you?
A We were decently close, yes.
Q You also had a relationship with Samir Rao, didn't you?
A Yes.

Q And isn't it true that based on what you witness Mr. Watson and Mr. Rao worked closely together?
A Yes.
Q And after Suzee Han joined the company, isn't it true the inner circle at OZY consisted of Watson, Rao, and Han?
A There were other executives of each department as well.
Q But isn't it true that the inner circle at OZY consisted of Watson, Rao, and Han?
MS. FRISON: Objection.
THE COURT: Sustained.
Q Ms. Lightfoot, you testified earlier that you spoke to the FBI in connection with this investigation; isn't that right?
A Yes.
Q And one of those times that you spoke to the FBI was in April of 2023; correct?
A I believe so. I remember it happened shortly after February, yes.
Q Okay. And when you spoke to the FBI, you knew it was important to tell the truth; right?
A Yes.
Q And in those meetings with the FBI, you did tell the truth, didn't you?
A Yes.
Q And so isn't it true that on April 6, 2023, you told the

FBI that the inner circle at OZY consisted of Watson, Mr. Rao, and Han?

MS. FRISON: Objection.

THE COURT: Do you remember saying that?

THE WITNESS: No, and I'm not sure what the inner circle is, the terminology is meaning.

THE COURT: Okay. Let's have another question.

MR. STERN: Okay.

THE COURT: I mean, do you want to -- who were --

MR. STERN: I can ask another question, Your Honor.

THE COURT: Yes, please.

BY MR. STERN:

Q I'd like to turn a little bit more to your job and your responsibilities when you were at OZY. Okay?

A Okay.

Q You testified that your role was more at the data entry level than at the finance level; is that right?

A Yes. For the first, you know, half of it, it was a lot of data entry. For the end of it, it was still a lot of data entry, but I would, you know, make sure that the financials had all of the data in them.

Q So, you said by the end. I think you testify on direct about how your responsibilities expanded after the *New York Times* article is that fair?

A Yes.

Q So, prior to that, it was more of the data entry than at the finance level; is that right?
A Yes.
Q So you worked for Janeen Poutre for a time?
A Yes.
Q And then you worked for Tripti Thakur?
A Yes.
Q Then you worked for Suzee Han at a time?
A Yes.
Q When each of those individuals ran the finance function?
A Correct.
Q So, you also testified that even though you may not have been strictly GAAP compliant, that you did your best to come as close as possible; correct?
A Correct.
Q And as part of your job, you closed the books in NetSuite every month; correct?
A Correct.
Q I just want to understand that. So in order to close the books, isn't it true you would reconcile what was in NetSuite against the actual numbers in OZY's bank accounts?
A Yes.
Q And OZY -- by the way, OZY banked at Silicon Valley Bank; is that right?
A Correct.

Q And then also at Wells Fargo; is that right?
A Yes.
Q And those were OZY's only two bank accounts; correct?
A Yes.

THE COURT: Sorry. You have to wait for the end of the question so that you're not speaking simultaneously.

MR. STERN: Sorry. I will ask that one more time just for the court reporter.

Q And those were OZY's only two bank accounts; correct?
A Yes.
Q And Ms. Rudy, you believe that all the cash and revenue was accurately recorded in NetSuite, don't you?
A Yes.
Q In fact, NetSuite was 100 percent accurate and complete, wasn't it?
A In -- from my perspective, what I would enter from the day-to-day transactions, yes.
Q And that included those insertion orders that you testified about on direct; is that right?
A Yes.
Q 100 percent accurate and correct from your perspective?
A Yes.
Q You testified also that Mr. Rao was a little more in the details on the finances than Mr. Watson. Do you remember that?

A Yes.
Q But isn't it also true that at your time at OZY, Mr. Watson was for sure focused on OZY's revenue and profitability?
A Yes.
Q Going back to your role a little bit, Ms. Rudy. You talked about your focus on NetSuite and the data entry component at least through the *New York Times* article.

You also talked about that you would book the money that came in through various funding rounds; is that fair?
A Yes.
Q But you didn't meet with investors yourself, did you?
A No.
Q You don't know what was said in investor meetings, do you?
A No.
Q You weren't on any phone calls?
A No.
Q Any other communications with investors, you weren't a part of that, were you?
A No.
Q So when you were at OZY, again, going back a little bit to your job, there came a time when you provided information to OZY's tax accountants; right?
A Yes.

Q And the tax accountants were from a firm called SingerLewak; is that right?
A That's correct.
Q And you intended the information you provided to tax accountants to be truthful; correct?
A Yes.
Q Complete?
A Yes.
Q And accurate?
A Correct.
Q So I'd like to actually show you a document. This is Government's Exhibit 5095. It's already in evidence.

MR. STERN: Just one moment, Your Honor, while we set up.

THE COURT: We are going to display this for the jury?

MR. STERN: If we can.

Q Ms. Rudy, are you able to see that on your screen?
A I'm not yet.

MR. STERN: Okay.

MS. GILBERT: What's the number?

MR. STERN: 5095.

THE COURT: All right. We are going to take our first break of the morning, ladies and gentlemen, while we wrestle with the modest technological difficulty here.

We will see you in about five or ten minutes.

(Jury exits.)

THE COURT: You can step down.

(Witness leaves stand.)

THE COURT: All right.

(Brief recess.)

(Continuing.)

MR. SIEGEL: Your Honor, before the jury comes in, just one question; Mr. Watson is going to be getting on the stand, there is the issue with contracts that are defense exhibits.

THE COURT: I think we will take that up after Ms. Lightfoot leaves the stand. I think we have agreement or at least you've decided not to oppose the quote/unquote "nine contracts" that were attached to Mr. Pinkus' disclosure sometime back and then there were -- I know this has been a moving target all along, but there were about 200 additional contracts as to which you were trying to ascertain how many have been produced in discovery and how many had not.

I am going to be informed by the level of prejudice here and not simply the fact of the discovery violations and, so, I think we're going to need to take this question up with reference to individual contracts.

MR. STERN: Understood, thank you.

THE COURT: You should be in a position -- both sides should be in a position that to the extent a contract was offered, to say this was produced by this party in discovery on this date and here is the cover letter or other items to evidence that.

MS. GILBERT: That's outside of the nine?

THE COURT: Correct.

MS. GILBERT: We sent a list to the Court and the Government.

THE COURT: Of Bates numbers?

MS. GILBERT: Which I also thought had dates, too.

THE COURT: Dates of cover letters? I would have expected to see just the actual cover letter; like, this is a cover letter from Ford O'Brien that shows that on this date, this document was produced as an example. I didn't see that, if that's what we're talking about.

The question is how do we know -- you said there are Bates numbers on these documents. The Government says we have never seen the Bates numbers before. We need to sort it out. The easiest way to sort it out will always be that --

MS. GILBERT: Well, many of them are off of government Bates numbers.

THE COURT: That is fine, but then you have a government cover letter that shows the Government producing it to you on X date.

MS. GILBERT: Do we need to have a government cover letter?

THE COURT: I just assume the Government wouldn't dispute that that document went from them to you, although in some instances we have had disputes. We produced an unsigned version of this contract and the defense has come back with a signed version.

MS. GILBERT: But not with their Bates number.

THE COURT: That wouldn't be the case I don't think. I think we have no alternative than to do it contract-by-contract.

MS. GILBERT: Okay.

THE COURT: To the extent there's no dispute as to production -- that leaves the question as to whether something was marked as an exhibit or not exchanged when marked exhibits were due to be exchanged or not and the like, but we're going to have to sort this out one contract at a time.

Let's bring in the jury.

(Jury enters.)

THE COURT: Please be seated, everyone.

Mr. Stern, please continue.

MR. STERN: Thank you, Your Honor.

BY MR. STERN:

Q I think where we left off -- and I think we said 5095 earlier. The exhibit is Government Exhibit 5096, already in evidence.

(Exhibit published.)

Q Are you able to see that now on your screen?

A Yes.

Q So, if we just zoom in starting at the top it says, "From Claire Lightfoot." That's the name you went by at the time?

A Correct.

Q And you sent this e-mail to Gloria Su. Who is that?
A She was the person I would network with at the audit firm. They helped us do our -- our -- I'm sorry, the tax firm. They helped us do all of our taxes and get them submitted so I would give her the paperwork to do that.
Q She was one of the tax accountants at Ms. Watson?
A Yes.
Q And then in the CC line, Ms. Han, Mr. Rao are copied and also a John Widdowson and Bing Liang. Are those two other tax accountants at Singer Lewak?
A Correct.
Q So in the first line you wrote, "Hi Gloria. Please see attached financials." Did I read that right?
A Yes.
Q And then if we just zoom out of that and look at the attachments line, do you see there that you attached financials for Ms. Su; is that right?
A Yes.
Q I'm going to show you Government Exhibit 5096-A, already in evidence.

(Exhibit published.)

BY MR. STERN:

Q If you can take a second to look through it, Ms. Ruby. Look at whatever you need and when you've had a chance to do that just let me know.

A (Reviewing.)

Okay.

Q These are the financials for 2019 that you sent to Singer Lewak; is that right?

A Yes.

Q And if we look there at Row 23 of the income statement and, actually, starting at the top, I should say, this is OZY Media's income statement for the full year of 2019; correct?

A Yes.

Q And if we look down at row 23 where it says "Total Income," can you please read the number that you told -- that you told Singer Lewak OZY earned in revenue for the year?

A 13,004,235.39.

MR. STERN: So now I'd like to show just the witness Government Exhibit 5130 --

Actually, before we move on let's pull up again briefly 5096-A. I apologize while this loads.

(Exhibit published.)

Q Are you able to see it again, Ms. Rudy?

A Yes.

Q Can we scroll to the bottom? Do you see where it says "Net Income"?

A Yes.

Q Net income is essentially the same as profit; right?

A Yes.

Q What's written there?
A Negative 17,054,117.51.
Q Thank you.

MR. STERN: Now we can take this down. Thank you.

Let's pull up now Government Exhibit 5130, please, just for the witness.

(Exhibit published to witness, counsel and Court only.)

Q Do you recognize this document, Ms. Rudy?
A Yes.
Q So this is an e-mail you sent to Singer Lewak with OZY's 2020 tax information; correct?
A Yes.

MR. STERN: Your Honor, the Government moves to admit Government Exhibit 5130.

THE COURT: Received --

Sorry, is there an objection?

MR. SULLIVAN: No objection.

THE COURT: Okay. So, without objection they are received.

(Government Exhibit 5130 received in evidence.)

(Exhibit published.)

BY MR. STERN:

Q Again, this is another e-mail that you sent to Ms. Su at Singer Lewak?
A Yes.

Q Copying John Widdowson who was another Singer Lewak employee?
A Yes.
Q And you wrote, "Good morning, Gloria. Attached is the V-1 sent for the 2020 tax return items." Did I read that correctly?
A Yes.
Q And if we look at the attachments, that's where you attached the information for the Singer Lewak tax accountants; correct?
A Yes.
MR. STERN: We can take this down.
And, now, just for the witness, I would like to show Government Exhibit 5130-A.
(Exhibit published to witness, counsel and Court only.)
Q So here is -- are you able to see the document now, Ms. Rudy?
A Yes.
Q We can take a moment to click through let us know what you need, but once you've had a chance to review it please let us know.
A (Reviewing.)
I recognize this.
Q These are the financials that you sent to Singer Lewak for 2020 tax year; correct?

A This is the information request that has details of certain financials that were in, but they're not the actual income statements or anything like that.
Q Fair to say though these -- this was the financial information that you sent to Singer Lewak attached to the prior e-mail?
A Yes.
MR. STERN: Your Honor, the Government moves to admit Government Exhibit 5130-A.
MR. SULLIVAN: No objection.
THE COURT: Received.
(Government Exhibit 5130-A received in evidence.)
(Exhibit published.)
BY MR. STERN:
Q So if we can actually click over to tab A, and you see there at the top it says, "OZY Media Inc., income statement detail from January 1, 2020 to December 30, 2020."
Did I read that correctly?
A Yes.
Q So this is a -- fair to say, a detailed income statement for the full year 2020; is that right?
A Yes.
MR. STERN: Can we please scroll down to the bottom, row 303?
Q Do you see that number in bold?

A Yes.
Q That's the total revenue for the year of 2020 that you sent to OZY's tax accountants; correct?
A I believe so, if this sums up everything from the top to the bottom.
Q And if you see there actually in that white bar at the top it says a sum line from 7 to 302?
A Yes.
Q Okay. Can you please read that number, the revenue for OZY's full year 2020?
A 11,210,611.40.
MR. STERN: One moment, Your Honor.
(Pause in proceedings.)
BY MR. STERN:
Q Ms. Rudy, when you sent both this statement and the prior one we looked at to the tax accountant, it was important to you that these statements be true and accurate; correct?
A Yes.
MR. STERN: Thank you, Your Honor. No further questions.
REDIRECT EXAMINATION
BY MS. FRISON:
Q Ms. Lightfoot you answered a question about two bank accounts that OZY had while you were the accountant there.
Did OZY have a bank account at Bank of America?

A Yes. Actually there was a Bank of America after Wells Fargo shut down -- they shut down other account due to the news in the media and asked -- we had to switch over to Bank of America at that time.

I apologize. I forgot about that one. That was not very long.

Q Was there a separate account for the Carlos Watson Show?

A There was -- I don't know if you mean specifically at Bank of America. What are you asking?

Q Other than Bank of America.

A So, Silicon Valley had about four or five different bank accounts. Each of the accounts was dedicated to -- one of them was a TV bank account -- they were different revenue structures. One was TV, one was events, the regular depository. And I believe that --

That's all that I can think of at the moment besides the Bank of America or Wells Fargo.

Q The spreadsheets you just went over with Mr. Stern, were those given to your tax preparers only?

A From me.

Q From you.

A Yes.

Q And did those spreadsheets include any barter or in-kind revenue?

A No.

MS. FRISON: Thank you. Nothing further.

MR. STERN: Briefly, Your Honor.

RECROSS-EXAMINATION

BY MR. STERN:

Q Just to be clear, that Bank of America account was opened after the New York Times article; correct?

A I believe so, yes. Because it wasn't open for very long before I left.

MR. STERN: Thank you, Your Honor. No further questions.

THE COURT: All right. The witness is excused.

You may step down.

(Witness excused.)

MR. STERN: Your Honor, would it make sense to have a quick sidebar?

THE COURT: Sure.

(Sidebar held outside of the hearing of the jury.)

(Continued on next page.)

(The following sidebar took place outside the hearing of the jury.)

MR. SIEGEL: I apologize. I should have raised this before the break but, Your Honor, Mr. Watson -- the Court needs to do a colloquy with him.

THE COURT: Outside the presence of the jury?

MR. SIEGEL: We can do it at sidebar.

(Sidebar ends.)

(Continued on next page.)

THE COURT: Ladies and gentlemen we're going to take a five-minute break here. We'll bring you back shortly.

(Jury exits.)

THE COURT: Please be seated, everyone.

Let's have everybody come to the sidebar.

(Sidebar held outside of the hearing of the jury.)

THE COURT: This is a standard allocution, we'll call it, regarding defendant's decision whether to testify or not in court.

So, I'm going to ask you, Mr. Watson, some questions.

I don't think he needs to be sworn for this.

MR. SIEGEL: It's up to you.

THE COURT: Mr. Watson, have you discussed with your attorney your decision whether or not to testify in this case?

THE DEFENDANT: I have.

THE COURT: You have the absolute right to testify. Do you understand that?

THE DEFENDANT: I do, yes.

THE COURT: And at the same time you have the absolute right not to testify. Do you understand that?

THE DEFENDANT: I do, yeah.

THE COURT: The right to testify or not testify is your right. If hypothetically your attorney did not want you to testify, but you wanted to, you would have the right to do so and if your attorney wants you to testify but you do not want to testify, it is your right to choose not to.

Do you understand that?

THE DEFENDANT: I do, yes.

THE COURT: If you choose not to testify -- and I realize you may know this stuff already. If you choose not to testify, the jury cannot hold that against you as I told them in my preliminary instructions to them. Do you understand that?

THE DEFENDANT: I do.

THE COURT: Is your decision that you're making with respect to your testimony your own decision?

THE DEFENDANT: It is.

THE COURT: And you are deciding, what, to testify or not to testify?

THE DEFENDANT: To testify.

THE COURT: And you are making that decision voluntarily?

THE DEFENDANT: I am.

THE COURT: Does either party, starting with the Government, think that any further allocution is necessary here?

MR. SIEGEL: No, Your Honor.

MR. SULLIVAN: No.

THE COURT: Thank you.

(Sidebar ends.)

MR. SIEGEL: This is a belts and suspenders thing but Your Honor made rulings about discussions about selective prosecution and race and I just want to reaffirm my understanding that that's not something that Mr. Watson is going to be testifying about or will be permitted to testify about.

THE COURT: I mean, I have said this with respect to every witness on both sides whose testimony has been the subject of any motion in limine, I am relying on the attorneys, all of the attorneys, to be sure that the witnesses who then take the stand are aware of the contours my rulings and don't stray outside them. I'm not going to do any more specific colloquy on the subject than that.

But, Mr. Sullivan, I trust that you and your client are clear about the history of rulings here.

MR. SIEGEL: Thank you, Your Honor.

THE COURT: I'll be back in about three minutes.

THE COURTROOM DEPUTY: All rise.

(Judge exits.)

(Recess taken.)

THE COURT: One additional thing to mention before we bring in the jury which came up in one of the letters submitted by defense counsel -- are we waiting on Mr. -- Mr. Sullivan?

One of the letters that came in from the defense over the weekend just listing forthcoming witnesses -- this is obviously a securities fraud and wire fraud trial as well as a trial about aggravated identity theft. In that context, I see the relevance of the testimony on the quality of OZY's products as largely beside the point; the same way the WorldCom accounting fraud trial was not about the quality of the phone service that WorldCom was providing, the Adelphia accounting fraud trial was not about the quality of the cable service that they were providing and the Computer Associate's accounting fraud case was not about the quality of CA's enterprise software.

Obviously, there's a fair amount of leeway on background, especially when a defendant testifies, but that's an observation. It came up again I thought this morning in some part of Ms. Lightfoot's testimony and, so, I thought I

would mention that just so people understand how I'm thinking.

Otherwise, are we ready, Mr. Sullivan, to proceed?

MR. SULLIVAN: Yes.

THE COURT: Do you want to call the witness in front of the jury?

MR. SULLIVAN: I will.

THE COURT: Okay.

THE COURTROOM DEPUTY: All rise.

(Jury enters.)

THE COURT: Please be seated, everyone.

Mr. Sullivan, please call your next witness.

MR. SULLIVAN: Thank you, Your Honor. The defense calls Carlos Watson.

(Witness takes the stand.)

THE COURTROOM DEPUTY: Sir, please stand and raise your right hand. Do you solemnly swear that the testimony you will give to the jury in this cause on trial will be the truth, the whole truth and nothing but the truth so help you God?

THE WITNESS: I do.

THE COURTROOM DEPUTY: Have a seat.

Please state and spell your name for the record.

THE WITNESS: Carlos Watson, C-A-R-L-O-S W-A-T-S-O-N.

**CARLOS WATSON**,

called as a witness, having been first duly sworn/affirmed, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. SULLIVAN:

Q Good morning, Mr. Watson.

A Good morning.

MR. SULLIVAN: Good morning, ladies and gentlemen of the jury.

THE JURY: Good morning.

BY MR. SULLIVAN:

Q Mr. Watson, did you conspire to commit securities fraud?

A I did not.

Q Did you conspire to commit wire fraud?

A I did not.

Q Did you engage in any form of identity theft?

A I did not.

Q We'll come back to those specific details later, but let's first introduce you to the ladies and gentlemen of the jury. Where did you grow up?

A I grew up in the sunshine; Miami, Florida.

Q And tell us a little bit about, well, first, your parents.

A Two of the nicest people you will ever meet. They were teachers. They were country kids originally. My mom grew up in the Virginia countryside and she was the daughter of a

Baptist minister and a teacher herself. And my dad grew up in the Jamaican countryside and they met when my mom was stepping on a ship not far from where we are now. My dad said she was the most beautiful person he had ever seen. He actually got on the ship and they had to kick him off and fifty years later they have four kids and were married.

Q Tell us a little about your financial circumstances growing up.

A You know, my parents were hard-working, thoughtful people. Work was sometimes tough to come by so they usually had second and third jobs. You know, for the most part I'm grateful for all the love that we had, but financially we had some times that were probably as tight -- as a lot of people know. We were on food stamps and had challenges that probably lots of other people have had.

Q Earlier you mentioned that there were "four of us." Do you have any siblings?

A I do. I have three sisters.

Q Tell us about your education. We'll start post high school.

A Yeah. Although you're leaving out the most important teacher. I had a great fifth and sixth grade teacher, Mrs. Trencher. She would be upset if I left her out, but after high school in Miami, Florida, I got a scholarship to go to Harvard University outside of Boston and I really enjoyed

that opportunity. I got a chance to study political science.

And then after a little bit of work, I went back to graduate school I moved out to California where I still live in the bay area and I went to law school at Stamford.

Q You reminded me that I mentioned in my opening that you got kicked out of kindergarten. Can you in two seconds tell us what happened?

A Well, my mom did love it as a teacher. You don't want to have a kid that gets kicked out, but I had a wonderful big sister, Carla. I'm Carlos and I was Robin to her Batman and growing up, you know, I was her right-hand guy and did everything with her. And when she went to off to kindergarten, she was frustrated that I couldn't come with her because we did everything together.

So, after about two weeks of trying to negotiate, she realized that if she couldn't bring me to school she was going to bring school to me. So, you can't have a better teacher than a five-year-old sister who loves you and, so, she taught me how to read and count and all of that good stuff. And, so, by the time I got to kindergarten in Miami when the teacher would ask what was two plus two I thought she was joking because Carla had already gone over that years before so I would answer yellow and they didn't think it was very funny and once you get tagged as one of those kids, you can have a little bit of a rocky road.

So I had a rocky road for a while but as a said I was fortunate to have great parents and even more fortunate to meet Mrs. Trencher down the road who really was an influential figure.

Q You told us about college. You graduated, I assume?

A I did. I did.

Q Where did you go after college?

A After college I actually went back to Miami. I always cared a lot about public service and I volunteered a lot in the community growing up. And, so, I had an opportunity to go back and work. So I worked in politics. I was chief of staff to an up-and-coming young member of the legislature and then worked on a presidential campaign.

Q Did you do any additional education or complete any additional education?

A I did. My dad and, more importantly, my grandma always wanted a lawyer. So I -- with their encouragement, I went back to law school and moved out to California to do so and really fell in love with the Bay area and Silicon Valley and all the innovation that I found out there.

Q So after you finished law school, what did you do?

A You know, I ended up going into business. Even though I was going to law school, I was going into business. Part of my college was paid for by a guy named Reginald Louis who was one of the first prominent black businessmen in the country.

And when I was a kid in Miami, I remember I walked by a newsstand and saw this black guy's face on the cover of the Wall Street Journal. It wasn't just his face but in those days, they drew you. That was really special.

And I went to the library and looked him up and for whatever reason I decided to write him a letter and he wrote back and gave me a partial scholarship to go to school which at the time was important and I always remembered that and I loved the kind of entrepreneur he was and he was someone who had gone to law school himself and had gone into business and with the help of a number of interesting people had bought an interesting company called Beatrice, that we may all remember.

And, so, after law school, despite the fact that I had gone there technically to be a lawyer, I went into business and I went to work at a big consulting firm called McKenzie and later worked at Goldman Sachs.

Q Before you get to Goldman Sachs, first, did you receive scholarship monies for law school as well?

A I did, thankfully, yes.

Q And at McKinsey -- tell us what you did at the McKinsey firm.

A I had a little nephew who came to spend time with me and tried to understand what I was doing and he described it as I was a doctor to sick companies. So, I'd work with video game companies, with pharmaceutical companies, with banks and if

there were challenges, maybe they hadn't expanded overseas yet or if they had a particular product that wasn't quite working as well, I would partner with a group of people to try and think it through and see if we can come up with a better plan and a better way.

Q What was your job title at McKinsey?

A They called me a consultant, which anyone remembers early '90s that was sometimes a word you used to mean unemployed. So, when I told my grandmother I was a consultant, she got worried and I had to go to the library and show her exactly what I was doing.

Q After McKinsey what did you do?

A After McKinsey I -- so I had done a lot of -- there was a really important book in the '80s by a black sociologist called Joyce Wilson and it talked about how a lot of our neighborhoods once were integrated, but in the '70s and '80s, a lot of black professionals moved out of neighborhoods and he thought it was important that more black professionals moved back in.

And, so, after I graduated from Stamford, I moved into a neighborhood called East Palo Alto, which at the time was unfortunately the murder capital of the country and I did a lot of -- I ran a mentoring problem for young black boys called the Successful Young Black Men's Mentoring Program and I found that a lot of our kids weren't getting good advice at

school about going to college.

So I would ask some of the kids; Chris, Keith, others, what they were doing. It wasn't on the road map. I started to volunteer at their high school. If anyone has ever seen the movie *Dangerous Minds* with Michele Pfeiffer and Coolio, that was the high school it was based on; Carlmont High School.

So, I started volunteering at that high school to help more of the kids figure out what college to go to, how to pay for it, what are these things called SAT exams and eventually I realized that my kids weren't the only kids that didn't have the help. There were more kids and school systems that often had 3 or 4,000 students, but only one college counselor. I started a company and a nonprofit at the same time and both of them did the same thing which is to try to go into some of the toughest high schools from -- here in New York we worked with a lot of schools, to Chicago, to Miami, to L.A. and we helped the college counselors prepare more of our kids for school. And, so, I left McKinsey and started this company called Achieva with the idea that we could ultimately help our kids properly prepare for college.

Q So, and you said there was a company and a not-for-profit. What was the not-for-profit?

A It's called College Track. It's kind of a very similar program. It's a not-for-profit that works all across the

country now. One of the biggest -- we now call it a college completion program because we want to be sure that our kids don't just get into college, but finish and get off to a good start. So, both of them had similar work. One was a not-for-profit and one was a for-profit.

Q And with Achieva, if you were a member, how many children were -- benefited from the program?

A We worked with about 100,000 students. Many of them were the first in their families to go to college. We worked -- we crossed about 75 districts and about 22 states and a lot of -- it was good because often it had a ripple impact, meaning that if an older sister or an older brother went off to college, often the younger sibling saw a new path or saw something additional to consider.

Q Tell us about how you founded Achieva. Did you raise money? Did you invest yourself? What were those mechanics?

A You know, we had to raise money. You know, my dad always says that the first rule of leadership is don't ask somebody to do something you won't wouldn't do yourself. So if you won't show up early, don't ask anyone else to show up early. If you won't be organized, don't ask other people to be organized or if you won't pick up trash, don't ask people to pick up trash.

So, my family and I put money in to begin with. My dad didn't love the idea right out of the gate, but my mom

talked him into it. Then my favorite uncle, Uncle Dunbar, who worked for about forty years down at Penzoil in south Texas, God bless him, he wired me everything he had in his 401(k). He wired me that and that's how we got started.

Q And how long did Achieva operate under you -- you as the CEO?

A It's still operating today. My sister and a good friend of mine, the three of us, started together. We built it up to about three hundred people. We were acquired after about five and a half years by the Washington Post who at the time owned Kaplan. If any of you know Kaplan, the test prep company. And so they merged Kaplan and Achieva. Today Achieva is known as Kaplan School Services. If you see Kaplan in a school today, that comes from Achieva.

Q And did you pay your uncle back?

A I did, I did, I did.

Q Okay. Now, after you sold Achieva, professionally what did you do next?

A Well, you know, it was a little bit unexpected. I have a friend, Rachel, who loves to do pranks on me. This was early 2002 and someone called me -- Elliot called me a couple of times asking if I wanted to be on TV. I just thought it was Rachel doing a prank so I didn't call the guy back.

I ended up having lunch with Rachel and her fiance and he said, no, it wasn't Rach this time. So, I called the

guy back and his job was to kind of find non-traditional people to be on TV. He's the kind of person who found Judge Judy to do that and things like that.

And so I started doing some TV appearances and I got in an argument with a guy named Bill O'Reilly who some people may remember. He asked me to hang on afterwards and -- or his producer David Tabacoff did. And I thought uh-oh, it sounds like Ms. Trencher asking me to stay after school. He came on and said Mr. Watson, you and I may not agree on everything but I like what you do and I want to encourage you. So I started doing more TV. I was what they called a pundit in those days.

Eventually I started hosting shows --

Q Before you do that, you're a your punditry, if that's a word, with Bill O'Reilly what station was that?

A That was on Fox. So, I started doing appearances with him and with David Asmond ((phonetic)) and Neil Cavuto and a bunch of people on Fox and then I started doing some stuff on CNN with Wolf Blitzer and some of those folks.

Q All right. Any other networks did you do, sort of, guest appearances on?

A So, they used to have a network called Court TV back in the day, if you remember that, and there was a woman named Catherine Cryer who used to ask me to come on.

Q So after -- and how long were you doing these guest appearances before you moved to the next level?

A I did them for the first couple of years. You know, I enjoyed it. I learned a lot. I always practiced on the weekend. So it was a good opportunity.
Q So I cut you off and I apologize.
After the sort of guest appearance portion for a couple of years --
A Yeah.
Q -- what did you do next?
A So I started hosting a show first at CNBC called The Edge, and then later --
Q What was The Edge about?
A You know, even back then I kind of really was interested in up and comers. So it was kind of a mix. So we had a young Eva Longoria when she was on Desperate Housewives and just a host of interesting up and comers who we had on the show. It was an interview show if you will.
Q So you started hosting on The Edge?
A Yup, yup.
Q CNBC?
A CNBC, yes.
Q And where he also?
A Then I ended up working at CNN both as a political commentator and hosting a show there as well.
Q What show did you host at CNN?
A It was called Off Topic and I would sometimes substitute

anchor for a show they had called Inside Politics, but the show that I hosted myself was called Off Topic.

Q Now, what was the show Inside Politics where you substituted? What was that about?

A You know, it was kind of their main political show at the time and there was usually --- at the time it was the Judy Woodruff who was the host and she was going away for a long weekend and she tapped me on the shoulder one day and said do you want to try this? And I said I would like to. So we practiced reading the Teleprompter a little bit and she said don't wreck it, I'll be back and that's how I started doing some guest hosting.

Q And then Off Topic, you were the host?

A I was, I was.

Q Tell us what Off Topic was about.

A You know, that experience at Inside Politics was an interesting one because the first time I got a chance to anchor they were asking which desk I wanted and even at that time in 2004 I had written a column for them about a young state senator in Illinois who I was thought was interesting Barack Obama and I said at the time I think we should have this young guy on and none of them wanted him on and a few months later after he gave the famous speech, the one at the senate, everybody wanted to see more of him.

The CEO of CNN at the time said how about creating a

show where you mix well-known people like Arnold Schwarzenegger or Heidi Klum with some less well-known kind of up and comers, the next Barack Obamas or other figures like that and so it was kind of very similar to what I had done on CNBC and was kind of these hour specials on weekends, usually on Sunday nights.
Q Did you host shows on any other television networks?
A I did. I hosted a show on BET called beat the faith.
Q What's BET?
A Black Entertainment Television.
Q You said the show's name was what?
A Meet the Faith.
Q What was Meet the Faith about?
A It was kind of looking at black spiritual life and looking at black topics in that space and, so, we had a mix of people. If you know the show *Me the Press* -- and *Me the Press* often brought together several members of the press. Meet the Faith might bring together, you know, a number of kind of prominent members of the black community including clergy members.
Q How long did you host Off Topic?
A That was short. There was kind of a change in leadership so less than a year.
Q And what about the BET network, how long --
A I think we did two seasons of that, I think. One or two

seasons.
Q So, did there come a time when you stopped hosting television shows?
A Well, I got approached by a company called the Hearst Corporation which owns a lot of the TV stations and magazines, et cetera and around 2007/2008 they became aware that Oprah Winfrey was about to step down from her show and their TV stations often aired The Oprah Winfrey Show in local markets, places like Boston, Orlando and Sacramento. And so they wanted to find someone who could step up and build a new talk show around it. So I worked with them for a couple of years to try to create such a talk show and, so, I left CNN in order to do that around 2007/2008.
Q How long were you with Hearst?
A Probably about two years.
Q Did you create a show?
A We did. We created it. We thought we had sold it and we celebrated at a Japanese restaurant and then I learned a lot about the TV business. The next morning I was called and told that the show was being given to someone else.

(Continued on the following page.)

DIRECT EXAMINATION
BY MR. SULLIVAN: (Continuing)
Q So that takes us to around 2010 or so; is that right?
A Takes us to around 2010, yup, 2009, 2010, yup.
Q What did you do then?
A I then was recruited by MSNBC and originally would do kind of morning appearances. They had a show there called Morning Joe, so I would do some appearances on there, and then I started co-anchoring with a woman named Contessa Brewer, who was one of their anchors, and then I started hosting my own show.
Q What was your own show?
A MSNBC Live with Carlos Watson.
Q What was MSNBC Live with Carlos Watson about?
A You know, it was a very basic kind of new show, so you really were going through what were the kind of five to ten biggest topics of the day. You would invite guests like Paul Ryan, who later became Speaker of the House, and others to -- to come in and be interviewed. But it was always in that kind of context.
Q How long did the MSNBC show air?
A I think I was at MSNBC a total of two years. I think the show was on about a year.
Q What did you do the second year at MSNBC?
A I -- I did guest hosting. I think I guest hosted for a

couple of different folks. Sometimes Morning Joe would have co-anchors, so I would do that some mornings. There was a gentleman who has since passed away from -- from the Dakotas, Ed Schultz would sometimes ask me to sit in for him.

Q And after your tenure at MSNBC, what did you do?

A So I did a little bit of an unexpected turn and I went back into the business world. Goldman Sachs had got more and more interested in education companies -- whether they were tutoring companies, whether they were test prep companies, whether they were schoolbook companies -- and they asked me to come back, given that I had worked with -- built my own education company, and they had asked me to come and lead that group and to try and help young education companies raise money or sometimes acquire other education companies or even try to go public.

Q So do you recall who recruited you back to Goldman?

A A couple of people were influential. A gentleman named George Lee was important there. Another gentleman named Greg Lemkau. But ultimately their CEO, a gentleman named Lloyd Blankfein, really was the one who -- who was central to me deciding to return to business and join them.

Q And -- I'm sorry, central to what?

A To me deciding to come back to -- leave media, come back to business and join Goldman in particular.

Q And at what level did you return at Goldman?
A I became a Managing Director and head of this particular group.
Q What was the name of the group again?
A Basically called the education practice.
Q Now, what was the -- what did the education practice at Goldman Sachs set out to do?
A Yeah, you know, again, not just in the U.S., but even more so in Asia and other parts of the world, education is really important business. And if you visit places in China, in India, they've got really big national exams and there's a lot of preparation for those, so there's a lot of big companies that do tutoring and test prep.

And so I really traveled the world trying to help some of those companies go public, helping some of those companies either get acquired or acquire other companies. Or sometimes giving them strategic advice about moving into new markets. Maybe they were a company only in the UK and they should come to the U.S. Or maybe they were a company that was only working in elementary schools and there was an opportunity to take their smart products and take it into high schools.

So I tried to be helpful in a couple of different ways, and sometimes just played matchmaker, introducing companies in different parts of the world.

Q How many people, if you recall, were on your team at Goldman?
A Probably were about a dozen, depending on how you think about it. At Goldman, you often aren't on only one team. Often you are a part of multiple teams. But probably about a dozen in that core work, and then I had some side projects that the CEO asked me to do that -- that I was responsible for.
Q Now, we've had some testimony on this, but just to be clear: Can you tell us where Managing Director falls on the hierarchy of Goldman titles?
A It's near the top.
Q How long did you remain at Goldman?
A I was there for a couple of years. I was there from about 2010 to about 2012.
Q Why did you decide to leave Goldman?
A You know, I had moved my parents from Miami, where I had grown up, out to the Bay Area, to California, Mountain View.
Q When had you done that?
A I had done that years before, 2005-ish, maybe 2004.
Q And why?
A You know, they were getting older and -- and I thought -- and they liked it when they came out to the Bay Area. We used to go to a place called Monterey that they

really liked. And so -- and my mom's little sister moved out there, so she had a little more family, and they were just -- they were getting older. It was kind of -- I know most old people move to Miami, but -- but they moved out to California. They liked it. And I had another -- two of my little sisters were there, so they also liked that, too, that they were getting three for the price of one.
Q So you moved family out there in 2005; 2004 or '05. Let's go back to 2012 when you made the decision to leave --
A Yeah.
Q -- Goldman. And apologies for cutting you off.
A Okay.
Q But why did you decide to leave?
A You know, unfortunately my mom got really sick or -- or maybe said more accurately, we found out that she had lead-stage cancer. We got to it too late and it spread pretty badly. So, you know, she was older, and I tried for a while to the commute, but that -- that wasn't as practical, so I had to move back pretty quickly to look after her.
Q Did you have another job lined up in Mountain View when you left Goldman?
A You know, I didn't.
Q Did not?
A I did not, no, yeah.

Q Why did you decide to go even without a job?
A You know, I used to always -- I'd tease my mom that she was at Muhammad Ali of moms. I told her ounce per ounce, she was the greatest. So she was a teacher. She was a late-in-life mom. She didn't have kids until what was considered very late in those days. But she was a very thoughtful, very attentive, very -- she was called "mom" by about a thousand people when she passed away. She just was that kind of person.
And so, you know, she had -- you know, both of them, I think, had always, you know, sacrificed for my sisters and me. Really not even just my sisters and me, but they just were very community-minded people. And so I didn't really -- I didn't think twice about it. She was sick. It was significant. We still were holding out hope that there might be some new drug or new treatment or what have you, and I realized the only chance of figuring any of that out was if I was there every day and focused just on that.
Q So what did you do there on a daily basis, focusing, as you testified, what did you do when you moved back?
A Learned lot about kidney cancer. I -- we went to every hospital we could in the Bay Area. That meant Kaiser, that meant UCSF, that meant Stanford. We just -- we went to as many people as we could. They were just beginning to

develop something called immunotherapy, which kind of sits alongside chemotherapy. And so we were trying to find all the trials we could and -- and not even just thinking about conventional medicine, but thinking about all the different ways to see if she could heal herself, make sure she ate right. We started eating at Whole Foods all the time. Made sure that she joined a writing group. Made sure that -- she always was very active in our church, but, you know, took on an added dimension in that window.

Q Now, we've already heard from other witnesses that OZY got its start around that time, 2012, 2013.

So tell us, how did the idea of OZY come into fruition?

A You know, I remember because we were sitting at Stanford Hospital and now in these --

Q The "we" is?

A What's that?

Q The "we" is?

A Oh, my mom and I were sitting at Stanford Hospital. And nowadays it's like the train station where they have like these big screens and it will say: Rose Watson, waiting for Dr. Srinivas, you've got 17 minutes.

And, you know, even though she passed, I'm still smiling when I think about my mom because she -- you know, she always -- she always was a teacher, always looking out

for other people. And I remember, she turned to me and she said, you know, you're too young to be in doctor's offices all the time, you know, every day. Let's get you busy again.

And when my mom said it, she didn't mean let's think about it for a year. She meant on the way home, let's go by Office Depot, let's get a White Board, let's start brainstorming. And so that summer of 2012 -- Mom also liked yellow legal pads. She liked -- she liked those yellow legal pads. And so --

Q Like this?

A Like that.

And so we just started thinking out loud and, you know, during my time, I'd always loved the news, I'd always loved information. I was that kind of geeky kid who not only like libraries, but I liked bookstores back when that was a thing. And I felt like when was anchoring at CNN and MSNBC, sometimes I just ended up repeating the same headline stories over and over. And, again, what really moved me was discovering what I always called the new and the next. So discovering a person's a rising star before that person's a household name or discovering a new trend before everyone's aware of that or a new place or a new book.

And so Mom and I thought we'd try to create a kind of news and media company that was less about repeating the

same handful of stories and more about giving people a sneak peek at the future. So could we introduce you to a young comedian from South Africa before everyone knew Trevor Noah of The Daily Show. Could we tell you about a high school kid in California before he was Aaron Judge of the Yankees. Could we tell you about a college kid with a stutter before she was Amanda Gorman, the poet.

And so we just -- we kind of got excited about that idea. And by late summer, we felt like we had something. And we wrote up the business plan and I didn't realize that there still were Kinkos, even at that time, so we found one and got it printed up, that was kind of around August 2012, September 2012, and -- and really got serious about it.

Q So how did you come up with the name OZY?

A You know, there's a great British poem from about 200 years ago, called as Ozymandias or some of the British pronounce it "Ozymandias." And we translate the poem to mean think big, because the world is changing so much, so many interesting and new things are happening, but be humble negative less, as the poem says, you end up two vast and legless trunks out in the dessert. We wanted people to think big, be humble.

And then what clinched it --

Q How did you come into contact with that point before

you tell me what clinched it?
A So my mom and grandmother both were English teachers, so they always loved poetry. If anyone knows James Weldon Johnson or Claude McKay or any of those folks, they always loved great poets. And so in the 1800s, the poets of that time had the equivalent of rap battles else, except they did it in their newspapers. And so this was essentially a rap battle at the time, the early 1800s, by this guy Lord Shelley.
Q So Ozymandias --
A Right.
Q -- how did it shorten from OZY -- from Ozymandias to OZY? You were telling us what clinched it.
A Well, my friend George who became an investor, George said, you know, I like OZY because it sounds like someone you want to have a beer with. And Mom and I really liked that because we wanted OZY to be very approachable. We wanted OZY -- there's always that friend you have who always has something interesting to tell you, who always has somewhere new to tell you to go or something interesting to read or a show to watch. And we kind of wanted OZY to kind of earn that with our audience. So I think between liking the meaning from the poem and between George making that point that OZY sounded like someone you'd want to hang out with, I think we -- we thought we have a winner.

Q Now, you also mentioned "new and the next" a couple of times.
A Mm-hm.
Q Why was this idea important to you?
A You know, honestly, probably because as a black kid growing up in the '70s and '80s, you know, you wanted to know that the world would have space for your ideas and your dreams and your hopes. And -- and that there could be space even if there hadn't been a Colin Powell before, even if there hadn't been a Tiger Woods before, even if -- there was a wonderful woman named Barbara Jordan, who my mom really liked who was from Texas. You just wanted to believe that there would be more space at the table for more people to participate. And I wanted to create the kind of media company that would elevate that. And I'd seen a couple of example of it. When I was in college, there was a magazine called The Source, which was a music magazine and you could discover young Jay Z there before everyone knew who he was and so I kind of liked that. And there was another magazine back in the day, it's still around, too, called Wired Magazine. And you know, you could discover new technologies, new companies. I always thought there was something special about almost kind of getting a sneak peek at the future. Almost kind of fast forwarding like Michael J. Fox, you know, in that movie, you know, fast forwarding

into the future.

Q So I diverted a little earlier, you were about to tell us the business plan of OZY, the initial business plan. So can you just describe how you and your mom chalked out the initial model for OZY?

A Well, you know, I think we both were big believers in research, so one of the first things I did, once we kind of had our idea, I then went around and talked to a lot of the new media and even old media companies that were around. So I went to go meet with the guys who started Slate, and I went to go meet with the guys who started POLITICO, and I went to go meet -- may he rest in peace -- with a guy named David Carr who was at the New York Times at the time. And I just kind of picked their brain about what they were seeing and what worked and how they thought about it and then brought that back home. And ultimately we decided that we wanted to focus on what we called quality instead of quantity. So we didn't kind of want to do the BuzzFeed Clickbait where you do lots of random stories. We wanted to do -- we really admired HBO, we really admired Apple, and we thought if we could do a few things really well even in a noisy world, maybe we could start to build a little bit of a following.

So we committed to do kind of eight to ten stories a day, hired reports all around the globe, let them compete

for one of the few slots, and see if they could come up with a young gymnast before people knew who Simone Biles was or an accountant before she was Nikki Haley. And so that was kind of our promise, was to -- to do that. And so we started, when we launched in 2013 -- we founded the company in 2012, but we actually started the website and launched the newsletter in 2013 --

Q All right. Let me put a semicolon there and come back to there.

A Sure.

Q So these references you're making, you know, Aaron Judge before he was Aaron Judge and Trevor Noah before he was Trevor Noah, were these actually people that you interviewed and exposed to the world?

A Yeah, yeah. It was -- it was really important to me, as well as -- if anyone's a foodie, Samin Nosrat, who is on Salt Fat Acid, if anyone likes that show, or, you know, Nobel Prize winners, there is a wonderful woman named Jennifer Doudna, who is going to help us live longer, she studies something called CRISPR technology. So yeah, that was our promise, was to really try and focus on a wide array of people including Trevor Noah and Aaron Judge and Simone Biles.

Q So before we get to the reporters around the globe, the initial -- I want to just draw your attention to the initial

investment to open up OZY.

Did you, yourself, invest in OZY?

A Definitely did. As I said before, even from being a very little kid, I could still hear him saying it now, my dad felt really strongly about leading from the front.

Q And "leading from the front" means?

A Means that you can't ask other people to put up money if you won't put up some yourself.

Q So do you recall --

Did your family put up some, as well?

A We did. We did.

Q Do you recall how much collectively you all put in?

A Initially, a hundred thousand dollars.

Q Did you look for other investors in OZY?

A I did.

Q Did you find any?

A Thankfully, I did. We found about eight or ten really great investors in 2012 to help get OZY off the ground.

Q How did you go about deciding whom to ask to invest?

A You know, the first thing is I really wanted people who I thought saw the vision and kind of were truly excited, who not only thought OZY made sense, but kind of felt OZY, if that makes sense.

Startups were such hard things. There are so many ups and downs. Even here, we've heard people talk about

cash crunch. And so there's got to be someone who, in their guts, believes in this new thing and wants to take a chance. And so I wanted to start there with people who I felt like got it and --

Q And why was that important? I mean, presumably there're people with money who didn't feel it in their gut as you put it?

A Just because, again, there's a -- you know, take Twitter and now it's called X. You know, Twitter went through three incarnations before it became the Twitter, the X we know today. And a lot of people jump ship the minute things get hard, right, or they start to wave the white flag. And so I wanted people who, even when things weren't obviously going well and even when things were tough, would take a moment with us, really think about the opportunity, and -- and hopefully, even if we had to evolve and change from what we were at that point, would at least do it with us collaboratively and constructively.

Q So this initial eight to ten, how did you find them; family or friends or both or just tell us?

A A mix. I was very honored that some of my first investors were some of my original investors from my first company, Achieva. I also had my bosses at Goldman, they proactively raised their hand. One of my clients from Goldman, she said I'm in. And -- and then just some other

folks who -- who I'd met or knew along the way or who I thought -- you know, who I -- who I thought cared about seeing a different world emerge and I thought would be invested not just in doing more of the same kind of media, but actually would go with me on a journey to really try and -- not just profile the new and the next, but literally try and build something that was new and next.

Q So you mentioned Source and Wired magazines as some your influences.

How did you want OZY to be either the same or different from some of those examples that you looked at?

A Well -- well, you know, I say in many ways even more than that was if anyone remembers Life Magazine. My grandmother used to talk about getting Life Magazine in the '40s and '50s. She lived in rural Virginia. And she said when it would come in the mailbox, it kind of took her, she said, to a new world. So that's where she first learned about Winston Churchill; that's where she first learned about the television; that's where she first learned about more women going to college. And so she always said that for her, it really kind of opened her mind, it was a like a telescope and yet it was very colorful, which was unusual at that time, it was very global, which also was very unusual at the time, and it not only talked about serious subjects, but also talked about entertainers. So you could have the

top entertainer at the time on the cover of Life, but you could also have the President of the United States.

And so even though I talked about The Source and Wired, really what kind of inspired me -- and there were other things that inspired me, like this show called Nightline with Ted Koppel I liked, Oprah, I liked, you know, lots of other stuff, but what really inspired me was probably honestly the way my grandmother would talk about Life Magazine. And in the attic she actually had old copies of it, and I could see the magic even, you know, decades later; it still was something interesting to read.

So that was kind of a, call it a, north star for me.

Q So you invested, you got eight to ten other investors. I think we've all learned a lot about investment. So was that what's called a seed, S-E-E-D, round?

A It was. Kind of like starting a -- to see a flower grow, to see a rose bloom.

Q How much of an investment did you raise in the seed round?

A We raised a little bit over $3 million.

Q Okay. So now we can go to hiring reporters around the world, because before that it's kind of difficult to understand how you were able to do that.

A Yeah, yeah.

Q So you were telling us you hired reporters around the world.

Was that commonplace?

A It wasn't. Again, at the time, a lot of stuff was kind of very U.S.-based or very narrow. Like Business Insider that was just business or POLITICO was just politics. And even so, they were kind of very U.S.-focused.

So -- but, again, Mom had a very global mindset. She, as a young woman, had gone to teach in Angola in southern Africa and spent time in Portugal and so she brought a very global mindset to the world and she worked with international students. And when I said there were a thousand people who called her mom, it's because many of her students were away from home and so she was kind of a second mom to them.

And my dad also had a very global mindset. And so it was unusual to do that, but we thought that's where we're going to be able to tell you about this young comedian from South Africa, only if we have people on the ground there. That's where we are going to be able to tell you about this young singer in the UK who becomes Dua Lipa. That's where we're going to tell you about -- there was a moment when Filipino food became a much larger presence on the global food stage, and that happened because we had folks in Manila. And so that was important for us to build this

global network of freelance and full-time reporters.

Q Now, you mentioned, when you first referenced the reporters around the world, you mentioned the word, they would compete for stories.

Can you say what you mean by that?

A Yeah. Again, we wanted to focus on quality instead of quantity. And so first people would have to pitch ideas and you had to prove that your story hadn't shown up. We had about ten or 12 major publications like The Economist and CNN and the BBC, and you had to show that none of these ten major publications had reported on this Trevor Noah or reported on Amanda Gorman or had told people about -- if anyone's a basketball fan, Jason Tatum, of the Celtics, who at the time was I think a high school student in St. Louis.

And -- and so -- and so first they had to pitch. And then, you know, it was a competition. And we ultimately had about 200 reporters who were competing each day for one of that ten slots. But I think what that did was it gave us better stories, because people knew that Charu in India or Oromo in Nigeria or Dan in the Ukraine all had really good ideas and were bringing the heat. And so you had to make sure that you were coming up with something that was flavorful and different and worth people's time.

Q So 200 reporters around the world.

Do you have a sense of how many countries you

covered?
A We covered every country. We ultimately got to that because in 2018, we did a wonderful project -- in 2017, we did a project called States of the Nation, where we sent young reporters to all 50 states to try and profile the new and the next, from Oklahoma, from Wisconsin, from Florida, from Pennsylvania. And it went so well and that ultimately got submitted for a Pulitzer Prize that the very next year, we did the equivalent, but around the world. And so we sent young folks to -- we both sent young folks and we hired in-country reporters in I think just short of 200 countries around the world, countries in major territories. And so that's how we ended up building a really good network from Burkina Faso to Belgium, from Mexico to the Maldives.
THE COURT: Mr. Sullivan, I indicated that I would be indulgent on background and I think I have been. I do want to move along to the events at issue here.
MR. SULLIVAN: Sure.
Q So is it fair to say this is the 2013 to 2016 timeframe or so?
A It was. It was. So 2013 to 2016, our first three years, we really focused on what we called our digital offering. So you could either type in www.ozy.com and read stories there. Or we sent out two newsletters; one in the morning called The Presidential Daily Brief and one in the

afternoon, called The Daily Dose.

Q The Presidential Daily Brief, how did you get that name?

A You know, it's named after the briefing the presidents of the United States have gotten for the last century. And so normally the director of the CIA gives that briefing. And our first columnist was a former long-time deputy director of the CIA and at one point director of the CIA, John McLaughlin. And we said we wanted to treat our audience like they were President. And so every morning we wanted to brief them on the five most important stories and the five most intriguing stories, and so we named it after that.

Q And then you said The Daily Dose?

A And so once we caught you up in the morning. In the afternoon, that's where we wanted to give you a daily dose of the new and the next. So that's where we would profile up and coming stars, new trends, big ideas that hopefully were a year or two away from showing up on NPR or showing up on Twitter.

Q Now, moving into the sort of '16 onward period, were newsletters the only media that you engaged in?

A No. You know, we started to take the best of our reporting, just like books become movies, so the Hunger Games or Harry Potter, we realized that we could turn our

best articles into first TV shows and then podcasts and then eventually festivals and even awards.

So OZY started with kind of one focus on the digital side and ended up having five different arms. So we had five newsletters, ultimately 14 TV shows, we had ten podcasts, we had four festivals, and we had five award programs. And so we became -- almost in the way that Amazon started with books and became broader, we realized that there were multiple ways to thrill our audience.

Q Let's talk about each of these and the way that these five earned revenue --

A Sure.

Q -- during the years in question here.

So first newsletters. How many --

What are the people called who receive your newsletters? Customers?

A We call them readers. We'd call them OZY readers or if you were -- if you were a truly dedicated reader, we'd called you a fanatic, we called you an OZY fanatic, so we had our --

Q So just in terms of order of magnitude, how many OZY readers would you -- did your newsletters reach?

A We reached ten to 15 million people a day and we sent -- most people got two. So we -- at our height, we were sending out about 25 to 30 million newsletters a day.

Q And what was your model in order to generate revenue from the newsletters?
A So we started it in one place and then added a second and we were on the verge of doing a third.
Q Start with the first.
A Yeah. So we started with ads. So if JPMorgan wanted to encourage people to get home loans from them, they could advertise there. If TikTok wanted not just young people to join TikTok, but they wanted to get 30-something, 40-something and 50-somethings to try it, they could advertise. If Airbnb wanted people to not just rent places, but become host and super hosts, they could advertise. So they would run ads in the middle -- at the top, in the middle. And at the bottom of it was the major way. And then --
Q And just, like I asked you before, you are saying if. But did JPMorgan, TikTok and Airbnb pay you for advertising space?
A They did. OZY had hundreds of -- of advertisers in our newsletters.
Q Okay. And were there separate revenue streams for Presidential Daily Brief and then the new and the next section, I think you called it Daily Dose?
A Yeah, I would say most advertisers wanted both, but some people had a love affair with one or the other. And so

they might -- the more serious kids wanted the Presidential Daily Brief and kind of younger spunkier companies might want The Daily Dose.
Q Now, once you've identified people in the Daily Dose, did OZY ever do followups to say, hey, look who Jason Tatum became? Just using that because it is an example you gave.
A Yeah.
Q Did you do followups for your new and the next people?
A We did. So we would -- we would -- almost kind of like where they do where are they now or kind of follow them, we would regularly do that, probably every year we would kind of do a look back and talk about some of that. But we would also use it to ask our audience who did we miss? And so by the time -- by the time OZY really had grown up, I would say about a third of our newsletter stories actually didn't come from our reporters; it actually came from our readers. They would say that was an interesting piece, but you really should have been talking about this. Or that was an interesting piece, but have you ever considered that.
Q Now, how did you decide how much to charge for advertising space in your newsletters?
A You know, once again, we kind of surveyed, so we -- our first advertising newsletter was actually Netflix, so it was not bad out of the gate. There was a wonderful woman in there who ran their advertising and she was a fan of ours

and she wrote to me and asked me why we hadn't called on her and I said it was because we hadn't started trying to solicit advertisers and she said you should start. So we worked on -- House of Cards, I think was the first of her shows that we advertised in our newsletters.

And so you know, honestly, we had to do a lot of learning along the way about what classic pricing was and -- and -- and, you know, we -- not just think about what people were willing to pay, but what our competitors were charging and were there certain packages if we packaged newsletter advertising with TV advertising, would that combination be even more appealing to a partner.

Q Did you have or come to develop something called a rate card?

A Very much so. We had a rate card that kind of laid out what our prices were for each of the different offerings. A big ad, a small ad, a once a week, a every day.

Q And how was the revenue --

Let's talk about -- let's chop it up a little bit, but let's talk about '16 through '18.

A Sure.

Q How was your revenue record at OZY?

A When you say that, you mean where was it captured?

Q Or where was it captured, yeah.

A You know, it was a little, as you've probably heard

from a couple people here, like a lot of young companies, it was kind of incomplete, people were doing the best they could. So some of it was captured in NetSuite, you know, not all of it. Some of it was captured in other spreadsheets. Typically, Samir would try to bring all that together for our quarterly board meeting, so we would meet with our Board of Directors almost every quarter and so we would typically present them there with a comprehensive picture, some of which would come from something like NetSuite, but frankly NetSuite wasn't up to date and didn't capture everything.

Q Now, you told us about The Presidential Daily Brief and The Daily Dose. Did you come to add additional newsletters to your book of business?

A We did. We had four other significant newsletters. We did -- we did one called The Weekender, which New York Times stole the name, we will have to deal with that another day, but a special Saturday newsletter to tell people interesting things to do. On Sundays we had something called The Sunday Magazine. And then on -- one of the members of our team recommended that we create a competitive morning offering, which we did in the midst of COVID and we called it Whiskey in Your Coffee.

So some people liked to get the Presidential Daily Brief, some people wanted a little whiskey in their coffee

to start the day, so we had --
Q How was that different from Presidential Daily Brief?
A A little younger, a little spunkier, a little more alive. So it was -- advertisers, again, there are advertisers like big banks -- so we had advertisers like Xerox, IBM, GE, they were going to do something like the Presidential Daily Brief. But as we started getting more advertisers like Coke, like Target, like Airbnb, they wanted something that felt younger and fresher. So you see car companies do that, where you've got both a Camry and a Lexus to reach different markets. That was kind of a similar thought for us.
Q And what was the fourth one, after whiskey in the coffee, fourth additional one?
A And the last one is -- is -- each year we'd tackle a special topic, a special series, so in 2016, it was The Election. In 2017, it was that States of the Nation, that I mentioned. 2018, it was Around the World. In 2019, it was Love Curiously. In 2020, it was Reset America. So we kind of chose, if you will, kind of a theme of the year and then try to give our readers something good.
Q Was your pricing the same for each of the newsletters, or was it a function of the readership for the particular newsletter?
A Effectively, the readership, yeah.

Q And how did you go about determining how to set the price as a function of the readership?

A Again, we -- we got feedback from the market. And newsletters became more and more popular, I think, particularly during COVID, more people were reading newsletters and you started seeing -- there was a time when lots of the perceived wisdom in new media was to only do social media or have a website and we had believed in newsletters before other people did. And by the time we got to 2020, you started to see lots of newsletters sprout up and so we could actually charge even more. So whereas in the early days maybe you could charge $25 to $50 per thousand readers, that's how they do it, as you got to 2019, 2020, 2021, you could start to charge sometimes $50 to $100 per thousand.

Q Now, as you mentioned, that was one revenue stream. I'm going to move to the TV shows, movies, documentaries and ask about how you generated revenue in that market as well.

So first, how did you move from newsletters to TV and documentaries and movies?

A You know, kind of two things happened at once. So we would bring the whole company together twice a year in kind of June and in December. And we would split the team up in groups to brainstorm things that OZY could do that would really be game changers. And -- and so we would mix people

in the finance team with people on the reporting team, people on the sales team. And at one of those meetings, as -- and we would also invite OZY readers, so we would fly in OZY readers who would sit with us and tell us what they liked, what they didn't like, what we could do better.

And at one of those, we started to hear from more and more of our readers that they wanted to be able to enjoy OZY in other ways and it included TV. And you may remember this was kind of when Netflix was starting to take off and so you're starting to see more and more streaming and so that was it. And at the same time, one of the three interesting groups who really loved OZY were not just teachers, teachers and professors loved OZY and, interestingly enough, investors really loved OZY, they could find the new and the next there to invest in. But we found that a lot of what they call TV development executives, so the people in TV who have to come up with new shows. And with so we started getting approached by places like Netflix and CNN who said: Love reading the OZY newsletter, have you ever thought about taking some of your best articles and turning those into TV shows?

So inside of OZY we were thinking about it, and we started getting confirmation from the outside. And so by late 2015, we began to negotiate for our first TV show.

Q What was your first TV show?

A It was a show called The Contenders, which we ultimately sold to PBS.
Q What was The Contenders about?
A It was about the greatest presidential campaigns in modern time. So from Reagan to Shirley Chisholm. From -- you know, from Goldwater to -- to Obama. So it was a -- it was a really interesting series. It was inspired a little bit by ESPN's -- if anyone's seen ESPN's 30 for 30 series, we called this The Contenders, 16 for 16, so we looked at 16 of the greatest campaigns in modern times.
Q And you said you sold that to PBS. Tell us how that works. How do you price it? How do you sell it? What does you sold it to PBS mean?
A Yeah, well, we learned a lot. That's how we did it. Because it's very unusual. Most of these groups have, if not hundreds, thousands of people who work for them and they're not really excited about buying TV shows from someone else. They're like let's just -- we'll do our own. We don't need to go outside to do it. You can imagine being a small newsletter company out in California, who are even more hesitant.
But we bet on ourselves. And so one of the things is rather than go pitch an idea because we were like if we just pitch an idea, they're just going to take forever and ultimately tell us no and just take our idea and go do it.

So we said: Do we believe in ourselves, do we believe in the idea, then let's put our money where our mouth is. So he with actually filmed the first two episodes, which is unheard of. I mean, people sometimes film a little bit of a pilot or a sizzle reel, but actually doing two full-blown episodes, nobody does that. So that's what he did. And then we had, you know, just a handful of conversations. I think we met with HBO and I think we met with Netflix and we met with CNN, but we decided to go with PBS, here in the U.S. And then we agreed to work with the BBC overseas, because, again, OZY had a global audience in terms of people who read our newsletters. Probably, at that time, maybe almost half of our audience was overseas. And so we liked the idea that they could also enjoy the program.

Q How did you come up with the pricing?

A We kind of negotiated with them. And, you know, when you're a young company, you don't have the leverage that you have as time goes along. And so we had to, in many cases, give, you know, meaningful discounts, which, you know, we were willing to do and you see young companies do that and so --

(Continued on the following page.)

DIRECT EXAMINATION
BY MR. SULLIVAN: (Continuing)
Q So by discount, can you explain to the jury what you mean by giving a company a discount?
A Yeah. It was kind of like when you go into a car dealership and a dealer says, you know, this car is $25,000 and you end up -- and that's the sticker price -- and you end up negotiating with them, and you are able to walk out of there with the car for twenty-two five or twenty thousand or whatever you're able to walk out of the car there with, or, you know, the same thing happens with a hotel room. The same thing happens at Walmart. This is 299, but it's on sale, and so you're going to get it for 249, or whatever the case may be.
Q So you thought your product was worth one number?
A Right.
Q But you sold it for a lesser number?
A Correct.
Q Was it important for you at the time to capture both of those numbers?
A Warren Buffet calls it, you know, there's the gross revenue, which is the value you conveyed. There's the discount, then there's the net revenue. And it's absolutely critical to capture that not only for yourself, as someone running the company to actually understand how much value

you're sharing, but also for your investors to understand what's the value of what you're sharing with a customer like Spotify, or PBS, Hulu, or JPMorgan.

Q At the time did you think your finance team was doing a good job at capturing both of those numbers?

A I mean, you know, as you heard, Professor Robinson say for startup investors those aren't the most important things --

MR. SIEGEL: Objection.

THE COURT: Sustained.

Sir, I'm going to ask you to answer the questions not by reference to what Warren Buffet thinks or what Professor Robinson thinks but with your answers to the question.

THE WITNESS: Sure.

A What I understood as someone who has run several startups and someone who has invested in multiple startups and has advised lots of startups, I knew what I was interested in was not revenue and getting that down to the absolute penny but making sure that the content was right, making sure that the team was strong, making sure that the vision was clear, making sure that we had signature partners out of the gate.

You know, whether or not I get the last dollar from PBS, as a young company, your first TV show is a 16-episode prime time series Tuesdays at 8:00, that's what matters, right.

Am I going to spend more time making sure that that show is great and PBS is subsequently going to do three more shows with me, or am I going to spend all my time making sure that every decimal is in the right place? I'm going to spend it on what I believe mattered to me and to creating value for all the people involved.
Q Now, so Contenders was your first show. Did you create other shows at OZY?
A We did. We created the third rail with OZY, was our next show.
Q And just as you're telling us, what sort of show was the Third Rail?
A Kind of like Bill Maher's Politically Incorrect. Kind of a debate show everyone from Amber Rose to Malcolm Gladwell on the show as an example.
Q Did there come a time when you sold or licensed that show?
A We did. So that show was on PBS as well. So, you know, I think, again, having done a good job for PBS out of the gate with the Contenders, we were fortunate to get -- which most people don't -- to get several more bites at the apple and really begin to build a deep relationship with them. And I think we did four shows in all, you know, but before we got disrupted.
Q Did you have to discount Third Rail as well?

A Oh, yeah, yeah.
Q By as much?
A At least 50 percent, sometimes more.
You know, as time goes along, you don't have as -- you know, as time goes along, hopefully you get more and more leverage, right. And, so, an experience for us, as an example, was our first contract, major contract with General Motors was for 250,000, and we basically gave them a 75 percent discount. So we gave them a million dollars' worth of services for $250,000.
Less than a year later, though, they were so happy that we signed a $5 million deal. And at that point we were giving them 10 million dollars' worth of services for $5 million. And the very next year, less than a year, it was a $25 million deal, and that time we were probably giving them a third of a discount. So we were seeing that not only the overall numbers grow very quickly in a short amount of time from 250,000 to 5 million to 25 million, but we were seeing discounts go from 75 percent to 50 percent to 33 percent. And our hope was that eventually, where you really want to get to is where there's no discount at all, and, in fact, you're getting a premium, right.
So, you look at someone like the New York Knicks now, when the team wasn't that good, you could get a $50 ticket, you know, for 25 bucks. But as they become better and

better, that same $50 ticket not only you can't get it for 50, you have to pay a premium. You actually have to pay 75 or 100 bucks in order to get it. That's where you want to get to, where everyone is fighting for your TV show or your podcast or that spot.

And so that's, you know, the journey you take as a young company. You got to earn your stripes basically.

Q After Third Rail at OZY, did you create and/or produce any other TV shows?

A We did. So after the Third Rail with OZY, we did a wonderful show called Breaking Big, which was also on PBS, and continued to expand our relationship. And later on it did so well that Amazon Prime picked it up, which was great. So we were getting paid twice for it, which was good for us.

And that was a wonderful show. And we profiled really interesting people who had unusual breakthrough stories. So Michael Strahan, for example, kind of we told his story. Or Trevor Noah. That was actually a good example of something that had started in OZY newsletters coming around to another part of the OZY platform, OZY TV show, to he later was a part of OZY Fest.

That's what we really wanted to see, which was identify a young Amanda Gordon or young Trevor Noah and not just do one thing with them, but to do several things with them over the years.

Q So Trevor Noah came back and did a Breaking Bad?
A Breaking Big.
Q Breaking Big. I'm sorry. That's another show?
A Yep.
Q After Breaking Big -- oh, and I'm sorry. Was that sold at a discount as well?
A Correct.
Q As big a discount or were you trending?
A We were trending. Thankfully, we were trending.
Q What was your next one?
A Our next show was Take on America.
Q And tell us what that was about.
A That was kind of a townhall show. So we went from Nashville to the Bronx, from San Francisco to Baltimore, and we wanted to have kind of really interesting conversations that may not always happen. So we had a conversation with 100 young Asian-American millennials and kind of what was on their mind. We met with 100 young men in Baltimore and talked about fatherhood, and a whole series of other things, a hundred white women in Nashville. So it was a really interesting opportunity to both go deeper but also to allow other people to kind of listen in. And it was a good show.
It was -- that was another show that we sold to multiple people. So we worked both with PBS, and at the time Facebook was trying to do more TV programming. We had

something called Facebook Watch. So it was PBS and Facebook Watch.
Q And did you have to sell that one at a discount as well?
A We did. We did. We still were young in the game, so we had to still do that.
Q Was it a 50 percent discount? Do you remember? If not, that's fine.
A I don't remember. But I'm sure we still were -- not until you really are doing kind of double digits in terms of shows are you enough -- do you have enough market power to really start to, on the TV side, to really start to move discount curve.
Q Okay. So after Take on America, what, if any, show did you do?
A We did -- well, we did a wonderful show called Black Women OWN The Conversation.
Q What was that about?
A We partnered with Oprah Winfrey to really, as she put it, to talk about things that matter: Motherhood, love, friendship, faith. And we gathered 100 black women for each episode. So, different women in Atlanta. And really, while it was TV show, it was actually more than that. It was more of an experience. And, you know, one of the -- it was one of the enduring opportunities that we had, and it was one of the shows that we won an Emmy for.

Q I'm going to come back to the Emmy. And apologies if I am pulling at a scab.
A That's okay.
Q But the Government asked Mr. Rao why was Carlos Watson hosting a show about black women. Is there some rule that you are aware of that prevents black men from hosting a conversation about black women?
MR. SIEGEL: Objection.
A No.
THE COURT: Sustained. Sustained.
Q Why did you decide to host a show about black women?
A Well, first of all, because that's what Ms. Winfrey wanted. And, so, you're not getting on the Oprah Winfrey Network unless that comports with her vision. But I think what I understood from her and from her president, Tina Perry, was -- because we talked about this -- was that a couple things mattered. One was that they wanted black men to actually be part of the conversation, that they thought it was important that it not only be black women, they were hoping black men would watch this too and that there would be a level of learning and engagement and participation. So they thought that was important.
Secondly, you know, Ms. Winfrey had said that often --
MR. SIEGEL: Objection. Objection.
THE COURT: Sustained. Let's move on to another

topic here.

Q So with Black Women OWN The Conversation --

MR. SULLIVAN: Can we pull up Government Exhibit 6121. It's already in evidence.

Q Focusing on the revenue generated with Black Women OWN The Conversation, as we are waiting for the exhibit to come up, I will let you know, how did you earn money with this show?

A So three ways: One is, you know, fees paid by the network; two is advertisers, like JP Morgan or Unilever or others, and then three was kind of really substantial barter revenue.

So, for example, early on we took much less to do this, but in exchange Ms. Winfrey created essentially a minute-and-a-half long testimonial that -- everyone's heard of the Oprah effect, you know, if she loves an pizza place or a place to travel or book, it can have a catalytic effect on a business. And the same was true for OZY.

When she taped that -- it was a minute, 22 seconds testimonial, we started every meeting we had with an advertiser, every meeting we had with an investor, every meeting we had with new employees with that. And, so, you know, when you read some of the Forbes pieces of how people value the Oprah effect, you know, we knew and we valued this at 20 million. It was for young OZY getting that one-minute

video that we could literally air tens of thousands of times was worth its weight in gold. There was no better validation for us.

Q And in addition to the video -- I'm showing you Government Exhibit 6121-A, 6121-A. Do you remember the tweet?

A My Aunt Lois told me about it. She saw it before I did. So, yeah. Yeah. My Aunt Lois --

MR. SIEGEL: Sir, again, your Aunt Lois is not relevant to the conversation. Listen to the question and answer the questions that's asked, please.

THE WITNESS: Sure. Sure.

Q How did you learn about the tweet?

A I originally learned about the tweet -- I learned about it from a couple of different directions. One was from my aunt who I didn't think was much of a Twitter user, and so that was significant to me. That told me this tweet was having greater impact, the fact that it reached someone who at the time was kind of in her 80s and -- because we didn't get any heads-up. Normally, when a partner does something significant and this is going to go out to tens of millions of people, they give you a heads-up, and we didn't get a heads-up. And it was a really significant moment for us as a young company.

When OZY first started, we got a call from Bill Gates and he agreed to become our first guest editor and that

was kind of a signature moment. We had an interview with Bill Clinton that was really a signature moment. And I would say this was another one of those moments where, again, you're a startup, that kind of external validation about a show that at that point was only a couple weeks old, so it wasn't a very old show. It's not like it had been around for three years. That was a game changer for us.
Q How do you go about assessing -- not how do you. How did you go about assessing the value of a tweet like this to your company OZY?
A You know, probably in three ways: One is just the investor feedback that we saw. I easily heard OZY had 75 investors --
MR. SIEGEL: Objection.
THE COURT: Sustained.
A So I probably --
THE COURT: Sir, when there is an objection, wait for the answer to come back whether it is sustained or overruled. And if an objection is sustained, wait for another question.
Q Not telling us what anyone said, as a function of the feedback that you received from investors, what did you do?
A Hum --
Q -- in terms of setting value?
A You know, I begin to do research and write some of the

articles about the Oprah effect. I thought about what value it could convey on the business. I asked myself honestly, because we had hired celebrities before, whether we had hired them to be at OZY Fest. We had hired hundreds of celebrities. I asked myself what would we have paid for this, so like what was the value for us. So, if someone had just come to us and said we could have this person do this for you, what would I have paid. And, so, we took that value and divided it by two in order to be conservative, and that's the number we used.

Q What would you have paid for it?

A Would have paid $50 million for it.

Q What value did you actually assign it?

A I said divided by two, but it's actually less than that. It's 20 million.

THE COURT: Sorry. When you say 20 million was the value you used, where did you use it?

THE WITNESS: As barter revenue.

THE COURT: How did you use it?

THE WITNESS: In saying that instead of getting paid this cash by the Oprah Winfrey Network, we got this from them that is worth that.

THE COURT: Where did you say that?

THE WITNESS: In a variety of places. We said that in every pitch meeting. We said it at board meetings and, you know, in a variety of settings.

THE COURT: So oral statements?

THE WITNESS: Yeah.

THE COURT: You told people we got $20 million? What did you say?

THE WITNESS: I said to people that -- well, I didn't have to say it. Everyone saw this and everyone saw the video and we would start our board meetings off with that. And they would say that's a game changer for us, how are we using that. And then we'd talked about what is this worth. And then I'd say I think this is worth $50 million, but, you know, I think about it as is X.

THE COURT: At board meetings, you're --

THE WITNESS: At board meetings, correct.

THE COURT: Okay.

THE WITNESS: But not only at board meetings, at board meetings and investor conversations, because investors would ask me about this too in our pitch meetings.

We would start an investor meeting out often, especially if they were just getting to know OZY, by showing this one-minute video, and that would immediately change the energy in the room. It would change the nature of the room. It would say that we weren't just digital; we were in TV. It would say we weren't just doing random TV. We were doing TV with Oprah Winfrey. It would say we had already won an Emmy even though we had only been doing TV for a few years. So it

literally would change the complexion of the conversation.

MR. SULLIVAN: We can take 6121 down.

Q Now, you mentioned the Emmy. Did that have an effect or an impact on the value of the Black Women OWN The Conversation television show?

A Not just on that show, yes. Not just on that show, though, but OZY overall. Again, it's hard to imagine, but when you're a young company and you're fighting to stand out and there are lots of bigger advertisers, there are bigger media platforms that an advertiser can work with, or they are bigger TV groups that someone could turn to for a new show.

So, you know, you want to be -- if you're going to be small, you want to be small but mighty. And, so, being able to say that, you know, less than 48 months after we started doing TV that we had already won an Emmy and we had beat out all the big boys for that, that allowed new partners like Hulu, new partners like A&E, new partners like the History Channel, new partners like Lifetime, new partners like HBO Max, that is now just called Max, that allowed all of them to kind of step forward and to begin to engage us in a completely different way, and in those cases, ultimately do deals.

Q Very well.

MR. SULLIVAN: Your Honor, I'm moving to podcasts. Is this a time to stop now?

THE COURT: This is a good time to break for lunch.

MR. SULLIVAN: Very well.

THE COURT: Let's remind the jury, as always, do not discuss the case even as amongst yourselves. Don't discuss the case with anyone else. Do not any research.

Have a great lunch and we will see you in about an hour.

THE COURTROOM DEPUTY: All rise.

(Jury exits the courtroom.)

THE COURT: All right. I think we should all be back here at 1:30. I don't have anything to take up now unless somebody else does.

MR. SIEGEL: No, thank you.

THE COURT: Seeing no hands, I will see you at 1:30.

(Lunch recess.)

AFTERNOON SESSION

(In open court; jury not present.)

THE COURTROOM DEPUTY: All rise.

THE COURT: Please be seated, everyone.

MR. SULLIVAN: Do you want Mr. Watson on the stand?

THE COURT: Yes, please.

(Witness takes stand.)

MR. SIEGEL: Your Honor, while we are waiting, can we talk about a few scheduling questions?

THE COURT: Sure.

MR. SIEGEL: So, depending on the length of the witness, we could be at a place where we would be able to close on Wednesday, and I just want to put on your radar, and if you have any ideas about when we would have the final charging conference.

THE COURT: Close on Wednesday?

MS. GILBERT: Your Honor, we had requested -- we have one witness who has a family emergency. I'm happy to, at sidebar, explain what the emergency is. But he is not available to testify until Monday. We had requested that he be allowed to testify on Monday. We had another witness who, as Your Honor is aware, flew in from Tokyo last week to testify. He was not permitted to testify on Thursday, but he will be available again on Monday or he is available by Zoom this week.

THE COURT: So the request for video testimony is denied. It may well be that we are done by Wednesday; it may not be. Let me find the letter from this weekend that we are talking about here.

MR. SIEGEL: And, Your Honor, obviously this will depend on some of your rulings because all of the witnesses that they have just talked about are witnesses we've moved to preclude.

THE COURT: Yes. Let me ask while we are all here, this letter dated June 29th, on letterhead from Mr. Sullivan that speaks to the Instagram account at issue that was first filed over a signature block that just said draft and was then re-filed, Ms. Frison, you signed this letter?

MS. FRISON: In the electronic sense, yes.

THE COURT: In the Federal Rules of Criminal Procedure sense is what I mean. You are a signatory. You have put your signature to this letter, in your view?

MS. FRISON: Yes.

THE COURT: Okay. I thought you had said something different about control of the Instagram account at issue. Is this a revision of your prior position or did I misunderstand?

MS. FRISON: As to that Instagram account, I don't believe so. I also don't know who --

THE COURT: Were we talking about a different Instagram account before?

MS. FRISON: I believe so, in terms of Ms. Daniella Androtti, an intern, our former intern.

THE COURT: Yes.

MS. FRISON: Yes.

THE COURT: There was one Instagram that I thought you took ownership of essentially.

MS. FRISON: She was certainly helping with my Instagram account.

THE COURT: All right. But this is a different -- and what's the significance -- then I don't know this Instagram account. I thought we were talking about the video, which I thought was on YouTube not Instagram.

MS. GILBERT: There were a few different things, Your Honor, that the Government had raised. They had raised previously Ms. Frison's personal Instagram account.

THE COURT: Right.

MS. GILBERT: And she had removed the postings from there. They raised the video that had been on the Judge Frison YouTube page, which she was unaware was actually accessible by the public, because when she previously had put it up there, she had to send a password or link to people in order for them to view it. So, she was unaware.

So when the Government accused her of having it posted publicly and she said it was not up, that was her understanding at the time. I showed it to her while we were

sitting here, and that's why she was surprised.

THE COURT: But what's the state of all that now then?

MS. GILBERT: That is down and not available anymore either.

There's a third Instagram site that the Government has found which I think is called Carlos Watson Trial, am I correct?

THE COURT: That's what this letter says.

MR. STERN: The Carlos Watson Trial.

MS. GILBERT: The Carlos Watson Trial, which we have no idea who controls that page. That is not anyone on the defense team or the defendant or anyone that we know of. So we have no control over anything doing -- anything to do with that particular page.

THE COURT: So when you say we don't know whose page that is, you're speaking not only of lawyers but the parties as well?

MS. GILBERT: I am speaking for Mr. Watson, yes, absolutely.

THE COURT: It is quite a mystery. I mean, I don't know what else to say about that.

MS. GILBERT: He has a following. There have been a lot of articles about this case.

THE COURT: Okay. All right. I was looking for the

upcoming witnesses.

So the description of Mayor Cruz's testimony speaks to the sophistication associated with OZY's content, effort and catalog and the value, apparently, thereof and therefore is key to determining ultimate issues in this case.

I don't believe that testimony is going to the quality of OZY's content is relevant to the issues of wire fraud, securities fraud, or aggravated identity theft for the reasons I said earlier. I am happy to have a letter from either or both parties who want to weigh in on that subject, but that's my initial reaction.

MR. SIEGEL: Your Honor, if you want a letter, but we agree, and we also think that there's a real risk of confusion on the issue and wasting the jury's time at this point under 403.

THE COURT: And I think that same observation applies equally to Sasha Mitchell-Fuller, television producer.

Before we get the jury, so we had testimony before the break, which maybe I'll remember precisely, maybe not, but my recollection is that Mr. Watson indicated that he ascribed a $20 million value to, I think, the tweet from Oprah Winfrey's Twitter account.

Is the defense intending to argue that that 20-million-dollar valuation, that that was properly recognized as revenue in the amount of $20 million?

Mr. Sullivan, that's a question for you. I think you elicited that testimony.

MR. SULLIVAN: That there is a value to the tweet and that the value should have been recorded as a form of revenue in OZY, that that was Mr. Watson's belief at the time.

THE COURT: That OZY should have recorded what, $20 million of revenue, some other number or --

MR. SULLIVAN: Correct, 20 million.

MS. GILBERT: I will say for the video, the one-minute video, the one-minute Oprah video.

THE COURT: So not tweet, but the --

MS. GILBERT: The video.

MR. SULLIVAN: Well, it was the tweet and the video. I showed the tweet --

THE COURT: Calling it a reel, a sizzle real or something like that?

MS. GILBERT: Correct.

THE COURT: Okay.

MS. GILBERT: The video is essentially a commercial. It's a free commercial for OZY. So as a commercial, it's value. There is a value attached to a commercial.

THE COURT: And the value should have been recognized as revenue by the company?

MS. GILBERT: Yes.

THE COURT: Okay. All right. We have the question

of Ms. Watson as a proposed witness. The Government argues that Ms. Watson should be considered a member of the defense team for purposes of Rule 26.2.

(Jury enters.)

THE COURT: Please be seated, everyone.

Mr. Sullivan, whenever you're ready.

DIRECT EXAMINATION

BY MR. SULLIVAN:

Q Good afternoon, Mr. Watson.

A Good afternoon.

MR. SULLIVAN: And good afternoon, ladies and gentlemen of the jury.

THE JURY: Good afternoon.

Q All right. We left off, we were about to talk about podcasts.

Now, how did the idea of podcasts emerge as part of the OZY platform?

A You know, again, it came out of those semi-annual retreats, which weren't just about updating people on where the business was but trying to think as a team about where we should go. And I think the team had seen our success in TV and gave us a lot of confidence right out of the gate, getting a big 16-episode order and then getting another one right away. And, so, you remember podcasts were just starting to take off. You probably remember that podcast serial that it

was just becoming popular. And, so, that's kind of where it came from. And we had very popular -- much of what OZY was about the new and the next. We had one sliver that kind of looked at history, history's most-interesting stories, and it was called Flashback. And it was a section on the website and it was also in our newsletters. And we had great anecdotes in there.

At one of these team meetings, one of the groups came up -- the groups would compete. Someone would say we should do a festival, someone would say we should do courses, someone would say we should do podcasts. And the podcast idea won.

Q And were the podcasts revenue generating?

A They were. And podcasts obviously become super popular.

We would have advertisers like Kohl's or Peacock streaming service, or Walgreens, who sometimes they just run a regular ad, either 10 seconds or 30 seconds. But sometimes they pay more if the host of the podcast will actually read their name. And so that can be really valuable.

And then along the way, one of the things that the team smartly discovered is that if you not only sell a podcast but they call it podcast to broadcast, so a radio group like iHeart or the BBC loves it so much that they don't just have it so that you can download it on Demand but that it plays as a radio show. You get paid twice. And you can get paid even

more. So we had a number of successes where we took some of our amazing podcasts and we did deals podcast to broadcast.

The other way you can make money on podcast is a lot of TV groups had begun to think of podcast as they called it the new sizzle reel. So sometimes groups like A&E would come to OZY and they would say we have an idea for a TV show; we don't have the strength ourselves to make really great podcasts, but we want a podcast that might help launch a new TV franchise or take one of our old franchises and give it life.

And, so, A&E, just to give one example, came to us and said if any of you have seen their series The Men Who Built America or The Generals That Built America, they said would you create a podcast for us called The Food That Built America. So, we did that.

And some of you may know about a series called Gangland, where they look at really controversial gang members, so they came to us and said would you create.

So, there are several different ways you could make money with podcasts. You could make money -- I'm saying with three, but you can make money with advertisers. So, Kohl's and Peacock streaming services advertisers. You can make money turning it into a radio show. So, again, you could get paid a second time for it, and, frankly, a lot more.

And then third, sometimes a TV group or even a

private company can say -- like Chevron can say I want to tell the story of Chevron, can we hire you, OZY, to create a podcast about the history of Chevron. And, so, you can do that.

So those are three different ways you can make money with podcasts.

Q So, in the first way you mentioned, advertisers, there was the traditional advertising and then host read name.

Can you give us an example of how that works in practice? In other words, what do you have to do to earn the revenue?

A Yeah. So, they will send you over copy, literally send you an e-mail, and you'll sit in a small studio, about the size of this area right here, and you will probably read it 20 times just so that they have different versions of it in case they don't like one version, too slow, too fast, and then you'll just do a bunch of them back to back.

So, you might do it for Target. You might do it for Coke, Walmart. And you just give them all -- you give a lot of variations and they will pay more for that. They, you know, pay 5 times, 10 times as much.

Q As compared to just running an ad?

A As opposed to just taking their ad and just running it, but it sounds like the ad everywhere else.

You're giving a little bit love to it. You're

giving obviously the most famous host reads. Like when Oprah used to say, the Oprah Winfrey Show is brought to you by Target, right.

Q So it's that kind of --

A It's that, yeah.

Q Now, were there separate rate cards for each of these forms of revenue generation?

A There were.

So each year -- and really I would say each -- every six months we updated our rate card. So, we would do what we call benchmarking studies. We would like at what competitive products were selling for. So, basically, we would get other peoples' rate cards. And then we would usually talk to four or five of the biggest players and then we would update our rate card.

So if it was 2016, there might be a January 2016 rate card. And that would last for probably six months and then you would refresh it probably middle of the year, and the prices could go up or down, depending on what the standards in the market were at the time.

Q You talked about discounting earlier with newsletters.

Did -- was this an issue with podcasts as well? Did you have to discount?

A Yeah. I see it less as an issue. I -- you know, what's that saying? You got to pay the cost to be the boss.

And, so, I see it just as what you have to do as a young company to begin to develop a relationship with a Fortune 500 company, like IBM or Xerox, you don't just get to walk in the door day one and pretend like you're on the same level as them. That doesn't work that way. You have to earn it and you have to prove to them that you're worthy of, you know, being one of their clients.

Q Over the years, did that turn out in podcasts? In other words, did you have to discount less over the years?

A We did. And, in fact, you know, two substantial things happened.

So our first podcast came out in 2017. And at that point, we basically had one podcast a year. By the time we were disrupted, we probably had five or six a year. And what happened in between that was critical is, one, we signed a deal with a large radio company in the country, which is iHeart. And, so, they became both an investor and they became a substantial advertisers with us, so it was kind of a two-part win.

And then, secondly, we really developed our relationship with the BBC. And as many people know, while we think of BBC as TV, in someways they're even bigger around the world as a radio company. And they have hundreds of millions of people who listen to their radio shows, and we ended up securing a terrific deal to take what started off as a

four-episode podcast, and we turned that into a weekly radio show that was broadcast to 30 or 40 million people around the world every week.

Q And do you, or did you assign a value to reaching 30 to 40 million people every week?

A Very much so. The -- again, with all of these we tried to kind of think it through carefully. As I recall, I think we assigned basically a $10 million value for that. The BBC told us what a typical ad would have cost, what we would have had to pay them for an ad, and then we used that information, plus some discounting to arrive at that.

Q Now, you mentioned that iHeart was both an investor and an advertiser. What was the nature of the investor piece of your iHeart relationship? And right now I'm talking about here with the podcast around 2017.

A Yeah. Again, I think -- what was interesting is when we first started working with them they weren't interested in us for podcast at all. They loved what we were doing on the digital side because they are an audio company and they saw that there was a compliment that we had websites and newsletters. So they weren't thinking about anything else with us.

But I think once our first podcast out of the gate was a hit -- it's called The Thread, and it -- we ended up having, you know, I think roughly 10 million downloads of it,

and it was a top 10. It cracked the Apple top 10. And the concept of The Thread is that the most interesting people, ideas, or things in the world are often connected in almost surprising ways.

So, Season 1, for example, starts with John Lennon of The Beatles and traces his story back 60 years before that to Vladimir Lenin, the famous Russian communist, and in between three continents, two wars, a crazy love triangle, but it's a real story. It's super addictive. It was really unusual. And iHeart heard that and saw it cracked the top 10 out of the gate, they said we want in with you guys.

So, it actually -- the original partnership was kind of vanilla, honestly. It was kind of like two different people saying hey, we each had complimentary skills. But when they saw we could tell audio stories, they got excited about us and led to yet a new agreement. And we made a big announcement about the fact that we were going to create podcasts together.

Q And now, in terms of creation of podcasts versus the two forms of advertising revenue, which one earned the most revenue as between those two?

A You know, it's interesting. You would think that it would be someone paying you for the podcast, but it's not. Same on the TV side. The best way to do it is, you know, they say bring your own beer, is to bring your own advertisers.

And if you were able to get a JP Morgan as an advertiser or to get a Goldman Sachs as an advertiser or get Airbnb or DoorDash as an advertiser, you can make 10 to 20 times as much money as you would if they would just pay you for it.

So it's like getting a ready-to-go apartment that's fully furnished versus someone saying I'm going to give you beautiful land and you build whatever you want on that. And if you build something nice on that, that's worth way more money than the fully-furnished apartment.

So we tried to bring our own advertisers to the podcast game.

Q And under the bring-your-own-advertisers flag, you mentioned JP Morgan, DoorDash and some others. Are those people that actually invested in Goldman Sachs actually advertised with OZY?

A Yeah. And, again, some of those like Goldman Sachs went further. They were like we like so much what you were doing that we don't just want to advertise; we actually want you to create a podcast for us. So that was -- that was almost a more elevated relationship and you could make more money. So we did that for Goldman Sachs. We did that for Allied Bank. If you know Allied Bank, we did a podcast with them called It Started with a Dollar. So we talked about people who kind of started on hard times and they managed to turn that into more. And for a young bank like Allied, they really saw that as

better than a 30-second ad. They saw that as even better than like the host reading the ad. It was like a whole podcast that was really on brand with what they wanted. It was like on point, and so they would pay you a premium.

Or Vital Farms. If anyone knows Vital Farms, they're another one. Or Chevron. They're the kinds of people who would probably even say hey, don't just give me an ad or a host read, make a whole podcast for me.

Q And how did you go about pricing a company like Goldman Sachs or Chevron asking you to make an entire podcast?

A One thing I'm kind of leaving out is we did our -- we did our work and our benchmarking to find out what industry standards were, but there's a key player in this industry which are called ad agencies. And they're big agencies that you've mentioned before, like Omnicom and WPP and like that. And, so, most of the advertisers have representatives, ad agencies who work with a young company like OZY.

So, you're really -- you're kind of negotiating with the company but you're also kind of negotiating with their representative. And, so, they also will tell you here's what I think it's worth, here's what they would be willing to pay. Package this podcast with an OZY Fest sponsorship and they will pay you three times what you would get if you sold it to them one at a time.

Q Was The Thread your most popular podcast?

A Our most popular podcasts -- the one -- one of the ones that got turned into a radio show just because of the sheer volume of the BBC's power had even more listenership, but *The Guardian* said this a -- I think it was the *Guardian*, they said this is the podcast that your mother warned you about. So, it was a very popular one. We had five seasons of it, which I think was important for developing not just a loyal listenership but also advertisers who knew -- you could tell them hey, we've got two new seasons coming next year, we've got one new season coming the year after that, so that they could plan with you.

Q For the ones that are super popular, like The Thread, were you able to charge more in advertising dollars for that one as opposed to maybe some of your other podcasts?

A Correct. Although, by 2021, when OZY really started to pull away from the new media pack, the kind young guns, we started to separate ourselves, we were getting premiums for everything. But sometimes you weren't getting premiums just because podcast was in demand. It was kind of the combination effect.

So, you know, once upon a time Microsoft, they knew you wanted Microsoft Windows. And, so, they would say we will sell you Windows but only if you buy these other two things. So they kind of bundled them together.

So something similar started to happen with us where

people really wanted to be involved in certain TV shows or really wanted to be involved with OZY Fest. And as a result of that, you could make sure all of them were more fairly priced as a result.

Q Was there any spillover effect from the very popular podcast to the other ones? In other words, did the rising price in something like Thread help your other price points?

A They did. Practically speaking, what we did, again, is to your point, we wouldn't just bundle a podcast with TV show, but sometimes you would say to an advertiser like Ford, for example, don't just advertise on this one OZY podcast, advertise on three. And Ford might say to you yes, I want to do that, but give me two of the ones you currently have. Just like Goldman, they may come to us and say let's create a third together, let's create a podcast called the Future X Automobiles together, and that would be a real win to do that kind of combination.

Q Okay. Let's turn now to festivals. So what was your principal festival while at OZY?

A It was called OZY Fest.

Q What was it designed to accomplish?

A Again, this is one that really came from our audience. So we would do these annual surveys. At the end of the year, we would send a note and we would get somewhere -- I'd say somewhere between 1 and 2,000 detailed responses. So we would

ask 35 to 40 questions. We would ask how do you use OZY? What do you like about it? What do you wish was better? How do you compare it? How do you explain OZY to your friends, et cetera?

And one of the things we started to hear from some of our folks, I like reading OZY, I like listening to OZY, I like watching OZY, but why isn't OZY getting people together? Why isn't OZY creating this community that they talk about in their things?

And, so, we thought we were being responsive. And we came back and said we were going to create a series of small events. People sometimes call them salons. And we called a number of the survey respondents who had been most helpful helping us think this through. And there was one woman in New York, especially, named Kim. And we called her and said we heard what you said, thank you so much, we are going to roll out this new series of kind of small gatherings. And I thought she was going to be excited and she wasn't.

And then I said well, what do you think?

She said that think that folks says sometimes, honestly.

I said okay.

And she said, you know, I don't need any small events. Let's go big, do something special, do something that people are going to remember.

So, Kim was a New Yorker. So we ended up -- even though we were and still are based in California, we ended up doing it in Central Park. We ended up creating an event that some people described as Ted Talks meets Coachella. Because like Ted Talks, we would have great speakers, like Malcolm Gladwell, Mark Cuban, Ava DuVernay.

But then like the music concert series like Coachella, you would get musicians, like John Legend, Chance the Rapper, Tove Lo.

Or if you're a foodie, we would have great chefs. We'd have Eddie Wong, POV Malachi, Alex Guarnaschelli, Marcus Samuelson.

Or I love comedy, we would have, you know, Chelsea Handler, Issa Rae, Michael Jay, Sam Bee, folks like that.

So it was at Summer Stage within Central Park. And then later we got promoted to the Great Lawn. And it started as a one-day event and eventually became a two-day event where you could start by hearing A-Rod, and you could go over here and listen to common sing, and you could go over here and see POV Malachi cook, and you could come over here and see Mark Cuban talk about business.

So it was really a nice kind of a smorgasbord. And I think people sometimes thought they were coming for one thing but they really discovered they liked something else.

And, so, the moment I knew it was a hit when I saw

we had a whole group of people listening to Ru Paul give one of the most inspirational talks I ever heard, and then they walked across the way to hear Karl Rove. And, so, wouldn't necessarily put those two people together, but I think the fact that you could get that and in Central Park and it was outdoors and it was festive, I think ended up giving it real success.

Q Now, there's been testimony that OZY Fest was too expensive. Did OZY Fest earn revenue or come to earn revenue?

A It did. It did.

And I understand when people say that because sometimes people think of events as lost leaders and they think, you know --

Q Slow down. What's a lost leader?

A You know, sometimes you have one product in your group loses money, but it creates enough shine, enough buzz that you're okay with that.

Like if you go to Vegas, they lose money on the buffet, but they're expecting to make us stay around to gamble. Or, you know, at most restaurants they may break even on entrees but really make their money on drinks or dessert. That's where they really make their profit.

Q Okay. Sorry to interrupt you.

A Yep.

Q But you said you did make --

A We did.

So we were -- you know, my grandmother obviously made it through the depression. So I've come up with people -- I've been raised by people who were very focused on trying to be scrappy with a dollar. So, you know, very early on we brought in big sponsors. So, one of our first big deals was a seven-and-a-half-million-dollar deal with Univision to be the initial sponsor. We brought in folks like Intel, folks like Ford.

Volvo actually brought a whole car. They paid about million dollars to put a whole car at OZY Fest.

So we had a lot of good sponsors.

And we also had some good barter sponsors. So, for example, CNBC, the big network, said to us, we love it, it's sexy, it's young, it's fun, it's outdoors, it's not the kind of thing we normally do, but we want to get involved, so why don't we do a barter? Why don't you allow CNBC to be listed as a sponsor of it and to have a booth and to get some shine from that? And that's something that normally we would have to pay you a million bucks for. And then why don't we, CNBC, in return, we'll run ads on our networks. CNBC also -- sometimes control in the back of taxis those little videos there and they also have some stores.

So we both brought in JP Morgan, Intel, Belvedere Vodka, but we also had people like CNBC, or NPR was another

important barter sponsor.
Q How did the barter relationship work with NPR?
A So, with NPR and WNYC here in New York in particular, again, they really liked it. Their CEO was a fan. I think she came to the first one, and she was like we want to partner with you on this.
So, normally, I would have had to pay them, I don't know, half a million or a million dollars, or they don't call them ads on NPR, but the equivalent of ads in order to try and sell tickets to OZY Fest. And instead, we agreed to give her the equivalent a million-dollar sponsorship at OZY Fest and in exchange she basically ran the equivalent amount of ads and that helped me sell tickets. So I otherwise would have had to spend the money to sell tickets and she otherwise would have been looking for that kind of sponsorship opportunity. So it was a win-win for both of us.
Q So two questions: The first, how did you come up with the idea to solicit or go after these barter relationships?
A You know, as a young entrepreneur in my first company, one of the people I got to know -- he actually was kind of in between things at the time. He wasn't the hero he is today. But I got to know Steve Jobs reasonably well. Reasonably well is too strong. But I got to learn from him. I got to go watch him at his company. I got to go hear him give his big annual presentations where he debuted things and I got to have

a series of conversations and he talked about some of --

MR. SIEGEL: Objection. Objection.

THE COURT: Sustained.

Q Without telling us what he said, what did you do as a function of what he said? Or what did you begin to think about?

A Yeah, I -- I realized that one of the best things you can do when you're a young company and you don't have a ton of money is to -- is to do barter deals. And the barter deals, which are sometimes referred to as strategic partnerships, frankly can be worth way more than money. Again, I don't think I could have -- if I had walked in and asked Ms. Winfrey can I pay you $50 million or $100 million, I don't think I could have done that.

And the same is true for CNBC being a partner for OZY Fest. If I just literally walked in and said will you be a true partner and being enthusiastic, I don't think I could have gotten that done.

But I think what you can do with a strategic partnership, sometimes it's worth more than you actually could have bought with cash. So -- so, I just -- I believed in them from the very beginning.

Our first three partnerships were with NPR, with PBS. There was a wonderful anchorwoman there named Gwen Ifill, who became an OZY newsletter reader, who nicely wrote

in to me, and we began doing a segment on the PBS NewsHour.

And then, I don't know if anyone is a fan of *USA Today*, but I've always loved the *USA Today*. And their editor-in-chief Dave Callaway also liked OZY. And, so, we had a partnership with them from the very beginning.

We struck the NPR deal even before we launched in September of 2013. So, we were meaningfully committed to barter from the very beginning.

Q Now, tell us how you decide what value to place on a particular barter relationship, unless there is like a book out there that says it, or do the parties just work it out?

A You usually basically use the other person's rate card, or sometimes they provide you with an adjusted rate card. So everyone has a rate card.

Like, if you were going to barter with Marriott Hotels, you would say what would it cost me to have rooms for all of my celebrity guests for OZY Fest, what would I otherwise had to pay for it, and so there's a pretty clear number. So it's pretty specific.

What I would have had to paid iHeart for all those ads, what I would have had to pay NPR for all those ads, what would I have had to pay Ms. Winfrey for that minute -- long video. So it's relatively clear.

I mean, we tended to be a little more conservative, as I told you. We kind of cut it in half. We probably didn't

have to do that, but, you know, out of, you know, an abundance of caution, that's what we did.
Q All right. There's also been some testimony about you giving away too many complimentary tickets and that that was a cash drain on OZY Fest.
What were your reasons for providing complimentary tickets?
A You know, honestly, I'm the son of teachers. We usually gave away tickets to teachers, to students, to first-responders, to Veterans and social workers. So, I -- will.i.am, who was one of our first -- who was our first big guest at OZY Fest, he said Carlos --
Q Who is will.i.am?
A He's a singer. He's a singer.
I had to beg him to do the show. He didn't want to. That's another instance where even if I paid him cash, like, he was no longer touring, like he didn't want to do it. And I walked him through it.
I flew down in L.A. and walked him through it, and he said the reason I'm going to do this --
MR. SIEGEL: Objection.
THE COURT: Sustained.
Q So after you spoke to will.i.am, what did you come away with in terms of an agreement?
THE COURT: An agreement?

I'm sorry.

Can we come to the sidebar for a moment.

(Sidebar held outside of the hearing of the jury.)

(Continued on next page.)

(The following sidebar took place outside the hearing of the jury.)

THE COURT: What is the question going to be?

MR. SULLIVAN: So, first, none of this is hearsay. I don't want to fight about it. It's what Mr. Watson did as a function of learning something, what was in his mind. It's not offered for the truth. In fact, they're arguing that it's not true.

THE COURT: What is not true?

MR. SULLIVAN: Barter revenue, for example. There's been a whole thing in this trial about whether it's real, whether it's not.

When people say things and you use those things in order to form your opinion, I'm offering it for that basis. I just didn't want to fight about it. It's not hearsay, it's coming in for the truth. It's not coming in to say --

THE COURT: So you're not going to argue that this barter revenue was properly recognized?

MR. SULLIVAN: Yeah, I'm not going to argue that will.i.am said X, Y, and Z. I'm going to argue that Mr. Watson believed that he had earned certain barter revenue.

THE COURT: Okay. And is that what's coming up here, that there was an agreement between --

MR. SULLIVAN: What's coming up here is will.i.am agreed to come to the OZY Fest, that he didn't agree --

wouldn't have agreed to do it for money, but he agreed to do it for a bartering exchange.

THE COURT: Which is relevant because it constitutes revenue?

MR. SULLIVAN: Because it constitutes revenue, it constitutes his belief that this is revenue.

THE COURT: And your objection is hearsay, not relevance?

MR. SIEGEL: Well, it's both.

And as to will.i.am, any testimony about what will.i.am would or would not have done gets into the issues that we have discussed at sidebar many times about Mr. Watson foundation or the helpfulness to the jury of talking about somebody else's state of mind.

THE COURT: I think they're saying that not only what he would have done, but that he actually did come.

MR. SIEGEL: If they're going to say we entered into an agreement with will.i.am and describe that agreement, that's fine.

It's that what we've been objecting to is the testimony, you know, this is what this person told me and this is what that person told me.

THE COURT: Okay.

MS. GILBERT: Judge, could we have a brief break a bio break?

THE COURT: Yes.

MS. GILBERT: Thank you.

(End of sidebar conference.)

(Continued on next page.)

(In open court.)

THE COURT: We are going to take a five-minute break here and then we will resume.

THE COURTROOM DEPUTY: All rise.

(Jury exits the courtroom.)

THE COURT: We will be on break for five minutes.

(Recess taken.)

(continuing.)

MR. SIEGEL: Before the jury comes in you were saying something about the 26.2 issues.

THE COURT: I haven't made up my mind on this. I need more facts before I make a decision, but in the interest of time the defense should be thinking of the question of what materials would be implicated if the Government were to demonstrate that that status is appropriate here.

MS. GILBERT: What?

THE COURT: So, the Government is saying that in their view Ms. Watson is a member of the defense team.

MS. GILBERT: I didn't know what we were talking about.

THE COURT: So, they indicate that she's transmitted communications that are labeled attorney/client privilege. The defense has invoked her status as a lawyer. She's with us here in the well of the courtroom throughout the trial --

MS. GILBERT: She's not in the well.

THE COURT: She is. She's on this side of the bar, of the gallery.

MS. GILBERT: She's in the yellow dress.

THE COURT: Because of the government's reference to people taking notes --

MS. GILBERT: You thought it was Ms. Robinson who is not --

THE COURT: A person who is taking notes. Okay.

MS. GILBERT: That's why I wanted to clarify who we were talking about.

THE COURT: Much appreciated.

So, whatever the facts are, there was this thing about note taking. All I'm saying is I don't know which way that question comes out but in the interest of speed I think we all have to think about what the implications are of the question coming out either way, right? So if there is going to be some document-gathering exercise that's required people should look at that and figure out how that's most easily accomplished --

MS. GILBERT: Sure.

MR. SIEGEL: Your Honor, I'm sure you know this, but just to be clear, even if she's not a member of the defense team, she did work at OZY for about a year after the conspiracy and we have virtually no documents from her time there which we understand is going to be the subject of her testimony of what she observed while she worked there.

And just a note, the defense has said that she's an attorney, which she is, but during the time that she worked at OZY, her license was suspended. So, a claim of privilege over the e-mails at that time I don't think is proper.

THE COURT: I mean, is there -- this may be completely academic, but is there a defense claim that there

was an attorney/client relationship between Mr. Watson and his sister?

MS. GILBERT: We'll have to get back to you on that one, Your Honor.

MR. SIEGEL: They've withheld documents on that basis from the order to compel.

THE COURT: I think I need an answer to the question. Do you want to take five minutes and then answer it? Take five minutes and let me know the answer to that question.

MS. GILBERT: Thank you.

(Recess taken.)

THE COURT: Sorry for the confusion. Who is Ms. Robinson?

MR. SULLIVAN: My partner from Sullivan Law LLC.

THE COURT: Who is working in this case and has entered an appearance?

MS. GILBERT: She's also an attorney.

MR. SULLIVAN: She's not entered an appearance.

THE COURT: But has an attorney/client relationship with Mr. Watson.

MR. SULLIVAN: Yes.

MS. GILBERT: Yes:

(Recess taken.)

MS. GILBERT: Your Honor. There were time periods

when Ms. Watson did have an attorney/client relationship with Mr. Watson. We do not plan to inquire as to those time periods.

THE COURT: Were those time periods --

MS. GILBERT: After the Ben Smith article in September 2021. Sometime after that. We plan to inquire as to the formation of OZY which she was present for and a part of. She also was an investor in OZY and she was employed by OZY for a while. None of those should implicate her attorney client relationship with her brother.

THE COURT: Okay.

MR. SIEGEL: So, Your Honor, assuming that's -- I mean, for the period after the New York Times article, as I said, her license was suspended but putting that aside -- her law license was suspended during the time period that they're asserting that they had attorney/client privilege.

THE COURT: Asserted attorney/client privilege as to what again?

MR. SIEGEL: Well, I don't know. They just said that there was periods of --

THE COURT: I thought you said that there were documents withheld on the basis of --

MR. SIEGEL: Well, the point is that she worked at OZY for a year from 2022 to 2023. I don't think they produced any of those documents because they have asserted a claim of

privilege over communications with Ms. Watson. Similarly, you know, they haven't given us any 26.2 relating to the formation of OZY and if they're going to talk about the time that she worked at OZY, that's all post conspiracy and post New York Times. So there's relevance issues, there's the 26.2 issues. And, frankly, it's talking about the formation of OZY given the testimony for Mr. Watson and that's undisputed, and it's all cumulative as well.

THE COURT: What is the --

MS. GILBERT: Again, she's an investor. So that is --

THE COURT: What is the defense position on the 26.2 material; that you made a diligent search and there is none?

MS. GILBERT: We do have more material that we would be providing if she were to testify.

THE COURT: Why hasn't it been produced already though?

MS. GILBERT: Because we are gathering it.

THE COURT: But you made an agreement with the Government and I so ordered that agreement. I need to ask this question because one of the factors I think I have to consider in connection with the Government's motion to exclude this witness, is the reason for the failure of timely production. What is the reason? Why didn't you produce this material on the day you agreed to?

MS. GILBERT: Well, Your Honor, I'm actually in the process of drafting you a letter with respect to that very specific answer, not just with respect to her, but with respect to all of the document production in this case.

So, as Your Honor may or may not be aware, there are 2.5 million documents in this case. On April 11th, the Government produced 411,000 documents. Between the time period of October 25, I believe, 2023 and April 11th of 2023 -- sorry April 13th of 2023, the Government produced 1.5 million documents in this case.

Your Honor is aware of the multiple substitutions of counsel and Your Honor may or may not be aware that Mr. Sullivan and his partner, Ms. Robinson, or a very small law firm --

THE COURT: I did not realize until ten minutes ago that Mr. Sullivan had a law partner. Now I'm led to understand that she's working on this case.

MS. GILBERT: Sorry, what was that?

THE COURT: I now understand that she's working on this case which I did not understand previously. But you made the agreement. If you didn't believe you could comply with it or intend to comply with it, you should have opposed it, instead of entering into an agreement, letting the Court so order the agreement, getting production from the early production from the Government and reliance on that agreement

and the reliance that you were going to live up to your side of it and --

MS. GILBERT: I believe at the time that Mr. Sullivan signed the agreement, he had every intention of complying with it. That agreement was agreed to before April 11th or on April 11th. It was filed on April 11th, which was the same day as the production of 411,000 documents by the Government.

THE COURT: Are you saying that the only place you can get the 26.2 material is in the productions that you get from the Government? You all still have access to OZY materials, right?

MS. GILBERT: Some. There's been -- there's been a lot of issues with respect to our -- to our access to materials.

THE COURT: What effort did you or Mr. Sullivan or anyone else on the defense team make to comply with the Court ordered deadline?

MS. GILBERT: May I have a moment, please?

THE COURT: Sure.

(Pause in proceedings.)

MS. GILBERT: If you don't mind I'll stand right here. We did provide 26.2 material for the two witnesses that we knew about which at the time were Mr. Pinkus and Dr. Robinson. All the other witnesses we were unsure about.

We also lost funding and were unable to do searches other than manual searches.

THE COURT: You said you lost funding?

MS. GILBERT: Yes, Your Honor. Funding was -- there was no -- there was no money at the time.

THE COURT: But there has then come to be funding thereafter?

MS. GILBERT: There is still very limited funding right now.

THE COURT: I am going to paraphrase and you tell me if I'm getting this wrong. I think I understand you to be saying you weren't making as diligent a search as you would have otherwise because you weren't getting paid and now that you are getting paid --

MS. GILBERT: No. We didn't have access to using the electronic services in the same way we may have been able to. So the searches were manual. That is what I'm saying has --

THE COURT: So, a third party cut you off?

MS. GILBERT: We're using a third party service that is required to be paid.

THE COURT: And they said since we haven't been paid we're not going to allow electronic searching? Is that the case?

MS. GILBERT: Yes. That's what I understand.

THE COURT: I'll reiterate --

MS. GILBERT: We still have had problems -- as you will see in my letter, we still have problems with searches and that is part of the problem with some of the delays when you order us to provide things at certain times and moments. We are relying on third party vendors for E-discovery.

THE COURT: Okay.

MS. GILBERT: And there's a limited amount of demand that we can make on third-party vendors at this time.

THE COURT: I am not sure I understand from that -- you're saying that now -- now for whatever reason you are in a position to produce 26.2 material for Ms. Watson to the Government and a month ago or two months ago you weren't. I'm not sure I understand precisely what has changed between back then and now. And, you know, that's just what I'll have to deal with.

MS. GILBERT: Your Honor, my understanding is that the insurance litigation is over, so we have received some funding.

THE COURT: When did that funding come in?

MS. GILBERT: We can't remember exactly.

THE COURT: Can you remember roughly?

MS. GILBERT: Within the last month or so.

THE COURT: And who is the payor on that funding?

MS. GILBERT: Mr. Sullivan.

THE COURT: Who is writing the check?

MS. GILBERT: Payor -- sorry, not payee. Mr. Sullivan does not remember the exact insurance company. It was a D&O insurance policy.

THE COURT: You're saying a big check came in within or approximately within the last month and that has made the difference here?

MR. SULLIVAN: It's given us some resources in the last couple of months. I don't know when it came in, but it has given us resources. It's untrue that we haven't provided any 26.2 material. We have provided some and every time we provide some, the Government asks for additional. I think we've given them for most of the witnesses documents that go beyond what's required by 26.2 because there's a pretty limited scope of what we're asking some of these -- some of these witness about.

THE COURT: Okay.

MR. SULLIVAN: The other category of documents are documents that we got from the Government so we spent a lot of time and money giving them back.

THE COURT: What search -- what efforts have you made to date to gather the materials required by Rule 26.2 as to Ms. Watson?

MR. SULLIVAN: Done searches.

THE COURT: Can you be more specific than that?

What are you searching on?

MR. SULLIVAN: Searching e-mail and texts for those sorts of things and relativity and we have turned over -- and we've turned over documents as a function of those searches.

THE COURT: You have 26.2 material for Ms. Watson now?

MR. SIEGEL: We have a couple. I think it's -- I think it's in the range of fewer than fifty documents that were given to us a week ago. The issue is -- one, let me take a step back. Your Honor, pursuant to the subpoena which requested all communications between Mr. Watson and all investors and all employees, all of her communications with Mr. Watson should have been turned over nine months ago. Had that been done --

THE COURT: Are you saying -- let me ask a question that maybe you're answering and maybe you're not, that some or all of the materials now turned over to you under Rule 26.2 as to Ms. Watson were also responsive to the grand jury subpoena and, therefore, should have been produced in response to the subpoena and in my order of compulsion.

MR. SIEGEL: Yes. In addition to that --

THE COURT: Can I hear Mr. Sullivan's response to that?

You were the attorney of record for Mr. Watson when

that order of compulsion issued. Was it violated?

MR. SULLIVAN: Not to my knowledge. I turned over everything that I understood was outstanding.

THE COURT: Do you dispute that these 26.2 materials are also responsive to the subpoena?

MR. SULLIVAN: I would have to look at them specifically. I don't know as I stand here right now. I don't know. I would have to look at them.

THE COURT: If there was a violation of the subpoena and my order of compulsion and on top of that a violation of the agreed upon and court ordered schedule on 26.2 material, and I think this is a very easy question at the end of the day, but I need somebody to explain that to me with some specificity, how do we know these materials were responsive to the grand jury subpoena and my order of compulsion and nevertheless not produced.

MR. SIEGEL: Your Honor, to provide specificity of what I'm basing this on; one, the subpoena to Mr. Watson that Your Honor issued the order to compel about required all communications with employees and investors in OZY. As the defense has proffered, Ms. Watson falls into both of those two buckets within the time period covered under the subpoena.

THE COURT: Mr. Sullivan, is that true. Do you have any reason to believe that that's not true?

MR. SULLIVAN: If that's how he described the

subpoena, I do agree that that is true. What I'm not agreeing to is -- and I don't know, is that the government didn't get it -- doesn't have it from the prior disclosures.

MR. SIEGEL: And --

THE COURT: You think it may be true, but you don't have any specific reason as you sit here to believe that it's true.

MR. SULLIVAN: Sure I do. They got everything -- the Government has everything from OZY, the entire OZY Google Drive. That's where we got it from.

THE COURT: Show me the cover letter then and we'll wait for this right now. Show me the cover letter under which that production was made with the Bates range. I would like somebody to hand up a copy of that letter of production and then show me that these documents at issue fall within the specified Bates ranges.

(Pause in proceedings.)

THE COURT: So this is not what I was asking about.

MS. GILBERT: That is the best that we have, Your Honor, and if you read the letter you'll understand why we don't have a lot of material.

THE COURT: In other words, the upshot is you keep saying you think this was produced to the Government by prior counsel, but you have no basis for that statement.

MS. GILBERT: Your Honor, if you read that letter.

It's twenty pages essentially with exhibits. If it says something responsive to my question and you want to point me to it, I'm happy for you to do that.

MR. SIEGEL: This is the opposition to the motion to compel.

THE COURT: I understand. I understand.

Show me here, Ms. Gilbert, where there is a basis for your and Mr. Sullivan's assertion that you believe these materials were produced to the Government by prior counsel.

MS. GILBERT: Well, I think if you read the first full paragraph under where it says "Mr. Watson and OZY's diligent effort to comply with the subpoenas."

THE COURT: You're asking me to read that paragraph? I'll read that paragraph. It says that, "In response to the subpoenas, OZY's counsel, Ford O'Brien, produced approximately 28,700 documents. Mr. Watson's counsel, Dechert LLP, produced approximately 20,000 documents that were in his personal possession, but that were not duplicative of materials that OZY produced. E-mails from Mr. Watson's OZY e-mail account while Mr. Watson supplemented such production with e-mails that were in his personal possession, but were not held by OZY."

So I don't need to tell anybody listening to that that it conveys absolutely no specifics about any documents being produced on any specific dates. If it's true that there

were these productions by Ford O'Brien and Dechert LLP, and I'm sure it is true, all somebody had to do is go back to Dechert LLP and Ford O'Brien and say may we have copies of the cover letters --

MS. GILBERT: They're not responsive to us, Your Honor.

THE COURT: Then it was your obligation to assume that these materials were not produced. You're telling me you had a good-faith basis on which to believe that these materials as to Ms. Watson were produced in conformity with the grand jury litigation? The Government says we never got them and all you have on which to dispute that assertion is this paragraph that says, hey, we produced lots of documents.

MS. GILBERT: Well, I think there's also the entire e-mail chain. I don't -- I wouldn't limit it to that one paragraph that you've chosen to read. I would read the entire letter because I think there's a long discussion about the back and forth with the Government in order to comply with the subpoena and comply with your motion to compel.

THE COURT: Are there references to date ranges -- or Bates ranges and dates of production that would support with some specificity the notion that these materials were produced?

MS. GILBERT: I don't believe there are references to Bates numbers Your Honor.

THE COURT: I've been asking the same question for weeks now and I think I'm done asking. If there's something else you want to call to my attention, I'm happy to look at it, but I think I'm left to conclude and, believe me, I'm extremely hesitant to conclude this, but I am left to conclude that the materials that have now belatedly been produced as to Ms. Watson as 26.2 material, there is no basis to believe that they were produced in response to the grand jury subpoena -- in fact, the Government says they were not produced in response to the grand jury subpoena.

There's no basis to believe that they were produced in compliance with my order of compulsion. They were not, I don't think, labeled as defendant's exhibits and turned over on that schedule and they were not turned over pursuant to the agreed upon and court ordered schedule on 26.2. So that's a litany of violations and potential violations, every one of which has for obvious reason prejudiced had the Government.

I don't know that this issue becomes live today, but that's the -- that's my understanding of where we stand here. If there is something else that the defense can point me to that can complicate or undermine any of those things that I just said, I am very happy to read it, but the ball is in the defense's court at this point.

Let's bring in the jury and continue the testimony.

THE COURT: And in the vein, Ms. Gilbert, of things

that might be helpful, if there's a record of you asking Dechert and Ford O'Brien for information, share that record with me.

(Jury enters.)

THE COURT: Please be seated, everyone. Mr. Sullivan.

MR. SULLIVAN: Thank you, Your Honor.

BY MR. SULLIVAN:

Q Mr. Watson, we left off talking about the singer will.i.am. So, he ultimately agree to participate in an OZY Fest?

A He did and I found with a number of our celebrities, John Legend and others, it mattered to them that we were making it accessible to the community.

MR. SIEGEL: Objection.

THE COURT: Sustained.

Q What year did will.i.am participate?

A 2016.

Q Can you describe the agreement you reached with him for his participation?

A Yeah. So, normally somebody like wil.i.am would probably -- would have charged a million dollars maybe a million and a quarter to perform and he agreed to do it after a fair amount of conversation including an in-person conversation do it for $400,000, which was -- we were grateful for and -- and so that

was important. I was grateful that he was willing to do that. And, again, the community tickets had three reasons we did them.

Q We'll go back to the community tickets. He did it for 400,000 instead of for a million to make it easy. What happens to the 600,000? How do you understand that in terms of keeping financial records for OZY?

A In the ideal scenario, that would be captured and that would be captured as a barter agreement.

Q Okay. So what is on the other side of the barter? In other words, what are you guys doing for wil.i.am?

A For wil.i.am we are making sure that he's very involved in education, that teachers, as well as first responders, as well as veterans and social workers are able to either get free tickets or get reduced rate tickets and the City of New York also felt strongly about that that's part of the agreement for using a public facility like the park, and, so it aligned very well.

Q And in spite of the tickets and the -- the free tickets and the cost of performers, et cetera, over years that you did OZY Fest was it net positive in terms of revenue or net negative?

A Definitely net positive. We -- again, a lot of times it will take five to seven years before an event. Franchise turns profitable, but the fact that we struck a meaningful

agreement out of the gate with Univision, the seven and a half million dollar deal and the fact that we were able to bring other average sponsors like Ally and Volvo and Intel and Belvedere vodka and aperol spritz and others to the table; CNBC as a partner, BBC as a partner, NPR as a partner, PBS as a partner, all of that ended up making it work out quite well.

Q I'm going to now ask you some questions about how detail-oriented you were at OZY. I'm going to focus your attention to the years 2018 to 2021.

Do you have those years in mind, Mr. Watson?

A I do.

Q So at the time how many direct reports did you have?

A You know, it varied, but about eight.

Q All right. And if it varied, was it fewer than 18 and more than 21? You can tell us that.

A It varied, but it was any point between six and ten and it was a global group. I had people overseas and I'm based in the -- and the company is based in the Bay area, but we had people in a variety of places including D.C. and Bangalore and Lagos and Paris.

Q Now, outside of your direct reports, during those years roughly speaking how many employees did you have? And let me just break this up. So, first, just full-time employees that you had.

A So, people you think of full-time either in the U.S. get

W-2s or the equivalence of that. So, probably about 75 people.

Q And in addition to the full-time, how many part-time employees did you manage?

A We had a regular core, meaning that they got several paychecks a year from us probably of about 200 and then we probably had an occasional core. So if you only worked, for example, for the series *Black Women OWN The Conversation*, we hired probably about 100 people; videographers, people who hold cameras, lighting people, makeup people, people who edit.

And, so, we probably hired, I think, one hundred primarily black women for that and so --

And similarly for OZY Fest. When you had a big OZY Fest, you could hire as many as 300 people. Because Central Park has nothing on it. You have to hire people who build the stages. You get -- hire people who can provide first aid, who were going to welcome people in, who can provide security. And, so, I typically had, I guess, the way I think about it in any given month I had three to 400 people working for me and you know, over the course of OZY's life, we probably hired somewhere between 1,000 and 1,500 people.

Q Now, when you described the part-time people, like the folks who were putting together the stage, is that inclusive of -- you used the term contractors before. Is that inclusive of contractors or is that a separate category?

A It's inclusive of contractors. Again sometimes you hire them individually. Sometimes, like with the *The Carlos Watson Show*, we set up, like, a separate payroll for them. You heard before reference to $150,000 a week and so that's not included in the 75 and that's not included in the 200. That's its own separate group of people.

We would do the same for each of our shows and so for *Defining Moments with OZY* or *Third Rail with OZY* or the podcast, *The Future of X* or *When Katty Met Carlos*, they would have their own pod of people that range from five to ten on the low side to, as I said, 300 people for a project.

Q So you've already told us that you hosted a lot of television programs with OZY. How did you divide your time between being the on-air talent and the manager of employees?

A You know, it wasn't always easy. Again, especially if you're a young company -- and, again, the opportunities that we were getting were not -- were high-profile opportunities. So if you get a show on PBS, you can't mess it up, right? You get a show with Ms. Winfrey, you can't, like, submit something that you, like, quickly throw together, right?

If you're going to do a top ten podcast, like, there's a lot of sweat. I'm making it sound easy, but it's not. Like, it's all of the things you have to put in in order to have something listened to by ten or twenty million people had to go into that. So, I spent the bulk of my time on

content. I started my mornings at 5 a.m. I had a meeting with key editorial people. I mentioned before Charu in Bangalore, with Eromo in Lagos, with Fiona in Paris, with Tracy in D.C.

And then we integrated different people at different times, but I usually started there and I spent a ton of time obviously with the newsletter group, a ton of time with the TV group, with the podcast group and the festivals group and we haven't talk about the OZY Genius Award. I spent a lot of time with things as well to make sure that those things were operating at a high level.

Q And I did skip over OZY Genius. My apologies. Let us do that.

First, tell us what the OZY Genius awards are?

A My mom inspired them. As a teacher, I think she had a strong belief that we shouldn't just profile the new and the next, but we should support the new and the next. So, we started the program where we would allow college students from all around the country to submit their biggest ideas; an idea for a new book, an idea for scientific research, an idea to start a company, to launch a nonprofit. And then ten students would win typically $10,000 to pursue their big idea.

And, so, it was a terrific program. A little bit like if people know the McArthur Genius grants or -- it's a special thing because these young people are eighteen,

nineteen. They've got an idea that probably sounds crazy to their parents, but it's deep in their heart. Maybe it's poetry. We had one woman Claudine who had lost some limbs -- she was Rwandan in a difficult situation there.

But she was doing really interesting research at the University of Washington about how you can use 3-D printers to create prosthetics. And that's the kind of thing that as a sophomore people wouldn't normally bet on her on do that.

As I said, my mom felt let's not just talk about it. Let's be about it. Let's support it and put our money where our mouth is. We invested about $100,000 a year in supporting students. And then folks like J.P. Morgan would back it or AT&T would back it or folks like Goldman would back it or folks like Chevy would sponsor it.

Q When did you start the OZY Genius awards?

A The first -- my mom passed in 2014, so we did it in 2015, the next year.

Q How are you able to afford it?

A Not easily.

Q If it's not easy, why did you do it?

A Again, we had a very different mission. That old Sesame Street thing, some of these things are not like the others. We weren't like the other new media companies. We weren't just digital only. We were TV podcast, et cetera. We were

more global, we were more inclusive, I think, and I think we just felt a larger mission.

We felt we were about a different mission. And, so -- and, so, we made a way. And you know, early on my mom hired interns even before we launched the website. I'm not sure we had money for it. She said we can't wait until our pockets are full to do the right thing. I think we built it into our DNA as something we did and, again, I'm grateful to AT&T and to J.P. Morgan and to General Motors and others because I think they saw that it mattered to back a young Amanda Gorman before she became this really well-known poet.

Q Is Amanda Gorman an awardee?

A She was. She was a college student at the time. She had a pronounced stutter and this is -- some of you may remember her in the yellow coat in the inauguration. She gave that beautiful poem and she and her mom always said they appreciated it. We -- we kind of helped launch her. She was an OZY Genius award winner.

Q Give us two more examples of past winners.

A Claudine Humure from Rwanda who I mentioned. I liked the fact that she was doing scientific research and it came from a very personal place where she unfortunately lost a limb and looking at how 3-D printing can help create prosthetics. I thought it was smart and interesting work. There was a young woman, Arlene Reyes, from Rutgers who wanted to be a doctor

and also -- her family was from Peru originally and was doing really interesting research.

We had people who started companies, like Tony Kelmpt or Michael Devore. We had people launch nonprofits Colleen Silverman. So the students had a variety of ideas and came from very different schools.

Q Now, even though it was tough early, did the OZY Genius awards -- did it ever earn revenue or was this just part of your service?

A You know, ultimately it did earn revenue and, again, I was grateful that folks like General Motors saw the power of it and saw the importance of putting our money where our mouth is and backing that next special group, but it was -- it was unusual. We were a very unusual media company, but also it was good sometimes to have that conversation because it's --

You know, two things often helped a big advertiser -- before they're going to spend 20 million or $36 million with you, they want to know why shouldn't I spend more money with Facebook or more money with NBC and they have to, like, not only intellectually understand how you're different, but they have to feel it. When they would come to OZY Fest that's better than any pitch you could give them because they can see who the OZY audience was and they can see how unusual and special this was.

There's no Buzz Feed Fest or New York Times Fest in

Central Park and also the OZY Genius awards -- again, it's a very unusual thing for a media company to do and I think they got a sense of our essence as a result of that.

Q Now, I was asking you before we went back to the Genius awards about how you apportioned your time at OZY. So, you were telling us about the -- your focus on content and tell us how you would manage that with the administrative issues that -- or I won't use "issues" -- the administrative obligations that you had?

A Like in every business, you had to divide and conquer a little bit. I tend to spend my time on the outside things if you will, so on content, on sales and partnerships. On that, Samir and some of other team spent time on the inside stuff so on tech, on finance, on operations.

So, you know, I was the Million Mile Club on United, although I like JetBlue, and I traveled four days a week probably, probably four days a week because we had TV shows in different places podcasts in different places. I think it matters if you go and see your potential partners especially if they're going to do a seven figure deal with you or even a nine figure deal with you. They want to meet you. They want to know that they can count on you.

Q E-mails, texts, any order of magnitude of how many you were receiving over these years and right now we're focusing on '18 through '21?

A A lot. You know, right now when I look back I haven't really touched it since the indictment last year, but I think I have 301,000 unread e-mails right now just to give you a sense of how much.

So I was probably getting hundreds of e-mails a day probably and, you know, I don't know how many texts but a lot. Again, we were a young company but we were ambitious so we were doing a lot and we had people on four continents. And, so, you know, it took a lot to coordinate and then I would say COVID made it even more complex because even when the U.S. was starting to get healthy, things were bad in India and I had a pretty significant team in India, both engineers and reporters. And, so, you had to be sensitive to what was going on in different places.

Q So you said you typically started your day around 5 a.m. What time did you typically end your day?

A Late. Probably too late; midnight, 1 a.m.

Q Give us a sense.

A Midnight, 1 a.m.

Q And, finally, can you tell the ladies and gentlemen of the jury what sort of processes did you create in order to stay on top of the administrative portion of OZY?

A I tried to have at least weekly meetings with each of my direct reports. So, you know, Tracy on the newsletter side, Chris or Sasha on the TV side, Mave on podcasts, Aaron with

festivals, Kendra with marketing, Stefan with sales, Samir really managed tech, but I would also meet sometimes with Raj or if we had other people in finance I would meet with them as well.

So we had -- I tried to have individual meetings, but we also would have a weekly leadership meetings, sometimes biweekly and we tried to go through the business well and I tried to make sure going into the year that we all had agreement on what the five or six major goals were and we went through a process where we tried to break down what we were trying to achieve by quarter so that everybody had visibility on that, so we had an overall calendar that we can look at together, so we knew when the podcasts and TV shows and festivals, how they all tied together.

We tried to start with what success would look like. So, what would be a successful OZY Fest or successful partnership with Hulu; what would make the folks at Apple smile and then we tried to work backwards from that and have kind of a clear timeline. So, while I couldn't get into the weeds with people, I did want to at least at a high level have agreed with them on what is a traffic podcast going to look like, what's our launch plan going to be, who are going to be our advertisers overall and what's the magnitude of revenue and spend on that.

So you wanted to at least have -- you wanted to at

least have that perspective, but at any given point we had five TV shows going and four podcasts going and a festival going and five newsletters going. And, so, I couldn't be as hands-on as I probably wanted to be, but I needed to at least on a certain level be able to give people guidance and made sure we all agreed on the end goal.

Q Were you the host of the podcasts as well?

A I was the host of some of the podcasts. We -- I call it ear magic. We had some real ear magic with our podcasts and we had a really good host, Sean Braswell, who was one of our first hires. He came from a small town in Texas. He did something really good. There was a woman named Faith Slessinger hostess others. Katty Kay from the BBC co-hosted one of our podcasts so we had a number of interesting partners for our podcasts.

(Continued on the following page.)

EXAMINATION
BY MR. SULLIVAN: (continuing)
Q All right. I want to now turn the page and ask you about some of the various job offers that you received during your time at OZY.
So let me just ask the predicate question: While you were at OZY, did you receive job offers?
A I did.
Q Can you say, just list out from whom, and then I will ask you a couple of questions about those.
A Sure. And some of them were verbal, some of them were, are you interested, some of them were at different levels, but the folks at Goldman asked me to come back as a partner, you know, BuzzFeed asked me to come on as president, Google News asked me to come on as president. At one point, when CNN was thinking about pushing out Jeff Zucker, the guy who was heading it at the time reached out to me about putting my name in the ring for that. And then at one point, Jeff Zucker had reached out to me about, we had a series of conversations about The Morning Show on CNN about co-anchoring. I think it was called American Morning at that point.
Q So back to the Goldman, they asked you to come back as partner?
A Yes.

Q And is partner higher or lower than managing director or are managing directors partners?
A It's funny, so every -- it's managing director and then partner.
Q Okay.
A Yeah.
Q So that would have been higher than --
A Managing director.
Q -- managing director?
A Yeah.
Q And did you have an idea of or an understanding as to what your compensation would have been had you accepted?
A I did.
Q And what was it?
A Somewhere in the neighborhood of $10 million a year.
Q So that's a lot of money. Why didn't you take that?
A Well, I ask myself that even more now as I sit here, but I'm -- again, it may not resonate for a lot of people, but I'm not a money-driven person. I drive a 15-year-old car. I live in the same house for 20 years. I eat at Chick-fil-A. I eat at Chipotle. I -- I -- you know, I am the son of people who were involved in the civil rights movement. And I -- I was the kid who got kicked out of schools and -- and knew that if people like Mrs. Trencher hadn't gone the extra mile for me, that I could just as

easily, you know, have been in the same place as some of the kids I grew up with are.

So I -- I think I've just always believed in -- what do they say, to much -- to whom much is given, much is expected? And so that's just -- that's been where -- where my heart is, which is not always easy where you're an entrepreneur, because many of the investors and many of the entrepreneurs don't approach it in the same way. And my value sense doesn't easily fit in a box that they're used to hearing from the 20-year old in a hoodie.

Q For BuzzFeed, what was your compensation package in the deal that you and BuzzFeed were negotiating?

A Well, we turned -- we turned them down five times. And I think the final one, it kept escalating. So it started with 125 million, then went to 170, to 225, to 250, to 300. And I think -- I think the number was something like 55 million.

Q And is this cash or stocks or mix?

A We had to negotiate all that, but I think that would have effectively been initial cash paid out over a two-year period of time.

Q And why did you ultimately decline the BuzzFeed acquisition, on two registers, for OZY and for you, personally?

A Well, I didn't do it casually. So we, you know, spent

six months having conversations. I brought investors to meet them. I walked it through with the board repeatedly. I wrote draft memos for the board to consider. I brought lawyers into it. I talked it over with my team.

So I -- just to be really clear, a number of these decisions didn't just impact me. And so I didn't just say no. I'd said, given where we are and given that we're really starting to take off and starting to separate ourselves, and we saw lots of the other new media companies like Mic went out of business or Mashable or Vice was going down or BuzzFeed was going down, we really thought that we had a chance to do something special that could be around for a long time.

And, again, I don't know how this will sound to people, but one of our early first reporters, her mom, who lives in Iowa, she said the world needs more OZYs, by which I understood, you know, media companies that could not just be media companies in a classic sense, but really could be new and next and could be change agents. And so I wanted to build something that could be around for a long time. And I have friends in India who -- friends is probably too strong -- acquaintances whose family started The Times of India, and he would sometimes show me nice letters that his great grandfather got from Gandhi or from Nehru or from others. And you just got a sense of what a media company

could be if it was around for a long time to come.

And so I think that also was a part of my thinking.

And then last, but not least, I did think that in success, you know, I live down the street from places like Apple and Tesla, so I've seen crazy ideas become really large, important companies. And so I knew that while there was no guarantee and most startups fail, I knew that there was a chance that if OZY was as magical as we thought it was, that it could become, you know, the next YouTube, the next CNN, the next -- you know, the next what have you.

Q So Google News, we've heard some testimony, though not by you.

What was your understanding of the salary offer, just the salary, for the Google News presidency?

A I think Sundar got it right. I think he said -- kind of, it was the seven to $8 million a year range.

Q And were you negotiating a payment to OZY and an additional payment to you?

A Yes. That was on the table.

Q And what were those numbers, as best you recall?

A Originally, it was $30 million overall, 25 to OZY and five to me. And then ultimately, they wanted to do slightly less, so it ended up, I think, being 20 to OZY and five to me.

Q And you turned that down, as well?
A I did, again, with kind of meaningful consultation of the board. So I -- and not even just the board, but our key investors. So I walked it through with them, I talked about the pros and the cons.
One of the gentleman you had here recently I think misrepresented what happened, but I laid it out to, for example, him, and said here would be the positives of taking it and here's how I think about where we would go if we said yes and here would be the negatives if, you know, if -- if we did.
Q All right. Now, the CNN presidency, that had not matured, I take it, to a formal offer?
A It hadn't.
He called me, I think, in late 2020, and he -- some of these calls, they usually start by saying, we're thinking about someone new, I've heard your name, I've heard you might know interesting people for this. And then once you share something, they'd say, is this something you would ever think about, and if so, you know, what do you think the challenges would be, what would you -- you know, what would you do with it, how would you reimagine it. And so I think we had either one or two of those calls.
Q And finally, The Morning Show anchor of CNN, how far did that develop?

A You know, not that far. Jeff and I are both from Miami, Jeff Zucker. And so I had known him when he was at NBC. And he had moved to CNN. And we had begun doing a segment on The Morning Show called The New and the Next with one of their anchors -- at the time it was Michaela Pereira and Chris Cuomo at the time. And that segment was doing well and he was thinking about resetting it and, I think, moving Chris to the evenings. And so I think he was looking at a number of people and asked me whether or not that's something that we should pursue.

And again, I went back and talked to my investors about it because there was a chance that they would say, you know, maybe that kind of thing could be good for OZY, but I think ultimately, the view of most of my board and my investors was we have a good thing, but it's still too young, if you were to go do that, you would have to spend all of your time doing that, and even though on the surface it would seem like a good thing for OZY, it probably would lead to OZY shutting down.

So with that advice, I thanked him for it and said can we continue to develop our partnership together.

Q And did you?

A We did. We did.

Q How long did that last on CNN?

A I think our partnership was for two years, I think, and

it was not only on TV but we also did stuff with CNN.com and I can't remember whether or not we did something -- and -- and they considered our first TV show, The Contenders, we ended up going with PBS instead of them and they ended up doing their own version of that show, but -- but two years or three years worth of a relationship.

Q Now, with the monies you earned at OZY, if any, or even before OZY, did you ever go out and buy a mansion?

A No, no. I'm in the same house I've been in for 20 years.

Q How about a Ferrari? That's a sports car.

A You know what? I've never been a fancy sports car guy, so that even if I could, that's not something I would do, but no. I -- I also think that if you do something like that and you are in a young company and everyone's working lots of hours and money's tight, you're sending a message to people. And I don't know that that's the message that you want to send, especially when everybody's got to lean in and there are hard times and things go up and down. So that's not naturally me. And even if it was, I probably wouldn't have done it, because I -- I think that would have -- that would have gone against the kind of culture that was -- I was trying to build.

Q So any extravagant purchases?

A I liked -- I liked travel, but I'm not an extravagant

traveler, but I've been lucky to travel. I didn't have a lot of time to do it running OZY, but if I was going to do something, that's probably what I would have -- would have -- would have most enjoyed. And, you know, obviously -- not obviously, but I don't have kids, but, you know, helping my sister and brother-in-law put my niece and nephew through college.

THE COURT: Let's take a short break here. We'll try and regroup in seven or 8 minutes.

THE COURTROOM DEPUTY: All rise.

(Jury exits.)

(Witness steps down.)

THE COURT: Five minutes, everyone.

(Recess taken.)

(Witness resumes the stand.)

THE COURT: We are going to bring in the jurors momentarily.

I am led to understand that there was some maybe modest consternation on the defense side about my having declined to qualify Dr. Robinson as an expert in front of the jury.

And I don't know, Mr. Sullivan, if that took you by surprise or not, but that is simply in response to what I think is pretty widespread guidance including from the American Bar Association to the effect that trial -- I am

quoting here from the ABA: Trial judges should not declare a witness to be an expert -- sorry. The Court should not, in the presence of the jury, declare that a witness is qualified as an expert or to render an expert opinion and counsel should not ask the Court to do so.

The Sixth and Eighth Circuits have talked about the reasons why.

The Sixth Circuit, in 2007, said: When a Court certifies that a witness is an expert, it lends a note of approval to the witness that inordinately enhances the witness's stature and detracts from the Court's neutrality and detachment. Except In ruling on an objection, the Court should not, in the presence of the jury, declare that a witness is qualified as an expert or to render an expert opinion.

And quoting the ABA, it says: Counsel should not ask the Court to do so.

That is United States versus Johnson, 488 F.3d, at 690.

Eighth Circuit, similarly: There is no requirement that the Court specifically make the finding of expertise in open court upon proffer of the offering party. Such an offer, and the finding by the Court, might influence the jury in its evaluation of the expert, and the better procedure is to avoid an acknowledgment of the witness's

expertise by the Court.

So I hope that clears up in whole or in part any consternation on that front.

Let's bring in the jury.

(Jury enters.)

THE COURT: Please be seated, everyone.

Mr. Sullivan.

MR. SULLIVAN: Thank you, Your Honor.

CONTINUED DIRECT EXAMINATION

BY MR. SULLIVAN:

Q Mr. Watson, I am going to turn to a couple questions about when you first met Mr. Rao.

Do you recall when you first met Mr. Rao?

A I did. I was at Goldman. I want to say maybe it was 2010, because I was new, they asked me to go around to the different groups and introduce myself and I met him at that time initially. Not a deep relationship, but enough to say hello.

Q Was he in the same group or area that you were in?

A He was not. He was in kind of a -- a special finance group. They helped media companies raise money. So like people who want to do a new TV show or -- or people who might want to buy, you know -- buy a media company, they would help them raise the money.

Q All right. And while you were at Goldman those couple

of years, did you and he interact after those initial meetings?
A Not really. I saw him a couple of times, but not -- not really, really.
Q All right. So fast forward to Mountain View, California.
How did you come to get reacquainted with Mr. Rao?
A I moved back to the Bay Area to take care of my mom and tried not to eat at McDonalds, so I'm going to Chipotle, and I was coming out of, I think, of the Chipotle and I think he was going in and he said he was just moving to the area because I guess his wife was starting a -- a program. And he had heard that I was leaving and I guess he had somehow heard that I was starting a new company with my mom and wanted to know more and -- and I think we agreed to get together after he got back from his -- from his honeymoon.
Q Did you?
A Yes, we did, yes.
Q Did you get a sense of how many meetings you had with Mr. Rao before he formally came aboard?
A Probably a half dozen, I think. And this is kind of in 2012, this is probably somewhere in that August, September, October window of 2012.
Q And give us a sense of --
Well, what did you hope to accomplish in these

meetings?

A You know, he had expressed interest -- he had kind of raised his hand. And I wanted to see whether he had any real interest, whether he had any real ability to be helpful. And so I think I -- with everyone at OZY, one of the things that we would invite you to do and ask you to do is be a critic. So we literally give people our business plan, which is very unusual, and we'd ask you to write a critique, what do you like about it, what do you think we can do better or different. And so I think I originally asked him. So I took the business plan that Mom and I had written and I think I had asked him to critique it.

Q What qualities were you looking for with respect to your early employees?

A You know, probably three or four things. Again, one very similar to investors, because early employees really are investors, right? I mean, they're investing their time, their career, their -- they're passing up other opportunities. And so you want someone who actually cares about this, who actually thinks it's special, who's going to lean into this, who's going to, you know, really bring some love to this, if that doesn't sound -- sound weird.

And, you know, I think you have to have -- even though startups are busy and they're a little frenetic, you actually need people who are organized. Like if you're not

organized, you can't pull off big things. And so I wanted to make sure, if he was going to help set up these different things, that he could be organized. And then I think, you know, the early people have to be pretty flexible because nothing goes perfectly according to plan and you've got to change up stuff a lot. And so it -- it -- you know, one minute, you're handing out lemonade to everyone who's waiting in line to get into OZY Fest. Another minute, you're holding the mic for someone who's taping a Podcast. Another minute, you're, you know, building furniture for the office. So I just think you have to have an open spirit and a flexibility.
Q And given those qualities, what was your assessment early on during those half a dozen or so meetings of Samir Rao?
A You know, good, good. I thought he was a good guy. You know, he was at -- he was at Chipotle and as he said, we both liked sports and -- and -- and so I had a good -- I had a good impression of him. I -- you know, when I gave him the assignment, he was a little slow in doing it, so I called his boss at Goldman, who I knew --
Q What assignment are we talking about?
A The assignment to kind of critique the business plan.
Q Oh.
A And he took a little while. And so I was a little

worried about that just because at startups, so many things have to happen and happen well and -- and so I was a little -- I was -- I was aware of that. So I called his -- his boss -- former boss, to, you know, get his sense of Samir and his sense was --

MR. SIEGEL: Objection.

THE COURT: Sustained.

Q So you called his boss.

And after the -- did you speak with his boss?

A I did.

Q For how long about?

A Probably half hour.

Q And after the half hour of conversation with his boss, what did you do?

A I extended an offer to him to join us.

Q So at that point, why did you feel comfortable, notwithstanding the delay, that Samir Rao could do the job?

A Well, I didn't know for sure that he could, but, again, I'm the son of teachers, and I hope I'm not saying that too much, but part of what that means is you believe people can learn and grow and you're willing to work with people. And -- and so, you know, I realized he hadn't run a startup before, I realized he might not be as seasoned, but, you know, if you've got a good spirit and I think you're interested in it and, you know, I think you're going to be a

decent person, then I'm willing to work with you until I'm proven otherwise.

Q And what was the initial job that you offered Mr. Rao?

A I can't remember exact name, but I think it was like director of strategic operations, I think, was the name we gave to it. But really it was Jack of all trades. And so, you know, in the early days, he was helping get the website set up, so literally, we had to buy the domain name. We had to find people to design and develop the website. We had to build furniture in the office. We had to --

Q And you said that twice. Do you mean actually physically build person?

A Yeah.

Q You didn't buy furniture?

A Again. My grandmother was thoughtful about the dollar. So we -- we got stuff from Ikea, we got some used furniture from someone who was moving out of the space, and so we tried not to overspend on that.

Q I cut you off.

So director of strategic operations. Had you finished telling us, basically, his job responsibilities?

A I think so. Kind of an operations, finance, technology, were kind of the core. I was doing kind of the editorial, which, in those days, meant the newsletters and the website and I was thinking about the marketing and

obviously brought together the initial set of investors.
Q Was Mr. Rao your first employee?
A Either he or that other gentleman from that small Texas town, Sean. It all kind of happened in that same kind of August, September, October window. But Samir happened to be in California where I live and where the company is based; whereas Sean at the time was in North Carolina and about to move with his wife to Germany.
Q Did you pay him a salary?
A I did.
Q Do you remember how much?
A I think it was on the order of $150,000 a year.
Q So how long did Samir stay -- or Mr. Rao, excuse me, stay in this director of strategic operations job before his title changed?
A About a year.
Q And what did it change to?
A Co-founder and VP of Operations.
Q In that period before his title changed to co-founder, did Mr. Rao invest in OZY in terms of cash?
A No, I don't think so, no.
Q Why were you willing to call him a co-founder?
A In retrospect, seems like not the best idea, but at the time, I -- you know, he was young and was working hard and we were growing. We went from an idea to a website and

newsletters and we had a little bit of bounce. And, as I told you, that that first ah-ha moment was when Bill Clinton agreed to do an interview with us, former President Bill Clinton, and it made national news because he said something very provocative. This was kind of in October and November of 2013. And then a couple of days later we got a call -- again, I thought it was a prank call, but was from Bill Gates's, one of his chiefs of staff, who said that Mr. Gates really like OZY and wanted to partner and it led to him guest editing our newsletter.

So, you know, Samir was a part of all of that. And that's -- that's really good momentum for a young company, to go from idea on paper to actually hiring people, launching the site, getting a couple of big wins really early on. And then we got our Series A that December of 2013. So about a year after, we got the Seed Series. That was -- that was really good momentum. I could see he was fired up. And I knew that, you know, being a little bit generous with him, you know, maybe could go a long way. So I was -- I was kind of taking a bet on him.

Q So as co-founder and, what did you say, Chief of Operations?

A Initially, Vice President of Operations.

Q Vice President of Operations.

A Yeah.

Q What were his job obligations?
A And, again, they kept evolving, so, you know, early on, it was basic setup, but as time went along, you know, the difference between being a co-founder and being an exec or an employee is the buck stops with you, right? And so that was one. Things I said to Samir. I said, hey, if you are to be a co-founder, that's a fundamentally different mindset and set of responsibilities. You can't just go home because you're tired. You can't, you know, if we're lucky enough to get a project with JPMorgan or with Airbnb, you've got to be the one to triple check and make sure that we're not just delivering, but we're thrilling them. And so, you know, it was not only the same areas, but a different level responsibility. So finance, tech, operations, were kind of where he spent most of his time.
And he also spent some time on marketing. He spent some time on getting the word out about OZY and helping build the number of people who read OZY or -- or spent time with OZY.
Q Did there come a time when Mr. Rao invested money into OZY?
A He did. It took him a little while and he had some hesitations about it early on, but he -- he ultimately did, to some degree.
Q And just, at least ballpark, can you give us your

understanding of how much he invested in OZY over the years?
A Probably $200,000 in actual investment, I think. Maybe it was a little bit more. Something like that.
Q How much did you invest in OZY over the years OZY was operational, of your personal money?
A My family and I probably did $5 million together. So I probably -- so about that.
Q Now, in addition to the $5 million of personal money, were there other investments that you made into OZY?
A Probably two categories. So as you heard, I didn't take salary for a long time. I think I was -- or I know I was the lowest paid person full time in the company for, you know, for most of the time there. I obviously had significant equity in the company.
Q Well, hold on.
So first, with salary, can you describe to the ladies and gentlemen of the jury how not taking salary represents an investment into the company?
A It was just more money left to, you know, pay a reporter, more money left to pay somebody in finance. During COVID, for example, the less salary I took, the fewer people we had to let go. Or the less salary I took, we didn't have to reduce salaries as much as we otherwise would have. So you're able to reinvest it back in the business and in -- and in people.

Q So what, approximately, was the value of your not taken salary to OZY?
A Probably a little more than $5 million.
Q Were there other --
A Other -- over that ten-year period of time or roughly ten-year period of time.
Q Were there other financial mechanisms through which you invested in OZY?
A Probably the other big one was you heard something about something called a secondary stock purchases. So often --
Q What do you understand that to be?
A So investors want to see you put skin in the game. They want to see that you care as much as that. And so not only did I put in my own money, but they knew that when times got hard, I made sure we made payroll by not sometimes paying myself.
And so when we got to a certain point, they allowed me to try and catch up a little bit and to sell some of my stock. So in 2014, when we raised our Series B, that was the first time they gave me the opportunity to, if I wanted to, I could have -- of the $30 million, roughly, we raised, they gave me the opportunity to take $5 million for myself. But I decided not to and I left it in the company so that, again, we could hire people and we could grow.

And then again, in 2021, they gave me another opportunity to do that with $5 million and I did the same thing.
Q And who is the "they"?
A The investors and the Board of Directors.
Q Okay.
A All the investors have to sign off on it. So we had 75 investors and you have to have a vote, both of the board and of all the shareholders in order to do something like that. So we had to get double sign-off for that.
Q So of the 5 million for the salary that you -- I'm sorry, for the investment that you and your family made, how much of that was yours, Carlos Watson?
A About four.
Q So four there, and the 2.5 million were the secondary stock --
A Correct.
Q -- buyouts, and then there was another 5 million in salary that you didn't take?
A Correct.
Q And roughly, how much is that in terms of just your personal investment?
A Probably just a little under $20 million.
Q Now --
A I will say that that's not the norm and I know that

that's not the norm, but, you know, it is a challenge when you are trying to build something different to attract support. And candidly, I found it challenging, my experience alone I can speak to, as a black entrepreneur in Silicon Valley trying to do that. And I knew that the more that I showed that I was all in, the more that I not only led with great content and tried to put the best team together on the field, but the more that I was willing to do something that frankly most other white entrepreneurs never have to do, like you're not going to hear of any other of those guys having to do that at early stage companies. But that's what it took in order to even just get on the field. But I -- I wanted to build something special, and I didn't want to end up having to become kind of a Clickbait, me too, kind of, new media company that wasn't doing quality work.

Q And of the $1 million that your family put in, do you have any sense of where that came from?

MR. SIEGEL: Objection.

THE COURT: Sustained.

Q Do you know?

A I do. I know.

So my -- my parents --

MR. SIEGEL: Objection.

THE COURT: The objection is sustained.

MR. SULLIVAN: Okay, I asked a separate, different

question.

THE COURT: It sounded much like the same question to me. If you want to come by the side and explain where we are going here, then I'm happy to talk or we can move on to another area.

MR. SULLIVAN: No, absolutely. Let's talk.

THE COURT: Okay.

(Sidebar.)

(Continued on the following page.)

(Sidebar conference held on the record out of the hearing of the jury.)

MR. SULLIVAN: His family took out second mortgages on their homes, liquidated 401(k) accounts in order to invest in OZY.

THE COURT: Why is that relevant?

MR. SULLIVAN: Because if he were a fraudster defrauding people, he would be defrauding his family and having them take out mortgages. That seems inconsistent.

THE COURT: This is what we call a fear of failure fraud, which means nobody's arguing, at least as I understand, the allegations here that this company was a Ponzi scheme from the beginning. The point is when the company didn't do well, he went out to raise more money from other people under fraudulent pretenses.

The relevance objection is sustained. And --

MR. SIEGEL: And hearsay.

MS. GILBERT: The investment continued all the way through.

MR. SULLIVAN: Even after the article.

THE COURT: When?

MR. SULLIVAN: Up to '22.

MS. GILBERT: Yeah.

THE COURT: Establish a timeline.

MR. SULLIVAN: Oh, sure.

And you know, I also think if the opposite had been true, maybe the Government would be singing that from the rooftops, you know, that you notice that he didn't put any new money, you notice that his family didn't put any money, the same argument we made with the cars and yachts and what not, you mention in any sorts of cases, the Government uses affirmative proof these trinkets of wealthy privilege to establish these guys were just trying to take money out. I'm just making the opposite proposition and I can't lay a foundation that they invested from the beginning.

THE COURT: Sorry, what are the dates of the family's investment, the later ones?

MS. GILBERT: They went all the way until the end.

THE COURT: I am asking when the latest dates of the new investments were by the family.

MS. GILBERT: I would have to look. I don't remember specifically.

MR. SULLIVAN: '22.

MR. SIEGEL: We have it in the wire chart. Beverley Watson continued to invest in 2022 and continued in 2023.

MS. GILBERT: Every year.

MR. SIEGEL: I haven't objected to the fact his family put money in. The question is where did it come from

and that gets into relevance, whether they put it in from money they had under their bed or they took a second mortgage, the fact is they put it in. And that gets the point. And his foundation for knowing that they took a mortgage out is hearsay.

THE COURT: Sustained.

MR. SULLIVAN: Or he may have been there. I can lay the foundation, he may have been in the bank with them.

THE COURT: Where the money came from is irrelevant. You've established that his family were investors. If you want to establish --

MR. SULLIVAN: The timeline.

THE COURT: -- that they continued to invest, you can do that, but I agree that where it came from is irrelevant.

(Sidebar conference ends.)

(Continued on following page.)

(In open court.)

BY MR. SULLIVAN:

Q So Mr. Watson, we were talking about your family's $1 million investment over the -- well, let me just ask the question.

Over what period of time did any members of your family members invest in OZY media?

A From 2012, so kind of from the very beginning, my mom and dad to -- you know, we were still, you know, running and winning until, you know, we got indicted last year, so literally, I think the day before the indictment, I think, some of the family wired money to help us meet payroll, so...

Q All right. And I am going to ask you now some questions about -- more specific questions about OZY's revenue.

So first, what do you understand "revenue" to mean?

A I understand revenue to be when you provide someone with a good or service, whether advertising or content or Festival tickets or what have you, the compensation, you know, the value and the compensation tied to that.

Q And I want to be clear, here, and I actually used the wrong verb tense.

So all of my questions are going to be what was

your understanding during the time that you were running OZY --
A Yeah, yeah, yeah.
Q -- and I asked you what do you understand, so not necessarily sitting here today, but --
A Right.
Q -- I will just re-ask it to be sure: What did you, when you were running OZY, understand "revenue" to mean?
A I understood it to be both people paying us cash and people doing barter deals with us. I understood it to be the total value of what we were giving to JPMorgan or to Hulu or to PBS or to Amazon. And -- and, you know, whether that was $50,000, as it was in the early days, or whether it was, you know, $75 million, as our biggest deal was as we developed, you know. It was -- it was, you know -- it was -- it was in that realm.
Q At that time, in this period when you ran OZY, did you consider in kind revenue to be on par with cash revenue?
A More valuable, because, again, as I said, I don't think -- I genuinely do not think I could have paid Ms. Winfrey to do that one-minute-and-22-second tape. I couldn't. I don't think if I came with a bag full of money, I don't think she would have said yes.
But in the context of a strategic partnership or what the kids call today called a collab or a collaboration,

you know, that's the new model of business. And that's way more valuable. And if you told me I could get -- it's just -- it's just -- it's way more valuable. Getting NPR or the Financial Times, a prominent newspaper, or CNBC or PBS or iHeart, like we're not just getting barter revenue from just any old body, we're getting them from like the most elite premium companies who can work with anybody, so I consider that to be extraordinarily valuable, maybe even more valuable in cases, than cash.

Q You mentioned iHeart Radio a couple of times in the context of barter revenue.

Can you explain to the ladies and gentlemen of the jury how that deal worked, what was the -- the barter?

A Yeah. So let's say OZY Fest is starting to grow and let's say it's going from a one-day event, where we maybe have two to five thousand tickets to a two-day event where we want to sell or give away as many as a hundred thousand tickets, maybe more.

Q And when you say let's say --

A Sorry, that's real. So from 2016, when it was a one-day event and we had will.i.am and Issa Rae and Andra Day and Malcolm Gladwell, to 2019 where we're no longer on Summer Stage, we are now at the heart of Central Park, the Great Lawn, talking about John Legend, talking about Trevor Noah, talking about Mark Cuban, talking about Chelsea

Handler, talking about Spike Lee, talking about A-Rod, you know, you're talking about a massive event, they didn't even let the Beetles do a two-day event on the Great Lawn. Like it was really special. You need help selling that many tickets.

And so the power of iHeart Radio, not only selling them in the New York market, but we had people coming to that from 43 countries. And so -- and coming from, I think, almost each state. And so imagine being able to run a really good ad campaign in Boston and in DC and in Philly and in other places. We didn't have enough money to do that.

So striking a deal where iHeart might give us $5 million worth of that and in return we give them $5 million worth of advertising on OZY, so, you know they become the top sponsor, the title sponsor of OZY Fest. That's a huge win for everyone. It's a no-brainer. And -- and that would be a real specific example of barter revenue and a barter deal. We help them sell tickets. They get close to our audience and to our partners.

(Continued on the following page.)

BY MR. SULLIVAN: (Continuing)

Q From the start of OZY to, let's say, 2016, did OZY capture value of barter revenue?

A Not properly. I mean, I asked Samir and, frankly, each of the succeeding finance folks to do it. None of them were experienced media CFOs. And sometimes, honestly, it can be a little complicated for people who aren't from the space to know how to do it. And, so, I didn't do it well.

Whenever someone started at OZY, you usually got a two-page onboarding document where we kind of laid out the key goals for the year and the key things that we're going to need you to do, kind of a first priorities, and I, you know -- you know, Tripti, for example, that was on her's, or Janeen, that was on theirs --

MR. SIEGEL: Objection, Your Honor.

THE COURT: Sustained. Sustained. Let's have another question.

BY MR. SULLIVAN:

Q So I was asking about whether you -- whether it captured this barter value. How about moving forward, 2016 through 2021, did OZY do any better capturing the value or was it still --

A You know, I thought so, and my expectation was that we had because we basically had board of meetings every quarter. We had fairly sophisticated people on our board, not only

serious investors but, more importantly, they were investors in the media space. So they owned properties like the Atlantic, like Business Insider, Morning Brew. They were investors in Facebook. So they knew the media space really well.

And, so, Samir would prepare the financials for each of those meetings and we'd walked through that. If you look back through those decks, you'll see that usually --

MR. SIEGEL: Objection.

THE COURT: Sustained.

Q Was the barter revenue captured in your decks?

A Yes.

MR. SIEGEL: Objection.

THE COURT: Was there an objection?

MR. SIEGEL: Yes.

THE COURT: Come to the sidebar, please.

(Continued on next page.)

(The following sidebar took place outside the hearing of the jury.)

MR. SIEGEL: Your Honor, under Rule 1002 and 1004, there are requirements for how to prove the content of a document like a deck. Generally, you have to provide the document, unless there is an exception, which has not been met here.

THE COURT: The document is in evidence, right?

MR. SULLIVAN: Yes.

MR. SIEGEL: There are no board decks in evidence.

MR. SULLIVAN: I didn't say a board deck. I asked was it captured on a deck.

THE COURT: What deck?

MR. SIEGEL: He was talking about board decks.

MR. SULLIVAN: I was not talking about board decks. There were pitch decks.

THE COURT: Either way, for lack of foundation, the objection is sustained.

And if you want, you can clarify what deck we are talking about.

MR. SULLIVAN: Okay. And any problem with the pitch decks?

MR. SIEGEL: Which pitch decks?

MR. SULLIVAN: Pick one. Pick one and put it in evidence.

MR. SIEGEL: Pick a single exhibit and show it to him.

MR. SULLIVAN: You're just telling me how to do my cross-examination.

I can ask him did you do decks? Was it captured in your pitch decks?

There's nothing wrong with that.

MR. SIEGEL: Well, under Rule 1002, to prove the content of a document you have to use the document.

THE COURT: If we are going to ask questions about unspecified decks, you know, unmoored from any actual factual context one way or another, this is going to be more confusing.

MR. SULLIVAN: I think did you do decks? Was that captured in decks? I see nothing confusing about that. It's five-word questions and no complicated words in there.

THE COURT: For all of the reasons we've discussed, the objection is sustained.

(End of sidebar conference.)

(Continued on next page.)

(In open court.)

BY MR. SULLIVAN:

Q So, Mr. Watson, did OZY prepare pitch decks?

A We did, yes.

Q Order of magnitude, how many?

A You mean how many literally individual ones?

Q Sure.

A Probably 1,500.

Q And in terms of variation between the 1,500 pitch decks, in a given year, a lot of variation, a little?

Give me a sense.

A Not much. Probably 20 percent. You know, most of our decks, like most startups, focus on your product and your team. So we would walk people through. As we started to evolve and have more offerings we would walk people through that. And it just depended where we were in the cycle.

So, when TV was new, we would go into more detail about this show the Contenders and how that worked, or the show the Third Rail with OZY, or the show Breaking Big.

Or when podcast was new, we'd talked about The Thread, or the Future With X, or When Katty Met Carlos, or the first time OZY Fest happened, we would walk you through more of that.

And as we had good news along the way in the course of a year, which thankfully we normally did, we would update

it. But it was 80 percent what it was, like it was -- it was -- I thought we did a good job of giving someone new an overview. Because, again, a pitch deck is kind of like a dating profile, like you can't get everything about the person from that, just enough to say hey, should we even say hello, right. That's what it is. It's like should we even spend some time together, and from there you decide whether you should be dating, married, and the rest.

Q To be clear, you didn't create 1,500 wholly distinct pitch decks over those years?

A No. I'm sorry. There fundamentally was one, two or three. There was a handful of them and then, you know, you'd keep updating it as you made progress along the way, if I gave you a pitch deck from 2016 and 2018 in 2021, they'd look pretty similar. They'd start with an overview. Then they would go into our content. They would go into our team. They would go into our business model. And then they might end with a slide or two on financials.

And then, most importantly, key challenges. We would always make sure we had a slide. Because nothing is perfect in a startup. And, so, we would always try and be really clear with people about what were some of the challenges involved in the company.

Q So, fundamentally, the same pitch deck with different names on the front in terms of who you were giving to; is that

fair?

A That's fair.

Q All right. I'm going to ask you about a couple of terms. Again, my questions have to do with what you were thinking at the time, and this is when you were running OZY.

So, have you heard of the term pro forma before?

A I have.

Q Did you ever use the term pro forma at OZY?

A I did, yes.

Q What was the context?

A We would put it on all of our financials to make it clear that these were tentative, that they were a draft, they were subject to -- you know, as a young company, they were subject to material revision.

Q What about have you heard the term unaudited before?

A I have.

Q Have you ever used the term unaudited with respect to anything at OZY?

A Always. Yeah. We -- you know, when you're a young company, hiring an auditor is a 1-to-3-million-dollar expense. It's not like it's 10 grand. Like, to do it properly, it's 1 to 3 million dollars, plus you have to have a whole team that's going to be dedicated to that.

And as you heard me say and as you heard other people say money was scarce. So, we wanted people to know

that until we got to a, you know, 100 million dollars in annual revenue or more, we weren't going to do an audit. It just wasn't a smart spend of our money. And our investors agreed. And, in fact --

MR. SIEGEL: Objection.

THE COURT: Sustained.

Q So what did you intend to signal to your investors about -- with the term unaudited?

A That we had not hired a third-party group who had gone carefully through the financials and made sure that they were, you know, forget 100 percent accurate, that they weren't 90, they weren't 80, they weren't 70, but they were what it says, unaudited, and we put that in all of our investment contracts. Not only did we put it in the pitch decks, but Section 3.5 of --

MR. SIEGEL: Objection.

THE COURT: Finish what you were going to say about Section 3.5.

A Section 3.5 literally says it's unaudited. So people have to read that and acknowledge that before they can even invest in OZY. You're not allowed to invest in OZY unless you read that, acknowledge you have read it and then sign. You're not allowed to invest in OZY.

MR. SIEGEL: Objection.

THE COURT: Come to the side for a second, make sure I understand the objection. (Continued on next page.)

(The following sidebar took place outside the hearing of the jury.)

THE COURT: What's the objection?

MR. SIEGEL: So again, under Rule 1002, he can't just testify to what is in a document. He either has to show the document and rely on that or --

THE COURT: Okay. I think you mean 1004.

MR. SIEGEL: 1002 is the requirement that the original is required to prove contents unless there is an exception, and then 1004 is the exceptions.

THE COURT: Right. Right. So I will sustain the objection.

MR. SIEGEL: And I move to strike.

THE COURT: And I will grant the motion to strike. Okay. I thought this was a hearsay objection if you have the documents.

MR. SULLIVAN: This is a monumental waste of time, but that's --

THE COURT: If it's disputed, it's not.

MR. SULLIVAN: It's not disputed in any good faith.

MR. SIEGEL: Then it is irrelevant.

(Sidebar ends.)

(Continued on next page.)

(In open court.)

THE COURT: The objection is sustained and I move to strike the prior testimony in response to the question.

Mr. Sullivan, you can proceed.

BY MR. SULLIVAN:

Q I'll pull out some documents later and let you look at the documents.

But what was your understanding of -- what was your understanding of the pro forma and unaudited designations on -- on your documents? Not one in specific, just generally.

A Yeah. My understanding basically was like buyer beware. It was startups often don't work out. The focus of startups is the team and the content. We don't have the time or the money to go hire a third-party auditor for $1 to $3 million.

THE COURT: I'm going to sustain my own objection to that answer and strike that last bit of testimony from the record as clearly hearsay.

Limit the answers, please, to the question that's being asked.

Q Did anyone tell you, Mr. Watson, about the cost of auditors or is this something that you in your knowledge?

A Both. People --

MR. SIEGEL: Objection.

Q Don't say anything about what anybody told you, but just what you knew.

THE COURT: Okay.

Q Just about what you knew.

MR. SIEGEL: Objection.

THE COURT: The objection is sustained.

Q Let me ask you some questions about -- about cash crunch. So there have been some reports about cash crunches.

Did OZY experience cash crunches?

A We did. We did.

Q And why did OZY experience cash crunches?

A Because we are a startup and almost every startup has some kind of -- if anyone has ever watched Shark Tank, you know that everyone struggles with money and, so, that's not -- that's not unusual, and it got even more difficult in and around 2018 because a couple of the -- to some extent how investors think about one company has to do with how they think about the whole market in the space. And, so, if one space like artificial intelligence is doing really well, then that's good for you if you're an artificial intelligence company.

But if it's not doing well anymore, then it can be harder on you even though your company is doing well. And, so, because a number of the bigger companies among new media, like Vice and BuzzFeed were not doing well, it became harder and harder to raise money even though OZY was innovating and winning and not doing so well. And, so, we continued to have

a cash crunch even though we were succeeding. And when we finally completed our Series C, which took us from 2016 to 2019, there was a lot of celebration in the space because no other of our peers had gotten a deal like that done in almost four years, like it was -- it was a watermark period that we had been able to do it, and I was invited on Squawk Box on CNBC to talk about how we managed to bring that together.

Q All right. And did OZY do its accounting on a cash or accrual accounting basis?

A Unfortunately, I think Samir often mixed those and didn't keep them clearly one or the other. Some companies use cash, some companies use accrual, and I think, unfortunately, he -- he didn't keep it --

MR. SIEGEL: Objection.

A -- clear.

THE COURT: I'm sorry. What was the objection?

MR. SIEGEL: Foundation.

THE COURT: Sustained.

MR. SIEGEL: And move to strike, Your Honor.

THE COURT: Granted.

Q What's your understanding of what a cash basis of accounting is?

A That you largely tie the accounting to when you get the cash in. So that if someone prepays you or -- then you're going to largely recognize that portion of the revenue at the

time you get the cash. Whereas, if, for whatever combination of reasons, you deliver the services, but they still don't pay you for another three months, then you're not going to recognize it until you actually get the cash on hand.

There are variations on how to think about it. But that's one way to think about a cash basis of accounting.

Q And what about accrual?

A Accrual says, as rather than focus on when you get the cash, you focus on essentially when you deliver the services. And, so, if you've got 16 episodes of TV show for PBS and you start delivering them in, you know, basically four months, September, October, November, December, then you basically would divide -- I'm going to being simple for a moment. You divide whatever number that is by 16 and you would recognize one-sixteenth of it each week.

So you would do -- even if you had either gotten prepaid or paid later, it doesn't matter. You would kind of focus on whether you delivered those services.

Q You told us earlier that you met with each of your direct reports or tried to meet with them weekly.

A Uh-hum.

Q Correct?

A Correct. Yes.

Q If not, at least biweekly?

A One on one, certainly weekly.

With the editorial people, I probably met, frankly, more than -- I probably met with them in some cases almost daily, like newsletters, I had to be there with them in the morning.

TV, podcast was more weekly.

Q Was Samir Rao one of your direct reports?

A He was one of the direct reports, yes.

Q Did you meet with him?

A I did, yes.

Q How often?

A I probably met with him in some form, if not every day, then most days, so probably -- probably a quality meeting at least two to four times a week.

Q Did you ever meet with him with respect to the accounting at OZY?

A I did at a high level to probably a number of times to say to him that I felt like what we had was like a lot of young companies, so I wasn't just picking on him, but needed to get stronger and needed to get more comprehensive and, for example, you can't just put all the revenue under OZY, you got to break out TV revenue versus podcast, versus festival, versus app, so we can see which of the businesses are more profitable than the others and we can think about making choices. And so, he wasn't a trained, startup media CFO. So I think he struggled with it probably --

MR. SIEGEL: Objection.

THE COURT: Sustained.

Q And during these meetings, the financial meetings with Mr. Rao, did you come to learn whether his department was using a cash or an accrual basis of accounting?

MR. SIEGEL: Objection.

THE COURT: Sustained.

Q All right. I'm going to move on to Series C. There has been a lot of talk about Series C here.

So, what was the Series C funding round?

A Yeah. So when OZY first started, we raised money roughly every year. So we raised it in 2012, the seed series.

We raised more a little over a year later, Series A. We raised more a little over a year later, Series B. And we raised more money each time.

So we went from 3 million to 7 million, to just under 30 million with the Series B. And having raised 30, it gave -- we had more to spend it on, but it also gave us a little more time.

But by the time we got to the end of 2015 and given that we were beginning to diversify into TV and podcasts and festivals and awards, we knew that we needed another round of funding. So as a board, we began having conversations. I think the first Series C term sheet we got was in 2015. And we began having board meetings to discuss our Series C plan in

the Fall of 2015.

And by 2016, we decided to do what we had done before, which is to do it in stages. So we kicked off the first round of it, which was a little under $10 million in August of 2016. And we took that money in from some of our existing investors, but also, you know, from myself and some family and friends.

Q Were there multiple closing dates in -- for Series C?

A There were.

And there always were -- I think we typically had between 5 and 10 -- we had what we call rolling closes. So, not everyone puts money in all at once, like on an IPO. But for a younger companies, like OZY, you let people put money in when they can. So they do it at different stops along the way. So that had been true in the seed series. That was true in A and B, and it was true in C.

C took a little bit longer than we wanted. We had several stops along the way. So it ran over three years, but, you know, that was not atypical and -- and -- and we were obviously grateful for the support.

Q You've been accused of selling people Series C stock without board approval. Is that true?

A No.

Q Did you, in fact, have board approval?

A Each and every time we got four separate approvals for

the Series C.
Q So at the time that you sold every one, is it true, Series C stock, was there existing board approval?
A Very much so, yes.
Q You mentioned that some of the other series had rolling closes.
How many closes were in Series A?
A I think Series A had five, I believe.
Q And how many closings were in Series B?
A I believe it was eight.
Q And Series C that we're talking about, how many closes were in Series C?
A Series C had four approvals and eight closes, eight separate closes.
We -- even after the 2019 that we've talked about here, several investors came back and knocked on the door in 2020 and asked to be able to invest. So we allowed additional people to invest.
Q And just so we understand, what is a close?
A A close is when -- it can mean several different things. It can mean parts of the following -- but it mainly means when people send you the money. It basically means when the money hits your account and when various papers get signed, and sometimes those happen all at once. Sometimes they are separated a little bit.

Q Now, you said there were eight closing and four approvals?
A Correct.
Q When were the approvals?
A August of 2016 was the first. April of 2018 was the second. August of 2018 was the third. And then September of 2019 I believe was the fourth.
Q Now, did --
THE COURT: Could I ask, and you may be getting to this, what form did the approvals take?
THE WITNESS: I think three of them were unanimous consent, meaning, as you know, as a lawyer, that we sent it around over e-mail and people did it over e-mail, and I think one of them happened live at a board meeting with all in favor, no opposed. So --
Q I forgot what I just asked you. Oh, did you give me all the four approvals?
A I think did. So April -- sorry, August of 2016 was the first. April of 2018 was the second. August of 2018 was the third. And then September of 2019 was the fourth. And we may have actually had a fifth.
I think the way that our board often left it, and you see it in our board decks, is with kind of a standing --
MR. SIEGEL: Objection.
THE COURT: Sustained.

Q So without reference to the board deck, you were saying the board often left the closing how?
A They left it open. So the phrase they used is opportunistic capital or incremental capital. And, so, they agreed that if someone interesting came along after the date, so take A-Rod in Series D, most of the people put their money in in May. A-Rod comes along in August and says I want in. Then, you know, we understand that he's a smart business person and that there's going to be value for us in having him once again join us, and, so, we were happy to have him come in for more.
Q Now, there has been some testimony about something called a convertible note in Series C. What is a convertible note?
A You know, if I make a straight loan to you, I would call it a promissory note. So when I have borrowed money or when OZY borrowed money from WTI, we borrowed four times and each time we sign a promissory note. So that means it's not going to convert into stock. It's a loan, just like a loan from your sister-in-law, your brother-in-law, and I got to pay you back. So that's that.
But a convertible note is what you do as part of a rolling close, and it means that this money is currently, in a worst-case scenario, it could get paid back, but everyone here expects that it's going to become shares in the company. And there typically is a term in there called automatic

conversion. So, because everyone knows that this is part of a stock fundraising round or an equity fundraising round, you're not guessing whether or not it's ever going to become that. It literally says it in a convertible note. It says is converts at this point to that.

So, that was why -- that's how we set it up. And this is just one of probably a half dozen ways you can execute a fundraising round. So I don't mean to say it's the only way. There are a half dozen ways that you can get it done. But for startups, in my experience and in my understanding at the time and now, is that this is a really common thing that people do.

Q All right. Now, we have also had some testimony about the status of Series C in January of 2017. Was there a Series C round in January of 2017?

A Yes, we announced it in the *Wall Street Journal*, *Variety* --

MR. SIEGEL: Objection. Objection.

THE COURT: Sustained.

Q So, let me show you --

MR. SIEGEL: Just the witness --

Q -- Defense Exhibit 533 and then 534. This is 533?

A Yes, I see that.

(Continued on next page.)

BY MR. SULLIVAN: (Continuing.)
Q Do you recognize it?
A Yes, I do.
Q And were you one of the recipients of it?
A Yes, I was.
MR. SULLIVAN: Can you show him 534?
(Exhibit published to witness, counsel and Court only.)
MR. SULLIVAN: And scroll through it.
Q Was is 533, the first one, an e-mail?
A Correct, yes.
Q An all OZY staff e-mail?
A Correct yes.
Q And is 534 the attachment to that e-mail?
A Correct, it's a press release.
Q Did you receive both?
A Yes, I did.
Q When?
A January 24th of 2017.
MR. SULLIVAN: Your Honor, I move to admit Defense 533 and 534 in evidence.
MR. SIEGEL: Objection. Hearsay.
THE COURT: Come to the sidebar. Let's have a break instead.
(Jury exits.)
THE COURT: Please be seated, everyone.

What's the response to the hearsay objection?

MR. SULLIVAN: It is not offered for the truth. It is offered for two purposes. The first purpose is to -- its receipt allows for the inference that Mr. Watson believed that there was a Series C round in January of 2017. The Government has argued that there was not -- that he defrauded people. Mr. Rao wouldn't even agree that he wrote this thing and sent it around.

The second purpose is that it impeaches that testimony through an individual who actually received his e-mail, but it's not offered for the truth. In fact, the Government claims it's not the truth. We are offering it for the very limited purpose to as evidence of Mr. Watson's mens rea and the Court should feel free to give a limiting instruction. I won't argue for its truth, simply that he received it, OZY Media raises $10 million in Series C funding and it goes to show that he believed in good faith that the Series C round was extant at a time when the government claims -- and went on at quite some length that their witnesses said that these people received nothing, they got nothing. They gave them these documents and it was worth nothing.

That's not true. This Series C round and the same is true for the announcements on Wall Street Journal and Variety. That clearly is not hearsay. It's that he did it,

it's evidence of the fact that the company did it, that it was an actual round. You're not defrauding people and announcing it on the Wall Street Journal and Variety and other places. That makes no sense. Frauds are secret, secretive.

I'm saying frauds are secret, clandestine. You don't go putting them on the squawk box. This was a Series C round. How do we know it? They sent around memos to staff. How do we know it? They announced it in major publications the Wall Street Journal. How do we know it? Board members went out and talked about it. How do we know it? They sent the same thing to the board of directors.

So, it's not for its truth, but to show that he had a good-faith belief when he was making representations about Series C funding. The Government has put that in issue. They challenged it. They said Carlos Watson gave these people nothing. It's demonstratively not true.

THE COURT: Can I jump in here? What is the response to the notion that, you know, if Mr. Watson gets notice that a Series C approval has come into existence -- I understand the document is hearsay to the extent it's admitted for its truth that a Series C vote has occurred and it's been approved, but if what we're testing here is his knowledge that certain facts are true or false, why wouldn't this also be relevant to his knowledge irrespective of whether it's true?

I'm trying to find my way back to some of the case

law that I cited to the Government when they were trying to put something in for somebody's state of mind and where the Second Circuit said it will always be the case that a document is inappropriately introduced for someone's state of mind when that state of mind is the ultimate issue in the case.

Do you remember the case law I'm talking about?

MR. SIEGEL: Your Honor, I recall you talking about testimony about another person's state of mind where the Second Circuit said that would always be unhelpful. I may be misremembering.

THE COURT: I think you're right.

MR. SIEGEL: Your Honor, in response to the state of mind, I think you have a real 403 issue there. Mr. Watson was the chair of the board. He either knew that the board had done this or he didn't. Saying that I knew that the board did this because there was one e-mail that I got where Samir said we did it, is confusing and prejudicial.

There is a document from a year before that from a year before this about the board action. It's a defense exhibit. They could just show exactly what the board approved. The reason they don't want to do that is because it doesn't say anything about a Series C. So this is an attempt to mislead the jury about what the board did or didn't do by saying that Mr. Watson, as chairman of the board, believed the board had done this because Samir Rao had told him that when

he's on the board. If they want to prove what the board did, show what the board did.

THE COURT: So you have a Rule 403 objection as well?

MR. SIEGEL: That's right.

MR. SULLIVAN: It makes no sense. It can't be case that under any competent regime and Anglo-American law, that the Government can call this man a fraud and the law doesn't let us put in a couple of documents that say, well, in fact, it's not fraudulent. I was announced to the world. I cannot see the regime that would allow for that result. That's a fundamental unfairness.

THE COURT: Mr. Sullivan, you've got to occasionally let me get a word in edgewise.

Does somebody have a copy of this exhibit that I can look at?

MS. GILBERT: It's in the binders at 533 and 534.

MR. SULLIVAN: If it's quicker, I can bring it up.

(Counsel approaches.)

MR. SULLIVAN: This is the document that I impeached Samir Rao with.

MR. SIEGEL: Your Honor, just for reference, at 548 in the same binder that is the written unanimous consent of the board.

MR. SULLIVAN: If Mr. Siegel would like to come try

my case, I object. I've been doing this for thirty years. I can choose my exhibits and I may come to that, but right now I'm using this piece. Mr. Watson has a right to defend himself.

THE COURT: So this is an e-mail from Mr. Rao to all hands at OZY. The subject is good news, we're announcing new funding and you're saying that none of this is going to be admitted for its truth.

MR. SULLIVAN: Correct.

THE COURT: It would be admitted solely to show Mr. Watson's belief, even if erroneous, that this approval had occurred and he would have formed that erroneous belief because he took Mr. Rao's word for it, even though as the Government says by definition Mr. Watson himself would have had to be at any board meeting at which this -- at which this approval transpired and indeed he just testified that such board meetings occurred and, if we want to, we can just look at exactly what emerged from those board meetings.

MR. SULLIVAN: It's part of the basis of his belief and we're going to look at some other things as well, but this is part of the basis of his belief and there is --

THE COURT: I don't understand how that could be, though.

MR. SULLIVAN: Because look at the attachment. The attachment starts with "OZY Raises 10 million in Series C

funding." The hyperlink is to a Wall Street Journal article where a board member Mike Moe talks about Series C funding. The Government can't have it both ways. If they can't prove Series C funding they shouldn't charge it. And they can't charge it and then not let me put in contrary evidence.

THE COURT: That makes it sounds like you're actually relying on this document for its truth.

MR. SULLIVAN: Absolutely not.

THE COURT: Either way, for both hearsay and 403 reasons, I'm going to sustain the objection.

MR. SULLIVAN: I don't know how I can go forward, Your Honor. We may as well just sit down. This is a railroad.

THE COURT: Mr. Sullivan, enough.

MR. SULLIVAN: How can I go forward if I can't put in documents?

Please, everyone be quiet.

If I can't defend this man, I might as well sit down and not get back up. If that's what you want me to do -- I understand the Court's analysis is -- for objections is whatever the Government says, but this is different.

THE COURT: Okay.

MR. SULLIVAN: This goes straight to Mr. Watson's state of mind. This is what this is all about.

THE COURT: Mr. Sullivan, you have my ruling. If

you don't like it, then that's what the Court of Appeals is for.

MR. SULLIVAN: Then we'll see.

THE COURT: Bring in the jury.

MR. SIEGEL: Your Honor, as we've just experienced here, but it's also happening in front of the jury, the audience is getting a little lively during Mr. Watson's testimony in response to objections and we would ask --

MR. SULLIVAN: We're getting lively because this is a railroad.

THE COURT: Mr. Sullivan, that really is enough.

Let's get the jury.

(Jury enters.)

THE COURT: Please be seated, everyone.

The objection is sustained for the reasons discussed just now.

Mr. Sullivan, you may continue.

Mr. Sullivan?

MR. SULLIVAN: Your Honor?

THE COURT: You may continue with the witness.

MR. SULLIVAN: Thank you.

THE COURT: And I note for the record that you appear to be keeping the jury and the Court waiting. I would like to continue with the witness or we're going to contemplate other actions.

MR. SULLIVAN: Okay, I'm ready. Is Your Honor ready?

THE COURT: I am.

MR. SULLIVAN: Thank you.

BY MR. SULLIVAN:

Q You were a member of the board of OZY, weren't you?

A I was, yes.

Q Was it your understanding that the board had authorized Series C funding for each offer you made of Series C funds?

A Yes, that was my understanding.

Q And at any point did you have any contrary understandings that there was no Series C?

A No, we very intentionally discussed it as a board and worked on a press release together and got everybody to sign off and got specific quotes from Mike Moe who later became our board chair in which he announced the Series C.

MR. SIEGEL: Objection.

THE COURT: Sustained.

BY MR. SULLIVAN:

Q Without saying what anybody announced, did the board publicly -- without saying what they announced, did the board publicly introduce Series C?

A Yes.

Q Okay. I'm going to ask you a couple of questions about -- let's move to A-Rod.

MR. SULLIVAN: So, can you pull up Government 6051 and 6051-C?

THE COURTROOM DEPUTY: Is this for the witness only, Counselor?

MR. SULLIVAN: Both documents are in evidence.

THE COURTROOM DEPUTY: Thank you.

MR. SULLIVAN: I think we need IT back. The computer is frozen.

THE COURT: Meaning a defense team laptop or the Court system?

MS. GILBERT: The Court system.

THE COURT: Maybe we'll shut it down and see if that works.

THE COURTROOM DEPUTY: Sure.

(Pause in proceedings.)

THE COURTROOM DEPUTY: We're going to bring it up on the big screen may moment. Do the jurors have it on their monitors as well?

THE JURY: Yes.

MR. SULLIVAN: This is -- let's get the main document, 6051.

BY MR. SULLIVAN:

Q Can you see it now, Mr. Watson --

A Yes.

Q -- on your screen?

A Both.
Q Both, okay. This document is already in evidence. It's an e-mail from Samir to you, a draft about -- with respect to Abbas for Al Nahda. Now, just remind us who Abbas is.
A He was one of -- we hired four different investment bankers to make sure we ran a good fundraising process and he was one of the ones we meet.
Q What did you understand an investment banker to do?
A Three things. One is to try and just vet whether or not your company can raise money because not every company can. So they essentially have to go through your content and your team and your financials and just see whether they think it's there. And then they'll think of who would be interested in investing. They'll come up with a target list names. Sometimes that target list is ten names sometimes it's 100.
Then they set up meetings for you and play matchmaker and then follow up. There's usually a one to three-month due diligence process even before they agree to work with you. So they dig in to make sure that they're pitching something real and valuable and then they take you on the road for one to three months and then they work to try and help finalize investment partnerships.

(Continued on the following page.)

DIRECT EXAMINATION BY
MR. SULLIVAN: (continuing)
Q And who, just remind us who Al Nahdha was or is?
A Al Nahdha is an investment fund in -- in the Middle East, in the UAE. It's the family money of a member of the royal family there.
MR. SULLIVAN: Okay. Now, let's scroll down, please, just to number two, investors, and if you can enlarge in that, that will be great.
Q Can you see that?
A I can, yes, thank you.
Q So number two, reads: Investors. As a reminder, Marc Lasry was the leader of the round and has been joined by Interlock Ventures, LionTree, the celebrity couple Alex Rodriguez and Jennifer Lopez, and others along with existing investors they have accounted for approximately $40 million of the raise. There is $10 million remaining.
Did I read that correctly?
A You did, yes.
Q Now, I just want to focus your attention on something that's been raised as an issue, and this has to do with Alex Rodriguez, or he's been referred to as A-Rod.
Now, did, in fact, A-Rod invest in this round?
A He did, yes.
MR. SULLIVAN: Can you go to C? I am pulling up the

same exhibit, but C.
Q Can you see this, Mr. Watson, on your screen?
A Yes, thank you. Yes, thank you.
Q Do you see that Jennifer -- I'm sorry, Alex Rodriguez plus Jennifer Lopez?
A I do, yes.
Q Now, what does it say as the committed amount?
A $1 million.
Q In this round, did, in fact, A-Rod commit a million dollars?
A Yes.
Q Now, this was in 2019, correct?
A Correct.
Q And in 2021, did Mr. Rodriguez put in additional monies?
A Yes. He initially thought about putting in an additional million, I think a million, a million and a half, and he ended up doing an additional two-and-a-half million in 2021.
Q So his total investment in OZY would have been, what?
A About three-and-a-half.
MR. SULLIVAN: You can pull that down.
Q How do you know that Mr. Rodriguez invested a million dollars into OZY?
A Because we went through a process with his lawyers and

his CFO, where we negotiated -- so I guess to take a step back, Alex and I are both from Miami, but didn't know each other, went to the same Boys and Girls Club growing up, but didn't know each other. Went to rival high schools. His girls went to the high school that I ended up going to. I met Alex in 2018, when we were doing OZY Fest and we were interested in having him as a speaker.

And he was kind enough, not only to agree to come, but to my great surprise, he was really interested in all of the concept of it. So we probably had, typically, with a speaker I have one or two conversations. With him, I think I had a half dozen. And he wanted to know who else was coming, how we were organizing it, who the sponsors were, how it worked, was I considering doing it in other cities, not just in New York. So we really actually began to build a good friendship and -- and so I started to share more with him. And at the time, he was at least dating, I can't remember whether or not he had gotten engaged yet, to Jennifer Lopez. And so by virtue of getting to know him, I started to get to know them as a couple.

Q Now, what was the nature of the initial commitment that Mr. Rodriguez made to OZY? This is in 2019.

A Yeah.

Well, so Alex, he really -- he loved the idea of OZY Fest --

MR. SIEGEL: Objection.

THE COURT: Sustained.

Q What was the initial commitment that Mr. Rodriguez made in 2019?

A One to $2 million. So we structured it as a barter agreement, similar to what we did with iHeart, similar to what we did with another group called Alchemy, whereby -- normally we would have had -- he loved -- so we wanted him to be the host of OZY Fest. We had had Katie Couric, I think, the year before.

And we were interested in having him do it. And typically, that could cost you a pretty penny. And so we agreed that rather than pay him cash or only cash, that we would compensate him with stock. And so we signed an agreement with him in March of 2019, and then because there was even more momentum and we were getting moved from Summer Stage, which is on the side of Central Park to the Great Lawn, which was a big deal, he created a special vehicle called A-Rod OZY Fest Corp., so literally set up a separate company to house his stock in. And so we signed a second agreement in June of that year. And -- and so that's the way we -- we got that done.

Q So with the first -- with respect to the first agreement you signed, how did you come to the -- how did you get to the value of one million? In other words, what was

his fees? How did you --
A Yeah.
Q -- come there?
A So he actually was hoping that it would be more. And so we actually left it open that it could be more because, again, as I said, whereas most of our speakers just want to prep for their talk, he was interested in --
MR. SIEGEL: Objection.
THE COURT: Sustained.
Q What was your understanding of his interest?
MR. SIEGEL: Objection.
THE COURT: Sustained.
Q All right. So what did he -- what did he do?
A So -- so we structured it such that it was a minimum of a million --
MR. SIEGEL: Objection. Rule 1002.
THE COURT: Sustained.
MR. SIEGEL: Move to strike.
THE COURT: The motion is granted.
Q So what -- in terms of the -- in terms of what you and Mr. Rodriguez agreed to, how did you get to the one million?
A We got there by analyzing what it would have cost us to hire someone like that to be a really active co-host. And not only appear and -- and oversee the two days, but agree to appear on The Today Show, on Jimmy Kimmel, on The

Breakfast Club, to help us pitch advertisers like JPMorgan, like Goldman Sachs, like -- like Bank of America. And so we -- like we would do with any barter agreement, we said what would this have cost us in cash, and -- and then how do we work that backwards. And so that's -- so that's how we -- we structured it.

Q And what was your view at the time of what that would have cost you in cash?

A You know, probably two-and-a-half million dollars, because at that point Alex and Jennifer were doing lots of stuff together. And so, you know, just hiring Jennifer alone for a performance is -- is -- at that time was, you know, two-and-a-half, $3 million.

MR. SULLIVAN: Just for the witness, Defense Exhibit 525. And scroll down so he can see all of it.

Q Are you good?

A Yes, sorry. Yes, sorry.

Q Is this the March contract between OZY and Rodriguez that you just testified about?

A Yes, it is.

Q How do you know? How do you recognize it?

A At the very top --

Q Well, without telling us what's in it, how do you recognize it? Did you negotiate it, did you --

A Sorry, yes. Negotiated it with -- with Alex and with a

woman named Malvina, who is a CFO. And with a guy named Paul, who was a combination -- was kind of a manager of his.

MR. SULLIVAN: Moving Defense 525 into evidence.

MR. SIEGEL: No objection, Your Honor.

THE COURT: Received.

(Defense Exhibit 525 received in evidence.)

MR. SULLIVAN: All right. Let's show it to the jury, please.

(Exhibit published.)

MR. SULLIVAN: And let's go to the very top, the heading.

Q Do you see this?

A Yes.

Q So can you read to us the heading?

A It says: OZY Fest 2019 Agreement. OZY Media, Inc. And A-Rod Corp.

Q I don't mean to be -- what do you understand A-Rod Corp to be?

A One of Alex's companies, his main -- his main company at that point.

MR. SULLIVAN: So let's go down to the document, to the OZY commitment section.

Q So can you read the commitment, the compensation bullet point?

A Yes. It says: OZY will commit to share 25 percent of

the profits from OZY Fest 2019 with A-Rod Corp, with 50 percent of such profits committed in cash and the other 50 percent to be issued as shares of common stock of OZY valued at a price per share of $5.42.

Q And then the second bullet, minimum commitment, can you read that?

A In no case will OZY's commitment total less than $500,000 in cash and $500,000 in common stock.

MR. SULLIVAN: You can take this. Thanks.

Q So does that fairly represent your understanding of what --

MR. SULLIVAN: And keep the exhibit up for a second.

Q Does this fairly represent what you just read, to your understanding, of what the economic deal was with Mr. Rodriguez?

A Correct. His expectation was that he was going to get two to three million, but --

MR. SIEGEL: Objection.

Q What was your expectation --

THE COURT: Sustained.

Q -- of what he would --

THE COURT: Hold on. Hold on. When there is an objection, wait for a ruling.

The objection was sustained.

You can ask another question.

Q What was your understanding of what the value of this deal was going to be?

A My understanding --

MR. SIEGEL: Objection. Relevance.

THE COURT: What was your understanding based on, before we get to what your understanding was?

THE WITNESS: At that point, probably a dozen conversations with Alex.

THE COURT: But did it involve future contingencies?

THE WITNESS: Yeah, but these were specific, meaning that he and I, for example, had pre-meetings with JPMorgan who was going to be a substantial sponsor or he and I were going to Bank of America. We --

THE COURT: I'm satisfied.

THE WITNESS: It wasn't random. We actually had said here are a half dozen places --

THE COURT: You answered my question satisfactorily. You can answer the question from your attorney.

A So my understanding was that this was going to be at least a two to $3 million deal and that I needed to be prepared that it could be up to five, which, again, I was happy with because I liked the degree -- as I said to you

before, I want investors that actually cared about OZY. I wanted them to be curious about OZY. I wanted them to roll up their sleeves. And he was showing me, by virtue of asking all these questions, by virtue of suggesting, here are sponsors who would be interested, by virtue of, you know, introducing me to Jennifer and bringing me along to other business meetings they had and really incorporating me into their conversations, that he was serious about being, you know, a robust partner and, you know, given that I hadn't known him a year before, I was grateful.

MR. SULLIVAN: And let's go to the bottom, the signature lines.

Q So who signed on behalf of OZY?

A Samir Rao did.

Q And who signed on behalf of A-Rod corp?

A Malvina Kazanian did.

Q And had you met Ms. Kazanian?

A I had, yeah.

Q And who was she?

A She was the CFO at the time of -- of Alex's company.

MR. SULLIVAN: Pull up Defense 523, please.

THE COURT: We are going to break at some point in the next five minutes, but --

MR. SULLIVAN: Yes. This will be quick. As soon as I get finished with this document, if the Court permits.

Q Mr. Watson, do you recognize this document?
A I do.
Q And is this the addendum that you have testified about earlier?
A Correct, yes.
Q Did you negotiate this, as well?
A I did. Alex and I met a number of times in the spring and as OZY Fest got moved from the edge of Central Park, Summer Stage could only accommodate a certain number of people, to the heart of Central Park, which was the Great Lawn, we realized that this could be even more successful, we could have some more tickets, we could have some more sponsors, and so he began -- or we began to discuss this as not just a one-year relationship, but something that ultimately could evolve and -- and could be even a thicker kind of relationship.
Q So the first contract was in March.
When was this addendum?
A This was three months later, in June, I believe.
MR. SULLIVAN: Move to admit -- not Government -- Defense 523 in evidence.
MR. SIEGEL: No objection.
THE COURT: Received.
(Defense Exhibit 523 received in evidence.)
MR. SULLIVAN: We can show the jury.

(Exhibit published.)
Q And so let me just, first, go down to the signature block.
So who signed this for OZY?
A Samir Rao did.
Q And so signed this for A-Rod Corporation?
A Malvina signed it for A-Rod Corporation.
Q And then who will signed for A-Rod OZY Fest LLC?
A Alex, himself, signed it.
Q And is this the LLC that you testified about where he held his OZY stock?
A Correct, yes.
Q Now, and Mr. Rodriguez identifies himself as manager of A-Rod OZY Fest LLC; is that right?
A Yes, correct.
Q So did you feel comfortable representing that A-Rod was an investor, or did you feel the need to say it was A-Rod Corp, Corporation, as an investor?
A No. I felt comfortable as we listed it and -- and he, in fact, had suggested to me that we do it that way.
Q Now, just very quickly, the last question, since we have to wrap: The terms here, so stock compensation, how did this change from the previous agreement, or what changed from the previous agreement?
A He wanted to make sure he got his stock. He -- we had

conversations, and we talked about the fact that -- that he tended to be a long-term player. And so he wanted stock, that's what mattered to him.

Q So the change was -- had to do with the compensation being in stock?

A It always was in stock, but he wanted to -- he wanted to make doubly sure --

MR. SIEGEL: Objection.

THE COURT: Sustained.

MR. SULLIVAN: That's all with this. This is a good time to break, Your Honor.

THE COURT: Let's break for the day.

Ladies and gentlemen, thank you, again, for your careful and close attention. We wish you a lovely evening. Don't discuss the case either with each other or anyone else. Don't let anyone who shouldn't be talking to you do that. Don't do any research. And otherwise, have a lovely evening. Thank you.

THE COURTROOM DEPUTY: All rise.

They are asking what time tomorrow.

THE COURT: Thank you. Let's be in at 9:15 tomorrow. I expect we are going to break around 4:45, so a slightly earlier day tomorrow, but we will see you here for a 9:15 start.

(Jury exits.)

THE COURT: The witness may step down.

(Witness steps down.)

THE COURT: It doesn't seem obvious to me that we are going to have another witness tomorrow. Do we know who the next witness will be?

MS. GILBERT: Your Honor, sorry, with respect to -- two things, one is with respect to tomorrow, I actually have a 7:40 a.m. doctor's appointment. I will endeavor to be here at 9:15. I shouldn't be here any later than 9:30. I would request the Court's indulgence just for those 15 minutes, if that's possible?

THE COURT: You mean don't start without you, I take it?

MS. GILBERT: Please.

THE COURT: Which is fine. If we told the jury to be here by 9:15, they are probably anticipating something like a 9:30 start any way. And what other thing?

MS. GILBERT: And second is the potential witnesses for tomorrow are Sasha Mitchell-Fuller and Beverley Watson.

THE COURT: Okay.

MR. SIEGEL: And Your Honor, we object to both of those witnesses for the reasons we've talked about today and in our letter.

THE COURT: So I think the Government is saying

you would have expected to have materials from the period at issue with respect to Ms. Watson and you don't?

MR. SIEGEL: That's right, as well as text messages, which we don't have, her investment agreements --

THE COURT: Well, text messages from ten years ago are very hard to come by, right? If the matter at issue is her issue investment in 2012, although I guess we heard that there are subsequent investments up through and perhaps including 2022, but the text messages would not have been responsive to the grand jury.

MR. SIEGEL: Well, they would have been. All communications.

THE COURT: They would have been.

MR. SIEGEL: In addition to the video footage from the documentary that we've talked about.

THE COURT: All right.

MS. GILBERT: Your Honor has received response --

THE COURT: Does defense know if anybody made a diligent search along the way for Ms. Watson's text message communications? And if so, who that was?

(Continued on the following page.)

(Continuing)

MS. GILBERT: Not since the previous disclosures, but -- so, no.

THE COURT: Okay. Remind me the date of my order of compulsion here.

MR. SIEGEL: I believe it was -- it was around September of last year. It might have been August or October of 2023. And the subpoena -- the subpoena of Mr. Watson, the date period was, I believe, 2015 to March of 2023.

THE COURT: And when was the subpoena issued?

MR. SIEGEL: March of 2023.

THE COURT: And when does Mr. Sullivan come into the case for Sher Tremonte?

MR. SIEGEL: It was the summer, I think. It was --

THE COURT: It was after the subpoena and --

MR. SIEGEL: It was after the subpoena, after we had filed the motion, but before the order to compel.

THE COURT: So, Mr. Sullivan, do you want to say anything about what efforts you made when you came into the case to comply with the Grand Jury subpoena?

MR. SULLIVAN: I have no additional representations.

THE COURT: Okay.

MR. SIEGEL: And, Your Honor, just to complete our objection, you know, in addition to the issue of the subpoena, in addition to the fact that despite the April 10th date,

according to what Ms. Gilbert said, we are still going to be getting new stuff from Ms. Watson, which is part of a document dump that has been going on this whole week. It's also not clear that any of it is relevant. She worked at the company, at least according to the press release, starting in 2022, which is all post the conspiracy. She's just going to talk about the formation of the company. There has never been any dispute about the formation of the company. It's not clear how it's relevant. Mr. Watson testified about it. Mr. Rao testified about what he was there for.

So it's just not clear what the relevance of her testimony is, how it's not cumulative, in addition to the pretty egregious discovery obligation violations.

MS. GILBERT: Again, she's an investor.

THE COURT: So what's the relevance of her testimony as an investor?

MS. GILBERT: She can testify as to what her experience was, what she looked for in the company, what her -- what her experience was with respect to the various series. Your Honor, I think it's relevant given what the defendant is being charged with.

THE COURT: Okay.

MR. SIEGEL: And, Your Honor, so, generally, as a general rule, an investor can talk about what they consider as important because the run-of-the-mill investor is a proxy for

the reasonable investor. Ms. Watson is not a proxy for the reasonable, objective investor here because she's the defendant's sister. What she's looking for investing in her brother's company is not what they're --

THE COURT: Nobody is saying, at least out loud, that the reason for the relevance of her testimony is the family relationship. I agree that would be a stretch. But, you know, you got to call the investors of your choice. And so, all things being equal, it might make eminently good sense for the defense to be able to call the investors of their choice.

We have an investor who started on the stand who I think may be coming back next week. We will see. From the defense side. Meaning, we will see what the defense has to say about that.

To me the bigger issue is -- I understand there are meaningful relevance questions here. I don't know that those would carry the day absent the long and tortured history of discovery issues that we're talking about.

I think I need Government to put this in a single letter. And I understand you have written a number of times on this subject. But I don't want to be the one that has to go through all of the scores of submissions on this topic and aggregate all of the case law into one submission and, more importantly, all of the timeline into one submission.

MR. SIEGEL: Your Honor, I think our letter from Saturday does exactly that.

THE COURT: Does it?

MR. SIEGEL: It attempted to. That was your best attempt.

THE COURT: So if I am inclined, in making this ruling, to rely not only on the 26.2 issues, but also the issues about what appears to be a violation of the Grand Jury subpoena and the order of compulsion that followed it, is that all made clear in your letter that you are now getting documents that were -- I don't know that you had the documents at the time, but are you getting documents that were responsive to the Grand Jury subpoena and not produced?

MR. SIEGEL: Just one moment, Your Honor.

(Pause in the proceedings.)

MR. SIEGEL: Your Honor, I know we made that argument with respect to Mr. Kalliarekos, but I'm just checking to see if we made that argument with respect to Ms. Watson.

THE COURT: Right.

So, Your Honor, I'm not seeing it. We can file an updated version of this letter, which does include most of the timeline, but focuses on Ms. Watson and adds the issue with the Grand Jury subpoena.

THE COURT: I think we have as many as four sources

of authority that have been violated in this context, which are -- maybe each five -- Rule 16, to the extent there was anything in Rule 16 that would have required the production of this material, the Grand Jury subpoena, my order of compulsion, the court-ordered deadline for the exchange of marked exhibits, and the court-ordered deadline for the exchange of 26.2 material. And if you can line that up in a single chronology, I think that will help crystallize the issues for me.

Anything else that we should be taking up?

So on the jury instructions, I have a consolidated draft that I am going to take one more passthrough myself tonight and endeavor to hand out a proposed set of jury instructions tomorrow.

What else from the Government side before we adjourn?

MR. SIEGEL: Just on the other witness that the defense called.

MS. KASSNER: Yes, Your Honor, so I believe the other witness for tomorrow is Sasha Mitchell-Fuller. Our understanding from the defense's letter is she was a television producer.

I think Your Honor sort of noted this earlier, but we believe that this testimony about various shows that OZY produced is irrelevant to the charges and cumulative. We

don't believe that it goes to any of the issues the jury, but also there are quite serious Rule 26.2 violations as to her as well.

I believe it was on Friday or Saturday that -- Friday, we received the production for her for the first time. It was 292 documents total. We cannot open 255 of them. We don't know what they are. Of the ones we can open, they are entirely nonsensical. They don't contain any statements by her. A lot of them are gray boxes. They are machine language. There's one -- I believe there is an Uber invoice for one specific day.

I'm not sure if this is intentional or not, but sitting here today, Your Honor, we have no 26.2 materials that we can open that contain any of her statements. We have no way to cross-examine this witness.

THE COURT: So as to Ms. Mitchell-Fuller, I think the relevance questions, there are much more substantial than they are as to perhaps Ms. Watson in her capacity as investor.

The proffered relevance is that she is a 20-year television veteran, helped build and guide a variety of talk shows and will testify as to her deep understanding of OZY's sophisticated and valuable content effort, including its premium television offerings, full stop.

MS. GILBERT: In addition, she was responsible for creating many of the advertisements and -- which secured a lot

of revenue for OZY.

MS. KASSNER: Your Honor, I submit that's irrelevant.

THE COURT: This testimony seems very clearly irrelevant, not to even mention the 26.2 issues, unless the defense has either, A, a better proffer as to the relevance, or B --

MS. GILBERT: There are no statements by her. We searched the OZY folders for anything with her name and the materials that we provided are what we have.

THE COURT: Was she an OZY employee or was she a contractor?

MS. GILBERT: She was an employee.

MS. KASSNER: Your Honor, how is that possible?

THE COURT: Well, hold on.

There is no e-mail to or from her?

MS. GILBERT: I've said to the Government that I am going to find out about the materials that they weren't able to open, because I don't understand what they weren't able to open.

THE COURT: Okay. All right. So I will wait for a further update on that before I make a final decision, but it sounds like an uphill climb from the defense perspective.

All right. Anything else from the Government?

MR. SIEGEL: Your Honor, on the jury charge. You

mentioned that you were going to hand that out tomorrow. To the extent you and your chambers finish it tonight, if you would e-mail it to us even late, then we can be ready tomorrow. To the extent that you are going to finish it tomorrow, then we will wait and see it tomorrow.

THE COURT: I think you're going to see it tomorrow.

MR. SIEGEL: That's fine.

THE COURT: Anything else from the defense side before we adjourn for the evening?

MS. GILBERT: No. We just request multiple copies since we are not all siting at the same table.

THE COURT: We will make three copies for the defense side and three copies for the Government and one for me and one for my law clerk. So we will start with eight copies here, unless anybody else has any other requests.

MR. SIEGEL: If Your Honor is able to send us a Word version so we can understand what's changed, that would make things more efficient.

THE COURT: That I think we will be able to do once this settles.

MR. SIEGEL: Thank you.

THE COURT: Okay. All right. Thank you all. We will see you at 9:15 tomorrow.

(Matter adjourned to July 2, 2024 at 9:15 a.m.)

# I N D E X


| WITNESS | PAGE |
|---|---|
| **JOAN CLAIRE RUDY** | |
| DIRECT EXAMINATION BY MS. FRISON | 2832 |
| CROSS-EXAMINATION BY MR. STERN | 2849 |
| REDIRECT EXAMINATION BY MS. FRISON | 2866 |
| RECROSS-EXAMINATION BY MR. STERN | 2868 |
| CARLOS WATSON | |
| DIRECT EXAMINATION BY MR. SULLIVAN | 2874 |


# E X H I B I T S


| | |
|---|---|
| Government Exhibit 5130 | 2863 |
| Government Exhibit 5130-A | 2865 |
| Defense Exhibit 525 | 3062 |
| Defense Exhibit 523 | 3066 |