UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - X
UNITED STATES OF AMERICA, : 23-CR-00082(EK)

-against- : United States Courthouse
: Brooklyn, New York

: Wednesday, July 3, 2024
WATSON, et al., : 9:15 a.m.

Defendants.
- - - - - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
BEFORE THE HONORABLE ERIC R. KOMITEE
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

For the Government: BREON PEACE, ESQ.
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201
BY: JONATHAN SIEGEL, ESQ.
GILLIAN KASSNER, ESQ.
DYLAN STERN, ESQ.
Assistant United States Attorneys

For the Defendant: Carlos Watson
RONALD SULLIVAN LAW, PLLC
1300 I Street, NW
Suite 400E
Washington, DC 20005
BY: RONALD S. SULLIVAN, ESQ.
JANINE M. GILBERT, ESQ.

For the Defendant: OZY Media, Inc.
FRISON LAW FIRM, P.C.
75 State Street
Suite 100
Boston, Massachusetts 02109
BY: SHANNON FRISON, ESQ.

(In open court - jury not present.)

THE COURT: Good morning, everyone, please be seated.

I don't think I saw any filings overnight. Am I right about that?

MS. GILBERT: None from us.

MR. SIEGEL: None from us.

THE COURT: Okay. Then I think we may be ready to bring in the jury.

MR. SULLIVAN: One brief matter I wanted to clear with the Court. I would like to use a white board with Mr. Watson's testimony later this morning to add up numbers. This will be in the "Revenue" section to physically add up numbers.

I'll set the predicate --

THE COURT: Whose using the white board?

MR. SULLIVAN: -- board as an illustrative aid.

I will do it consistent with Your Honor's procedures. Sometimes Courts will let the witness do it, sometimes Courts prefer counsel to do it, but -- he'll say, you know, 30 million here, and I'll write "30," 40 million here, "40," 50 million here, "50," and add up the row with the number.

THE COURT: I think this will be a first for me.

Does the Government have a view on this?

MR. SIEGEL: Your Honor, my first view is it's not clear that we are going to get there, because to the extent he is testifying about numbers and contracts, we have our objection to each of these contracts. And he can't testify to the contents of the contracts without the contracts.

So, we may not even --

THE COURT: The objection is that the contracts came to you late or that you don't have them at all?

MR. SULLIVAN: Well --

THE COURT: Let me talk --

MR. SULLIVAN: It doesn't involve --

MR. SIEGEL: It's going to depend on the contract, I guess.

MR. SULLIVAN: Yeah. It involves Mr. Watson's negotiations with companies. We've already got the evidence in that he did the high-level negotiations, agreed to a number, and staff worked out the details. He is going to testify, to his understanding, of what the sum total of those contracts he negotiated was. And that was his understanding of the revenue that came into OZY Media.

And it's going to be, like, five or six numbers. It's a little difficult to -- we can do it, if we have to, but a little difficult to add up in your head. So, the standard is for an illustrative aid, whether it will help assist the jury in understanding the testimony. It's relatively low bar.

So, that's what we would like to do.

MR. SIEGEL: Yes, Judge. I mean, I don't have an objection -- if there are numbers in evidence, I don't have an objection to writing them on a board and adding them up. But the -- what -- the proffer of what he just described as is, it's just not clear if there is relevance or a foundation.

THE COURT: So, let me just -- to the extent we are talking about a summary chart here, there is a -- obviously, a federal rule of evidence on that subject.

Are we in the world of Rule 1006 here or no?

MR. SULLIVAN: No, I'm actually just talking about an old-fashion demonstrative aid.

THE COURT: Okay.

MR. SULLIVAN: Not coming in evidence, of course. Simply, a demonstrative aid for illustrative purposes.

THE COURT: Okay. And these are agreements that Mr. Watson will testify he negotiated, but as to which there is no writing; is that a fair understanding?

MR. SULLIVAN: No, some of them had a writing later that we saw and put in evidence. Mr. Rao signed contracts and whatnot.

This is what was in Mr. Watson's mind at the time when he negotiated the contracts, and what was in his mind when he had an understanding of what the revenue was that was coming into OZY Media.

So, we are not relying on the contracts, we are relying on his negotiations. Ms. Frison will deal with OZY Media as a company and the various contracts. All we want to elicit is what's in Mr. Watson -- what was in Mr. Watson's head at the relevant times.

THE COURT: Okay.

MR. SULLIVAN: We have a white board and it will just be -- you know, if he says TV 30, I will put TV 30. I'm just making up numbers right now, and then have him add it up. But it is enough numbers that it is difficult to -- I think it would assist the jury in having those numbers listed and added up.

THE COURT: All right.

MR. SIEGEL: Your Honor, Mr. Sullivan just said that, you know, he is going to talk about the numbers that were in Mr. Watson's head and then Ms. Frison is going to come in with the contracts. This sort of feels like an end run around the rule about talking about what's in documents.

If he is going to say, this is what I thought was in the document --

MR. SULLIVAN: That's absolutely not what he's going to say.

THE COURT: I think he is going to say, I thought I had an oral agreement, which may or may not implicate the statute of frauds or who knows. And -- well, I guess we will

have to hear what the testimony is.

And if you want to voir dire the witness before a process happened, that's what the voir dire process is for, if you have questions about foundation, not -- voir dire is not an excuse for early cross-examination and I will monitor that aggressively.

But if you have genuinely foundational questions about whether a line of testimony is appropriate or a document should come into evidence or the like, we can do that voir dire, either in or out of the presence of the jury.

MR. SIEGEL: Okay.

THE COURT: And we will resolve it that way.

MR. SIEGEL: Okay.

MR. SULLIVAN: And, Your Honor, I'm thinking logistically --

THE COURT: All right, Drew. Let's bring in the jury.

MR. SULLIVAN: I'm thinking logistically if I put it here, the Court can see it, the Government can see it, the jury can see it.

THE COURT: I think that's fine.

MR. SULLIVAN: That's it from the defense.

Should Mr. Watson go up?

THE COURT: Yes, please.

MR. SULLIVAN: Thank you.

THE COURTROOM DEPUTY: All rise.

(Jury enters.)

THE COURT: Please be seated, everyone.

Ladies and gentlemen, good morning.

THE JURORS: Good morning.

THE COURT: Thank you all for being with us bright and early today.

Mr. Sullivan, you may continue.

MR. SULLIVAN: Thank you, Your Honor.

**CARLOS WATSON**,

called as a witness, having been previously duly sworn/affirmed, was examined and testified as follows:

DIRECT EXAMINATION (Continuing)

BY MR. SULLIVAN:

Q Good morning, Mr. Watson.

A Good morning.

MR. SULLIVAN: And good morning, ladies and gentlemen of the jury.

THE JURORS: Good morning.

MR. SULLIVAN: All right. Let's first start with -- I'm showing you, and only the witness, what's been marked Government Exhibit 6497-A.

All right. If you could scroll through for the witness, please.

Q All right. Mr. Watson, do you recognize this exhibit?

A I do, yes.
Q What is it?
A It's -- it's one of our pitch decks for our Series D fundraising round from June of 2021.
Q And just so the record is clear, this is D as in dog?
A D as in dog.
Q Very well. And did you assist in the preparation of this --
A I did, yes.

MR. SULLIVAN: All right. Your Honor, I move Government Exhibit 6497-A in evidence.

MR. SIEGEL: No objection.

THE COURT: Received.

(Government Exhibit 6497-A received in evidence.)

MR. SULLIVAN: All right. Let's go -- show the jury. Let's scroll down to page 15.

Q Okay. So, Mr. Watson, you have seen, I'm sure, a lot of these charts --
A Yes.
Q -- over the course of the testimony; right?
A Yes.
Q Now, do these revenue charts constitute the bulk of your pitch decks?
A No.
Q All right. Let's -- let's look at what you actually send

to potential investors.

MR. SULLIVAN: Can you scroll back to the beginning.

Q Now, as we go through -- or right before we go through this, can you tell the ladies and gentlemen of the jury what your intent is, what you are attempting to convey to potential investors in the creation of these pitch decks?

A Sure. You know, so many investors get lots of different pitches. And so, in a really concise way you want to explain what OZY is, why it's worth your time. What we see as potential challenges because nothing's always an easy road. And in success, what could it looks like. And so, we tried to do that as clearly as we could.

As I mentioned yesterday, in addition to the decks, we often started with a video, just to give people a kind of one-minute introduction. But the decks were a good way to say hello.

Q All right. So, let's go through the deck.

So, your cover page, what are you thinking here? Why OZY? Why not OZY Media, Inc.? What are you thinking here?

A You know, you want the name to be really clear. You want it -- and I always said that I wanted our style to be Apple goes to Brazil. I loved the fact that Apple back in the day was stylish, but I thought it needed just a little bit more color, a little more bounce.

And so, we tried to be simple and clean in the way that someone like Apple or HBO would, explain what we are doing. And then as the deck unfolds, offer a little more context and a little more bounce.

Q Now, how did you decide what order the different slides in the deck go in?

A You know, a couple things. One is I, frankly, knew that a lot of people wouldn't get through a whole deck. So, at the beginning of every deck and every presentation you'll see at OZY that we always have a summary. And so, the idea is even if you don't have time to read the whole thing, in one or two pages we can try and capture everything for you.

But then I wanted to get to what I thought really mattered for most kind of early-stage investors, which was content. And so, you'll see that in this deck most of this deck is about our TV shows, our podcasts, our festivals, our newsletters, our award programs.

MR. SULLIVAN: All right. Let's go to page 2.

Q All right. So, just tell us quickly what this is.

A Just kind of a table of contents, if you will.

MR. SULLIVAN: All right. Next page, please.

Q All right. What's this page?

A This is a beginning of an executive summary. So, you know, we wanted you to know that the world was changing, we felt like OZY was right for this moment. Unlike lots of our

competitors, we didn't just have one business, but we had five. And on the right-hand side we wanted to show and not tell, we wanted to give you a little bit of a visual sense.

And so, I don't know how many folks got a chance to go to OZY Fest, but you can see in the middle photo there, that's a photo from OZY Fest with thousands of people. And then in the bottom corner, one of our partners, he is the CEO of A&E. And many of you may know that A&E owns A&E Lifetime and the History Channel. So, he was a really good partner and we did about five TV shows with him across those -- his channels.

MR. SULLIVAN: All right. Next page, please.

Q All right. And it says: "2 of 2 Executive Summary."

What are you conveying to potential investors on this page?

A You know, a couple of things. One is that we didn't just want to be a business, we wanted to have a little bit of cultural bounce. You know, companies like Nike weren't just shoes, but they stood for something more. I think the same is true probably, arguably, for Disney at one point. Certainly for Apple. So, that was in our mind, which is if -- people wouldn't just see us as something to use, but maybe something that they loved. And so, that mattered.

And then we wanted to try and give people a sense, if we were able to raise the money in the Series D, how we

would use the money. That we would invest, as it said first and foremost, in the new programming.

And secondly, we ultimately might add a sixth line of business called, essentially, eCommerce.

And then third, and what we talked a lot about, was the fact that we needed a quality CFO and we needed, you know, a better financial infrastructure. And so, it says that we're going to build out OZY's infrastructure to support our growth.

So, we really tried to lay that out clearly on the left-hand side.

Q And on the right-hand side, how and why did you choose these images?

A We wanted to give people a sense that you could click on the Hulu app and watch one of our shows there. "Defining Moments With OZY," which became a Hulu original, which they don't normally do.

You know, the second was -- Alex was kind enough to join me on Squawk Box and talk about OZY's commitment to the new and the next, and how we were identifying up-and-comers.

And then John Legend, the singer, who originally we got to know through OZY Fest, became kind of a larger fan of what we were doing there. And so, agreed to do a series of interviews with us, and also some charitable work in Harlem with one of the schools there.

MR. SULLIVAN: All right. Let's go to the next

page, please.
Q All right. "OZY is taking off," what did you mean? What were you attempting to convey?
A Just as we were starting to get some good coverage in *Variety*, in *The Wall Street Journal*, in the *Financial Times*, in other places, we are remarking on the fact that even though new media companies like Vice and BuzzFeed weren't doing well, we were starting to break away from the pack and we had a chance to become, you know, that new breakthrough media company.
And so, it wasn't just us saying it. Other people like the Colbert show and Good Morning America were starting to say, this company's got something.
MR. SULLIVAN: All right. Let's go to the next page, please.
Q All right. So, "Meet OZY." I guess this is about to introduce us to something?
A Correct. Yeah. "Hello, my name is" -- yeah.
MR. SULLIVAN: All right. Next page, please.
Q All right. So, what are you attempting to convey here?
A You know, that from a young Mike Pence to, you know, a young AOC, from Dooley, by The Singer, to Simone Biles the olympian, that, you know, what OZY -- really at the heart of what we did, not the only thing, but at the heart of what we did was trying to help you discover people, places, and trends

a year or two before you might see them on X or come across them on WINS or ABC or, you know, other networks.
Q All right.
MR. SULLIVAN: Next page, 8, please.
Q All right. So, what's going on, on this page?
A Here were some of the good folks that we brought to our audience before they were in mainstream places. So, folks like Aaron Judge, folks like Dua Lipa, folks like Trevor Noah were examples. Not the only ones, there were hundreds, if not thousands, but this was a good opportunity for people to just get a sense of sports to music to comedy to politics.
OZY was, as I told you --
THE COURT: Let me intervene here. I'm sorry.
I think we are covering ground we already covered in this testimony. And if we could move this along --
MR. SULLIVAN: Next page, please.
THE COURT: -- to another area.
Q Okay. So, now, "Smart Millennials" you have highlighted.
What did you want to convey in terms of highlighting "Smart Millennials"?
A Just that our audience -- one of our readers once said that she described OZY as --
MR. SIEGEL: Objection.
THE COURT: Sustained.
A Okay. I wanted to give people a sense of who came to OZY

Fest, who downloaded a podcast like The Thread, who was going to click on Defining Moments on Hulu, who was going to suggest to their little sister that she apply to the OZY Genius Awards, who was going to get excited when the Presidential Daily Brief hit her inbox. And, so, I wanted to give people a clear sense of that.

The other way I did it is we always invited potential investors to come to OZY Fest, because there's nothing better than seeing it yourself, able to talk directly to our audience. And I think most folks took us up on that.

Q Now, these bullet point facts that you have down here, why did you think this was important to potential investors?

THE COURT: Mr. Sullivan, when I asked you to move this along, I didn't mean move it along one slide. I mean move it along to another topic, please, something -- and if you want to discuss this at the sidebar, we can, but the -- we are in a place that is of questionable relevance, from my view.

MR. SULLIVAN: Well, then let's discuss it at sidebar and not in front of the jury, Your Honor.

THE COURT: Let's have the jury --

MR. SULLIVAN: Sorry, Judge.

THE COURT: -- step out for the first break of the morning.

(Jury exits the courtroom.)

THE COURT: All right. Please be seated, everyone.

Mr. Sullivan, I have been trying to be clear since this issue first came up sometime ago that this trial is not about the quality of OZY's content, again, any more than the WorldCom accounting fraud case was about the quality of WorldCom's phone service or the Adelphia accounting fraud case was about the quality of Adelphia's cable programming.

We are spending a lot of time now on topics that I have said are of questionable relevance, at best, and topics that I have already given you a lot of leeway to cover and that we are now covering for a second or even in some cases third time.

I would like you to move along to another topic.

MR. SULLIVAN: May I be heard?

THE COURT: Yes. What is the relevance of the education levels of OZY's audience?

MR. SULLIVAN: Before that, I would like to make an application for a mistrial. This is at least the third time this Court has said -- questioned the relevancy of something we have done in front of the jury.

THE COURT: Well, I --

MR. SULLIVAN: Mr. Watson cannot --

THE COURT: I told you --

MR. SULLIVAN: May I finish making my motion, Your Honor?

THE COURT: Sure.

MR. SULLIVAN: May I be heard?

THE COURT: Briefly, yes.

MR. SULLIVAN: Mr. Watson cannot and has not received a fair trial when the Court is telling the jury that his testimony is of questionable relevance.

THE COURT: I'm jumping in here. Thank you.

MR. SULLIVAN: So, I move for a mistrial.

THE COURT: I'm jumping in here.

Your motion for a mistrial is denied. And let me say again why it was important for me to speak up the way I did.

MR. SULLIVAN: It's --

THE COURT: I said -- no, I'm talking now.

I said, out of the presence of the jury, that this topic was not relevant. I said that days ago. You chose to ignore it. I said to you, in a very gentle way, I want you to move on to another topic, and then you chose to ignore that, too, instead, moving forward one slide, but staying on the exact same topic. And only then did I speak up more clearly after you had disregarded my instructions twice, only then did I speak up more clearly on the subject of relevance.

Your motion for a mistrial is denied.

MR. SULLIVAN: The appropriate way --

THE COURT: I would like you to move on to a topic

that is relevant.

MR. SULLIVAN: Well, we think this topic is relevant. It is relevant --

THE COURT: Why?

MR. SULLIVAN: That's what I am saying. It's relevant because the Government spent hours on one slide in decks like this, hours, upon hours, upon hours suggesting that investors relied on that slide.

THE COURT: What slide?

MR. SULLIVAN: Move to 15. Slides like this, hours and hours and hours, witness after witness after witness.

THE COURT: This is a slide on revenue, which is what the trial is about.

MR. SULLIVAN: Well --

THE COURT: This is relevant.

MR. SULLIVAN: Well --

THE COURT: The stuff about the makeup of OZY's audience is not relevant. So, move on.

MR. SULLIVAN: So, in a --

THE COURT: End of story. Let's get the jury back.

MR. SULLIVAN: In a criminal trial -- in a criminal trial, there are two sides.

THE COURT: I understand that there are two sides.

MR. SULLIVAN: The Government has a theory. The defense has a theory.

Our theory is that they did not rely simply on revenue. The Government's theory is not the lodestar for relevance. They have this theory. Our theory is that they relied on all of this other stuff --

THE COURT: I have permitted Mr. --

MR. SULLIVAN: -- the majority of the slide.

THE COURT: I have permitted Mr. Watson to discuss at length OZY's business model, the ways in which OZY was innovative. We are not going to go slide by slide through a 15-slide deck on that --

MR. SULLIVAN: Then I move for a mistrial again because Mr. Watson is not able to put on a defense.

THE COURT: He has been on the stand for two days now. I assume he's going to finish out the day on direct today as well.

MR. SULLIVAN: Mr. Rao was on the stand for six days.

THE COURT: I would like you to move along to a topic that is more relevant.

MR. SULLIVAN: I think this is relevant.

May I ask him some closeout questions just in terms of how many slides were about OZY versus how many slides were about this revenue deck?

THE COURT: Absolutely. And going forward, if I say something to you like, Mr. Sullivan, I'd like you to move on

to another topic, and you're not -- I think you understood exactly what I meant and just chose to ignore it.

But if you have any questions in your mind about the contours of my directive, instead of just winging it and doing what you want to do, I would like you to ask me for clarification before --

MR. SULLIVAN: I resent that. I don't wing anything.

THE COURT: Well, you have been ignoring --

MR. SULLIVAN: I don't wing anything.

THE COURT: -- my directives throughout this entire trial.

MR. SULLIVAN: So, I'm going to ask the Court to please stop --

THE COURT: Call it what you want.

MR. SULLIVAN: I'm going to ask the Court to please stop making prejudicial comments in front of the jury.

THE COURT: If you will --

MR. SULLIVAN: No --

THE COURT: If you will abide my instructions --

MR. SULLIVAN: I don't have a Sixth Amendment right. He has a Sixth Amendment right.

THE COURT: If you will abide my instructions, then I won't have to speak up to clarify my instructions.

MR. SULLIVAN: Mr. Watson has a Sixth Amendment

right --

THE COURT: This conversation is over --

MR. SULLIVAN: -- not me.

THE COURT: -- let's bring the jury in.

THE COURTROOM DEPUTY: All rise.

(Jury enters.)

THE COURT: Please be seated, everyone.

Mr. Sullivan, you may continue.

MR. SULLIVAN: Thank you.

BY MR. SULLIVAN:

Q Mr. Watson, so looking here at, I think this is slide -- page 15 of the deck.

Do you recognize this revenue chart?

A I do, yes.

Q First, consistent with the deals that you negotiated, do these numbers look about right?

A They do.

Q Now --

A Maybe a little under, but, yes.

Q I'm sorry?

A Maybe a little undercounted, but, yes.

Q Okay. Now, why is this way back in number 15? Why don't you have this, you know, front and center, you know, here's the revenue, people? Why did you put this way back here?

A Because although folks have tried to assert that

early-stage investors care most about revenue --

MR. SIEGEL: Objection. Objection.

THE COURT: Sustained.

A Because I knew that early-stage investors --

MR. SIEGEL: Objection.

THE COURT: Sustained.

Q What was your belief about what was important to early-stage investors?

A My belief about what was important to early-stage investors was team, content, vision, partnerships. What they're looking for -- my experience, both as a startup investor myself, as a board member of startups, as chairman of an audit committee of a publicly-traded multi-billion dollar company, I was very clear on the difference between big late-stage companies and the early-stage companies.

And what I understood that early-stage company, as a startup investor myself, that I had to deliver a great product. If I didn't have a great product, the rest doesn't matter. If I don't have a clear vision, the rest doesn't matter. If I don't have a great team, the rest doesn't matter. If I don't have really signature partnerships, we don't have anything to talk about, right? We have zero to talk about.

So, I was in pursuit of being the next Apple, the next HBO. I wasn't in pursuit of a company that was already

big and moving slowly, 5 percent a year.

And, so, what I talked about, and the reason why this is not page 1 and it's page 15, not even in the first five pages, page 15, the reason why it's page 15 is because that's where it is in the priority rank.

And remember, I had 75 investors. If I thought that this was the most important thing, after eight years, it would be page 1, but it wasn't. After eight years, it's page 15.

And out of a 30-page deck, there are only, like, two pages on this. And they're investing, the most sophisticated people, the people who own Politico and Business Insider and invested in Facebook. And if they wanted 30 pages on this, then that's what I would've done.

But that's not what I, as a startup investor, and I, as a startup CEO -- they're, like, trying to make the 40-yard dash the most important thing in determining whether or not Tom Brady is a great quarterback. That's not how you determine whether or not he's a great quarterback. And you can say it over and over again, but that doesn't determine whether or not he is a great quarterback. It just doesn't.

So, it may make someone feel better in some book. But in real life they want to know, do you have a product that people really get excited about. And the reality is, whether it was a young person or whether it was Bill Gates, people knew that OZY had something different and special. And that's

why we ended up having the kinds of success and partnerships that we had.

And, so, they can say over and over again that it's revenue and that may make them feel better 3,000 miles away from Silicon Valley. But in Silicon Valley what matters is the product, right. I don't know why I'm here in Brooklyn, but -- I don't live here. But in the Bay area where I'm based, where the company was based, for that whole time never was in Brooklyn, never had executives here, never had an office here --

THE COURT: Let's have another question.

MR. SULLIVAN: All right.

Q So, now, you said --

MR. SULLIVAN: You can take this down.

Q You said only two pages or so in the entire deck?

A Out of 30 pages.

Q Is that consistent with -- I think you testified you had written, like, 1,500 decks over the years, is that consistent?

A That is consistent.

Q Now, I won't put it up.

MR. SULLIVAN: You can take everything down.

Q I won't put it up, but you recall the Government showed some -- some revenue sales on some -- it was some spreadsheets.

Do you have that in mind?

A Yes.
Q Do you have any sense of how many lines of data that is?
A I think, in one of them, it's 28,900 or something like that, a lot.
Q When you are reviewing decks, are you reading 27,000 lines of data to check whether Samir got it right?
A I couldn't, even if I wanted to.
Q All right. So, let's take a look --
MR. SULLIVAN: Pull up Government Exhibit 5091, 5-0-9-1.
THE COURTROOM DEPUTY: Is it in evidence, counsel?
MR. SULLIVAN: It is in evidence. Thank you, sir.
THE COURTROOM DEPUTY: You're welcome.
Q All right. So, here's an example, Mr. Watson, that the Government put in evidence.
So, Samir Rao -- who's this -- who sends this e-mail?
A Samir Rao sends it to Suzee and copies me.
Q All right. And then there is an attachment: "WTI Diligence Update."
Do you see that?
A I do.
Q And ".XLSX," what does that mean?
A That it's a spreadsheet.
Q And is that the spreadsheet that you -- or a spreadsheet

that you just described with these tens of thousands of lines of data?

MR. SIEGEL: Objection.

THE COURT: Come to the sidebar.

MR. SULLIVAN: I can ask another question, Your Honor.

THE COURT: The question is withdrawn. We will have another question.

Q So -- so, can you tell us what time they sent this to you?

A Yes, it looks like a little bit after midnight, at 12:40 a.m.

Q 12:40 a.m., so a lot a bit after midnight?

A Yes.

Q All right. So, 12:40 a.m. they send this to you with this -- you do recognize XLSX as an Excel spreadsheet; right?

A I do, yes.

Q All right. So, let's look at 5092, Government 5092.

Now, does this "WTI Diligence Update, 914.xlsx," look like the same attachment from the previous?

A Yes, it does.

Q Now, who is this from?

A This is from Samir Rao.

Q To?

A Maurice Werdegar.

Q And Maurice was one of your investors?
A Really a lender, but, yeah, yeah.
Q Okay. Debt lender.
A Yep.
Q My apologies.
A Yep, yep.
Q Now, what time does he send this?
A A little bit after 1:00 a.m., 1:16.
Q All right. So, they e-mail it to you at 12:40 a.m.
And by 1:16 in the morning, have you had an opportunity to review an entire Excel spreadsheet with potentially thousands of lines of data? Have you had that opportunity?
MR. SIEGEL: Objection.
THE COURT: Sustained.
Q Between 12:40 a.m. in the morning and 1:16, did you have time to review the attachment on this thing?
A I did not.
Q Would that have been your practice?
A No, I -- that's -- that wouldn't have been reasonable to expect me to do that.
Q Why wouldn't that -- that not have been reasonable?
A You know, first of all, my focus is on the five newsletters that we're running, they're going to -- sending out tens of millions a day. It's on the 14 TV shows that we

are managing across nine networks. It's on the 10 podcasts that we are doing across iHeart, Apple, Spotify, and BBC. It's across four festivals. It's across more than 229 partners.

It's not -- everyone can't do everything. You have to divide and conquer at some point.

And, so, in my mind, this is the equivalent of someone putting a duplicate thing on my calendar. It's -- it doesn't mean that I'm going to go to those other 300 meetings. And it also doesn't mean that you can reasonably expect me to go through a detailed spreadsheet and find out that Cell Number 4 on page 18 had something wrong. That's not possible.

Q And as you sit here today, do you have any memory of whether you actually even saw this e-mail at 12:40 in the morning?

A I don't have any memory of whether or not I saw it.

And as I said, I have a -- even today, I have about 301,000 unread e-mails in my e-mail box, which means, on average, I had over 100 unread e-mails every day. And, so, you know, the chances are that something that comes in after midnight and goes out half an hour later is probably among those unread e-mails.

Q Okay. Thank you.

MR. SULLIVAN: You can pull that down.

All right. Let's do one more thing, actually. Why

don't we pull up --
THE COURT: Gesundheit.
MR. SULLIVAN: Bless you.
-- Government Exhibit 10,009 -- I'm sorry 1009, 1-0-0-9, which is already in evidence.
And -- well, all right. Can we scroll down to the bottom picture.
Q All right. Do you recognize this as your -- as an OZY tax return?
A Yes.
Q All right.
MR. SULLIVAN: Let's go to the signature page. All right. And let's expand that signature.
Q All right. For what year is this?
A 2016 tax return.
Q All right. Is that your signature?
A It is. Or my dad would say it's his. But, yeah, it's mine.
Q All right.
MR. SULLIVAN: Let's move to 2017, which is, I'm sorry, Government Exhibit 1010 already in evidence.
Q Do you recognize this as the 2017 OZY tax return?
A Yes.
Q All right.
MR. SULLIVAN: Let's go down to the signature and

expand it.
A Yes, that's my signature.
Q All right. Now, let's move to the first year of the Government's case, 2018.
MR. SULLIVAN: Can you pull up Government Exhibit 1011.
Q Is this a tax return?
THE COURTROOM DEPUTY: It's in evidence, correct, counsel?
MR. SULLIVAN: Yes, I'm sorry. It's in evidence.
Q Is this a tax return?
A It is, for 2018.
Q All right.
MR. SULLIVAN: Let's go down to the signature.
Q Is that your signature?
A It is not.
Q Did you authorize anyone to forge your signature?
A No. Samir forged it on his own.
MR. SIEGEL: Objection.
THE COURT: Come to the sidebar.
(Sidebar held outside of the hearing of the jury.)
(Continued on next page.)

(The following sidebar took place outside the hearing of the jury.)

THE COURT: Is the objection foundation?

MR. SIEGEL: Yes.

THE COURT: What?

MR. SIEGEL: Yes.

THE COURT: Okay. He keeps --

MR. SULLIVAN: I didn't ask --

THE COURT: He keeps going well beyond.

MR. SULLIVAN: I didn't intend to elicit whose it was. I'm moving on.

(Sidebar ends.)

(Continued on next page.)

(In open court.)

THE COURT: Okay. The objection is sustained. The last answer is stricken from the record.

BY MR. SULLIVAN:

Q Okay. So, we don't want you to speculate as to whose signature it is, but can you confirm whether this is your signature?

A That is not my signature. It's --

MR. SIEGEL: Objection.

THE COURT: Sir, listen to the questions that your lawyer asks, please.

THE WITNESS: Uh-huh.

THE COURT: And try to constrain your responses to his questions.

MR. SULLIVAN: I renew my application, Your Honor.

THE COURT: You may continue.

MR. SULLIVAN: And just note for the record.

So, now, can we pull up the signature of, say, 2017 on top of this.

BY MR. SULLIVAN:

Q So, what we are doing, Mr. Watson, is --

MR. SULLIVAN: There we go.

Q -- we're putting -- on the bottom is Government Exhibit 1010 and on the top is 1011. Now, which one is yours, top or bottom?

A The bottom.
Q All right. And have you ever signed anything that looks like this --
A No.
Q -- on top?
A No, I have not.
Q All right.
MR. SULLIVAN: Thank you.
Q All right. Next, I'd like to draw your attention to OZY's period after what you described on the stand yesterday as the *New York Times* hit piece on OZY.
Now, did OZY shut down even after Samir Rao's impersonation was publicized?
A No, we did not.
Q What did you do in order to survive -- well, first tell us, what happened in the aftermath of the *New York Times* reporting on Samir Rao's call?
A We protested to the *Times*. One of our lawyers wrote a letter to their general counsel pointing out Ben Smith's 23-and-a-half-million-dollar incentive to knock us off and asked why they allowed him, despite that, to write seven front-page pieces in seven days against a young company that was not only beating BuzzFeed, but was starting to beat the *Times* in order to get big contracts like GM's 25-million-dollar contract.

And at that point, they began to scramble. They began to limit the degree to which he could write about us.

I went on The Today Show with Craig Melvin. I went on Squawk Box with Andrew Ross Sorkin. I went on The Breakfast Club and explained that as hard as it was, and even if it was going to be just a few of us --

MR. SIEGEL: Objection, Your Honor.

THE COURT: Sustained. Let's have another question at this point.

Q Okay. So, again, without telling us what you said, you visited media, got your story out, what did you do to get additional investors?

A So, we had just a handful of people, Claire, who was here, was gracious enough. My sister quit her job and came and joined us. And, so, there were about five or six of us who got our newsletters going again.

Created new TV shows like Sneaker Fiends. We created a new show with Rick Ross, the musician, called the Rick Ross Car Show. We created a pilot for a show called HBC New Med, which was going to be set in Tennessee. We did some other things on the podcast side, a wonderful podcast called Shirelics. We did a new season of the OZY Genius Awards.

And we announced that we were going to take OZY Fest out of New York for the first time and we were going to bring it to Miami, in South Beach. And we were able to win back big

customers, like Coke came back, AT&T came back, Procter & Gamble came back, DoorDash came back.

One of the biggest agencies in the world signed with us for the very first time, IPG. WPP, the biggest agency in the world, came back in deals with Verizon.

And, so, we were very grateful that despite all of the attacks, that our content was running again. Our audience was built up again and we were running and thriving. And had just gotten word on what would have been our biggest contract ever with Omnicom, which was going to be an eight-figure deal for us in February of last year from the chief investment officer.

Q Did you begin building back up the staff of OZY?

A We did. We were back up to about 50 people.

MR. SIEGEL: Your Honor, can we have a sidebar, please?

THE COURT: Yes.

(Sidebar held outside of the hearing of the jury.)

(Continued on next page.)

(The following sidebar took place outside the hearing of the jury.)

MR. SIEGEL: Your Honor, we've left the period of the conspiracy, so talking about getting new customers, building, hiring new employees is not relevant to any of the facts at issue in this case.

THE COURT: What's the relevance?

MR. SULLIVAN: The relevance is that they continued to get income, they put in evidence, and they elicited evidence of 21 and 22 future projections. We have testimony about it. We just ask for the same consideration and we can cover the same ground that the Government did.

MR. SIEGEL: Your Honor, I don't recall asking about projections about 2022, but --

MR. SULLIVAN: They did.

MR. SIEGEL: But either way, we're not alleging that there was a conspiracy in 2022. The conspiracy was over.

MR. SULLIVAN: But they have prejudiced the jury by asking people could this number be possible, did you think this number could be possible, and Your Honor let that in.

MR. SIEGEL: If Mr. Sullivan could point to a question where I asked about a 2022 number and asked that that could be possible, I'd be very surprised.

THE COURT: Do you have the transcripts?

MR. SULLIVAN: I don't. I'm trying to do a direct

examination that the Government keeps asking for sidebars to break the flow of the direct examination.

THE COURT: All right.

MR. SULLIVAN: Without any legitimate bases.

THE COURT: I'm going to allow a few more questions on this topic. I do think we are reaching the outer perimeter of relevance here, but I will indulge you a bit.

I do want to say that there has been a lot of colloquy between me and you in front of the jury, and there have been what -- I won't go into in a great amount of detail now, but we will all remember as instances of elevated vocalization, and I'm telling you now that I think those interactions are at risk of affecting the propriety of this trial and the due administration of justice here.

MR. SULLIVAN: I --

THE COURT: I don't want to debate this now.

MR. SULLIVAN: Fine.

THE COURT: I'm just putting you on notice that if they recur, we are going to begin considering contempt issues.

MR. SULLIVAN: That's fine. I'm happy to accept the contempt. I don't care how you treat me. You can call me crazy and all other sorts of --

THE COURT: That was off the record here. I think you're totally wrong that the jury heard that.

MR. SULLIVAN: I didn't say the jury heard that.

THE COURT: You alleged that the jury heard.

MR. SULLIVAN: I said you can treat me however you want, call me names, call me crazy, demean me, whatever you want to do.

I object when you start talking in front of the jury and saying that things are -- my client's testimony is not relevant. That's a Sixth Amendment concern.

THE COURT: When I have given you two prior indications that the testimony is not relevant and you've disregarded them, then you start running that risk.

MR. SULLIVAN: The proper way is to call us to sidebar.

THE COURT: Let's continue.

(Sidebar continues.)

(Continued on next page.)

(In open court.)

THE COURT: All right. All right. The testimony should continue. I don't know that we even have an objection.

MR. SULLIVAN: There was an objection that the Court overruled.

I'm so sorry --

THE COURT: Come to the sidebar, please.

Let's let the jury go.

You all can step out for five minutes, please.

(Continued on next page.)

(Continuing)

(The following occurred at sidebar.)

THE COURT: That was an example of the kind of colloquy I'm talking about. Okay?

MR. SULLIVAN: You did overrule the objection.

MS. GILBERT: There was an objection, Your Honor.

MR. SULLIVAN: There was an objection. You overruled it.

THE COURT: Either way -- you're right about that, but I want those conversations -- and I was wrong, but you don't need to correct me in front of the jury, the same way you don't want me to say that your questions are irrelevant in front of the jury. Even though I said it to you twice in private we're not going to have the conversations in front of the jury, even when I'm wrong.

MR. SULLIVAN: Fair enough. I apologize.

I'm going to set up the board. I will stop this line after two questions and then move.

THE COURT: Okay.

(Sidebar ends.)

(In open court; jury not present.)

THE COURT: Let's consider this the first full-fledged break of the morning.

The witness is excused.

We'll resume, let's say, 25 minutes after the hour.

(Recess taken.)

MR. SULLIVAN: One quick request.

My handwriting is atrocious. Does the Court mind if Ms. Gilbert writes on the board?

THE COURT: How is Ms. Gilbert's handwriting?

MR. SULLIVAN: Much better than mine.

THE COURT: Then no objection.

MR. SIEGEL: Judge, on this issue you said that, as he talked about these deals, I could do a voir dire.

What do you want the procedure for that to be?

THE COURT: So I think your question is: Are there written contracts and, therefore, is there a 1002 issue?

Is that a fair --

MR. SIEGEL: Yes.

THE COURT: -- high-level statement of the issue?

Then we should do that outside the presence of the jury.

Let's hear the foundation from the defense first and then, if you believe there's a 1002 objection, you'll raise it and we'll proceed accordingly.

MR. SULLIVAN: Okay.

THE COURT: We're ready for the jury.

MR. SIEGEL: Are we going to do that now or outside the presence of the jury?

THE COURT: So I don't understand your objection to be ripe yet. Maybe you're telling me it is.

I was anticipating that Mr. Sullivan would lay whatever foundation he wants to lay for the line items that he and Ms. Gilbert are going to mark on the board and if you think, having heard that foundation, that there is a evidentiary issue, then you will raise it; and if the voir dire is appropriate, we will do that at that point out of presence of the jury.

MR. SIEGEL: So, Your Honor, I leave it to the Court but just to avoid having the jury come in and then potentially, pretty quickly, go right back out, if we could just understand what the foundation is and then we can understand if we need to do it. And then we can do it now or just not.

MR. SULLIVAN: I can certainly make a proffer, so as not to be duplicative.

But the witness Mr. Watson has already testified that he negotiates at high levels with the CEOs on the other side and then his staff and those folks do the details. And we've put in evidence a couple of contracts already and it

shows Rao's signature on the actual contract.

His testimony is going to be limited to his understandings of the deals that he struck with his counterparties, the top person at whatever agency, and what was in his mind as to what the revenue was coming in to Ozy. And on that basis alone, very similar to the NPR testimony that, wait a minute, I know I negotiated a deal with NPR, I don't see it reflected here.

THE COURT: Okay.

But I think the precondition for the relevance of all of that is the implicit assertion in what you just said; that these high-level negotiations that Mr. Watson negotiated resulted in binding contracts.

Right?

MR. SULLIVAN: Not necessarily. Remember; good faith, you could be wrong.

Let's say he had a good faith belief that the contract with Omnicom was done. He put that in his head, you know, we got a hundred dollars here. For whatever reason, it -- there were hiccups with the two staffs and it didn't get signed. But if he, in good faith, believed that this was a done deal, that revenue was starting to come in on X date, that is admissible.

It goes to weight, not credibility, what Mr. Siegel was saying, and even what Your Honor is suggesting, he can

cross-examine on it, but all I'm asking is what was in his mind.

We've already gotten testimony and agreement from one of their witnesses, Mr. Watson was Mr. Outside, Mr. Rao was Mr. Inside. This was Tom Franco. He testified. Mr. Watson testified to the same effect.

So I'm just going to limit it to what was in his mind without reference to any contracts.

THE COURT: So I think this all goes to what is appropriately termed a good faith defense. That even if the revenue didn't exist, Mr. Watson believed in good faith that it did.

But there are still foundational questions that I think need to be satisfied which were -- which are what was the good faith understanding to which you're referring. You're saying this was a good faith understanding that this revenue was realizable, essentially. Mr. Watson is a lawyer. I just learned, I think, that he was the chairman of an audit committee.

THE WITNESS: Of the largest education company in the world, worth north of $10 billion.

THE COURT: Okay.

So obviously familiar with accounting rules if he's chairman of an audit committee at a extremely large publicly-traded company.

You can have two kinds of good faith understanding at least. One, I understand that we have some sort of nonbinding agreement in principle and that, hopefully, a contract will emerge when the parties sit down and hammer it out in writing. Or two, we have an oral contract. And I think the rule that the Government is invoking of Federal Rule of Evidence 1002, and -4, apply differently from one of those two contexts to the next.

MR. SULLIVAN: Yeah, I think it applies differently if we were invoking a contract.

But ours is the former.

Let's see, the sort of --

THE COURT: Sorry, so you thought they did have a binding contract or they didn't?

MR. SULLIVAN: No, no, that he thought they had an agreement and that the people would work out -- they would work out a contract. But once he's finished --

THE COURT: You said: He thought he had an agreement.

A legally-binding agreement?

MR. SULLIVAN: He thought he had an agreement with the CEO.

THE COURT: A legally-binding agreement?

MR. SULLIVAN: I mean, I can ask him. I don't know how much he remembers from first year of contracts. He

actually never practiced law. But he thought that the deal would go through.

So no -- I'm not going to ask him about the actual contract, but what was in his mind at the time. Did he think that this was revenue coming into the company? Obviously, things can happen, but did he believe that in good faith? And that's a jury question.

MR. SIEGEL: If I could clarify my objection.

THE COURT: I'm going to jump in, the Government can tell me I'm misunderstanding their argument.

But to the extent the Government's argument is he should not be allowed to testify to his understanding of the agreement unless the original copy of the agreement is coming in, I think that that objection should be overruled.

Because he's not testified to the -- as I understand the proffer now from Mr. Sullivan, Mr. Watson is not testifying to the contents of a written agreement that is missing from evidence. He's testifying to a different subject, which is an oral conversation with somebody on the other side that may have resulted in a binding contract, it may not have.

I actually now think, as we drill down even more, that the answer to that question may not even matter on the 1004 question. But either way, unless I'm missing something, the objection will be overruled.

MR. SIEGEL: Well, that wasn't my objection. I apologize, Your Honor.

THE COURT: Sorry.

What's the objection then?

MR. SIEGEL: So the objection is, if we're talking about his state of mind, I guess there's two scenarios. And obviously, there could be gray, but just to break it down.

It could be he had these discussions, he passed it off and he actually never saw the final agreement, so he doesn't know what's in the final agreement, so his understanding is based on those discussions. If that's the testimony and he doesn't actually know what -- the contracts, then I don't have an objection.

But if it's: I had these discussions and then later saw the contract and I know what's in the contract, then what he discussed before isn't actually relevant to his state of mind because he would have seen the actual contract.

So the foundation to just talk about in -- the foundation to talk about this was my understanding before I actually saw the contract has to be that he didn't actually see the contract. Because if he saw the contract than what's relevant is what's in the contract.

THE COURT: That sounds like fodder for cross-examination to me.

Right?

So let's say he admits on cross, yes, there was a written contract, later this was all reduced to writing and I saw that writing.

MR. SIEGEL: But we don't have that writing.

THE COURT: Well, then that may be a foundational question that we want to ask by way of voir dire.

MR. SIEGEL: And so that's what I'm getting at.

If the foundation is: Actually, I did see the contract -- if the testimony is: I did see the contract and I understand the terms of the contract, then we should have the contract.

If it's: I don't see the contract and I don't know it, here's my understanding based on the high-level conversations I had beforehand, then I don't have an objection.

But what I don't want is a situation where it's:

Did you have these discussions.

Yes.

On cross: Well was that ever reduced to an agreement?

Yes, it was.

And then we can't talk about what was in the agreement because we don't have the agreement.

THE COURT: And you would ask me at that point to strike all of the testimony as a discovery sanction,

essentially.

Is that where that ends up?

MR. SIEGEL: And it's become irrelevant.

THE COURT: All right.

Let's have the voir dire then and just hear where this is going so we don't have to hypothesize.

Mr. Sullivan, do you want to lay the foundation here?

MR. SULLIVAN: Sure.

THE COURT: And the Government will have its opportunity.

MR. SULLIVAN: Sure.

VOIR DIRE

BY MR. SULLIVAN:

Q Mr. Watson, did you negotiate contracts on behalf of Ozy?

A Yes.

Q With whom did you negotiate? At what level?

A Typically, the CEO.

Q Did you engage in the drafting of the contract?

A Typically, I handed that off to other people.

Q Your testimony you're about to give today, are you testifying about contracts or are you testifying about the conversations?

A Testifying about the conversations.

Q Now, with respect to any contracts that derived from

those conversations, is it your habit and practice to actually read those contracts when they come in?
A Typically, the lawyers and others make sure that they go through that.
Q How long are they, if you have a sense?
A Anywhere from ten to a hundred pages.
Q And do you have time to go through and check and see -- did you ever go through a contract and check and see if it comported with what you and the counterparty CEO agreed to?
A I'm sure I did on occasion, but given that we had over 500, you know, I'm sure there are many that I did not.
Q Do you have a specific recollection of any of those contracts where you're going back and forth, checking?
A Not at the moment, but I'm -- you know, I'm sure I could be refreshed.
Q In terms of the vast majority of what you were doing, were you relying at all on the contracts?
A I was relying on the conversations I was having with the CEOs and/or the senior exec who was in charge.
Q And I guess the last question.
In terms of the numbers you formulated in your head that you're about to testify about, what are those based on?
A Those are based on those conversations.
MR. SIEGEL: May I voir dire, Your Honor?
THE COURT: Yes.

VOIR DIRE
BY MR. SIEGEL:
Q So, Mr. Watson, the negotiations you're about to talk about, did they result in written contracts?
A Many times, yes.
Q But not all the time?
A No. We had both orally and written contracts.
Q Okay.
For the written contracts, did you ever see those contracts?
A I'm sure in some cases. In fact, we had binders in the office that had contracts in them. Didn't mean I necessarily looked at the individual one, but I knew that we had binders that kept all of our contracts.
Q So did you see them?
A I can't say that I saw all of them, no.
Q Did you see any of them?
A Sure, yeah.
Q Which ones?
A Probably would take me too long to go through those.
Q Are you familiar with those contracts?
A Certainly at a high level. But again, if it's a 54-page contract, could I tell you for sure what the active guide clause is or could I tell you for sure what the renewal policy is or could I tell you for sure what that is, no, couldn't.

Q If I were to show you the contract, would you be able to say: This is the contract?
A Normally, I would say yes. But given that your star witness has said that he altered a number of them, you gotta -- I probably would want to make sure that these were the real ones.
Q So we have defense exhibits, supposed contracts.
A Yeah.
Q If I showed you those contracts, would you know if they're the real contracts?
A I bet you in some cases I would.
Q In which cases?
A I would have to see which ones you're talking about.
I mean, again, you know, we're talking about more than 500 contracts, right?
THE COURT: I thought we were talking about -- I'm sorry.
THE WITNESS: Yeah.
THE COURT: I thought we were talking about five or six contracts.
MR. SIEGEL: Yeah.
A But I thought you were talking about all of Ozy's contracts.
Am I misunderstanding what you're referring to?
Q Whatever we're going to be putting on the board.

THE COURT: Yes, could we say the names of the contracts.

MR. SULLIVAN: I'm not asking about any contracts. I don't have any names of contracts.

But all of our contracts, I think over 200 contracts are in the early binders there. So the Government's representation they don't have contracts, they can look at all the contracts they want to look at. I'm not going to ask him a single question about contracts, just what his idea of the revenue was over the years based on his negotiations with the CEOs. That's it.

MR. SIEGEL: Your Honor, I may have misunderstood the whole thing.

MR. SULLIVAN: It's simple good faith.

THE COURT: So revenue recognition requires a contract.

THE WITNESS: I'm sorry?

THE COURT: So revenue recognition requires a contract. Point one.

Point two, whatever we call these things, whether we call them contracts or agreements, as you said, or conversations, whatever, which contracts or agreements or conversations are we talking about so we can figure out if there's a written contract on these subjects or not?

MR. SULLIVAN: So we're talking about the revenue

from 2016 to 2021.

And unless, of course, the Government will agree to strike all the testimony they elicited from 16 and 17 and 22, I'm happy to do 18 through 21.

THE COURT: Who are the counterparties? I thought we said it's just five or six. And we're right about to hear them as soon as the jury comes back in.

MR. SULLIVAN: Right.

I'm not sure what the Court means by five or six.

Oh, I know what you mean. Five or six categories; so TV, podcasts.

THE COURT: I see.

MR. SULLIVAN: Newsletters.

There was an understanding. That's what I meant; of how much he was earning on each of those lines. Not contracts.

THE COURT: But not by reference to this was NPR or this was Goldman Sachs or whoever the advertising partner would be?

MR. SULLIVAN: No -- right. He has a general understanding of who he negotiated with.

So for example, he'll say, look, in a particular year we had three TV shows, two were earning about 3 million a year, I negotiated those contracts and I negotiated the Carlos Watson advertising deal for 5 million. Right?

That's his memory.

THE COURT: Can we have a few names?

I assume there are going to be names that we're going to hear in the next five minutes, assuming we can wrap this topic up.

MR. SULLIVAN: Sure.

VOIR DIRE (Continuing)

BY MR. SULLIVAN:

Q Mr. Watson, let's pick a year; 2018 TV revenue.

How many shows did you have?

A We had two shows.

We had Breaking Big at PBS and we had Take on America, also at PBS.

Q Did you negotiate with anyone at those two networks?

A I did, yes.

Q I'm just going to fast-forward.

And do you recall what the price was you negotiated for with the first one, was Breaking Big?

A Roughly $3 million.

Q And what was the second one?

A It was Take on America.

Q Take on America.

Do you have a memory of what you negotiated with them?

A Roughly the same, $3 million.

Q So that's what I want to --

THE COURT: So the counterparty on the first one is somebody and the second one is PBS?

THE WITNESS: Both were PBS shows.

THE COURT: Both PBS.

THE WITNESS: Yes.

THE COURT: So you understood, if I understand this whole line of questioning correctly, that that revenue was going to be due from PBS.

THE WITNESS: Correct. Or their affiliates.

PBS is a particularly interesting group in that they work with something called the Corporation For Public Broadcasting as well, too. But yes.

THE COURT: Whatever, yes.

THE WITNESS: Yes, yes, the PBS family.

THE COURT: But did that ever -- so for that example, was there a written contract in the end?

THE WITNESS: There was a written contract, I believe, yeah.

THE COURT: Do you have that written contract?

MR. SIEGEL: I'm not sure.

But the question is, the question for this voir dire is: Was -- is he familiar with that written contract?

THE COURT: Ask a couple of, you know, genuine voir dire questions.

VOIR DIRE (Continuing)

BY MR. SIEGEL:

Q Are you familiar with that contract?

A At a high level, that there was a contract.

Q Have you reviewed it?

A I have not.

Q So you would not be able to recognize that contract if I showed it to you?

A I hope, if we sat together for a while and I looked through it, I probably could, but I can't tell you for sure.

Like, I don't have a specific immediate memory of it.

Q Yeah, but why is it that if we sat for a while, you could determine it, if it's not something you reviewed it before?

A I can determine it, generally.

But good question, if you wanted me to do it to 100 percent certainty, I couldn't do it while we're sitting here.

THE COURT: I think we're trying to figure out here whether the contract we're going to be hearing about, even obliquely, was produced in discovery or as otherwise required or not.

MR. SIEGEL: I mean, we have one for PBS for 2017. I'm not sure if this is the right one. There's a picture of Breaking Big in it, but again, I don't know. But it

appears -- there was a Bates number that it was produced during the trial.

THE COURT: By the defendants, to you?

MR. SIEGEL: Yes.

THE COURT: Okay.

So what is your objection at this point, if anything?

MR. SIEGEL: Well, my objection is, if he's familiar with the contract and knows what the contract says, then he shouldn't testify about what he thought before he saw the contract, he should testify from the contract, if it can come in to evidence, which we would object to.

THE COURT: And you object to it coming into evidence on what basis? Discovery violations?

MR. SIEGEL: Yes.

THE COURT: And the prejudice to you of that contract being produced to you in violation of -- well, let's count the violations, if there are.

Was it produced to you pursuant to Rule 16 discovery?

MR. SIEGEL: Not at the deadline set by the Court.

And look, I want to be super careful with my words, Your Honor.

There's several hundred defense exhibits. They have Bates numbers on them. When I say something wasn't produced

in discovery, I'm basing that on the Bates number.

THE COURT: Have they been produced under a different Bates number, you're saying?

MR. SIEGEL: I have not been able to do a comprehensive search of was this produced under a different Bates number.

That's a question that we've asked and haven't gotten an answer on.

THE COURT: I think the burden is on the defense to answer to that question.

MR. SIEGEL: Like, but in terms of the Bates number, this wasn't produced pursuant to the Grand Jury subpoena, it wasn't produced during the trial, and it wasn't identified as an exhibit.

MR. SULLIVAN: So I'm not offering it as an exhibit. This has nothing to do with -- this is what was in his mind in conversations with a CEO counterparty. That's all.

It goes to good faith.

THE COURT: So if the Government, by all fairness and reason, should be able to cross-examine on the basis of this contract because whatever's in his mind might be contradicted or amended by the fact that there's a written contract, that says something different than what --

MR. SULLIVAN: Then that's cross-examination.

THE COURT: Yes, but I'm trying to assess the

prejudice of the fact that the Government sent the Grand Jury subpoena, that I take it the Government is going to argue to me called for the production of this contract, point one;

Got no response to that Grand Jury subpoena, point two;

Filed a motion to compel compliance with the Grand Jury subpoena, point three;

The Court ordered compliance with that Grand Jury subpoena, there was a court-ordered Order of Compulsion, point four;

Point five, this would be, I think, perhaps Rule 26.2 material as to the -- would it be or no?

MR. SIEGEL: No.

MR. SULLIVAN: Not with respect to Mr. Watson.

So, Your Honor --

THE COURT: But all of those --

MR. SULLIVAN: Well, just that I don't accept one, two, three, four and five, Mr. Gilbert is going to speak to that because many of these contracts have EDNY Bates numbers on them, but --

THE COURT: But this doesn't --

MR. SULLIVAN: -- this is just classic --

THE COURT: So let's pause there.

MR. SULLIVAN: Okay.

THE COURT: Because this is really important and

we've been having this same conversation this whole way through.

Do you have a good-faith basis to believe that this document was either produced by you to the Government in discovery or by the Government to you in discovery?

And if you think you do have that good faith belief tell me what inquiries you made on that specific subject and what you learned.

MR. SULLIVAN: Okay, two answers. I'm going to ask Ms. Gilbert to respond specifically, she's been dealing with documents.

A second answer is, Mr. Watson just said on voir dire he couldn't recognize it anyway. So the Government could show it to him and he would say --

THE COURT: He said he wasn't sure.

MR. SULLIVAN: -- could say, you know, I don't know, I didn't do it at this level.

THE COURT: He said: I might, I might not. I don't know that we got a definitive answer to that question.

But look, we're going in circles here, for the most part.

MR. SULLIVAN: Can I just make one quick record?

THE COURT: Let me just say something that I've already said before, but I think is very important to reiterate here.

When a document is produced in discovery, there is typically, if not almost always, a cover letter that indicates --

MS. GILBERT: Your Honor, I provided those.

THE COURT: Let me just finish.

You have a cover letter on this document?

MR. SULLIVAN: I don't know what this document is.

What number are you talking about?

MR. SIEGEL: So, Your Honor, if I could go to specifics.

THE COURT: Let me just finish.

No, I thought I was going to get a very quick and maybe conclusive answer from Ms. Gilbert.

MR. SULLIVAN: But we don't know what document they're talking about.

THE COURT: Let me just finish I'm saying.

If you believe either this particular contract was by the defense to the Government or by the Government to the defense, it should not be very difficult to come up with a cover letter that says, from whichever party to whichever party, we are hereby producing documents Bates numbered as follows, and setting forth a Bates range that includes this document.

And it is incumbent on the defense to try to come up with that evidence. And it has not materialized one time

despite the maybe dozens now of times we've had conversations like this.

I understand the defense has said that they've had trouble communicating with prior counsel, but I also think that prior counsel has an ethical obligation -- I could be wrong about this -- to turn over a defendant's, a criminal defendant's files, even if the criminal defendant is not paying his or her legal bills.

And so, I would want some further specifics, all of which have so far been not forthcoming, about exactly how you asked prior counsel for these files and exactly how they refused to respond.

Did you send them letters on what date, to whom, what makes you think they got these letters? Show me the back-up. I am, again, asking for that and, again, not receiving it.

MR. SIEGEL: Your Honor, if I may?

THE COURT: No. I want an answer to that question from the defense first.

MS. GILBERT: Hold on.

Your Honor, first of all, we did provide as Exhibit A to our letter --

THE COURTROOM DEPUTY: Counsel, please use microphone. The mic.

THE COURT: You provided what? I'm sorry.

MS. GILBERT: We provided as Exhibit A to our letter, I believe it's seven letters from Dechert, which were their seven --

THE COURT: Okay. Get the Bates number of this document from the government right now.

You have a Bates number?

MS. GILBERT: So, Your Honor, if I could just finish my sentence, I would appreciate it.

The problem is, it relates to our e-discovery system.

We produced numerous documents as -- under -- when Dechert had the case. They produced thousands of documents.

THE COURT: That's the answer I get every time: We produced thousands and thousands of documents.

MS. GILBERT: Can I finish my sentence?

THE COURT: But you can't tell me -- can you tell me, please, yes or no, whether this contract was produced.

Can the government give Ms. Gilbert, right now, a copy of -- whatever copy you're looking at -- of the PBS contract so that we can get a specific answer? Do you have a record that this document was produced, yes or no?

I don't want to have a wide-ranging and general colloquy on the history of discovery. I want to know if somebody can tell me definitively whether this document was produced in discovery or produced in response to a grand jury

subpoena or not.

MR. SIEGEL: And, Your Honor, this is Defense Exhibit 25 that we're showing to Ms. Gilbert.

THE COURT: And for the record, it's Defense Exhibit 25.

Can somebody read the Bates number into the record right now?

MS. STERN: Your Honor, it's --

THE COURT: We need you on a microphone.

MS. STERN: Your Honor, it's Watson 01714676.

THE COURT: Thank you.

Ms. Gilbert, do you have a definitive answer as to whether that document was produced or not? And this is really just in the first instance a yes or no question.

MS. GILBERT: The answer is not a yes or no answer, Your Honor. So --

THE COURT: You either have the evidence or you don't.

Do you have a document that shows that this was produced in discovery? A cover letter, an e-mail, anything like that, yes or no?

MS. GILBERT: That specific version of this document, the answer is no.

And if you would let me --

THE COURT: Please.

MS. GILBERT: Thank you.

THE COURT: Thank you for answering in the first instance with a yes or no.

MS. GILBERT: Our e-discovery system makes it very difficult for us to find documents. And so what we've had to do is search for documents and then re-Bates stamp them.

So, many documents that we have and that we've provided in our discovery -- or, I'm sorry, in our trial exhibits, are documents that either have been previously provided to the government under a prior Bates stamp number or have been provided actually by the government to us and they now have a Watson Bates stamp number.

THE COURT: Okay.

Do you know who put that Bates number on the document that we just -- the Bates number that was just read into the record, do you know who put that there?

MS. GILBERT: We did, Your Honor.

THE COURT: Who is "we"?

MS. GILBERT: The defense did.

THE COURT: The current defense did.

MS. GILBERT: Yes the current defense team did.

THE COURT: And do you know when that happened?

MS. GILBERT: That would have happened before we provided the documents on May 29th, which was when we provided those files to the government.

THE COURT: How do you distinguish your Bates numbers from prior counsel's Bates? Is it the same kind of alphanumeric string or it's a totally different number of digits or?

MR. SIEGEL: Your Honor --

MS. GILBERT: It's the same, Your Honor.

The problem is, the documents that are in the system are not actually stamped. They're given control numbers.

The e-discovery system is part of the problem here, which is why we have not been able to give you a definitive answer to all of these questions. Because the e-discovery system puts these documents in something called Relativity.

Relativity doesn't necessarily have the Bates stamped numbers on them all the time. And so they re-image them and then add Bates stamps to them.

THE COURT: Okay.

But so if the answer -- now that I've heard a little bit more of the background, if the question is, do you know one way or the other whether previous counsel produced this document, I think the fair answer to that question is: We don't know.

MS. GILBERT: Correct. That's what I said.

THE COURT: Okay.

And so then my question becomes: What efforts did you make and when, starting when, to find out, if any?

MS. GILBERT: To find out when that particular document was provided?

THE COURT: Whether and when that document was provided, yes.

MR. SULLIVAN: As soon as I came on the case, I spoke -- I'll take this, because Ms. Gilbert is new. I undertook to speak with prior counsel. I was told that between their --

THE COURT: Who did you speak to?

MR. SULLIVAN: The people at Sher Tremonte.

And I was told that between the government seizure and their production, that everything on Ozy's Google Suite has been produced, every e-mail, every attachment to e-mail -- all of the contracts were attachments to some e-mail -- that everything was produced to the government well-before I came on the case.

THE COURT: Everything in Ozy's Google Suite?

MR. SULLIVAN: Everything in Ozy's...

THE COURT: What's a Google Suite?

MR. SULLIVAN: The thing that hit -- that holds all of their documents. I may be using not the exact term.

THE COURT: A cloud drive?

MR. SULLIVAN: Yes. Yeah, something like that. Whatever -- wherever all of their material is, that was given to the government.

And that was the nature of the discovery dispute and we sent that as attachments, that they have everything.

THE COURT: Mr. Watson just indicated that these binders were made -- sorry, that these contracts were maintained in binders, which I took to be a reference to a physical, three-ring binder.

Did you make any efforts in respect of physical documents to ascertain whether they were produced or not?

MR. SULLIVAN: I did, yeah. And no, they don't have any other of the physical documents in their possession.

THE COURT: Ozy has no physical documents?

MR. SULLIVAN: No.

MR. SIEGEL: Your Honor?

THE COURT: Yes.

MR. SIEGEL: Just on the -- I understand that Mr. Sullivan is relaying what was shared by Sher Tremonte.

THE COURT: What about the prior counsel?

Did you speak to --

MR. SIEGEL: Hold on, but just, I want to be clear.

THE COURT: Yes.

MR. SIEGEL: This idea that we got the entire Google Suite is, is not -- that's certainly not my understanding.

THE COURT: Okay.

MR. SIEGEL: That would be many more documents than we've gotten. Then we wouldn't have need the order to compel.

Because we would have had everything.

THE COURT: Okay.

Mr. Sullivan, who told you at Sher Tremonte that they produced the entire suite of Google documents?

MR. SULLIVAN: It's in the letter that we provided Your Honor. I don't have a specific recollection.

THE COURT: The name?

MR. SULLIVAN: I'm sorry?

THE COURT: The name of the lawyer with whom you had that conversation is in the letter?

MS. GILBERT: No.

MR. SULLIVAN: Or the names of the lawyers who made these representations are in the letter.

THE COURT: Mr. Sullivan, you just told me that you had a conversation with one or more lawyers at Sher Tremonte when you came onto the case.

MR. SULLIVAN: Correct.

THE COURT: And that they represented to you that the entire Google Suite of documents had been produced.

MR. SULLIVAN: Correct.

THE COURT: Who was that conversation with?

MR. SULLIVAN: I don't remember.

One of the -- there were two or three lawyers I spoke with. I didn't know them before, I don't know them now.

THE COURT: Do you remember if it was a man or a

woman?

MR. SULLIVAN: There was a man and a woman on the telephone.

THE COURT: Do you remember who told you that statement about the Google Suite?

MR. SULLIVAN: I don't, Your Honor.

I remember the conversation and I remember the e-mail string that we put on your -- that we attached to a letter.

THE COURT: Okay.

MR. SULLIVAN: So that's my knowledge.

And they -- but the representation was that prior counsel could not, through Mr. Watson, afford to keep reproducing the things that they believed had already been produced.

THE COURT: Sorry, so when -- in the conversation with Sher Tremonte, do you remember whoever this lawyer was saying that Sher Tremonte produced the Google Suite or that prior counsel had produced it, or do you not remember?

MR. SULLIVAN: I don't remember specifically.

THE COURT: Okay.

MR. SULLIVAN: But some prior counsels.

MR. SIEGEL: My recollection is that Sher Tremonte, which wasn't in this case for very long, didn't produce -- I don't think Sher Tremonte produced anything because they

joined the case and then they left before the order to compel.

THE COURT: So that's where I was going earlier.

MR. SULLIVAN: It could have been prior counsel. I accept that. I just don't remember.

THE COURT: Okay.

So, Mr. Sullivan, what effort did you make to understand what documents had been produced by what we're now calling prior counsel? Which I assume includes Dechert, Covington.

MR. SIEGEL: The only productions that we got were from Ford O'Brien and Dechert and then we got eight documents from Steptoe at one point.

THE COURT: Okay.

MR. SIEGEL: But the bulk of it was -- were from Dechert.

THE COURT: But put aside the Steptoe.

What efforts, Mr. Sullivan, did you make with respect to understanding what had been produced or not by Dechert?

MR. SULLIVAN: Looked at the letters and the e-mail traffic I was provided between the government and prior counsel. I looked at the seizure.

THE COURT: How did you get those letters?

MR. SULLIVAN: Prior counsel would have forwarded them to me. I think there were in his e-mail chain that we

attached to one of the letters to you.

So I say letters loosely. E-mail, e-mail chains about the history of discovery.

I also undertook --

THE COURT: Just to jump in here, I thought I understood Ms. Gilbert's letter of yesterday on this subject to indicate that you were constrained in your ability to know what prior counsel had produced or not because they wouldn't answer your phone calls or e-mails.

MR. SULLIVAN: Yes.

THE COURT: And now I'm hearing --

MR. SULLIVAN: No, no, not now. This was later. When I first came on the case, I got this. When some of these issues ripened --

THE COURT: You have their file of everything they produced?

MR. SULLIVAN: -- a few years ago.

I do not.

I have the representation that material has been turned over not once, but more --

THE COURT: Who did you get that representation from?

MR. SULLIVAN: Well, let me finish putting on the record.

THE COURT: Well, no. I need to be able to jump in

because I want to make this -- the devil is always in the details, obviously, and specifics are important.

When you say you got the representation from Dechert that they had made these productions, who at Dechert made that --

MR. SULLIVAN: No, no. I talked with the previous counsel. With Sher Tremonte. They sent me a --

THE COURT: Did you speak to anyone at Dechert?

MR. SULLIVAN: I did not speak to anyone. I did not personally speak to anyone at Dechert.

MS. RONCZYK: We have their communications.

MS. GILBERT: I have seven cover letters that I attached to the letter that we sent to Your Honor, which list --

THE COURT: That are from who, from Dechert?

MS. GILBERT: From Dechert.

THE COURT: Okay.

MS. GILBERT: That list all of the productions that they did.

THE COURT: And did you get those from Dechert or did you get those from Sher Tremonte?

MS. GILBERT: Your Honor, I believe that we received them from Sher Tremonte.

THE COURT: Okay.

So you got, I mean, this is where we keep circling

back to.

You got a grand jury subpoena, or two grand jury subpoenas. The government represented in a filing to the Court that they had not received full compliance -- full production in compliance with those subpoenas. There was litigation about that and I ended up issuing an order to compel production of all materials that were responsive to the subpoena, but that had not been produced.

And I am trying to be measured in my language here, but it is astounding to me that in that context, there was not any more effort to understand whether materials like the ones we're about to see today, this PBS contract, were produced in response to the grand jury subpoena or were not produced.

Obviously, compliance with grand jury subpoenas and court orders of compulsion are very, very important things in Federal Court, not to be treated trivially or cavalierly.

And all I'm hearing today from the defense, I think, is that you believe that everything had been produced because you talked to Sher Tremonte and they said the entire Google Suite has been produced, notwithstanding all this specific litigation in which the government was making representations about omissions and gaps in the production.

Is that a fair characterization? What am I missing?

MR. SULLIVAN: No.

First, you misrepresented what I said.

Second, you never let me finish, so I can't complete the thought.

So I submit on the letters that Ms. Gilbert has put before the Court.

THE COURT: What else did you do, besides having the conversation with Sher Tremonte when you first came into the case, what else did you do to assure yourself that compliance with my order of compulsion was complete?

MR. SULLIVAN: I reviewed the letters or e-mails that they sent me, the representations from big law firms that I tend to trust what they're doing, what they're saying.

I also looked at the seizures. They seized both of Mr. Watson's telephones and they seized the computers at Ozy.

THE COURT: Okay.

Where did you get --

MR. SULLIVAN: The information that I have seen has come from an Ozy e-mail. And I have, as I sit here today, a good faith belief that the government has every e-mail from Ozy. Any document I have was an attachment to an e-mail that I found on the same database that the government seized when they arrested Mr. Watson.

That's my belief. If there is anything extra out there, I don't know about it, I don't have access to.

THE COURT: Where did you get this contract?

MR. SULLIVAN: Sorry?

THE COURT: What number? Give me the exhibit number on this PBS document.

MR. SIEGEL: Exhibit 25.

And, Your Honor, Mr. Sullivan said we seized the computers at Ozy. That never happened. We seized a laptop that Mr. Watson had in his possession, which we've never been able to access.

THE COURT: Mr. Sullivan, where did you get Defendant's Exhibit 25 from?

MR. SULLIVAN: Most directly from Relativity.

Prior to that, it came from an Ozy e-mail where this was attached.

THE COURT: Who set up the Relativity database?

MR. SULLIVAN: It was set up before I got in the case. I don't know.

THE COURT: Okay.

So the Relativity database is set up before you got in the case. This document is in it. You don't know who collected it or from where. The government says -- well, let me -- did somebody produce -- yes.

So, I think your --

MR. SULLIVAN: I don't know if the government doesn't have this document already.

THE COURT: Well, you know that they do.

MR. SULLIVAN: The number is 25 and these are

documents that the Court already said in that first evidence batch, you said if we have it in by this date, then we're okay. That was numbers one through what.

THE COURT: Not saying you're okay.

MS. GILBERT: That was --

THE COURT: I said if you didn't get it in by that day, you wouldn't be okay.

MS. GILBERT: And those were all in.

MR. SULLIVAN: What were those numbers, 1 through what?

MS. GILBERT: It was 1 through 517.

MR. SULLIVAN: Yeah, 1 through 500 or so.

THE COURT: But when? When was this document produced?

MS. GILBERT: May 29th, Your Honor.

So the government has had it for over a month.

THE COURT: Okay.

But this, so I think we've been talking about the contracts in two batches, by and large, which are batch number one was the nine contracts attached to Mr. Pincus's report, which they've had for longer and I think we all agree that those are fair game.

I think we've been sort of generically referring to the next 200 contracts as being contracts we would assess on a case-by-case basis.

If I made a ruling that everything produced as part of those 250 numbered exhibits would be admissible over a discovery-related objection, please point me back to that. I don't remember issuing that order.

MR. SIEGEL: Your Honor, if I may?

THE COURT: No, we've got to get one thing at a time. Let's answer that question.

Do you believe that I said at some point that --

MS. GILBERT: Yes.

THE COURT: -- everything produced in that first batch of 250 -- I think this is on the docket, right?

Let me just pull up the docket.

MR. SIEGEL: Your Honor, I believe it's a May 24th order. And I think Your Honor actually said exactly the opposite.

THE COURT: That was my recollection.

MS. GILBERT: No, I think you said it actually in court.

THE COURT: Well, I need you to point me back to it then.

MS. GILBERT: I'm going to look. Since it's just being raised now.

MR. SIEGEL: Your Honor, I think we've raised this, basically, every day of trial.

THE COURT: I understand, but if I made a

commitment --

MR. SIEGEL: Just in response that this is just being raised now. I think everyone is sick of me raising this every day.

THE COURT: All right. One thing at a time.

My order was what date, Mr. Siegel?

MR. SIEGEL: I believe it was May 24th. I just -- it could be May 23rd or.

THE COURT: I'm going to look at the document now.

Yeah, this is May 24th, ECF 160.

(Continued on the next page.)

(Continuing.)

THE COURT: So I say, I'm telling the defense that they are delinquent in producing exhibits. This is my order of May 24th. I say given the late hour, the defense should assume that any exhibits not produced by the deadline will be precluded at trial and I cite some cases and I say at the same time the defense should not assume that exhibits it does so produce will be admitted over a timeliness objection.

So, Ms. Gilbert, you're telling me that you believed I reversed myself on that?

MS. GILBERT: I believe so. I'm looking right now if you can just give me a minute.

(Pause in proceedings.)

THE COURT: Let's proceed this way. I'm going to give you the entire lunch hour, Ms. Gilbert, to find this instance where I reversed myself on that order and came out the opposite way. Let's resume the direct examination, but not on this subject. We'll cover a different area.

MR. SULLIVAN: This is the last subject for me, Your Honor, and I'm not invoking any -- to get back to the original conversation, I'm not invoking any contracts. This is his memory of his discussions, classic good faith. Every defendant in a criminal case has a right to put on a good faith defense. The jury can believe him or not but it's classic good faith.

THE COURT: Do you agree that whether the violation was willful or un -- or not willful, that the later appearance of this document is a violation of my order compelling production -- compelling compliance with the grand jury subpoena?

MR. SULLIVAN: I'm happy to brief it. I don't know as I sit here today. I don't think it's relevant to my continuing testimony with Mr. Watson, though.

THE COURT: That was my next question. So, I understand, as we all do, that a defendant's rights to put on a full throated defense are of absolute paramount importance under the Sixth Amendment and otherwise. At the same time, those rights are not a license to engage in not only sustained gamesmanship, but also the willful choice to ignore Court orders.

Let's say this was material the Government should have had and should have had an opportunity to investigate pursuant to any of the following: The rules of discovery under the Federal Rules of Criminal Procedure, the obligations of the defense in response to the grand jury subpoena, the order I issued compelling production under that subpoena and otherwise?

What should the consequence be if there was a choice made simply to blow off all of those imperatives?

MR. SULLIVAN: And I would say when we wave the

Sixth Amendment imperative against either a statute or a rule, the Sixth Amendment, the Constitution, trumps and trumps always.

THE COURT: But the Sixth Amendment is not unlimited. We've all been through *Taylor versus Illinois* and the other cases here. I'm asking you what should the sanction be?

MR. SULLIVAN: That's what I'm answering. I'm weighing the equities in full view of the Sixth Amendment and the values that underwrite the Sixth Amendment always trump statutes and rules. I would say if the Government actually maintains that they never had that document, whatever document they're talking about, and they need additional time to review it, then the Court should grant a brief continuance and let them review it.

MS. GILBERT: And I would cite Your Honor to two Second Circuit cases for that.

THE COURT: Maybe a continuance is the right answer, but that should be the only consequence of --

MR. SULLIVAN: Absolutely. Not allowing Mr. Watson to put on a good faith defense does far too much injury to his Sixth Amendment rights than some sort of remedial action for a rule or statutory violation.

THE COURT: So, on your view, then, if I understand it correctly, defense attorneys in federal court should be

permitted simply to ignore the discovery rules, grand jury subpoenas and court orders of compulsion and the only consequence in your view should be that the trial is delayed and the jury is sent home so we can take extra time so we can allow the Government time to come up to speed in the middle of trial?

MR. SULLIVAN: I'm saying on the facts of this case if is, in fact, true that the Government does not have this contract and I absolutely do not think that is true, but on the facts of this case, they've had it now for a month at least, the -- the case has always been about contracts and revenue. That's not new. That's not a surprise and Mr. Watson has a Sixth Amendment right to testify, a Sixth Amendment right to put on a defense, and a Sixth Amendment right to aver a good faith evidence decision, whether it's true or not.

And the last thing I want to put briefly on the record, you know, the Government says that they want to, I guess, cross-examine him, but cross-examine him on contracts that he doesn't have any full throated knowledge about, but they can cross-examine him -- they can ask him about it and they can prove up the impeachment through third-party witnesses if they so choose in their rebuttal case. So he says there's a contract for $10. He says there's an agreement for $10 and they have a contract for $9, that's what

cross-examination is for and that's what the rebuttal case is for.

THE COURT: What does the Government want to do? What is the request at this point?

MR. SIEGEL: Okay. So, the prejudice that we have is not that we need time to review this. We can read quickly. The issue is that had this been produced appropriately, we would have asked Mr. Rao about it, we would have called a witness to explain what the contract says. Mr. Watson says that it's a $3 million contract. It says the payment to OZY is $600,000.

And as part of voir dire he said if we showed it to him, he didn't think he could authenticate it. So if he's saying I had these discussions for $3 million, we would want to prove up that actually this is a $600,000 contract.

THE COURT: Can't you do that?

MR. SIEGEL: How are we going to admit it?

THE COURT: Call Mr. Rao back. Call somebody on the defense team who produced this e-mail. Put a paralegal on the stand to say, yes, I found this in OZY's --

MR. SIEGEL: Can we just get a stipulation that this is the CBS contract for Breaking --

MR. SULLIVAN: Anything we've given them, we'll stipulate to its authenticity.

THE COURT: And admissibility?

MR. SULLIVAN: If they lay the right foundation, it doesn't matter.

THE COURT: I do not think contracts are hearsay. I think they're verbal acts, not statements, but if they have a hearsay objection, are you going to fight them on whether this is a business record of OZY?

MR. SULLIVAN: No, of course not.

MR. SIEGEL: So, Your Honor, if he wants to talk about Breaking Big, that's fine, as long as we can admit this as the Breaking Big contract.

THE COURT: Is there any objection to this contract coming in?

MR. SULLIVAN: I'm not admitting any contracts. I'm not going to even talk about contracts.

THE COURT: I understand that, but if the Government seeks to admit this on cross-examination, will there be any objections?

MR. SULLIVAN: No objection.

THE COURT: Ms. Frison?

MS. FRISON: To the Government admitting it on cross?

THE COURT: Yes. If the Government says we'd like to put this evidence -- this contract in evidence through Mr. Watson on cross-examination.

MS. FRISON: I do not have an objection to that and,

actually, I plan to put in that same document.

THE COURT: And I take it it's true for all the contracts that are going to be responsive to this line of questioning?

MR. SIEGEL: How is she going to admit it? Mr. Watson, just said he didn't think he'd be able to recognize it.

THE COURT: She said she's stipulating to its admissibility.

MR. SIEGEL: This is the Breaking Big. He also talked about Take on America.

THE COURT: That's why I just asked. Is what we've established with respect to this contract also agreed to with respect to all of the contracts that are responsive to this forthcoming line of questioning.

MR. SIEGEL: I'm not sure that we have the Take on America even now. And, again, there's 700 defense exhibits. If they can refer us to it --

THE COURT: So, Mr. Watson, what specific conversations are we talking about here? And I need not examples, but a full list.

There's the PBS conversation. What else?

MR. SULLIVAN: What years is Your Honor referring to?

THE COURT: Whatever years you're talking about.

MR. SULLIVAN: '16 through '21 is what I'm going to ask about.

VOIR DIRE

BY MR. SULLIVAN:

Q So, '16?

A PBS. So, across our TV platform there are probably, as I said, fourteen shows, so whatever those shows are as an example. So, PBS, A&E, Lifetime, History channel. Who else? BBC.

THE COURT: Every deal that's going to be proffered as a source of potential revenue, we need to know what was the deal. I think you might need to descend from the level of the network to the level of the individual show if I understand how this revenue thing works. So, please.

THE WITNESS: So, in -2016, in 2016 PBS and BBC would be at the heart of a TV deal. On the festival side it would be a handful probably anchored around Univision. On the newsletter advertising front, probably a handful including Netflix and Amazon and Spotify and others and so that probably would cover 2016 as an example.

THE COURT: But what deals? We just agreed that it's not enough to say that Netflix was the counterparty. There might be multiple Netflix deals in relation to multiple products.

What revenue from what shows or otherwise are we

going to be talking about?

MR. SULLIVAN: I mean, what you're hearing is the level of generality that Mr. Watson is going to testify to because it's the level of generality that he experienced while at OZY. So he's going to be able to say that, look, I talked to these three or four --

THE COURT: The way I heard it was -- I'm paraphrasing here. The testimony will be something along the following lines: I had a conversation with the CEO Netflix, or whoever the responsible programming person was at Netflix, in which I took away that we had agreed that Netflix would provide me with, or would provide OZY with, $3 million in revenues. But the conversation will not extend to what that revenue was for; no indication about what show Netflix was buying. It's just top line, Netflix, 3 million.

MR. SULLIVAN: We can do it that way. To the extent he knows the show and Your Honor wants it --

THE COURT: That is why I'm asking.

MR. SULLIVAN: My point is that when he says X-Y-Z and a handful of others, it's because he may not recall the $30,000 deal.

THE COURT: That's fine. Anything he's going to say by name, the Government has to be able to ascertain are there written contracts associated with those deals or not and do we have them. For every name that's going to come up we need to

hear it now.

MR. SULLIVAN: Okay.

BY MR. SULLIVAN:

Q So it's '16 on TV. Do you remember the entities?

A PBS and BBC.

MR. SIEGEL: Your Honor, would it make sense -- he's going to list these and Ms. Frison said she was going to introduce them and she may have a list.

MR. SULLIVAN: Can we do one thing at a time?

THE COURT: Let's give the defense a crack at answering the question.

BY MR. SULLIVAN:

Q So across festivals, 2016.

A Univision, Ford Foundation, probably Hewlett Foundation.

Q Newsletter?

A Netflix, Amazon, maybe Spotify.

Q Podcasts?

A No podcasts in 2016.

Q Barter, if any, in 2016. Actually there is none in 2016 --

A I probably won't call out any specific large ones. One of the things on barter that I know we included in our letter is that there actually are both large barter agreements like the Oprah one, but there are also small ones embedded within almost every contract.

Q Okay. So we won't need to go with that. So 2018, for example, barter?
A BBC and iHeart.
Q 2019, barter?
A Oprah Winfrey Network, iHeart, the Wondery, CNBC.
Q And 2020, barter?
A BBC, iHeart, Oprah Winfrey Network. That's what stands out at the moment.
Q That's fine. Only what you remember. In 2021?
A BBC, iHeart, Amazon -- sorry, I forgot across, actually, I think the entire window, 2018 to 2021, FT, the Financial Times newspaper was a very active partner across that whole time so we should add that.
Q Now were all barter agreements later reduced to writing -- to a contract?
A Not all, no.
Q Okay. Podcasts?
THE COURT: Were any?
THE WITNESS: Yes. Like, the FT one I just mentioned for example, CNBC, and sometimes what would happen is you have a contract and then it would get further augmented on top of it. So you might start with FT. They like it and they say, whoa, this is working really well; do we agree to super size it. And we would go far above and beyond.
THE COURT: And then there would be a second written

contract?

THE WITNESS: Sometimes. I think in the case of the XP, there was at least one addendum, but sometimes not. CNBC would be a good example Surrounding OZY Fest and the barter agreement. They were like this is too small, let's super size it.

Q So your podcasts started in 2017?

A 3027, yeah.

Q So 2017 partners?

A Oh, iHeart and Apple.

Q 2018?

A IHeart, Apple and BBC, I believe.

Q 2019?

A IHeart, BBC, Goldman, Allied Bank. Those would be the core ones.

Q 2020?

A IHeart and Apple again. Vital Farms, I believe. And then a kind of category of deals called programatic, so --

Q And then 2021 on podcasts?

A IHeart, Apple, A&E -- sorry, iHeart, Apple, BBC, A&E, Ford. Those would be the core ones.

Q Okay. Newsletters. I think you had three in 2016. Do you remember your partners?

A Newsletters probably were almost too many to count. So I probably should give the biggest ones is probably what I

should do.
Q That's fine.
A 2016 I think we mentioned Amazon and Netflix and Spotify. 2017 it would be folks like J.P. Morgan and Discover. 2018, it would be folks like J.P. Morgan and Discover. 2019, it would be folks like J.P. Morgan, Discover, Allied bank, where are we going next, 2020?
Q 2020.
A 2020, J.P. Morgan, Discover, Wal-Mart, Airbnb, there are a couple of goodies in there. Come back to that.
Q Okay, '21?
A Sorry, apologies. 2020 should also include General Motors, plus Chevy and American Family Insurance also, too.
Q '21?
A And '21 should include -- and I'm sorry 2020 should also include WPP, the big ad agency.
2021 should include WPP. It should include Dentsu. It should include Omnicom. It should include General Motors. It should include Coke and Target and Wal-Mart and -- yup.
Q Festivals -- that's the OZY Fest, festival singular?
A Festus.
Q '16?
A '16, I think we did '16. I said Univision and Intel and Ford and Hewlett. 2017 I think we'll include Ford and PBS and J.P. Morgan and I think Visa, yeah.

Q '18?
A 2018, we'll include some portion of J.P. Morgan, some portion of Discover, Belvedere, I think -- the vodka who is part of a larger company called LVMH.
Q And then '19?
A '19 would include, again, iHeart, CNBC, Allied Bank, Chase which also doubles as J.P. Morgan and -- sorry, going back to 2018 in festivals I forgot Volvo. Volvo should be in that.
Q Right, you testified to that.
A Yup.
Q 2020, no festival?
A No festival, unfortunately.
Q And '21?
A '21 should include WPP. It should include Dentsu. It should include Omnicom it should include GM. It should include American Family Insurance.
Q All right. And TV, a couple of these we may have done, but just to have it in one place?
A Sure.
Q '16?
A 2016, it should be PBS and BBC.
Q '17?
A '17 should be PBS.
Q '18?

A '18 should be PBS and Facebook and a group called Now This News.
Q '19?
A '19 should include the Oprah Winfrey Network. It should include -- it should include Amazon. It should include Hulu.
Q '20?
A '20 should include A&E. It should include History. It should include Lifetime. It should include Oprah Winfrey Network. It should include Amazon.
Q And finally, 2021?
A We're only finally -- because that's how they look at it. We had more in 2022 and in 2023. So 2021 should include A&E. It should include Lifetime. It should include History Channel. It should include Amazon. It should include probably some -- PBS should be every year because we also get paid residuals on all the shows and BBC should be every year because we get paid residuals on all the shows.
Q Did you enter into new negotiations every year or --
A It's part of it, yeah. Who am I forgetting? Did I put Hulu in 2020?
Q I don't know.
A I should put Hulu in 2020. To be clear, the way TV works is you don't only get revenue from the year it shows, but you had residuals. The first time Hulu appears, it shouldn't be just that year but every year after. The first time that PBS

appeared, it shouldn't be just that year but every year after. That first time History Channel appears, it should be that year and every year after, and on and on.

Q Does your forthcoming testimony rely on things you've read or having reviewed actual contracts?

A No.

Q What does it rely on?

A On oral conversations that I had with either the CEO or the senior leadership at these different places.

Q Okay. As a function of these conversations that you've had, did you develop an understanding of what revenue was coming into OZY?

THE COURT: Before we leave the subject of what revenue sources we're talking about, the -- I think the remedy here is we don't need a continuance so long as, A, the defense is consenting to the admission of written contracts where the Government has them for the deals we're talking about. And, B, we're not going to hear about any deals in front of the jury that we have not already heard about from Mr. Watson here because obviously that would defeat the entire purpose of this voir dire.

So, I just want to make sure that everybody understands that both defense counsel and the defendant -- that whatever list we've now deduced of deals that will be the subject of that revenue, that is an exhaustive list, and I

wanted to say that now so if you want to make sure that that's the case, you have the opportunity to do so.

Q Anybody you forgot?

A Yes, on the festival side, I probably should have said Central Park because Central Park is you pay them and they pay you.

THE COURT: What is the park --

THE WITNESS: It's the Central Park Conservancy.

And then tickets -- so you sell tickets and, so, whoever your tickets purveyor is and I know we had different ticketing groups, but the most prominent was Ticket Fly, but -- you may already know this, but when you sell tickets you not only sell them directly but then they go on these secondary exchanges so people can buy them.

THE COURT: Stub Hub and --

THE WITNESS: Stub Hub and Groupon and that kind of thing. And, sorry, I wasn't going to mention this but if you want me to go there, one of the things we did was we had --

Q I think we're good, unless there's a particular person you named, we'll wait for your testimony.

A Okay.

MR. SIEGEL: So, Your Honor, just to make clear, I wasn't saying that the Government was going to stipulate to them admitting whatever contracts they want. What I said was that as long as they provided us contracts that we can admit

at cross, there's a stipulation to that.

THE COURT: Why is that different from what I said?

MR. SIEGEL: I may have misunderstood what you said. I know that Ms. Frison said she's going to introduce contracts, there's still a live issue --

MR. SULLIVAN: Those are the nine.

THE COURT: If those are the nine, then I think the Government has indicated that they will have no objection.

MR. SIEGEL: Ms. Frison said she's going to admit twenty-five.

THE COURT: Is there anything you intended to introduce through Mr. Watson that is not one of those nine contracts?

MS. FRISON: Yes, I believe so. I have thirteen contracts that I intend to introduce through Mr. Watson. I can say the exhibit numbers.

THE COURT: Please.

MS. FRISON: These are all defense exhibits: 17, Ford Foundation; 25, PBS; 37, J.P. Morgan; 102, J.P. Morgan; 103, Chevy; 113, General Motors; 115, Hulu; 117, Hulu; 134, Discover; 126, Chevy; 136 Dentsu, 129; Coca Cola; and 142, Ford.

MR. SIEGEL: Is that in addition to the nine or have we moved past the nine?

MS. FRISON: That is not the nine.

MR. SIEGEL: So is it thirteen plus nine or is it the full set?

THE COURT: If they want to put in the nine, that's fine.

MR. SIEGEL: But we still have the relevance objection on the nine about -- the original point on the nine.

THE COURT: That you don't have --

MR. SIEGEL: They're going to say it's not the general ledger and Mr. Watson testified he didn't look at the general ledger and we don't have it.

THE COURT: So we have no way of testing whether those were recognized or not recognized.

MR. SIEGEL: Hence he can't testify that they weren't because he's testified he didn't look at the general ledger.

MR. SULLIVAN: He testified that he did notice in board meetings when things were missing from presentations.

THE COURT: If the upshot of some or all of this is going to be Mr. Watson testifies about a bunch of contracts and then says, by the way, I have no idea whether those were recognized as revenue or not, and we have no way of testing that because the company went in and altered its general ledger after the investigation in this case was live; A, there's an obvious relevance issue. This has nothing to say one way or the other about whether there was underreporting of

revenue. And, B, that gets us to, again, the problems with the way the -- the rather fundamental problems with the way the defense preservation and production of documents have occurred in this case. So, what is the foundation on that? Let's figure it out. Otherwise we're going to be excluding all of this?

MR. SULLIVAN: Are we talking about the nine again or the thirteen?

THE COURT: Everything.

MR. SULLIVAN: The Court already said the nine would --

THE COURT: We said the nine would not be excluded for discovery related reasons related to those documents because you provided notice of those documents, but the relevance is dependent on --

MR. SULLIVAN: On foundation.

THE COURT: Yes.

MR. SULLIVAN: Ms. Frison, can establish the foundation.

THE COURT: Can we do that now.

MR. SIEGEL: What's the relevance also for these other thirteen?

THE COURT: I think that's the same issue. Ms. Frison, do you want to lay that foundation, please?

MR. SULLIVAN: I will put on the record the

relevance is obvious. These were contracts that -- remember, Your Honor, named him custodian of OZY and OZY records. These are contracts that came into the company. It's their claim -- it's the Government's claim that OZY did not have the revenues that it represented. Mr. -- OZY has a right to show that, well, you know, yes, we did it. Look at these contracts.

THE COURT: You may be making a point that I agree with here if the sum total of all the revenues of these contracts is going to exceed the reported revenue for a given year because that would necessarily imply that at least some of these documents had not been recognized as revenue in real time but I don't know that that's the case either.

MR. SULLIVAN: I think we've already got enough information on the record that gestures at that, that they have -- the wires alone going into OZY represent numbers higher than the government claims and they didn't even include checks in there. And as I understand the testimony, they didn't include ACH transfers in there either and there's plenty on the record that they did not account for barter revenue and even though some of the government witnesses said they viewed barter revenue as a different quality --

THE COURT: So if there's been testimony we never recognized any of the barter agreements as revenue and Mr. Watson wants to say here are some barter agreements that I think should have been recognized as revenue, that's adequate

foundation for a connection, an adequate conditional relevance for the notion that this revenue should have been higher.

Let me use an example in which I make up numbers. If OZY, let's say, reported, you know -- if its internal books and records showed $10 million of revenue in 2017 and it was saying externally we have $42 million worth of revenue and I realize I'm making up numbers here, then for you to put in a bunch of contracts that total $6 million doesn't -- if we don't know if they were recognized or not recognized, it literally doesn't tell us anything about whether the internal numbers were better, or the external numbers were better. It's entirely consistent with both.

MR. SULLIVAN: Not necessarily true. Deploying your hypo if the Government says year one there was $6 million and we produced $7 million of year one contracts, then that -- the factfinder can make the reasonable inference that more revenue was generated than the government is saying.

THE COURT: That doesn't contradict my hypothetical.

MR. SULLIVAN: Maybe I misunderstood you.

THE COURT: Accounting fraud trials are a fight between the inside story and the outside story, right, almost always. If the Government is saying the inside story was seven and the outside was twelve and you say, look, here is nothing, then that tends to show that the government -- it rebuts the Government's evidence of what the real numbers

were, but if you come up with $2 million and it's literally entirely consistent with either story, then it's not relevant. So I think we need to know the math.

MR. SULLIVAN: Right. I think the Government's -- well, I sort of think our math is better and I --

THE COURT: But does it do that?

MR. SULLIVAN: In the 13 contracts I think we'll will add up to greater numbers than the Government says. But it's not just that. Remember, that's just one -- as I offered the Court some time ago, Whitmore, a brick is not a wall. Imagery before the relevance. That's one brick in the story of a relevant piece of evidence. So if we have numbers that reach a sufficient height and then add the barter that's missed, there's been testimony about whether they recognized gross or net revenue properly. You put those things together and others, then you get a number higher than the number proffered by the government and that has to be relevant because, as you said, these are cases about, you know, the difference between outside and inside numbers.

So, we think that these contracts added -- add these contracts, add the barter revenue, take account of gross versus net revenue, then our position and we'll be able to argue this with the numbers, is that in fact OZY undercounted not overcounted. So that's the relevance of --

THE COURT: Proffer that number to me. What do you

get to in a given year with these contracts?

MR. SULLIVAN: I think Omnicom -- there were three very big ones. I forget which is which. Omnicom, Dentsu, WPP one was 75 million, one was 36 million, one was 25 million. You know, the numbers start adding up. These are over two or three years so you have to take it year by year by year, but the notion that OZY only made, you know, $12 million in a given year is belied by its vigorous contract history and particularly the barter history.

Even their witness, Mr. Rao, said, yeah, we didn't really account for barter in the way that we should have and -- and even the investors came in. Again, they acknowledged that barter history -- that barter revenue is a thing, but there was dispute about that it is as valuable as cash revenue, but it's a thing. Economists and accountants can assign a number to barter revenue and argue about what that number is, but if Mr. Watson believed in good faith that a particular barter number existed, let's take the Oprah Winfrey video, right, that you know given what was in his head about what she received for one Tweet and --

THE COURT: Is she contractually obligated to provide that service?

MR. SULLIVAN: No, no.

THE COURT: She just did it.

MR. SULLIVAN: Yeah, it was unexpected and it raised

their profile and their value in a positive way that was quite unexpected. So these sorts of things, in addition to the contracts have to be added up together and we'll be able to make a presentation, and we think a winning presentation that OZY undercounted its revenue, instead of overcount its revenue. So, that's the relevance to this, but with this testimony upcoming, we are not just talking about any contracts at all. It's what was in his head.

THE COURT: Let me ask about the argument. This is a little bit of a detour. Ms. Winfrey has no contractual obligations to put out that Tweet, but she does, and that's invaluable as Mr. Watson just testified. That is a source of recognizable revenue in the defense view? What if the New York Times wrote a really glowing Sunday Business article about Mr. Watson and provided enormous publicity for OZY Media in the process, you take a $20 million revenue gain?

MR. SULLIVAN: I don't know. Not my area. What I do know is that the people believed in OZY, our witnesses, their witnesses, that this small sizzle reel, whatever you call it, plus the Tweet had real tangible value -- added real tangible value to the company. How accountants do that, you know, you wouldn't let us put our accountant in, but that is for them. But the point is that there is a way, there is a mechanism. Accountants do this sort of thing all the time.

(Continued on the following page.)

(Continuing.)

MR. SULLIVAN: But the limited point we are making is what was in Mr. Watson's mind, in Mr. Watson's mind, he had a good-faith belief that that added value, they assigned a number to it, they talked about it, you heard in the testimony, at a board level with all of these super high-profile investors that this thing has value.

THE COURT: What is the Government asking for at this point?

MS. GILBERT: Your Honor, it's called the Oprah Winfrey effect.

THE COURT: I understand.

MR. SIEGEL: I just come back to your original hypothetical. I mean, they are talking about barter revenue; it's unclear if any of these are barter contracts. They are talking about this discount revenue; it's unclear if that's reflecting that it is --

THE COURT: I think we need to see the math. Let's just have the testimony. Let's just have the testimony so we can see the math. Because I'm trying to get to the bottom of this and this is too --

MR. SIEGEL: How can we do the math without admitting the contracts?

THE COURT: Because we are going to do it out of the presence of the jury.

MR. SIEGEL: I see.

THE COURT: Right.

How long is this testimony?

MR. SULLIVAN: I don't know. I certainly object to the Government previewing the witness's testimony in advance of -- it's what's in his mind.

THE COURT: We get here, though, because -- and I don't want to rehash all of this -- because of the problems that have led us here, problems of preservation and production.

MR. SULLIVAN: I'm not producing anything with him.

THE COURT: I understand. The Government is prejudiced by those failures in connection with this testimony potentially. Let's hear the testimony.

MR. SULLIVAN: Over strong objection.

THE COURT: The Government is not going to be allowed to impeach with -- I mean, there may be objections if the testimony is different, but the Government is not going to introduce the statements they hear now.

MR. SULLIVAN: They have the benefit of them. I will just note --

THE COURT: They would hear it in 20 minutes, right?

MR. SULLIVAN: I'm sorry?

THE COURT: If we weren't doing this now, they would hear it ten minutes earlier?

MR. SULLIVAN: I would've loved to preview Mr. Rao's testimony before he did it and prepare my cross-examination, that would be great.

THE COURT: I understand. You get an extra 20 minutes.

MR. SULLIVAN: I would have loved an extra 20 minutes.

THE COURT: Okay.

MR. SULLIVAN: May I just say for the record, Your Honor, on this good-faith basis, just to make a final clear record. I mean, I've taught this in evidence classes over the last 30 years.

Assume the following hypothetical: Someone named Ralph walks up to a boat dock and takes a boat and drives it somewhere else. The police come and get him and he said, my friend Jay told me that was his boat and he asked me to drive it to another dock. Now, there is nothing about Jay that indicates that Jay can afford a boat, nothing at all.

Question: Can Ralph's testimony that, oh, Jay told me that it was his boat and to move it, that's why I did it, because I believed Jay.

Question: Does that testimony come in?

Answer: Yes. It goes to Ralph's good faith.

And even if he had an unreasonable belief, as long as that faith -- as long as that belief was made in good

faith, it's a question of fact, question of weight. It goes to the jury. The jury can say that's wholly not credible. We don't believe that you believe that Jay could afford a boat, but that's the province of the jury, good faith is only what's in that man's head right then at the time and that's what I am asking about up here. No contracts, nothing else. What was in his head. If it's farfetched and incredible, I'm sure that my brothers and sister on the other side are competent lawyers, they know how to do cross-examinations, but we are conflating a contract issue with OZY with Mr. Watson as an individual and his individual right to testify.

THE COURT: Let me give you a hypo of my own that is counterfactual to this case, I'm not suggesting this is what happened here, it's an ultra extreme example.

A CEO, his name is Bob Smith, is committing accounting fraud and gets a Grand Jury subpoena to produce the books and records of the company, decides to blow off the Grand Jury subpoena and not only that, goes into the books and records of the company, alters them and deletes all the originals, throws them off a bridge into the Hudson River. Then the CEO goes to trial and says, oh, when we reported $10 million in revenue we actually had much more, and here are a bunch of contracts that I know for a fact were not recognized as revenue -- I'm assuming that's going to be in the foundation, if it's not, this is, as I say, not relevant --

that I know weren't recognized as revenue but should have been.

What happens? I mean, is the Government moving for the admission of instructions about how the accounting systems were a moving target here, you're not.

MR. SIEGEL: Your Honor, all we are asking is -- and we are not even talking about Mr. Sullivan's --

THE COURT: You're making a relevance objection.

MR. SIEGEL: We are asking for a proffer to understand if we have an objection for these 13 contracts.

THE COURT: Let's have that proffer. So let's have the foundation. Let's see what the numbers are going to add up to, and then we will have the objection in a harder context, a more firmed up context than we have now, that, given the history of this case, that is not much to ask. Let's do it.

MR. SULLIVAN: So there's no objection of Mr. Watson's testimony on his belief; this is OZY Media and the 13 contracts. I'm not introducing any contracts. And his testimony --

THE COURT: Does Mr. Watson have a belief as to each of these contracts --

MR. SULLIVAN: -- these 13 contracts --

THE COURT: Does Mr. Watson have a belief as to each of these contracts that they not only should have been

recognized as revenue, but were not?

MR. SULLIVAN: I have no idea. I'm not asking him about those contracts. This is OZY Media OZY's lawyer asking about OZY's contracts.

I'm asking him about revenue over the years that he was aware of and these numbers are higher than what the Government has adduced as numbers.

Might there be some overlap? I have no idea as I sit here. I'm asking him from his knowledge unrelated to any contract, you know, what those numbers were. So if he earned, in his belief, $5 in each of those five categories in 2016, that's $25. And if the Government is arguing that the actual revenue was $10, then that's your delta, that's the increase.

THE COURT: That's a profer for the counsel, that the numbers will add up to more than --

MR. SIEGEL: This is a question for Ms. Frison. I'm not evening talking about Mr. Sullivan.

THE COURT: What's the question?

MR. SIEGEL: For the 13 contracts that Ms. Frison just listed, what's the relevance of those? Because for a long time we talked about the nine contracts. The argument about those nine contracts is they are not in the general ledger. We have talked extensively there is no way to know that's true because for many of these years we don't have the general ledger. Now for the first time we are hearing these 13.

THE COURT: Is the question whether Ms. Frison has any basis to believe that these were omitted from revenue?

MR. SIEGEL: Or if there is any other basis for them being relevant to this case.

THE COURT: And, Ms. Frison, what is the relevance?

MR. SIEGEL: We've quickly done the math, just to give it to you, Your Honor. And this spans across several years. And we did it quickly. So let's add some error bars here. But it's less than a million dollars in 2017, less than 3 million in 2018.

THE COURT: So in every case, less than the top line?

MR. SIEGEL: Less than 3 million in 2020, less than 6 million in 2021.

THE COURT: All right. Let me speed this along.

Ms. Frison, what is the relevance?

MS. FRISON: The relevance is -- is essentially the same. The good-faith basis of the CEO to believe that the total revenue for --

THE COURT: You don't have a basis that Mr. Sullivan just articulated, namely that the contracts in question sum to more than -- well, I guess they do sum when you add up what Mr. Sullivan is eliciting with what Ms. Frison is eliciting.

MR. SULLIVAN: I don't understand they're saying these are all of them. Yeah, I don't understand.

MS. FRISON: So, Your Honor, for 2017, the first three that I listed, those were for Foundation, PBS and JP Morgan, those alone three contracts are almost $6 million.

The -- I believe the Government's contention is that for 2017, the total revenue for OZY was $7 million. So my question to Mr. Watson would be getting the contracts entered, does he recognizes them, are those the amounts that he believe those deals were, and how many contracts did OZY have for 2017. If the answer is 50 --

THE COURT: I think that's enough of a foundation.

MR. SIEGEL: I just want to check, I mean, we can just check that math. What exhibits are you referring to?

MS. FRISON: So 17, 25, and 37.

THE COURT: While the Government's looking at that, let me, apropos of absolutely nothing relevant to this trial, but musing out loud, that one day after this trial is over, a charitable organization's lawyer will have to explain to me why the Ford Foundation, which is, as I understand it, a 501(c)(3) organization, is making donations to a for-profit entity in connection with its for-profit endeavors.

Leave that aside.

MR. STERN: Your Honor, Defense Exhibit 17, a grant from the Ford Foundation $750,000. Defense Exhibit 25 --

THE COURT: Mr. Watson is going to testify that despite the contract saying $700,000, he understood it to be

X million and you guys will be able to cross-examine. Is that?

MR. STERN: That's not my understanding of what Ms. Frison just said.

MS. KASSNER: Your Honor, I just want to say there's this -- by having two separate questions on this subject, one, whatever is in his mind and, two, what's in these cherry-picked seven contracts, eight contracts, however many that we've received at various times, somehow he doesn't recognize any contracts that we would try to confront him with. But these 15, he's going to authenticate even though he doesn't seem to recognize --

THE COURT: That's a good question.

Ms. Frison, can you lay down the foundation with Mr. Watson for how he knows about these contracts?

MS. FRISON: How he goes about them?

Well, first, I don't believe he has been shown any contract that he could not identify by the Government. I believe they asked him a general question as to --

THE COURT: They said, if it we show you a contract, would you recognize it, and he said maybe, maybe not.

MR. SULLIVAN: I thought we already stipulated to authenticity and admissibility. I don't know why we're having this question, but I just -- we did that already.

MS. GILBERT: Can we have a break, Your Honor?

THE COURT: Let's take a short break.

I think the way this is heading is we are likely to hear this testimony first and then to the extent there are reasons to strike the testimony, we will evaluate that once we've heard it. All right. I don't know how else to do this other than proceed that way, because right now everything is just in the realm of hypotheticals and generalities and it's impossible to sort out evidentiary objections on that basis.

If the Government -- if there is something specific you want to know, tell me right now, what is the specific question you want an answer to. Tell me after the five-minute break, what are the specific evidentiary threshold questions that you believe are necessary to understand the admissibility, not the relevance or the power or weight, but admissibility of these documents.

I will see you all literally at 12:15.

MR. SIEGEL: Your Honor, can I ask, given where we are, I think Mr. Sullivan's testimony with Mr. Watson is going to take some time. We will probably take a lunch break at some point at which point we can review the contracts to understand --

THE COURT: What is your proposal?

MR. SIEGEL: Is that we give you that question after the lunch break, after we have had a chance to look at these contracts.

THE COURT: Do you want to break for now? We will tell the jury to go?

MR. SIEGEL: Well, I think we can use the time with Mr. Sullivan, but I leave that to you.

THE COURT: Use the time with Mr. Sullivan to do what?

MR. SIEGEL: To finish his direct. The question we are raising about is about Ms. Frison's direct.

THE COURT: All right. Then let's have a five-minute break, yes. If we have no further threshold evidentiary objections, we will continue after the five-minute break with the direct.

MR. SIEGEL: Thank you, Your Honor.

THE COURT: All right. We are bringing the jury back in.

MR. SULLIVAN: Your Honor, how long are we going to go before lunch? I just looked up, it's 12:20 now.

THE COURT: 12:45.

MR. SULLIVAN: 12:45?

THE COURT: Yes.

MS. GILBERT: Maybe we should break for lunch now.

THE COURT: The jury is coming in. Everybody can leave the schedule, please, to me.

THE COURTROOM DEPUTY: All rise.

(Jury enters.)

THE COURT: Please be seated, everyone.

Ladies and gentlemen, thank you for bearing with us during the unavoidable delay, as they say.

It is a priority of every judge in this courthouse, but a meaningful personal priority of mine, to work through as many of the complicated evidentiary and other legal issues as may come up during trial in advance of trial as possible. Nevertheless, it is sometimes, as I say, unavoidable that issues will come up on the fly, you see us resolving those sometimes at sidebar, and sometimes those questions are complicated enough even to require a break as long as the one we just took. So, thank you for your patience.

Mr. Sullivan, back to you.

MR. SULLIVAN: Thank you very much, Your Honor.

DIRECT EXAMINATION

BY MR. SULLIVAN:

Q And, yes, good afternoon, Mr. Watson.

A Good afternoon, Professor Sullivan.

MR. SULLIVAN: And good afternoon, ladies and gentlemen of the jury.

THE JURORS: Good afternoon.

Q We were about to enter into the next part of your direct examination, and I'm going to ask you questions about revenue.

Now, as a predicate to that, when you are talking with a prospective new investor, can you give the ladies and

gentlemen of the jury an idea of at what level you personally communicate?
A Whenever I would talk to kind of a new client, I would often talk to the CEO, sometimes I would talk to one of their senior execs, but I try to build a relationship at that level.
Q And, again, just at a level of generality for now, so when you are talking to the CEO, what sort of arrangements, what sort of deals are you talking about, at what level?
A So I might to the CEO of PBS or the Oprah Winfrey Network about a TV show, I might To the CEO or the president of iHeart about a podcast partnership. I might talk to the head of Parks here in New York City about OZY Fest in Central Park. So those are some of the folks who I was speaking with collaborating with, striking partnerships with.
Q And give the ladies and gentlemen some idea of how far in the weeds you and the CEO or top chief executive go in talking about these partnerships.
A Usually it's kind of more high level because they are usually pretty busy. You can imagine if it's a network in any given year, they have 100 or 200 shows, so they can only go so deep with me. So, you know, do they like the idea, is it a good fit, roughly how much are they going to spend on it, when is it going to launch, is it a one-episode special or is it, you know, 16 episodes. So we kind of agree at a high level as to what we are doing together.

Q Okay. So, let's say, at TV, just by way of an example. So, once you've come to these high-level agreements -- and I should ask, does the high-level agreements include how much money they are going to pay?
A Yes.
Q Okay. Once you come to these high-level agreements, how does the deal formally get worked out?
A And I should say money or if it's an in-kind strategic partnership, we will talk about that too.
Q Great.
A Then I usually would hand it off to folks on my team and I also would typically -- those folks or I would bring in a lawyers. So we had different lawyers who worked on different deals. So if it was a TV or podcast deal, it might be a specific one named Lisa Davis. If it was a OZY Fest deal, it might be at a different lawyer, but I would hand it off to a second team of people to kind of work through the details of it.
Q And would the CEO on the other side of the deal stay involved in those details, to your knowledge, or did something different happen?
A In my experience, we both did the same thing, which is we got together, figured out whether or not there was there there, and sometimes there wasn't, and so not every deal went through, or not every deal. We didn't always agree on a deal.

But where we did agree on a deal, we would then hand it over -- that person on their side and me on my side would hand it over to the teams to see it all the way through, get it to conclusion.
Q When you say see it all the way through and get it to conclusion, do you mean see it all through consistent with those top-level numbers that you and the CEO had worked out?
A Correct, yes.
Q In other words, were your subordinates empowered to sort of change the amount that the client was paying you?
A No.
Q All right. Now, I'm going to ask you some questions about only your understanding of what revenues were coming in OZY from 2016 through 2021, and my questions are only regarding the conversations that you had with CEOs and what you understood to be the revenue coming in based those conversations.
Do you understand?
A I do, yes, I understand.
Q And is that clear what I am limiting you to?
A Yes, I understand.
Q Okay. So, as you know, Mr. Watson, ladies and gentlemen of the jury do not know, my handwriting is horrible and the judge has allowed my colleague, Ms. Gilbert, to actually write what you're going to talk about so it's halfway legible.

A Okay.

MR. SULLIVAN: And I appreciate it, Your Honor.

Q So 2016, what -- what were the groups that you had at OZY in 2016?

A We ultimately had, I guess, I think, five buckets, but that year we had TV, we had our first show, we had our first OZY Fest.

MR. SIEGEL: Your Honor, could we have a sidebar for one second? I'm sorry.

THE COURT: Yes.

(Sidebar held outside of the hearing of the jury.)

(Continued on next page.)

(The following sidebar took place outside the hearing of the jury.)

MR. SIEGEL: Your Honor, I apologize, I could be wrong, but it appeared to me that when Mr. Watson was testifying he was looking down at notes. If that's the case, we would like to see the notes that he's reading from. If I'm wrong and there aren't any notes, then I apologize. It was a false alarm.

MR. SULLIVAN: I didn't see any notes.

(End of sidebar conference.)

(Continued on next page.)

(In open court.)

THE COURT: Let's let the jury step out literally into the hallway for 30 seconds.

(Jury exits the courtroom.)

THE COURT: Now we are going to come to the sidebar, including Mr. Watson, please.

(Sidebar held outside of the hearing of the jury.)

(Continued on next page.)

(The following sidebar took place outside the hearing of the jury, Government counsel, defense counsel, and Mr. Watson present.)

THE COURT: So, I'm not suggesting any impropriety here, but there are rules that give opposing parties access, under certain circumstances, to notes that a witness uses in connection with his or her testimony, and we had a question as to whether you have notes up there or are taking notes up there.

What's on the yellow pad?

THE WITNESS: I've just written down some notes for myself.

THE COURT: Okay. Can we have you hand those to defense counsel and I would like a photocopy of those notes and produce them to the Government.

THE WITNESS: Sure.

THE COURT: We are going to put a court exhibit sticker on this.

MR. SULLIVAN: Sure.

THE COURT: We will make copies. Will you put Court's 3500-1 at the break.

(Sidebar ends.)

(Continued on next page.)

(In open court.)

THE COURT: We are going to bring the jury back in.

THE WITNESS: Am I going to be able to get my notes back?

THE COURT: You will. Do you need them back now?

THE WITNESS: Yes.

THE COURT: Let's mark a quick copy, somebody on this floor.

THE COURTROOM DEPUTY: Yes.

MR. SULLIVAN: What was the question?

THE COURT: The question is can he have his notes back.

MR. SULLIVAN: I don't want you --

If you don't remember, that's fine.

THE COURT: Drew, we're not giving the notes back, at least not now.

That's just doodles. Okay.

THE WITNESS: This is wild. Okay. Do I need to turn this in too?

THE COURT: There are lawyers who will sketch the judge.

THE WITNESS: I can sketch. I can sketch.

THE COURTROOM DEPUTY: All rise.

(Jury enters.)

THE COURT: Thank you again. All right.

Mr. Sullivan.

MR. SULLIVAN: Thanks.

BY MR. SULLIVAN:

Q Where we left off, you said in 2016 you had TV, festivals and what else?

A We had newsletters.

Q And was that it in 2016?

A That was it.

Q All right. Now, let's look at TV. And again, I'm talking about deals you negotiated with higher-ups at different places, how many TV deals do you recall?

A We had two TV deals for one show. So we had a wonderful show called The Contenders, and I negotiated deals at both PBS, so the people could watch it here in the U.S., and I negotiated deals at the BBC so that people could watch it outside of the U.S.

Q And over those TV shows, how much revenue did you understand that OZY generated?

A About 3 million in gross revenue.

Q Now, festivals in 2016, or I should say festival?

A Festival, yes, OZY Fest, yep.

Q The OZY Fest. Who were your partners there that, well, revenue-generating partners, either cash or barter?

A We had a number, but I would say the core folks included Univision, the Ford Foundation, the Hewlett Foundation, were

among the core folks there.
Q And how much revenue was generated from the OZY Fest in 2016?
A It's the one that we had will.i.am and Issa Rae and Malcolm Gladwell, about $3 million in gross revenue.
MS. GILBERT: Three?
MR. SULLIVAN: Three.
Q And then for newsletters, how many newsletters, if you recall, did you have at that time?
A We had three. We had the one in the morning that we called the Presidential Daily Brief and the afternoon is the one that we sent, Daily Dose as The New and the Next. I think that was the year we did Jayson Tatum and -- among others. And then, because it was an election year, we did a special series just on the election. So we had three newsletters.
Q A combination of the three newsletters, how much revenue was generated from those?
A About a million dollars bucks a piece, so about 3 million total.
Q Okay. So across these three groups in 2016, what was your understanding of the revenue generated by OZY?
A About $9 million in gross revenue.
Q Now, is this to the penny, Mr. Watson?
A No, no. This is just my general understanding.
Q And does this include every vendor no matter how small?

A No, I'm sure I'm probably leaving stuff out. I'm sure it could even be more, but that's kind of ballpark, what I believe.
Q Okay. Now, let's move to 2017.
Now, in 2017, how many TV shows did you have?
A We had one. We had our second show, which was the Third Rail on OZY, it was on PBS. It was kind of a Bill Maher Politically Incorrect show.
Q All right. And how much revenue did you generate from Third Rail?
A Again about 3 million in gross revenue.
Q Did you have an OZY Fest that year?
A We definitely did. We had Common and Andra Day and had Malcolm Gladwell back again and some other good folks. It was a good one.
Q How much revenue did you generate from OZY Fest?
A That one we kind of took a step up. That was about $5 million in revenue.
Q What accounted, as best you can recall, for the step up?
A Again, OZY Fest is a combination of people buying tickets. It's also people buying food and merch and then it's also sponsors and then you also sell the streaming rights for people to be able to view it. So it was a combination of those. And we had folks like JP Morgan and Belvedere Vodka and the Central Park Conservancy paid us some. And the ticket

were done by a group called Ticketfly, so they'd write you a check after it's over.

Q Okay.

A I'm sorry. And PBS, our TV partner, was also involved in the festival.

Q Now, how many newsletters did you have in 2019?

A We had three newsletters again.

Q Were those the same three that you had before?

A No. So two of the three were.

So we had the Presidential Daily Brief in the morning, and then we had the Daily Dose in the afternoon. And that was the one I shared with you where we did a special series called States of the Nation, where we sent young people out to all 50 states to try and profile what was new and next. And that was the one that was submitted for a Pulitzer Prize.

Q All right. So -- and I can't remember if you told me, correct me if you did.

Who were your partners for the newsletter revenue in $2017?

A We started getting some bigger, more thicker partnerships. So folks like Discover and JP Morgan kind of added to the mix alongside people like Amazon and Netflix.

Q Right. How much revenue did you generate from newsletters?

A About $5 million, so kind of call it instead of a million

dollars in newsletter, call it a million and a half in newsletter. Again, maybe a little bit -- little bit more, I'm probably leaving stuff out.

Q So in 2017, did you have your first podcast?

A We did. We had -- I told you I loved that, and it's one of the things I'm most proud of at OZY, this series called the Thread was the one that did well, and it was a top 10 podcast on Apple, and I was very proud of the team for making that come alive.

Q And who were funders for the podcast?

A Some of our partners included Apple and iHeart and Spotify.

Q And for iHeart, was that cash revenue or in-kind revenue?

A Both.

Q How did the in-kind revenue part work?

A They would -- so they had a suite of podcasts, and so they would take some of the slots on OZY, so I would give them one of our 30-second spots or ten-second spots and they could run ads for some of the their other podcasts, like if anyone likes Dax Shepard, his podcast. Rather than pay us cash for that, it would -- they would give us advertising spots on -- on their other podcasts, so it was a barter swap.

Q How did you calculate the value of them advertising for you?

A Again, we had a rate card and we knew what a 30-second

spot cost, what a 10-second spot cost and what, I told you before, what they call a host read, where the host actually reads the ad.
Q So instead of paying that to iHeart, you were able to keep those resources; is that how it works?
A Correct, yeah.
Q Okay. What was the revenue that you gained from your first podcast in 2017?
A About a million dollars, give or take.
Q So in 2017, what was your understanding, at least roughly, of what OZY's gross revenue was?
A Call it 14, you know, maybe more, but in that realm, 14 to $15 million in gross revenue.
Q And that's, if you add it up, three and five and five and one, is 14?
A Yes. Yes.
Q Okay. And, again, is this -- is this to the penny?
A No, it is not.
Q Okay. Let's move to 2018.
So, in 2018, how many TV shows did OZY have?
A That was a good year because we started -- we started doubling up things. So that was the year -- that was the first time that we had two TV shows. And we really were starting to hit on all cylinders with PBS, so both shows were with PBS. Initially, we had wonderful show called Breaking

Big, where we had Trevor Noah and a number of other good people, Michael Strahan, a couple of other good folks.

And then we had a terrific show called Take on America, which was a winner. And we had folks like Kimora Lee Simmons and Eddie Huang and some other good people.

Q Okay. So how much TV revenue did you earn in 2018?

A You know, think about it as roughly, the way I thought about it is about $3 million a show, gross revenue, so about $6 million all in.

Q Did you do an OZY Fest in 2018?

A We did. And, again, this was a year of doubling. You'll hear that as kind of a theme. So we felt like we were finally getting our legs under us and we were ready not just to go one at a time, but to do more. This was the first year that OZY Fest was a two-day event. Previously it had just been a Saturday and this was the first year that we took the chance to bet on ourselves and did a Saturday and a Sunday.

Q All right. And who were -- oh, I forgot to ask TV, 2018, who were your partners?

A PBS was our central partner there. They were fantastic both on Breaking Big and on Take on America. And when I say "PBS," they sometimes they got like a family you may hear on PBS, the Corporation For Public Broadcasting, and that's kind of like sister organization to them, and so sometimes they also helped fund new shows.

Q But the total was?
A Total, yeah, total, about $3 million a show is the way to think about it.
Q So festivals. So 2018, you told us year of doubling, who were your partners in the festivals?
A We earned a number of great partners. JP Morgan stepped up, was grateful to them, Allied Bank, iHeart, BBC.
Q And how much revenue did you earn from OZY Fest in 2018?
A Probably about 10 million all in. I guess the way I thought about it was five on the festival and then I started more specifically thinking about some of the biggest barter agreements we had, and so I probably would almost create kind of a fifth category, and probably, you know, part of that was there, but, yeah, call it 10, and that includes -- probably at least half of that was barter.
We struck a deal with the BBC. Whereas we let Univision broadcast OZY Fest in 2016. In 2018, the BBC kind of elbowed body them out of the way and we let them broadcast OZY Fest all around the world.
Q And how did the barter work? Who was on the other side?
A So, again, we took the value of that exposure of them literally broadcasting the heart of OZY to the entire world and what it would have cost us to buy that if we bought that as an ad, or they call it product placement sometimes, and as I told you we typically divided by two and valued it that way.

Q So does this $10 million number include both cash and barter --
A It does.
Q -- from your strategic partners?
A It does, correct, yes.
Q You're going to get me in trouble with the court reporter, I have to finish the question and then you answer?
A Oh, sorry.
Q Does this $10 million include both cash and barter revenue from your strategic partners?
A It does, yes.
Q Okay.

MR. SULLIVAN: Your Honor, it's 12:45. If the Court wants to break.

THE COURT: Yes.

All right. Ladies and gentlemen, we are going to break for lunch now. We will see you back here in approximately an hour. And I do expect to break a little bit early for the day today.

(Jury exits the courtroom.)

THE WITNESS: Do you want a sketch? No.

All right. The parties are going to sort out your questions over the lunch break about what contracts we are talking about and otherwise I will endeavor to be here as close to 1:30 as I can. And we will take it from there.

MR. SIEGEL: Your Honor, can I make a quick record on the notes so we have it clean?

After we had the sidebar where Mr. Watson handed up the notes, at least, as I understood it, the Court was going to give it back to him, but Mr. Watson and his attorney said that they didn't want the notes back, so he has been testifying without the notes at this point. And I just want to make sure that's everyone's understanding of the record, that it wasn't that he wasn't allowed to testify with notes; it's that he chose not to.

THE COURT: Correct. I had instructed the Court's deputy to make a photocopy of the notes and return it to -- return that piece of paper to Mr. Watson. We were endeavoring to do that before the testimony resumed, and I will let the defense counsel speak for themselves, but I understand they made the choice that Mr. Watson would not proceed with notes.

MR. SULLIVAN: Yes, that's correct. I think that's the only point Mr. Siegel was making, and that we chose for him to testify just from his memory, not from his notes.

THE COURT: Understood.

MR. SULLIVAN: Yep.

THE COURT: See you all at 1:30.

(Lunch recess taken.)

AFTERNOON SESSION

(In open court.) (Parties present.)

THE COURT: Please be seated.

We're a few minutes early for the jury but any housekeeping matters?

MS. GILBERT: Your Honor, you asked which pages in the transcript where we had previously -- where you had previously indicated that you were going to let the exhibits that we had initially provided on May 29th -- actually, we had provided them prior to May 29, but we provided them with defense exhibit stickers on May 29th. They're not sticker markings.

THE COURT: Can I just reiterate as a housekeeping matter something I said in the past, which is, this is Judge Cogan's courtroom, there is no eating or drinking anything, except water, in the courtroom.

MS. GILBERT: This is a mint.

THE COURT: Oh. Sorry. You seem like you have your mouth full and you're chewing.

Okay. Next topic.

MS. GILBERT: Do you want me to spit out the mint?

THE COURT: No.

MS. GILBERT: Oh, okay.

THE COURT: I may need some lozenges myself given my failing vocal cords as a result of this trial.

All right. So what's the page and what's the statement?

MS. GILBERT: That's 63.

And this was in a discussion about the exhibits.

And --

THE COURT: Page 63 of the?

MS. GILBERT: 163.

THE COURT: Okay.

What does it say?

MS. GILBERT: On line ten:

Mr. Siegel: And then, Judge, I just wanted to put --

Tell me if I'm reading too fast okay?

-- and then, Judge, I just wanted to put it on your radar. We had submitted a letter, and I know there have been a lot of late-coming letters, but all of these contracts that they're referring to were produced to us for the first time on Sunday and we have seriously -- we have serious authenticity concerns about it.

The Court: I mean, I think that when you were talking about the discovery or Discover investment, I took you -- I could be wrong -- to be talking about the Discover contract that was attached to one of the expert's disclosures.

Mr. Siegel: They produced 185 contracts with new Bates numbers that we're not aware of, so we do have a pending

motion to exclude all of these.

Mr. Sullivan: All of those were on Ozy e-mails that they gave back to us.

Mr. Siegel: But they don't have any Bates numbers.

Mr. Sullivan: They can pick and choose contracts that they like. These are contracts that are all -- that are available to them.

The Court: But there are rules of discovery and the rules -- and there are rules of requiring the parties to exchange their exhibits to, A, avoid unfair surprise and B, allow the Court to make intelligent decisions about what should come in and what should be excluded in a way that doesn't keep the jury sitting in the jury room for hours at a time.

Mr. Sullivan: Perhaps not --

THE COURT: Sorry, tell me the page again.

I have the transcript now.

MS. GILBERT: I'm now on 164.

THE COURT: Okay.

I can probably read along with you.

MS. GILBERT: Line ten.

Mr. Sullivan: Perhaps not Bates marked, but we have given them to them and now it's marked pursuant to your one-day rule.

The Court: How many exhibits do you have total?

Ms. Gilbert: 500-something. Five-twenty-something.

Ms. Kassner: Your Honor, you limited them to 250.

The Court: No. I said produce the top 250 and assume anything outside of that is going to be excluded. They produced 500. They did not pre-mark them.

Mr. Siegel: They did not produce 500. I just want to be clear. They did not produce 500 to us.

Ms. Gilbert: We have. We have boxes of material for you. We've actually --

The Court: We're getting the jury.

Ms. Gilbert: We've actually printed them for you. We've actually e-mailed to you digitally.

Mr. Siegel: When?

Mr. Sullivan: So in here we're talking about nine contracts and these nine contracts have been the subject of experts and all for a while, but the bottom line is, everything is marked now.

The Court: They're not coming in during the next fifteen minutes. We'll take that up after.

Later the same day --

THE COURT: Can you just point me to the, like we'll start at the end and then work our way back.

Where is the point in which you see me ruling on this?

MS. GILBERT: Well, Your Honor, you actually never

ruled. But you undo'ed what you said before.

So you say --

THE COURT: What do you see is the operative section of this?

MS. GILBERT: Page 248, line 11 to line 15.

THE COURT: 248.

I just said: I'll render a final decision once I understand the issue holistically.

MS. GILBERT: Yes.

But Your Honor said earlier that you had already excluded everything.

THE COURT: No, I didn't. I don't think so. That I had already excluded?

I thought you said: Judge, you told us that when you order us to produce the 250 documents, essentially forthwith. You told us that if we did that, they would be admissible.

And I all said was: No, I didn't.

I said the inverse or the converse, I always forget which is which; that if you omit something, you should assume it is going to be excluded. But at the same time just because you do include something, that's not a basis on which to assume that it will be admitted.

That's what the order says and this is entirely consistent with that. Right?

MS. GILBERT: Yes.

THE COURT: Okay.

So I think we are where we started.

Anything else by way of housekeeping?

MS. GILBERT: And I would like to address one thing.

You have consistently said that the discovery violations are willful misconduct. I would like to state for the record --

THE COURT: Where did I state the phrase "willful misconduct"?

MS. GILBERT: I'm sorry what.

THE COURT: Where did I use the phrase "willful misconduct"?

Are you quoting me?

MS. GILBERT: I'm sorry. I actually believe that you did use the phrase both yesterday, Friday -- yesterday, Monday and maybe or maybe not today.

THE COURT: These transcripts are word-searchable. Can you point me to where I used the phrase willful misconduct?

You may be right. I don't remember saying that.

MS. GILBERT: Oh, maybe you used the term willful violations.

But I do believe on prior --

THE COURT: Yes, misconduct has a meaning.

MS. GILBERT: I do believe on prior days you did use misconduct.

THE COURT: Can you show me?

MS. GILBERT: We'll search. I don't have the -- I'm going to.

THE COURT: Let's pause until we get there.

MS. GILBERT: Sure.

THE COURT: You said I used it on multiple occasions.

MS. GILBERT: I said twice, but.

Your Honor, I'm looking at transcript page 2,639.

THE COURT: Does it contain the phrase willful misconduct?

MS. GILBERT: It says willful violation.

THE COURT: Okay. That's different.

And I would like you to -- misconduct is -- it has a specific meaning. It implicates perhaps the ethics rules. I'm not suggesting anything along those lines and I didn't use the phrase that you claimed a minute ago that I used multiple times.

MS. GILBERT: Actually, I said twice.

THE COURT: And I try to be careful with my words, even though it's sometimes hard to do on the fly here with so much going on.

That having been said, I've said what I've said on

this topic. And if you want to respond on that topic in writing, you may.

MS. GILBERT: I have written on it, Your Honor.

THE COURT: Okay. Then we're good.-

MS. GILBERT: But I would like to add one thing, which is this. If you're intending to exclude our evidence and testimony about these contracts, both the Second Circuit and the Supreme Court have said that you have to find willful misconduct to do so, not just --

THE COURT: To exclude the witness?

MS. GILBERT: To exclude the witness, to exclude the evidence.

THE COURT: Sorry, what are we talking about right now? Excluding?

MS. GILBERT: The evidence. Our contract -- these contracts, which are evidence in our case.

MR. SIEGEL: I don't think there's -- I thought we were past that. I thought there was 13 that we --

THE COURT: Well, there's a relevance objection, yeah.

MR. SIEGEL: Yeah, but I thought we're past the Rule 16 issue.

THE COURT: Let's bring in the jury and resume.

MS. GILBERT: Okay, if we're past the Rule 16 issue, then that's fine. I thought that we were still addressing the

Rule 16 issue.

MR. SIEGEL: I mean, for today, at least as I understand it, for the 9 and 13, we're past it.

If now it's going to start becoming different things, then that raises different issues.

THE COURT: Is there a Supreme Court case you want me to read?

MS. GILBERT: There are several. I'm happy to list them all for you, if you would like.

THE COURT: Just give me the top two or three.

MS. GILBERT: Sure.

Well, there's *Taylor v. Illinois*.

THE COURT: We've all been talking about *Taylor v. Illinois*.

MS. GILBERT: *Michigan v. Lucas*.

THE COURT: Okay.

And *U.S. versus Nobles*.

MS. GILBERT: Yes, *U.S. versus Nobles*.

I'll also direct you to the Second Circuit cases of *Noble v. Kelly* and *Wade v. Herbert*.

THE COURT: Can you spell the last one.

MS. GILBERT: Wade -- W-A-D-E. Herbert -- H-E-R-B-E-R-T.

And *Escalera v. Coombe* -- C-O-O-M-B-E.

THE COURT: I've got them.

MS. GILBERT: Thank you.

THE COURT: Thank you.

(Pause in proceedings.)

THE COURT: All right. We are waiting on one juror. The *Nobles versus Kelly* opinion is 246 F.3d 93?

MS. GILBERT: I'm sorry, what was that?

THE COURT: I think you said *Noble versus Kelly* in the list of cases.

MS. GILBERT: Yes.

THE COURT: And I thought you said it was a Second Circuit case.

MS. GILBERT: Yes. 246 F.3d 93 Second Circuit.

THE COURT: Okay.

This says: The District Court held that it was constitutional error to exclude Yamagata's testimony absent a finding that defense counsel's noncompliance with the discovery rule was willful. We agree.

So that seems to speak to willful noncompliance with a rule, not willful misconduct, to the extent that distinction matters.

MR. SIEGEL: Your Honor, while we're waiting, can I just confirm Mr. Watson has the notes with him at the stand again?

THE COURT: Mr. Watson, do you have your notes with you?

THE WITNESS: I do.

THE COURT: Okay.

THE WITNESS: I put it in my pocket, if that's what you're asking, yeah.

THE COURT: I think you're allowed to have notes. I don't hear anybody saying you shouldn't.

MR. SIEGEL: We don't have an objection. We just want the record to be clear.

THE COURT: To the extent the witness going to be using notes, it has to be disclosed to the other side.

THE WITNESS: I will not be using notes.

I will use water.

THE COURT: That does not have to be disclosed.

THE WITNESS: Okay.

THE COURT: I will say, I made a joke to Mr. Watson earlier. Not a joke, an observation, that you know, I asked him what was in front of him after we had the conversation about the notes.

He pointed to a drawing.

I said: As long as it's not a drawing of the judge, that's fine.

There is a certain amount of familiarity, obviously, that develops after people spend a long time with each other, as we are here. At the same time, this is a very formal environment that we're in. I'm not saying there was anything

inappropriate about Mr. Watson making a joke back to me about the sketch, which he did, but that happened in front of the jury.

We should all be observing the formalities in front of the jury, including me. We will speak to each other in the formal sense, lawyers will address their clients, their clients will address the lawyers in response. Even things as seemingly innocuous as, you know, joking asides with the jury about who has the better handwriting, let's leave those aside here and communicate within the formal strictures of the setting that we're in going forward.

And again, this is not meant to cast aspersions on anyone's behavior. It's just a reminder.

(Pause in proceedings. )

THE COURTROOM DEPUTY: Your Honor, are we ready to go?

THE COURT: We are.

THE COURTROOM DEPUTY: All rise.

(Jury enters.)

THE COURT: You can be seated, everyone.

Mr. Sullivan, back to you.

MR. SULLIVAN: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. SULLIVAN:

Q So, Mr. Watson, we were at 2018 festivals, 10 million.

How much of that 10 million was barter and how much, roughly, was festival?
A Let's see. Probably -- maybe the right way for me to think about it is 5 and 5.
So, the largest of the barter partnerships was with the BBC who again, had taken the opportunity to broadcast a two-day event. So, if I was going to break it out, I would probably put festival at five and I probably would create a new category that we currently don't have and put barter at five.
And Univision, justfor example, just for one day had paid kind of roughly 2, 2-and-a-quarter for -- in gross revenue for the rights. And so, a two-day event that was not just in the U.S. but would be broadcast around the globe, you know, we marked it at 5 million.
MR. SIEGEL: Your Honor, could I just note for the record, because of the white board, that there was a ten for festival that's being erased and replaced with a five, and then a new category for barter of five?
I just want the record to be clear of what's happening on the white bored.
THE COURT: Yes. Noted.
Q And for newsletters in 2018.
How many did you have?
A So newsletters, we had three, primary newsletters.

So we had the Presidential Brief in the morning, The Daily Dose in the afternoon. And then we did a new series that I mentioned before called Around the World where we sent young reporters not just every U.S. state, but from every country, from, you know, Belize to Burma. And that was also submitted for a Pulitzer prize. And so, we started to see, you know, a little over 2 million per newsletter. So call it seven for the year.

And that, again, included particularly large partnerships like JP Morgan, Discover, Volvo, others like that.

Q And podcasts, how many podcasts did you have in 2018?

A So that was really a nice evolution.

So again, just like with TV and festivals where we kind of doubled, we went from one TV show to two, one festival day to two. With podcasts, we went from one main podcast to two. So now we not only have The Thread, and in fact we had season two and season three of The Thread, but we also had a fantastic podcast that went along with the TV show called Take on America. So, call it two franchises, but three seasons worth of podcasts in total.

Q And what level of revenue did you earn in podcasts in 2018?

A Call it 2 million or so.

So kind of, again, double. It probably -- I'm

probably being conservative. It probably was a little more than that. And, you know, we saw some good, some good advertisers come on. Folks like Allied Bank who did -- I think I mentioned it started with The Dollar. So they actually named one of the podcasts.

Q And if you add that up, what was your general understanding of Ozy's revenue?

A Call it 25 million in gross revenue.

Again, I'm probably leaving some stuff out pretty meaningfully, but that, you know that was kind of the baseline expectation between the two TV shows on PBS, between the two-day festival, between the three daily newsletters, between the two podcasts and between the significant barter partnerships with BBC, IHeart and others. You know, probably 25 million is a conservative number.

Q You kind of answered that, but is this to the penny?

A Sorry, no. No, it's not.

Q All right. Let's go to 2019.

So in 2019, how many TV shows did Ozy have?

A So 2019, Ozy had three TV shows. We had our first show with Ms. Winfrey, so we had Black Women Own the Conversation, the show the that later one the Emmy.

We had Breaking Big, which was our show on PBS. We were able to then sell it or syndicate it, as they say, to Amazon. And then we had our first show on Hulu called

Defining Moments.
Q Now, other than PBS, Amazon and Hulu, did you have other partners of TV in 2019?
A We did. But those were the -- are the core ones to begin with.
One thing happened is, once you got your first deal with PBS, you not only got paid that main year the show dropped, but you'd get residual checks each year. So I'm not re-announcing that each time, but you get kind of trailing residual checks. So if you do The Contenders in 2016 you still, you get the main checks in 2016, but you get another one in 2017, another one in 2018, another one in 2019, and on and on.
Q How much revenue on these three shows did you earn in 2019?
A For a variety of reasons think of it as about 6 million. I say that because it's a little less than I otherwise would have expected. Part of that is because, as we explained with the Oprah deal, we took less in cash and agreed to a significant kind of barter relationship in exchange for the fantastic commercial that she did for us, the promo.
Q And festival?
A Festival, again this was another exciting year where it was two-day event John Legend, Trevor Noah, Mark Cuban, Chelsea Handler, others. Unfortunately, it got canceled at

the last moment by Mayor de Blasio and the heat wave, so something we expected to generate 15, $20 million I think we probably only thought of it as a $6 million event.

Q And where, generally speaking, did the 6 million come from?

A Various advertisers and sponsors who already were a part of it. Folks like Warner Brothers who had a new movie coming out. People like CNBC who had a new TV show coming out. People like American Family Insurance who paid for the kind of VIP area and the VIP events.

Q All right.

Newsletters. Any change in your newsletters in 2019?

A Yeah. We continued to grow.

And again, 2019 is the year where a lot is happening from BuzzFeed trying to buy us to, you know, continuing our series C. And so newsletters were a part of that momentum. And we had three significant newsletters in addition to The Presidential Daily Brief and The Daily Dose, we did a thematic one on the theme Love Curiously. So we were looking at love and relationships around the world, how things were changing.

And again, that was a terrific opportunity, I think. There were just -- our newsletters were starting to come into their own and people were spending more and more. So we were starting to see, call it on the order of about $3 million in

gross revenue per newsletter. Probably a little bit more but call it 9 million for the year between the Presidential Daily Brief in the morning, The Daily Dose in the afternoon and then the Love Curiously special newsletters that ran.

Q And who were your partners in 2020?

I'm sorry 2019.

A 2019, you know, a variety of good folks. Still, you know, Goldman Sachs was a meaningful advertiser in there, American Family Insurance was a meaningful advertiser in there. And you know, a number of others, JP Morgan, Discover, you know, dozens of partners.

Q Podcasts. What was your podcast situation in 2019?

A So podcasts really is starting to ramp up not just for Ozy but for everyone. And so we had not only new seasons of The Thread, which was great. Season five debuted. We had a fantastic new franchise that I love, if you haven't tried it, you should try it. It's called The Future of X. And so it kind of looked 50 years in the future and kind of asked what will work look like, what will automobiles look like and it's a really strong franchise in that regard, which was great.

We also had a podcast that went alongside, I believe, Black Women Own the Conversation. So I think we had about four podcasts in all for that year.

Q What revenue did you earn?

A Oh, call it roughly a million per. So think of it as

4 million in gross revenue for the year.
Q And finally, barter revenue in 2019.
Did you earn barter revenue in 2019?
A We did. Obviously, I said we struck that strategic relationship with Ms. Winfrey in the Oprah Winfrey Network and for us that one-minute commercial was -- I don't know if you remember that Weight Watchers, she had done a single tweet and it made $19 million for a single tweet, and then got 7 million --
MR. SIEGEL: Objection.
THE COURT: Sustained.
The response is stricken.
MR. SULLIVAN: Sure.
Q So Oprah, you were talking about Oprah.
A Oprah.
Q What strategic --
A So the strategic relationship, and we valued that at 20 million. We thought it was worth more because we looked at other comps and understood what the market price would be for that sort of thing. We judged it to be at about 50 million. We thought getting that kind of validation was worth looking at other situations where it would have been worth far more than that.
And we decided to be extraordinarily conservative. Discussed it, valued it at 20 million and accounted for

10 million of it in 2019 and another 10 million of it in 2020.

MR. SULLIVAN: 10 million.

Q Now, the overall value you thought was 50 -- five, zero?

A We thought again conservatively. We did a -- we both knew from the past and we had a conversation about what we understood its market value to be and again --

THE COURT: Who is "we"?

THE WITNESS: Board. At the board level.

A And so we understood it to be, you know, worth north of $50 million. And out of an abundance of caution, we valued it at 20 million and understood that we were not only going to use it in 2019, but we were going to use it again very meaningfully the next year.

Q All right.

MR. SULLIVAN: For the witness only, showing you Defendant's Exhibit 552.

Q Do you recognize 552?

A I do.

Q What is it?

A This is the Oprah Winfrey commercial.

Q The $50 million commercial.

Is that fair?

A Probably worth more than that, but yeah.

MR. SULLIVAN: Defense moves Defendant's Exhibit 552 in evidence.

MR. SIEGEL: No objection.

THE COURT: Received.

(Defendant's Exhibit 552 received in evidence.)

MR. SULLIVAN: Please publish to the jury.

MR. SIEGEL: Volume.

(Exhibit published.)

(Video played; video stopped. )

Q So for 2019 -- can you see it still Mr. Watson?

A I can.

Q All right.

Can you add up what your view was of revenue?

A Let's see. 6 and 6 is 12, and 9 is 21. Four is 30.... sorry.

So, 35.

Q So is this to the penny?

A It's not.

Again, I'm sure that I'm being conservative and I'm leaving stuff out, but ballpark.

Q All right. Let's do 2020.

So first TV. Any new shows?

A It was an exciting year. It really expanded. We had -- we did -- we had five shows that year.

We had our first show on A&E called Race and Resolution.

We had our first show on The History Channel called

History's Greatest Campaigns.

We had a second season of Black Women Own the Conversation.

We had -- oh, my goodness. Too busy.

Hulu. Our show on Hulu got named a Hulu original, so when they have like, Handmade's Tale or something, shows that Hulu really loves, they don't put it on, but for less than two percent they call them the Hulu original. So that was our show.

And then we debuted the Carlos Watson show that summer. So we had five shows in all that year across different networks.

Q How much did you earn in TV revenue in 2020?

A Call it -- so the four shows that are not the Carlos Watson show, I would kind of think of them as kind of two-and-a-half, 3 million per. So just to be a little conservative, call those four shows 10 million. Plus the Carlos Watson show alone had kind of signature advertisers like GM where we had a $5 million deal or American Family Insurance where we had a $2 million deal. And then we had lots of other advertisers like Discover.

And so call the TV segment about $20 million. That was in terms of gross revenue. That turned out to be a real expansionary year where we went from, you know, we took the leap from one show a year, to two shows, and now we're going

to five shows across five different networks, which was, you know, where you want to be when you're a young company. So that was great.

That was also the year that we won an Emmy for that show so we were awarded an Emmy.

Q Black Women Own the Conversation?

A Yes, for best docuseries.

Q In 2020, no Ozy fest that year, correct?

A You know, we actually got to announce it. And we were excited. We announced it a couple of days before COVID put the curtain on everyone. But the team kind of teased me because they said that I liked some of the older singers like John Legend, who I didn't think of as older, but they told me he was older.

So we got Chance the Rapper to headline and everyone was excited about Chance the Rapper, and Miguel, and a bunch of other good folks. And so we thought it was going to be fire, but we had to -- once COVID hit in March, we had to take that down. We were going to do it in June, but we had to take a step back.

Q All right. The newsletters.

What was the newsletter situation?

A Newsletter, again, it was COVID, more and more people were home so they weren't commuting as much. They were reading more. Newsletters took another step.

And here's where, I told you before, the team got creative. So we not only did the Presidential Daily Brief in the morning but a younger version of it called Whiskey in Your Coffee, if you remember I shared with you. And then -- so that was the second one. Then we had Daily Dose in the afternoon.

And then in light of everything that happened with George Floyd, we did a really -- our audience wrote kind of literally thousands of letters to us. So I remember one, and so we ended up building something called Reset America. So result of audience feedback, we launched a fourth newsletter. So we had four meaningful newsletters that year.

Q And how much did you earn in revenue for your newsletters?

A You know, again, anchored by people like Airbnb and General Motors, and you know, Wal*Mart and other folks, kind of four-ish million per each. So call it, just to be conservative, call it 15 million in newsletters revenue.

The other nice thing that year is that we really saw our audience shoot up. Because again, more people were home, so not only more advertisers, but literally more readers. And from an advertiser's point of view, they loved that. That was more eyeballs and more that they can work with, so it was good.

And some people bought multiple products. So they

may have started with the newsletters, but they then jumped in to the TV and the podcasts, too.
Q That leads us to podcasts.
A Yeah.
Q How, if at all, did your podcast division or group change?
A Again, grew. I think we had five podcasts. The team was smart and creative on this.

They, one, they partnered with the BBC and they did When Katty Met Carlos, which I told you did so well it became not just a podcast, but a radio show. A&E asked them to do The Food That Built America, so I was proud of them for that.

Then they came back with something new called Flashback, which was really, really good stuff. Once again, cracked the Apples Top 100. And then we did something very powerful around Juneteenth on an often-forgotten story called Ocoee in Florida. And then, like we did with Take on America, we did a companion podcast for the TV show that I was hosting. So the Carlos Watson Show podcast.

So it was starting to feel like we were getting the strength in each of the areas. We were no longer going to one or two. We were doing five TV shows, five podcasts and you could feel the momentum even amidst COVID. You could feel like the team was turning a difficult situation into a different way to serve our audience.

So we probably -- you know, we -- probably did north of 5 million in revenue from podcasts and folks like, you know, wide range of people from Wal*Mart, to Airbnb, to Chevy to others were advertisers.

Q All right.

And any barter revenue, 2020?

A We had a lot of barter. I guess I will for now just single out the commercial that we did with Ms. Winfrey.

But there was other really good barter that year that I was proud of the team for doing. But if I were just to maybe again, just be a little conservative and keep it simple just for the purposes of this conversation, I would just include that. And that we recognize, as I said before, to the tune of 10 million. So we took the 20 and recognized ten in the first year, and then ten in the second year. But again, I think a meaningful argument that it was worth a heck of a lot more than that.

Q All right.

So can you add up your revenue from that year?

A Yeah.

So conservatively, you know, call it, let's see, 20 plus 15 is 35, and 5 is 40, so 50. 50 million in gross revenue.

Q And last year, 2021, last year that we're going to do, I realize Ozy was in existence beyond this, but last year we're

going to look at.

So 2021, did your TV situation change at all?

A It did.

The team, we had a really good team or set of teams. People were working on different shows. And I think once again, we had -- I think we had six TV shows that year. So we had our first movie on Lifetime. If anybody's ever watched Lifetime movies, it's a big deal to get one of those. We have one called Torn From Her Arms based on some reporting from our team. Really proud of them for that.

We had our second show on A&E called Voices Magnified, which was -- again, was proud of the team for bringing that, bringing that to life.

We had the Carlos Watson Show, which was on both YouTube and then later in the year we struck a deal with Amazon Prime and so people could watch it on Amazon Prime.

And then we had two other shows that were coming and got interrupted by the Ben Smith attack. One was called The Katty Kay Show and another was called Sofia's Salon. So about six shows in all.

Q And any partners in addition to the one that you've named, A&E, Lifetime, the networks?

A Um, I think I've mentioned in prior testimony that the folks at Procter & Gamble, who are the largest advertisers in the world, had essentially become -- they were the ones who

helped launch soap operas back in the forties and fifties, that's why they're called soap operas, became our partner for any new show we were doing.

So sometimes you go talk to the network first, but they so liked our creativity that they said come talk to us first and we'll decide together whether we just do it on YouTube or we do it on YouTube and Amazon, do we do it YouTube and Hulu, do we go to A&E. So they were -- I was grateful to them and they were good partners in that regard.

(Continued on the next page.)

BY MR. SULLIVAN: (Continuing.)
Q And how much revenue in TV did you earn in 2021?
A Yeah, these numbers have a slight asterisk next to them because again we got attacked at the end of September so we weren't really able to recognize all of the Q4 revenue that we had already booked; namely we had signed deals with Coke and Target and Wal-Mart and Eli Lilly and Pfizer and others that got interrupted as a result.
Q And what do you mean by Q4?
A Sorry. By that mean I mean the last quarter of the year. October, November, December. So -- so, assuming that all of those had played out and not even counting new stuff that could have happened because the fourth quarter of the year is the holiday season sand that's when often advertisers have saved their money and they want to push hard in that and so you can see sometimes even double what you thought you were going to do or quadruple that you thought you would do, but not even assuming that, that was roughly a $30 million business in gross revenue.
Q So that's not including your fourth quarter projections?
A Sorry, that is including fourth quarter.
Q Is?
A Is, yeah.
Q Is including what you've got in fourth quarter?
A What we had, but not what we could have gotten. We had

some relatively -- we had deals that were even bigger than the Omnicom one that we talked about that were on the table that if we had gotten signed would have -- would have dwarfed all of this.

Q OZY Fest, how did you do at OZY Fest. Was it still COVID?

A It was still COVID. This was the first year that we tested a virtual festival. So, if anyone is a fan of the singer H.E.R. We had H.E.R. We had Steven A. Smith. We had Mark Cuban. We had a comedian Tig Notaro. So we had a nice virtual festival and we had booked General Motors and American Family Insurance and Discover and others. It was a team that did a really good job. It was created and we did it over two days.

Q How much revenue did you earn in 2021 for OZY Fest, the virtual OZY Fest?

A You know, call it 10 million in round numbers across those two days and across our various -- our various partners on various news streams.

Q In newsletters in 2021, did your newsletter profile change at all?

A It did. The team introduced two additional ones. I told you before about the morning offerings, the Presidential Daily Brief and Whiskey In Your Coffee and in the afternoon The Daily Dose. They vary brilliantly came up on Saturdays with

one called The Weekender to tell you about cool stuff happening on the weekends and then on Sunday we did something called Sunday Magazine, which was great. So we effectively now had kind of at least five kinds of hardworking franchises at that point.

Q And who were your partners?

A Variety, Airbandb got excited; TikTok got excited; Chevy, Ford, others. A lot of people liked the fact that unlike a social media ad, with newsletters you have to know who opened it, why they opened it, how far down they got in the newsletter. So it ended up being a winner for us.

Q How much revenue did you earn for 2021?

A Kind of on the order of, you know, on average 4 million per newsletter. It didn't really exactly work that way. Some were more. Some were less, but call it 20 million for the year. Sorry, I left out General Motors. We mentioned before they signed a $25 million contract and they were big on our newsletters.

Q And what was your podcast profile in 2021?

A Again, the team was getting strong because now we had multiple partners who wanted our podcast. So you not only had iHeart but you had the BBC and A&E coming to you and you had individual companies who were like I want my own special podcast that tells my own story. So we had on the order of five podcasts. Like, the folks at Ford got excited about the

future of transportation and so they underwrote a season of our podcast called The Season of X: Transportation; basically where are cars going over the next 50 years.

Q What revenue did you generate in podcasts?

A On the podcast side we started to see a little bit more here as well and I think that that was probably on the order of -- it was somewhere between five and ten so let's call it five just to be a little conservative. Sorry, I actually forgot. One of the -- I used to call them football monsters of the midway.

One of the monsters of the midway was the BBC because they were the ones who took what was originally an order for four episodes of a podcast and got so excited they turned it into a thirty-two episode order, but not only as a podcast but a radio broadcast that they sent around the world on BBC Radio around the world.

Q And last, but not least, what was your barter income in 2021?

A Yeah, you know, there was a lot going on there. BBC was a significant partner. That radio show was worth its weight in gold again, a -- not a few things will be as powerful as Ms. Winfrey. Amazon Prime being a partner there we took less of a financial deal in order to get some of the additional benefits there. IHeart showed up and showed out. They were really good as well. So, you know, probably on the order

of -- you know, across all of those probably on the order of $15 million in barter.

Q And can you add that up for us?

A And just to be clear, those are major barter deals. There's some barter baked in each one. We had small barters along the way like Do Something, Now This News that I'm not pulling out into the big category. Let's see 30, 10, 20, 60, 65, 80, 8-0.

Q And is this 80 million to the penny?

A No. Again, had we not be attacked, I think we would have many more additional deals in Q4 because that's the busiest time for most advertisers and you have what's called a pipeline you can see who has asked you in the preceding months to submit a proposal and who is getting close to saying yes. And we knew we -- we felt we were close to someone between fifteen and twenty really important yeses which would have -- which would have -- you know, which would have been meaningful.

So I'm sure I'm undercounting this and if we had signed the big deal with NBC that we were negotiating it would have been more than most of these years added up, that one deal.

Q Mr. Watson, thank you very much for your time. I have no additional questions, sir.

A Thank you. I appreciate it. Thank you, Professor

Sullivan.

THE COURT: Let's take a five-minute break here. Five or seven. We'll regroup shortly.

(Jury exits.)

THE COURT: All right, five minutes everyone.

MR. SIEGEL: Your Honor, could I make a request that the white board stay available so we can use it on cross if we need to.

THE COURT: Yes, sure.

MS. GILBERT: I think we were going to use it for something else.

THE COURT: I think my new rule on demonstratives is that people do it beforehand.

MS. GILBERT: Can you take a picture of it?

THE COURT: It needs to be memorialized.

MR. SULLIVAN: The parties will work it out. So, yes.

(Recess taken.)

(Judge resumes bench.)

THE COURT: Are you ready for the jury?

MR. SIEGEL: Yes, Your Honor.

(Jury enters.)

CROSS-EXAMINATION

BY MS. FRISON:

Q Mr. Watson, good afternoon.

A Good afternoon, good to see you.
Q I know you've been talking about money, but I'm going to direct your attention back to February of 2021 and particularly to the day that Samir Rao impersonated Alex Piper on a call with Goldman Sachs.
You testified that you went into the office, the OZY offices, early that day; is that right?
A Yes, that's right.
Q Was this still during COVID time, pandemic?
A It was. It was February of 2021 so it was towards the end of it but it was still towards -- everyone wasn't back in the office.
Q What time did you get into the office that day?
A You know, I got in early -- I think I got in at 5. I woke up at 4. I think I got in at 5. And I mentioned that we had an interview with an actress named Priyanka Chopra who I had been trying to get for a long time. She agreed to do it but only if I agreed to do it at a really early hour. So I got there at 5 a.m.
Q Was this office OZY's Mountainview, California office?
A Yes. It's our only office. OZY is based in California, not here.
Q Was this the second or bigger office space that OZY had?
A I don't think we showed the picture here, but we had the first office in Mountainview that my partners built furniture

for and then we moved to this space that could house 50 or 60 people.
Q When you came into the building that day, what was the first thing you did?
A I think I went and dropped my bags off in my office and we -- we had redone the office basically for it to be a TV and podcast studio. One of the spaces is where you go to put on makeup and do wardrobe. So I went over there to do makeup and wardrobe.
Q Who did you see that morning before you saw Mr. Rao?
A I saw four or five people. I think Liz was doing makeup. I think Karina was doing wardrobe and I think I saw Marco, who was one of our camera operators.
Q Those people that you just named, were they OZY employees?
A They were with an asterisk. Like Ms. Lightfoot said, I think we have them on a separate payroll but they effectively were.
Q Were they also there for the interview?
A They were there for the interview, yeah.
Q Did you see Suzee Han in the office that morning?
A I'm not sure. I'm not sure. I'm not sure.
Q Did you actually do the interview once you got set up?
A I did, I did. She was great. I think we may have gone for an hour and a half or so, but she was great. She was an

exchange student here in the states even though she was from India and took us through her story, how it brought her to London.

Q It was an hour and a half?

A Yes. All in.

Q Was Mr. Rao part of that interview?

A I think he was a fan of hers and he had shown up. Members of the team would show up in person or essentially watch through Zoom. They wanted to kind of watch the live feed. Sometimes even people's families would tune in to kind of watch if we had Secretary Rice or Bill Gates or something.

Q So did Mr. Rao come and observe the interview?

A I think he did. I think he did.

Q When you finished the interview, what did you do?

A I think I immediately went back to the makeup and wardrobe and kind of took off the clothes and took the makeup off and then I think I went back to my office just to do some work. I had a pretty full day of things to do.

Q Where was your office as compared to the studio area that you had been in for the interview?

A My office was kind of on the other side of the studio. So if you walked into the door of our office space, you walked through the kitchen and then you kind of walked into an area that's about the size of the jury box, which was kind of the main TV studio and that was that and then my office was along

that side -- along the street side, yeah.
Q And where is Mr. Rao's office in relation to yours?
A Not exactly but kind of where you are, maybe a little bit -- probably a little bit further.
Q Would that be about 30 or 40 feet apart?
A Probably, yeah.
Q After you left the interview and took off makeup and all of that, did you go see Mr. Rao?
A I didn't originally. I went back to my office and I think I was just writing a bunch of things. I think I had some calls and so I originally didn't. I went to the bathroom, I think, at one point and then didn't see him, I think, until I was on my way back from the bathroom.
Q You said yesterday that you sort of popped your head into his office. Is that right?
A I did. I did. In those days again not many people were around and so if there were a couple of people it was not unusual to kind of pop in and say hello and we had a lot of things going on. And so I would pop my head in just to kind of see what he or other people were up to.
Q And so when you did that that day in particular, were you trying to meet with him or were you just saying hi?
A More just saying hi, just saying hello.
Q When you looked into Mr. Rao's office, what did you see?
A I -- he was not working normally. He was more in the

center of his office. His office kind of doubled as a conference room at times. He tended to be in the center of it and looking forward and he was more in the corner with his back -- with his back to the door.

MR. SIEGEL: Your Honor, could we have a sidebar?

THE COURT: Yes.

(Sidebar held outside of the hearing of the jury.)

(Continued on next page.)

(The following sidebar took place outside the hearing of the jury.)

MR. SIEGEL: I just submit this is incredibly cumulative. We've been through this entire story with Mr. Sullivan.

THE COURT: What story is it?

MS. FRISON: Goldman Sachs.

MR. SIEGEL: We sent through the same thing. I got up early, went to the interview with Priyanka Chopra.

THE COURT: I know all of that. I don't understand how this is in the company's interest. Although we may be going somewhere, I don't understand. Where is this going?

MS. FRISON: Well, I think the -- the details around the call and Mr. Watson stepping into it relate to the overall conspiracy that he as the CEO is alleged to have been engaged in with Mr. Rao. Mr. Rao's testimony is that this was a plan, had been decided and worked out and tested and everything else.

MS. GILBERT: One of the overt acts.

MS. FRISON: Certainly this ruse on Goldman Sachs is a part of the allegations of defrauding.

THE COURT: Are you disputing that there was a ruse?

MS. GILBERT: No.

MS. FRISON: I'm not disputing that there was a ruse by Mr. Rao. I'm disputing that the CEO was involved in it.

THE COURT: That is not a defense for your client. If Mr. Rao is guilty then OZY is guilty. I don't understand where this is going in a way that comports with your attorney/client interest, number one, and it's cumulative, number two. I will sustain the relevance objection. If you can tell me something specific that is different somehow from --

MS. FRISON: The way that the testimony came in on this topic essentially implied that Mr. Watson gets to the office, goes into Mr. Rao's office and all of this occurs. There is actually a lot more that happened in that setting and none of the details of what he saw, heard, any of those things in that atmosphere were really done into on direct with Mr. Watson.

THE COURT: Don't ask any more questions that were already asked and answered in Mr. Watson's first trip through this episode. If you have new questions that are specific to your client's interests in some way or that further in some way your client's interests, I will allow you to ask those questions.

MS. FRISON: Okay. I don't know that question by question how that comports with Your Honor's direction.

THE COURT: Neither do I because you're not telling me where you're going but that's my direction.

MS. FRISON: Okay. (Sidebar ends.)

BY MS. FRISON:
Q Mr. Watson, when you went to Mr. Rao's office, were you going there in response to the meeting invite that you discussed with Mr. Sullivan yesterday?
A No.
Q Was anyone else in Mr. Rao's office?
A No.
Q From the door, how far were you from Mr. Rao?
A Probably like where this door is right here probably, I think. If I'm standing in the door probably right there, I think.
Q From where you are sitting on the stand to the first juror?
A First or second juror, I would think.
Q Did you step into the room, into the office?
A Not initially, no.
Q Did you have your cellphone with you at the time?
A I did, yes.
Q Did you have a conversation with Mr. Rao when you popped your head in?
A No. It looked like he was on some version of a Zoom call or something so I wasn't looking to interrupt --
MR. SIEGEL: Objection.
THE COURT: I am going to sustain the objection that was offered at sidebar.

MS. FRISON: May I be heard again at sidebar?

THE COURT: No, because we just took the opportunity and it's the same subject.

MS. FRISON: I believe some clarification is needed for me to continue.

THE COURT: All right, come to sidebar.

(Sidebar held outside of the hearing of the jury.)

(Continued on next page.)

(The following sidebar took place outside the hearing of the jury.)

THE COURT: I think I can give you some more guidance if you tell me where this is going, but I can't give you guidance in the abstract.

MS. FRISON: I'm trying to get through the actual details of his interaction with Mr. Rao during this call.

THE COURT: But that's all been covered.

MS. FRISON: Not really, Your Honor. We don't know if there was a cellphone or a computer -- we don't know exactly --

THE COURT: Why is that relevant? He already said he didn't see the text messages that Mr. Rao -- sorry, that he sent to Mr. Rao. There's been testimony about what he read in real time, but anyway I don't understand how it's relevant to OZY. If -- even if Mr. Rao is acting alone --

MS. GILBERT: In bad faith. If he's acting alone in bad faith is OZY then guilty on a conspiracy count?

THE COURT: If he commits a crime while acting within the scope of his employment. You all have seen the jury instructions.

It doesn't matter whether Mr. Watson was a party to it or not from OZY's perspective.

MS. FRISON: It matters tremendously. This is OZY's cross-examination.

MS. FRISON: I think I get to show that despite the rogue actors admissions that the CEO was not involved and -- and to flesh out the details of that because it's still a question for this jury whether or not there was an aggravated identity theft. That's not a foregone conclusion just because Mr. Rao testified --

THE COURT: If your question is about whether any crime is committed. I think that's --

MR. SIEGEL: OZY is not charged with aggravated identify theft.

THE COURT: Sorry.

MR. SIEGEL: Your Honor, my concern about this is Mr. Watson testified about this, they went step-by-step through it. Now we're in the next day and --

MS. FRISON: I am a different party and it's technically cross. I believe I get to go into whatever Mr. Sullivan asked him.

MR. SIEGEL: Under 403 the Court can weigh the probative value.

THE COURT: We're not covering the same ground.

MR. SIEGEL: There's no probative value as to OZY. The beneficiary of this is to Mr. Watson who already had an extended examination by his own attorneys and they're wasting the jury's time.

THE COURT: What is going to be different about

this?

MS. GILBERT: The benefit for OZY --

MS. KASSNER: You don't represent OZY.

THE COURT: You can't argue on behalf of someone that is not your client.

MS. GILBERT: But I can still speak --

THE COURT: This conversation is coming to its natural conclusion. If you have, again, topics that nobody has talked about with respect to this phone call, you can go into them, but who was sitting where and who was on the phone, we're beyond.

(Sidebar ends.)

(Continued on next page.)

BY MS. FRISON:
Q Mr. Watson, during your pop in to Mr. Rao, did you eventually determine that he was pretending to be someone else?
A I did.
Q What type of call did you determine that call to be?
A A reference call.
Q And what is a reference call?
A Like when you go for a job and once you've gone through the process and sometimes they've already made you the offer, then, as you know, they may call two or three references. And, so, similarly we've been negotiating with Goldman Sachs and going through diligence for maybe five months and in December of 2020 they offered us a term sheet. We then negotiated it. We then signed it January 18th.
So the deal was largely done. They had gone through their committees and now they had to do due diligence -- sorry, reference calls. So they had spoken to the CEO of NBC --
MR. SIEGEL: Objection.
THE COURT: Sustained.
BY MS. FRISON:
Q Had Goldman Sachs done some reference calls already?
A They had and I knew --
MR. SIEGEL: Objection.

THE COURT: Let's hear a question or two.
A The reason I knew it was because I got calls and e-mails back from the people who --
MR. SIEGEL: Objection, objection.
THE COURT: Sustained.
BY MS. FRISON:
Q Were you aware that Goldman Sachs was in the process of doing reference calls for OZY?
A Yes.
Q On a reference call for an investor, that an investor was doing, would OZY be a part of that call?
A No, just like you wouldn't do if it was a job reference call.
Q So, that reference call between Goldman Sachs and what should have been YouTube, Mr. Rao would not have been on at all?
A No, definitely not.
Q You testified that you had physically signaled to Mr. Rao to stop?
A Several times, yes.
Q Why didn't you text him words to that effect?
MR. SIEGEL: Your Honor, objection.
THE COURT: Sustained.
BY MS. FRISON:
Q How long were you standing there listening to or taking

in the call?
A I can't be sure but probably a couple of minutes before I realized what was going on and probably in total, you know, probably less than, you know, five or seven minutes, something like that.
Q Were you present when the call came to an end?
A Yes.
Q And did you talk to Mr. Rao when it was over?
A I did.
Q How did that go?
MR. SIEGEL: Your Honor, objection.
THE COURT: Sustained -- well, sustained.
Q Were you upset with Mr. Rao after the call?
MR. SIEGEL: Objection.
THE COURT: Sustained.
Q You noted yesterday with Mr. Sullivan that you discussed the call and --
MR. SIEGEL: Objection.
THE COURT: These questions so far have been asked and answered. I'm looking at the transcript from yesterday. If there's a new area, a genuinely new area that you want to cover, I will indulge that.
MS. FRISON: I did not get the question out, so I'm not sure what topic was sustained.
THE COURT: What is the question?

BY MS. FRISON:

Q The question is you discussed with Mr. Sullivan that you talked about the call with your board and that -- that there was a decision not to fire Mr. Rao. Why didn't you push to fire Mr. Rao?

MR. SIEGEL: Objection.

THE COURT: Sustained.

MS. FRISON: May I be heard?

THE COURT: This is going to be the last sidebar on this topic because I think we have to push this forward, but, yes, come to the sidebar, please.

(Sidebar held outside of the hearing of the jury.)

(Continued on next page.)

(The following sidebar took place outside the hearing of the jury.)

THE COURT: I'm looking at transcript from yesterday as we're doing this.

MS. FRISON: This will be my last question. I know that Mr. Sullivan elicited that he did not terminate him and that he talked to the board.

My question was why Mr. Watson didn't push for termination. I think that is very relevant to OZY and I don't think that was asked by Mr. Sullivan.

MR. SIEGEL: My recollection is that Mr. Watson testified that he felt compassion. That he wanted to understand what had happened and there was a debate on the board about it.

THE COURT: Everyone stay here. I'm going to look at the transcript about it and I will come back.

(Pause in proceedings.)

THE COURT: This is covered at page 3183 of the transcript.

He decided not having compassion. One of the board member's children had a mental health issue. This has all been covered.

Asked and answered. Sustained. We're moving on to another topic.

MS. FRISON: Your Honor, may I ask him as CEO why he

did not do more to protect the company from Mr. Rao at that time?

THE COURT: It's been asked and answered and I don't understand how it's relevant to OZY's defense; so, no.

(Sidebar ends.)

(Continued on next page.)

BY MS. FRISON: (Continuing.)

Q Mr. Watson, who was on the board of directors of OZY in 2021?

A Marc Lasry, owner of the Milwaukee Bucks at the time and a well-known investor. A gentleman named Jens Mueffelmann who was an executive at one of Europe's largest media companies and a guy named Michael Moe who was on the board from the beginning was a well-known investor in companies like Facebook and Spotify and Dropbox and I was on the board and for a period of time Samir Rao was on the board.

Q Did OZY have a board of directors since its inception?

A Always, yes.

Q Did all of the people on the board have a financial interest in OZY as well?

A They did, both because they invested and then we also at times offered additional compensation to thank them. Most of them were -- we were fortunate to have them. A lot of them had extensive experience in media. You know, they owned media properties like the Atlantic, like Politico, like Business Insider or they invested in Twitter or Apple or Disney and so they knew the space well and our hope was that they could help us grow in scale.

Q What types of decisions at OZY required board approval?

A You know, similar to most startups, the major ones, if there's going to be a major hire, you want to interview them

with the board and make sure the board is on board. I had a strong belief that every full-time person should have stock options. That's not the norm in most media companies.

THE COURT: The question was what types of decisions were put to the board?

THE WITNESS: Stock options was one of them, but that that involved more because it wasn't typical in our space to give out stock options to everyone. Typically only a couple of people get it. So you actually had to have a conversation with the board in order to depart from the norm and make sure that everyone was going to get a piece of the pie.

If we looked at any acquisitions if anyone approached us for an acquisition, if we wanted to take on debt. So when Maurice Werdegar said we borrowed money from him and paid him back and then some, if we were going to do a new round of fundraising, we had to do that.

THE COURT: Let's have another question, please.

Q Did the board approve all of your fundraising rounds?

A Very definitely, yes.

Q Am I correct that you had a seed round Series A, B, C, D and E?

A We had the first five and we were about to do the E and in order to do the E we had to do board signoff in order to hire J.P. Morgan who was the investment bank who was preparing

to do our pre IPO round.
Q You've discussed being Mr. Outside and being -- garnering -- being the person to find investors. Were OZY's investors allowed to speak with board members other than you?
A Not only allowed, but because it's weirdly kind of a small club, people who invest in small companies they know people from other deals in other parts of their lives, even when we didn't, say, hey, please meet this person or that person, inevitably they knew each other and inevitably they would speak. So I often would find out secondhand that they had spoken to Michael Moe or to Marc Lasry or to Tom Franco or to Laurene Powell Jobs or to someone else.
Q Other than his board of director duties, was Mr. Rao a decision maker at OZY Media?
A He was for sure on the inside stuff. He obviously ran finance and tech and operations and, so, he was kind of the person who led and drove those.
Q So was Mr. Rao authorized to take some actions without your preapproval?
A Of course, sure.
Q Was Suzee Han a decision maker?
A To the extent that Samir green lit it. She fundamentally was his deputy and, so, I assume that there was some divide and conquer between them and I assume that there were sets of things that he gave her --

MR. SIEGEL: Objection.
THE COURT: Sustained.
BY MS. FRISON:
Q Was Suzee Han authorized to take some actions without your preapproval?
A Of course, sure.
Q You also mentioned that OZY hired investment bankers. When did OZY first hire an investment banker?
A I think we first hired an investment banker in 2018 at Tom Franco's suggestion. Tom is a professional fundraiser. He has raised billion of dollars for funds. When he saw our seed, he not only put money in himself but he said I think you would do well to hire investment bankers who can also make sure you've got the strongest pitch, the right targets and can also work it through. So I think he helped us hire the gentleman, Abbas Maniar, who you met earlier. He helped us hire Alex Brown who was another group. He helped us hire Brooks Lynn and then he weighed in on the hiring of a group called JMP.
Q And were those your four investment bankers?
A They were the four initial ones and then as we got ready for the Series E, when we were going from raising 30 or $40 million at a time to trying to raise 200 million, that's when we spoke to both Goldman Sachs and to J.P. Morgan and ended up choosing J.P. Morgan.

Q How involved in the fundraising were the investment bankers that OZY hired?
A Well, we paid them a lot of money so they better be. We -- they usually take about one to three months to work with your finance team and whoever your inside people are.
MR. SIEGEL: Your Honor, objection on the same basis that we had at sidebar.
THE COURT: Sustained.
BY MS. FRISON:
Q Did the investment bankers do their own investigation?
A They did, yes.
MR. SIEGEL: Objection.
THE COURT: Sustained.
BY MS. FRISON:
Q Mr. Watson, you told Mr. Sullivan that you never logged into OZY's NetSuite account; is that correct?
A That's correct.
MR. SIEGEL: Objection.
THE COURT: Sustained.
Q Why hadn't you logged into that cloud?
A Just, again, my focus was on content and partnerships and building out the team and that would have been a level of detail that -- that I really wouldn't -- that -- that in a world where you have to divide and concur it wouldn't make sense for me to go into something that's got 28,000 lines.

That wouldn't make sense.

Q Were you aware that Samir Rao was actually creating fake contracts?

MR. SIEGEL: Objection.

A I was not.

THE COURT: Sustained.

(Continued on the following page.)

EXAMINATION
BY MS. FRISON: (Continuing)
Q Did there come a time when you became aware of very high interest loans that Mr. Rao had taken out for OZY Media?
A I did, unfortunately, yes.
Q When was that?
A In late 2019 is really where it became clear, and then it -- some of the details of it became even more clear in 2020. I hadn't realized that he had taken out personal guarantees in my name and signed my name to all sorts of guarantees.
Q During that period --
MR. SIEGEL: Objection.
THE COURT: Sustained.
MR. SIEGEL: Move to strike.
THE COURT: Granted.
Q During that period, how many loans did you find out about?
A It took months to figure it all out, but we ultimately -- and I had to bring in two different lawyers, but we ultimately found more than a dozen loans that he had taken out in my name.
Q When you found out about approximately a dozen loans, what did you do about it as the CEO?
A I -- well, first tried to understand -- as I said, it was

very hard to piece it together. And I'd asked him over and over again to get it in one place, so that I could see it.

Then I brought in a lawyer from Perkins Coie, Sara Chenetz, and she tried to help me negotiate with some of these guys.

And then I brought in another lawyer, Rafael Zahlraddin, to try and help me finish that out and make sure that we dealt with it in a straightforward way, that we got everybody paid back. And then we --

MR. SIEGEL: Objection. Can we get a timeframe?

THE COURT: I was just going to say. Can we get a timeframe here? When does this discovery first start and what are the months that it takes to figure it out?

THE WITNESS: So, we really -- I really become clear on it beginning in 2019. So, 2019, as I said before, the financials was a big year, we went from doing Onesies in 2016, 2017, to two TV show --

THE COURT: I'm sorry. It's not a question about what was a big year.

It's a question about when, and it just calls for a timeframe. When did you first discover what you just described discovering about loans taken out in your name?

THE WITNESS: So, 2019 -- late 2019, I would say, was the heart. And then 2020, with some digging by Rafael, I got greater clarity on exactly what was going on.

THE COURT: Thank you.

BY MS. FRISON:

Q And when you say 20 -- what month, approximately, in 2020?

A I would say it was kind of February, March, April, May-ish of 2020.

COVID, remember, also, kind of intersects in there as well, too, in March, but kind of in there.

Q Once you found out all of the loans that were attributed to OZY, what did you actually do about it?

A I had the lawyers call these lenders directly. Many of them were, effectively, loan sharks literally. And I had them negotiate with them, find out exactly what he had gotten us into, and tried to negotiate what it would take to pay them back and separate them from having any relationship with the company.

Q Did that --

THE COURT: Sorry, I had asked when the first discovery was, and I think you said that late 2019 was the heart of it.

This may be the same answer, but as best you can remember, when, approximately, was the first time you discovered that Mr. Rao had taken out a loan in your name?

THE WITNESS: I don't know the answer to that, but -- let's see. I believe when I first became aware of it

was in the fall, probably somewhere in the September, October, November of 2019 range. And, again, it wasn't that he, all of a sudden, became forthcoming and one day we had a conversation and he laid everything out easily.

I -- there was a drip, drip, drip, where I found out more and more issues. And having brought in one lawyer and having her tell me, he is not giving me the full story, I then had to get a second lawyer and say, Rafael, figure this damn thing out and let's get this thing fixed.

So, it -- so, there was an evolution in it. I didn't get the full picture on, like, one day where he came in and gave a presentation and said, here's what's happening in these 12 places.

THE COURT: But was there a point at which you first saw a signature that purported to be yours that you believed was forged? And when, if so, was that?

THE WITNESS: I probably actually saw that kind of documentation that you are describing in early 2020, I would think.

THE COURT: Okay.

THE WITNESS: So...

THE COURT: Thank you.

THE WITNESS: And sorry. Just to be clear, Judge, I was aware that there were loans. It took a little bit of time before I realized that he had taken them out in my name with

personal guarantees. And then it took a little while until I realized that he had signed my name to these various agreements.

BY MS. FRISON:

Q When you described instructing the lawyers to negotiate payoff of those loans, did that actually happen?

A Yes, of course, we paid everybody back.

Q What period -- was that in 2020 as well?

A That was probably in 2020, and -- yes, probably in 2020.

Q Do you know how long it took for that process of research and repaying to be completed?

A Probably roughly a year, all said and done, from trying to understand the situation to trying to deal with it properly and make sure that it was handled appropriately.

Q That occurred before the Goldman Sachs call in 2021; correct?

A They kind of overlapped a little bit to some extent, yeah.

Q And when you found out about the loans that had been taken out, you -- did you talk to the board about that as well?

A I did. I did, very much so, yeah.

Q But you did not fire Mr. Rao after that, either?

A I did not, no.

Q And why not?

A Probably for three reasons.

One is that I didn't have a full picture of what was going on. We were very busy, as I described before. I was traveling constantly. So, in retrospect, it all looks clear. But at the moment, this is happening at the same time that people are trying to acquire you, that you're doing TV shows, you're doing podcasts, you're meeting over here. So, it's not like everything is happening in one clear organized way. So, that's one.

Two, I didn't have a larger context for other things that he was doing, so I heard it as him trying to do his best in and around getting the company supplemental financing. And it was at that point that I said to him, rather than do these crazy high interest loans, why don't you work with someone like WTI, who had tried to approach us a year before that, they had tried to loan us money. And why don't you substitute 50 percent interest loans for something more like 20 percent interest loans. And rather than have 12 partners, why don't you have one partner and try and be organized.

And the last thing, I guess, and I guess I do feel -- I'm sure I sound stupid saying this, but, you know, he was my friend.

Q Mr. Watson, you spoke -- you have spoken a lot about what we call barter agreements and strategic partnerships and the importance of those relationships.

Why was it that not until after the Ben Smith article did OZY incorporate that value on OZY's books?

A I think that -- I think it was a combination. I think -- I think Samir was busy --

MR. SIEGEL: Objection.

THE COURT: Overruled.

A I think Samir was busy. I think, in retrospect, you know, doing accounting for a young media startup is not always that easy. As we've heard here, there is cash, there is in-kind. There is TV, there's podcasts. There is gross revenue, there is net revenue. There is cash, there is accrual.

People want to think that it's simple, but it isn't that simple. And it isn't that simple. And, so, I think -- I think it was hard to get right.

And, again, we went from literally having no contracts, as in zero, to having over 229 large contracts, and another 500 small clients, who bought OZY through third parties. Like, you would go to hotels tonight, people could sometimes buy lower price OZY add inventory by not coming to one of my sales reps, but by going to a third party.

So, I had hundreds of clients. And that happened in, like, a 48-month period of time. And, so, you can imagine that that could be a little bit overwhelming for someone, even someone who is smart and even someone who, you know,

hopefully, wanted us to do well.

Q Did you, yourself, understand how to account for that value or revenue?

A At a high level, I did. I may not have known -- you know, I'm not a CPA, but having -- you know, having been a CEO before, having been an investor, I was chair of the board of the audit committee of the largest education company in the world, they're a very big company, kind of worth over $10 billion, so, just to get prepared for that you, actually, literally have to -- and, so, yes. So, I was clear that in-kind is something that people regularly do and how to do it. I was clear that things like gross versus net were central to proper accounting. And, so, I was aware of that, yeah.

Q Mr. Watson, you described an acquisition offer by BuzzFeed. Was BuzzFeed the only company that offered to buy OZY?

A They were the most aggressive in terms of reducing it to writing.

The CEO of *The New York Times*, a guy named Mark Thompson, got wind that BuzzFeed was trying to buy us and asked me to fly to New York in the fall of 2019 and meet him at his club. And talked about whether or not we'd be open to being acquired.

Q Were -- and, so, were those the only two times there were

real offers to acquire OZY Media?
A They were the main two.
In 2021, there was something called a SPAC craze, where people were doing kind of a backdoor way to go public. And some of the other new media companies approached us about would we want to partner up with them. And, so, whether you call that then trying to acquire us, or whether you'd call it a merger, a number of people approached us. And, so, those were the -- those were the -- those were the instances where people were trying to buy us in a meaningful way.
And then he didn't -- the conversation didn't get to full out acquisition, but the then CEO of what they call CBS Paramount, he and I had a conversation and -- maybe a couple of conversations about where OZY was going. And it felt clear to me that part of the interest was in a potential acquisition offer.
Q With regard to the BuzzFeed offer, you -- you stated that both companies signed an NDA; is that correct?
A That's correct, yes.
Q And what is that?
A It's a nondisclosure agreement. So, it says, I'll open up my -- show you my content, catalog. I'll show you my team. I'll introduce you to my investors. I'll kind of give my secret sauce and you'll show me some of yours.
MR. SIEGEL: Objection. It's the same objection

from sidebar.

THE COURT: Asked and answered or the other objection? Come to the sidebar briefly.

Ladies and gentlemen of the jury, we will take our final short break of the day. I will ask that we be back in about five or seven minutes.

(Jury exits the courtroom.)

(Sidebar)

(Continued on next page.)

(The following sidebar took place outside the hearing of the jury.)

MS. FRISON: Your Honor, may I state something that can be off the record.

THE COURT: I don't think anything can be off the record.

MS. GILBERT: I know what you're going to say.

MS. FRISON: Not having to do with the objection.

We have been laboring under five to seven-minute breaks, I just want to say --

THE COURT: You want the breaks to be longer?

MR. SULLIVAN: It is particularly short for women because of the set up for bathrooms.

THE COURT: Thank you for saying so, yes. 10 minutes, 15.

MS. FRISON: That would be --

THE COURT: I feel like if we say ten minutes breaks we end up with 15. And if we say 15, we end up with 20. But we will start saying 10, yes. I appreciate you bringing that up.

MR. SIEGEL: So, Your Honor, we had --

THE COURT: I think it was asked and answered.

MR. SIEGEL: So there was testimony -- well, I guess cumulative, is what I'm getting, but the same concept. There was testimony about the NDA with BuzzFeed, and I remember Mr.

Watson testifying how it allowed him to be open Kimono, that said he could share the secret sauce. So not only are they asking about the same topics, he's using the same words.

THE COURT: I think the data room being part of a Kimono. When he said --

MR. SIEGEL: Your Honor, you can search the transcript for the word Kimono. It probably only comes up once.

THE COURT: This is yesterday's transcript?

MR. SIEGEL: Yesterday.

THE COURT: Do you all want a bathroom break? I'm happy to take this up in ten minutes.

MS. FRISON: Yes, Your Honor.

MR. SIEGEL: Yes, Your Honor.

THE COURT: Do you have a sense of what time we are going to end?

MR. SIEGEL: So I don't think any cross today.

(Sidebar concluded.)

(Continued on the following page.)

(Brief recess.)

(In open court.)

THE COURT: Everybody back?

Well, we had an objection. I searched the transcript from yesterday. I see the part to which the Government referred in which Mr. Watson said: "I think they probably didn't, again, want to be too open Kimono."

There was a conversation about sharing information with BuzzFeed, but I don't remember a conversation about an NDA specifically.

MR. SIEGEL: I mean, Your Honor, it's easy enough to search it. But if it's not there, then --

THE COURT: Well, I searched for "NDA." And I was --

MR. SIEGEL: Then I'm mistaken.

THE COURT: Yeah.

MR. SIEGEL: I apologize.

THE COURT: So, the objection is --

MS. FRISON: Your Honor --

THE COURT: -- overruled or withdrawn, take your pick.

MS. FRISON: The other thing, I'm not sure if I made it clear enough at the sidebar, but as a separate party, Mr. Sullivan directed his client, I'm not directing him. And, so, I believe I get to go over topics that Mr. Sullivan did

because this is technically a cross-exam.

So, barring me from whole topics as cumulative is not fair to OZY Media and takes an out entire swath of my examination of Mr. Watson. I'm certainly not trying to ask the same questions as Mr. Sullivan, but there are things within those topics that have not been gone over and that he did not get to discuss with the jury.

THE COURT: I mean, I say, again, that's fine if you want to ask questions that have not been asked.

But I was looking at the transcript from yesterday while you were asking questions about, for example, the incident with Mr. Rao on the phone with Goldman Sachs. And it was, like, one question after another, tracking it almost the same order. Not verbatim language, obviously, but same questions on the same subject matter one after another.

I think it is also incumbent on you to ask questions that are relevant to your own client, right. And, so, there has to be some --

MS. FRISON: I mean, I think, arguably, the aggravated identity theft was the only topic so far that there's even an argument is not related directly to OZY Media. Everything else I talked about, including the board, investment bankers, all of these topics directly relate to OZY --

THE COURT: Right, but we -- you understand that --

MS. FRISON: -- and overt acts that are alleged.

THE COURT: What's the overt act? If you are disputing an overt act -- so, what -- can you give me an example of an overt act that you were asking questions about?

MS. FRISON: That was regarding the aggravated identity theft topic.

THE COURT: So, not applicable anymore?

I know that you've established that your client is not charged with the aggravated identity theft.

MS. FRISON: Yes, but that -- the allegation that they did this call together and planned it together is certainly an overt act to the fraud that is alleged and that OZY is charged with.

THE COURT: Which overt act?

MS. FRISON: Planning the fake call, testing the fake call. These things that Mr. Rao testified to. That they conducted it together in his office. I think I get to test Mr. Watson on what happened on behalf of OZY, despite Mr. Sullivan's direct exam and going over that with him.

THE COURT: That's all fine.

To state what I know is obvious to you all and what I know we've talked about already at the sidebar, in the federal system companies are liable on a respondeat superior basis for the acts and omissions of their employees committed in the scope of their employment. And that may be good

policy, it may be bad policy, but that's the law we have in this system. I know it's different in New York State. It may be different in other states as well.

What that means is that any line of questioning that would be designed to elicit testimony that Mr. Rao may have acted badly, but he did it without Mr. Watson's knowledge is, I think it's fair to say, literally irrelevant to OZY as a defendant in this case. And that's the only client you're here on behalf of.

Can somebody point me to -- what page am I looking to for the overt act in the indictment?

MS. GILBERT: It's a speaking indictment.

MR. SIEGEL: I have it right here.

Your Honor, it is page 35, starting on page 35.

And on page 38, overt act R says that --

THE COURT: So, what overt act were you -- I'm not sure what overt act you're disputing or even leading up to disputing.

MS. FRISON: With regard to the Goldman call?

THE COURT: Or with regard to any objection that I sustained.

MS. FRISON: Well, some of the objections sustained, A, I did not know the basis of, but I literally cannot ask for a sidebar every time Mr. Siegel or someone says "objection." But if there is no basis -- it's just this eye contact as if

we all know what the basis is, and I do not, because some of them were to my setup questions.

I'm not even allowed to lay the context of what I'm talking about or a segue without calling an objection. If I say, you discussed this yesterday and thereafter will be my question, I'm getting sustained objections.

THE COURT: You can always have one question to set the stage, point us back to particular testimony from yesterday.

Let's bring the jury in and get as much use as we can out of the last 30 minutes here.

MS. FRISON: On page -- I'm sorry. On page 38, just for Your Honor, since we were looking at the indictment, the on or about, R, letter R, describes this impersonation as an overt act. And Mr. Rao certainly put the CEO in that overt act with his testimony.

THE COURT: But the overt act doesn't do that. And from a legal perspective, it's irrelevant. So, I don't understand --

MS. FRISON: Why is it irrelevant, Your Honor?

THE COURT: Because the respondeat superior rule applies precisely equally, whether it is the COO or the CEO.

MS. FRISON: But that is based on an assumption that --

THE COURT: And this overt act is only about

Mr. Rao.

MS. FRISON: That is based on an assumption that Mr. Rao is telling the truth and that the jury believes him. I have two executives --

THE COURT: If you want to dispute --

MS. FRISON: OZY has -- OZY had both of them as executives.

THE COURT: Well --

MS. FRISON: I can at least try to prove that one of my executives did not do what he's alleged to have done and leave the jury to decide whether they believe Mr. Rao.

THE COURT: Are we still talking about overt act R?

MS. FRISON: Yes.

THE COURT: Okay. Overt act R says that on or about this date, Mr. Rao spoke by telephone with employees of this financial institution and impersonated this other person.

MS. FRISON: And that's fine, Your Honor. I understand how it reads. But I'm very certain that the prosecutors are going to argue in closing that Mr. Watson and Mr. Rao did that call.

THE COURT: Okay. We are ready.

THE COURTROOM DEPUTY: All rise.

(Jury enters.)

THE COURT: Please be seated, everyone.

Ms. Frison.

MS. FRISON: Thank you, Your Honor.
CROSS EXAMINATION
BY MS. FRISON: (Continuing)
Q Mr. Watson, we were, I think, discussing an NDA --
A Yes.
Q -- a non-disclosure agreement that you signed with BuzzFeed?
A Yes.
Q Is it the case and am I correct that both parties have to sign that?
A Correct, so that if each side or even if just one side is sharing secrets, you want it to be kind of protected. You don't want someone to just be able to take your secrets and tell everyone or to use them improperly in order to take your best ideas and strengthen their business.
Q So we understand, with your NDA that you signed with BuzzFeed, did it open BuzzFeed's books to OZY as well?
A It did, yes.
Q So, is it fair to say that you and the board were seriously considering the BuzzFeed offer since you did an NDA?
A For sure. And also just, again, we were a young company and engaging in something like this takes a lot of your time. Especially, as I said, that was the moment when we were having more TV opportunities, more festival opportunities, more podcast opportunities. And, so, dedicating peoples' time to

all the diligence that's required, to all of the meetings that are required.

You know, BuzzFeed asked me to meet with 12 of their different execs in three different cities. And, like, that's a lot of my time just doing that.

Q For how long was the non-disclosure agreement in effect?

A I believe it still is in effect.

Q So, an NDA does not have an end date?

A Sometimes they do, but in our case they didn't. And we, obviously, think it's a problem with what they and Ben Smith subsequently did.

Q Before your -- what you described as your last no to BuzzFeed's offers, how long had the due diligence taken place?

THE COURT: I'm sorry. You think it's a problem what they did about what?

THE WITNESS: Ben Smith who, like, looked through all of our books and didn't tell his editors at *The New York Times*. And then used it to write false stories about us, which almost destroyed my company and directly led to me getting prosecuted 3,000 miles away from where I even live. He lives in Brooklyn, I don't.

THE COURT: Are you saying -- we are not going to be more -- please stick to the questions that are asked.

You're not suggesting that he learned about -- well, what appeared in the -- you know what, I'm sorry. I withdraw

my own question.

THE WITNESS: But I am suggesting that. I'm suggesting precisely that, that we have a two-billion-dollar suit against him because of --

THE COURT: No. What did he learn or they learn that ended up in *The New York Times* article? What did they learn as a part of the diligence process? They learned about the --

THE WITNESS: About our TV shows, about our newsletter, about our audience. He met more of our investors and teams. Yeah, very much so. And there are -- in discovery, there are notes between --

THE COURT: All right.

THE WITNESS: -- him and his former boss.

THE COURT: Sir, I'm going to sustain my own objection here.

Let's have another question from your lawyer. My own objection to my question.

Ms. Frison.

MS. FRISON: Okay.

BY MS. FRISON:

Q I'm not sure -- I don't think you answered my question before the Judge's question.

So, my last question was before your last no to BuzzFeed's offers, how long had they been doing due diligence

on OZY?
A About five or six months.
Q At any point in that five or six months, did Jonah Peretti, Ben Smith or anyone at BuzzFeed question what was in OZY's books?
MR. SIEGEL: Objection.
THE COURT: Sustained.
MS. FRISON: Judge, I'm not sure of the basis.
May we have a sidebar?
THE COURT: No, let's push ahead here. That same objection has been sustained in respect of analogous context a number of times now.
Q Was there any concern brought to you about the data that BuzzFeed had access to?
MR. SIEGEL: Objection.
THE COURT: Sustained.
MS. FRISON: Again, I do not understand the basis. May we have a sidebar?
THE COURT: No, the objection is sustained.
MS. FRISON: I'm not sure how to proceed, Your Honor.
THE COURT: All right. Let's have a sidebar.
(Sidebar.)
(Continued on next page.)

(The following sidebar took place outside the hearing of the jury.)

THE COURT: All right. I'm going to end this examination if we can't move to a topic that's actually relevant. There is no relevance to whether BuzzFeed discovered the fraud or didn't discover the fraud, to whether Goldman discovered the fraud or didn't discover the fraud. None of that is a defense, that a third-party looked at the books and didn't conclude that a fraud was going on. We have had the same exact discussion in a number of other context.

The objection is sustained. Let's move on, and I would like you to be done by 4:30.

MS. FRISON: When you say done, what do you mean by that?

THE COURT: I mean with this examination in full. There is too much irrelevant material coming in here. That's my ruling.

MS. FRISON: I am unclear about your ruling. Are you saying that I can't ask any more questions after 4:30?

THE COURT: Correct.

MS. FRISON: I have approximately 13 contracts to go over with Mr. --

THE COURT: Start on those then.

(End of sidebar conference.)

(Continued next page.)

CROSS-EXAMINATION
MS. FRISON:
Q Mr. Watson, I'm going to ask you about some contracts.
A Sure.
Q That Ozy had.
A Mm-hm.
Q First, did Ozy maintain physical copies of its contracts?
A Yes, I believe the finance team did.
Q And is it your recollection that they were in big binders like these?
A Yes.
Q Were they maintained at Ozy offices?
A I think pre-COVID, yes. I think when COVID happened, as I said, we turned the office into a studio, so they may have moved some of the stuff so people coming in to film shows wouldn't have access to all of our contracts.
Q Do you know about how many of these binders comprised all of Ozy's contracts by the time you shut down?
A Can you show it to me again just so I can see the size?
Probably ten to fifteen.
You're talking about, you're talking just about the kind of big contracts with the -- with General Motors or Coke or Target or Wal*Mart?
Q Yes.
A Yes.

So, probably ten to fifteen binders worth of contracts.

Q Let me ask you about 2017.

MS. FRISON: And can we pull up Defense Exhibit 17 just for the witness?

Thank you.

Q And Mr. Watson, just ask you, do you recognize this document?

MS. FRISON: If you can scroll for him.

A Yes, I do.

Q How are you familiar with it?

A I negotiated with the head of the Ford Foundation, who was an Ozy reader and fan named Darren Walker. We had a conversation about Rosewood and about Black Wall Street and about what happened in those instances and about the importance of telling new stories. And that, in part, led to Breaking Big.

Q What year did you speak with him?

A I think the first time I spoke with him at length was probably 2015, and I spoke to him with some regularity, including in 2017.

He was kind enough to come to our very first two Ozy Fests, which I appreciated.

Q Is the document you're looking at your agreement with him reduced to writing?

A I believe so, yes.

MS. FRISON: Your Honor, I offer Defense Exhibit 17 into evidence.

THE COURT: Can we see the signature page?

Any objection?

MR. SIEGEL: No, Your Honor.

THE COURT: Received.

(Defense Exhibit 17 received in evidence.)

MS. FRISON: And if we may publish it?

Thank you.

(Exhibit published.)

Q Mr. Watson how -- what type of agreement is this with the Ford Foundation?

A It's an agreement around one of our TV shows Breaking Big. So that was a show that initially launched in prime time on PBS and then, in success, was also picked up by Amazon Prime.

Q If you see in the first sentence: I am pleased to inform you that the Ford Foundation has approved a grant of $750.

A Yes. Yes.

Q Was this grant different from other contracts with other companies?

A This is the way foundations would say it.

So, for example, we had contracts with the Coke Foundation, we had contracts with the Hewlett Foundation. We

did deals with other groups like the Emerson Collective. We had a partnership with the MacArthur Genius Grant Foundation.

So we not only worked with companies and cities, but we also worked with nonprofits.

Q How much money did the Ford Foundation grant via this agreement?

A This particular one was three-quarters of a million dollars. But they ultimately, very kindly, did several that totalled millions of dollars.

MR. SIEGEL: Objection.

THE COURT: Sustained.

Q This $750,000 grant, what year was it given to Ozy Media?

A In May of 2017.

MS. FRISON: Thank you. You may take that down.

And will you put up, please, Defense Exhibit 25.

Just for the witness. Thank you.

And if you can just scroll all the way to the end for the witness.

THE WITNESS: Would you scroll a little slowly for me, just page by page, just for -- sorry, I apologize, I'm being slow. Okay, keep going up just a little bit.

Okay, and keep going up a little bit. In one second. Okay, there it is. Okay. 3 million. Thank you.

MR. SIEGEL: Your Honor, objection.

THE COURT: Sustained.

Q So, Mr. Watson --

THE COURT: Let's have the jury step out.

(Jury exits.)

THE COURT: Please be seated everyone.

Mr. Watson, to reiterate you are not allowed to read from documents that are not yet in evidence.

THE WITNESS: My mistake, my apology. I -- that certainly was not intentional. I apologize for that. I'll be thoughtful about that.

THE COURT: Okay.

You're also offering a lot of testimony that goes well beyond the scope of the questions that are asked and that's when the risk of inadmissible testimony is highest.

The lawyers, being skilled and experienced as they are, they understand how this somewhat artificial conversation happens and they are asking their questions in that vein. And if you try to restrict yourself to an answer to the question you're actually asked, the risk that we'll hear testimony that's not technically admissible will be minimized.

Was there anything else -- was -- did the government have -- can we just scroll back to that page?

Okay. All right. I think I just covered what was the government's objection, right?

MR. SIEGEL: Yes, thank you.

THE COURT: Let's bring the jury back.

THE COURTROOM DEPUTY: All rise.

(Jury enters.)

THE COURT: We're in the homestretch here, ladies and gentlemen.

Ms. Frison.

MS. FRISON: Thank you.

CROSS-EXAMINATION (Continuing)

BY MS. FRISON:

Q Mr. Watson, as to the document you're looking at, do you recognize it?

A I do, yes.

Q How are you familiar with it?

A Um, we were fortunate enough to do several partnerships with PBS, so this is their kind of standard agreement.

Q Did you negotiate this deal with PBS yourself?

A I did, yes.

Q And what year was this?

A I think it was 2017.

Can you just scroll back to the top just so I have that, please?

Yes, it was March of 2017.

MS. FRISON: Thank you.

Your Honor, I offer Defense Exhibit 25 into evidence, please.

MR. SIEGEL: No objection.

THE COURT: Received.

(Defense Exhibit 25 received in evidence.)

(Exhibit published.)

Q Mr. Watson, what type of agreement is this with PBS?

A It's for a TV show Breaking Big, the show that would air on PBS.

Q So the same show that the Ford Foundation had given money for?

A Correct. Yes.

Q And what's the amount of money that PBS promises in this contract?

A The gross number is 3,005,000. And I think the net number is 600,000.

Q And was that amount, the 3 million, for one series or one year of that show?

A For one year, yeah.

MS. FRISON: Thank you. And you may take that down.

Please, will you pull up Defense Exhibit 37. Just for the witness.

And if you can scroll slowly through it for the witness.

THE WITNESS: You can keep going a little faster. I apologize. I know I was a slowpoke before. I'm all right now.

Okay, there we go. All right.

Q Mr. Watson, do you recognize that document?
A I do. I do.
Q How are you familiar with it?
A I negotiated that with the chief marketing officer of JP Morgan Chase.
Q And what type of deal is this with JP Morgan?
A It's a $2 million deal to -- they fell in love with our newsletters and so it's an --

MR. SIEGEL: Objection.

THE COURT: Sustained.

A It's a $2 million deal --

MR. SIEGEL: Objection.

Q How much money is JP Morgan promising in this contract?

MR. SIEGEL: Objection. It's not in evidence, Your Honor.

THE COURT: Do you want to offer the document?

MS. FRISON: I thought I did. My apologies.

Your Honor, I offer Defense Exhibit 37 into evidence.

MR. SIEGEL: Objection.

THE COURT: Being that I don't understand what the objection is as I sit here, and we are not going to keep the jury here while we sort that out; ladies and gentlemen, this concludes the workweek here.

Have a great holiday weekend. Get some rest.

I'm going to reduce the frequency with which I repeat my instructions that you've already memorized by now, but given that we have a long weekend ahead, I will remind you this time. You know, I'm sure you need no reminding.

Don't read anything about the case, don't research the case, don't discuss the case with anybody, even your loved ones and close friends. Don't let anybody approach you who shouldn't be talking to you about this and, obviously, report that to us if it happens.

Otherwise, have a restful and productive weekend and we look forward to seeing you at 9:15 on Monday morning.

Thank you, all.

(Jury exits.)

THE COURT: All right.

We can knock out this objection before we break for the week.

MR. SIEGEL: Your Honor, the objection was just the foundation that was laid.

He was asked how he knew what this was and he said that he negotiated this deal. But we had a long colloquy that negotiating the deal, he then passes off for someone else to actually handle the contract.

He hasn't said whether he's ever actually seen it before. And when we had the voir dire before he was clear that he generally actually wouldn't know what contracts look

like.

And this isn't something that he signed or, frankly, I don't know how anyone could just recognize this.

THE COURT: Ms. Frison, do you want to lay more of a foundation?

MS. FRISON: I think -- do I want to do that now?

I think the last, on the other two contracts my question was: Is this your agreement with the other CEO reduced to writing?

THE COURT: I don't know that we've established that he ever saw this document specifically.

Does the government want to voir dire on this topic? We don't have the jury here, but we can at least --

MR. SIEGEL: I just don't think the foundation has been laid, so that's the basis of our objection.

VOIR DIRE

BY MS. FRISON:

Q Mr. Watson, have you seen that document before?

A Yes, ma'am, I have.

Q Is it your agreement with JP Morgan reduced to writing?

A Yes, it is.

THE COURT: Voir dire.

VOIR DIRE

BY MR. SIEGEL:

Q Mr. Watson, you said you've seen this before.

When did you see this before?
A Um, I don't remember the specific date, so I don't want to risk giving you an inaccurate date.
Q Did you see it around the time that this actually happened?
A I've seen it more than once over the last couple of years. I've seen it several times over the last couple of years. It was one of our larger agreements, so I've seen it.
Q But can you give us any time period for when you saw it?
A Certainly I saw it between 2017 and 2023. At least three times.
Q I mean, sure. That's the period that it existed.
Can you give us -- when you say that you see this and you recognize it, can you tell us when you saw it and how you recognize it? I mean, you see it?
THE COURT: You said at least three times.
Do you remember when those three times were?
THE WITNESS: Sorry, just to be clear, and I'm very happy to do it, I'm not resisting.
Do you want me to guess at it? I will, if that's what you want.
THE COURT: I want to get this done and exit the room.
THE WITNESS: I know I saw it, seen it, three times between 2017 and 2023. If you want me to estimate as best as

I can, an estimate would include 2017. I would estimate that I probably saw it again in 2019 and I would estimate that I saw it again in 2021. But those are estimates subject to material revision.

Q And when you say that you recognize this as a document that you saw from 2017, this is a ten-page, unsigned document with -- I don't know if it's computer code, but what doesn't look like normal English.

How do you recognize that this is the same document that you saw in 2017?

A Respectfully, it's not unsigned. So I probably would say about half of our contracts have what you see there, which is a digital signature. And if you look at the front it says: Accepted. And so half of our contracts have that.

I know we've talked about that before with regards to Discover and others. And so I'm happy, if it would be helpful, to sit together and go through our contracts. But you'll see that as a norm. That's not an outlier. That's a norm, to have digital signatures.

Q I'm sorry, signed by whom?

A By someone on their side and someone on our side. You probably see it at the very top there.

If someone puts it back up on the screen, I'm very happy to tell you who. It'll say who it's accepted by.

THE COURTROOM DEPUTY: Should I put it back up,

Your Honor?

THE COURT: Yes, please.

THE COURTROOM DEPUTY: Okay.

A Megan Lane and Sophie Hall, November the 10th, 2017. 9:03 a.m., which is short of 9:04 a.m., and then countersigned that same day, about 13 minutes later at 9:16 a.m.

Q Sorry. Yes, so I understand that now. I hadn't recognized that.

And how is it that you recognize that this is the same document that you saw in 2017?

A Again, per your request, I gave you an estimate of 2017, 2019 and 2021.

This was a signature moment for us. For a young company like us having a blue-blood company like JP Morgan do seven-figure deal is -- not that we don't appreciate all of our partners, but this would represent a distinctive moment.

MR. SIEGEL: All right.

Thank you, Your Honor.

THE COURT: Do you object to the document coming in or you don't object?

MR. SIEGEL: No, we don't object.

THE COURT: The document will be received on Monday morning.

MR. SIEGEL: But we would ask that they lay the foundation that they laid. You know, Ms. Frison did the

foundation and then I voir dired. I would like to do that in front of the jury.

THE COURT: You want to do the voir dire in front of the jury?

MR. SIEGEL: No, no, no. Just the foundational questions.

THE COURT: Okay. The foundation is fine.

We're working on finalizing a preliminary set of jury instructions, which I'm hoping to transmit to the parties. I don't think we're going to file this, but transmit to the parties tonight for your weekend reading pleasure at the beach.

We have -- let me just make a list of open items.

The motion to exclude Ms. Watson's testimony.

I sustained some objections about the credit investor issue. I'm going to write a very short note on that.

Obviously, we have the jury instructions.

Remind me what else, what other open loops are with me at this point?

MR. SIEGEL: I don't know if the defense is still planning to call some of the other witnesses who they talked about, but we had a motion to exclude them as well.

THE COURT: I've said that the witnesses whose testimony is simply about the high quality of Ozy's content and programming will be excluded on both relevance and 26.2

grounds.

MR. SIEGEL: I think the only additional witness that leaves...

So there's Sasha Mitchell-Fuller, which I think that is out under your ruling, and Carmen Cruz, who I think is out under your ruling.

THE COURT: Mayor Cruz.

MR. SIEGEL: Mayor Cruz.

That leaves Mr. Kalliarekos, assuming he's coming back.

THE COURT: He's an investor though, right?

MS. GILBERT: Yes.

THE COURT: And the basis of your motion to exclude him is just 26.2?

MR. SIEGEL: That's right.

And Mr. Zahlraddin.

Our objection is both 26.2 and relevance.

THE COURT: Remind me what the proffered evidence is on Zahlraddin. If I'm pronouncing it correctly. I thought it was content as well.

Remind me who that person is.

MS. GILBERT: He was a lawyer for Ozy. And he came in and actually assisted with some of the deals and assisted with some of the -- the loans. Sorry, the loans, the high interest loans.

THE COURT: Is he one of the lawyers who ran the investigation after the forged signatures we heard about?

MS. GILBERT: No.

THE COURT: So what, he just papered over loans that got -- what is the relevance of his testimony?

MS. GILBERT: Revenue, Your Honor.

THE COURT: Why don't you just put the contracts in evidence? Why do you need him?

I'm sorry, revenue. How does a loan agreement give rise to revenue?

MS. GILBERT: Well, he can talk about what the state of the revenue was at the company at the time that he came in.

MR. SIEGEL: On what basis?

THE COURT: He was an in-house lawyer?

MS. GILBERT: No. He was a lawyer for Ozy.

THE COURT: Outside counsel?

MS. GILBERT: He was an external lawyer for Ozy. Correct.

MR. SIEGEL: So anything he knows about Ozy's revenue is hearsay.

THE COURT: What role would he have in Ozy's revenue recognition if he's outside counsel?

MS. GILBERT: Well, I mean, he saw many contracts, he participated in -- he observed a lot of activity in the company. He was embedded in the company for a while, I

believe.

THE COURT: I think we need a more fulsome proffer of what his testimony will be so that I can assess the relevance.

Are these --

MR. SIEGEL: And just, part of the reason that we don't really have an understanding of what he's talking about, again, as it has with all of these witnesses, because of the lack of a full 26.2 material.

THE COURT: You still don't have 26.2 material for him?

MR. SIEGEL: We have 26.2.

THE COURT: Does it include all of the contracts about which we're going to be hearing?

MR. SIEGEL: No, and I --

THE COURT: Because lawyers have ethical obligations not to lose documents. He should have copies of all this stuff.

MR. SIEGEL: But the 26.2 we have is from 2022 and 2023; you know, our understanding is he was going to testify about something from that period which --

THE COURT: I'm in the same position I've been in on so many occasions now throughout this case in which I have a number of objections from the government, one of which is 26.2 related, the other of which is relevance.

And those twin problems, there's an interplay, a negative interplay between them whereby, number one, the defense is not willing to provide anything more than the most generic high-level statement of relevance, which to my mind at least does not establish the relevance at all, point one.

And point two, the 26.2 material that the opposing party would usually look to, to ascertain the relevance, A, was late, and B, unless we're all missing something, seems like it's incomplete.

(Continued on the next page. )

(Continuing.)

THE COURT: So, the defense -- I'm going to withhold judgment on this for the defense to provide a specific statement, a specific proffer, about the relevance of his testimony. That will help us assess, among other things, the level of prejudice associated with -- with any delays or omissions on Rule 26.2. Absent that proffer, the defense should expect that this lawyer's testimony will be excluded.

MR. STERN: Your honor, in addition, as per Ms. Gilbert, Mr. Zahlraddin, Mr. Z, is going to come testify about his actions regarding revenue during the conspiracy period which I believe Mr. Watson testified that he was, in fact, one of the lawyers who was brought in to help deal with the high interest loans.

We have a Rule 16 objection as well because those documents -- we have a minimal number of documents with Mr. Zahlraddin in our overall database and I don't know how many of those were produced by Mr. Watson or OZY. So we would have a Rule 16 objection as well.

THE COURT: So I've asked -- maybe the defense is correct that in order for me to exclude a witness in whole or in part on the basis of discovery violations, nonresponsiveness to grand jury subpoenas, nonresponsiveness to orders of compulsion and the like, I need to assess whether any or all of the violations in question were willful.

I've asked the defense to do that, to let me know as best you can what efforts you made. I think that's maybe the foremost factor in the assessment of what to do about these issues and I had a long colloquy with Mr. Sullivan today on the subject of what did you do when you got the grand jury subpoenas and lived through as the lawyer of record, the litigation over the order of compulsion and I -- I'll go back and read the transcript again.

I could well be missing something, but what I remember hearing was in substance, I had a conversation with Sher Tremonte. I don't remember whom I spoke with. They told me that everything on the Google suite of documents had been produced; pretty much full stop. Did you have a conversation with Dechert --

MR. SULLIVAN: That grossly misrepresents what I said, but that's par for the course.

THE COURT: I am saying that's my recollection.

MR. SULLIVAN: That recollection is grossly misinformed.

THE COURT: There are other issues in which I've asked for additional clarity and none has been forthcoming. And just by way of example, the defense indicated that they were hampered for reasons beyond their control by the document vendors having turned off the defense's search capabilities as a result of nonpayment of fees.

I asked, I think twice now, for specifics about the timeframe in which that was true, when money came in; no specifics once again have been forthcoming and, so --

MR. SULLIVAN: That's also untrue. We sent five, six, seven letters at this point. We'll send an eighth or a ninth if you want.

THE COURT: What is the period?

MR. SULLIVAN: I'll put it in writing because every time I try to talk, you talk over me. I don't have it in front of me. I will write the Court a letter if you want. I have no additional representations.

THE COURT: Okay. Once again --

MS. GILBERT: Judge, all of this has been addressed in the letter.

THE COURT: Where is it in the letter?

MR. SULLIVAN: Read.

MS. GILBERT: Would you like a copy of the letter?

THE COURT: Yes, please.

MS. GILBERT: This was filed July 2nd.

(Counsel approaches.)

MS. GILBERT: I don't have a copy for you, Mr. Siegel.

THE COURT: So here we are. Tell me if I'm looking in the wrong place here, but I see this issue discussed in the letter --

MS. GILBERT: Your Honor --

THE COURT: Let me finish, please. This letter does not have page numbers, but I see this issue discussed in the letter on page four, and I see the following in respect of this outside E-discovery vendor. And I'm going to read this verbatim to make sure that if I'm missing something, you point me to the right place.

MS. GILBERT: Sure.

THE COURT: Here is the paragraph: "Finally, due to lack of resources and staffing the undersigned counsel have had to rely on an outside E-discovery vendor to maintain all documents, Bates stamp, mark all exhibits and produce them. That vendor has, on various occasions, had delayed processing, outages and holidays which have prevented the undersigned from complying with all of the Court's orders with respect to the production of documents. Furthermore, due to this third-party vendor not being paid on time due to the lack of financial resources previously explained, during extended periods of time the defense was unable to run searches to properly and timely review the documents in their power."

There is no timeframe in there. I ask again: Have you answered my question about when this was the case and if, so, can you point me to it?

MR. SULLIVAN: It's the entire letter.

THE COURT: The entire letter?

MR. SULLIVAN: The entire letter.

THE COURT: That is your representation as an officer of the court that the entire letter sets forth the time period in which those issues persisted?

MR. SULLIVAN: The entire letter and all of our previous letters gives Your Honor --

THE COURT: You can say that 100 times, Mr. Sullivan. It doesn't make it true.

MR. SULLIVAN: 101. I don't know what else to say.

THE COURT: We're done.

MS. GILBERT: Also the attachments, Your Honor.

THE COURT: I do not want to hunt through the attachments.

MR. SULLIVAN: Then don't ask.

MS. GILBERT: The attachments are incorporated by reference in the letter.

THE COURT: Where in the attachment is my question answered?

MS. GILBERT: Appendix A.

THE COURT: What is the answer?

MS. GILBERT: The answer is there have been times throughout the pendency of this investigation and this litigation --

THE COURT: What time periods? When? If it was one day, it's a very different thing than if it was six months.

End of story. I'll take it under advisement.

I'm trying to get the defense to answer the question so that if there was good faith here or a lack of bad faith then I know that and I come to the right conclusion here.

Mr. Sullivan just keeps repeating the same --

MR. SULLIVAN: I rely on our written representations.

THE COURT: As though saying it a thousand times will make it true.

MR. SULLIVAN: I rely on my written representations.

THE COURT: Don't tell me when I say that there was no time period offered that yes there was because it is simply false.

MR. SULLIVAN: It is not. I rely on the written representations. Have a great weekend.

THE COURT: Have a good weekend.

MR. SULLIVAN: You, too.

(Matter adjourned until Monday, July 8, 2024.)

- ooOoo -

# I N D E X


| WITNESS | PAGE |
|---|---|
| CARLOS WATSON | |
| DIRECT EXAMINATION BY MR. SULLIVAN Continuing) | 3286 |
| VOIR DIRE BY MR. SULLIVAN | 3328 |
| VOIR DIRE BY MR. SIEGEL | 3330 |
| VOIR DIRE (Continuing) BY MR. SULLIVAN | 3334 |
| VOIR DIRE (Continuing) BY MR. SIEGEL | 3336 |
| VOIR DIRE BY MR. SULLIVAN | 3367 |
| DIRECT EXAMINATION BY MR. SULLIVAN | 3426 |
| CROSS-EXAMINATION BY MS. FRISON | 3448 |
| CROSS-EXAMINATION MS. FRISON | 3496 |
| VOIR DIRE BY MS. FRISON | 3505 |
| VOIR DIRE BY MR. SIEGEL | 3505 |

**E X H I B I T S**

Government Exhibit 6497-A 3287
Defendant's Exhibit 552 3435
Defense Exhibit 17 3498
Defense Exhibit 25 3502