UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK (BROOKLYN)

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>CARLOS WATSON,<br>Defendant. | Case No. 1:23-cr-00082-EK-1<br>Brooklyn, New York<br>August 9, 2024<br>10:15 a.m. |

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE ERIC R. KOMITEE
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For the Plaintiff: Jonathan Siegel, Esq.
Gillian Kassner, Esq.
U.S. Attorney's Office
271-A Cadman Plaza East
Brooklyn, NY 11201

For the Defendant: Ronald S. Sullivan, Esq.
Ronald Sullivan Law PLLC
1300 I Street NW
Suite 400 E
Washington, DC 20005

William A. Burck, Esq.
Quinn Emanuel Urquhart & Sullivan
1300 I Street NW
Suite 900
Washington, DC 20005

Clerk: APJ

Court Recorder: Electronic Sound Recording

Transcription Service: Chris Hwang
Abba Reporting
PO Box 223282
Chantilly, Virginia 20153
(518) 302-6772

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

(Call to order at 10:15 a.m.)

THE COURT: Please be seated, everyone.

THE CLERK: Good morning, Judge.

THE COURT: Good morning. I'm ready when you are.

THE CLERK: Judge, okay.

Criminal cause for bail appeal, docket number 23-CR-82, USA v. Watson.

Counsel, please state your appearances for the record, beginning with the Government?

MR. SIEGEL: Good morning, Your Honor, Jonathan Siegel and Gillian Kassner for the United States joined at counsel table by Special Agent Gurdeep Singh.

THE COURT: Good morning.

MR. SULLIVAN: Good morning, Your Honor, Ronald Sullivan, Ronald Sullivan Law and William Burck with Quinn Emanuel for Carlos Watson, who is present.

THE COURT: Good morning to you both as well.

MR. SULLIVAN: Good morning.

THE COURT: All right, so and Mr. Watson, good morning to you.

We -- thank you. We are here for the Government's appeal of Judge Scanlon's decision on bail.

Just to, you know, set the stage for where I understand this to be, I said when we talked about bail immediately following the jury's verdict that even though I

regarded the bail package in existence at that time as insufficient under §3143, I would be willing to consider a meaningfully stronger package and I'm aware that the parties had a fair amount of back and forth before Judge Scanlon on that topic.

This is a stronger bail package obviously in many ways than the one that was in place before trial. The Government has raised two issues that I want to bear down on today, two related issues, which are, one, the view that they express that despite the fairly large number of suretors, it's unclear that there is enough security attached to this bail package to actually meet the $3,000,000 amount of the bond.

And two, and this is a little bit more subtle, I think I understand the Government to be saying essentially that the responsibility to satisfy the bail amount is so broadly distributed that there's no single surety.

You know, the purpose obviously of the bail system we have at the federal level is to ensure that there's enough moral suasion built into the bail package that the Defendant would not seek to abscond because doing so would impose too high a cost on one or more people a defendant cares about deeply.

And you know, I'll take two examples in that regard. One that the Government points out is that one of the sureties, I think Beverly Watson, has posted a condo as security but A,

it's not her residence. She lives elsewhere.

And B, there's only 100 -- even though the condo has a value of a million dollars, there's only $100,000 worth of equity in it.

And then, the second example that perhaps jumped out at me from the bail submission was Kosmas K., who has posted $100,000 of stock.

His financial affidavit was not particularly revealing, but I think it's not irrational to presume that the amount he's posted is a very small percentage of his liquid net worth, not enough to be life changing for him in any noticeable way if Mr. Watson for whatever reason were not to be return at sentencing.

So I'm still where I was essentially, which is I don't see this as a case where no condition or combination of conditions will satisfy the applicable statute. I do think we might have a little bit work to do on those two concerns.

I am eager, you know, if the Defense can satisfy §3143 to get to that point, we are all aware as Defense counsel has pointed out of the ongoing operational challenges at the MDC.

And I think it's not particularly controversial to say at this point that the MDC may not be suitable for its intended purpose as it stands.

So, with that, I guess this is the Government's

appeal. We'll hear in the first instance from the Government, but -- and I think the rubber will probably meet the road more when we hear from the Defense.

MR. SIEGEL: Thank you, Your Honor. I think you laid out two of our concerns fairly well. I'm not going to spend a lot of time elaborating on what you said.

I do think that there is a third concern that Your Honor didn't quite touch on, which is the standard here being clear and convincing evidence as you know, it's what kind of package?

And I understand Your Honor's saying that there may be such a package, but for -- from the Government's perspective, it's hard to think of what kind of package it actually would be that would be clear and would actually convince that there is not a risk that Mr. Watson would flee because even if the numbers were larger and even if they were less diffuse, and I agree that that's an issue of what Your Honor raised.

But even if it were -- if those factors were not there, the fundamental assumption is as Your Honor said that the harm to others would prevent Mr. Watson from fleeing.

And given his conduct and given his demonstrated dishonesty, and not just the fraud and not just the concept of perjury in the abstract, but just the depth of his unwillingness to say things that are simply not true at every

point does raise the concern for the Government that even if the numbers were higher, even if the two concerns that you listed were not there, that just the concept of harm to others will dissuade Mr. Watson.

He has consistently put his own interest first and has consistently inflicted financial harm on others, including people close to him and including his family.

And given that, it's hard for us to think of a package that would satisfy that. For all the reasons you said you don't think this package gets there, but I think there is that sort of higher theoretical issue that we want to make -- that we want to make clear.

THE COURT: Okay.

MR. SULLIVAN: Thank you, Your Honor. Mr. Burck is going to --

MR. BURCK: Your Honor, with Court permission, and thank you for granting the limited appearance for today's purposes. I will address some of these issues.

Mr. Sullivan obviously is much more familiar with a lot of facts as well as the suretors than I am.

So with the Court's permission, there may times I will ask Mr. Sullivan to intervene such that if I'm not saying something that's accurate.

THE COURT: Happy to have the tag team approach --

MR. BURCK: Thank you.

THE COURT: -- for this purpose.

MR. BURCK: Your Honor, just on the last point that the Government made about whether or not there really is any set of conditions that would satisfy the standard, you know, we've done an analysis of the number of Defendants in the 2nd Circuit that we defined quickly who have -- fall into the following category, which we think applies to Mr. Watson.

They're white collar defendants. We found 62, who went to trial, did not cooperate, were categorized under general fraud Guidelines, so the white collar offenses, and fell within criminal history Category 1 and scored on the Sentencing Guidelines based on our initial analysis at a 29 or higher.

Of those 62, we found only 5 were remanded after trial. And in the -- one of those people consented. And then, in the other four instances, they were foreign nationals or people who had very strong ties overseas and there was concern about those overseas ties leading to the possibility of a risk of flight.

So we haven't really found somebody who really fell into Mr. Watson's category. He has no meaningful ties overseas. He is somebody who falls into all -- clearly into all the other categories we mentioned.

Again, the Sentencing Guidelines aspect is somewhat of a guess at this point to somebody, because we don't exactly

the loss amount will be, but certainly it's a high number.

So our view is that clearly courts have looked at people like Mr. Watson and have determined that especially if they've complied with their conditions of bail, showed up for court, did the things they were supposed to do with respect to showing up for court prior to trial, that they -- there's a presumption that they're going to not be remanded after trial.

And I won't belabor the MDC points, but one of the main reasons I'm here is because I've had a particular interest in how the MDC is operated and how it's failed to operate.

And I've had two recent experiences in other districts, in Northern District of Illinois and the District of Washington in Seattle with white collar defendants, where the courts in those cases really focused on the type of facility that a white collar defendant would be designated to after sentencing. And it was a very important point to both those judges.

In one of the cases, the one in Seattle, the defendant that I represented, he pleaded guilty, but he was a foreign national with very few ties to the United States.

He received a short sentence. It was only about four months, but the Court, because he's a foreign national in that case, the BOP does not permit a foreign national to be designated to a known security camp, just their rules. There's no law or anything, but it's just their rules.

The Court nevertheless said on the record that he thought that a minimum security facility would still make sense and designated the defendant to a minimum security facility because we thought it wasn't -- didn't make sense for him to have to go to a low security facility for a short period, especially with a white collar defendant -- white color crime.

The BOP nonetheless designated him to a low security facility despite the Court's request. And as a result of that part, that defendant is actually going to be released after three months rather than four months and spend the last month in a halfway house.

So the BOP did take that in consideration in giving him a month off from incarceration. But I just mention that because the Court there really focused on the conditions of confinement.

In the other case in the Middle District of Illinois, that was more dramatic. In that case, and this is a co-defendant. My client was the defendant who received seven and a half years in prison from 15 years that the Government was seeking.

He was put in a -- he was designated to a minimum security facility, but one of his co-defendants, also a foreign national like the one in the other case, she was not eligible for a minimum security because of her status as a foreign national. She's Canadian.

The judge in that case was going to put her in for five years and made clear on the record that because the BOP was taking the position that she was not eligible for minimum security, he put her in for five years of home confinement.

So he turned it from a five-year incarceration into five years of home confinement. And he, again, focused very closely and carefully on the conditions of confinement.

And here, the reason why I mention this point before I address the Court's specific questions is because Mr. Watson currently is in at least a medium security and often a high security facility.

He's had to spend time in the SHU because of threats that were made to him. And we can tell you more about the threats on sidebar if you want to hear about those.

And any time a -- an inmate is threatened or reports a threat, they're put in the SHU. So he's been put in the SHU there and we've gone through the litany of issues that have happened at MDC, nothing unusual for MDC, but certainly startling and shocking.

So he's currently effectively in a position where he's at a minimum to high security facility for four months until sentencing and probably longer after the sentencing till he's designated and he's transferred.

And he wouldn't be eligible for -- he would not get anything worse, we believe, than a low security facility after

he's sentenced depending on the length of the sentence.

If he gets 10 years or less, he gets a default as to a camp, a minimum security camp. If he gets more than 10 years, he could be in a low security facility, but then once he gets to 10 years, he would be transferred to a minimum security facility.

So he is currently in a position where he's being held in a facility that is not appropriate for white collar defendants and certainly ones with no criminal history.

If he was a repeat offender, different story, but he's not. This is his one criminal act as found by the jury.

The issue for us is that because we've -- based on our research and of course unfortunately we didn't have time to present all this to the Court, but we can do that.

Because it's so unusual for a white collar defendant with no criminal history to be remanded, and then he's being remanded to MDC with all its issues to a medium to high security facility, we think this is a very unusual situation and one that puts Mr. Carlos Watson at risk in ways that are not commensurate to the offense and commensurate to the risk of flight or the risk to the community that he might present.

We don't believe he represents a risk of harm to the community because I understand the Government had made during the five-day hearing before Judge Scanlon arguments that because of the fraud and because of maybe the perjury, and that

he could be a risk to the community.

But Your Honor, I think that courts routinely look at defendants like Mr. Watson, who is a public figure. His trial was heavily covered. This is not a person who's going to be able to raise funds while he's out on home incarceration. He's not somebody who's going to be looking to start a new business. No one's going to invest with him even if he did.

And of course, if the Court wanted to impose additional conditions such as he's not allowed to raise money period other than to pay his lawyers or to, you know, get money for food and clothing, that would be something that Mr. Watson would have no objection to.

And on the risk of flight, we believe and I'll get into this. This goes more to the Court's concerns, that there is really a minimal and there would be -- I don't think the standard is absolutely no risk of flight because there's no such thing. The question is whether or not there's a real risk of flight, a reasonable risk of flight.

Here, Your Honor, the diffuse nature of the sureties to us cuts the other way. There are 17 people who have been willing to come forward after he was convicted, after he was publicly humiliated by this verdict, covered in all the major newspapers, and nonetheless say that this is a person that we believe in. We're going to put up what to us individually, maybe not to Mr. Kosmas K., is a substantial amount of money in

assets and taken lots of step to do that. These have all been perfected over the course of the last couple weeks by Mr. Sullivan and his team.

These are people who are close family friends, family members, and who have put up things that not only are valuable in terms of the actual asset value, but are extremely valuable to them as emotional attachments.

And I'll just pause for a moment on the land, which there's been a lot of back and forth about how much land is worth.

And of course, valuing land, especially undeveloped land, is not the easiest thing. We have a analysis that's been submitted that suggests it's worth anywhere from 400- to $750,000.

But putting that aside, that is -- if you look at the chart that Mr. Sullivan submitted to the Court, that is land that is owned collectively by a group of people from Mr. Watson's family that they've had in their family for over 100 years.

And it's tied to a very emotional, very personal history going back to the 1800's that is land that means a lot to that family. And they've been willing to put the entire thing up as part of this package.

And that goes to the moral suasion issue. And that goes to the depth of commitment these people have to Mr. Watson

and their belief that he's not going to flee and the harm that will come to the family, not just in terms of the loss of the value of the asset, but also the emotional attachment to it.

Imagine a family that's had a piece of land, 42 acres, for over 100 years, and now belongs to the U.S. Government because Mr. Watson has fled. The --

THE COURT: What do they do with the land?

MR. BURCK: The land is mostly undeveloped as I understand it, Your Honor. There is some revenue that comes from I believe logging on the land, but it's not a substantial amount of revenue. It's not a business asset or any sort.

It's much more of a piece of land that could be developed into something else if they so chose. They haven't done that, but it does have a very serious meaning to the family.

And I think that the number of sureties, it's odd to me because when I was an AUSA across the river, you always want to have more sureties than fewer. That's what we always argued as AUSAs is that --

THE COURT: Right.

MR. BURCK: -- you only have one or two, well, who knows if we'll get anything out of these people, right?

THE COURT: Who do you think is the surety who would be most profoundly impacted if the Government were to collect on the bond?

MR. BURCK: Your Honor, I believe it would be his family members, Ms. Watson and his other -- the other members of his family that are listed.

They are not wealthy people. They have good incomes. I think Ms. Beverly Watson has an income of roughly $350,000 a year although that's somewhat up and down.

These are people who if you take away that amount of asset value from them, it's a severe harm to them and their ability to function.

So I think that it would hurt them a great deal. And putting aside the emotional harm of having Mr. Watson do what he is not allowed to do, which is to flee.

We also think that Mr. Kosmas K. is very relevant because although it -- probably the $100,000 probably wouldn't mean a lot to him based on what we can discern from what he's submitted, the fact is and I think this is something the Government argued the other side of in the hearing, he's an alleged victim of this offense. And he doesn't believe he's a victim of this offense.

He knows what happened at trial. He witnessed parts of the trial. And he is somebody who is nonetheless going to stand behind Mr. Watson.

And the fact that his assets are clearly much greater than everybody else's, I think that should give the Court some comfort that there really are funds available if he does flee

and the Government is -- and the -- all the assets that are taken that are collateralized are taken by the Government and there's still a gap. There's still an ability to get additional funds based on his representations.

THE COURT: I mean, he lives in Hong Kong, I think. And I don't know how easy it would be for the Government to collect on a judgment when the assets are there, but just why doesn't he put up more money?

MR. SULLIVAN: He -- just a factual correction, Your Honor. The Government raised that point and Mr. Kalliarekos sent U.S. based assets to collateralize his commitment, so.

THE COURT: Well, the $100,000 but --

MR. SULLIVAN: The account, yes.

THE COURT: But where -- does he have additional assets located in the U.S.?

MR. SULLIVAN: Yes, I think the account itself was slightly over a million dollars. It was a Schwab account that he sent. It's in the -- Your Honor's papers, but that itself is over a million dollars, that particular account.

THE COURT: Okay, I mean, I'm -- again, he didn't really file a financial affidavit at all despite the invitation. He could --

MR. SULLIVAN: My understanding for --

THE COURT: -- move the needle.

MR. SULLIVAN: -- someone for him, I think as Your

Honor might be aware, it would take him a month to pull together a complete financial affidavit given this assets around the world and so forth. So we asked him to do what he could because we wanted it before --

THE COURT: Yeah.

MR. SULLIVAN: -- this hearing. So, again, I agree it's light, but we -- it was --

THE COURT: I mean, all he says is that he's got more than a million dollars in investments. That could be a 1,000,001 or it would be 100,000,000 or it could be more.

I'm assuming that for a guy who's worked at a very large private equity firm for decades now, that this is a very small portion of his liquid net worth that he's talking about here.

And I do -- it's up to you to assuage my concerns about, you know, where we started today, but I would think that he could be part of that effort if he were willing to commit assets that would go farther toward satisfying the bond if needed.

On the subject of Beverly Watson, what is her source of income?

MR. SULLIVAN: She's a consultant, Your Honor.

THE COURT: Can you say a little bit more about that?

MR. SULLIVAN: Yes, she consults both private and nonprofit organizations. She's a lawyer by training as I think

Your Honor knows. And in the hearing with Judge Scanlon, we presented 1099s and so forth. So that the income representation from Mr. Burck is accurate, about $350,000 a year.

And I'll also note that but for the trial, Ms. Watson herself probably could have covered the bond. And we expect that as time goes on, she will increase her savings and pay down some of the loans that she made in order to support her brother in this. And they've been paying to live here. And she's principally been paying to live here in Brooklyn for a month and so forth.

But so we anticipate that her net worth will continue to increase now that this portion is over. So she is a -- an excellent surety. Her history suggests that her future will look more like her past and not this snapshot right now.

MR. BURCK: Your Honor, not to put too fine a point on it, but Ms. Watson as I understand it, has spent a great deal of money to support her brother, not just in terms of living expenses, but also paying his legal fees.

So that shows the level of commitment I think that suggests that the -- her level of commitment to Mr. Watson I think would be clearly reciprocated by Mr. Watson in effectively financial ruining her if he were to flee.

She would obviously be -- who knows what the Government would do to her even if Mr. Kosmas K. was not

effectively available because he resides in Hong Kong, but her wages could be garnished. Who knows what would happen? So these are things that she would be in deep trouble financially if he were to flee.

Also, Mr. Kosmas K., even though he does, as I understand, he lives in Hong Kong, he is a -- his business is very largely U.S. oriented.

So I don't think he would -- this is a representation I would make. I don't know him. I've never spoken to him, but I don't think a person like him would effectively evade the U.S. for the rest of his days if Mr. Watson were to successfully flee to a country that would have no extradition treaty.

I mean, I think it's also another factor is that the idea that Mr. Watson has a realistic ability to flee given the package that we're talking about where it's not that he's going to be free to roam in the Northern District of California. He's going to be confined to his home. It'll be home incarceration. He's got a ankle bracelet.

You know, he would have to saw through that ankle bracelet and then flee to Canada or Mexico and then on to Iran or Russia. I mean, it's just not plausible.

So even -- and this is something courts take into consideration when they think about the risk of flight.

Of course, all of these financial penalties occur if

the person's not captured. And the courts have mentioned that before. And they've said, you know, what are the real odds this person's going to be able to escape U.S. justice for the rest of his days? Extremely low.

And in Mr. Watson's case, given that he has no ties overseas, given that he would have to break free of his ankle bracelet and in live in California and somehow cross the border into countries that will immediately send him back to the United States.

And then, get to a country that does not have an extradition treaty. And putting aside the extradition treaty, I don't know how many countries are out there that would actually keep him if they knew he was there.

I don't think countries like Brazil or Ecuador or the UAE would say, yeah, fine, come on over, no problem stay here with what assets, I don't know how he's going to live in those places.

Really, it's we're talking about the Irans and the Russias of the world. Those are the places that probably would not send him back, but they might, too.

So the idea here, Your Honor, is that it's both a question of the practical reality given that Mr. Watson proposed home incarceration, ankle bracelet, restrictions on his ability to even go to church, seek medical attention. The Government gets notice of everything that he's going to be

doing along with of course Pre-trial. If there's any kind of hiccough there, the Government will know, the Court will know.

There's really an infinitesimal chance here that Mr. Watson is going to flee. And on the danger to the community, Your Honor, we just think that there's -- it's -- there's nothing to suggest that Mr. Watson can be a danger to the community.

He's not an unknown check kiter, who might go out there and start forging checks. He's somebody who raised money in a very high profile company from very sophisticated investors and family and others.

And everybody in the business community knows that he's been convicted of fraud. This is not somebody who can effectively do anything like what he did or what the jury found that he did again.

And again, the Court can also order that he may not have anything to do with fundraising of any sort other than presumably to raise money for his counsel or to pay for his living expenses.

THE COURT: Yeah, I mean, I, you know, don't have a comprehensive sense of how hard it is for somebody to evade the U.S. justice system for a sustained period of time in 2024. You know, these are moving targets and they're hard to know at any point in time.

When I was -- just anecdotally, when I was a

supervisor in the securities fraud section here, there were two cases in which CEOs had -- were successfully evading the U.S. justice system.

One was the Symbol Technologies case. It wasn't after trial that that Defendant had absconded. I think he'd been sued by the SEC civilly and he knew that an indictment was coming, but it had not yet been returned.

He went to Sweden, where it took a while for anybody to find him. And I think some journalist located him in a small town somewhere.

And the Swedish government would not extradite him even after his indictment. I think they made some, I could be wrong about this, but some statement to the effect that they would not extradite. He was a Swedish citizen, so that's a distinction, would not extradite their citizens to non-EU countries in white collar cases.

And the other was the Converse Technologies case, where the defendant went to Namibia, a country with which the U.S. does have a -- an extradition treaty.

And nevertheless, he was able to fight extradition for I think more than a decade before he elected voluntarily to come back and to negotiate a plea deal on his way back into the country at the end.

I do think it's harder. You know, the time period I'm talking about is '06, '07, '08. I think it's meaningfully

harder to abscond now when everything happens via cell phone and credit card.

And I think it's harder, not impossible, but harder to abscond when one is on home confinement with electronic monitoring.

I do think -- I think we're not all that far apart in terms of what §3143 requires in this case in my view. I think there's needs to be some showing of a stronger individualized commitment from one or more sureties to evidence a degree of skin in the game, A, and a likelihood that the Government will be able to satisfy the bond if necessary the $3,000,000 total amount on the bond, B.

And so, I would invite the Defense to tell me how we go about doing that? I think one obvious possibility, whether this is impartial or full satisfaction of what I'm asking for, is that the existing surety we know has meaningfully more assets than he's posted so far, including assets in the United States is willing to step up in that regard.

You know, I don't want to be the person who proposes how to bridge the gap. I would look to the Defense to figure that out for me.

But as of now, I do think the Government is right that it would be at the very least exceedingly difficult to satisfy the bond in this case.

There just -- there aren't $3,000,000. You know,

looking at everything that's been proposed, I don't see how they get to $3,000,000 without an enormous amount of effort over a very long period of time. And even then, they probably still fall a bit short. I think $3,000,000 is a good enough number at this point.

Have all the properties that have been pledged so far now been the subject of perfected security interest or is there anything more to do in that regard?

MR. SULLIVAN: Yes, they're perfected. I put at the top before Your Honor, it's Exhibit B, 1 through 9 I believe, my letter.

THE COURT: Okay, and that's undisputed?

MR. SIEGEL: No, we do dispute that and that's a thing I was going to raise.

THE COURT: What's the dispute?

MR. SIEGEL: So there's two sets of kinds of property here. There's real estate, which in some ways is the simplest to perfect the lien, but a lot of this is also in cash or stock.

And Mr. Kalliarekos is a good example. He says that he has a Schwab account in the United States. I don't know the exact method by which you would secure a Schwab account so that it is actually secure and that he can't take money out of it and that money is there effectively held in escrow.

But that's not what's been done here. What they have

given us is a confession of judgment by Mr. Kosmas Kalliarekos that he'll pay $100,000. That's really not any more security than just being an unsecured --

THE COURT: Yeah, I would imagine this would be a three-way agreement between the Government, Mr. Kalliarekos, and --

MR. SIEGEL: Schwab.

THE COURT: -- Charles Schwab.

MR. SIEGEL: And that applies, just to be clear, that applies for Mr. Kalliarekos. That applies for the $100,000 from Dr. Mattis (phonetic). That applies to the retirement account of his cousin and some other smaller pots of money. So that was just the first thing we noticed.

For the land, looking at the land, I don't know either way whether it has been done to the letter right, but I know it's -- I know there is a well-established process to perfect an interest in land and I'm sure we can figure that out.

But the accounts, particularly since some of the sureties don't live in the United States, for example Ms. Troner (phonetic) and Mr. Kalliarekos, a lien that says that they will pay $100,000 doesn't really give us any security at all.

THE COURT: Right. All right, I'll leave that to the parties to sort out. I would think that in the case of land,

if there are any questions about the validity of the security interest, if that's a question of Virginia law, then a Virginia lawyer could write a short opinion letter to the Government indicating his or her opinion that the security interest has been perfected. I would imagine that would not cost that much to do.

In the case of Schwab, my experience with the pledge of securities as collateral for anything is that it typically requires a three-way contract in which the custodian says I'm not releasing these assets except in the following circumstances, and then, to the following party. And so, I'll wait as well to hear from the parties on that.

Mr. Sullivan, what do you propose in terms of next steps? We could put this on for next week.

MR. SULLIVAN: I would say that the land is perfected and it's recorded at the relevant state offices, which I actually don't think there needs to be more.

Massachusetts, for example, is recorded in the Hampshire Registry of Deeds. And it's the normal process to encumber some of this property.

For the financial accounts, I mean, we've done -- they are listed. We've done UCC-1 financing statements. There are filing numbers that we provided to the Court and the Government and the Secretary of State from the relevant states where the money exists.

THE COURT: So if Mr. K. calls his broker at Schwab tomorrow or just goes on the website and sells everything in that account and instructs Schwab to wire the cash to a bank in Hong Kong, will Schwab follow those instructions or will they not?

MR. SULLIVAN: My understanding is that the UCC-1 statement in accompany -- with the affidavit that Mr. Kalliarekos signed, which is in the packet, it confesses the judgment and that that money is encumbered. That is my best understanding after our research on how to encumber things like these cash accounts and retirement accounts and --

THE COURT: Does Schwab have a copy of the -- of this filing? I mean --

MR. SULLIVAN: Schwab would have a copy of these filings. And again, it's recorded.

THE COURT: How did they get it?

MR. SULLIVAN: From us here.

THE COURT: You send the copy to Schwab?

MR. SULLIVAN: Yeah.

THE COURT: Okay.

MR. SIEGEL: Your Honor, I made be misremembering. I don't -- I think the lien that they gave us for Mr. Kalliarekos doesn't even list the account number. It just says a Schwab account.

And as we saw in this trial with UCCs, UCCs provide

notice to other lenders. They can look up and see that this stuff is encumbered, but it doesn't -- unless there's separate agreement in place, it doesn't actually prevent you from transferring the assets.

THE COURT: Yeah, it sounds to me like we have ideas about how this might work, but not real certainty. And I'd like to get to a place of real certainty. I'll leave it to the parties in the first instance to figure that out. I --

MR. SIEGEL: And Your Honor just on Mr. Kalliarekos, and I just want to raise this argument now because I don't want to come back and then have them say that they've taken you up on your suggestion. There is case law that using victims from the offense as sureties is not appropriate. Even --

THE COURT: Categorically not appropriate though? Like I don't understand why.

MR. SIEGEL: I don't think there's -- in this setting, I don't think there's -- I think there's few things that are categorically not appropriate.

It's the question of can we -- can you -- is it -- can it be clear and can the Court feel confidence that Mr. Watson would not cause Mr. Kalliarekos $100,000 or a million or $3,000,000 worth of lost property?

In this case and regardless of Mr. Watson's view and regardless of Mr. Kalliarekos' view, he has been convicted of defrauding the investors OZY and lying about OZY. And he lied

to Mr. Kalliarekos according to the jury and took over a million dollars from him already.

So the question is if Mr. Kalliarekos says I have a $100,000,000 and I would put everything on the line for Mr. Watson --

THE COURT: Well, I do want a financial affidavit -- a real financial affidavit from him.

MR. SIEGEL: I mean that's --

THE COURT: Doesn't have to be perfect, but it has to give a better sense of what is this person's net worth.

MR. SIEGEL: That speaks in a very admirable way I guess to Mr. Kalliarekos and his devotion to Mr. Watson, but the law is also clear that just because a surety is devoted to the defendant does not indicate that the defendant is necessarily devoted to the surety. And there are numerous cases that we cited on that.

THE COURT: Right. I'm not suggesting that the only necessary improvement in this bail package is with respect to Mr. Kalliarekos, but I do think there's room for improvement there. And I don't think his commitment is entirely irrelevant.

All right, I'd like to look at the calendar for next week because I would like to resolve this in short order. Are we trying to block out --

Drew, do we have 3:30 on Wednesday free?

THE CLERK: Yes we do, Judge.

THE COURT: All right. Does the Defense think you can be in a position to tie up whatever loose ends here one way or the other by Wednesday, the 14th?

THE CLERK: 13th, Judge.

MR. SIEGEL: 14th.

THE COURT: 14th.

THE CLERK: The 14th at 3:30?

THE COURT: Yeah, Wednesday, the 14th at 3:30.

THE CLERK: No, that's not good because --

THE COURT: Are we looking to schedule something then?

THE CLERK: Okay, we have a pre-trial conference that's ending at 3:30. Okay, Judge, we're good.

THE COURT: All right, 3:30, Wednesday the 14th.

MR. BURCK: Your Honor, if I could ask one question according to your schedule. The -- if we were able to -- understanding the Court -- if the Court is inclined potentially to grant the bail, if we provide additional information, additional collateral from these suretors, if we can get to an agreement with the Government on that, would the Court require a hearing if the Government consents?

THE COURT: No.

MR. BURCK: Okay, I think the question then that I have is whether or not the Government has any additional

arguments they want to make beyond challenging the effectiveness of the collateral that we would offer on top of what we've already done.

Because if we can get to an agreement with them, say Mr. K. says he'll put up $500,000, I'm just making up a number, Your Honor, I have no idea, and we have additional collateral from everybody else, and the Government would say that, okay, well, that is okay from the perspective of the collateral, but we still have these other issues.

I just want to understand if we can get agreement from the Government that they're not going to re-litigate anything else.

THE COURT: I mean, you all can talk about that offline today. Just from my perspective, if Mr. Kalliarekos has an account with $1.1 million in the United States at Schwab, my working hypothesis was that he would simply pledge that account.

MR. BURCK: Understood.

THE COURT: Not some, you know, greater, but still less than complete portion of it.

As to what will satisfy the Government, I'll leave that to you and them to work out amongst yourselves.

MR. BURCK: Understood, Your Honor.

THE COURT: But I think you've seen a clear enough indication of how I'm thinking about this case that to the

extent that's to inform your conversations, it should be able to do that.

MR. SIEGEL: Yeah, Your Honor, just because it was raised the issue of other arguments, there are other arguments that we have. Given what Your Honor said, I don't think we need to or it would be productive to get into that today.

I'm happy to go through all my arguments if we want to do it now, but given what Your Honor said, I don't know that that's necessary.

THE COURT: I mean, these are arguments that are in your letter presumably or --

MR. SIEGEL: Some of it is responding to some of the things that were said. I, you know, given where we are, I don't think we need to respond to everything that was said.

THE COURT: Yeah.

MR. SIEGEL: But again, I leave it to the Court.

THE COURT: All right, we've blocked out 3:30 next week Wednesday, August 14th if we need it. Hopefully, we won't. I'll leave it to you all. And with that, we'll be adjourned.

MR. SIEGEL: Thank you, Your Honor.

MR. BURCK: Thank you, Your Honor.

THE COURT: Thank you.

(Proceedings concluded at 11:01 a.m.)

**CERTIFICATE**

I, Chris Hwang, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

/s/ Chris Hwang

______________________ August 12, 2024

Chris Hwang Date

Court Reporter