UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - X

UNITED STATES OF AMERICA, : 23-CR-82(EK)

-against- : United States Courthouse
Brooklyn, New York

CARLOS WATSON and OZY MEDIA, INC., : June 27, 2024
8:45 a.m.

Defendants.

- - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
BEFORE THE HONORABLE ERIC KOMITEE
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

For the Government: BREON PEACE, ESQ.
United States Attorney
Eastern District of New York
271-A Cadman Plaza East
Brooklyn, New York 11201
BY: JONATHAN SIEGEL, ESQ.
GILLIAN KASSNER, ESQ.
DYLAN A. STERN, ESQ.
Assistant United States Attorney

For the Defendant Carlos Watson: RONALD SULLIVAN LAW FIRM PLLC
1300 I Street NW, Suite 400E
Washington, D.C. 20005
BY: RONALD S. SULLIVAN, ESQ.
JANINE I. GILBERT, ESQ.

For the Defendant OZY Media, Inc.: SHANNON FRISON, ESQ.
75 State Street, Suite 100
Boston, Massachusetts 02109

REPORTED BY:

Kristi Cruz, RMR, CRR, RPR
Official Court Reporter
kristi.edny@gmail.com

Proceedings recorded by computerized stenography. Transcript produced by Computer-Aided Transcription.

* * * * *

**P R O C E E D I N G S**

(In open court; jury not present.)

THE COURT: Let's go on the record. I had aspired to start at 8:45 this morning so as not to keep the jury waiting longer than necessary, and yet here we are.

Mr. Sullivan, anything to report on the Robinson disclosures in respect of taking historical numbers with a grain of salt?

MR. SULLIVAN: He said that was --

THE COURT: I'm sorry, I'm not interested in what he said to you last night. I'm interested in what he said in the disclosures that he made prior to trial. Have you located --

MR. SULLIVAN: Yes. He said unaudited is a proxy for historicals not being 100 percent accurate.

THE COURT: Where are you pointing me to?

MR. SULLIVAN: Pardon me?

THE COURT: Where are you pointing me to?

MR. SULLIVAN: There's a section in the first rule called pro forma and unaudited. He says that that is the definition of unaudited, but it's subject to some later revision. Again, it's just a fundamental principle that's, you know, not even argued in literature. That is what unaudited means.

THE COURT: Where is the --

MR. SULLIVAN: There's two definitions. Pro forma and unaudited. And if asked about 100 percent accuracy of historical data, that's what he would point to, that unaudited signals to a reader that --

THE COURT: I'm looking at it now, and what he says -- I think you're referring to Document 127-1 on ECF filed April 12th, of this year, page 205, Section E, definition of pro forma. Many startups label their financials "pro forma," "unaudited," "subject to revision," or with some is similar caveat. In lay terms, this is a well-accepted signal to sophisticated investors that the data they are receiving are projections - unaudited estimates - based on assumptions about how future events will unfold.

So for me, that's the key phrase there based on

assumptions about how future events will unfold. And I'm at a loss to understand how uncertainty as to how future events will unfold would lead a normal person to take statements of historical actual revenue with a grain of salt.

Why are assumptions about how future events will unfold relevant to that calculous?

MR. SULLIVAN: So June 20, 2024 submission by Dr. Robinson, third page, my working understanding of the term unaudited --

THE COURT: Hold on. Let me get there. This is the most recent one?

MR. SULLIVAN: Yeah. It's my letter of June 20, 2024, with an attachment from Dr. Robinson.

THE COURT: Okay. Just for the record, we're talking now about ECF 196-1, filed June 21, 2024.

Where are you in this document?

MR. SULLIVAN: The second -- third page of the attachment. My Working Understanding of the Term "Unaudited" is the heading.

THE COURT: Let me read this.

This doesn't say anything about historical revenue being taken with a grain of salt. I mean, show me what you're pointing me to, but I just read it and I'm not seeing it.

MR. SULLIVAN: That entire -- that entire section.

THE COURT: Okay.

MR. SULLIVAN: So if asked, he would say that that's what "unaudited" means. An accountant has not looked at it. It is subject to revision.

As I said, I know you don't want to hear what he said last night, but the grain of salt was not in reference to historicals. The only reference to historicals is unaudited.

THE COURT: Okay.

MR. SULLIVAN: And he said that that is the definition of "unaudited."

THE COURT: Yes, he can testify about what "unaudited" means, and he can testify about the fact that statements of historical actual revenues that are unaudited may be understood a certain way by investors. But he hasn't provided any basis for the assertion -- and again, I'm not even sure he's delivered the opinion, let alone provided a basis for it, that investors take unaudited historical revenue with a grain of salt in the sense that they expect it to be inaccurate.

I think you might have a *Daubert* problem if that was his opinion, and I would find it surprising if he expressed it. But either way, he hasn't complied with the discovery rules in respect of such an opinion, and so we should not be hearing it today.

Is that line between what is properly admissible in his testimony and not admissible clear enough, or do we need to talk through that further? Because I do want you to communicate with him in advance of his testimony about where the guardrails are here.

MR. SULLIVAN: Understood.

THE COURT: Okay. Anything else to take up this morning?

MS. KASSNER: Your Honor, just one more very brief point of clarity.

I think the same goes for the term "pro forma." Based on the most recent disclosure, it's very clear the term is that the numbers are projections, they're based on assumptions about expected future revenues. I mean, that's what --

THE COURT: Yes, that's what he says. Again, that's -- I think that diverges a bit from the common understanding of the word "pro forma," which people often, in my experience, use to refer to historical numbers that are presented according to assumptions about the past that are not true, such as let's look at what these companies would have looked like in their combined financials last year had they been one combined entity, when that is essentially a counterfactual because the merger's not scheduled to close until some future date.

That's not what he's saying. And so, yes, he's going to be constrained to his -- what he has said he understands "pro forma" to mean and the implications thereof.

MS. KASSNER: Thank you.

THE COURT: It does look like we are unlikely to get started in the very near future given the number of jurors we are still waiting on.

MS. GILBERT: There's also a long line downstairs.

THE COURT: And there's a long line downstairs. So everybody should figure we're probably going to get started around 9:15 this morning. But stay close so that as soon as the jurors do arrive, we are ready to start.

MR. STERN: Thank you.

(Recess was taken.)

THE COURT: We lost Mr. Sullivan.

We are on the record.

I was going to ask whether there's any additional color on what "venture capital" means, what "startup" means, what "early stage" means, and the like.

MS. GILBERT: He stepped out.

THE COURT: Okay.

MS. GILBERT: I'm assuming -- I can try and look for him.

THE COURT: Okay. No worry.

(Recess was taken.)

THE COURT: The question I asked that made its way to you, but I was also wondering out loud if any additional color has crystallized on the question of what we mean when we say "venture capital," what that universe is defined to include "early stage," "startup," and the like.

MR. SULLIVAN: Yes.

He would testify that "venture capital" is a broad rubric that includes a number of different institutions, that they are the institutions that fund startups, that banks fund them, PE firms fund them, venture capital firms fund them. All of those are private equity institutions that invest in private as opposed to public companies. So he understands that as a broad category that points to a certain activity that financial institutions engage in.

THE COURT: When you define the VC universe, you get it by the reference to the phrase "startup."

How do we know a startup company when we see one?

MR. SULLIVAN: Well, he will say that there are a number of factors that investors use to determine startups. One is whether they continue to need capital investment to survive, as opposed to businesses that are self-running. Time is one of the conditions, how long it's been in existence, and the amount of actual money that it has is another condition. He will say that the literature -- well,

let me put it more in -- this is my words -- legal terms. It's a standard rather than a rule. And when firms look consistent with the standards that the literature lays out, then investors see them as startups.

THE COURT: That sounds a little bit like an I-know-it-when-I-see-it type of definition --

MR. SULLIVAN: Not quite. I mean, he will lay out, as I said, I gave three of the sort of --

THE COURT: One of those criteria you just gave is that they need outside capital. Mature companies go to the capital markets all the time to raise additional equity or issue debt. You know, I don't think that --

MR. SULLIVAN: I'm not going to ask that. The Court should feel free to ask him if you want a quick voir dire.

THE COURT: We may have to hear from him outside of the presence of the jury. Is he here?

MR. SULLIVAN: Yes.

THE COURT: This is a question for Ms. Kassner, who is the sole U.S. Attorney with us at the moment.

What group at Goldman were Mr. Moerman and Ms. Berardo working in at the relevant time?

MS. KASSNER: Your Honor, I need to confirm. I know that --

THE COURT: I think it's in the testimony.

Somebody just has to go through --

MS. KASSNER: We're going to find it.

THE COURT: You have it?

MS. KASSNER: We want to make sure we're correct.

THE COURT: I think we've located it.

But yes, let's bring Dr. Robinson in, please.

(Pause in proceedings.)

MS. KASSNER: And, Your Honor, I believe it's merchant banking, Your Honor, that the transcript should bear that out, the actual name.

THE COURT: Okay.

(Witness takes the stand.)

THE COURTROOM DEPUTY: I'm going to swear you in, sir.

Would you please stand and raise your right hand.

(Witness sworn.)

THE COURTROOM DEPUTY: Please have a seat.

THE COURT: We're going to wait for Mr. Siegel, who I'm confident did not go far.

MS. KASSNER: The FBI is currently looking for him, Your Honor. We'll find him.

THE COURT: You put out a BOLO on Mr. Siegel? Is that still something people say?

Dr. Robinson, good morning.

THE WITNESS: Good morning.

MS. KASSNER: Your Honor, I have a transcript cite for you, if that might be helpful.

THE COURT: I think I have it.

MS. KASSNER: There's a specific statement about what the group --

THE COURT: Let's hold off on that for a moment --

MS. KASSNER: Yes, your Honor.

THE COURT: -- given we have the witness in the box.

MS. KASSNER: Yes, understood.

(Pause in proceedings.)

THE COURT: We're all here now?

MS. KASSNER: Yes, Your Honor. Thank you.

THE COURT: I have a couple of questions for the witness, and obviously I'm happy to hear questioning from either or both sides after that.

Dr. Robinson, thank you for being with us this morning.

A lot of the opinion disclosure that we've seen from you speaks to the behavior of venture capital investors as they very investments in quote/unquote startup companies, early-stage companies, and the like. We all spent some time yesterday going through some of the studies that your disclosures cite, and the best we could ascertain by way of a definition of venture capital investors is that -- and I

understand we're not looking at everything we should be looking at, but based on our quick read yesterday, those studies identified venture capital investors by asking people whether they self-identified as venture capital investors.

Put that aside for the moment.

Is there a working definition that you would rely on to identify the contours of the venture capital universe?

THE WITNESS: So here's how I see it.

The survey that was conducted that informed the paper that I referenced in my disclosure that I believe you're referring to, we speak of people self-identifying as venture investors, that was mailed to alumni of the University of Chicago, Wharton, Harvard, and those were people that worked in firms that made venture capital investments. Many of those are organized as partnerships, where they raise capital from outsiders and invest in startups, and so they're specifically organized as venture firms.

My working definition of what a venture investment or venture investor is would be broader than that, though, because one of the things that we've seen over the last 10, 15 years is that an increasingly diverse set of investors participate in the investment in early-stage startups. And so we see that in everything from companies like Fidelity

and merch mutual funds making investments. We see the angel investment community --

THE COURT: What's a venture investment?

THE WITNESS: A venture investment is an equity investment in an early-stage high growth company, typically structured as a convertible preferred equity security.

THE COURT: Convertible preferred equity security, meaning preferred stock that would convert into common?

THE WITNESS: Meaning preferred stock that would convert into common under certain circumstances, but the owner of the stock would retain the option to keep the stock as preferred equity if they, pardon me, preferred. In other words, they're holding the security that can either be treated as -- you know, it's essentially a bond-like security that can convert into equity at their discretion, and that to me is the defining feature of a venture investment, would be equity in an early-stage, high-growth company.

THE COURT: What does early-stage mean?

THE WITNESS: Early-stage, I mean, there's -- you can't -- I don't think you can really put a timeline on it and say three years or earlier, whatever. But an early-stage company is a company that's still in a rapid growth phase.

THE COURT: Is Invidia an early-stage company?

THE WITNESS: Invidia has certainly experienced dramatic growth, as the chips that they make have taken off.

THE COURT: Right. I'm saying, if you know what an early-stage company is by the rapid nature of their growth, that would seem to me to include a company like Invidia, which I don't think anybody would call early stage at least in common parlance.

But my suggestion is there must be something else to it other than the speed of their growth.

THE WITNESS: Yeah, and that's why -- that's why I think that being a young company is part of that. Invidia is not a young company.

THE COURT: So what does "young" mean?

THE WITNESS: "Young" means not yet mature. In other words, the organization is changing, the roles that people undertake and carry out in the organization change from, you know, situation to situation. We think about startups as being nimble organizations, where there aren't clear hierarchies in place for who does what. And partly that's a function of the fact that the company is growing not just in terms of revenue, but in terms of products that it's making, the employees it has, its head count, things that it's doing.

THE COURT: Give us an order of magnitude in years. When you say "young companies," are we talking about

first two years, first ten years? What is the --

THE WITNESS: First ten years.

THE COURT: First ten years?

THE WITNESS: There's a common statistic that's batted about. You know, most businesses die within the first five years.

THE COURT: Why did you just say ten years if that's the statistic that matters?

THE WITNESS: Because I think you need to account for the fact that the ones that don't die need more time to grow, meaning you can't --

So here's the thing. If you think about, like, for example -- well, I'll give you an example. I have a former student who has started a business around a technology that allows -- it uses carbon nano material to let stuff pass through the blood-brain barrier so that you could hopefully deliver medicine to the brain. She's been at this for, gosh, six, seven years and is still trying to gain traction in the market around this. So I think that her business has not failed. She receives promising feedback from scientific studies that she does, and she's still trying to grow the business.

So I think it's very hard to say, you know, X years because it's dependent on the maturation of the company itself.

THE COURT: Okay. So everything you just said is helpful in terms of fleshing this out with additional content. Is any of that apparent from the studies that you've cited? So yesterday we were looking at Hellmann and Puri, P-U-R-I. You also, I think, rely fairly heavily on the survey, what we're calling the Gompers, G-O-M-P-E-R-S, study.

Do you see any of those definitions of what a venture capital investment is, what an early-stage company is, what a startup is, in any of that literature to which you referred?

THE WITNESS: I don't think those papers necessarily lay out a definition of what a startup is or what a venture investment is. They assume that the reader has sort of working knowledge of those things. Like the Hellmann and Puri paper, for example, the key result in that paper is that venture investors help to professionalize startups. And so the understanding that you take from that paper is that when the investment in the start up is made, the startup is not fully developed.

And so the venture investor comes along, puts money in the company, but does so with a contract that allows them significant latitude for vetoing certain decisions the entrepreneur might make, helping the firm do this or that. And the evidence shows that that's what

venture capital investors do. So that's evidence that venture investments take place in companies that are not fully mature, that need to be professionalized.

THE COURT: Do you see any of that happening here with respect to OZY Media, outside investors?

MS. KASSNER: Your Honor, he's never worked for OZY Media.

THE COURT: I understand that. But he's looked at OZY Media.

If the answer is you don't know, the answer is you don't know. But are you aware of any of that with respect to OZY --

THE WITNESS: When I looked at -- I'm sorry to speak over you, sir.

THE COURT: And I'm not saying this would be admissible in front of the jury; I'm asking a question.

Do you know if any outside investors actually vetoed any such decisions or required any such personnel changes or otherwise at OZY in this case?

THE WITNESS: So I know that the Goldman Sachs investment memorandum talks about key risks associated with the investment.

THE COURT: That's not my question, though. My question is: Do you know of any outside -- I don't think Goldman actually invested in OZY. I don't know that for a

fact one way or the other. Obviously I'm not a fact witness here.

I'm asking whether any company that actually invested in OZY actually undertook the quote/unquote professionalization efforts in some concrete way.

THE WITNESS: Oh, I don't know. I do not know.

THE COURT: Okay. But that's how you know venture capital investors, among other ways, is that they are -- I mean, I think I've heard you say making a particular kind of investment, which is a debt-like preferred instrument that can convert into common stock, that they are undertaking these kind of professionalization efforts and may have other veto rights concerning the operations of the entity.

What else? Anything about profitability? Is a company that is strongly cash flow positive, is that typically an indicator that would cut against labelling something a startup?

THE WITNESS: I mean, a company that's heavily cash flow positive doesn't need to receive investment from outside investors.

THE COURT: Right.

THE WITNESS: And so, you know, it's not a question of whether it would be attractive to a venture investor.

THE COURT: I asked: Does that cut against

calling it a startup?

THE WITNESS: In most cases, yes, because the cash flow profitability would be an indication that the business had matured.

THE COURT: Okay.

Mr. Sullivan, do you want to ask any questions on the subjects that I've just inquired about? Do you want me to have the Government go first and then you can take it up?

MR. SULLIVAN: Sure, that's fine.

THE COURT: Sure.

MS. KASSNER: Thank you, Your Honor.

If a company was earning, like, $449 million in revenue, do you think that would mean that it was -- would that cut one way or the other as to whether you would consider it a startup?

THE WITNESS: I couldn't say on the basis of just the revenue alone whether it was a startup or not. If you're making 449 million in revenue and you're growing rapidly, you have 2 billion in cap ex, that, you know, that can make you be a startup.

MS. KASSNER: You've also explained that one of the ways you can tell if something is a startup is if venture capital investors recommend specific changes after they invest. Is that fair to say?

THE WITNESS: I'm not sure that that's really what

I said. I don't think that -- I don't think that the definition of the startup is that a venture investor chooses to make changes in the company after they invest. I think that when venture capital investors invest in startups, they do so with the -- they do so with the legal right to intervene in many actions, and the evidence suggests that they, in fact, do quite often.

MS. KASSNER: Okay. Understood.

So one of the things that the evidence shows that venture capitalists do when they do invest in a startup is they often replace the founders with an outside CEO, correct?

THE WITNESS: That does happen, yes.

MS. KASSNER: And they also often introduce stock option plans, correct?

THE WITNESS: That's right.

MS. KASSNER: And they often hire a VP of sales and marketing, correct?

THE WITNESS: The evidence suggests that those are things that they do, yes.

MS. KASSNER: And they often implement human resources policies. Is that fair to say?

THE WITNESS: I think -- I think the ways to think about it is they do that more often than companies that don't receive venture capital. In other words, companies

that receive venture capital experience these changes more often and more quickly than ones they don't.

MS. KASSNER: So if a company has had those charges, it would be an indication that it's a startup, it needs these improvements to be made. Is that fair to say?

THE WITNESS: So if a company -- I mean, I'm not sure that you can use this as -- you know, I'm not -- I'm not sure that you can use the ex post act of having done one of these things as a definition of what a startup is. I think many startups need these things and many venture investors provide them.

MS. KASSNER: I believe you said earlier that one of the ways you can tell if a company is a startup is if venture capitalist invest and make these improvements, right?

THE WITNESS: I'm not sure exactly what I said earlier, but I think of a startup as a young company that is not yet mature.

MS. KASSNER: And young is just your opinion, right? It's not based on an actual study that says what "young" means.

THE WITNESS: I don't know of any studies that try to attach a length of time to an age of a company.

THE COURT: Let me just --

Are you aware of any definition employed by any

business, professors of business administration, as to what an early-stage company is, what a venture investment is, what a startup is, any of the stuff we're talking about? Any definition you can point us to other than self identification?

THE WITNESS: Not yet publicly traded would be one definition that the literature has looked at and used in the past.

THE COURT: I mean, is that -- who uses that in the past and how far in the past?

THE WITNESS: So that's a good question, because one of the things that we've seen over the last 10, 15 years is that companies remain private much longer than they used to.

THE COURT: Right.

THE WITNESS: Companies like SpaceX, they're in a Series I, Series J round, whatever. We don't think of that company necessarily as a startup because it's a mature company, it's doing the same thing today that it did yesterday, but it still remains private.

THE COURT: Right. But I thought you were suggesting --

THE WITNESS: Well, I'm explaining to you why I agree with your statement.

THE COURT: So if that were a definition, that

every company that hasn't gone public is a startup, we would agree, I think, that that's an out-moded definition given --

THE WITNESS: I wouldn't offer the definition that every private company is a startup.

THE COURT: Right. But --

THE WITNESS: But I think that companies that receive venture investment can be considered to be startups before they are public. There are millions of companies in this country, and most are private and most are small and most aren't growing. So I don't mean for my definition to include them.

THE COURT: Right. The dry cleaner on Main Street --

THE WITNESS: Correct.

THE COURT: -- is not a startup.

THE WITNESS: Perfect example.

THE COURT: Okay. So now back to my question.

Is there a working definition anywhere in the literature that you can point us to that would circumscribe the universe as to which you will be opining?

THE WITNESS: I'm trying to think of a specific reference, and right now it's not coming to me. But I think many authors would have a working definition that said young, high growth, capital constrained.

THE COURT: Young, high growth, capital

constrained. What does capital constrained mean?

THE WITNESS: The high growth and the capital constrained go hand in hand. The fact that the company is growing rapidly means it needs injections of outside capital in order to -- in order to continue growing.

THE COURT: Have you looked at OZY Media as a company?

THE WITNESS: Yes.

THE COURT: Do you have an opinion as to whether in the year, let's say, 2020 OZY was a startup company and the investments people might have been considering in OZY that year were venture investments?

THE WITNESS: I do think they are. I do think the company was a startup, and I do think that the types of investments that people were looking at would be venture investments.

THE COURT: And why is that?

THE WITNESS: Because the company was growing rapidly, the company needed capital, outside capital in order to fund its growth, and the company had, you know, strong growth prospects going forward from there.

THE COURT: Okay.

MS. KASSNER: Your Honor, I do have a few questions about that.

THE COURT: Please.

MS. KASSNER: You stated that the company was growing rapidly. What are you relying on for that opinion?

THE WITNESS: The revenue bookings numbers suggest that the company was growing rapidly. The company also grew rapidly if you think about it from a head count standpoint, employee standpoint.

MS. KASSNER: How many employees are you aware that OZY had in 2020?

THE WITNESS: I think that it had around 75 or so, if I recall the data from the Goldman Sachs investment memorandum correctly.

MS. KASSNER: Are those full-time employees?

THE WITNESS: I am not sure whether they're full time or part time.

MS. KASSNER: Okay. And you also said that --

THE COURT: Before we leave that subject, you're saying the 75 number for head count in 2020 reflects rapid growth in head count. What do you base that on?

THE WITNESS: I think they had a head count of two founders when they started.

THE COURT: Okay.

THE WITNESS: I think they had a head count of maybe ten or so in the first year.

THE COURT: Right.

THE WITNESS: I think they had a head count of

maybe 20 or so in the subsequent year or two. And so to grow from --

THE COURT: Do you know where they were in head count in 2017, '18, '19?

THE WITNESS: I don't have a precise number, but my understanding is that they went from two founders to ten, to 20, to upwards of 75 people by the time 2020 came around.

THE COURT: Right. But what if they hit 75 in 2017 and then plateaued for the next four years, would that cut against your assessment?

THE WITNESS: Not necessarily.

THE COURT: But you don't know one way or the other where they were in '17 --

THE WITNESS: I don't know. Not off the top of my head, no, sir.

THE COURT: Sorry. Please continue.

MS. KASSNER: Those numbers for the head count, where did you get those numbers? You didn't independently verify them, did you?

THE WITNESS: Let me see. I believe I got them from the Goldman Sachs investment memo, at least the 75 number. I'm using the two number, that's based on the company having two founders, which I don't believe is a -- I don't believe there's any uncertainty around that.

MS. KASSNER: I want to focus on the later years

of the company. You never -- you don't know how many full-time employees the company had, right?

THE COURT: Come to sidebar for a second, I'm sorry.

(Sidebar conference.)

(Continued on the following page.)

(Sidebar conference held between judge and counsel only.)

THE COURT: I don't understand the relevance because I would have thought that whether these are properly considered venture capital investments should be considered from the perspective of the investor making the investment and what they understood about the company and not the reality.

So let's say theoretically, hypothetically, there is a difference between what Goldman thinks about head count on the one hand and reality on the other hand. I think the way that investors would look at the investment should be dependent on what the investors are told, not what reality is.

MS. KASSNER: So, Your Honor, I think they're two distinct questions. Number one is how the investors would view the investment. Number two is, is OZY a startup. Those are separate questions.

THE COURT: The question really is are these startup investments. He's going to testify about how venture capital investors look at startup companies, and that's all going to be determined by reference to what the investors are told, always.

MR. SIEGEL: Your Honor, at least my understanding of the defense argument has also been that part of this goes

to Mr. Watson's good faith, and he made these claims for his understanding of what would be important and what was relevant. Therefore, it's not just what the investors were told, but also --

THE COURT: He's not here to testify about a defendant's mental state, from what I can hear. He's here to testify about the industry.

MR. SIEGEL: Obviously he can't testify about Mr. Watson's mental state, but to the extent that he's going to make arguments and there's going to be argument from that, the jury can infer that that was Mr. Watson's understanding.

THE COURT: You'll get that on cross. I don't think it's foundationally relevant to what we're doing right now.

How much longer do you have on this? Five minutes?

MR. SULLIVAN: I'll just lodge a general objection. We're varying into a practice cross-examination.

THE COURT: Well, that's why I just called us all to the sidebar.

MR. SULLIVAN: I appreciate that.

THE COURT: To say this is about the definition of the universe and whether he's talking about the same universe that we see here and not every aspect of cross-examination under the sun.

(Sidebar ends.) (Continued on the following page.)

(In open court; jury not present.)

THE COURT: Please continue.

MS. KASSNER: If a company has an EBITDA volume of 4 million, would that be consistent with the company being a startup?

THE WITNESS: Not necessarily.

MS. KASSNER: Why not?

THE WITNESS: Because EBITDA 4 million could have been 4 million last year, could have been 4 million the year before that, could have been 4 million the year before that, could have been $4 million of EBITDA for the last 45 years. That wouldn't make it a startup. That would make it a company that had $4 million in EBITDA.

MS. KASSNER: What about 16 million in EBITDA?

THE WITNESS: Same answer.

MS. KASSNER: So sitting here today, you can't say based on hearing -- so it sounds like for you, the most important factor in whether a company is a startup is its growth.

THE WITNESS: Correct.

MS. KASSNER: What if the company has existed for eight years, it has the same business model, it has the same products, it has the same people in charge, and it has 16 million in EBITDA. Is that a startup company?

THE WITNESS: So in order to answer that question,

I need to know what the previous EBITDAs were and I'd need to know what the expected future EBITDAs were, because that's how you would determine whether it was growing. If I had an eight year old company that had -- if I had an eight year old company that had $16 million in EBITDA in year one, two, three, four, five, six, seven, eight, and was expected to continue, I wouldn't call that a startup. I would say that's a mature company. It's stable. So I think it's very hard to attach a, you know, a number like 16 million or 4 million to a definition of what a startup is because to define a startup, we need to think about its growth.

THE COURT: So, in other words, to the extent we're looking at year-over-year changes in revenue as one component of the definition of a startup, it's the vector. It's not revenue in any single year; it's how it's changing over time.

THE WITNESS: That's correct.

THE COURT: Anything else? I think we may be done here.

Mr. Sullivan, do you want to ask any questions?

MR. SULLIVAN: Sure.

Dr. Robinson, is there a bright line rule in the literature for the definition of a startup?

THE WITNESS: I mean, other than being a high growth company that's not yet mature, no.

MR. SULLIVAN: So putting it a different way, is there a single factor bright line rule in the literature that's definatory of startups?

THE WITNESS: No, sir.

MR. SULLIVAN: Based on the literature that you cited, it's not just the Gompers study, but all the footnotes and all the articles that you read and relied on and disclosed in this case, in reading those studies and just relying on those studies, what can you say about the definition of a startup?

THE WITNESS: I mean, beyond what I've offered already, really nothing else. I mean, these companies that are receiving or searching for venture capital are young companies with high growth plans, and they need outside capital in order to fuel their growth.

MR. SULLIVAN: And those working assumptions are present in the literature that you've already --

THE WITNESS: That is correct, yes, sir.

MR. SULLIVAN: In terms of VC investors, based on your knowledge, experience, research, and the research that you have done, is there a category of VC investors such that only a company with the name "VC investor" can invest in startups?

THE WITNESS: No, sir.

MR. SULLIVAN: Who invests in startups based on

the literature that you've provided? What are some examples of VC investors?

THE WITNESS: So VC investors could be what we think of as traditional venture capital firms, which are organized as limited partnerships where they raise outside capital and invest in companies. VC investors could also be, you know, nontraditional VC investors like corporate venture investors.

There are many prominent corporate venture firms. They make venture investments just like a traditional VC would because they invest in -- you know, there will be a Series A, a Series B, a Series C, and these investors all buy securities in that. Traditional corporate, you could have -- I mean, anyone who chose to participate in that securities offering would be a venture investor because they would be investing in a venture round of the -- you know, of the company's financing.

MR. SULLIVAN: So, and finally, when just asked by the Government's question if a company has this or if a company has that, are you able to make a determination whether a company is a startup by reliance in isolation on one factor or one condition?

THE WITNESS: No.

MR. SULLIVAN: That's all, Your Honor. Thank you.

THE COURT: Okay. Just a couple more questions

from me.

You've looked at OZY Media's capital raising efforts here?

THE WITNESS: Yes, sir.

THE COURT: Do you think of Antara Capital as a venture capital investor?

THE WITNESS: I'm not incredibly familiar with the ins and outs of how Antara operates. But, I mean, they were -- I don't know.

THE COURT: Do you think of Clayton -- I'm going to mispronounce his middle name -- Dubilier & Rice as a venture capital investor.

THE WITNESS: They're a very well-known venture investor, yes.

THE COURT: Venture investor.

THE WITNESS: Yes. CD&R.

THE COURT: Do you think of Goldman Sachs merchant banking operation as a venture capital investor?

THE WITNESS: I think they're an example of a nontraditional investor in the space.

THE COURT: Okay. What was the firm run by the Stanford guy?

MR. SIEGEL: Western Tech Investments, WTI.

THE COURT: Do you think of WTI as a venture capital firm?

THE WITNESS: So if I understand correctly, WTI is primarily a venture lender.

THE COURT: Right.

THE WITNESS: They lend money to venture-backed organizations.

THE COURT: Does the Gompers study speak to venture lending?

THE WITNESS: I don't know if the Gompers study included any venture lenders or not. I just don't know.

THE COURT: All right. I don't have any more questions.

Why don't we have the witness step out for a moment.

Is everybody here?

THE COURTROOM DEPUTY: We're missing Juror No. 5, Judge.

THE COURT: We're missing one juror.

Take a short break in the hallway. We'll come get you when we need you.

THE WITNESS: Okay.

MS. GILBERT: Can he go back into the witness room?

THE COURT: The witness room is fine. We don't have witness rooms on the other side of the building, so that's a new concept for me.

(Witness exits the stand.)

THE COURT: I think what we've learned here this morning -- let's just wait for this door to close fully.

I think what we've learned this morning is that to the extent we're facing significant uncertainty regarding the contours of the venture capital universe, the startup universe, the early-stage universe, whatever, that is due in significant part to the fact that those are concepts that are hard to define, not to the fact that the expert being proffered failed adequately to set forth a definition.

(Continued on the following page.)

(Continuing.)

THE COURT: I do think there's a real question about how much of this testimony will apply in this case, but I think that's a matter generally speaking for cross-examination more than it is for -- more than it is for preclusion purposes. And I understand that it took multiple iterations to get clarity on some key topics from Dr. Robinson. I understand that should not be the case, but I am not prepared to exclude what remains of his testimony on those Rule 16 and related bases. So I think we're just going to go forward with the examination as soon as Juror Number 5 arrives.

MR. SULLIVAN: Thank you, Your Honor.

And it looks like he'll be our second witness in way. We have a witness leaving the country, and I think you may recall, neither matter realized this was a short day. So we just have to make some accommodations.

Yesterday, Ms. Shannon and I neglected to make an application, which we'll do so now before we formally open our case. But on behalf of Mr. Watson, we make an application under Rule 29 and submit on the record for Your Honor's consideration.

THE COURT: I will reserve judgment on that motion according to the rules. But the motion is noted.

Anything, Ms. Frison, from your side?

MS. FRISON: No, Your Honor. Other than the same motion, Your Honor, for OZY Media.

THE COURT: Noted, as well. All right. I think we're just waiting for the jury at this point.

MR. SIEGEL: Your Honor, the defense said I think they're going to call another witness before Dr. Robinson.

THE COURT: Yes. Who is the witness so we can all --

MR. SULLIVAN: Kosmo Kalliarekos, is the pronunciation.

MR. SIEGEL: So, Your Honor, that just raises up the 26.2 issue that we were going to discuss after Dr. Robinson, but this is live now.

THE COURT: So who is this person?

MR. SULLIVAN: He is a former investor in OZY, and he's going to testify to what considerations were important to him in deciding to invest in OZY.

THE COURT: All right. Let's begin with Dr. Robinson this morning so that we don't keep the jury waiting while we resolve any Rule 26.2 issues as to that witness.

MR. SULLIVAN: Okay.

MR. SIEGEL: And, Your Honor, while we're sitting here, just to flag the -- a 26.2 issue for that witness, Mr. Sullivan just said that he was an investor. One of the

requests that we made is for his investment agreements which are certainly statements by him that are relating to his testimony. We have not been provided with those.

THE COURT: And you don't have them any way?

MR. SIEGEL: I don't -- I don't know. I mean, some of his investments were in 2023, I believe. The investment -- the materials we have are generally from well before that.

THE COURT: What's the indictment period?

MR. SIEGEL: The indictment period is 2018 to 2021, but if he's talking about his investments --

THE COURT: If he's not an investor during the investment period --

MR. SIEGEL: No, he invested both. He invested both.

THE COURT: But how do you know then that he's an investor during the indictment period --

MR. SIEGEL: We have the wires.

THE COURT: The wires? You see him on the cap table?

MR. SIEGEL: Well, there are multiple versions of the cap table, but yes, I believe he shows up on the cap table. We're not disputing that he's an investor, but in terms of --

THE COURT: But why is -- let's go down this road

as long as we're waiting for the jury.

Why do you need a copy of his stock purchase agreement in order to effectively cross-examine him?

MR. SIEGEL: It goes to what he was told and what he understood. For example, if he invested in a Series D or a Series C, at a time and has a stock purchase agreement that says, the board will authorize and issue the stock, that's before that happened, that's certainly relevant for us to be able to talk about with him.

THE COURT: Okay.

MR. SIEGEL: And that's just an example. I mean, again, we don't know the universe, but what we got and we made a request of are there -- where are his agreements? Where are the communications about his agreements?

THE COURT: So during the break this morning, we'll all stay while the jury goes out, we'll have this witness come on the stand, we will ask him whether he executed a written agreement in connection with one or more of his investments in OZY, and if so, where it is and why the Government -- does the defense dispute that the Government does not have this?

MR. SULLIVAN: Yes, of course we dispute it. Yes --

THE COURT: When was it produced?

MR. SULLIVAN: I can look. I can -- I don't know

offhand. What I can say and represent is that --

THE COURT: Why don't you -- if it was produced, there's going to be some indication of that, you know, bring the indication to the Court's attention.

MR. SULLIVAN: Very well.

THE COURT: Because that would solve the issue. If the Government is saying they don't have a copy of this investment agreement and, in fact, they do, then we might not have a dispute here.

What Juror Number is this?

THE COURTROOM DEPUTY: Juror Number 5.

MR. SULLIVAN: If that's all, can I take a minute? I will pull it back in before --

THE COURT: We're waiting. And let me say one other thing. It turns out there's an attorney trying a case in a different courtroom in this building who has lost her phone and some speculation on someone's part -- I don't know who -- that that phone might have gotten mixed up with the phone of somebody in this courtroom. Everybody is holding a phone. If you could just check whether it's yours or possibly someone else's.

MS. GILBERT: It happened while I was going through the line, and I have my phone. I -- because they asked me whether this was my phone, and it was just mine.

THE COURT: You know your phone.

MS. GILBERT: Yes.

THE COURT: Do you want me to ask the foundational questions of how you recognize that phone?

MS. GILBERT: Sure. Please do.

THE COURT: No. I think we're done on that subject.

MS. GILBERT: There are 52,000 photos on there that I identify.

THE COURT: Yes. It would be very strange if those were all on someone else's phone, as well.

MS. GILBERT: And my face opens it.

THE COURT: There you go.

All right. We're going to see what we can do with helping our missing juror through security. I'll return in five minutes.

(A recess was taken.)

THE COURTROOM DEPUTY: Judge, they're lined up.

MR. SIEGEL: We're short.

THE COURT: Let's just bring them in.

THE COURTROOM DEPUTY: All rise.

(Jury enters the courtroom.)

THE COURT: All right. Please be seated, everyone.

Ladies and gentlemen of the jury, good morning.

THE JURY: Good morning (unanimously).

THE COURT: Thank you all for being with us, again. I know it's inevitable that every once it a blue moon, somebody will have complications in travel. Please let us know. If you can, call Mr. Jackson as soon as you have a sense that things are going to take longer so we have some predictability as to when we get started. But, again, thank you for being here.

All right. Mr. Sullivan, do you want to call your first witness?

MR. SULLIVAN: Yes, Your Honor. The defense calls Professor David Robinson.

(The witness takes the stand.)

THE COURTROOM DEPUTY: I'll just swear you in. Please raise your right hand.

(The witness was sworn and/or affirmed in by the courtroom deputy.)

THE WITNESS: I do.

THE COURTROOM DEPUTY: Thank you. May you please have a seat.

Keep the mic between six to eight inches from your face, and please state your name for the Court, and spell your first and last name for the court reporter.

THE WITNESS: My name is David Robinson. That's spelled D-A-V-I-D, R-O-B-I-N-S-O-N.

MR. SULLIVAN: And may I proceed?

THE COURT: Yes.

**DAVID ROBINSON, called as a witness, having been first duly sworn/affirmed, was examined and testified as follows:**

DIRECT EXAMINATION

BY MR. SULLIVAN:

Q Good morning, Professor Robinson.

A Good morning.

MR. SULLIVAN: And good morning ladies and gentlemen of the jury.

THE JURY: Good morning (unanimously).

Q So Professor Robinson, where do you work?

A I am a professor at Duke University.

Q How long have you been there?

A I joined in 2003. So I guess that's about 21 years.

Q Prior to being a professor at Duke University -- well, let me ask you first: What do you teach at Duke University?

A I teach entrepreneurial finance, venture capital, and private equity.

Q And are those the classes that you've taught in the main during your tenure at Duke?

A Yes, sir. I've taught that for all 21 years I've been at Duke, and I taught it prior to that. I used to be a professor at Columbia University, and I taught it there, as well.

Q And are you a tenured faculty member at Duke?
A I am. I am.
Q And can you tell the ladies and gentlemen of the jury what tenure means?
A So tenure is when you start off as a professor, you're untenured and that means that if they don't think that you've done enough research productivity or if they don't think that your teaching is up to standard that at the end of this tenure clock, which is at Duke, it's, like, seven years, then they can basically just fire you, and you, you know, go do something else. But if you receive tenure that means that they've evaluated your research and they've looked at your teaching and things like that, and they've decided that you're kind of, you know, over the bar, so to speak. It would be kind of, like, making partner in a law firm or an accounting firm or something like that.
Q And how long have you been tenured at Duke?
A I think I got tenure in 2008, if I'm not mistaken.
Q All right. Now, at Duke, in addition to teaching the classes that you've named, can you tell the jury what your research interests are?
A Yeah. Going back all the way to my doctoral dissertation at University of Chicago, I've been interested in understanding how startups are financed. And so that's where most of my research is focused. I've looked at it

through the lens of just how newly-founded companies -- that could be high-growth startups, but it could also just be mom-and-pop shops on the corner, that kind of thing, how they access capital in order to start their business. And I've also done a lot of work that has studied the returns that investors get when they invest in venture capital and private equity. So kind of both sides of the market, sort of. In one sense, you know, one is, like, who is raising, who is getting, who is receiving the capital, and the other is who is putting capital into the market and what are their -- what do they get, you know, in return.

Q And since you've mentioned University of Chicago, I'll just put a semicolon here and just ask you briefly about your education.

Where did you do your undergraduate work?

A So this is not always easy to say for someone at Duke University, but I went to the University of North Carolina -- big basketball rivalry. I went to the University of North Carolina for my undergrad, and I double majored in English Lit and Economics, and I was much better at Economics than I was English. And so I went from there to the London School of Economics.

Q And what did you school at the London School of Economics?

A Well, pretty much everybody studies economics at the

London School of Economics. I studied -- they have different branches of economics that you can study. You know, some people do economic history, some people do econometrics and stuff, but I did just standard, you know, just economics.
Q Did you receive a degree from the London School of Economics?
A I received a master's degree from the London School of Economics.
Q And did you write a thesis paper for the London School of Economics?
A No, sir. At the London School of Economics, the master's degree that I earned was just -- it was just coursework. There was no thesis involved. It's basically -- basically, what you do is it's, like, doing sort of the first year of a PhD.
Q After finishing at the London School of Economics, where did you go?
A Well, I worked for a few years as a computer programmer in a public health economics research unit.
Q What was the name of the --
A Well, it was at the University of North Carolina. It was called a population -- it was called the Carolina Population Center. They studied questions, like, you know, after the collapse of the Soviet Union, what happened to

peoples' nutritions and how is that connected to, you know, their economic circumstances, and stuff. I did that for a few years and I went back to the University of Chicago to continue pursuing my PhD.
Q And at -- did you receive a PhD from the University of Chicago?
A I did, indeed. I did, indeed. I have two degrees from the University of Chicago. I have a PhD and I have a MBA, a master's of business.
Q Now, with respect to the PhD, did you write a dissertation?
A Yes. Yes, I did. You have to.
Q And what was your dissertation on?
A So my dissertation was called strategic alliances in the boundaries of a firm, and what it was about, it was trying to understand why big companies a lot of the time will form partnerships with small upstart young companies in order to do certain types of research. So for example, like, in the biotech space, a lot of the big biotech companies, they have substantial research and development that takes place in-house, and yet, they still spend millions and millions of dollars writing strategic alliances agreements with startup companies. These startup companies might be -- it might be, you know, a professor of genetics at some university and his research team, they go out and

form a company because they've got some idea, and they get funding from the big biotech company. And so what I tried to understand in my dissertation was why does a giant company like Eli Lilly or whatever, they have hundreds of millions of dollars of research budget, why do they find the need to write -- to go find this upstart in order to pursue research in that area.

And the answer that I came to was basically that startups have really strong incentives, people, you know, it's like -- inside a mature large company, the hierarchies kind of prevent people from being innovative. And so the big company contracts with the small companies that they basically, you know, rent the innovation, if you will. They can't be as innovative in-house as the small startup is, and so -- but they need what the startup does. And so -- and so that's -- the long and the short of it is that's basically what my research showed.

That that got me interested in understanding how startups were financed, because these companies were getting money from large incumbent organizations that would otherwise be their competitors in certain markets. And so it kind of fascinated me to understand, like, how does the startup financing landscape really work if they're, like, biotech startups that are getting money from large pharmaceutical firms in addition to raising venture capital.

And that kind of got my started down this road of trying to understand the entrepreneurial finance better and private equity and venture capital.
Q I'm sorry, I --
A I didn't mean to interrupt.
Q And you also menaced while at University of Chicago, you took an MBA degree?
A Yes, sir.
Q And that stands for master of business administration?
A Correct.
Q And why did you decide to take an MBA in addition to the PhD?
A Well, the University of Chicago was very generous to its PhD students, and it allowed you to earn this degree, you know, at the same time as earning the PhD. And you know, you were talking about tenure earlier. I mean, I kind of thought it would be good -- this MBA degree would be a great degree to learn about the practical side of business and stuff, and I thought that would be a good thing to have. I thought if I'm -- at the time, what I thought was, if I'm successful as a professor, I'm going to need to go into the classroom and teach people who are earning MBAs, and will help me relate to them if I have and MBA myself. And I thought, well, then if I'm unsuccessful, then I'll have an MBA from the University of Chicago, which is not such a bad

thing.
Q All right. I'm going to bring you back to where we took the brief pause. This is you as a tenured professor at Duke. In addition to teaching entrepreneurial finance, I would like you to say a word or two about your academic research.
In addition to teaching, can you tell the ladies and gentlemen of the jury what your research agenda is?
A Yeah. So my research agenda for many years has been to try to understand how capital markets -- so how venture capital, how bank financing, how strategic alliances, how that affects entrepreneurship, how it affects startups' ability to grow, how it affects the types of startups that we have, how it affects the growth trajectories that startups experience. So that's, in broad strokes, kind of what my research has been about.
Q And have you authored any scholarship in this area?
A Yes. I have.
Q And without -- I know the list is very long. You don't have to go through all of this.
Just give the jury an example of some of your scholarship in the area.
A Sure. So I had a -- I had a paper in -- I can't remember when. I think I published it in 2007 or 2008 or so, where we were interested in understanding the how --

like, what makes someone want to be an entrepreneur in the first place. And so we used a large-scale survey dataset called the Survey of Consumer Finances which is this nationally representative survey. And basically, we used it and we developed measures that allowed us to see how optimistic people were and how, you know, how risk averse people were, and we used it to show that basically people who are entrepreneurs, people who are self-employed are more optimistic than those who are not. They're more -- they're more willing to take risk than those who are not. That would be one example in the entrepreneurship side.

I did some work with the Kauffman Foundation. The Kauffman Foundation is a large philanthropic organization that supports -- that used to support research and entrepreneurship. And I worked with them to create this thing called the Kauffman Firm Survey where, basically, what they did is they went out and identified a bunch of firms that started in a particular year, 2004 was the year. And they followed these firms for, I think, eight or 10 years after that. And they looked at their -- they looked at their growth. They looked at their growth in terms of employees, in terms of profitability, in terms of various other things, and they also looked at where they got capital from. And one of the things that we found in that paper was that startups rely very heavily on bank financing. And that

was kind of a surprise to people at the time because you'd think about -- you think about startups and it's easy to confuse startups and small businesses. And we kind of understand that small businesses rely on bank financing. But what that paper showed is that firms use bank financing in order to launch the business. So in other words, a new firm relies on bank financing, not just an old small firm.

Q And here --

A I can go on for hours, but I probably should stop there.

Q We will not ask you to go on for hours about that.

As interesting as it is, can you give us a -- just an order of magnitude, you may or may not know the precise number, but how many articles and book chapters have you authored?

A I think around 40. I forget the exact number.

THE COURT: You teach venture capital and private equity related subjects, right?

THE WITNESS: That's correct.

THE COURT: And also that your research interests include venture capital and private equity?

THE WITNESS: That's correct.

THE COURT: What is the difference between venture capital and private equity?

THE WITNESS: That's a good question.

So private equity is an umbrella term that captures venture investors, venture investors or people who invest in early-stage high-growth firms. Private equity is a broader term than that and it includes venture capital, but it also includes people who make private equity investment -- people who make private investments in later-stage companies. Sometimes we call them LBOs, leverage buyouts.

And so the mechanics are a little bit different, but by in large, the similarity is that buyout firms are like venture capital firms in that quite often, they raise capital from outside investors, and they invest in companies. The difference is that venture capital investors invest in young high-growth companies, buyout firms tend to invest in older more mature companies. Generally, what a buyout investor is trying to do is turn around a company that's may be kind of going sideways, or kind of on the decline. Whereas, what a venture refer is trying to do is invest in a company and help it grow.

So in a sense, a buyout investor and a venture investor, they're both sort of activist investors. They take -- they purchase equity in a company and they do so with the intention of making changes in the company helping it grow. But buyout firms target older more mature companies, venture investors target young high-growth

companies. And we kind of use the term private equity as an umbrella term that encompasses that.

The term private equity has gotten quite confusing over the last few years as the private equity industry has matured -- grown and matured. You know, we now have publicly traded private equity firms, as weird as that is to say. We also have private equity firms that specialize in providing credit, debt, to firms. But we typically use the word private equity as a big umbrella term to kind of capture these different investment strategies that are -- that are taking place in the private firm space.

Did that answer your question, sir?

THE COURT: It did. Please continue.

MR. SULLIVAN: Thank you, Your Honor.

BY MR. SULLIVAN:

Q And just a couple more questions on this -- in this area.

Have you had an opportunity to do any sort of policy-related testimony in this area of entrepreneurial finance?

A I have, yeah. I appeared before a House subcommittee on the small -- you know, overseeing the Small Business Administration. So the Small Business Administration, as you know, is sort of the branch of Government that works to -- works with small business, sets policy for small

business. They have, for example, they support small business investment companies. So these would be, like, small private equity organizations that receive government funding in addition to private funding in order to make investments in companies. And so because of my background and my expertise, the committee wanted me to speak about just sort of about the small business -- some of their investment programs that they've done.

Q And at Duke, are you faculty director of any programs?

A So we have -- at Duke, we decided that -- this has been 10 or 12 years ago, we decided that we had a lot of great ideas that were being created at Duke. We were getting lots of patents and things like that. But there weren't enough startups. We were good at licensing patents to big firms, but we weren't good at taking ideas that were coming out of the lab or out of the law school or out of policy school or whatever and creating businesses out of that.

So we developed this thing called the Innovation and Entrepreneurship Initiative, and the purpose of that was to work with students and work with faculty members who have innovative ideas that didn't necessarily lend themselves well to being sold off to large corporations. Instead, we tried to help them build businesses with it. And so I was a research director of that. I like it say that, you know, part of what we did at the Innovation and Entrepreneurship

Initiative was the commercialization of science, and what I did was the science of commercialization.

In other words, I tried to help people think about how to study these processes so that we could do a better job of it. And so I did that for many years and that initiative used to be run kind of centrally at Duke University and it's since been pulled into the business school.

Q Now, I'm going to ask you about your professional service.

Do you engage in any professional service in this area of entrepreneurial finance?

A I do. There's an organization called the National Bureau of Economic Research. You might have heard that name whenever there's a recession, like, the NBR has announced that there's a recession. The National Bureau of Economic Research is actually -- it's a large organization of researchers who study different aspects of the American economy or the global economy, for that matter. And I'm part of that organization and I'm the director of what's called the entrepreneurship working group which is a collection of about 150 scholars who they come from different backgrounds, economics, sociology, business strategy, management, but they're all interested in understanding the startup process and various aspects of it.

So I'm the director of the entrepreneurship working group and so my job there is to kind of cultivate and sort of -- I don't know -- maybe shepherd is the word you could use, research in this area and I do that both with faculty members at universities across the world, but I also run a program where we teach PhD students who are coming out of economics programs, business schools, where we teach them the tools that they need in order to be scholars in this area, because there are very few universities that have enough faculty that are specialists in this one area to really help someone get the tools that they need. So we kind of bring experts from across the country together and run a PhD training program there. That's something I'm --I've really enjoyed -- that's part of my service I've really enjoyed quite a lot.

Q Are you a member of any editorial boards of journals, specifically, related to the area of entrepreneurial finance?

A I'm currently an associate editor at the Journal of Finance, which is the top academic journal in financial economics. And that -- but that's a broad economic -- that's a broad journal that would include people who are interested in asset pricing, and you know, lots of different other things.

I'm on the editorial board of journal called the

Journal of Entrepreneurial Finance which is more closely specialized to questions related to entrepreneurship, as you could imagine. And in the past, I've served in an editorial capacity at other journals.

Q And what does referee service in your field mean?

A Referee service -- so when you hear the term peer-reviewed, sometimes you'll hear that a piece of scientific research was peer-reviewed. What peer-reviewed means is they send it out to other people who are experts in the area who were not affiliated with doing the work, and those people evaluate the scientific merit of the study, and they call you a referee if you do that. It's thankless work because it's often -- you know, often it takes quite a lot of effort and you remain anonymous through the process because they -- you know, the scientific process is based on anonymous peer review.

Q And I take it, Professor Robinson, since you said it's thankless work that you have been a referee in these peer review --

A I have been a referee many, many times, and as an associate editor at a journal, one of my jobs is to find referees for work that comes across my plate. You know, you complete a scientific study in economics and you send it to a journal for -- hoping that they'll publish it, and that the journal editors take the paper and try to find referees

who can judge its scientific merit, and then the referees provide an analysis of the research, and as an editor, you make a decision about whether the papers' published or not. Journals only publish about, you know, 10 percent of the papers they receive, maybe less than that. So it's a -- it's a brutal business.
Q Have you received any awards in your area of scholarship?
A I received an honorary PhD from the Stockholm School of Economics with whom I've had a long affiliation. That's maybe the award that I'm most proud of. But I've got other awards. I received an award a few years ago for some work that I did looking at minority startups and over the years, I've received different awards for research and for teaching.
Q And what's the Swedish House of Finance?
A So the Swedish House of Finance is -- it's an organization that was created to stand alongside the Stockholm School of Economics. The Stockholm School of Economics is, as you imagine, you know, a school in Stockholm and Stockholm is kind of, you know, one of the capital markets centers in the Nordic region in Scandinavia, and what they wanted to do is create an organization where practitioners, private equity investors, investment bankers and stuff were more closely connected to the school so that

they could provide, you know, better training to their students, and so that they could have sort of a more -- a richer dialogue between academics and people actually working in practice. It's a -- they created this things called the Swedish House of Finance.

(Continued on the following page.)

BY MR. SULLIVAN (continuing):
Q And what's your relationship with the Swedish of Finance?
A I'm one of the scientific advisors for the Swedish House of Finance.
Q Just ballpark number, in the last 10 years or so, have you been invited to speak to -- at schools or other financial organizations on the topic of entrepreneurial finance?
A I have and it would be hard for me to say off the top of my head, but like over the last 10 years, probably between 10 and 20 schools, maybe more. So what happens is universities, they bring in outside experts to talk about -- at Duke, we have an active seminar series, lots of universities do, and you get invited to present your research at places. So over the last decade or so, I've gone to MIT, Stanford, you know, other places, Columbia, and presented research related to entrepreneurial finance.
Q Have you had an opportunity to review materials related to OZY Media?
A I have.
Q Can you give the jury just a sense of what you have looked at in preparation for your testimony today?
A So I've looked at -- I've looked at some of the materials that they use to pitch to investors. I've looked

at some of the investment memoranda that investors prepared in order to think about, you know, to evaluate an investment in OZY. I've -- I've looked at, you know, various other internal documents related to the business.

Q Have you reached any conclusions with respect to OZY Media?

A What do you mean, specifically?

Q Well, we'll talk about specific conclusions later, but --

A Oh --

Q -- have you reached conclusions as a basis --

A Yes.

Q -- based upon your review --

A Yes, I have.

MR. SULLIVAN: At this point, Your Honor, we would tender Dr. Robinson as an expert in the area of entrepreneurial finance.

THE COURT: I do not qualify witnesses as experts, but the witness may give testimony pursuant to Rule 702.

MR. SULLIVAN: Very well.

Q All right, so now we're going to talk specifically about OZY Media. Can you describe to the jury, based on your review, what OZY Media is or was?

MS. KASSNER: Objection, Your Honor.

THE COURT: Overruled.

A So my understanding of OZY Media is that it was a media startup. It was a new media business that was trying to approach the news in a different way than other businesses that were already operating?

Q Have you --

THE COURT: You can ask the question.

MR. SULLIVAN: I'm sorry?

THE COURT: Please continue.

Q Have you done any research with respect to what investors consider when making a decision to invest in startups?

A I'm familiar with research in this area, yes.

THE COURT: The question was: Have you done any research yourself on that subject?

THE WITNESS: Yes, I have.

Q And I'll ask the followup question.

And are you familiar with scholarship in the field on that question?

A I am.

Q Have you reviewed any empirical studies that relate to investor -- what investors find important in investing in early-stage companies or startups?

A I have, yes.

Q So let's start there. So based on your research, your own scholarship and the scholarship that you have reviewed,

what is the most important factor that investors look at when making a decision to invest?
A So there was a survey done a few years ago, and they surveyed, I think, 500 or so firms that did venture investing. And they asked them, you know, a variety of questions and they asked them to rank the factors that were, you know, most important in order of importance. And the most important factor was the team, the people behind the idea. In other words, you know, who were the founders, what were their characteristics. Team was most important.
I think maybe business model was the second most important factor. So business model would be, for example, like what's your strategy for, you know, how you're operating.
Q So let me just stop you there, and go back to team for a second.
Can you tell the ladies and gentlemen of the jury what is it about the nature of a team that these investors found important, such that it was ranked first?
A Investors understand that in -- in the context of making investments in early-stage companies, there's a tremendous amount of uncertainty. There's uncertainty around what the nature of the financial product will look like, there's uncertainty around whether there will be acceptance of that product. There's uncertainty around even

if the product is accepted in the market, can it be produced and sold at a scale that would make it worth doing. And, you know, and so there's so much uncertainty around other factors that when you -- you know, when you talk to investors, they say, we invest in people, because they understand that the founder, the team that's responsible for the business, it's -- you know, it's all inside their head, you're -- you're investing in their thoughts and you're investing in their labor.

THE COURT: Sorry, this is what the study showed or this is your gloss on the study? I think the question was what did the study find about why investors expressed preferences they expressed. Is this theme that you are describing reflected in the study?

THE WITNESS: So there's -- there's several studies in this area. And I'm thinking of one, in particular, that describes -- that describes this, it describes how investors evaluate the team first. And if they -- if they -- they may make a decision not to invest in the team, potentially because of, you know, the fit of the team with their -- with their -- I'm not making myself clear, here.

THE COURT: What's the study that you are describing? Is that the same survey you were talking about earlier or is it a different one?

THE WITNESS: No. It's not the same survey. It's a different survey. Kaplan and Stromberg.

THE COURT: Okay, sorry, let's have the next question. I just want to understand what the context was.

BY MR. SULLIVAN:

Q So team, second business model. What is a business model?

A So a business model is -- is basically an operating plan. It's -- it's -- it's what your product is and it's how you plan to create it and put it into the market.

Q And then what were some of the other factors that businesses or investors, I'm sorry, consider?

A So -- so the number one was team. Number two was, I believe, business model. Number three was product, if I recall. I might have this reversed. Team, business model, product, market, and -- and so -- and by market, one of the things that you're concerned about is what's the size of the market, is it a large market, is it -- you know -- is it a -- is it a big opportunity. And then I think the number five was valuation.

Q Okay.

A I can't remember beyond five.

Q And that's fine.

Product. Tell the jury what product is, what you mean by "product."

A So product is the good or the service that you're putting into the market. So in the case of OZY Media, it would have been the -- you know, the TV shows and the podcasts and the -- and the e-mail -- you know, the newsletters and stuff like that, the shows, the -- the events in -- in Central Park.
Q And what would be the market considerations, specifically with respect to OZY Media?
A So when you think about market, you know, specifically with respect to OZY Media, you're thinking about the -- you know, the market for news. And so you'd think, you know, sort of -- you'd think about the market for news and you'd think about the market for -- for content, stuff that you see, you know, on TV. And so those would be the relevant markets that you'd be thinking about. You'd be thinking about like what's the -- what's the -- what's the content market look like for these different distribution channels, television, Podcast, whatever. And then you'd be thinking about, like what's the overall media market look like.
Q And then you said five was valuation.
What's valuation?
A So when -- when an investor is contemplating making an investment in a company, they're going to provide capital to this company and provide, you know, cash to this company. And in exchange, they're going to basically take a

percentage ownership of the company. And so in order to determine that -- that, you basically do a valuation.

So for example, if I tell you that I'm going to give you a million dollars for your business, but I'm going to take 10 percent of your company, I've basically valued your company at $10 million, because I -- I own 10 percent of it and I gave you a million dollars for that.

So that is the sort of the outcome of the valuation process. And so the question is: How do I arrive at that number? I'm -- you want a million dollars for your business. How do I know whether to give you 10 -- how do I know whether to ask for 10 percent or 20 percent or 30 percent or whatever? And -- and -- and that's the process of valuation. So basically, what you're doing is you're looking at the company's projected growth in the future. You're saying what's this company doing going forward, what do I think's going to happen to this company going forward. And based on that, you kind of figure out how much do I -- how much of this do I need to earn today -- how much of this do I need to own today in order to generate a certain return over the next, you know, let's say five years.

Q And why is valuation, the money, relatively lower on the list of investor concerns as compared to, say, team, which is number one?

A So --

THE COURT: Sorry, the question is what did the study find about why that was, or what does the professor think about why that was?

Q What you think based on the -- your own research, the scholarship that you've reviewed, and -- but limit it to the material that you reviewed for this case.

A So in the -- you know, in the process of teaching venture capital and private equity for 20 some years, I have had a chance to speak with many venture investors. The reason why valuation is low down on the list is because most ideas fail. You're looking at a problem where you have a very low probability of a gigantic outcome. And so the valuation is -- there's so much uncertainty around it that it ends up being de-prioritized relative to other things about the business, specifically, the team.

So to give you an example, here, about 65 percent of venture investments lose money. When you talk to venture investors, there's a common rule of thumb, one-third, one-third, one-third. A third of the investments that you make, complete write-offs, zero. A third of the investments that you make, lose money. You make everything on that final third. And sort of the difference between being good and being great is, what is that third that actually makes money, do you hit home runs or do you hit triples, to use a

baseball metaphor.

So the reason why valuations are being de-prioritized is because you're operating in an environment where there's a very high probability of losing a lot, but in this state of the world where things work out, it's completely transformative. And so really -- you're betting on the transformative nature of the product, in the company. You're betting on the entrepreneur's vision. And these bets go -- I mean, they go horribly wrong in both directions.

One of the things that I love to show my students is the Bessemer Ventures, what they call the Anti-Portfolio. So Bessemer Ventures is a -- is a very well-respected venture investor. And they quite -- with a good deal of humility, publicize investments that they passed on. They said no to investing at Apple, in Apple, when the valuation on Apple was $60 million. Apple's the second largest company in the world and it's worth about three-and-a-quarter trillion dollars today. So they just got it completely wrong.

Maybe you've heard of this company, Square. They're the people that make the -- you know, like, if you go to a market or someplace, somebody pulls out their phone and they clip the little white thing into it so that they can swipe your credit card. They do that technology as well as like other point-of-sale-type stuff. There's a legendary

angel investor named Vinod Khosla who wrote a $10 million check in the very early stages to fund this company, Square. He bought shares that had an implied price of $0.22 a share. The company IPO'd at $12 a share. So his $10 million investment became a $650 million payday.

So you're -- you're -- you're trying to find needles in haystacks. And most of the time, you reach in, you don't pull out anything, but occasionally, you shoot the moon.

And this -- you know, in statistics, we call this skewness, where, you know, you have a small probability of a really crazy thing happening and that kind of drives everything. And the venture investment space and the entrepreneurship space is a place that's fraught with skewness. And because of that, you tend to de-prioritize valuation because if I'm -- just imagine, like, you know, if I take -- if I have a 50 percent chance of winning $10 and a 50 percent chance of losing everything, 50 percent times 10 plus 50 percent times zero is five. Easy.

What if you got a one-in-five-million chance of making a trillion? The math just gets -- there's so much uncertainty around that, that valuation just isn't as important as the other factors.

Q I'm going to ask you a couple questions about the relationship between cash and revenue in this startup space.

Now, have you ever heard of the term, "cash crunch" in relation to startups?
A Yes.
Q And what do you understand that to mean?
A So startups are companies that are --
MS. KASSNER: Objection, objection, Your Honor.
THE COURT: Let's come to the sidebar for just a moment, please.
(Sidebar.)
(Continued on the following page.)

(Sidebar conference held on the record out of the hearing of the jury.)

THE COURT: What's the objection?

MS. KASSNER: It's not noticed in any of the disclosures, a cash crunch of startups. It's not been disclosed ever.

MR. SIEGEL: The relationship between cash and revenue.

THE COURT: He did discuss the relationship between cash and revenue in the second submission.

MS. KASSNER: That's cash flow projections, Your Honor. Either way, the cash crunch of startups is entirely absent from every disclosure.

THE COURT: So what is the topic, here? Where is it disclosed?

MR. SULLIVAN: I think you are right, in the second submission. I can use a different term if "cash crunch" bothers people, but I just don't think there's a disclosure rule that says I've got -- every term of art in this field, he has to, you know, pre-provide definitions. I can -- I can ground the question in revenue.

THE COURT: He's got the disclosure about how 31 percent of early-stage VC's report, that they do not report cash flows.

MS. KASSNER: That's forecasting. That doesn't

have to do with the cash constraints.

THE COURT: I don't know where this is going, but that's why I'm asking what part of the disclosures are we tacking towards?

MR. SULLIVAN: Yes, so this general relationship between how a startup or how investors understand cash projections of startups is where I'm going to.

THE COURT: Okay. You are going to rephrase this.

MR. SULLIVAN: I mean, we use -- the term "cash crunch" has come up in trial. I just thought it was useful shorthand to orient the jury, but I can do it a longer way, that's fine, too.

THE COURT: Okay.

(Sidebar conference ends.)

(Continued on following page.)

(In open court.)

THE COURT: All right. Mr. Sullivan, let's please repose, rephrase the question.

BY MR. SULLIVAN:

Q Sorry, Professor Robinson. So what's a -- I'm not going to refer to cash crunch, so just withdraw that.

What is a cash flow projection in a startup?

A So if you are investing in a business, you care about cash flow, what we call free cash flow in finance. And free cash flow captures a couple of different things. So one of the things that cash flow captures is how much cash do you generate from your operations? But then if you have a growth plan in place, you have to spend money on things like CapEx, you have to spend money on --

Q What's CapEx?

A I'm sorry, I'm sorry. Capital expenditure. So for example, like, let's say -- I worked in a pizza restaurant in college, so let's use pizza. Suppose I got a pizza restaurant and it's doing well and I'm making profits selling slices of pizza at my pizza restaurant, but I want to grow. So what is my free cash flow or what are my free cash flow projections? So I say, well, here's the operating profits that I'm making from this pizza place that I've got, but I know that if I'm going to open two new pizza places every year, I've got to have money -- I've got to have

additional money to, you know, for the leases, for the ovens, for all of those other things. And we tend to kind of, loosely speaking, like lump that in as kind of capital expenditures. So that's building new -- building new assets that you operate, right? So capital -- so -- so going back to the question, like what is free cash flow. The operating profits that you make from what you're doing today is one component of that, but then another component of that is the -- the money that you need in order to meet your -- your growth plans. And so that's -- the two big items there are capital expenditure, sort of procuring the assets that you need to -- to operate. And also all of the things like additional inventory and so forth. It's what -- we call that working capital, just the, you know, like the -- the inventory and the -- those type things that you have on hand.
Q And now, to shift the lens from the perspective of a prospective investor in a startup, what are the sort of important considerations with respect to, I think you said, free cash or working capital? What are the -- what are the important considerations there?
A You're asking from -- through the lens of the investor?
Q The lens of the investor.
A So you know, the entrepreneur has a business plan and, and that business plan has growth projections. And

typically what happens is early on in the company's life, because it's growing rapidly, it's consuming more cash than it generates in operations. And that's because of like the capital expenditure and the working capital needs that it has, as it's growing, it's got to -- it's got to build the stuff today even though it's not going to necessarily generate profits from that until down the road. And so that creates a cash, you know, shortfall in many businesses that are trying to grow rapidly.

Q So --

A And the speed -- I'm sorry.

Q No, please, go ahead. Finish your thought.

A No. So the speed -- the more rapidly and the more ambitiously you grow, the more cash you need. And so it's kind of a -- it's kind of the world of entrepreneurial finance is a little different than the world of mature companies. A mature company that's not growing, that's kind of doing the same every year, if it hits a cash crunch, that's probably an indication that it's losing, you know, it's losing customers, it's losing -- it's losing traffic. Its costs are the same, but its money it's bringing in is lower. That's in a mature business, a stable business. And you think of that as a bad thing, right? They're -- they're going downhill.

But in a startup, it's often that -- it's often

the -- the best startups are the ones that are in most need of cash because they're the ones that are growing the most rapidly, the most ambitiously.
Q So to sort of play this idea out, let's assume that a businessperson opens a lemonade stand on the street corner. Let's further assume that it's -- the community thinks this is the best lemonade in the neighborhood.
A In Brooklyn?
Q Best lemonade in Brooklyn. And let's further assume that that one lemonade stand makes a profit.
A Yeah.
Q Now, if the entrepreneur wants to grow, say, five lemonade stands because the demand is greater, in just simple terms, about lemonade and lemons and what not, what sort of implications on the cash position would this expansion have?
A The expansion would cause you --
MS. KASSNER: Objection, Your Honor.
THE COURT: You can answer this question.
Q You may answer.
A So -- so your question was how would the expansion impact the cash that the company had?
Q Correct.
A So if I go from having one lemonade stand, let's say, I make a hundred dollars in profit. And let's say it costs,

you know, $200 to build a new lemonade stand. And I've also got to buy the lemons and the sugar, all that, get the permit for the water. So I've got a hundred dollars in profit, but every lemonade stand that I want to build is going to cost me $200. Well, you can see right away that I would -- if I was trying to grow, the faster I was trying to grow, the more cash I would need because today, starting with one lemonade stand, I've got a hundred dollars of profit that I'm making. Every lemonade stand that I want to add is going to cost me 200. So if I want to add one lemonade stand, I'm short a hundred dollars, I've got a hundred dollars; I need 200.

If I want to make 10 lemonade stands, I want to grow really rapidly, well, that's $2,000 in expenses I'm going to have to put down today before I start earning money from these lemonade stands. $2,000. I've only got a hundred. I need 1900. So the more -- as you can see, you know, like the more ambitiously my -- I grow, the more cash infusion that -- that I need.

Now, sort of the maintained assumption here is that these lemonade stands are making a hundred dollars in profit, right? So once I -- once I get the lemonade stand up and going, it's going to make money for me. It's just, I need the money now in order to build these things, get these things going. And then once they're up and going, then, you

know, maybe my ideal size is a 10-location size. Maybe once I have 10 lemonade stands, I'm kind of done growing, I just, you know, every day's like the day before. Well, then the business becomes highly profitable because suddenly I've got 10 lemonade stands each making a hundred dollars. And, you know, then my cash -- then my cash shortfall, my cash -- immediately cash needs go away, because my growth has stabilized.

From that point forward, I just -- you know, like inflation, I raise prices, whatever, prices go up, I pay more people, whatever, but I'm not -- I'm not consuming cash in order to continue growing.

The problem with -- the problem with --

THE COURT: Why don't we have another question? I think we're fairly far afield from the last question at this point.

Q So now in reviewing OZY's growth, specifically, have you reached any conclusions with respect to the way OZY's growth --

MS. KASSNER: Objection.

THE COURT: Let's hear the question first and then -- so can you finish the question?

MR. SULLIVAN: Yes.

Q -- the way OZY's growth may or may not have been -- may or may not have impacted its cash position?

MS. KASSNER: Objection.

THE COURT: All right. Let's take a five- to 10-minute break here, our first of the morning. We're going to try to be back with the jury before 11:15.

(Jury exits.)

(Witness steps down.)

THE COURT: All right. What's the objection?

Please be seated, everyone.

MS. KASSNER: Your Honor, there are no opinions about OZY Media as a company that have been disclosed in any expert disclosure that this Court has not precluded.

THE COURT: Where is this going?

MR. SULLIVAN: I was going to ask him to contextualize the imagery, the analogy he just made to OZY. He's testified that he's looked at OZY, his entire disclosure is about the business of OZY.

THE COURT: It's really not. His entire disclosure is about the industry and how --

MR. SULLIVAN: Okay, fine.

THE COURT: -- venture investors --

MR. SULLIVAN: I won't ask him about OZY specifically, that's fine.

THE COURT: Okay. Then we'll be back here in five minutes. Thank you all.

(Recess taken.)

(Continuing.)

(In open court; jury not present.)

THE COURT: Can we get the witness back so we're ready to go?

(Witness resumes the stand.)

MR. SIEGEL: Before the jury comes in, you set the 11:00 deadline for attorney names for any hearing we're going to have.

THE COURT: Correct.

Do we have a name?

MR. SULLIVAN: I think we might have some representations that might obviate the need for live testimony with respect to Bates numbers.

THE COURT: We'll table that, then.

THE COURTROOM DEPUTY: All rise.

(Jury enters.)

(In open court; jury present.)

THE COURT: Please be seated, everyone.

Mr. Sullivan, please continue.

MR. SULLIVAN: Thank you, Your Honor.

BY MR. SULLIVAN:

Q And thank you, Professor Robinson. I don't have much longer here.

Let me just ask you a couple of questions about your role in this case, Professor Robinson.

Who hired you as an expert witness?
A You did.
Q And am I compensating you for your time in this case?
A Yes, sir.
Q Am I compensating you depending on what you say in this case?
A No.
Q What's your hourly rate?
A 900.
Q And how long have you been, roughly, working with the defense in this case?
A Probably 20, 30 hours. I'm not sure exactly.
Q Now, when I asked you am I compensating you for your time in this case versus what you say, can you give the jury some color --

THE COURT: Are we getting ahead of ourselves in the same way we had questions about bolstering in the prior case?

MR. SULLIVAN: No, that was with respect to a document.

THE COURT: All right. Please continue.
Q So what does that mean, your time in this case?
A So when I review material, when I prepare various disclosures that I provided to the Court, I keep track of how many hours that takes and I submit a bill to you for

that. And when I come here, I do the same.
Q And if you reached a conclusion that I don't like, can I tell you to change it?
THE COURT: Sustained.
THE WITNESS: I'm sorry?
THE COURT: I sustained an objection to that question. We'll have another question.
Q So let's move to a couple other questions.
You heard the term "pro forma" before?
A Yes, yes.
Q And what does pro forma mean?
A So pro forma means projection. It means you're looking forward, you're looking ahead. It means -- we use the word pro forma, they attach it to a business plan or the cash flows that are associated with a business plan, and it says these are the projected cash flows that we think we're going to experience under various assumptions about how our business model works.
Q And various assumptions, what might those assumptions be?
A Well, so, for example, let's say you've got a product or a service and you're offering it into the market. You know, an important thing would be how much -- how much do people like the product, how much market share do you capture, right? And so --

Q I'm sorry to keep cutting you off, but just so we can understand terms, what do you mean by market share?
A So market share is just the proportion of the -- of the relevant market that you capture. So, for example -- and market is this loose term that economists throw around a lot. For example, I could think about the sporting goods market, and that could be like basketballs and golf balls and golf clubs and running shoes and stuff. That could be a very broad market, and maybe I make specialized running shoes, and I might have a large fraction of the running shoe market, right, if I sold a lot of running shoes, if I was very popular amongst runners. That would be an example of, like, having high market share in a market.

And so, you know, when investors talk about business model and product and market, they're trying to understand, like, how big is this market and how much of that market are you likely to capture with your product.
Q Okay. Thank you. So you were telling us pro forma, and I'd asked you what are --
A Sure.
Q -- future, given some assumptions.

THE COURTROOM DEPUTY: Mic, please.

MR. SULLIVAN: My apologies.
Q You were answering what are examples of some assumptions that might be relevant in a pro forma financial

sheet. So you can continue there. And sorry for the interruption.
A Sure, no problem.
So you've got a business plan, a business model that you've written down into a business plan to communicate to investors, and you'd be making assumptions in that about, you know, for example, how much market share you were able to garner over a period of time. You might be making assumptions about how much it cost you to produce a product or what have you. That's what I mean when I say that, you know, under certain assumptions you would make a set of projections.
So, you know, you might be -- you might be making a -- you might have this idea for a product that requires a lot of assembly and requires you to obtain a very special material, and so your pro forma might say, well, if we could obtain this material at this cost and if our assembly costs are this, then we can sell it into the market, and if we get this much market share, this is what we expect our cash flows to be.
Q Let's switch lenses like we did before.
So from the lens of an investor, an investor sees a financial statement with the words "pro forma" on there. How does that investor read that financial statement?
A Well, the investor understands that they're looking at

the entrepreneur's projections of what the entrepreneur hopes to achieve. Sometimes, you know, you call -- sometimes when you're doing a valuation of the business, you'll refer to this as, like, the management case or the management projections. In other words, this is what the management of the -- this is what the founders are telling us they think things are going to look like. And so, you know, pro forma would indicate that.

Q Now, what about the term "unaudited," what does that mean? And that might be self-explanatory, but just to have you explain, what does "unaudited" mean?

A Okay. So if something's unaudited, then it's not been audited, obviously. So what does it mean, then, to audit something? Well, if you have your financials audited, what you do is you take them to an independent CPA, a certified public accountant, and they offer an external validation that the numbers were correctly prepared.

And so if you say "unaudited," it means that you haven't put the numbers through that process. So it means that no independent accountant has signed off that the numbers are, you know, square and, you know, so forth.

Q From the lens of an investor who looks at financial sheet and sees unaudited, what does that investor -- how does that investor read it?

A Well, the investor would just understand that they were

looking at numbers that hadn't been verified by an outside party. You know, that's what unaudited means. They would understand that they were looking at figures that could potentially be subject to revision or could potentially be wrong.
Q So -- I'm sorry. Please continue.
A No, that's just what unaudited means, you know. It means you need to understand that the numbers haven't gone through the scrubbing and the scrutiny that would occur if the numbers had been given to an outside party, a CPA, for them to sign off.
Q And once financial statements are audited, do they sometimes change?
A Sometimes financial statements have to be revised after the fact, even if they're audited.
Q What is GAAP?
A GAAP stands for generally accepted accounting principles. And basically what that is is a set of guidelines that have been created by I think the Financial Accounting Standards Board and the Government Accounting Standards Board. Just a set of rules governing how accounting is done, what certain things mean and don't mean.
GAAP accounting is sort of the gold standard -- so, in other words, if you had -- if you're a publicly-traded company let's say on the New York Stock

Exchange or NASDAQ or whatever, you have to have GAAP accounting.

Q Do you have to have GAAP accounting for startups?

A No.

Q Do startups usually employ GAAP accounting methods?

A Not to my knowledge. I think that, you know, it's expensive to hire external auditors, and many times, as I was saying earlier, there's a lot of uncertainty around the cash flows themselves. Investors are looking primarily at the team, primarily at the product, at the business plan --

MS. KASSNER: Objection, Your Honor.

THE COURT: Let's have another question.

Q Now, you mentioned earlier that startups have a very low probability of gigantic outcome. Did I state your earlier testimony correctly?

A I think you did. I mean, that's certainly the idea I was trying to get across.

Q Now, this gigantic outcome, the potential of a gigantic outcome. You also just used the word management case. Now, management case -- you said management case or management projection. Now, is that the --

Well, let me just ask you, from whose vantage point is the management case, management projection?

MS. KASSNER: Objection, Your Honor.

THE COURT: Overruled. Let's see where this is

going.

A The management projections are as it sounds. They're provided by management. So they -- you know, they reflect what the management's expectations of the business are.

THE COURT: You're talking about historical financials or revenue projections for other forward-looking financials?

THE WITNESS: Well, investors are primarily interested in forward-looking financials. So I want to make sure I understood your -- maybe I misunderstood the question here. We were talking about pro formas, which are projections of future cash flows.

THE COURT: Okay.

Q Absolutely.

So what's the management case in that scenario, forward-looking?

A Well, management, you know, they're excited about the idea. They're the entrepreneurs. They're the people behind it. They're the people who are pouring their, you know, blood and sweat into this thing, so they think it's going to go well.

So generally an investor looks at the management projections as sort of the top end of a range of potential outcomes, and investors would typically, you know, take that as the top number, come up with a way of -- sometimes we use

this jargon "apply a haircut," which sort of means how it sounds, you sort of cut their numbers down in various ways. You know, you might do that to develop a base case scenario and you might do that more aggressively, more severely in order to come up with, like, more of a downside scenario. If you're looking at it as an investor, you want to consider a range of potential outcomes when you're evaluating whether to make an investment or not.

Q So do investors accept the management case in terms of that being the base for their decision to invest?

A Not typically, no.

Q And you said the "base case." Is that the investor term?

A So the investor will make a base case evaluation of the company. So they'll take the pro formas that they receive from the entrepreneur and they say, okay, these show that you're growing at this rate, whatever, what have you, and they'll adjust those downward to something that they think is more conservative because they want to have -- they -- if they're going to make an investment, they want their return calculations to be based on more conservative numbers than necessarily the entrepreneur believes to be the case.

Q And did you review any examples in this case that support your conclusions here about management case and base case?

MS. KASSNER: Objection, Your Honor.

THE COURT: Come to the sidebar, please.

(Sidebar conference.)

(Continued on the following page.)

(Sidebar conference held outside the presence of the jury.)

THE COURT: So we're talking about forward-looking projections here.

MR. SULLIVAN: I was about to introduce the Goldman memo that he relied on and that's in his papers.

THE COURT: Okay. But is there anything in the indictment that anybody can point me to that accuses either defendant of misrepresentations in connection with forward-looking projections?

MR. SULLIVAN: It's been half their case, Your Honor.

THE COURT: That's not my question. By the way, I foreshadowed this.

MR. SIEGEL: Your Honor, this is one where we cite an example where they gave two different projections to people on similar dates. I don't know that that actually came in at trial.

THE COURT: Where is it? Point me to it or have somebody point me to it.

MS. GILBERT: They used the graph several times that had forward-looking projections.

MR. SIEGEL: Well, yes --

MS. KASSNER: We didn't question.

MR. SIEGEL: But we never asked investors what was

your -- I'm not going to get into that.

THE COURT: You're going to establish that Goldman came up with their own numbers in which they discounted --

MR. SULLIVAN: Yeah.

THE COURT: That's fine. But we're going to move on from this relatively quickly because of the relevance issue.

MR. SULLIVAN: It's my last area.

MR. SIEGEL: I guess our objection is having him given an opinion about what Goldman did in the investment memo which they said they were admitting to impeach the Goldman witnesses --

THE COURT: Right.

MR. SIEGEL: -- is not appropriate.

MR. SULLIVAN: You admitted it. Ms. Gilbert moved it in evidence.

MS. KASSNER: Your Honor, he can't speak to what the investors considered or how they viewed it --

THE COURT: What Goldman did is not relevant. Let's move on.

MR. SULLIVAN: At least let me make a record. He's testifying about what is going on in the minds of investors when they're making these investment decisions, and this is evidence of what is in the mind of a particular investor. He can't show -- they can say -- they can

cross-examine him on it, but it's his opinion based on --

THE COURT: Anything that comes in through Dr. Robinson would be hearsay. Experts are generally permitted to give hearsay testimony, but to the extent they're talking about literature in the industry or the things that he's here to testify about. He's not a fact witness here. He's not here to testify about Goldman's particular investment process.

I am going to sustain the objection and we'll move on.

MR. SIEGEL: This is paragraph 50-B, which relates to a deck or an email sent to Al Nahdha in 2020 that claims they're going to do 65 million in 2020, and the indictment says that they had in a short period of time around that --

THE COURT: So it was forward-looking, for very near future.

MR. SIEGEL: Yes. And again, I'm not sure if that particular email was admitted; I don't know. I don't remember focusing on that issue.

THE COURT: The objection is sustained.

(Sidebar ends.)

(Continued on the following page.)

(In open court; jury present.)
BY MR. SULLIVAN:
Q With apologies, Dr. Robinson. We were talking about management case and base case scenario.
In your work, your own scholarship and the scholarship that you had reviewed, are you aware of investors accepting at face value the management case, the case presented by the entrepreneur in their decision to invest?
A No, that's not typically how the due diligence process work.
Q What is due diligence?
A Due diligence is the, you know, doing your homework so to speak. The background work, the checking up on stuff that you do when you are evaluating whether to invest in a business.
Q And -- I'm sorry. Please continue.
A No, I was just going to give some kind of rough statistics here.
So, like, a venture capital investor on average might see 100 ideas for every idea that they invest in. But of those 100, they would probably only do due diligence on maybe -- I'm forgetting the number off the top of my head, but maybe 15 or 20. So most business ideas that they look at don't make it to the point of where you're actually going

to roll up your sleeves and, you know, talk to people and try and figure out, really do the homework of really understanding the investment thesis of the investment, and that's the due diligence process.

Q Now, why is it that investors do not accept the management case?

A They understand that management is optimistic and they need to invest based -- also understand that most venture investments fail. They don't generate -- they're not the success. So the entrepreneur shows you the successful scenario and you want the entrepreneur to succeed. It's not bad, it's just that you understand that the statistics are against you.

So you need to -- when you're making your investment decision, you need to evaluate, you need to say, okay, that's the successful scenario, let's look at less successful scenarios because, after all, we're trying to determine how much of an ownership stake in this company I need to take in order to be -- in order to earn the return that I need to earn over the next, say, five years or so. And I'm trying to earn a return knowing that most investments I make are going to fail.

So the successes have to be successful enough to compensate for the failures that I earn along the way. And as a result, when I'm looking at a particular investment, I

want to make sure I'm not investing based on that, you know, successful scenario, but I'm folding in scenarios that are less optimistic.

Q Now, how mechanically do investors come up with a base case? In other words, is there a factor number? Explain to us how they come up with this base case.

MS. KASSNER: Objection, Your Honor.

THE COURT: There is an objection.

The objection is sustained.

Q Is a base case typically less than the management case?

A Always.

MS. KASSNER: Objection, Your Honor.

THE COURT: Sustained.

MS. KASSNER: I move to strike.

THE COURT: Yes, the motion is granted.

Come to the sidebar for a moment.

(Sidebar conference.)

(Continued on the following page.)

(Sidebar conference held outside the presence of the jury.)

THE COURT: I can't remember where I said this, but I did foreshadow this I think rather clearly that I wasn't going to categorically exclude all his testimony about forward-looking projections and the extent to which they're taking it with a grain of salt, but I said that the relevance would be minimal, perhaps, at best, given that this is not a case about misstatements in connection with forward-looking projections. We're just totally untethered from the allegations in this case here. It's not relevant and --

MR. SULLIVAN: Then I move to strike all the testimony that the Government elicited about forward-looking projections. There were several instances.

THE COURT: Please lower your voice.

MR. SULLIVAN: There were several instances where they elicited information about what was going forward and looked at these graphs; would you -- and Your Honor will remember -- would you rely on this, well, it's near the fourth quarter, so I think that future number should be within a million dollars, one witness said. I --

THE COURT: But you're not needing that testimony here. You're just talking about forward-looking projections generally. Obviously there's a very significant difference

between a statement about next quarter, where the picture may not have resolved completely but it is well within view on the one hand, and forward-looking projections about revenues three or four years down the line on the other hand. If you want to ask him about next quarter projections, you can do that.

MR. SULLIVAN: It wasn't limited to next quarter projections.

THE COURT: I don't remember anything beyond that.

MR. SULLIVAN: I'm going to move to strike the testimony --

THE COURT: Show me the testimony. I may well accept your motion to strike.

(Sidebar ends.)

(Continued on the following page.)

(In open court; jury present.)

BY MR. SULLIVAN: (Continuing.)

Q So let's pick up on, this is all grounded in forward-looking projections.

A That's correct.

Q Pro forma.

A Correct.

Q Let's assume that a company provides a deck, and we're in Q2 or Q3 and they project some future number for the end of that fiscal year.

In the investor decision, do they actually rely on that number provided by the investor, or do they, I think you used the term "haircut," give haircuts to those numbers?

MS. KASSNER: Objection.

THE COURT: Overruled.

But I do want to clarify the question a little bit. Let me say how I understand it, but then you'll get another question from Mr. Sullivan ultimately.

I understand the question to be framed by reference to a future accounting period, but a very near future accounting period, such as if we're in Q3, maybe towards the end of Q3, and the company is making a statement to one or more investors about what it expects either in that quarter that hasn't quite finished yet or perhaps the next quarter. That's what I understand the context to be.

With that, Mr. Sullivan will either correct me if I'm wrong or pose the question given that context.

MR. SULLIVAN: That's fine.

BY MR. SULLIVAN:

Q What the Judge said, do you consider that the management case?

A So that would be the management case. The management would be telling you -- I'm going to try to use your framing correctly here -- you know, we expect Q4 to look like this, you know, that's -- we're standing here in August and that's December, whatever, near term.

But you wouldn't make your investment decision based on that number alone. You would be -- you're interested in where the company's going to be five years from now, not next quarter.

THE COURT: Well, we're talking about two different things here and I want to be --

THE WITNESS: I apologize.

THE COURT: So one is whether you'd make your investment decision on that or not. The other is whether you haircut it in your own expectations. You talked about projections from management being haircut. Would your testimony about haircutting change at all, and if so, how? To the extent we're talking about forward-looking projections, yes, but very near-term, forward-looking

projections such as even the current the quarter which hasn't closed yet, but which we're in the middle of.

THE WITNESS: I mean, I think it would be very natural to assume that near term numbers are more certain than further away numbers. No question about that.

THE COURT: All things being equal.

THE WITNESS: All things being equal, yeah, exactly.

THE COURT: Okay.

I'm sorry to have interrupted you.

BY MR. SULLIVAN:

Q And it's in the all things being equal that I'm asking the question. Are there assumptions that are built into these near-term future projections based on your scholarship and your research?

A Well, I mean, typically you're assuming things are going to -- you know, deals that are live are going to close and you're making statements about -- you know, under the assumption that they're going to close.

Q And do you think that investors understand that there are some assumptions that inform these near-term future projections?

A Definitely. And that, in some sense, is the nature of the due diligence process. It's trying to -- you know, a haircut in this context is not just as simple as, like,

cutting your hair. You need to sit down and really think about how the business works and understand, like, where are the critical points of uncertainty and how do I want to make adjustments so that I come up with something that's more, you know, more conservative. It would not be -- it would not be common to just cut, you know, cut everything in half, for example, because that would overlook all of the nuance of how the business would work.

And so this due diligence process is exactly this process. We're trying to figure out the nuance of the business so that you can adjust management scenarios into base case investment scenarios that make sense for your company, your investors.

Q So let's assume there's a projection about the second quarter; April, May, and June of a fiscal year. In March of that fiscal year, after a company has made a projection, there's a worldwide pandemic. Might that impact what that future projection is?

A I would expect it to.

Q Even in the near term?

A Yes.

Q And do investors understand that there may be even unexpected events that impact the management case scenario?

A Yes.

Q You mentioned half in terms of a haircut is not a

useful mechanism to make these haircuts. Is there a rule of thumb of how much of a haircut investors apply to these future -- even near-term future projections?
A It's hard to give a blanket rule of thumb here because it kind of depends on the nature of the operations of the business.
Q Do investors have only one base case or do they typically make different scenarios?
A So there would be one base case --
MS. KASSNER: Objection, Your Honor.
Q One base case. Okay.
THE COURT: Hold on, hold on.
Can you ask the question again, please? I'm sorry. Just repeat the question.
MR. SULLIVAN: Yes.
Q The base case you told us about, is there typically one base case?
A There are typically multiple scenarios they envision, one of which is a base case. Often they will incorporate more pessimistic scenarios than the base case.
Q Why?
MS. KASSNER: Objection. Relevance, Your Honor.
THE COURT: Sustained.
MR. SULLIVAN: Okay.
Q So for the near term, do they also -- near-term

projections, do investors also use more optimistic projections closer to the investor's projection?

MS. KASSNER: Objection, Your Honor, to form and scope and --

THE COURT: Sustained.

MR. SULLIVAN: Okay.

Q You do agree that the base case is typically lower than the management case?

MS. KASSNER: Objection, Your Honor.

THE COURT: What does "base case" mean to you, Professor?

THE WITNESS: "Base case" to me means the case where the investor has taken the management scenario and made it less optimistic, but it is still sort of a, you know, good scenario. In other words, the base case scenario is sort of middle scenario between the management scenario and a worst case scenario.

Q And do investors, when they do decide to invest after having made the base case scenario, do they still think they're going to make money off of the deal?

A Well, if they didn't, they wouldn't invest --

MS. KASSNER: Objection, Your Honor.

THE COURT: Sustained.

MR. SULLIVAN: No further questions. Thank you, Professor.

THE COURT: Ms. Frison, do you have any questions for this witness?

DIRECT EXAMINATION

BY MS. FRISON:

Q Good morning, Professor Robinson.

A Good morning.

Q Just a few questions for you.

Can you describe what the definition of the term "sophisticated investor" is?

MS. KASSNER: Objection, Your Honor.

THE COURT: Are you aware of a generally-accepted definition of the term "sophisticated investor"?

THE WITNESS: Here, my answer would be that it's an accredited investor.

MS. KASSNER: Objection, Your Honor.

THE COURT: Sustained.

You're talking about the SEC -- you're giving a regulatory definition?

THE WITNESS: That would be the standard definition here.

THE COURT: Okay.

The objection is sustained.

BY MS. FRISON:

Q Professor Robinson, in your research, you stated that most startups fail; is that right?

A That's correct.
Q Why do investors continue to invest in startups if most of them fail?
A Most fail, but the ones that succeed are completely transformative. Take Apple, for example.
MS. KASSNER: Objection, Your Honor.
THE COURT: Overruled.
A Take Apple, for example. It was a startup. Now it's the second largest company in the world. Take Microsoft, for example. It was a startup. Now it's the largest company in the world.
So the reason why you make the investment in light of the high loss rate is because the successes are -- can be astronomical.
Q Is it fair to say that investing in an unaudited company is more risky for an investor than investing in an audited company?
MS. KASSNER: Objection, Your Honor. Relevance. And if we could have a sidebar on this matter.
THE COURT: All right. Come to the sidebar.
(Sidebar conference.)
(Continued on the following page.)

(Sidebar conference held outside the presence of the jury.)

THE COURT: Relevance and?

MS. KASSNER: And it hasn't been disclosed, anything about whether it's risky to invest in audited versus unaudited. If the fact of whether a business is audited is merely whether a CPA confirmed the numbers, that doesn't inherently have anything to do with the risk of the business itself, particularly if he's just testified that they didn't focus on the numbers and they were focused on the team.

THE COURT: So the defense here, as I understand it, is -- or a defense here, as I understand it, is that there was revenue available to be recognized. I understand there's some foundational problems here potentially, but a defense is that there was revenue available to be recognized.

Did we lose Mr. Sullivan?

THE COURTROOM DEPUTY: He's right there.

THE COURT: He's in the courtroom, but not at sidebar.

(Mr. Sullivan approaches.)

THE COURT: You don't have to be here if you don't want to.

MR. SULLIVAN: Ms. Gilbert was here.

THE COURT: Okay. I wanted to make sure.

So a defense is that there was revenue available to be recognized and for whatever reason, or maybe specifically because of operational problems, limitations, et cetera, it didn't get picked up. You know, if that's the defense -- I understand your accusations are all about bad intentional misstatements, but if that's the defense, then why is it not relevant that the investors understood the risk that the defense says actually materialized?

MR. SIEGEL: Just as a general matter, the fact that it's a risky investment, even if they realized it was a risky investment, that's not a defense to fraud because the risk that they're taking on here is that they were lied to, not that there was some error in the accounting. So if you're told, hey, I have a great investment that might make a billion dollars, but only a 1 percent shot, but it turns out the whole thing was made up, the fact that you were told or you knew it was risky is totally irrelevant.

MR. SULLIVAN: This goes to materiality of any representation. It bears on materiality of a representation, clearly, and --

THE COURT: That I think is plainly wrong, that if there are intentional misrepresentations, that they would be deemed immaterial because somehow it was disclosed that these were unaudited financial statements.

MR. SULLIVAN: We're not seeking any intentional misrepresentations. Just some variance.

THE COURT: If there's no intentional misrepresentation, there's though materiality question that arises in the first place.

MR. SULLIVAN: They've elicited testimony that says we would expect it to be within a million dollar range, we expect it to be within this range. That's the materiality here.

THE COURT: I'm going to allow one question here about whether investors understand that there are risks associated with investing in companies that don't have audited financial statements, and then we're going to move on to another topic.

(Sidebar ends.)

(Continued on the following page.)

(In open court; jury present.)

BY MS. FRISON: (Continued.)

Q Dr. Robinson, I'll ask that again.

Is it fair to say that investing in an unaudited company is more risky for an investor than investing in an audited company?

A I think that's fair to say, yeah.

Q You discussed a valuation some with Mr. Sullivan. Is it the case that a company's valuation is not necessarily tied to its revenue or even revenue growth?

MS. KASSNER: Objection, Your Honor.

THE COURT: Overruled.

Is that the case, that it's not necessarily tied to revenue -- I'm sorry, projections or revenue growth?

Can you repeat the question?

MS. FRISON: Yes.

Q Is it the case that a company's valuation is not necessarily tied to its revenue or revenue growth?

A That could certainly be the case, yeah. I could think of an example, in fact.

Q So are there companies who have high valuations and little or no revenue?

A Yes.

Q In your estimation, was OZY Media a startup right up until it shut its doors?

MS. KASSNER: Objection, Your Honor.
THE COURT: Overruled.
Was that your --
THE WITNESS: That's my opinion, yes.
MS. FRISON: Thank you. I have nothing further.
THE COURT: Redirect?
MR. SIEGEL: Do you want us to go now? I know you have another --
THE COURT: I want you to go now. We're going to press forward another 25 minutes or so.
MS. KASSNER: Thank you, Your Honor.

CROSS-EXAMINATION

BY MS. KASSNER:

Q Good almost afternoon, Dr. Robinson.
A Thank you.
Q You shared some opinions on direct examination about what you called the management case. Is it fair to say that the management case is about how a business will perform in the future?
A It's how the management expects the business to perform in the future. It's one party's expectations of what will happen.
Q And you stated that entrepreneurs understand that the people who run startups tend to be optimistic about the future, right?

A I believe that I said investors understand that about entrepreneurs.
Q Investors understand --
A Yes, ma'am.
Q -- that entrepreneurs are optimistic about the future?
A Yes, ma'am.
Q And so they might apply what you called a haircut to that management case; is that right?
A That's right.

(Continued on the following page.)

BY MS. KASSNER: (Continuing.)
Q All of your opinions on that subject, they have to do with projections, right?
A That's right.
Q So things that haven't happened yet, but might happen in the future?
A Investors are investing based on what's going to happen in the future, so yes.
Q So that haircut is about future revenues, right?
A That's right.
Q It doesn't apply to historical revenues, what the business already earned?
A You -- the historical revenues wouldn't inform your valuation calculation. So there wouldn't be any scope for applying a haircut to them.
THE COURT: That's your view that the amount of money a company is making and has made is absolutely irrelevant to the valuation of the company?
THE WITNESS: I didn't say it was absolutely irrelevant. What I mean is that when you're making a -- when you're doing the financial analysis and you're looking at what your returns are going to be, you base that on, you know, what are you investing today and what are you getting in the future. And I'm not saying that the historical performance of the company isn't important for that for

understanding that, I'm just saying that you don't plug yesterday's numbers into the calculation that you use.

THE COURT: Okay.

BY MS. KASSNER:

Q But you'd agree that investors do not apply a haircut to historical revenue numbers, correct?

A That's right.

Q And same thing with pro forma, pro forma and the discussion of pro forma, that allies to projections, right?

A Correct.

Q Or expected future revenues, right?

A That's right. Stuff that is not actual.

Q Not actual.

So pro forma is not a term you would use when disclosing historical revenue numbers, right?

A Correct.

Q And if you were to write pro forma on a financial statement, it doesn't mean, be warned, these historical numbers may be wrong, right?

A That's correct. That's what the word unaudited would do.

Q Well, the word unaudited means that an accountant hasn't independently verified the numbers, right?

A Correct.

Q But if you write the word, unaudited, it doesn't mean,

be warned, these numbers might be entirely made up, correct?
A Correct.
THE COURT: I think we need you a little closer.
THE WITNESS: Sorry.
A Correct.
Q You shared an opinion earlier in your direct examination where you stated that investors tend to prioritize things like the team, the market, the product, a company's valuation, more than financials, correct?
A So I just want to make sure I understand what you're saying correctly, because when you talk about valuation, you can't make an assessment of that without looking at the firm's financials.
Q Okay. Well, let's talk about valuation first then.
In order to consider a business' valuation, you need to look at a company's financials, right?
A Yeah. You look at their pro formas.
Q And well, if you apply a multiples analysis, one of those inputs to a valuation would be the revenue a company has earned, right?
A If you used -- what we call a trailing multiple, yes.
Q So revenue can be important to determining a business' valuation, you'd agree?
A I think that when people use trailing revenue multiples, they use it a safety check in their calculations,

but yes.
Q So the answer is yes, revenue can be important for determining a business' valuation, correct?
A Yes. If you're using a revenue multiple.
Q Right. Which is one of the ways you can value a business, right?
A Totally.
Q And the bigger the valuation, the more a business is worth, right?
A That's right.
Q And that's important to investors, you'd agree?
A Definitely.
Q And same thing with growth.
Investors care about growth, right?
A Most definitely.
Q And one of the ways to measure growth is to look at how a company's revenue has increased over time, right?
A That's right.
Q And that requires looking at what revenue the company earned in the past, right?
A To make the comparison with the future.
Q Right.
A Yes.
Q So revenue is also important for determining how much a business is growing, right?

A In certain situations, it can be, yes. There are other ways to measure growth, but yes.
Q And so fair to say investors care about growth?
A Investors care about growth.
Q And you also -- so you stated -- I'm going to go back to an earlier question.
You stated that investors tend to prioritize things like the team and the market more than certain financials, is that fair?
A That's correct.
Q But you'd agree that investors don't have to choose one or the other, right?
A I don't think they're making a binary choice or a single choice, yeah. I don't think there's any research that says that.
Q Right. So investors can consider both things like the team and the product, and also, the numbers that show how a business has performed, right?
A Yeah. The evidence suggests that they have a priority ranking of those things, yes. But all are potentially important.
Q And so things like a business' accounting numbers are one of the things that investors can reasonably consider when deciding to make an investment, right?
A They could.

Q And a business' historical revenue is also one important factor out of many in the total mix of information available that investors can reasonably consider when making investments, right?
A I mean, they could reasonably consider it.
Q So yes?
A Yes.
Q In fact, generally speaking, you agree that a company's accounting information can be important when it comes to early-stage financing?
A I'm -- I mean, could it be potentially, is that your question?
Q Yes. That's my question. It could be important?
A It could be in some situations.
Q Well, in fact, didn't you author a white paper titled, On the Importance of Accounting in Early Stage Financing.
A I did, indeed. It's a working paper.
Q Right. And in that working paper, your conclusion stated, In spite of the large body of anecdotal and survey evidence to suggest that investors primarily rely on difficult to grasp and difficult to assess soft qualitative information when making early-stage investment decisions, we find that accounting numbers reflect information relevant for explaining whether a firm receives funding, the equity financing amount provided, and the valuation implied by the

financing round.

Is that accurate?

A Yeah. That was based on data in --

Q Well, I'm going to stop you --

MR. SULLIVAN: Objection. Objection.

THE COURT: Overruled. The question is, is that an accurate recitation of what you wrote?

THE WITNESS: Correct.

THE COURT: Let's have another question.

Q And you also mentioned investor -- you also stated earlier that investors care about cash flow, right?

A Yes.

Q And you would agree that revenue is a central component to cash flow, right?

A It is part of it.

Q In fact, there is no meaning to the word cash flow unless it's understood to include revenue, right?

A Correct. Revenue is part of cash flow.

Q Right. And, in fact, a company's profits are also relevant to cash flow?

A So -- yes, that's right.

Q Okay. So I want to ask you a couple of questions just to clarify your opinion.

Let's say you have two identical companies, same product, same business model, same leadership team, all else

being equal, one company earned $22 million in revenue in a given year and the other only earned 10 million in revenue.

Do you think that difference would matter to investors?

A What does it mean to be identical in this case?

Q Same company, same business model, same market, same leadership team. There's no difference except one company earned 22 million in revenue, the other only earned 10.

THE COURT: I think we need to clarify whether all else being equal means that before this most recent year, their revenue was identical to each other each year prior.

Q Yes. Everything about the businesses is identical, one earned 22, this past year, one only earned 10?

A I would want to know what their growth rate looked like.

Q Same growth rate?

THE COURT: Well, can I -- assume two companies that are equal in every way, we really do mean all else equal, one is growing its revenue at 20 percent a year, the other is growing revenue at 5 percent a year, is it fair to say there would be a difference in the way those two companies were valued?

THE WITNESS: Very likely, yes.

THE COURT: All right. I'm sorry. I don't know if that gets to your question or not. But let's have

another question, please.
Q And let's say one company's revenue was 53 million and the other identical company, the other was 11 million, do you think that would matter?
MR. SULLIVAN: Objection. Asked and answered.
THE COURT: I don't know that it's asked and answered. I think that it raises the same foundational questions that the prior question did.
Q Okay. Let's say all else being equal, one company was doubling its revenue year over year and the other company's growth was more of a flat line, do you think that would matter to investors?
A Yes.
Q All else being equal, one company was making a profit of $4 million per year and the other was losing $10 million a year, do you think that would matter to investors?
A So, the reason why I'm struggling with your questions is I don't understand what it means for companies to be equal and then for these things to be true.
So if two companies are equal and -- I'm just trying to wrap my head around what your question really means when you say that one is making $4 million of profit and one is -- I forget the number you used -- but different than that. And so that would be -- the only way that could happen is if the companies were not the same. So I just --

I apologize. But I just don't understand the question.

THE COURT: I mean, I think the question is meant to imply that all else equal means that revenue and profit has been equal until this most recent year in both cases. So if I may vary the hypo a little bit, imagine that for the five prior years, both of these companies were perfectly break even, their revenue was flat, their call structure was flat, in the both had $0 in profit, no profit, no loss, and then in the most recent year, one of those companies earns -- I forget the number, but call it $25 million and the other earns 2 million, would that difference in current year earnings be relevant?

THE WITNESS: Potentially, yes.

THE COURT: I'm sorry, to the valuation. I interrupted you.

THE WITNESS: You were asking was it relevant to the valuation?

THE COURT: Yes.

THE WITNESS: It easily could be.

BY MS. KASSNER:

Q You also explained earlier that generally speaking, investors view a company's team as very important when deciding whether to invest?

A That's what the evidence shows, yes.

Q And team, meaning, the leadership team of the company?

A Team, meaning, yes, the leadership team of the company at the time of investing. There's research that suggests that investors are aware that the team will need to be further developed as part of their investment.
Q Okay. But team at the time of investment is very important to investors?
A That's what the evidence is clear on, yes.
Q And you would agree that the integrity of the leadership team would also be very important to investors?
A Absolutely.
Q So if it turned out that a company's leadership team was involved in making up historical revenue numbers, would you agree that that would matter to investors?
A It easily could.
Q And if the company's leadership team was involved in exporting a version of a company's general ledger and modifying it in connection with an investment, that might matter to the investors? And by modifying, I mean falsifying.
A Yes, it could.
Q And if members of a leadership team lied to investors about who was leading company's fundraising rounds, you would agree that might matter to investors?
A Yes.
Q And if members of the leadership team lied about which

other investors were participating in the fundraising rounds, that might matter to investors?
A Yes.
Q And if members of the leadership team stated that certain prominent companies were leading investment rounds when they really weren't investing at all, you would agree that might matter to investors?
A It might.
Q And if members of a leadership team lied about acquisition offers to purchase the company, you would agree that might matter to investors?
A It might.
Q And if members of the leadership team lied about the company's business partnerships, you agree that might matter to investors?
A Yes.
Q And if members of the leadership team engaged in forging business contracts, that might matter to investors?
A Absolutely.
Q And if members of the leadership team forged contracts with major television networks, you would agree that might matter to investors?
A Yes.
Q And if members of the leadership team created a fake contract --

THE COURT: I think we can -- you can ask this last question, but I think we can move on to another topic or another subject here.

Q And if a CEO of a company was in a room when its chief operating officer impersonated an executive from another media company and didn't fire him, you would agree that would matter to investors?

A It might.

THE COURT: What do you mean when you say it might?

THE WITNESS: I mean, I would want to know more about the circumstances of the situation to determine what was an appropriate course of action. It might well be that the appropriate course of action is firing the person. But people might disagree with that.

THE COURT: But generally speaking, what's your take on the relative importance of management integrity?

THE WITNESS: I think it's important.

THE COURT: All right. Let's move on.

Q You stated earlier that startups generally have a very low probability of success; is that fair?

A That's fair.

Q Most of them fail?

A Correct.

Q And when startup businesses fail, you can tell because,

among other things, they can't make payroll, right?
A I mean, people can not make payroll for a variety of reasons. So I'm not sure -- I want to make sure I understand your question.
Q Well, so one of the signs that a business is failing is that it can't meet its financial obligations, correct?
A No. That could be an indication that the business was growing very rapidly and needed injections of outside capital in order to continue to meet its obligations.
Q Okay. But if a business can't make payroll, can't make rent, can't pay its vendor, can't repay its loans, you would agree that it's a sign that the business is failing?
MR. SULLIVAN: Objection. Compound.
THE COURT: If you had that combination of conditions, would that be a sign that the business was in danger of failure?
THE WITNESS: It would be an indication that the business needed an injection of capital, but that doesn't necessarily mean that the business was in danger of failing in the sense -- I mean --
Q Well, when you say, needed an injection of capital, it needed cash to survive, correct?
A Yes. Startups need cash to survive, generally --
Q Okay --
A -- because they're growing.

Q And just a few more questions -- so you said because they're growing.
You agree most startups fail, correct?
A Yeah, that's clear.
Q Okay. And so it might not be because they're growing, it might be because they've failed?
A I mean, if the business has failed, it's failed.
Q You were asked a few questions about OZY Media in particular?
A Yes.
Q You never, at any point, worked for OZY Media, correct?
A I did not.
Q You were not part of OZY's finance department?
A I was not.
Q You weren't part of OZY's leadership team?
A I was not.
Q You never served on OZY's board of directors?
A Correct.
Q You never invested in OZY?
A Nope.
Q And the information that you obtained about OZY, you got from the defense time, correct?
A That's correct.
Q You also haven't spoken with any people who have invested in OZY, correct?

A That's correct.
Q And you haven't reviewed the information that was shared with OZY's investors, all of it, correct?
A I've seen quite a lot of it. I don't know if I've seen all of it or not. I can't attest to that.
Q And so you can't say one way or the other how important any one factor was to the investor's in OZY when they decided to invest, correct?

THE COURT: Sustained.

MS. KASSNER: Just one moment, Your Honor.

No further questions. Thank you.

THE WITNESS: Thank you.

THE COURT: All right. We're going to break for lunch at this point.

Ladies and gentlemen, I'm going to ask for a shorter lunch break today just given that we have a short day all around. So if you could be back in the jury room around 10 after 1:00, that would help us. We'll push on to about 2:15, 2:30, and then break for the week.

(Jury exits the courtroom.)

THE COURT: You can step down. I'm going to ask everybody here to clear out, please, as quickly as we can so that we can get the next case called.

(The witness was excused.)

MS. GILBERT: Judge, do you want us to move our

stuff?

THE COURTROOM DEPUTY: You can leave it there.

THE COURT: Yeah, you can leave everything here?

MR. SIEGEL: Your Honor, are these criminal cases?

THE COURT: They are criminal cases.

MR. SIEGEL: If it's other AUSAs as opposed to civil lawyers, I'm going to leave the stuff here.

THE COURT: That's extremely discriminatory, but also, perhaps understandable.

(A luncheon recess was taken.)

A F T E R N O O N S E S S I O N

(Time noted: 1:21 p.m.)

(In open court; Jury not present.)

THE COURT: We'll bring in the jury as soon as we're all ready here.

Remind me, where we are here, redirect?

MR. SULLIVAN: Redirect, correct.

MR. SIEGEL: Judge, the only question I have is you'd raised that we might need to do something with Mr. Kalliarekos outside the presence of the jury. If we finish the direct, redirect, and recross of this witness in a couple of minutes, will we then take a break with the jury or just --

THE COURT: What was the question again, whether he signed a written stock purchase agreement?

MR. SIEGEL: Yeah, so our objection is that we don't think we've gotten all of his witness statements or at least they haven't been identified for us. And so in addition to questions of whether there written agreements, were there communications about those agreements, he's also in the YouTube video, the documentary, so is there additional footage of that?

THE COURT: We'll start with that. The Government should be prepared to get done what it needs to get done in 10 minutes.

THE COURTROOM DEPUTY: All rise.

(Jury enters the courtroom.)

THE COURT: Please be seated, everyone.

Mr. Sullivan.

REDIRECT EXAMINATION

BY MR. SULLIVAN:

Q Professor Robinson, can you see me okay?

A Yes, sir.

Q The judge has given us permission to do a very short redirect from our seats.

And just very quickly, do you remember the Government asking you some questions about unaudited -- the term, unaudited, in relation to historical data where the Government asked, you unaudited does not mean warning, these numbers are entirely made up?

Do you remember those questions?

A That's correct. Yeah, I do.

Q Does unaudited mean that these numbers are entirely accurate?

A No.

Q What does unaudited mean with respect to historical financial figures?

A It means that the historical numbers simply weren't audited by an external, you know, accounting firm so that those historical numbers have not been scrutinized by a

certified public accountant.
Q All right. You recall the Government asked you a series of questions about whether accounting, cash flow, revenue, and other -- some other things were important for an investor to consider investing in a startup?
A Yes, sir.
Q And do you recall the Government read from an article you wrote about -- that said accounting was important?
A Yes.
Q Did any of those questions undermine anything you said about the priority ranking --
A Not at all.
Q Well, just so the full question gets in. The priority ranking of what is important?
A No, sir.
Q And your research indicates that the number one in terms of the priority ranking is what?
A The research and the literature suggest that team is the most important factor.
Q Right. Just two more quick areas.
Do you recall the questions about the identical companies and the complicated set of assumptions we made to get to equal companies?
A Yes, I do.
Q All right. Same premises, equal companies, both

companies have revenue of 53 million, company one, 53 million, company two, 53 million, but it turns out that company two has understated its revenue, it's actual revenue is actually 55 million --

MS. KASSNER: Objection, Your Honor.

THE COURT: Sustained.

MR. SULLIVAN: Okay.

Q If the -- let me ask a final series of questions.

So the company -- the Government asked you some questions about whether it turned out that senior -- the leadership team, rather, engaged in a series of misconduct and went through a list of things, would that be important to investors?

A I remember.

Q So if it turned out that the CEO of a company was wholly unaware of conduct engaged in by rogue members of the senior team, would that be important for an investor to know?

MS. KASSNER: Objection.

THE COURT: You can answer that question.

A I think it very likely would be important, yes.

Q Why?

A Because it would speak to the fact that part of the team lacked integrity and, perhaps, part of the team didn't, and one of the things that we talked about this morning was

the fact that venture capital investors understand that they're investing this companies where the team needs to be developed more fully.

MR. SULLIVAN: No other questions.

REDIRECT EXAMINATION

BY MS. FRISON:

Q Professor Robinson, when you say team, do you mean the founders of the company?

A Yes, ma'am.

MS. FRISON: Thank you.

THE COURT: Redirect?

MR. SULLIVAN: That was the redirect.

THE COURT: I'm sorry, recross?

MS. KASSNER: No, Your Honor. Thank you.

THE COURT: Okay. Thank you, Professor. You may step down.

(The witness was excused.)

THE COURT: That was perhaps briefer than I might have expected it to be. I'm going to ask the jury to step out again for a short break. We're going to try to get you back here in 10 minutes and resume the testimony at that point.

(Jury exits the courtroom.)

THE COURT: Let's bring in the next witness now so we can proceed as efficiently as possible.

So of the documents the Government does have, do they have dates on them such that we can tell that some or more of them were in existence on the date when the agreement between the parties and the Court's order called for the exchange?

MR. SIEGEL: I'm going to just confer with our paralegal for a moment. We're just pulling it up, Your Honor.

THE COURT: They all postdate that, maybe that's the concern?

MR. SIEGEL: I don't think that's the case, but we're going to confirm that.

(Pause in the proceedings.)

MR. SIEGEL: So just the first one that Mr. Menz pulled up just now was from 2023. So there are certainly things that predate the Court's order.

And to be clear, if there were things that were postdating the Court's order or that were recent, we wouldn't be raising any objection at all.

THE COURT: All right. Let's bring the witness to the stand, please, and we'll swear the witness.

THE COURTROOM DEPUTY: Outside the presence of the jury, Your Honor?

THE COURT: Yes.

(The witness takes the stand.)

THE COURTROOM DEPUTY: Good afternoon, sir. Please raise your right hand.

(The witness was sworn and/or affirmed in by the courtroom deputy.)

THE WITNESS: I so swear.

THE COURTROOM DEPUTY: Please have a seat.

Can you please state your name for the Court, and spell your first and last name for the court reporter.

THE WITNESS: Yes. My first name is Kosmas and my full name is Kalliarekos. Spelled K-O-S-M-A-S, last name K-A-L-L-I-A-R-E-K-O-S. But you can call me Kosmo, it's easier.

MR. STERN: Is it okay if I proceed from here, Your Honor?

THE COURT: Yes.

MR. STERN: And I'll try Mr. Kalliarekos.

THE WITNESS: Kosmo is fine. Kalliarekos, you did a great job.

**KOSMAS KALLIAREKOS, called as a witness, having been first duly sworn/affirmed, was examined and testified as follows:**

VOIR DIRE EXAMINATION

BY MR. STERN:

Q So Mr. Kalliarekos, you signed -- excuse me, you invested in OZY multiple times from 2018 through 2023; is

that right?
A Yes. I'm not exactly sure of the dates, but you're absolutely right.
Q And in connection with those investments, did you sign agreements with OZY?
A Yeah, I believe I did.
Q So would that include stock purchase agreements?
A I assume they were stock purchase agreements, yes.
Q And what about loan agreements, were any of your investments loans?
A I don't recall. But it could have been.
Q Did you exchange any text messages with Carlos Watson about your interest in OZY?
A Could be, yeah. I mean, I'm not 100 -- yeah, I'm sure. I mean...
Q Well, do you specifically remember ever texting him about your interest in OZY?
A We were communicating. So presumably, I would be --
THE COURT: Can I just -- on the prior subject about contracts with OZY, you think you did sign one or more investment contracts?
THE WITNESS: I believe I did.
THE COURT: Okay. Did you return them to the company after you signed them?
THE WITNESS: I can't recall.

THE COURT: Did they send you stock certificates?

THE WITNESS: I don't believe I received any stock certificates, no.

THE COURT: Did you have a lawyer representing you in any of those transactions?

THE WITNESS: No.

THE COURT: Please continue.

MR. STERN: I would just go back to -- actually, I'm fine on the text.

BY MR. STERN:

Q Did you exchange any text with Mr. Watson about you coming to testify today?

A Sure. I mean, in terms of just issues around what time, when, you know, this kind of things, yes.

Q So it's purely scheduling?

A Mostly, yes.

THE COURT: Text messages between you and Mr. Watson when?

THE WITNESS: It wasn't with Mr. Watson, it was with Ron, I believe, and other members of the legal team or Beverly, yeah.

THE COURT: When is the last time you communicated by e-mail or text with Mr. Watson?

THE WITNESS: He could have been -- it was just purely on, you know, where do I come this morning.

THE COURT: Listen to my question. When --

THE WITNESS: Today. At presumably today or last night.

THE COURT: When was the last time that you communicated with Mr. Watson himself by e-mail or text?

THE WITNESS: Just with Mr. Watson or --

THE COURT: Not just with him, but any e-mail that he was on and that you were on or a text with him.

THE WITNESS: E-mail -- text, I think yesterday in terms of just --

THE COURT: You texted with Mr. Watson yesterday?

THE WITNESS: It wasn't just Mr. Watson. I think it was a group, I believe.

THE COURT: Who's in the group?

THE WITNESS: Beverly and Ron.

THE COURT: Okay.

BY MR. STERN:

Q Mr. Kalliarekos, do you remember filming a video in support of Mr. Watson's defense?

A I did.

Q And in that video, you talked about your views about Mr. Watson, right?

A I did, yeah.

Q And your views and reasons for investing in OZY, right?

A Yes.

Q How long -- when you sat for your interview, about how long were you interviewed in total?
A Half an hour -- 15, 20 -- 15, 20 minutes. I mean, thereabouts.
Q Who interviewed you?
A That's a good question. I can't -- to be honest, I can't recall.
Q Was it a member of the defense team?
A I can't recall.
Q Did you ever receive a complete version of your statements on that video? The full 15 to 20 minute clip, I should say?
A I didn't ask for it.
THE COURT: How did you come to appear in that video? Did somebody ask you?
THE WITNESS: Yes.
THE COURT: Who?
THE WITNESS: I think it was -- well, at some point, I had talked to Ron about it, and maybe, you know, Carlos himself or together.
THE COURT: Did you speak to Mr. Watson by e-mail or text?
THE WITNESS: I don't recall.
THE COURT: When was this?
THE WITNESS: Two, three months ago.

THE COURT: When did you sit for the video interview?

THE WITNESS: Two, three months ago.

THE COURT: Okay. And how long before that would you have had communications, potentially, with Mr. Watson?

THE WITNESS: Well, again, I'm not sure it was Mr. Watson himself, but it was either Ron or Shannon that I remember really talking to.

THE COURT: Did they call you out of the blue, though, or did somebody tell you a lawyer will be calling you? That seems like something you would remember.

THE WITNESS: There was nothing -- well, we had communications during that time period.

THE COURT: Who is we?

THE WITNESS: Ron, Carlos, Shannon.

THE COURT: Do you have your phone with you right now?

THE WITNESS: No. I left it.

BY MR. STERN:

Q One more question about communication with Mr. Watson. My question is, just with Mr. Watson directly, not with a member of his defense team on those communications. Okay. So that's the structure.

Have you had any just one-on-one communications with Mr. Watson since February of 2023?

A Only with or through Ron.
Q Only through Ron?
A Yes.

(Continued on the following page.)

MR. STERN: Nothing further on this, Judge. Thank you.

THE COURT: Okay. Let's have the witness step out.

(The witness steps down and exits.)

THE COURT: All right. There is, at a minimum, a live question here about whether there are other documents out there that should have been produced but weren't. I'm not saying that we can answer that question definitively at this point, but the witness himself is saying that may be the case. I don't fully know.

I'm assuming that Mr. Kosmo does not appear for a full 15 or 20 minutes in this video and that, therefore, the government thinks there are outtakes from the video that have not been made available to him.

MR. STERN: That's correct, Your Honor.

THE COURT: Thank you.

The defense should make a diligent search for any and all communications due to be produced under Rule 26.2 and report back in writing as to what that search consisted of and what, if anything, has been turned up along the lines of, A, a stock purchase agreement or any other investment related documents or contracts that he may have signed, B, any and all outtakes from the video here that have not been made available to the government so far and, C, any and all text communications between Mr. Kosmo and Mr. Watson that may, may

come within the strictures of Rule 26.2.

In the meantime, let's put the next, the next defense witness on.

MS. GILBERT: Your Honor, I have an answer to the first part of that question.

THE COURT: If we don't have a comprehensive answer now, I don't want to take partial answers.

MS. GILBERT: Well, the government has --

THE COURT: As I said, I don't want to take partial answers.

Who is the next witness for the defense?

MR. SIEGEL: Your Honor, this is just an additional question. You mentioned text messages. We would just also like e-mails.

THE COURT: E-mails, of course, are involved. The list that I gave, for the sake of avoidance of doubt, is not meant to be an exhaustive list. The exhaustive list is everything that's responsive to 26.2. I'm giving examples that I think are clearly implicated by what we just heard, but those examples are not meant to constitute limitations of any sort.

MR. SIEGEL: And then, Your Honor, one of the people he said --

THE COURT: We're wasting the jury's time right now. I can finish this conversation shortly but tell me -- yes,

what is the -- I want to put the next defense witness on the stand and move this along.

MR. SIEGEL: Part of the issue is that whoever the next defense witness is, we're going to have the same issues.

THE COURT: I think the next defense witness is going to be Mr. Watson himself.

Who is the next defense witness other than Mr. Kosmo who doesn't have this issue?

MS. FRISON: Claire Lightfoot is the next defense witness.

THE COURT: Are we going to have the same issue with respect to Ms. Lightfoot?

MR. SIEGEL: If they want to call Claire Lightfoot, that's fine.

THE COURT: All right. Put Ms. Lightfoot on the stand then, please.

Let's get the jury.

Did you want to add -- now that we've got the jury coming in, is there something I left out?

MR. SIEGEL: One of the people he talked about communicating with is Beverly Watson and we're aware of other witnesses who have been contacted by Beverly Watson and I think it's raising the question of whether Beverly Watson is part of the defense team and whether communications with her also need to be disclosed.

THE COURT: Put it in writing.

MR. SIEGEL: Thank you.

THE COURT: Thank you.

I'm going to ask you if you can sit for a minute, I'm going to ask you to be sworn when our deputy comes back.

MS. RUDY: Thank you.

THE COURT: I think we've got about 30 minutes left.

MR. SIEGEL: Your Honor, I just want to make sure, Ms. Lightfoot is not local so I just want to make sure she can come back Monday if we're not finished.

MS. RUDY: I can come back Monday.

THE CLERK: All rise.

(Jury enters.)

THE COURT: Ladies and gentlemen, we apologize for the unavoidable delay, as people say in these moments. Please be seated, everyone.

And Ms. Frison, I believe, you may call your next witness.

THE CLERK: Please stand and raise your right hand.

(The witness, JOAN CLAIRE RUDY, was sworn by the deputy of the court.)

THE CLERK: Please have a seat. Keep the mic eight inches from your face.

Please state your name for the Court and spell your first and your last name for the court reporter.

THE WITNESS: Joan Claire Rudy, J-O-A-N, C-L-A-I-R-E, R-U-D-Y.

THE COURT: That was not the name that I was expecting but, Ms. Frison, you may continue.

DIRECT EXAMINATION

BY MS. FRISON:

Q Good afternoon. I'm over here. Thank you.

Good afternoon. You just stated your full name for the record. Do you go by another name?

A I go by "Claire." I was also married when I was at OZY so I go by "Claire Lightfoot" originally.

Q Thank you.

How are you doing today?

A I'm good. How are you?

Q Good. Thank you.

Where did you come in from today to be at this trial?

A I flew in from New Braunfels, Texas.

Q Is that where you live?

A Yes.

Q How long have you lived there?

A I lived there since June of 2022. I'm sorry. June of 2023. I'm sorry. June 2022. It's 2024 this year.

THE COURT: I'm having some trouble myself these days.

THE WITNESS: Yes.
THE COURT: It's understandable.
Q That's how long you've lived in Texas?
A Yes.
Q Where did you live before that?
A I lived in San Jose, California.
Q Do you have a family?
A Yes.
Q And who's part of your immediate family?
A I have three kids and my husband.
Q Do you work?
A Yes.
Q What do you do?
A I'm an accounting manager right now.
Q And where do you -- where are you an accounting manager?
A I am an accounting manager for Vico. It's a consulting firm where I go to different businesses and help them go through their financials and help process and procedures.
Q How long have you been working for that company?
A Almost a year now.
Q How long -- are you an accountant?
A Yes.
Q How long have you been an accountant?
A Since 2011. So 13 years now.
Q Can you describe what educational training you had to

become an accountant?
A I went to school. I have a finance degree and then I immediately went into accounting as an entry level accountant and then I've grown since there.
Q When you came out of school and you were an entry level accountant, what company was that at?
A That was at a place called Dionics.
Q Is that in California?
A No, that's actually in Texas.
Q And did you have any accountant responsibilities between that job and the one you have now?
A Oh, yes.
Q Are you familiar with a company called OZY Media?
A Yes.
Q And how are you familiar with it?
A I used to work there.
Q When did you begin working at OZY?
A I started working the summer of 2017.
Q And when did you leave OZY?
A February of 2023.
Q Do you know Mr. Carlos Watson?
A Yes.
Q How do you know him?
A He was my boss and the owner of the company.
Q Did you know Mr. Watson before you started working for

OZY?
A No.
Q Do you know Mr. Samir Rao?
A Yes.
Q And how do you know him?
A He also was my boss and the co-founder of the company.
Q Did you know Ms. Suzee Han?
A Yes.
Q How do you know her?
A She actually became my direct boss eventually but also through the company. We worked together.
Q And when you were at OZY, what was Ms. Han's position?
A She first started as almost a partner to Samir and Carlos helping them kind of with the day to day, they needed like a right-hand person, and then eventually turned into she became the head of finance.
Q And do you know Janeen Poutre?
A Yes.
Q Did you work with her?
A I did. She hired me.
Q And so did you report to her during your time at OZY?
A I did. There was a dotted line to her, but I reported to her. She saw over me.
Q And when you say a dotted line to her, what do you mean by that?

A So she was a CFO and there was a manager in between her and I, so we would work out all of the tasks and everything together and then if we needed Janeen to give her opinion or help us in any way, that's when we would pull Janeen in.

THE COURT: I'm sorry if I missed this, but did you say what your position or title was when you were first hired at OZY?

THE WITNESS: I was first hired as a senior accountant and then I moved up to an accounting supervisor and then eventually an accounting manager.

THE COURT: I'm sorry.

Q That was my next question.

When were you hired in 2017, what was your title?

A Senior accountant.

Q And how many senior accountants were there at OZY at the time?

A Just myself.

Q And did you have anyone reporting to you?

A Not at the time.

Q Were you at some point -- let me back up.

So in that role as senior accountant, what were your day-to-day duties?

A So in that role, it was a lot of AP stuff which is basically bills and vendors that are wanting to get paid and I would go and enter all of the data into the accounting

networks so that we could get those bills paid. I also ran payroll and administered payroll and I did all the day-to-day style general ledger accounting so any transactions that would hit the entire business of the month, I would help record into the system.

Q So were you actually doing data entry?

A Yes.

THE COURT: When you said that you did AP stuff, can you just tell those of us who are not accountants what AP means?

THE WITNESS: Yes. So, basically, that means anybody that you owes money bills, you owe money to and get a bill for, there's a process, you net 30 to pay, and I would be able to gather all of the data for that. So contracts, any kind of legal documents that we need to be able to enter those bills, and then process and where we pay the bills.

THE COURT: Does "AP" stand for "accounts payable"?

THE WITNESS: Yes, sir.

THE COURT: Okay.

Q So when you started at OZY, you were responsible for paying the bills of OZY, is that right?

A So Janeen Poutre would actually physically pay the bills but I would get the data entered and gathered for that purpose.

Q How long did you stay in that senior accountant position?

A I would probably say about a year and a half maybe.
Q And were you promoted from that position?
A Yes.
Q And to what title?
A To accounting supervisor.
Q And at the time, how many accounting supervisors were there at OZY?
A Just myself.
Q How did that change your duties?
A I took on more of, a little bit more of a role where, yes, I had my hands in the data entry, but I actually had a direct report at this time who would do the job that I just explained and then I took over billing our, where we are invoicing our customers at that point and making sure that the general ledger is closed on time and managed on time. I would also deal with all the cash management. So any kind of transactions that went in and out of the bank account, I would be recording.
Q And when you say "closed on time," can you just describe to me what you to the jury what you mean by that?
A Yes. So the close is every month, after the month ends, you want to make sure that all the transactions have happened, that happened in the business, everything that happened for the business that month is recorded in the general ledger.
The general ledger is basically the keeper of all

records inside of the accounting system. If you print out everything in the general ledger, you will have everything that touched the business that month.

So I recorded everything and then I would make sure that everything was recorded by different ways, but just confirm that everything was recorded and then I would basically put a stamp on it saying it's complete and closed.

Q You mentioned in that supervisor role, that you then had a direct report. What year were you promoted to that position?

A I think it was -- I want to say it was around early '21, I believe.

Q And was that the first time that you, someone was reporting to you at OZY?

A Yes. And, I'm sorry, I think it actually was '20, 2020 that -- yes, it was. It was 2020 that I was promoted to accounting manager -- accounting supervisor. I apologize.

Q And how long did you stay in that role?

A It was about a year, a little over a year.

Q Were you promoted again from that position?

A Yes, I was.

Q And to what title?

A An accounting manager.

Q What did that change in terms of your responsibilities?

A Really at this point, I was able to give some of the

responsibilities I last said to the direct report, give her a little bit more, help grow her career and give her a little bit more responsibilities, and at that point, I would take on really consolidating and making sure that all the financials were, everything that she entered was actually reported on the financials, that I actually would see that.

If there was any dips or trends that I would see, I would go and investigate and start learning. I would have talks and conversations with any executives to try to help the budgets or be able to get a budget in line for a project that we were having. I also helped with any vendor contracts or customer contracts that needed to be put together or once they were finalized and executed, stored, any kind of documentation storage.

Q Who was your direct report?

A I first had a direct report, her name was Jenny Lin and then Mercedes West was my other direct report that came in and replaced Jenny Lin.

Q And was that third role your final title at OZY?

A Yes.

Q When you started working at OZY, why did you want to join that company in particular?

A I originally left my former company or started looking because I had just had a child and I wanted a little bit more of a work/life balance, and so a recruiter reached out to me

with this role and after I met the team, I really felt connected with the team. I also thought that they really had a really good product and something that really everybody could have their hands in and they -- it was inviting and exciting to be a part of that.
Q How closely did you work with Mr. Watson himself?
A Really the first three or four years, I didn't -- I only saw Mr. Watson a couple of times a week, if that. He was a lot, always traveling, and constantly just being the face of the company, trying to, you know, network and build, network out there for investors and sales. So it wasn't until later on when Mr. Rao no longer worked there that I got a little bit more of a day-to-day scene with Carlos.
Q And did you, in those first three to four years that you described, did you work closely with Mr. Rao?
A Yes. Mr. Rao was constantly in the office, for the most part. He was the operations. Like, I would like to say he kind of ran the operation, the day to day, helped with sales. So any time that I had any kind of questions about that or needed any kind of direction from any kind of spend, that's the first person I would probably go to after a finance head.
Q And with regard to Ms. Suzee Han, did you also work closely with her?
A Yes. The first year or so, maybe a tiny bit longer that she was there, I didn't work that much with her at all. Once

she became the head of finance, she became my boss.
Q Do you remember what year that was?
A That was September of 2020.
Q Did you work with Ms. Han one on one on a daily basis after that?
A Pretty much, yes.
Q Was your department the accounting department?
A Yes.
Q How many people in total worked in that department?
A When I first started there, we had just brought the accounting team in house. We outsourced it prior to that and I was one of three people that was brought in to build a team. By the time I left, it was two of us.
Q How many?
A Two.
Q And is that a separate department than the finance team?
A They kind of lumped together as a startup typically does.
Q I'm going to ask you about NetSuite.
A Okay.
Q You discussed making data entries into the general ledger. Was that on NetSuite?
A Yes.
Q Can you just describe what that is?
A So NetSuite is the accounting system that -- it basically is the record keeper of all things that happened in the

system, whether it has to do with invoicing to a customer or invoicing or getting bills from a vendor and everything in between. So any cash transaction that may have happened from an investor, that all is being recorded as each transaction happens into the general ledger.

Like I said before, if you ever printed anything that happened in that month, if you just print the general ledger, you'll see every transaction that happened that month in the accounting system.

Q Who all at OZY had access to NetSuite?
A Anybody in finance and I believe Samir and maybe Carlos.
Q Do you know about how many people that would be in total?
A I'd probably think we probably had four or five licenses total.
Q And is NetSuite a program you need log-in credentials to get into?
A Yes. You have to be -- the admin. has to appoint credentials for you.
Q And does NetSuite keep a log of who logs into it day to day?
A Yes.
Q How -- you stated that you were making entries of transactions into the general ledger. How else did you use NetSuite?
A You could pull reports from there for any kind of

financial data to see what the month looked like, to see what the quarter looked like. You could -- we didn't run payroll through there, but we had all the reporting through so you still had to upload journal entries which is basically the transactions I was describing before, putting them on a piece of paper and loading them in. That is called a journal entry. So you would have to create those for different transactions that happened throughout the business, one of them being something like payroll.
Q Would you say that you were in NetSuite doing something almost every day?
A Oh, yes, for sure.
Q During your tenure at OZY, were you aware that anyone was exporting from the ledger and changing numbers?
A No.
Q Were you responsible for monitoring who went in and out of NetSuite?
A Not, not necessarily. Anybody that had access could go in when they wanted to go in.
Q Are you familiar with the term "GAAP" or generally accepted accounting principles, if I have that right?
A Yes, you do.
Q And what do you know that to mean?
A Really, it's just responsible accounting in a nutshell, you know, making sure that you are going across with the rules

that's come up with the GAAP rules and all the regulations and keeping up with it since it changes frequently.

Q Is that a principle or a concept that you learned when you were getting your accounting degree?

A Yes. I actually have a finance degree but you have to learn a lot of accounting in finance. So I did take a bunch of accounting classes to get my degree and, yes, that's exactly what you're learning about.

Q What is the difference between accounting and finance?

A Really finance is taking the data and creating a story line out of it whereas accounting is getting the data into the story line.

Q And what does it mean to be GAAP compliant?

A Really you're following a set of rules. You know, it's a lot of different rules that I can't really name, but that you are following the regulations that have come up, have been, come, and come up with and been able to make sure that you're following a standard that people that are really audited kind of go by.

Q Had you worked for companies in the past where you were using GAAP in your accounting?

A Yes.

Q And what types of companies were those?

A I worked for a -- basically, like network services. They built networks. And then Lucile Packard Children's Hospital

before.

Q And is it your understanding that there are certain companies that have to, that are required to follow GAAP?

A Yes.

Q And can you tell us which companies?

A Usually it is public companies that are being audited.

Q Were you using GAAP in your accounting for OZY media?

A We didn't strictly stay to GAAP. We just tried to be as close to it as possible because it is, you know, has a structure that helps you get set up for going public eventually and I think that was always, you know, maybe going to be the dream but, you know, so we want to just get as close to as GAAP as we possibly could be as a startup.

Q Is it difficult for a startup to be GAAP complaint?

A Sometimes because, you know, there's not this flow that's already created with process and procedures. So sometimes, you know, a big expense that really needs to be in the previous month that maybe we've already, you know, said that the financials were closed and sometimes we would need to get that expense, it was an oops and we needed to get that expense in that month. So sometimes like that, it would be where we wouldn't be exactly compliant, but other than that, we pretty much stuck to the guidelines.

Q And in those instances like the example you gave where you needed to account for something in a particular month,

would you go back and reopen the books for that?
A If the books were not closed, then I would do it. If the books were already officially closed which means in the accounting system, you press a button that closes it and says you cannot put anything in here anymore, the system will not let you, we would not.
Q Did you get any direction from Mr. Watson as to whether or not to use GAAP?
A No.
MR. STERN: Objection. Hearsay.
THE COURT: Sustained. The answer is stricken from the record.
I'm sorry. The objection is overruled.
You answered the question?
THE WITNESS: Yes.
THE COURT: Okay.
Q Were you -- was it your decision that you say OZY was moving towards GAAP compliance, was that your decision?
A No. It was more, I think, a team decision, kind of. It's accounting's mindset. You know, whenever an accountant is going to come and try to build a team into a company they believe in, they're going to want it to be as close to compliant as possible so that we can get ready for growth and projecting the future.
Q During your time at OZY, was the company audited?

A No.
Q Were you involved in OZY's fundraising rounds to any extent?
A No. I only recorded any bank transactions that would have come in for that.
Q When you joined OZY, do you remember what round of fundraising you recorded money for?
A I do not.
Q Did OZY receive money from investors in those rounds in different forms?
A Yes. Any kind of cash transaction form that could happen to receive any kind of money would happen at OZY, so any bank transactions, either checks or wire, ACH transfers.
Q How often were investors wiring money to OZY for their investments?
A I feel like often.
Q And how about hard checks, how often would OZY get hard checks from investors?
A Sometimes. I feel like a lot of our heavy checks came from our sales really.
Q And when you got hard checks, was that money also recorded by you?
A Yes.
Q Or your team?
A Yes.

Q Did OZY Media have agreements with other companies called in-kind or barter agreements?
A Yes.
Q What did you understand those to be?
A So I never actually physically saw any of the barter/in-kind contracts until about I would say two years ago, maybe, and they stated mostly some kind of trade with OZY in order to provide a service to them.
Q And how was it that you knew about those types of agreements with other companies?
A It was -- I took on a project in order to really look at to see what that in-kind revenue would look like in the books and see what the gross revenue would look like and once that was taken to a team to review and another third-party accounting team to review and tell us how they would recommend us doing that is when I first came to see after the team saw it. They pulled all the contracts together that would have been part of this project and then as I was implementing the project in our system, you know, checking all the records is when I would have received that.
Q What year are you saying that this, you undertook this project?
A That was around February to May-ish time of '22.
Q Of 2022?
A Yes.

Q And did you initiate that project or were you directed to do that project?
A I was directed.
Q By whom?
A It was really -- at the time, this was a project that had been talked about but Carlos had directed that project and whenever he wanted us to do it, we talked to a third party to get the actual direction of how to make that project happen and if we were, if we could do it.
Q And can you state what the purpose of the project was?
A The project was to --
MR. STERN: Objection.
THE COURT: Sustained. Let's have a foundation for that question first.
Q You stated that Mr. Watson directed you to undertake this project, is that right?
A Yes.
Q And were you given -- were you told the purpose of the project?
A Yes.
MR. STERN: Objection.
THE COURT: Were you told. You can answer yes. Who told you, just a name, full stop.
THE WITNESS: A name for what? I'm sorry.
THE COURT: A name for who told you the purpose of

the project.

THE WITNESS: I can't for sure say.

THE COURT: Okay. All right. Regardless, the objection is sustained at this point.

Q So you worked on this project in 2022. Who else worked on it with you?

A Mercedes West and a team of accountants from a different third party.

Q And what was the third party?

A I cannot remember their name at this time.

Q Was that an accounting firm?

A It was an accounting firm. It was an accounting firm that -- they were knowledgeable in this area in order to do this. They had done this at their firms before they had --

MR. STERN: Objection.

THE COURT: Let's have another question.

Q What did you accomplish or let me back up.

How long did you work on this project?

A Probably a couple of months.

Q And what did you accomplish at the end of that project?

A So at the end of the project, there was financials that sat with the same net revenue but the gross revenue was increased based off of discounts and barter.

Q Can you describe what you mean by the difference in the gross revenue and net revenue?

MR. STERN: Objection, Your Honor.

May we have a sidebar?

THE COURT: Sure.

(Continued on next page.)

(Continuing.)

(Sidebar conference held outside the presence of the jury.)

THE COURT: What's the objection?

MR. STERN: She's describing a project that took place at the defendant's direction while the investigation was ongoing to alter the books. It's an ex post behavior that raises concern because it has nothing to do with his mens rea intent, anything like that during the charged period for the conspiracy at '18 to '21.

THE COURT: I mean, I think we're going to break here anyway. We keep getting to areas in which the relevance is entirely conditional and the conditions are not set, and I keep inviting the defense to give me a proffer of who's going to testify to whether that would establish that, yes, there are these other contracts.

I think we need to have Mr. Watson, if he's the person through whom all of these conditional foundations are going to be laid, I think we need him on the stand.

MR. SULLIVAN: She was talking about what she did in 2022.

THE COURT: At the direction of lawyers? Under the supervision of lawyers? Why is it relevant?

MS. FRISON: It's relevant because she's describing a point at which she finally accounted for barter

revenue and how that occurred.

THE COURT: Okay.

MS. FRISON: She will say, I believe, that before that she was not accounting at all for barter --

THE COURT: Is this barter revenue a subject of written contracts, or is this stuff she heard about from Mr. Watson?

I'll just note for the record here how long the answer to this question is taking.

MS. GILBERT: Some of it was email.

MS. FRISON: I think she's now talking about a project in which --

THE COURT: Let's stick with my question. Is this barter revenue the subject of written contracts, or is she going to say she heard about it from Mr. Watson?

MS. FRISON: I believe these are contracts --

THE COURT: What do you mean you believe? I need to understand where does this barter revenue stuff come from, otherwise I'm excluding all of this. If it's going to come from Mr. Watson's testimony, let's have Mr. Watson's testimony.

MR. SULLIVAN: It's the same process that she just testified to --

THE COURT: No, no --

MR. SULLIVAN: She puts in revenue.

THE COURT: No, accounting processes do not generate barter revenue. There has to be a contract. Where is the contract coming from?

MS. FRISON: May I ask her that before we --

THE COURT: Not if it's going to call for hearsay. Again, I need to know how she knows this stuff. If she's going to say I heard from Mr. Watson that there was all this barter revenue, you're going to have a hearsay question. Figure out what the conditions are --

MR. SULLIVAN: How is what Mr. Watson said hearsay? It's the statement of a party opponent --

THE COURT: Are you crazy?

MR. SULLIVAN: No, I'm Ron Sullivan, Your Honor.

THE COURT: Statement of a party opponent --

MR. SULLIVAN: Read the rule. It doesn't say it's not limited to the oppositional party.

MR. SIEGEL: Judge, that's exactly what it says.

MS. KASSNER: That's exactly what the party opponent is, Your Honor.

(Sidebar ends.)

(Continued on the following page.)

(In open court; jury present.)

THE COURT: Ladies and gentlemen of the jury, we're going to break for the day at this point. We're not sitting tomorrow. We will be back on Monday. We will see you at 9 a.m. on Monday.

We will sit -- I'll make sure I get this right, I'm looking at my calendar so I don't screw this up -- we will sit Monday, Tuesday, and Wednesday, the full day each of those days next week. We will obviously not sit on Thursday, July 4th, or Friday, July 5th.

After that, we have no other weekdays on which we will not be sitting. So we're full speed ahead, unless we go as far as July 22nd, but I'm imagining that that will not be the case.

MR. STERN: Your Honor, just to confirm, will we have a full day on July 3rd?

THE COURT: I think we should sit the full day on July 3rd. We can talk about that next week, if anybody has issues they want to bring up. We'll go at least later than this on July 3rd, let me just say that for the moment, and maybe as far as the full day.

Have a great weekend. Don't do any research or speak to anybody, including even each other, about the case, don't let anybody who shouldn't be speaking to you do that. But get some rest, have a barbecue, and otherwise enjoy

yourself.

(Jury exits.)

(In open court; jury not present.)

(Witness exits the stand.)

THE COURT: I'm missing something, Mr. Sullivan, deeply fundamental about Rule 801 if what you just said to me is correct. And I actually want to take this up on Monday just to make sure I'm not laboring under a deep misimpression about how the rule works.

I got the hearsay objection wrong before. The question was: Did Mr. Watson tell you to use GAAP or not to use GAAP? Commands are not hearsay.

MR. STERN: Understood, Your Honor.

THE COURT: So that testimony is in. And if the defense feels like I stepped on the testimony in a way that made it come in less cleanly than you want, you should feel free to retread that same ground given my error.

Let's have the defense letter by close of business tomorrow on the 26.2 issues.

What else is there before we adjourn for the day?

MR. SIEGEL: On the 26.2, any communications that the defense team has, including communications with Mr. Watson about this project to change OZY's general ledger in the middle of this investigation, is 26.2 and we would like all of that.

THE COURT: 26.2, assuming we're going to have testimony on the subject.

MR. SIEGEL: She already testified that this project was happening and that she was directed to do it by Mr. Watson. And it's a subject of cross --

THE COURT: I think I need to understand, and I've been asking this for several weeks now, what is going to be the evidence that gives rise to a foundation on these barter revenue questions? Are there written contracts that people are going to point to as the subject of this barter revenue? If so, is there an exhibit sticker on them? If it's not written contract and instead it's testimony, then I have to wrestle with the hearsay objections, and so I need an answer to that question from the defense. I'd like that question to be answered also by the close of business tomorrow.

So by 5 p.m. tomorrow all of the 26.2 submissions we've discussed, including with respect to the, what I'll call the restatement process, if everybody understands what I mean by restatement. Whatever this accounting project was that took place in 2022 or 2023.

Also, I need a proffer of what the evidence of this barter revenue will be. Doesn't have to be a detailed proffer, but it has to answer the questions: Is this documents? If so, what are the exhibit numbers? And if it's testimony, who is going to give that testimony about

which deals?

MR. SIEGEL: Your Honor, I just want to be clear about our view on this project, this restatement project as you referred to it. This actually came up earlier in the trial on page 744 of the transcript. We told the Court that we had spoken to Ms. Lightfoot and that this project had occurred. The Court's question was why isn't somebody being charge the with obstruction, if that's the case? But Mr. Sullivan said I don't know anything about that, and Ms. Frison said I don't know anything about that.

THE COURT: Yes, Mr. Sullivan also told me he didn't know anything about this video except that he'd be interviewed for it, and now we just heard from another witness today that the person who invited him to be interviewed for that video was Mr. Sullivan. So there's been a lot of moving targets here on a lot of important subjects. We need to get to the bottom of what the point of this restatement was. If the point was to prepare hearsay statements for trial, then that's a very different thing than if there was some independent business purpose for it.

MR. SIEGEL: Your Honor, I would say even if there was, even if there was some independent business purpose, part of the foundation they'd have to lay is that this is stuff that Mr. Watson knew all along, even if there are these written contracts.

THE COURT: I'm prepared to exclude, unless I get satisfactory answers to these questions, all testimony about this restatement.

MR. SIEGEL: Thank you, Your Honor.

THE COURT: Again, it depends on what the foundation is, and so far the foundation has not materialized despite my many inquiries about it.

MR. SIEGEL: And in our motions in limine, we did cite law about post hoc analyses and how they've been excluded as a general matter because they're not relevant to --

THE COURT: And that's not even a close call.

Anything else from the defense before we adjourn today?

MS. FRISON: No, Your Honor.

THE COURT: All right. Thank you all. I'll see you 9 a.m. on Monday.

(Matter adjourned to Monday, July 1, 2024, at 9:00 a.m.)

* * * *

# I N D E X


| WITNESS | PAGE |
|---|---|
| **DAVID ROBINSON** | |
| DIRECT EXAMINATION BY MR. SULLIVAN | 2691 |
| DIRECT EXAMINATION BY MS. FRISON | 2755 |
| CROSS-EXAMINATION BY MS. KASSNER | 2761 |
| REDIRECT EXAMINATION BY MR. SULLIVAN | 2781 |
| REDIRECT EXAMINATION BY MS. FRISON | 2784 |
| **KOSMAS KALLIAREKOS** | |
| VOIR DIRE EXAMINATION BY MR. STERN | 2786 |
| **JOAN CLAIRE RUDY** | |
| DIRECT EXAMINATION BY MS. FRISON | 2797 |