UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------X **Docket#**
UNITED STATES OF AMERICA, : 23-cr-00082(EK)
:
:
- versus - : U.S. Courthouse
: Brooklyn, New York
CARLOS WATSON, :
: August 22, 2024
Defendant : 9:46 a.m.
--------------------------------X

TRANSCRIPT OF CRIMINAL CAUSE FOR BOND HEARING
BEFORE THE HONORABLE ERIC R. KOMITEE
UNITED STATES DISTRICT JUDGE

**A P P E A R A N C E S:**

**For the Government:** **Breon S. Peace, Esq.**
United States Attorney

BY: **Dylan A. Stern, Esq.**
**Jonathan Siegel, Esq.**
Assistant U.S. Attorneys
271 Cadman Plaza East
Brooklyn, New York 11201

**For the Defendant:** **Ronald S. Sullivan, Esq.**
Ronald Sullivan Law PLLC
1300 I Street NW, Suite 400E
Washington, DC 20005

**Transcription Service:** **Transcriptions Plus II, Inc.**
61 Beatrice Avenue
West Islip, New York 11795
RL.Transcriptions2@gmail.com

Proceedings recorded by electronic sound-recording, transcript produced by transcription service

THE CLERK: Good morning, everyone. This is a Bail Appeal Hearing, docket 23-cr-82, *USA v. Carlos Watson.*

Will counsel on behalf of the government please state your appearance.

MR. SIEGEL: Good morning, your Honor. Jonathan Siegel and Dylan Stern for the United States. I'm joined at counsel table by FBI Special Agent Thomas Kovacs.

THE COURT: Good morning.

THE CLERK: Good morning. And on behalf of Defendant Watson?

MR. SULLIVAN: Ronald Sullivan on behalf of Mr. Watson who is present.

THE COURT: Good morning, Mr. Sullivan and Mr. Watson, good morning to you as well.

All right. We've had a fair amount back and forth here. I'm trying to solve two main issues and maybe some subsidiary issues as well.

I agree, I think I've said this already, that the amount of the bond set by Judge Scanlon is sufficiently high in this case. The two conditions that I wanted to see satisfied are (A), that the security was sufficient that the government would have the ability to collect on the amount of the bond in the event Mr. Watson

did not surrender for sentencing, or surrender to serve his sentence as directed. And (B), that there be one person at least whose personal commitment here gave rise to the kind of moral suasion that this federal system generally relies on.

And I had asked about financial affidavits from a handful of sureties in that connection, in connection with the ability to assess okay, I know what this person is posting but I don't know what it means to them in terms of the situation they would find themselves in in the event the bond was forfeited.

I'm happy to hear in the first instance from defense counsel, your view as to where we are and where we go from here and then from the government.

MR. SULLIVAN: Thank you, your Honor. I think we've satisfied your Honor's conditions and concerns.

If I may, I have an affidavit from Mr. Kalliarekos as well which came in Hong Kong time but very early. We haven't had a chance to file it yet. Very early for us. The government has that.

THE COURT: Thank you.

MR. SULLIVAN: And it addresses the central concern, particularly the second paragraph of the affidavit where he says that it's a meaningful financial risk that he is assuming in this matter. The first

paragraph says the amount is indeed meaningful in the context of my financial situation and its forfeiture would result in economic harm to me.

And with respect to the other affidavits, in addition to the pledged amounts, the sureties also agreed to provide monthly certifications in a form similar to the attachment. One concern was that well, they can just take the money out. One, they can't really do that for at least one of the accounts, the retirement account. But to the extent they could, they've agreed to do monthly affidavits as a means to at least assuage any concerns that they'll somehow empty out the account. That's no longer a concern obviously with Mr. Kalliarekos. You know, we're prepared to submit a bank check today should your Honor sign the bond. So that's cash in the clerk's office.

The only other category is the (indiscernible) and there are deeds -- I'm sorry, there are liens recorded on each of the deeds. We have the -- the file numbers have been submitted. It's recorded. And that's the normal course. That's what generally happens.

So by our calculations, at least 85 percent of this entire $3 million bond is secured and that's a really high number at least based on my experience. Most of the time, people just sort of sign and say we pledge

this amount. But this is backed up with cash and land and that's most of it. That's $2 million that is secured.

And then we have these other accounts from people who certainly don't have the sorts of resources that Mr. Kalliarekos has, but they are giving what they can give in an effort to indicate their support of this bond. And it's some 17 sureties, which is also an unusually high number.

So we think we've met the conditions by clear and convincing evidence consistent with the statute to warrant signing the bond and I'm happy to answer any specific questions the Court may have in that regard.

THE COURT: Who is the person in your view who stands to lose the most for them relative to their financial situation in the event of noncompliance?

MR. SULLIVAN: Probably the nine members of the family who own the land in Virginia. And it's not just the economic piece of it, but it's the emotional attachment to the land which has been in the family for a very, very long time. You know, the family had plans for that land over the generations. It's passed down. I think that would harm them not only financially but existentially, and it's significant.

A strong number two is Mr. Kalliarekos -- $1

million is a lot of money. You know, he's not a billionaire. So $1 million is a lot of money. I think that is a significant harm.

Ms. Watson, Beverly Watson, is up there as well. You know, she pledged the entire value of her condominium and essentially during the course of this trial drained all of her accounts already, so that would absolutely I think economically devastated her.

So those would be I think my top three.

THE COURT: Thank you.

MR. SULLIVAN: Yes.

THE COURT: Mr. Siegel?

MR. SIEGEL: Thank you, your Honor. I think it's helpful to talk about where we were the last time we were here and what's actually changed other than sort of the rhetorical phrase about what's changed.

When we were last in front of your Honor, your Honor expressed the concerns that you expressed. And what's changed -- and so you wanted sureties to put up more, you wanted to sureties to be perfected.

What's changed is Mr. Kalliarekos has gone from $100,000 to 1 million dollars and one other surety went from 25,000 to 50,000. From the government's perspective, and I'm not going to spend a lot of time on this because you've heard it, Mr. Kalliarekos and the

other surety who increased, those other two people with the least moral suasion. Mr. Kalliarekos, as we've talked about, is someone who the defendant has victimized already of more than $1 million. So the idea, as we've said, that Mr. Watson would be deterred by loss to Mr. Kalliarekos, a person who he victimized four years, we just don't think there's any confidence.

The other person who increased their amount, Michael Troner, is the father of a friend of one of Mr. Watson's sisters. There is a relationship there but it's not the kind of close relationship there we think gives a lot of confidence.

But putting those aside, there's the issues of the security. Mr. Kalliarekos has offered to put up the $1 million cash and we agreed to the extent there was any concern about the security for him. That's settled.

But for everyone else, there really hasn't been any progress. And this is an issue that started from the very beginning of the hearings with Judge Scanlon where we raised how are you going to secure ties to all these accounts. The defense repeatedly assured Judge Scanlon that they would be able to secure ties to the accounts. The defense said he should be let go. We'll get the security done. Judge Scanlon didn't do that. And what we find ourselves now is the defense is now acknowledging

it's not really possible to provide a security interest in some of these accounts. What they're offering --

THE COURT: Which accounts?

MR. SIEGEL: So for all of the cash other than Mr. Kalliarekos, they have indicated to us that it is not possible to put a security agreement in place for those. So like your Honor suggested a third-party agreement, which would be the normal way to securitize an account. The defense has indicated to us that those people have spoken to their banks or custodians of their securities who have said that they won't do that.

So what they've offered is basically an affidavit of we have the money, we'll give you the money, but that's exactly what a bond is. That's just an unsecured pledge.

THE COURT: But that money can't be posted with the clerk, why? Because (A), I understand you can't post corporate securities with the clerk's office. They're not a custodian for that kind of asset.

MR. SIEGEL: And some of them are retiring in accounts where you can't actually take the money out.

THE COURT: Without penalty.

MR. SIEGEL: Without a penalty. And as far as I know, they haven't offered to do that. I mean again, if they want to say here's $100,000 cash, we would agree

that would satisfy the security side of this.

THE COURT: Okay. But just for the people wh have IRAs or 401(k)s implicated here, is it your position that all of the documentation they've agreed to submit, affidavits and whatever else, it adds literally nothing to the picture of their liability? So they're on the hook for the bond anyway. I suppose they could withdraw all the money from their 401(k) or whatever, pay the penalties in the process if they are not yet at the relevant age for withdrawal and then move the money somewhere where it would be hard for the government to get it.

First of all, that's a lot of machination for somebody to go through. And second of all, my real question do the affidavits add nothing? I mean they've served an affidavit on the government now saying we pledge to leave this money where it is. And wouldn't that make them at least theoretically subject to 1001 prosecution if the money later moved? I suppose you have to show that the statements were false when made rather than false when the money was withdrawn.

But there's some value, is there not, in the paperwork that's been submitted in accompaniment?

MR. SIEGEL: Your Honor, anytime someone signs a bond, which is a pledge to pay money, and there is an

examination by the magistrate of can they pay the money, there's value in that. I don't think that these affidavits create any marginal value on top of that. They were on the hook in theory before in an unsecured way, they're on the hook now in an unsecured way.

To the extent that Judge Scanlon and your Honor and all of your Honors have said that you want the security perfected, that has not been done. There is not security. Is there an unsecured pledge? Yes.

THE COURT: Well, I think --

MR. SIEGEL: And I'm not suggesting that these people are trying to defraud the government.

THE COURT: Right.

MR. SIEGEL: But there is a higher value of the secured pledge. It's something that Judge Scanlon wanted, it's something your Honor wanted. That has not been done.

THE COURT: Okay. So yes, I'm looking at a series of excerpts from the transcript of the parties, from both the minute entry from July 31st when the parties were before Judge Scanlon and the transcript. The minute entry says the Court signed the bond but stayed its implementation until all of property to be posted is restrained or posted in various jurisdictions. Defense counsel to submit confirmation of surety

posting in writing to the Court; if satisfactory, the Court will so order the bond.

And on the record, Judge Scanlon said that the release order would become effective only once Judge Scanlon has said "that the bond has been fully satisfied with all of the property, real property being posted with the appropriate documentation for the county and state the property is in and for each of the different kinds of accounts that are here, that the proper restraint be provided. Counsel is going to have to get that information as to what that is from the different accounts. And for monies that are overseas, they need to be in the United States." And there are a handful of other clear statements to that same effect.

But what I'm going to interpret all that to mean and the way I'm going to proceed myself is that the defense needs to do that which can be relatively readily done. And I am sympathetic. So you know, as far as providing true legal encumberments on securities held by third-party custodians, that is hard to do. You know, Charles Schwab doesn't want to take the risk that monies are going to leave a Charles Schwab account and they're going to get sued under some three-way contract for having failed to comply with a bond that they as a company have no real interest of their own in one way or

the other and that they're not really getting compensated to deal with.

The Virginia property is obviously a really complicated thing that requires perhaps the knowledge of Virginia property law that I and maybe everybody here lacks. But I do feel like we're getting very close in that monies that were in a Schwab account or wherever Mr. Kalliarekos has his U.S. account, that's now ready to be deposited with the clerk's office. I understand we still don't know despite our best efforts anything about Mr. Kalliarekos's real financial picture and this may be -- to me, the bigger problem with him as the suretor is not his status as a putative victim here or maybe even an established victim but rather the fact that this money could be immaterial to his way of life for lack of a better way of putting it. But it's something and it's a statement of some confidence that is worth more than zero.

MR. SIEGEL: But your Honor --

THE COURT: What do you want, what is readily achievable in your view that has not been done that you would want to see done before we all conclude that Judge Scanlon's and my criteria have been satisfied?

MR. SIEGEL: Your Honor, but just to go back to what you said for a moment. The issue here is that

there's sort of a bait and switch going on. Normally when you have sureties, the sureties sign for the full bond, which here would be 3 million. Here, there were sureties who said I have assets but the only assets I can post is, for example, $100,000 or $25,000 because that's the only thing that I can securitize. Like they didn't sign the full bond, they only sign for that small, for that limited amount because they said this is what I can pledge.

Now, we said at the beginning we don't think they're going to be able to pledge it. And the defense that we will, we can.

THE COURT: So then going back to my question --

MR. SIEGEL: And Judge Scanlon said okay, but this is your problem, defense, you have to do it.

THE COURT: Understood. So --

MR. SIEGEL: And now they're coming back and saying we can't but let's just stick with it this way.

THE COURT: So therefore what? Therefore they should go on the hook for the full $3 million amount of the bond because they can't actively securitize the amount they undertook to securitize?

MR. SIEGEL: So I guess, your Honor, the issue that the government sees, and maybe this is just a losing

battle, as we've expressed I think that everyone understands, we don't trust Mr. Watson and we don't trust representations of the defense. And even now after the whole trial and all the orders your Honor had, every order that you give or Judge Scanlon gives is still being treated as the opening place for negotiation.

And so we fundamentally think, we continue to think that he should not be released, but I don't want to play a game where we set conditions and then they say actually we can't meet those conditions and then we keep moving the line.

So at the very least, it should be that they should do what they've agreed to do. If --

THE COURT: Which is what? Which is get you a perfected security interest in the Virginia property?

MR. SIEGEL: No, it's not the Virginia property. The Virginia property we don't think is worth particularly much. We litigated this in front of Judge Scanlon. Even the emotional attachment that they talk about, and I --

THE COURT: I mean here is where I am just to net this all down hopefully. I'm very close as is to signing the bond. I understand the Second Circuit's directive to me that district judges are supposed to approach the setting we're in from a de novo perspective.

And I understand that the baseline legal standard is very different post conviction and imposes a high burden on the defense. I understand that Mr. Watson has a lot of problems at the starting gate given the way this litigation has progressed especially over the last year.

At the same time, questions of bail in my view are, in some degree, big data problems. You get better at determining how to set the dial on a bail package by hearing hundreds or thousands of bail hearings and magistrate judges do that and district judges don't. And so it matters, even from a de novo perspective, it matters to me that Judge Scanlon was prepared to release Mr. Watson on the conditions she set.

I understand those conditions haven't been satisfied in their entirety because she was waiting on perfected security interests that have not materialized. At the same time, there have been other measures undertaken by the defense that at least in part make up for those shortcomings.

What I'm saying to you here is if you have a handful, and maybe a small handful, of specific items on your wish list, if you're saying Judge, we cannot collect on the bond here unless the defendant does X, Y, and Z and X, Y, and Z are things that the defendant reasonably can be expected to do in the near term future, I will

consider, you know, requiring those readily achievable goals to be met. If you're just saying we just think that release is inappropriate under anything remotely resembling the circumstances we have here, then I have your argument and we'll move on.

MR. SIEGEL: Understood. So your Honor, let me say a couple of things and I'm going to answer your question but I just want to establish the context.

I agree with everything that you said about magistrate judges and Judge Scanlon in particular from whom I don't think I've ever appealed an order before.

Just what is different here is that, I think your Honor experienced it, there is an expectation for what goes on in federal cases and the candor to the Court that we expect in federal cases. This is a case that is outside that norm and I don't think that until you lived it the way that you have and we all have that you can really believe it. And I think that was the context that Judge Scanlon was missing. But just that piece and I'll move on.

Look, I think -- so if the goal is how can we actually collect that 3 million, so we have -- I mean just to run through the numbers to make it concrete, we have $1 million posted from Mr. Kalliarekos. So that leaves 2 million. There's the three people who signed

the $3 million bond. I think if you look at their net assets based on the financial affidavits we've gotten, their net positive assets I think is a couple of hundred thousand dollars, maybe 3, maybe less. So that's just their assets.

There's the condo which I'm including in those assets. That only has $100,000 of equity in it.

There's the Virginia land which we estimate, based on the arguments we presented to Judge Scanlon which Judge Scanlon accepted, about $100,000.

If you include the other sureties unsecured, that gets us another couple of hundred thousand dollars. So let's call it about $1.5 million. So we're halfway there.

I think if the other sureties signed the full 3 million, they have additional assets. I know at least one of them has several hundred thousand dollars in other assets that they said they couldn't legally pledge because they're retirement accounts. But if we're just doing it unsecured, I think that would get us closer.

THE COURT: Who is that particular surety?

MR. SIEGEL: There's Dr. Mattis who is a dean I believe at Rutgers who the defense provided us with her retirement accounts which are I believe in excess of $500,000. Originally she had said she would pledge that

and she said oh, I talked to my custodian and I can't pledge it, so it was reduced to just $100,000.

So we could have the people who put in for the limited amounts sign for the full 3 million. That would get us closer to being able to collect and it would increase the moral suasion.

The defense, at least in emails to us, and I think it was in their -- I don't know if it was in their last letter, has talked about getting an insurance bond so that that would cover at least some portion of the missing gap.

THE COURT: I took their letter to say that that was done or at least ready to be done, that some insurance company has committed to a $300,000 bond.

MR. SIEGEL: So if we put --

THE COURT: But I don't think we know who the company is.

MR. SIEGEL: Yeah. I mean it's not clear to me why we're taking $300,000 when we have a $3 million bond, most of which is unsecured. But to the extent a third-party insurer who then would have an economic incentive to go after them can plug -- whether it's 300,000 or the missing 2 million or whatever gap your Honor feels, those are the kinds of things that can be done.

I say all that again in the context of myself

even with all that not feeling any confidence that Mr. Watson would not jam these people up for $3 million in a blink of an eye. But if your Honor wants to, then I think those are the things that get us closer to actual security.

THE COURT: So let me just make sure I understand the list.

Dr. Mattis would commit to the full amount of the bond even though she's not posting --

MR. SIEGEL: Yeah, I would say I mean all the people who put in limited amounts and said like because this is what we're posting, and that would be Dr. Mattis, that's Ms. Troner, her father Dr. Troner, the Wallace Estes, those are all people who have assets who said we'll pledge the specific property. If we're moving away from a specific property point of view, I don't see any reason why they shouldn't just sign the bond away. In my experience, that's what's always done any time a surety signs the bond.

Here we did something a little different because we were securing particular properties. But if we're not doing that, then I don't see why it should be any different from what it normally is.

THE COURT: Okay. So that plus the insurance company bond, that's the ask.

MR. SIEGEL: Again, if the Court's view is --

THE COURT: A limited ask, yes.

MR. SIEGEL: Yeah. If the Court's view is all that we need to accomplish is security and then we're good, I think those are the kinds of things that we'd need to accomplish to make this collectible. Whether that's sufficient, you have our arguments.

THE COURT: I do. And I understand they're not waived. And I agree with you this is an extremely close call that could go one way or the other. But the system is set up to rely on the commitments of third parties to some degree. Well, I'll leave it at that.

Mr. Sullivan, if the delta between where we are now and where we need to be is that the insurance company bond materializes and that one or more of the sureties who went on the hook for less than the full amount of the bond because the expectation was that they were going to post and perfect as the specified property that since has not been perfected, those people, one or more of them would be to go on the hook for the full amount of the bond, is there any reason you can't achieve that?

MR. SULLIVAN: Well, I don't know, your Honor. We have to speak to these people. These are regular working people. They've put up a lot of their assets, their home, one, the Estes Wallace, you know, their

actual home, a piece of it.

The moral suasion here is already significant. We're talking about $267,000. It's less than 10 percent or about 10 percent of the total bond that we are arguing about.

THE COURT: No. Actually, I think if you're going to accurately describe the other side's position where your position is the bond is 85 or whatever percent secured --

MR. SULLIVAN: Correct.

THE COURT: -- I think there's a legitimate dispute, a non-frivolous dispute on that point because we're still talking about whether Judge Scanlon's and my requirement of perfected security interest has been satisfied. Right?

MR. SULLIVAN: Well, it --

THE COURT: So if we just leave things at the status quo which are okay, Judge Scanlon's order persists as is and Mr. Watson will be released when liens on all of these properties are perfected including the securities, I think where that leaves us is Mr. Watson is not getting out because we've been -- I think where we've gotten to is a point where everybody acknowledges that the security interests that were proffered cannot be perfected at least in all cases.

And so the question is what gets substituted in place of that? What is this insurance bond which is valuable that we need to know who the insurance company is. And two is can somebody who was going to perfect the security interest in one or more properties but didn't then go on the hook, you know, at least for purposes of moral suasion sign the bond in the full amount knowing that if and when Mr. Watson reports for sentencing and surrenders that the bond will be exonerated and they can go on about their business with nothing lost.

MR. SULLIVAN: But let me take it step by step. I don't think the government's representations are accurate.

First of all, 100 percent of the real property has been perfected. A full 100 percent. We have --

THE COURT: Do you think that's undisputed though or you --

MR. SULLIVAN: Yes.

THE COURT: -- you acknowledge the dispute there?

MR. SULLIVAN: No, it's not in dispute.

THE COURT: The Virginia property you're saying is now the subject of a perfected security interest?

MR. SULLIVAN: Yes. We've done that. All of the properties that weren't at the time when we were in

front of Judge Scanlon were not perfected. We asked if we could have time to do that while he was released. She said no, get it done. 100 percent of the properties are perfected.

THE COURT: Can I just --

MR. SULLIVAN: And your Honor has -- they're recorded on the deeds and it's part of the --

THE COURT: Can we just pause here for a second?

MR. SULLIVAN: Yes.

THE COURT: I don't usually like to ping-pong back and forth but I think I need to just understand a little bit better what the government is saying are the defects in whichever of these security interests.

MR. SIEGEL: Yeah. The land I think is -- land is the easiest thing to post and I think that's where we have the least distance. The representation that there's no disputes left is not accurate.

THE COURT: Why?

MR. SIEGEL: So for the Virginia land, and again I think this is just a paperwork thing but that we've been raising for a couple of weeks, the Virginia land has somewhere around a dozen owners. Most, possibly all of them, I don't recall, but most if not all of them signed a power of attorney to allow Beverly Watson to

sign a lien on their behalf. We've just been raising that we think that the lien they gave us is just Beverly Watson signing the lien. We think that there needs to be something that makes clear who she is signing on behalf of and each person that that lien --

THE COURT: No, but we all understand well enough at least, even if our secured transactions days of studying for the bar exam are far behind us, what it means to have a lien. And so is there one in place as to this land or is there not?

MR. SIEGEL: Well --

THE COURT: Or you say there's a lien but it might be flawed because --

MR. SIEGEL: There's a lien but it's -- I mean the whole idea of the lien is that we can just go into court and say like here we go, it's default, we take the land.

THE COURT: Right.

MR. SIEGEL: There's a piece of paper from Beverly Watson saying I am signing this lien. But there's about --

THE COURT: But a Virginia lawyer would tell you this is either a good lien or it's a bad lien. Is it not that simple? I would think if there's some --

MR. SIEGEL: I'm not a Virginia lawyer and this

is a concern we've raised to the defense that just hasn't been addressed either with an opinion letter or with them meting our concern. All that we've asked for is that they modify the lien to just make it clear who Beverly Watson is signing on behalf of. That's the only issue we've raised with the Virginia land.

THE COURT: Oh, not even to get signatures from each of those people but simply to list their names?

MR. SIEGEL: No. Yeah, she has the power of attorney. So we're not disputing that. We just wanted to be, for purposes of making sure this lien is actually perfected against each of the people who have an interest in it, just making it clear I am signing this through a power of attorney on behalf of one, two, three, four, whatever. That's the only issue we've raised about the Virginia land.

THE COURT: Okay.

MR. SULLIVAN: And that issue is not a real issue. That's already been done. It's been taken to the clerk's office. In Ms. Watson's affidavit which gave rise to the lien, it says the undersigned hereby confesses judgment herein and authorizes entry thereof against owners, plural, in the sum of $750,000.

The Virginia clerk accepted it, put the lien in. This has already been -- your Honor already has a

copy of this. The government has as well.

I'll pass this up. This is the affidavit associated with the confession of judgment that clearly says owners, plural. The clerk's office reviewed the -- this is at paragraph 1. The clerk's office reviewed this, reviewed the powers of attorney. Everything was good. And as the government said, there is a lien on there.

So we have addressed it and addressed it in writing that it is a lien, it's perfected, judgment has been confessed. It's as though the government just wants us to jump through more and more and more hoops. You know, go back to Virginia one more time at great expense and do this again. This is done, your Honor. 100 percent of the land is perfected.

THE COURT: This has been recorded in the clerk's office of --

MR. SULLIVAN: It has.

THE COURT: Pronounce the name of the county for me.

MR. SIEGEL: Gloucester.

THE COURT: Gloucester?

MR. SULLIVAN: Gloucester.

THE COURT: County Circuit Court on August 5th in the Commonwealth of Virginia.

The copy that's just been handed to me says in paragraph 3 that this confession of judgment is for a debt justly due arising from the following facts. But after the word justly, there's an asterisk and I don't think I see where the asterisk, where it calls out to. Do you have another copy of this, Mr. Sullivan, or you want me to hand this back?

MR. SULLIVAN: No, I have another copy. I don't think that's a footnote. I don't see anything on here either. I don't know if that's some sort of typo or something. But again, the clerk accepted it and there's a lien filed and judgment of confession against owners, plural, of the property. But no, there's nothing that was filed that modifies justly.

THE COURT: Odd. Okay.

MR. SULLIVAN: So that's point one. Since we were in front of --

THE COURT: All right. So let's pause. So that's the property. The government I think was going to say that there are bigger problems with other security interests --

MR. SIEGEL: Yeah. So the real estate --

THE COURT: -- or bigger disputes.

MR. SIEGEL: The only disputes we have about the real estate is not whether it can be done or whether

there's a lien, but there were sort of minor issues that we raised that for whatever reason haven't been addressed. Maybe they don't think -- I mean I understand they don't think they have to be but we've isolated the issues.

The other issues are the money and the accounts. Those other things that we've largely been talking about. The retirement account for the $130,000, how do you securitize that. We've always taken the position that we didn't think that it really could feasibly be securitized.

THE COURT: No, but I'm sorry, what I'm trying to get at is where the parties disagree right now about what is securitized and what's not. Mr. --

MR. SIEGEL: Yeah. So between the 85 percent and our numbers?

THE COURT: Yes.

MR. SIEGEL: So one, they don't break down their numbers but this is as far as I can tell. They're counting the full value of Ms. Watson's condo for about $400,000. It has --

THE COURT: It's encumbered.

MR. SIEGEL: -- pre-existing debt on it so it only has equity of about $100,000. So I think that's part of the delta. I think they're valuing the Virginia

land at over $700,000. We're valuing it at about $100,000.

THE COURT: All right. So fine. Disputes over valuation. But there's no -- okay. So there's not a security interest that they say has been perfected and that you say has not apart from any qualms you may have about this Virginia lien.

MR. SIEGEL: That's right.

THE COURT: Okay. Thank you. Sorry.

MR. SULLIVAN: No problem, your Honor. Thank you.

So the second significant difference, at the time before Judge Scanlon -- you know, initially Mr. Kalliarekos was at 100,000 and has increased it tenfold to a million. So to the extent there were concerns about security, he then moved this million to cash which we are ready to deposit. So that million, that increase in number from 100,000 to a million, plus the change to putting that in an account with the clerk, is a significant difference.

THE COURT: Yes.

MR. SULLIVAN: And it is our position that it obviates concerns about this 267,000, these smaller accounts.

The government left out --

THE COURT: But not --

MR. SULLIVAN: -- just one -- I'm sorry.

THE COURT: -- not necessarily in a way that speaks to moral suasion. Let me put a proposal on the table and you all will consider it perhaps and you can make some phone calls if necessary during a break.

The proposal is that the defense do the following and then the bond gets signed today once the requisite documentation has settled. The defense does the following.

One, amends this filing in Virginia to remove the asterisk and to name the actual owners. That may be necessary, it may not be, but let's resolve all doubts there. That's point one.

Point two, one of the sureties who was signing the bond only as to a limited amount in contemplation of them perfecting a security interest in that amount will, since they have not perfected that security interest, now sign the bond for the full amount of the bond. That can be Dr. Mattis, it could be the Troners. Well, the Troners or the Wallace Estes, but it has to be at least one of them. That's second.

And third, we get whatever documentation we need to make sure we understand this insurance company bond.

I think if the defense can satisfy those three conditions this proceedings will come to its successful conclusion today over the government's objections I understands.

MR. SIEGEL: Your Honor, can I just make a few comments on those conditions?

THE COURT: Yes.

MR. SIEGEL: The asterisk I think is in all of the liens so to the extent we're removing it on one, I think it should be removed from all of them.

THE COURT: Okay.

MR. SIEGEL: And then for the sureties, you said any of them. Amy Troner does live in the UK and part of the issue was that she was going to -- she had a U.S. account where that money was going to be in that was going to securitized.

THE COURT: Right. So not Amy Troner.

MR. SIEGEL: So we would just say not Amy Troner. But for the others, you know, understanding your ruling, that's fine.

THE COURT: Okay. All right. Let's break here. The parties have a local extension for either the Court's deputy or law clerk. You'll let us know when you're ready to go back on the record and we'll take stock of where we are at that point unless, Mr. Sullivan,

there's something you want to say.

MR. SULLIVAN: Well, just one other point that, you know, there are already three people who signed for the entire $3 million bond. The Court is asking for a fourth. Now we have to go out and try to contact these people and so forth.

I guess our position is that Mr. Kalliarekos's change should --

THE COURT: Mr. Kalliarekos has not submitted a financial affidavit. This piece of paper you handed up today, it says affidavit at the top but that's not what it is. And I understand his hesitation. His personal financial position is private. I get why he wouldn't want to file it even under seal.

But the upshot of that is that I think we have to assume that the amount of money he's posting is immaterial to him one way or the other and therefore it confers no moral suasion. He's worked in private equity for a very long time. It's not a big stretch to assume that his liquid net worth is 50 or 100 or more times the amount that he's prepared so far to post today. So I just don't take that much in the way of moral suasion from the Kalliarekos part of this equation.

You'll do your best and you'll let us know, you know, half an hour or 45 minutes from now, whatever it

is, where things stand and we'll reconvene at that point.

MR. SULLIVAN: Very well.

THE COURT: Okay. Thank you all.

The other thing is once we get there, if we get there, the parties will have to make sure the documentation looks like what it looks like, that the bond we all agree says what it should say, that it has whatever attachments it should have. You may want to discuss that amongst yourselves as well and get that part of the process rolling. We have working drafts of the bond but obviously there are a number of moving parts there as we speak.

MR. SIEGEL: And your Honor, on the bond conditions, all the other conditions that Judge Scanlon set, those would remain in place in terms of the home incarceration and --

THE COURT: Correct.

MR. SIEGEL: And for any of the changes, I think this would apply to Mr. Kalliarekos, Mr. Troner, and whatever surety changes, I think there would need to be another bond swearing and signing by them.

THE COURT: Yes, which they can do on the phone presumably, right?

MR. SIEGEL: Yeah. I'm just noting it.

THE COURT: Okay. All right. Thank you.

(Off the record)

THE COURT: All right. We're back on the record. It is a little after 2 p.m. Mr. Sullivan?

MR. SULLIVAN: Thank you, your Honor. May I remain seated?

THE COURT: Yes.

MR. SULLIVAN: So we have an additional suretor, Terri Thomas. I just sent the Court an image of a financial affidavit from Ms. Thomas. Ms. Thomas is a cousin and she's also one of the owners of the Virginia land and has agreed to the entire 3 million. The government has a copy as well.

Second, we have the insurance bond ready should your Honor order it. Mr. Judelson is here in court and ready to sign on the dotted line. The government has interviewed him and met with him.

Third, with the land, our position is still that there is a lien on each of the relevant deeds. We are in the process of doing what your Honor asked. At least two of them require in presence. The Virginia one is a five hour drive, so that can't be done today. But the government advised that their position is that to the extent your Honor is otherwise satisfied, then they won't object to the sort of technical things that might need to be done with the land.

Given that, our position is that we are there --

THE COURT: Okay.

MR. SULLIVAN: -- and we'd ask the Court to sign the bond and the relevant orders.

THE COURT: Is there a bond that -- well --

MR. SIEGEL: Your Honor, can I just --

THE COURT: Yes.

MR. SIEGEL: So there's an additional surety. And your Honor, as your Honor knows, our objection stands for the whole procedure but understanding the conditions that your Honor set. There is an additional suretor. The financial affidavit indicates that she has net assets of about $80,000. It doesn't do terribly much to close the gap towards the 3 million, but it is an additional person which was the condition that your Honor set.

We have spoken to the insurance bondsman and we don't have any additional comments on that.

On the land, we really defer to your Honor. Your Honor had set the requirements for today. If your Honor chooses to waive those, we don't have anything to add. But it's sort of an unusual position given that we object to the whole thing and whether we object to parts about whether they satisfy the Court's conditions.

THE COURT: Understood. Yes. So I had said

look, let's work out the issues with respect to the lien documents in Virginia of which I was focused on two. One, that the owners were not listed in the affidavit as the government pointed out and two, that there's this asterisk that remains unexplained. That's going to happen but not necessarily today. And the government objects to bail under any circumstances but is not asking me essentially to withhold release if I'm otherwise inclined until the lien corrections are made. So that, I think we all have --

MR. SIEGEL: That's right.

THE COURT: -- relative agreement on.

Two, the government was going to learn whatever it needed to know about the quote/unquote insurance company at issue. Just for the sake of the record, what company are we talking about?

MR. SULLIVAN: It's called Ira Judelson Bail Bonds.

THE COURT: Ira Judelson Bail Bonds.

MR. SULLIVAN: Judelson.

MR. SIEGEL: I think he's the agent for an insurance company who's like Empire something, but there is an insurance company that he's the agent for and it works much like -- we see it -- it's much more common in the state than it is here.

THE COURT: Yes, I've never seen this before.

MR. SIEGEL: He would sign. Basically the insurance company would be the surety with him signing as its agent for $300,000. Then four people have made sort of side agreements with him that if he ends up having to pay that bond, he will have the ability to go after them. So it's effectively outsourcing the surety process.

THE COURT: And you know who those people are?

MR. SIEGEL: Counsel's represented it's Amy Troner, her father Michael Troner, Annye Watson, and Dr. Mattis.

MR. SULLIVAN: That's correct.

THE COURT: Okay. All right. I suppose there's an efficiency there perhaps.

You know, as to the additional surety, I was not actually thinking of an additional surety. I thought we were talking about one of the existing sureties who is signing on for less than the full amount of the bond.

MR. SULLIVAN: Oh, she is, your Honor. She's one of the landowners, so she's already signed the bond with respect to the land.

THE COURT: Oh okay. Okay. Not one of the people we were otherwise talking about.

MR. SULLIVAN: Right.

THE COURT: All right. So I think what that

leaves is the bond. And I have a bond in front of me. It's blank. I would like the parties, together with the courtroom deputy, to execute this as they collectively see fit. Obviously bring any points of disagreement to my attention. This was a pretty complicated bond in the first instance and has only gotten more complicated since, so I'm expecting that the parties need some time for this.

MR. SIEGEL: Your Honor, I think in order to avoid needing to have every surety come back and sign, it would be -- to the extent it's possible, make more sense to amend the bond issued by Judge Scanlon just for sort of the changes that we've identified here as opposed to doing a new bond.

THE COURT: That's fine.

MR. SIEGEL: So if we do a new bond, we'll need to get re-signings for everybody which --

THE COURT: Yes. These are logistics that I would like otherwise to be as little involved in as possible. And I assume the parties will reach agreement on the logistics. If you don't, you'll let me know where you're stuck. But I'm happy to sign the bond once it settled between the parties. Let me hand this, Sandy, to you.

MR. SULLIVAN: Very well. Just in an abundance

of caution, Ms. Thomas is on the phone. She was already interviewed by Judge Scanlon. I'm not sure if the Court requires anything additional because she's signing on to more but she's in Illinois.

THE COURT: Does the government see any colloquy that's required with --

MR. SIEGEL: She would need to express that she understands as opposed to the limited amount that she was signing onto before she's now signing onto the full 3 million.

THE COURT: Okay. You want to just email two sentences to my law clerk and I'll use that as the basis once we've all otherwise agreed on the amendment to the bond?

MR. SIEGEL: That's fine. What I'm just thinking is I think all the magistrates have like a script that they read from and I don't know if it's possible for the Court or for your clerk to just reach out to the magistrates to get their script, which I don't have.

THE COURT: We can do that.

MR. SIEGEL: But there's a set number of questions that they ask. And so I think it would just need to be Ms. Thomas --

MR. SULLIVAN: I think --

MR. SIEGEL: -- Mr. Troner, Mr. Kalliarekos, and Mr. Judelson are the ones who would need to be re-sworn because they're the only ones who have changes.

THE COURT: Okay.

MR. SULLIVAN: Oh, I'm sorry, it was --

THE COURT: And is that the kind of thing I can send you to the arraignment court to conclude once we've settled on what the bond should look like? I'm getting some positive head shaking here.

MR. SIEGEL: I think you can. The only question is getting it done today and --

THE COURT: It's only 2:10. Finish the bond and then once you're all agreed on what the amendment to the bond, what the documentation should look like, we'll send you off downstairs for the formalities.

MR. SIEGEL: That's fine.

THE CLERK: (Inaudible).

THE COURT: Okay. Then we can just transfer her down to --

THE CLERK: Yeah.

MR. SIEGEL: And I don't know who's on duty today and actually there's a chance that it's Judge Scanlon, but it might make sense to see if Judge Scanlon is available just given her history of the case to see if we can just --

THE COURT: I mean I don't want to impose a lot of burden on a magistrate judge. And so if you think this is complicated, then maybe I'll do it myself. I was thinking that once everybody is 100 percent agreed to what the bond modification documentation is going to say that from that point on this really is a formality where we're just reading a script to the sureties and having them indicate their agreement as necessary. I would have thought any magistrate can do that. If there are things that require some familiarity with the case, I would keep it. But I'm going to let you all figure that out in the first instance and let me know when you're ready either for me to come back and approve the bond or for whatever you think the next steps are.

MR. SIEGEL: Okay. Thank you, your Honor.

MR. SULLIVAN: I do think -- so again, Ms. Thomas is on the line. She's at work. For efficiency sake, she had a sort of limited time window. I think Ms. Richards has the colloquy. If your Honor is inclined, that could be one thing because it's --

THE COURT: This Ms. Richards?

MR. SULLIVAN: Yes.

THE COURT: Has the colloquy?

MR. SIEGEL: That's fine by us.

(Pause in proceedings)

THE COURT: Do we think Ms. Richards actually has the colloquy or does not have the colloquy? No. This is to the defendant himself.

All right. I'm going to step -- I don't want to be involved in these logistics. I am going to leave them to the parties. Pretrial I think wanted to say something.

PRETRIAL OFFICER: For the record, Pretrial Services, Robert Long.

Just to add to the logistics of sending it down to the magistrate, I agree with your Honor, as long as the bond conditions have been laid out by the parties, we can have any sureties call in. The judge would take the surety's signature by telephone. The fact that she's on the phone now without having the bond conditions laid out to any potential surety, I don't think --

THE COURT: That sounds like out of order, right?

PRETRIAL OFFICER: Exactly, your Honor. And that would be --

THE COURT: Yes. I'm still where I am which is I need the parties to work out the logistics and you'll let me know when you have. And to the extent can send things for pure formalities downstairs, we will. Otherwise we'll deal with it here.

THE CLERK: Judge, would you like them to go downstairs (inaudible)?

THE COURT: They may be. May be. Yes. We don't know for a fact yet. All right. You'll all let me know when you're ready to go.

MR. SIEGEL: We will.

(Matter concluded)

-oOo-

**C E R T I F I C A T E**

I, MARY GRECO, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **23rd** day of **August**, 2024.

Mary Greco

Transcriptions Plus II, Inc.