UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X

| | |
|---|---|
| UNITED STATES OF AMERICA, | : 23-CR-82(EK) |
| -against- | : United States Courthouse<br>: Brooklyn, New York |
| CARLOS WATSON, et al, | |
| Defendants. | : July 2, 2024, Monday<br>: 9:30 a.m. |

- - - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR A JURY TRIAL
BEFORE THE HONORABLE ERIC KOMITEE
UNITED STATES EASTERN DISTRICT

A P P E A R A N C E S:

For the Government: BREON PEACE
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201
BY: JONATHAN SIEGEL
GILLIAN KASSNER
DYLAN STERN
Assistant United States Attorneys

For the Defendant Carlos Watson: RONALD SULLIVAN LAW PLLC
1300 I Street NW, Suite 400-E
Washington, D.C. 20005
BY: RONALD S. SULLIVAN, ESQ.
BY: JANINE M. GILBERT, ESQ.

For the Defendant Ozy Media, Inc.: FRISON LAW FIRM, P.C.
75 State Street, Suite 100
Boston, Massachusetts 02109
BY: SHANNON FRISON, ESQ.

Court Reporter: SOPHIE NOLAN, RPR, RCR
225 Cadman Plaza
Brooklyn, New York 11201
718-613-2622
E-mail: NolanEDNY@aol.com

Proceedings recorded by computerized stenography. Transcript produced by Computer-aided Transcription.

(In open court; Jury not present.)

THE COURT: Everyone please be seated.

Three things on my agenda this morning. Mr. Sullivan, can we have you back at counsel table, please? Thank you. I can't see you behind the podium.

First, the jury instructions; we're working on them. I think they're going to come out probably late in the day today, late in the trial day or even perhaps post the close of trial which raises the question of when does it make sense to have a charging conference. We could let the jury go a little bit early tomorrow and start their 4th of July weekend perhaps earlier than they might have, but I'm conscious of the fact that that won't give the lawyers all that much time to read what is going to be, I'm guessing, 75 pages or so of instructions.

We can also do the charge conference on Monday and my sense is that depending on what happens with the witnesses, that probably makes more sense.

Mr. Sullivan, do you have a preference on that question?

MR. SULLIVAN: Ms. Frison is handling the jury instructions.

MS. FRISON: I think either is fine with me. I think Monday makes more sense so we can look at whatever the

differences there are between our version and the Court's.

THE COURT: I think that's my preference as well.

Does the Government have a strong preference with respect to this topic?

MR. SIEGEL: Your Honor, we defer to the Court with the exception of -- I think we should see where we are at the end of the day today because if at the end of the day today it appears we're not going to have any witnesses tomorrow, which is at least a possibility given the motions, and Mr. Watson finishes, but assuming we have Mr. Watson going or additional witnesses, then Monday is totally fine.

THE COURT: Okay. Next is the Government's motion to preclude testimony by Ms. Watson. The Government's letter came in overnight last night. Absent any further submissions on this topic by the defense I think it makes a rather compelling case that the defense --

MS. GILBERT: Your Honor -- we do have an additional submission, Your Honor --

THE COURT: Okay.

MS. GILBERT: -- which I'm stapling and will hand up shortly.

THE COURT: And you're going to file it as well?

MS. GILBERT: I will file it as well.

THE COURT: That was my question, whether the defense intends to respond to that. The next thing is the

defense letter of July 2nd which contends that the conduct by the Court has been prejudicial to the defendants. I think it's incumbent upon me to respond to this in writing, and I will do that, but just given that this letter is in the public domain now, I think it is incumbent on me to say a few words by way of a preliminary reaction.

One is that the defense suggests, without any citations that I can see to actual instances, that I have made disparaging remarks about defense lawyers and witnesses in a way that sends a negative signal to the jury. And, again, there are a number of cases cited, decisions in prior cases, but no specific instance from this trial that I can see.

The one reference to any colloquy between me and one of the attorneys in front of the jury is when I sustained an objection to a question put to Mr. Rao, that -- the objection was that that question had already been asked and answered. I sustained the objection.

My recollection of that is that Mr. Sullivan then argued the objection in front of the jury and I made the comment about there being at least 99 percent overlap between the prior question and the instant question only in response to Mr. Sullivan's argument and so I think the solution to that issue which every trial lawyer knows before I even have to say it, is as always we don't argue objections in front of the jury.

Mr. Sullivan, if you want a sidebar in response to any of my evidentiary rulings, I think the record will make very clear that I've been generous in arguing objections at sidebar whenever the defense wants. That's point one.

So, I think the suggestion that I have influenced the jury in any way by virtue of my comments to the lawyers is simply not true. I have been, I think it's fair to say, forthcoming in -- with some constructive feedback, let's say, to the defense team on two major subjects, which are, number one, the real world extent to which the shortcomings and the defense compliance with the rules of discovery, the grand jury subpoena, the order of compulsion, my orders in respect of the exchange of exhibits and 26.2 material have not been complied with.

I think it's incumbent on me to engage with these issues especially when they have as large an impact on the course of a trial as those issues have had in the course of this trial. That's point one and point two, I think I also have been forthcoming with some constructive feedback to the defense on the subject of candor to the Court.

It has been -- and I will go back through the record on this to the extent necessary, but it has been a recurring theme in this trial that the defense -- I'm sorry, that the Government will say, Judge, this document was never produced and Mr. Sullivan will respond almost reflexively, We produced

it, in substance. And I will then ask, okay, what is the backup for that? Where is the cover letter indicating that this production has been made?

And for whatever reason, either the defense is unwilling or unable, and I think it's mostly the latter because the production just didn't happen, the defense has not come forward with any, any, records to support Mr. Sullivan's assertion. I don't want to belabor this point now, but I think that we all agree that candor to the Court is an important feature in cases like this one.

The defense --

MS. GILBERT: Your Honor --

THE COURT: No. I'm still going here.

The defense objects that I have sustained my own objections on a number of occasions to defense questions. I think a review of the record will indicate that I have sustained my own objections to questions from the prosecution as well. To the extent that there are questions that plainly call for inadmissible evidence, I think the Judge is well within his or her remit to preclude those.

The defense suggests that my questions to some defense witnesses have essentially rendered me a fourth prosecutor in this case. I have to say I think nothing could be further from the truth. I have asked clarifying questions at times from witnesses on both sides and I will continue to

do so. Among other things, there is a pending Rule 29 motion from the defense. I will have to rule on that motion and it's essential that I understand the evidence that's coming in in this case and, therefore, I think it is -- and I think some of the cases even the defense has cited here indicate explicitly that it is not only permissible for the judge to ask clarifying questions at times, it is part of the judge's core job description.

And if you think that my questions have been not so much in the vein of clarifying questions, but in some effort by me to push the evidence towards one side's favor or the other, I'll simply say that expresses a general lack of respect for my abilities as a lawyer. I think that if I was trying to ask cross-examining questions that impeached or undermined one side or the other's case that would be substantially more apparent from those questions than the record reveals.

And I will say again, it is, I think, revealing in this regard that even though the defense has a long list of instances in which I asked questions of witnesses, they don't quote any of those questions or certainly don't quote the vast majority of those questions in their letter and I think that's.

There are flare-ups on these issues from time to time. I think we probably all read some of the news reports

about the SEC trial in the Southern District on this subject last week or the week before. I think it was Terraform Labs, that there was a spat between the defense team and the prosecutors. I would defy anybody to identify aspects of the record here that even remotely approach the level of controversy that surfaced, just by way of example in that case. So the message I have here is that I believe my questions have been restrained and appropriate and that they will continue to be that.

Lastly, I will leave this alone in a moment and we'll get the jury, but the last thing I want to say is that this letter indicates -- you know, after the questions about what Mr. Watson was alleged to have shouted in the hallway in the presence of jurors, this letter from the defense says that "Without even asking," and the word "asking" is in italics, "Attorney Sullivan or any member of the defense team about this alleged incident, the Court automatically assumed the Government's account was true."

That's not my recollection. My recollection is we had some response from Attorney Sullivan himself in which he indicated that he was in the hallway and did not dispute the Government's report of the contents of Mr. Watson's statement. He merely indicated that he did not -- he did not understand there to be jurors present. I could be wrong in my recollection of that. We'll go back through the record and

see what it says.

All right. I don't have anything else on my agenda this morning.

Do we have all the jurors here now?

THE COURTROOM DEPUTY: Yes.

THE COURT: All right. Let's bring in the jury.

The final thing I want to say is, Mr. Sullivan, that you had another bout yesterday of shouting at the Court. That's not the first time that's happened in this case. I don't want to spend my time thinking about what to do about that, but I'm just telling you right now that if that happens again there will be con consequences.

MR. SULLIVAN: Give me a decibel level. I will stay below it. I will stay below it. Just give me the order.

THE COURT: I am not going to respond to sarcasm like that.

MR. SULLIVAN: It's not sarcasm. You want me to have my voice below a certain level, tell me what the level is and I will gladly comply with the Court's order.

THE COURT: I think we might have audio from yesterday.

And let me ask the court reporter to please preserve that audio if you still have it.

MR. SULLIVAN: Is there a particular level that you want me to stay below?

THE COURT: I want you to speak at a conversational tone and not shout.

MR. SULLIVAN: I don't know what that means. If there's a particular level you want me to stay at, I will do that. Let me know, and I will do that.

THE COURT: I think I've given you all the guidance that will be forthcoming at this time.

(Jury enters.)

THE COURT: Good morning, ladies and gentlemen.

THE JURY: Good morning.

THE COURT: Everyone please be seated.

Mr. Sullivan, please continue.

**CARLOS WATSON**, having been previously duly sworn/affirmed, testified as follows:

CONTINUED DIRECT EXAMINATION

BY MR. SULLIVAN:

Q Good morning, Mr. Watson.

A Good morning.

MR. SULLIVAN: And good morning, ladies and gentlemen.

THE JURY: Good morning.

Q We left off, I think, talking about A-Rod. Let's talk about Oprah.

I want to draw your attention to season two of Black Women OWN The Conversation, and the testimony and you've been

accused of saying that there was a season two before there was a season two approved. So I want to talk to you about that.
A Sure.
Q When was your understanding that season two was approved for Black Women OWN The Conversation?
A My understanding is that it was approved in September at the request of Oprah's president, a woman named Tina Perry. I flew down to Los Angeles and met with her for about an hour and we walked through season one. It was going really well and she said, let's move forward with season two. Have your folks work with my folks on the details. Are there going to be eight episodes, will there be twelve. At that point she envisioned that we begin filming as early as November.
So she was eager for us to build and capitalize on the momentum. We wanted to make sure that we didn't lose some of the team that we assembled in order to film it, the excessive producers and others. So we very quickly agreed on that and I sent that message to Samir and some of the other team and the next day Samir got on the phone with a woman named Shirley Solomon and began --
MR. SIEGEL: Objection. Foundation.
THE COURT: Okay. Let's have a foundational question.
BY MR. SULLIVAN:

Q So when you -- let's back up.

So, September 2019, that's when you had the conversation?

A Correct. Correct, yes.

Q So it's fair to say that by December of 2019 did you still have the understanding that season two had been approved?

A Very much so and it had begun hiring people to that end so we were fortunate enough -- our executive producer was a wonderful woman named Jennifer Ryan. We were very afraid that she was going to get poached by some of the other shows. So we worked hard to keep her available and the core of her team available. And, so, I was glad we were able to do that and they didn't go work on shows at Netflix or other places.

Q When was the contract formalized?

A The contract, I believe, was formally signed on January the 3rd of 2020.

Q So, between that time, September and January, why is it that you understood that season two had been approved?

A Well, one is because I had been in a -- not only the hour-long conversation in September which I think was around September 10th, but then a week later Ms. Winfrey sent that Tweet which was very powerful and then I had subsequent meetings with Ms. Perry, the president of the company, and other members. And, again, we weren't talking conceptually,

we were talking specifically. Who were we hiring? What will the next episodes be on? Will we stay in Atlanta? Will we stay in Piedmont Park where we were or should we shift -- Tyler Perry had a new studio and he wanted us to come and film it there where we shift the head studio.

So, we were having the kind of conversations that you have when you're definitely doing something and you're just kind of working through the specifics.

Q So what was going on -- to your understanding, what did you see happening in your office with respect to the formalization of what you had agreed to between September and January?

A You know, they were moving a little slowly. I think we had a lot going on in those ninety days, so we had our first deal with Hulu happen in that time. We had our first offer from Live Nation at that time. We had Buzz Feed make five different offers. Four of the five offers happened during that time. We had a big announcement on CNBC in that time. We had three new executive hires just all in September, October, November, December. So, it was very busy.

What I said -- I got very frustrated in November and December that we hadn't gotten it signed and inked had so I said to the team, hey, guys, stop going back and forth with people with one-off things. Put everything you want to do in one place and then send one thing to them. Don't send a text

to this person, an e-mail to that person. Say how many episodes you want to do, when you want it to start, who are going to be the people, what is going to be the budget, who are going to be our key advertisers.

Make it easy for them. These are busy people. They've got, like, fifty shows. We can't pretend like we're the only the people they work with.

Q Now, did you ever tell Mr. Thakur to draft a fake contract?

A No. I'm very angry that she said that. It's one thousand percent not true.

Q Now, this -- you are aware now that there is a fake Oprah contract out -- that was -- that was made?

A By Samir -- I thought just by Samir, but I guess it turns out by Samir and Suzee.

Q Did you ever -- whoever it was made by, did you know anything about it?

A I one thousand percent did not.

Q Did you tell anybody to do it?

A I not only wouldn't because of the ethics of it, but also just practically speaking. My understanding is that he sent this on December 30th or 31st and as I said we got the signed contract, like literally two days later. Even Tripti in her own resignation said this is insane. You're getting the formal notice tomorrow. So, it's not only wrong, but it's,

like, there's no practical purpose to this. It's not, like, someone we don't know. This isn't someone who's holding us at arm's length. There was no reason practically speaking for him to do it. So at the time he told me that it was a mistake, you know, for better or worse I believed it because there was no practical reason to do what he did.

Q So, when you -- there's been testimony that you said get this done. What did you mean?

A The same thing I meant when I would say that to Tracy who ran newsletters. It's the same thing I meant when I said to Chris with TV shows. It's the same thing that I meant when I said to Mave with podcasts or Kendra in marketing or Stefan in sales. I didn't mean go create some fake thing, photocopy it seven times so it looks older. Like, who means that -- if that's the case, then that means -- that meant that thousands of times every year which I didn't. I, meant we're a small company.

We have to be respectful when we work with serious partners and we have to make it easier for them to work with us. We want them to be thrilled. We want them to do what PBS did, which is work with us not once, but many times over. We wanted to hear what J.P. Morgan; not hire us once, but hire us every year. Do what Goldman did; don't just hire us once, hire us every year. Do what Central Park did; don't just hire us once hire us every year. That not only happens if did you

not only do a quality job, but people find you easy to work with.

Q And just to be crystal clear, "get it done," what is the "it" in "get it done"?

A Make sure that you get all of the different ideas in one place, work it through with our entertainment lawyer Lisa Davis at Frankfurt. Then take that and have Lisa send it to Karen Grant-Selma, who is Ms. Winfrey's general counsel; make sure that they agree and sign off on that and then send it in a DocuSign or whatever way is easiest for them and make sure that we get it signed.

Understand that all of this is happening over the holidays. People are doing Christmas shopping, they're with their families. They don't want random texts from some small company about doing a deal. You have to make it easier for them. So if you really are trying to get a second season across the line then be really organized and be really easy to work with.

Q So, before January did you, in fact, tell people that you -- that there would be a season two of Black Women OWN The Conversation?

A Very much so. We told advertising partners like J.P. Morgan and Unilever and American Family Insurance. We told the folks in Atlanta who we were going to rent space for. We told a core group of women, including Jennifer Ryan, Candace

Conley, other people. We told our own team. You know, we probably told, you know, many other folks as well. Obviously at our board meeting we briefed the board on that that this was coming. It was important.

And if you looked at our 2020 plans or if even if you look at Ms. Thakur's 2020 budget because we had to look ahead for the year, you'll see it's already baked in in its own line.

MR. SIEGEL: Objection.

THE COURT: Sustained.

BY MR. SULLIVAN:

Q Did you believe that to be true when you said that there would be a second season of Black Women OWN The Conversation?

A Yes.

Q And you mentioned you hired people in addition to all the other reasons you mentioned, that you believed that you had a deal --

A Right.

Q When you said you hired people, did you hire people before the sort of Is were dotted and Ts were crossed on that final contract?

A We did.

Q Do you have a sense of how many you hired?

A I think we probably had at least a half dozen people primarily women actively working on it in Atlanta and in New

York and in California.
Q Would you have hired people if you didn't believe that a deal was done?
A Well, you heard people talk about a cash crunch. So that wouldn't be very smart, so, no. I would -- but again, this is being presented in a weird way. It wasn't contentious at all. It was excitement. It was wildly successful. We had great advertisers in the show haven't the show itself went well. Ms. Winfrey Tweeted about it. It would later go on to win an Emmy award. This wasn't some half successful thing that people weren't sure about and we don't know. Everybody was excited about this. This was getting bigger and stronger and we were going to do more with it.
So, at one point, I had a conversation obviously out of respect which was did Ms. Winfrey want to host the show or host a special version of it because obviously in many ways she pioneered this whole thing. And, so, I said I would be happy obviously to step back if -- if that was something that she was thinking about and they actually thought about it for a little bit and ultimately said no, let's go forward but obviously I deferred to her and obviously if that's what she wanted, I would have done that.
Q All right. I want to stick with Oprah for a little bit at Live Nation. There's a claim that you misrepresented Oprah and Live Nation as being participants in one of your raises.

So, let's first -- let's just. I'm talking about 2019. Was there a time when you believed that Oprah was going to be a funder in one of your rounds?
A Yes.
Q Which ones?
A C.
Q Why did you believe that -- and did you have a sense of what the potential contribution would have been from Oprah?
A $10 million.
Q And how did you arrive at that number?
A We had a series of conversations with some of her investment team at Oprah Winfrey Network; a gentleman named Dan Fox, a gentleman named Bruce Campbell, both in-person -- I flew out to New York.
Q Let me pause you to there. Remember you said "I flew out."
A Sorry.
Q You said you had a conversation with the people at Oprah Winfrey network?
A Actually technically it's Discovery. So the Oprah Winfrey Network is a partnership with Discovery. They're partners but she has ultimate control and say-so on everything so things only happen if she says yes.

MR. SIEGEL: Objection. Foundation.

THE COURT: Not -- well, come to the sidebar for a

moment.)

(The following sidebar took place outside the hearing of the jury.)

THE COURT: So, all of this is hearsay. He's talking about what people at the Oprah Winfrey Network with are indicating about their intentions. Maybe there's a hearsay exceptional apply.

MR. SIEGEL: He's saying that this is how Oprah Winfrey worked. That Ms. Winfrey had absolute control in the final say, I don't know what his foundation is to make that claim.

THE COURT: It's his conversations with the Oprah Winfrey Network.

MR. SIEGEL: If that's what it's based on, its hearsay. So I want to --

THE COURT: Okay.

MR. SIEGEL: If he has some other knowledge that this is what they told me. And, Your Honor, we move to strike.

(Sidebar ends.)

(Continued on next page.)

THE COURT: The objection is sustained. The motion to strike is granted.

BY MR. SULLIVAN:

Q So, talking about the Oprah Winfrey Network, you told us that those were the people that you had conversations with?

A Yes. But if I can step back just for a second, this was not a new relationship. I first met Ms. Winfrey in 2004. She was kind enough to allow me to do an interview with her. She invited me to her home in Chicago. I brought my mom and my niece with me and we had a fantastic experience. I learned a lot about growing up in Mississippi and Tennessee and Milwaukee and other places and she was supper kind to me and I appreciated it.

A couple of years later she asked me to go to South Africa when she opened up a beautiful school in South Africa for young girls and with a belief of trying to transform the whole continent by this really exceptional school. I couple of years later Ms. Winfrey asked me -- really allowed me -- so, one of the last things my mom did when she was alive was that --

THE COURT: Let me interrupt here. The question was, "Who at the Oprah Winfrey Network did you have conversation with?"

And I'm going to ask you to please keep your answers responsive to the questions that are asked.

BY MR. SULLIVAN:

Q So, who did you have conversations with at the open Winfrey network?

A It started with a gentleman named Eric Logan and it extended to Dan Fox and to Bruce Campbell. So, there were more than those three, but they were the three core people.

Q Was this the first time you had interfaced with Ms. Winfrey or her staff?

A It was not. I had several interactions with her going back to 2004 and 2005 and continuing through the years. And, so --

Q In addition to what you already testified to, did you accompany Ms. Winfrey to an opening of her South African school?

A I did that and then she also asked me -- when the first group of girls graduated she asked me to come be part of that here in New York.

(Continued on the following page.)

BY MR. SULLIVAN: (Continuing.)

Q Thank you. Now, to your knowledge and based on what you knew, were you asking -- were you in conversations with Ms. Winfrey's personal investment advisers or Ms. Winfrey's companies' investment advisers?

A The latter, the company investment advisers.

Q And you were saying, and I can't remember where we got cut off, what are the two companies or the two related companies?

A The Oprah Winfrey Network which is a joint venture between Ms. Winfrey and Discovery.

Q Very well. So, you were saying -- I cut you off. So you got on a plane, and then what happened?

A So we had probably a dozen conversations, either in person or over Zoom, and then they ultimately gave me a term sheet offer to invest in OZY in October.

Q And is that term sheet the basis of your belief that Ms. Winfrey was going to invest $10 million dollars during that series?

A Yes, in addition to conversations with Dan Fox and Bruce Campbell and Eric Logan and others.

MR. SULLIVAN: Brief indulgence.

Just for the witness, Defense 627.

Q Mr. Watson, I am showing you what's been marked as Exhibit 627 for identification.

MR. SULLIVAN: If we can scroll through it so he can see it.

A Yeah, I -- yes, I recognize this.

Q What is it?

A It's an offer from Ms. Winfrey along with Google and a venture capital firm known as Andreessen Horowitz to, as a group, invest $60 million dollars.

MR. SIEGEL: Objection.

THE COURT: Come to the sidebar.

(Continued on the next page.)

(Sidebar conference.)

(The following occurred at sidebar.)

THE COURT: The objection is just to the reading of it, it's not in evidence; is that correct?

MR. SIEGEL: That's correct.

THE COURT: Okay, Mr. Sullivan will cabin that.

But you don't have an objection to the document?

MR. SIEGEL: I do. I need to look at the document. I just heard him describing it.

THE COURT: Okay.

MR. SULLIVAN: I'm moving into evidence.

THE COURT: Okay.

(End of sidebar conference.)

(Continued on the next page.)

(In open court; jury present.)

BY MR. SULLIVAN:

Q Defense 627. Without yet telling us what's in the document, is this something you negotiated?

A Yes.

Q And do you recognize it as the document you negotiated with Ms. Winfrey?

A I do. Yes.

Q All right.

MR. SULLIVAN: Defense moves Exhibit 627 into evidence.

MR. SIEGEL: Your Honor, can we have a sidebar?

THE COURT: Why don't we take our first five-minute break of the morning, we'll let the jury step out, and we'll talk about this amongst ourselves.

THE COURTROOM DEPUTY: All rise.

(Jury exits the courtroom.)

THE COURT: Please be seated, everybody.

Mr. Siegel?

MR. SIEGEL: So, a couple things. One, I may have misunderstood, I thought they were talking about 2019 and this is a 2017 agreement. They've also repeatedly referred to it as an agreement with Ms. Winfrey. At least the text of this is, this is an agreement with Discovery, which Mr. Watson just testified is not Ms. Winfrey but is her partner and a separate

entity.

So, one, I don't think there's any relevance, but also I think there's a major 403 issue to talk about a 2019 meeting that led to a 2017 term sheet with a different corporate entity that he has testified is not Ms. Winfrey.

THE COURT: Well, I think you're just -- that sounds to me like another way of saying that the foundation that was laid does not match the validity of the document.

MR. SIEGEL: Well, he can lay the foundation that this is a term sheet with Discovery, but --

THE COURT: Right, but that's not the foundation we heard.

MR. SIEGEL: Yeah.

THE COURT: So --

MR. SULLIVAN: Well, he testified that Oprah Winfrey controls Winfrey and Discovery. That's what he -- that's what he said on the stand --

MR. SIEGEL: No --

MR. SULLIVAN: That foundation is sufficient --

MR. SIEGEL: No --

MR. SULLIVAN: And I asked him was this the basis of his understanding that Ms. Winfrey was going to invest in this series, which we've already established through his testimony and others, that had a rolling close date.

THE COURT: So can I get a read back of the

testimony. There's a question by Mr. Sullivan, "You said you had a conversation with the people at Oprah Winfrey Network," and then the response begins with, "Technically it's Discovery," but I can't -- I'm not sure I can read what follows that.

(Pause in the proceedings.)

THE COURT: All right. I can't read that answer in full but I think it's Mr. Watson saying in substance that even though Discovery is technically Ms. Winfrey's partner, that all investments made through Discovery are subject to Ms. Winfrey's approval and so he thinks of them --

MR. SIEGEL: That's what I objected to and that you struck.

THE COURT: Oh, because it's hearsay?

MR. SIEGEL: And there's no foundation. How does he know that?

MR. SULLIVAN: So it's not -- it's not hearsay. This has been misconstrued several times. So let me back -- back this up. By way of example, declarant on the stand says: The moon is made of green cheese.

Witness: How do you know that?

Well -- Answer: A physicist told me.

Objection. Hearsay. Denied.

Why? It's because -- that the moon is made of green cheese is not offered for the truth of the matter asserted,

the moon is made of green cheese; rather, it is offered to explain why the declarant thought and said that the moon is made of green cheese. It is offered for that limited purpose --

THE COURT: I don't know that you had --

I don't know that you had a foundation for the notion that -- the specific notion that Discovery is controlled by Ms. Winfrey. Did he say how he knows that?

MR. SULLIVAN: He did not say how he knows that. Let us assume it's hearsay. I don't know, I can ask him. Even -- even if it is an out of court statement, the basis of his knowledge, it's not offered for the truth regardless. It is only offered to explain what he thought. His mens rea is central in here. The Government can cross examine him on it.

THE COURT: Right. So my --

MR. SIEGEL: But, Your Honor, even assuming that -- I mean, first of all, we need to understand what the foundation is, but that gets to a big 403 issue. I mean, part of the dispute here is, was there a commitment from Oprah. Discovery is an entirely separate corporation and so --

MR. SULLIVAN: There's no foundation for that --

MR. SIEGEL: Excuse me, Mr. Sullivan --

MR. SULLIVAN: You're excused.

MR. SIEGEL: -- you have to balance the probative value --

THE COURT: Let's do it out of the presence of the jury.

Mr. Sullivan, do you want to elicit a foundation for the assertion that is the precondition for the relevance of this document?

MR. SULLIVAN: Sure.

BY MR. SULLIVAN:

Q Mr. Watson, we are talking about the same exhibit that's I think still on your screen, the term sheet with Discovery.

First, what -- did you rely on this term sheet in order to make a representation that Ms. Winfrey was going to invest in Series C?

A Correct. Yes.

Q It's -- the date is 2017. What's your basis for relying on this for a 2019 investment?

A The fact that there's a rolling close.

Q Is there --

THE COURT: I'm sorry, what does that mean, there's a rolling close. Is that a reference to some section of the document?

THE WITNESS: No. It's a -- it's a -- well, I'm sure it is in the document that people can invest at different windows, so.

THE COURT: Can you show us where?

THE WITNESS: Yeah. I'd probably have to read through it, but sure. Let's -- let's scroll up and see that.

MR. SULLIVAN: If I give you a hard copy --

THE WITNESS: Sure.

MR. SULLIVAN: -- it will be easier.

THE COURT: There's a section called Closing Date. Can we stop there. Targeted date for the closing --

THE WITNESS: But, sorry, let me make a broader answer to that.

THE COURT: Well, can you just tell me what you mean by "rolling close" before you give the broader answer?

THE WITNESS: Yeah. That's -- sorry, I'm not being clear. That is what I'm trying to do. So it was very common, in our Series C and in prior ones, that someone might, like a group like Interlock, might give us --

THE COURT: You're talking about the Interlock deal. I'm talking about this deal. You said a rolling close was contemplated. I'm looking at a provision that says a closing date of November 30th, 2017 is contemplated or anticipated.

THE WITNESS: Right. That was the --

THE COURT: What's the basis for the understanding that this investment was subject to a rolling close?

THE WITNESS: Because I'm used to seeing a closing date in there even though all the people involved understand that it may or may not happen. And that is form and not substance is my understanding. And not just from this term sheet. We received, I think I counted 26 term sheets, between

2013 and 2021, and that very few of them closed on the date as listed in the original term sheet.

THE COURT: Twenty-six term sheets with the Oprah Winfrey Network?

THE WITNESS: No, with various people.

THE COURT: Okay. I was just trying to clarify the date issue.

THE WITNESS: No problem.

BY MR. SULLIVAN:

Q And earlier -- earlier, I think yesterday, Mr. Watson, you testified about rolling closes. Do you remember that?

A I do. Yes.

Q Was Series C a rolling close?

A Series C was very much a rolling close.

Q Was Series A a rolling close?

A Yes.

Q Was Series B a rolling close?

A Yes.

Q How many close dates were in Series C?

A I believe there were eight and ultimately eight.

Q All right. And then you gave us the four closings. Do you remember what those are -- were?

A There were four board approvals. August of 2016, April of 2018, August of 2018, September of 2019. And -- and then at a board meeting, I believe in November of 2019, the board explicitly said that we would be open to, quote, opportunistic

incremental investment, and, in deed, we ultimately did take in more capital in that round in 2020.

Q Were you still in conversation with Ms. Winfrey about Defense Exhibit 627 in 2019, or Ms. Winfrey's investment advisers?

A I -- I -- I would say I was in touch with them. I -- I wasn't necessarily -- Dan Fox was our primary point.

Q And were -- was it your understanding that this was --

THE COURT: Sorry, let me clarify before we move on.

Dan Fox was your primary contact. Were you in touch with him in 2019 about this?

THE WITNESS: Yes, 2019 and 2020.

THE COURT: About?

THE WITNESS: About an investment, yes.

THE COURT: Okay.

THE WITNESS: Yeah.

Q And about this investment?

A It wasn't gonna look exactly the same because, at that point, Google and Andreessen weren't necessarily coming along, but we had continued conversations about what an investment would look like.

Q Well, just limited to the 10 million --

A Yeah.

Q -- was at least that on the table still?

A Yes, and I think I asked him about the possibility of it

being more.
Q Right, I knew that you were getting at, so --
A Yeah.
Q But at least the 10 million that you talked about in 2019, was that, at a minimum, still on the table with respect to this term sheet that we're looking at?
A Yes, I believe so.
Q All right. Oh, and how do you know that Oprah and Discovery are the same, or that Oprah -- or that Oprah is in charge of both of these entities?
A I -- well, A, because that's what was relayed to me by Erik Logan who is the president of the Oprah Winfrey Network. Also that was confirmed to me by Bruce Campbell at Discovery, and Dan Fox. And, again, I had worked with other celebrity investors including, we talked about Alex Rodriguez yesterday, and you saw, he alone, had multiple investments. So he didn't do all of his investments through A-Rod Corp. In fact, he -- he set up A-Rod OZY.

So it was not unusual that sophisticated people would set up more than one vehicle to invest. I mean, all -- all serious investors -- Marc Lasry has more than one way he invests. He doesn't simply invest through one thing.
Q And is that --

THE COURT: Okay. Let's pause here for a moment. I think I have -- I don't think the threshold for authentication

under Rule 91 is particularly high or taxing. I think we're all probably, at least generally, on the same page as to that. If we roll the movie forward a little bit here, I think what we're probably looking at is the document coming in and then Mr. Watson is going to be -- well, let me hear what the Government's objection is.

MR. SIEGEL: Yeah. So our objection is relevance and 403. One, as it stands now, there hasn't been any foundation laid that Ms. Winfrey is Discovery. The only testimony that will be given is that Mr. Watson thought so --

THE COURT: There's hearsay testimony.

MR. SIEGEL: So now it's only going to his state of mind that he believed that Discovery was Oprah, but you're gonna have to tell the jury that they can't take that as a fact, that it's actually true, it's just did he believe that. Then you have this term sheet from 2017, which is quite clearly a draft because it has draft written in several places, describing a deal --

THE COURT: Why isn't all that just fautor for the cross-examination?

MR. SIEGEL: Well, because it gets the 403 of it and it's discussing a separate transaction to buy Essence. So if he's talking about, I thought they were investing in 2019 because I have this draft term sheet from 2017 with a different corporation to do a different deal.

THE COURT: And we're going to have a fight on the side here about whether this is the same company or a different company, and all of that is going to be fought by reference to hearsay --

MR. SIEGEL: Exactly, and so you have to take the probative value -- what the probative weight of that Mr. Watson somehow thought that there was going to be a 2019 investment based on this document --

What is the probative weight of that Mr. Watson somehow thought that there was going to be a 2019 investment based on this 2017 document to purchase Essence versus the prejudicial weight that now we're having the jury hear hearsay testimony that Oprah discovers Discovery -- excuse me, owns Discovery, which --

THE COURT: Who do you believe owns Discovery?

MR. SIEGEL: It's a --

THE WITNESS: I believe it's a well-known public fact that was announced publicly by a public company and, so there would be significant penalties if they got it wrong, that Oprah has a multi-billion dollar partnership with Discovery and that they actively invest together and have made more than a dozen co-investments together. And, so, pretending like that hasn't happened --

THE COURT: Who, do you understand, owns Discovery?

THE WITNESS: I understand that Discovery is a

publicly traded company and I understand that Oprah Winfrey Network is a joint venture, and that when Ms. Winfrey invest, one of the things --

THE COURT: When we look at -- so Discovery is a public company. If we look at their filings on EDGAR, we're going to see a joint venture agreement between -- they have to file their material contracts, right?

THE WITNESS: Correct.

THE COURT: We'll see the joint venture agreement between them and the Oprah Winfrey Network?

THE WITNESS: Correct.

THE COURT: If somebody can pull that up. Judicial notice of SEC filings I think.

MR. SULLIVAN: And I have not found an SEC filing. I found an article that says Discovery now, just says 95 percent ownership of OWN, the joint venture between Oprah Winfrey and Discovery.

THE COURT: I'm not gonna take judicial notice of a news article, but I --

MR. SULLIVAN: We can look --

MR. SIEGEL: Just so --

MR. SULLIVAN: I'm talking, Mr. Siegel. Mr. Siegel, I'm talking --

THE COURT: All right. You wanted some guidance on voice levels. That was too loud.

MR. SULLIVAN: All right. I would like -- my apologies. I would like -- I would like some guidance on the Government not interrupting me when I'm talking.

THE COURT: Well, everyone's interrupting everybody.

MR. SULLIVAN: Only one person can talk at a time and I have the microphone, respectfully.

MR. SIEGEL: I'm trying to agree with Mr. --

THE COURT: Can you just make the point concisely and then we'll hear from everybody we need to hear from.

MR. SULLIVAN: Okay. So I would ask the Court to accept this testimony de bene. I'll subpoena someone tonight, someone from Oprah Winfrey Network or Discovery, fly them all the way here just to say what I think the Government knows to be true. I will do that.

THE COURT: I understand you will -- I just gave you a much easier route to that same end which is just go on EDGAR and pull the joint venture agreement and that will be enough.

MR. SULLIVAN: Okay. I don't know what EDGAR is but will do that. Second, I don't think any of this is necessary because this all goes to Mr. Watson's mens rea, what he thought.

THE COURT: I understand.

MR. SULLIVAN: We can redact the part about --

THE COURT: The problem you have on that is -- let me jump in here. The problem you have on that is that his

mens rea emerges from conversations with other people that I know you say you're not introducing those for their truth, but the whole point is the truth of those conversations. It's just --

MR. SULLIVAN: Absolutely not.

THE COURT: -- that this was an Oprah Winfrey investment. You may be able to get there. If you have -- I think that where we're probably going here is that this document comes in and all this stuff becomes the source of cross-examination, but I would like to see the fact of the joint venture agreement before I make a final decision on that.

MR. SULLIVAN: Thank you, Your Honor.

MR. SIEGEL: Your Honor, what I'm trying to say is we don't dispute that there was a joint venture agreement. I mean, we can get the filing, we can --

THE COURT: So then why isn't this close enough to the idea of an Oprah Winfrey investment that you all can fight in front of the jury about whether it is or whether it isn't, whether it's 2017 or whether it's still live in 2019. You're making a 403 objection that's substantially more prejudicial than probative. What is the unfair -- I mean, you disagree with the arguments that are going to be made from this document, but is that enough under 403?

MR. SIEGEL: Well, it's confusing to the jury, even

we're talking in circles in here about what is a joint venture. If Discovery is a publicly traded company and they enter into a joint venture with Oprah Winfrey to create the Oprah Winfrey Network, that does not mean that every investment by Discovery is an Oprah Winfrey investment. If this said OWN and they want to attribute OWN to Oprah Winfrey, fine, we could debate about that.

THE COURT: Discovery is a publicly traded company that does what?

MR. SIEGEL: They -- The Discovery Network, Time -- they weren't, but now they're a part of Time Network.

THE COURT: What is the Discovery Network? This is a science channel on T.V.?

MR. SIEGEL: They do reality shows like The Biggest Catch -- but now they're part of Time Warner Discovery.

THE COURT: I see. So it's not a company set up to function as a joint venture.

What was the 95 percent figure that we heard? That 95 percent of the investments are in common or something?

MR. SIEGEL: No, no. So, Discovery -- Discovery is a --

MS. GILBERT: 95 percent --

THE COURT: Hold on a second. Let me just get an answer to that question.

Ms. Gilbert, what?

MS. GILBERT: Discovery now has just under 95 percent ownership of OWN --

THE COURT: Oh, okay. But that --

MS. GILBERT: -- the joint venture between Oprah Winfrey and Discovery the company has increased its stake from its prior holding of 73 percent and --

THE COURT: Right. But the bigger question is what is the size of what Discovery does separate and apart from the Oprah Winfrey Network.

MR. SIEGEL: So, let me -- I mean, there's just history here. There was Discovery. They had a television station. They're a big media conglomerate. They had a joint venture agreement with Oprah to make OWN. So at some point, the ratios have changed. At some point, it may have been 50/50. At some point, it may have been 75. As of 2020, which is the article that Ms. Gilbert was reading, it became 95 percent, Ms. Winfrey was largely bought out.

Discovery is a large company. It is now part of Time Warner. They own HBO and Warner Brothers. But OWN is a small part of what Discovery does. It was a joint venture between two separate companies, which is what a joint venture is. You have two companies, they come together to make OWN.

To now suggest, well, here's a deal with Discovery so, therefore, that was a deal with Oprah, confuses the jury about what is a joint venture, what these companies are. And

now, you know, potentially we're flying an executive to talk about the corporate structure of OWN all to this issue that they're saying only goes to the -- to this one slice of mens rea. So whatever probative value --

THE COURT: Can we put up the term sheet again? Does it mention the Oprah Winfrey Network in any way?

MR. SIEGEL: No.

MS. KASSNER: No, Your Honor. We can hand you a copy.

THE WITNESS: Mr. Sullivan, can I add one thing here?

THE COURT: No, hold on just a second.

This is a term sheet for an investment of up to $60 million dollars in new capital from three parties, Andreessen Horowitz, Google and Discovery Communications, LLC, and it's dated October 2017, and it contemplates a closing one month later. And this is being offered, as I understand it, as evidence of Mr. Watson's good faith belief that -- not the truth of the matter that, but Mr. Watson's good faith belief that there was going to be an Oprah Winfrey investment two years later. So that's extremely strained to begin with. And just on those facts, I think risks misleading the jury.

But then we would have to have an entire collateral trial on the subject of what is the investment relationship between Discovery, on the one hand, and the

Oprah Winfrey Network on the other hand, that relationship is a moving target because investment percentages are changing overtime. And even when Discovery comes to own Oprah Winfrey Network almost in its entirety, I'm being advised that that Oprah Winfrey investment was still a relatively small part of the operations of the Discovery Network which had an entire business separate and apart from the Oprah Winfrey Network. So there is a substantial 403 problem here.

I think there is even a foundational problem that this document is being offered as something other than what it is. Although I think the 401, 403 problems are substantially greater than the 901 issue. And on that basis, I will exclude this document.

MR. SULLIVAN: Okay.

Note for the record that -- that it is fundamentally unfair that Mr. Watson, who is on trial for these charges, cannot even prove up what he was thinking when he made representations. That strikes me as odd and fundamentally unfair.

I'll also point out that the Court accepted the Government's representations about Discovery, asked us to look at EDGAR and Gibus --

THE COURT: No, I accepted your representations also --

MR. SULLIVAN: I have no idea --

THE COURT: Mr. Sullivan, let's be fair --

MR. SULLIVAN: Yes. That's what I'm doing. I'm being fair --

THE COURT: There were representations about the percentage ownership by Discovery in the Oprah Winfrey Network that I asked you about. Ms. Gilbert answered my question and I accepted her answer as true. So there's absolutely no disparate treatment of one side versus the other. And I would appreciate you being more careful in that regard given the severity of the allegations that you're making.

Your objection is noted for the record.

MR. SULLIVAN: May I make a record on what Your Honor just said?

THE COURT: No. You can write a letter on that subject.

MR. SULLIVAN: I will write about it.

THE COURT: Okay. Let's bring the jury back in.

MR. SULLIVAN: Can I ask Mr. Watson questions, without introducing the document, about his understanding of why he made certain statements and what he relied on?

MR. SIEGEL: Your Honor, he can't testify about a document --

THE COURT: Yeah. Then he's testifying to a document -- that's --

MR. SULLIVAN: No. Just ask questions -- I can ask him did he think he had an agreement with Ms. Winfrey. He can tell me if he had an agreement --

THE COURT: No --

If you want to call a witness -- Mr. Watson, you can leave the stand, you can come back to the stand -- if you want to call a witness to say -- well, let me think about that a little bit.

But, no, for the moment, this document is excluded and testimony about understandings that arose from the document are excluded for the same reasons.

MR. SULLIVAN: So Mr. Watson cannot say what was on his mind when he said Oprah Winfrey was investing? That's the Court's ruling? He cannot tell the jury what he's thinking. We have to accept the Government's narrative for that. He's a defendant in a criminal case, Your Honor. He gets to say --

THE COURT: I understand but you're saying what he is saying he's thinking is that because there was a term sheet with three investors, none of which is the Oprah Winfrey Network, in 2017 that contemplated a closing one month later in November of 2017 that therefore he should be allowed to testify that he believed in 2019 that Oprah Winfrey was investing in his company. And the problem with that testimony is if we have it, then we, you know, we have to then have a mini trial on the subject of what is the difference

between the Oprah Winfrey Network and the Discovery Network.

MR. SULLIVAN: That is precisely what good faith means. He can be wrong. A criminal defendant can testify, why did you do something? Well, I believed the Egyptian God Osiris whispered in my ear and told me to do it. The jury can buy it or not. If that's what he believed and the jury believes that's what he believed, then that's an absolute defense. That's what good faith is. The reasonableness of good faith is a question of fact for the jury. He cannot be prevented, prohibited from telling what was in his head. If you want to exclude the document, I think that's wrong --

THE COURT: So let's say this comes in along the lines you're describing, do you have any objection then to the Government calling a witness from Discovery to say that this 2017 term sheet was not an Oprah Winfrey investment?

MR. SULLIVAN: No objection.

THE COURT: So why isn't that the path forward?

MR. SIEGEL: So, Your Honor, to Mr. Sullivan's example, if he wants to testify that Osiris was going to invest $10 million dollars, if he wants to testify that Osiris -- if he wants to testify that Oprah Winfrey told me she was going to invest $10 million dollars, we disagree but he can testify to that. He's going to testify --

THE COURT: But -- just so I understand the framing here, he's going to testify, I understood Oprah Winfrey was

going to invest $10 million dollars in 2019 because I had the term sheet with three investors who are not Oprah Winfrey in 2017. I understand you think that's a stretch, but good faith, it does go to the core issue in this trial.

MR. SIEGEL: But that's what 403 is about. Just because it has relevance doesn't mean that that relevance can't be outweighed by the judicial prejudice.

THE COURT: I understand but the relevance is heightened when it goes to the core of the defense theory even if you think this is crazy that this would support the defense theory.

MR. SIEGEL: Well, as I said, he can testify that he thought Oprah was going to invest. What he can't do is admit this document, which has nothing to do with that and invites a mini trial, and say, and here's this -- and here's the evidence of that, because that evidence is substantially outweighed by the prejudice. But to his own belief of this is -- I believed Oprah was going to object, we don't object to that.

THE COURT: I think we are going to have the mini trial. I think you might have to get a witness here from Discovery to say, no, this was not an Oprah Winfrey investment.

MR. SIEGEL: Just one minute, Your Honor.

So, I'm sorry, Your Honor, I just didn't hear you.

What were you saying is where we are?

THE COURT: That I am going to allow the testimony, and if you want to call a witness from Discovery to establish what you think is the proper understanding of the relationship between Discovery and Oprah Winfrey, we'll proceed that way.

And I understand that there is enormous risk of confusion here, but at the same time, this goes sufficiently closely to the heart of the defense that I am loathed to exclude it, and even willing to tolerate, perhaps, the mini trial that we are all otherwise hoping to avoid.

MR. SIEGEL: So then, Your Honor, if you're going to allow testimony about the document, then I think there would be less confusion if the document comes in.

THE COURT: Yes. I agree with that.

All right. So, Mr. Sullivan, why don't you proceed as you were.

MR. SULLIVAN: Very well, Your Honor.

THE COURT: All right. Let's bring in the jury.

(Jury enters the courtroom.)

THE COURT: Please be seated, everyone.

Mr. Sullivan, please continue.

MR. SULLIVAN: Thank you, Your Honor.

BY MR. SULLIVAN:

Q So, Mr. Watson, we were talking about the Oprah Winfrey investment of 2019 for $10 million dollars, so I want to just ask you a couple questions about that. So, when did you first

begin discussing this 10 million-dollar investment with Ms. Winfrey's representatives?
A In 2017. The late summer of 2017.
Q I'm sorry?
A I believe the late summer of 2017.
Q And in the late summer of 2017, what was the number contemplated -- top number contemplated for an investment?
A $10 million dollars.
Q Between 2017 and 2019, did you continue to have conversations with Ms. Winfrey's representatives about investing in OZY?
A Yes, I did.
Q And did you -- what was your impression of -- what did you understand their intent to be in 2019?
A What I understood was that their intent was open and that because we had made good progress on a business relationship, meaning that we were doing a show like Black Women OWN The Conversation, that increased the chances that something could happen and I asked about a higher number than ten.
Q And what higher number?
A I believe that I asked about 20.
Q Was it your understanding that they were considering even 20 million by 2019?
A In a general sense. It's a -- they had a lot of cap until so that was not a big number for them.

Q Were there any other elements to the financial agreement that informed your belief that Ms. Winfrey was going to testify -- I'm sorry, not testify -- that Ms. Winfrey was going to invest?
A The -- the -- the term sheet that I received and the email trail around it and the conversations all came together to -- to give me confidence and, you know, it was a pretty thick document, so.
Q Without -- without reference to the document --
MR. SIEGEL: Objection, Your Honor.
THE COURT: To the prior answer?
MR. SIEGEL: Yes. And, Your Honor, I think there was a prior motion to admit the exhibit which we've withdrawn our objection to.
THE COURT: So what's this exhibit number?
MR. SULLIVAN: 627.
THE COURT: So Defense Exhibit 627 is received --
MR. SIEGEL: 627 or 628?
THE COURT: Defense Exhibit 628, in that case, is received.
MR. SIEGEL: I just didn't hear. Which was it?
MR. SULLIVAN: 627.
MR. SIEGEL: 627. Okay. I apologize.
(Defense Exhibit 627 was received in evidence.)
MR. SULLIVAN: Okay. We can publish it to the jury.

THE COURT: Okay. But let me just rule on the objection to the prior testimony.

MR. SULLIVAN: I think it's moot.

MR. SIEGEL: It's moot.

THE COURT: Okay. Then I won't rule on it.

(Continued on the following page.)

DIRECT EXAMINATION: (Continued.)

Q So is this the term sheet that you just mentioned?

A Correct, yes.

Q And who is Discover?

A Discovery Communications is now known as Warner Brothers Discovery Communications. It's a multi-billion dollar media company that started with the Discovery Channel, and did a joint venture with Ms. Winfrey to create the Oprah Winfrey Network, of which I believe they were the majority owner. I think they were 51/49 owner.

Q This is my fault. Let me cabin my questions to what you knew back in 2017. What was Discovery -- what was your understanding of Discovery's relationship with the Oprah Winfrey Network between 2017 and 2019?

A My understanding is that they were one of her major partners in a way in which she got the Oprah Winfrey Network up on the air and a way in which made investments sometimes.

Q Did you understand the investment to be coming from a Ms. Winfrey affiliate company?

A Very much so.

Q That's all. Thank you. You can take this down. There's also been, Mr. Watson, some testimony about your relationship with Live Nation. First, back in 2019, what did you understand Live Nation to be?

A Live Nation was a spinoff of the iHeart Company. It

became a publicly traded multi-billion dollar concert promoter. They owned actual venues all over the country where people have concerts and they also put on concerts, and they're probably the biggest in the country.

Q Why did you desire a relationship with Live Nation?

A Well, it started with Alex Rodriguez. What I said before that I couldn't pay him to do what he did for us, we had wanted to meet with Live Nation for years having started Ozy Fest in 2016, but in over three years had never been able to meet with the top folks.

In a matter of days, Alex set up a meeting for me with the CEO of Live Nation in either June or July of 2019. And so there I was sitting with the CEO of Live Nation able to explain how Ozy Fest was different than most of the other concerts that he did at his venues.

He liked the idea that we were, as I said before, bringing the best of Ted Talks. So we had really good talks by Malcolm Gladwell or Mark Cuban or Salman Rushdie, but we also had what he was more familiar with, which was musical performances by Chance the Rapper or John Legend or Common, plus comedy because they also do comedy events. So he was used to those.

He wasn't as used to food events, but he liked the fact that we had chefs like Eddie Wong and Alex Guarnaschelli and Marcus Samuelson all part of this. So he really, when he

looked at his stable of offerings he felt like this would be new.

MR. SIEGEL: Objection.

THE COURT: Sustained.

MR. SIEGEL: Move to strike.

THE COURT: Granted.

Q Without telling us what anyone was thinking, just what were you thinking about the relationship between Live Nation and --

A I felt like they were serious about it because he was a very -- I could tell that he was a very busy person. I could tell that he took time. He locked into the meeting in a way that told me he was taking it seriously. It didn't just stay high level. It got down to how many Ozy Fests would you want to do in a year, do you only want to do them in New York, hey, this could work because I actually own venues. So rather than having to paying 1 to $3 million in Central Park, which is what we normally have to do, I could get you set up in San Francisco, in Miami, and other places without that.

I could help you with ticket sales because I know who already has bought tickets for some of the performers you have. Rather than just do broad marketing, I could say who is come to see John Legend in Miami over the last three years and we could specifically market towards that. So I liked him, I liked the idea, and then for me, I know people are serious if

they signed a deputy to it.

If they talked about it generally and said let's keep the conversation going, I understand they're busy people and they probably don't want to move forward. When they choose one of their top five lieutenants and say to her or him, please work with Carlos and his team and let's see if we could get a deal in place, and then specifically when they start to bring in lawyers, then I know they're serious about doing the deal.

And so all of that happened relatively quickly in the fall of 2019. And Alex stayed close to that to make sure it didn't fall off the radar and that everybody was taking it seriously.

Q During this time in 2019, did you, as you recall, make any representations that Live Nation was going to be one of the leaders in the Series C round?

A I probably both said Series C, if we were going to extend that. One option was just to keep doing that or potentially Series D, because it all was kind of happening at the same time.

Q All right. Do you recall at what amounts?

A I don't think I gave a number because I think the term sheet they gave us didn't have a specific number.

MR. SIEGEL: Objection.

THE COURT: Sustained.

MR. SIEGEL: Move to strike.

THE COURT: Granted.

Q What was the basis of your belief that Live Nation was going to invest?

A Again, between July and December I had at least ten meetings with at least five key people, so the CEO plus Alan, who, you know, was one of his top deputies and their general counsel. And they had me over to their offices several times, and we got really specific which venues we wanted to bring Ozy Fest to, would they all be the same size as Ozy Fest in Central Park, or would we consider doing some smaller ones, did we want to talk about doing it overseas.

So all those things, you know, made it clear to me that they wanted to do this. They thought that this was important, and for me, I love Ozy Fest. It was good to be with someone like Alex who saw the value of it. And Alex thought, you know, in the same way you guys are supercharging your TV business and your podcast business, you're not just doing one a year, you're doing multiple. Alex kept pushing me and said hey, why not allow more people to enjoy Ozy Fest and not just people who were in New York and I thought that was right.

Q Did you ever receive a term sheet that memorialized your discussions with Live Nation?

A Yes, from their general counsel.

Q I show the witness only Defense 626.
A By general counsel I mean from their top lawyer.
Q If you look on the screen --
MR. SULLIVAN: May I approach, Your Honor, and pick up the paper?
THE COURT: Yes.
Q If you look on the screen as they scroll down, take a look at that and look up when you're finished.
A Could you go back? Yes. It says investment offer. Yes. Keep going. Yes, yes. I recognize this. Alan, yes. This is it. This is it. Yes, this is it.
Q Thank you.
MR. SULLIVAN: Move to admit Defense Exhibit 626 in evidence.
MR. SIEGEL: No objection.
THE COURT: Received.
(Defense Exhibit 626 was received in evidence.)
BY MR. SULLIVAN:
Q We can show the jury. Let's just look at the first paragraph in the heading.
A Do you want me to read that?
Q Just as soon as we get it up. Can you see it okay?
A Yes.
Q Read the heading and the first paragraph?
A Festival consulting agreement. Part of it may be cut

off. Is the top cut off? Yes, that's everything.

This festival consulting agreement is entered into as of November blank 2019, effective date, by and between Live Nation Worldwide, Inc., a Delaware corporation, Live Nation, and Ozy, a corporation company, company.

Whereas companies presenting a certain event featuring live music, food, comedy, known as Ozy Fest each a festival, collectively a festivals, and including performances by various musical artists, comedians, chefs, politicians, and other marquee speakers each an artist and collectively the artists, at venues to be agreed upon by company in consultation with Live Nation, each a venue and collectively the venues.

Q Okay. We can stop. We're not going to bore the jury by reading the long contract. Was this part of the basis for you believing that Live Nation was going to be an investor in 2019?

A Very much so, yes.

Q Did you consider this to be in the final round of discussions?

A Correct, yes.

Q You can pull the document down. Thank you. I'd like to pick up on an area where we were, we didn't complete yesterday. So I want to draw your attention to we were talking about what your understanding of investor expectations

were for documents labeled pro forma and unaudited.
Do you remember that discussion?
A Yes, I do.
Q And you told us that it was a form by various things, including, without telling me what was on there, but including statements in documents that each investor signed?
A Yes.
Q Do you remember that?
A Yes, I remember that.
Q I'm showing you, the witness only, Government Exhibit 2019. Do you recognize Government 2019?
A Yes, I do.
Q Scroll through it, please, so the witness can see it.
A Sorry. Would you go back just to the outline on top? One more. I just want to see what Section 3 says, make sure this is -- Section 3.5, financial statements, yes. Sorry. I want to make sure and 4.4. Speculative nature of investment. Yes, I recognize those.
Q You recognize this. What is it?
A Every investor before you can have the ability to invest in Ozy. You have to sign multiple key agreements, and this is the cornerstone. It's called the stock purchase agreement. So it's a contract by which you'll share with us compensation and return, and, you know, you'll get access to a certain amount of stock or sometimes warrants or other things.

Q Okay.

MR. SULLIVAN: Move to admit Government 2019 in evidence.

MR. SIEGEL: No objection.

THE COURT: Received.

(Government's Exhibit 2019 was received in evidence.)

Q Let's scroll down to 3.5. Who is this specific agreement with?

A This is with all the investors in Series C. This would include Tom Franco, who we met; Marc Lasry, you know, any of our folks who were part of Series C.

Q Let's expand 3.5, please. Mr. Watson, I'm going to ask that you read 3.5 for the ladies and gentlemen of the jury.

A Yes, 3.5 it says: Financial statements. The company is delivered to each investor unaudited financial statements consisting of a balance sheet and a profit and loss statement for the fiscal year ending in December 31, 2018, and the six-month period ending in June 30, 2019, the balance sheet date together the financial statements.

The financial statements fairly present in all material respects the financial condition and operating results of the company as of the dates and for the periods indicated therein, subject to normal year-end adjustments. Since the balance sheet date, there has been no adverse change

in the assets, liabilities, financial conditions, or operating results of the company, except immaterial changes in the ordinary course of business.

Except as set forth in the financial statements, the company has no liability or obligation, absolute or contingent, individually or in aggregate, except and then it lists obligations and liabilities incurred after the balance. Obligations under contracts made in the ordinary course of business that would not be required to be reflected in the financial statements prepared in accordance with generally accepted accounting principals, which in both cases individually or in the aggregate are not material to the financial condition or operating results of the company.

Q So first, with unaudited, what did you understand unaudited to mean in that section?

A That these financials were -- we had not hired an external firm like Ernst & Young or PricewaterhouseCoopers and paid them 1 to $3 million to spend six months going through our financials, and identifying mistakes and issues which you would normally see in most companies that we were saying to our investors these are unaudited, these are tentative, these are buyer beware. They're start-up financials.

Q So you also say that it fairly represents the financial condition of the company -- I'm reading sentence two -- for the dates and periods, and then subject to normal year end

adjustments.

How do you understand that to relate to historical numbers that were in your financials?

A That even big companies have year end adjustments, and if you're a small or smaller company and you don't have a team of 20 people in finance, you don't have an external auditor, you know, you're going to have meaningful year end adjustments.

This contract that came in in December, should I count it as part of this year and part of it next year. This contract that came in September, how do I think about it. So there are a lot of decisions and calls to make. Sometimes people miss contracts, so they forget to include them, and so you have to go back and find those.

Sometimes people use the wrong standards. So you have to make an adjustment. Someone counted this revenue on a cash basis when they should have done it maybe on accrual or maybe a hybrid. And so there can be, especially for a young company like Ozy that went from no contracts to over 200 in a short window, there are pretty substantial adjustments each and every year, and even years after the fact there are adjustments.

Q I also want to draw your attention to Roman numeral number II, obligations under contracts made in the ordinary course of business that would not be required to be reflected in financial statements prepared in accordance with GAAP

generally accepted accounting principals.
Why did you add that line in your papers?
A Just again -- and again, all of our investors have to confirm. There's another piece in here that says they're an accredited investor, which is a way of saying they're very sophisticated, they make these investments regularly, they have lots of resources and so --
MR. SIEGEL: Objection, Your Honor.
THE COURT: Sustained.
Q That's fine. Tell us about GAAP.
A It's, as Clare testified, we didn't follow GAAP as a young company.
MR. SIEGEL: Objection.
THE COURT: Sustained. What is the part of the agreement we're focusing on here?
MR. SULLIVAN: Roman numeral II.
Q What was in your mind? Why did you include Roman numeral II?
THE COURT: Can we get a foundation on that?
Q Mr. Watson, were you the CEO of Ozy?
A Yes.
Q Did you read through the financial -- the closing documents before sending?
A Yes.
Q Why did you include number two?

A We wanted to affirm for people that these were tentative draft documents and that there were going to be meaningful changes, and that they shouldn't look upon these historical numbers as 100 percent accurate or as firm and final.
Q All right. Let's scroll down to 4.4, please. Scroll up to four. Now, 4.4, this is in the same document, correct?
A This is in the same document.
Q Same document that every investor received?
A Every investor receives and signs, including me as an investor in Ozy.
Q Okay. 4.4, can you read that for the jury?
MR. SIEGEL: Objection, Your Honor.
THE COURT: Come to the sidebar.
(Sidebar; continued on next page.)

(Sidebar conference held on the record in the presence of the Court and counsel, out of the hearing of the jury.)

MR. SIEGEL: Relevance, Your Honor.

THE COURT: I'm sorry?

MR. SIEGEL: Relevance. We had argument before about telling investors that this is speculative. It has nothing to do with fraudulent intent. Everyone knows businesses can fail.

THE COURT: He's making his buyer beware argument. The document is in evidence at this point. He can read this paragraph. He was going to talk about accredited investors and, yes, for people in the investment management industry it's a source of common knowledge and also some controversy that the accredited investor definition has absolutely nothing to do with sophistication. It has to do with how much money you have. Full stop.

And so the dumbest wealthy investor in the world is allowed to make investments, whereas the smartest investor who doesn't meet the financial minimums is not. So that testimony should not come in.

MR. SIEGEL: Your Honor, the whole buyer beware argument that he's making, the Second Circuit said that that's not appropriate in a fraud case.

You can't waive reliance or get buyers to waive

reliance.

THE COURT: You can object to the argument during closing arguments and I'll sustain that objection.

(Sidebar concluded; continued on next page.)

BY MR. SULLIVAN:
Q Sorry for the interruption, Mr. Watson. Can you read -- let's pull the document back up for the jury. Can you read 4.4 for us?
A Yes. And often 4.4 and 4.6 go together.
Q I'm going to get to 4.6.
A Okay. So it says, speculative nature of investment. The investor understands and acknowledges that the company has a limited financial and operating history, and that an investment in the company is highly speculative and involves substantial risks.
The investor can bear the economic risk of the investor's investment and is able, without impairing the investor's financial condition, to hold the shares and the conversion shares for an indefinite period of time and to suffer a complete loss of the investor's investment.
Q So same questions with 3.5. This is a document that every investor receives?
A Yes.
Q And this is in the document that every investor signs?
A Correct.
Q Let's move to 4.6, please. Would you read 4.6, please?
THE COURT: We talked about this at the sidebar. The objection is sustained as to this piece.
MR. SULLIVAN: The document is in evidence, Your

Honor.

THE COURT: I understand.

Q Did you have an understanding, Mr. Watson, of -- your understanding, what was in your mind, of who was permitted to invest in Ozy?

A I did. I understood that we were only allowing --

THE COURT: The objection is sustained. Come to the sidebar or move on.

Ladies and gentlemen, why don't we take our second and final break of the morning here. We'll see you back here in five minutes.

(Jury not present.)

THE COURT: Mr. Sullivan, I had just said at sidebar that we were not going to have testimony about the accredited investor definition.

MR. SULLIVAN: No, you didn't. You said that -- at least I heard you say that well, this comes in and if he argues it in a way that --

THE COURT: No.

MR. SULLIVAN: -- Mr. Siegel misconstrued my argument, then you would sustain the objection.

THE COURT: No, that was as to 4.4. And then I went on, I thought very clearly, maybe I was misunderstood, to say we were not going to have testimony about the accredited investor definition.

MR. SULLIVAN: I would like to be heard on that. You mentioned some definition of --

THE COURT: I'm looking at it right now. The definition of an accredited investor proceeds purely by reference to income and assets as to individuals.

It has nothing to say about the actual sophistication of the person, and there has to be a limit. I know you're about to say that Mr. Watson can testify to his mistaken assumptions, but you can't have him testify falsely to everything in the world, including the definition of a legal standard here under the guise of well, this is what he understood.

At some point the testimony gets sufficiently misleading, sufficiently confusing, and requires a sufficient waste of resources. I'm not having a mini trial on what the definition of accredited investor actually means and doesn't mean. We're going to move on.

MR. SULLIVAN: May I be heard?

THE COURT: Yes.

MR. SULLIVAN: So will the Court please point me to where there has been testimony about the definition of accredited investor? Your Honor offered one. I don't think that any testimony in this trial --

THE COURT: We're reading -- 4.6 that you're seeking to ask about right now is titled accredited investor.

MR. SULLIVAN: Exactly. You're saying there's some other definition. I don't think there has been any testimony of some opposite definition.

THE COURT: This definition right here says the investor is, "An accredited investor within the meaning of Reg D, Rule 501 promulgated by the SEC. Mr. Watson was about to give the jury his impression of what Reg D means. I just read from the actual Reg D and I said we're not having testimony on this.

MR. SULLIVAN: I was not going to ask him that. It's a document in evidence. I was asking him to read a document that Emerson Collective and Marc Lasry, all of these people signed. They didn't X it out and say oh, I disagree with this definition. That is relevant. This is also --

THE COURT: They all made more than $200,000 in the two prior calendar years. It's not relevant to this trial.

MR. SULLIVAN: There's no evidence --

THE COURT: The question is not being -- the objection is sustained.

MR. SULLIVAN: So --

THE COURT: And next time you think you're unclear at sidebar about a ruling that I've given, ask for clarity. Don't just proceed.

MR. SULLIVAN: And the next time Your Honor thinks he's clear about issuing an order, please do a second run.

What I would say --

THE COURT: I'm going to take a five minute break now.

MR. SULLIVAN: I just want to be clear. Is the rule now we cannot read from documents in evidence? Is that the rule?

THE COURT: The rule is -- Mr. Sullivan.

MR. SULLIVAN: Judge Komitee.

THE COURT: The rule is that to the extent you want to give erroneous and confusing testimony about what SEC regulations actually say, that testimony will be excluded. We'll take a five-minute break.

MR. SULLIVAN: Your Honor, I have an application. I have an application, Your Honor. May I be heard? I would like to move to strike everything that the government has read from documents as erroneous.

THE COURT: Okay.

(Recess taken.)

THE COURT: We're not going to have a mini trial in the meaning of securities law in which a fact witness gives an impression of what the law is, and then I have to tell the jury what the law actually is. That's just a bridge too far for me. What is the next subject?

MR. SULLIVAN: We're still on this document, Your Honor.

THE COURT: Okay. Are we going to talk about SEC registration and what that means?

MR. SULLIVAN: I'm sorry.

THE COURT: I'm looking at a provision that says no registration.

MR. SULLIVAN: I'm not talking about what anything means. I'm asking him to read in evidence, it's already in evidence, but read what the investor signed. So I won't ask him any questions about what he thinks it means.

THE COURT: Are you going to ask him to read Section 4.1?

MR. SULLIVAN: Yes.

MR. SIEGEL: Your Honor, we move to redact this document to remove 4.1.

THE COURT: What is the relevance of Section 4.1?

MR. SULLIVAN: What the investor -- it goes to the what the investor understood himself or herself or itself to be engaging in.

(Continued on next page.)

(continuing.)

THE COURT: Okay. The Securities Fraud Statute that is at issue in this case and the Wire Fraud Statute, they apply equally to the sale of publicly traded and also privately traded securities. Is that a correct understanding? I'm asking Mr. Sullivan.

MR. SULLIVAN: Yes, that's a correct understanding. I'm not asking him to opine on those statutes. I'm asking him to read statements in the document that's been admitted in evidence and it's the Government's document.

THE COURT: But there's no reason to do that other than to mislead the jury.

MR. SULLIVAN: No --

THE COURT: Again --

MR. SULLIVAN: It has to do with Mr. Watson's understanding of the --

THE COURT: Of the law.

MR. SULLIVAN: No. Of the representations that he was making.

THE COURT: Ask him what he understands the representation about securities being unregistered under the Securities Act to mean.

BY MR. SULLIVAN:

Q Why did you include this 4.1?

A Would you guys be kind enough to put it back up on the

screen, please?

(Exhibit published.)

A Just important for people to understand what kind of security they were buying and what kind of provisions we were following as part of this -- part of this raise.

THE COURT: Why?

THE WITNESS: Probably the same reason you explain anything you're selling to someone. People need to understand what they're buying. I can't say -- say I'm selling you a hamburger but selling you a hot dog. I have to tell you what I'm selling.

THE COURT: Yes. My ruling still stands.

MR. SULLIVAN: So can I ask about 4.2, Your Honor?

THE COURT: What could the possible relevance of this be other than to mislead the jury?

MR. SULLIVAN: What's misleading the jury is the Government's entire case.

THE COURT: Put it back. I was going to look at 4.2 which talks about the private placement exception.

The ruling stands with respect to 4.2 also.

MR. SULLIVAN: There was a generally accepted rule that things in evidence we can read from. It certainly applied to the Government. I'm surprised it doesn't apply for us. Then let's go to 4.3. I would like to read 4.3.

THE COURT: 4.3 does not speak to the securities

laws of the country.

MR. SULLIVAN: I would like to read 4.4.

THE COURT: You already did.

MR. SULLIVAN: I would like to read 4.5.

THE COURT: So, that goes to the motions in limine we had. That the investors should have done better diligence is not a defense to securities fraud and not relevant here and it would be misleading on the law for you to suggest otherwise, so 4.5 is out.

MR. SULLIVAN: I would like to read 4.7.

THE COURT: The residency --

MR. SULLIVAN: Yes, 4.7.

THE COURT: What's the relevance of that?

MR. SULLIVAN: As Mr. Watson said, that the investor should know exactly what they're getting and what the rules are.

THE COURT: That's out.

MR. SULLIVAN: Okay. 4.8.

THE COURT: It's the same issue.

MR. SULLIVAN: Right. Scroll down. Is that out?

THE COURT: Yes, Rule 144, the legal definition.

MR. SULLIVAN: All right, 4.9.

THE COURT: What is the possible relevance of the fact that there's no public market for these securities?

MR. SULLIVAN: It goes to Mr. Watson's good faith

and the reasonable belief that he was giving each investor a fair product and he was making all possible disclosures towards that end, not hiding anything, not being fraudsters. I would like to read 4.9 in evidence.

THE COURT: That there's no public market for the resale of these securities.

MR. SULLIVAN: Yes, Your Honor.

THE COURT: You can read 4.9.

MR. SULLIVAN: 4.10.

THE COURT: 4.10 is very long and it talks to the investor's requisite power and authority to make the investment. You're running the risk that I'm going to exclude this entire document on relevance grounds even though it's already in evidence.

MR. SULLIVAN: Of course.

THE COURT: I am not understanding any purpose of you engaging with this document other than to mislead the jury about the law.

MR. SULLIVAN: So 4.10 is out?

THE COURT: 4.10 is out because of 401 and 403 reasons. There's absolutely no relevance to it.

MR. SULLIVAN: 4.11 is next.

THE COURT: Do you want to read every paragraph in the agreement?

MR. SULLIVAN: No. I just want to know what I can

ask about and what I can't ask about.

THE COURT: How many paragraphs do you want me to rule on?

MR. SULLIVAN: I was under the impression that when a document is in evidence --

THE COURT: That you can use it however you want to mislead the jury about the law? That's your impression?

MR. SULLIVAN: I'm not misleading the jury. I'm not misleading the jury. I will remind the Court that Mr. Watson is presumed innocent.

THE COURT: I understand, but that is not a license to misstate the law. Mr. Sullivan, it's not --

MR. SULLIVAN: So to say --

THE COURT: You don't need to lecture me about the presumption of innocence. It's not a license to mislead the jury about the law.

MR. SULLIVAN: Then I disagree that he's misleading the jury by reading what an investor signed.

THE COURT: Okay. What's next?

MR. SULLIVAN: Maybe the investor is wrong about the law. That's got nothing to do with Mr. Watson. The investor signed this.

THE COURT: They signed it saying it's a private placement. It has nothing to do with what we're talking about in this case.

MR. SULLIVAN: So what else can I not talk about on this document?

MR. SIEGEL: Your Honor, I ask that we put a stop to this.

THE COURT: I am a little bit at a loss here. If you point me to something that you think comports with the ruling that I've made here that we're not going to have fact testimony about legal issues especially to the extent that it would not be misleading -- if you're doing it in good faith, I'm happy to consider --

MR. SULLIVAN: I'm not aware of anything in this document that would require a second trial or that it's misleading to the jury.

THE COURT: We're done on this topic.

MR. SULLIVAN: Mr. Watson cannot testify to his belief about why he put in provisions of the document that the investors signed. So, you're excluding the rest of the testimony.

THE COURT: The provisions that say things like that the investor is an accredited investor -- again, I fail to understand the relevance. It has nothing do to do with investor sophistication and, anyway, investor sophistication is not a defense.

MR. SULLIVAN: Can we elicit that he's signed the document?

THE COURT: We've already elicited that.

We can bring in the jury.

MR. SULLIVAN: Okay. Thank you.

THE COURT: Do I have a physical copy of this document or, if not, can someone hand it to me?

MR. SULLIVAN: It's in the binder.

MR. SIEGEL: Your Honor, I can pass you a version.

(Counsel approaches.)

(Jury enters.)

THE COURT: Please be seated, everyone.

Ladies and gentlemen, we're going to break a little bit early for lunch today around 12:15 but we'll push through for another twenty minutes.

Mr. Sullivan?

MR. SULLIVAN: Thank you.

Can we pull up -- we had 626 which is in evidence just the very top.

(Exhibit published.)

MR. SULLIVAN: I'm sorry, Government 2019. I'm looking at the wrong number.

(Exhibit published.)

MR. SULLIVAN: Just this cover page.

BY MR. SULLIVAN:

Q So, Mr. Watson, so that we don't have to go through each and all of the series, this has Series C preferred stock

purchase agreement; correct?
A Correct.
Q Is the language in the other agreement substantially the same as the language we've talked about here?
A Substantially the same. We had two law firms that did the work for us.
MR. SIEGEL: Objection, Your Honor, to the entire question and answer.
THE COURT: I am going to sustain the objection to the answer. The question was simply, was the language substantially the same.
A Yes.
MR. SIEGEL: Rule 1002, Your Honor.
THE COURT: OH, then the objection to that is sustained.
MR. SULLIVAN: After lunch we'll pull up the rest of the -- the other documents and I'll --
THE COURT: Sure.
MR. SULLIVAN: We'll go through this again.
THE COURT: Okay.
BY MR. SULLIVAN:
Q Let's turn to the call that Samir Rao made when he impersonated -- when he impersonated Alex Piper. I want to ask you questions about that call, Mr. Watson.
Do you have the day in mind?

A I do. February the second, 2021.
Q How did you start that day?
A It started a little bit early. There was a wonderful Indian actress, Priyanka Chopra who I had wanted to interview for a long time and she was kind enough to agree to do an interview, but she was in London and she was many hours ahead. So I had to get up early that morning, I think at 4, and I got in the office at 5 and I think we turned the office in Mountainview, California into a studio in which we can do long distance interviews and then I think -- you know, we started the interview probably somewhere in the 6 or 7 a.m. range. And she was very kind and, so, I was glad we were able to do it.
Q Was Mr. Rao in the office when you got in at 4 or 5 that morning?
A I don't think he was there when I got in, no.
Q Do you recall -- do you recall when you saw him after you finished your interview?
A I did. I -- I think I saw him -- I think he came in during the interview at some point because I think he was also a fan of hers and so I knew that he was around along with the other members of the TV show crew.
Q Now, did there come a time when you encountered Mr. Rao on a telephone call?
A I did. I did. I --

Q Can you tell us where you were and how that came about?
A So, after the call I went back to my office to do some work and I think I went to the bathroom at one point and on the way back from the bathroom as I often would do -- this was still kind of COVID times so people would often -- there were very few people in the office. People in the office you would kind of pop your head in and do that.
Again, it was early in the morning probably around 8:15, 8:20 something like that so it was pretty early. So I popped my head in the office as other people would do to me as well. I popped my head into his office to see what he was up to.
Q And when you popped your head into his office to see what he was up to, what did you notice?
A It looked like he was on a call. At first I was in the doorway, he was in the corner. It looked like he was on a call of some sort.
Q Tell us about what you did when you saw him on the call?
A I kind of just hung around the edge for a little bit waiting to see -- we had lots of activity going on. We were striking new deals with Dentsu and WPP and some of the big ad agencies. So I didn't know if he was potentially on one of those calls with one of those folks on the east coast so I listened quietly for a couple of minutes.
Q When you first walked in the office did you have any idea

that he was on the call with the people from Goldman Sachs?
A Definitely not, no.
Q The Government introduced in evidence a -- I guess a calendar invite that said dupe. Do you remember that?
A I do, yes, I do remember that.
Q Was there anything on there that talked about the substance of what was going on?
A No --
Q By the way what does dupe mean?
A Dupe means duplicate. So most of my direct reports if they had something important going on, they would put kind of a heads up on my calendar. So, if Tracy was finalizing an important new addition, she might put a placeholder or if Chris was -- if we were filming something in Atlanta or Puerto Rico for one of our TV shows, he might put a little notice on there so I had a heads up and I would do the same for people. If I was going to be doing something I might do that. So I probably had a couple of hundred dupes a year.
Q All right.

MR. SULLIVAN: Can you pull up Government 3546, please.

(Exhibit published.)

Q Is this the calendar invite?
A I think so. It's not normally the way it looks when you're on Googling calendar. This isn't the way it looks so

this is kind of a pullout of it, but -- but I -- yes, I believe that this is.

Q And is there anything on here that -- is the word Goldman Sachs on here?

A No, no.

Q How about Allison Borado (ph)?

A No.

Q How about Hillel Moerman?

A No, I don't see that.

Q Do you see any indication on here that gives you a sense or gave you a sense of what this call was about?

A No, it's kind of blank and generic.

Q All right. So where it says that this event is a video call, what did you expect if you even read that at the time?

A I probably didn't pay attention to that because of the way the Google stuff worked sometimes it lists stuff as a video call even if it's a phone call, so I probably didn't lock into that.

MR. SULLIVAN: Okay. You can take that down.

BY MR. SULLIVAN:

Q So, when you walked into Mr. Rao's office, was he just beginning the call, was he dialing or was the call already existing?

A As best I can tell, he was already in the middle of

something.
Q So you walked in, what did you do?
A I did what I normally did. I kind of just stood on the side to see if he was on the photo with GM, who was a big client of ours; was he on the phone with WPP which was a big client of ours. You know, who was he on the phone with, where was he going. So I quietly listened for a minute or two.
Q As you quietly listened for a minute or two, what did you come to determine?
A It was -- it was a strange call. I -- I think it probably took me a couple of minutes to put together what was happening, but I realized that he was or I came to believe, I guess, that he was pretending to be someone that he wasn't.
Q And why did you come to that belief?
A Part of it was body language. He was kind of hunched over in the corner a little bit, which was not really like him. Part of it was it was just a weird conversation. He was -- babbling is a little bit too strong, but he wasn't fully coherent.
Q Did you come to an understanding of who he was talking to?
A I wasn't sure who he was speaking with. I obviously tried to guess, but I wasn't 100 percent sure who he was speaking with.
Q So, what did you do?

A Well, in those kinds of moments a lot goes on quickly. I started to worry, panic probably a little bit and I began to kind of furiously do the cut sign that you do when you want someone to stop something trying to get him to stop what he was doing.
Q And why were you worried and giving him the cut -- the cut sign?
A Because it seemed clear to me that he was doing something wrong, but I wasn't sure if he was on a video -- remember this is still COVID. So I don't know if he was on a Zoom or a conference call, what he was on. And, so, I was saying get off, end this thing.
Q Did he?
A He didn't, no.
Q What did you do when he did not respond to your get off signal?
A I tried to move to the side and do it again and say, you know, get off, stop this.
Q Did that work?
A It did not.
Q Was he still talking when you were giving him the stop sign?
A He was, yes.
Q What did you do next?
A I started -- you know, running through my mind was a

couple of things; do I run and tackle him? If so, does a bad situation become a clown show, like, if he's on video am I all of a sudden -- are we, like, fighting over the phone? You know, it wasn't clear to me whether he was on a phone or on a computer. And, so, it's not like the old days where there's a red button where you can push it and hang it up.

And, so, after a few minutes, I thought, you know -- almost like you're driving with someone who is drunk and you keep trying to tell them to stop driving and I thought let me see if I can get him to just bring this to an end and deal with it on the other side. So I sent him a few texts trying to get him to just stop babbling in the call and move on.

Q So, what were you thinking when you say that you wanted to bring it to an end?

A I assume at the time that I was watching someone melting down and I thought that, you know, let me end this as quickly and gracefully as you can end something like this and let me get on the phone with the people and try and sort through this and figure out what happened.

Q So in that moment in those instances when you say you wanted to get to the other side, what did getting to the other side entail?

A First of all, figuring out what was happening so who he was actually on with. I wasn't sure. So, one of the texts I wrote was, Who is this. I didn't know for sure he was on

with. But whoever it was, I knew I had to get on the phone with that person and explain what had happened.

Q Let's just take a look at your text messages. They are already in evidence.

MR. SULLIVAN: Can we pull up Government 3545?

(Exhibit published.)

Q You may have to make them a little bigger.

MR. SULLIVAN: Let's go to page four, please. Let's look at these texts.

Q At what point did you write the texts? Were they before you gave them the cross sign or after?

A After. I tried a couple of times. I tried a couple of times to physically get him to stop.

MR. SULLIVAN: Let's try the next one.

Q "I am a big fan of Carlos, Samir and the show." Can you explain what you mean by that?

A As I said before it's kind of hard to explain, but he was not speaking well. It was kind of gibberish. And, so, I -- it was clear to me that he was talking about the company, and I guess in this particular case The Carlos Watson Show, and so I was trying to get him to just speak clearly and, again, end it and move on.

Q And how in the world would this text bring the conversation to an end, as you've told us?

A In the cool light of day, it may not make as much sense,

but at the time given that he rejected the other ways I tried to get him to stop, I thought let's just let him have a couple of minutes of coherent conversation and then I can deal with it on the other side.

Q What about use the right pronouns?

A He literally, again, was referring to, as I understood it, women as men, men as women. It was not a coherent conversation.

Q Again, when you say, "You are not OZY," not OZY in caps, what did you mean by that?

A That this is not your company and you're messing this up for all of us.

Q What did you -- what did you mean by that?

A Literally that there are hundreds of people working for OZY. We had 75 investors. We had lot of people who helped get us to where we were and here he was doing a clown show, you know, just trying to point that out.

MR. SULLIVAN: Let's scroll down one more. I think. I think we got all of them. Scroll up, please, to page three. Okay, you can take that down.

BY MR. SULLIVAN:

Q So after you gave him the cut sign and attempted to stop him and after you sent the text messages to bring the conversation to a rapid close, what did you do next?

A Well, he didn't look at my text and he didn't respond.

Normally, if we were working on something together he would respond back and as you can see I sent six or seven texts and he didn't respond and he told me later on that he hadn't seen them so at that point --

MR. SIEGEL: Objection. Objection.

THE COURT: Sustained.

BY MR. SULLIVAN:

Q The sustained was only to what he told you later on. So don't tell us what people told you.

So you sent him the texts and did he respond to your texts?

A He didn't respond to my texts which made me believe that he hadn't seen them.

Q So, then what did you do? Did the call come to an end?

A The call came to an end.

Q Did you think your text messages were effective to bringing the call to an end?

A No, unfortunately not.

Q So, the call came to an end. What happened immediately after Samir Rao hung up that phone?

A You know, honestly, I got pretty upset. I screamed at him.

Q And why did you scream at him?

A The same reason any of us would. I felt like that he was -- I felt like he was potentially destroying something I

had spent a long time building.
Q How did he react -- and don't tell me what he said. How did he react to you screaming at him?
A He was quiet at first. Then he started to offer excuses and then he eventually said, I'm sorry, I'm going through a hard time and explained that he had changed his medication for the first time in a number of years.
Q So after that, after you screamed at him and heard Mr. Rao's excuses, what did you do?
A I -- honestly, I think I sat down for a second and I think I got up and I went for a walk. I had to kind of clear my head and then I came back in and I asked him again what happened because I felt like I had to gather information and start to make some calls.
Q And did you have a similar conversation with him when you came back in?
A Similar conversation. I asked him, you know, tell me everything. Why did you do it? Who was on? Who were you talking to? How long had you been on before I walked in, why didn't you tell me, you know, all of those kinds of things.
Q As a result of that conversation, did you come to learn who Samir Rao was impersonating?
A I did, I did.
Q And as a result of that conversation did you come to learn who Samir Rao was on the telephone with?

A At the time, he told me that he believed he was on with Allison Borado, but I subsequently came to learn that at least Hillel was on, I think, as well too.
Q All right. So after that second conversation with Mr. Rao, what did you do next?
A I -- I made about a half a dozen calls or texts or e-mails. So I think the first person I reached out to --
Q And before we do that, half a dozen calls texts or e-mails. Before you started making calls, texts and e-mails, did you hear from anybody, anybody on the planet, about this -- about this call?
A I did not, no.
Q Okay.
THE COURT: Mr. Sullivan, we're looking for a place to break in the next two or three minutes. I have another court appearance on the other side.
MR. SULLIVAN: My pleasure.
BY MR. SULLIVAN:
Q So, did you get a call from Goldman?
A Not at that point.
Q Did you get a call from Alex Piper?
A I did not, no.
Q Why did you decide to make these calls even not having gotten complaints from everybody?
A So, what happened was, you know, what happened was a

train wreck and I needed to let the board know and I needed to let Goldman no and I needed to ultimately let Alex Piper and YouTube know.

Q And prior --

MR. SULLIVAN: Last question, Your Honor.

Q Prior to Samir Rao impersonating Mr. Piper on that telephone call, did you have any knowledge whatsoever of what Samir Rao was planning to do?

A No, no, definitely not.

Q Did you buy any voice changers?

A No, no.

Q Did you send any fake e-mails to anybody?

A No, no.

MR. SULLIVAN: This is a good place to stop if it's convenient for the Court.

THE COURT: Ladies and gentlemen, let's take an hour break for lunch here. If you can all be back in the jury room at 1:15, that would give us a quick start.

(Jury exits.)

(In open court.)

THE COURT: We're going to break for lunch here. I'll try to be back around 1:10 in case there's anything that emerges over the lunch hour. Enjoy. I will see you soon.

MS. GILBERT: Your Honor, I did file a letter on ECF just now.

MS. FRISON: Your Honor, when we return may I make a record with regard to our submission of July 2nd?

THE COURT: I don't remember what that is. Maybe we can do it at the end of the day, so we don't keep the jury.

MS. FRISON: The letter that you addressed before the witness took the stand today about the treatment of the defense essentially.

THE COURT: I think your letter is the record. So I don't expect to take that up again today, but if you want to submit a second letter on subject I will look at that as well.

MS. FRISON: I know Your Honor is planning to respond in writing, but as to Your Honor's comments this morning I would like to make a record of that.

THE COURT: Please put it in writing.

MS. FRISON: An oral record is what I'm requesting.

THE COURT: Again, I don't want to keep the jury waiting on what I see as a highly collateral issue at this point.

MS. FRISON: We can certainly do it at the end of the day, if that makes sense.

THE COURT: If that's the kind of thing we want to have a conversation about, then we can do it orally. If it's just making a record, I'm going to ask you again to do it in writing. We're on lunch.

(Luncheon recess taken.)

A F T E R N O O N  S E S S I O N

(In open court; jury not present.)

THE COURT: Please be seated. Let's bring in the jury if they're all here.

MS. GILBERT: Your Honor, can we have a sidebar for a moment?

THE COURT: On what topic?

MS. GILBERT: If we can tell you at the sidebar it would be more appropriate.

(Continued on the next page.)

(Sidebar conference.)

(The following occurred at sidebar.)

MS. GILBERT: It's twofold. First is that -- not this court reporter, but the court reporter who was here right before lunch apparently was making faces while the defendant was testifying, making faces, smirking.

THE COURT: I don't want to do this while we're waiting on the jury. We can take it up tomorrow at 9:00 o'clock sharp.

MS. GILBERT: I am just afraid if she's going to be rotating back in. Who was the --

THE COURT: Who was the person you said apparently --

MS. GILBERT: We heard from several people in the audience as well entire back row of students because they all saw it and were surprised and commented on it to us.

Second, is we were informed by again the audience, people in the audience, that Mr. Siegel was making eye contact with -- I don't know, I only remember his juror number from --

THE COURT: Let's bring in the jury. Thank you.

MS. GILBERT: -- voir dire but in the second row --

THE COURT: Making eye contact when and with -- what?

MS. GILBERT: During the course of the testimony and smirking and smiling and laughing.

THE COURT: Okay. Noted. I'm not saying we're not

going to take these issues up. We're not going to take these issues up now. If you see the court reporter who you think was making the faces -- do you know who the court reporter was? Do you know her name?

MS. GILBERT: I don't know her name.

THE COURT: All right.

(In open court; jury not present.)

THE COURT: I will note one thing while we wait for the jury which is that, Ms. Gilbert, your letter filed today speaks to occasions on which you had not had access to search functions or when the document vendor was not being paid. I had tried to drill down yesterday with you and Mr. Sullivan when those periods were, beginning and end. Mr. Sullivan said, I think definitively, that he had nothing else to add on the subject. The letter does not contain any specifics but I'm offering the opportunity if you wish to supplement that today.

(Jury enters the courtroom.)

THE COURT: Please be seated, everyone.

Mr. Sullivan, you may continue.

MR. SULLIVAN: Thank you, Your Honor.

And good afternoon, Mr. Watson.

THE WITNESS: Good afternoon.

MR. SULLIVAN: And good afternoon, ladies and gentlemen of the jury.

BY MR. SULLIVAN:

Q Let's pick up where we left off. So, as I recall, you had gone to take a walk, you come back, headed out a second time with Samir, and I think that's where we left off. Why didn't you just fire him on the spot when you were having these rigorous discussions with him?

A Yeah. Well, I did think about that at the time. I think probably a couple things were going on. One was I hadn't seen him do something like this before so I had a level of compassion for someone I had worked with for almost eight or nine years, I would want someone to have some compassion to me if the situation were reversed. Two, that's a big decision to make to fire a cofounder so you have to talk to the board. That's not just something you can do unilaterally on the two you can't just fire a cofounder in moments you actually have to have a cofounder with board members.

And, third, I had to actually gather all of the facts and actually understand what had happened. So probably for those reasons, I didn't do it, and if you're asking why didn't I do it, like, literally in that moment. That's probably why I didn't do it literally in that moment. I obviously took subsequent action pretty quickly, but that's why I didn't fire him literally in that moment.

Q Okay. And we're gonna come back to the subsequent action but where we left off right before lunch, you said you made

half a dozen calls to board members and others. Do you recall who you called first?
A I think I called Marc Lasry first because Marc was effectively acting as our chairman. He hadn't formally been named but he was effectively acting as our chairman. He had just led our Series C around a couple years before. He was -- we were working very closely. He was actually helping me close big deals. So when I mention deals like the Dentsu deal or the deal like TikTok, he actually, literally, was helping me pitch those people. So he was very actively involved and I knew that he had run big organizations for a long time and probably had seen situations like this. So a variety of reasons. I think he was -- he was the first one.
Q And did you have a conversation with him?
A I did. I did.
Q Do you remember who you called next?
A I think I reached out to Michael Moe who had been on our board since the very beginning before we actually launched. He was one of our first investors. I had known him at my first company. He actually helped me sell my first company, so I had known him for 20, 25 years and so I think he was the second person.
Q Were you able to reach him?
A I think with most of these people I will never reach them on the first time, you know, ultimately, I did speak to him

that day.
Q All right. Do you remember who you called next?
A I think I tried a gentleman Jens Mueffelman who's on our board. He's a German media executive, and I think he was traveling so he wasn't easy to reach. I think we missed each year several times. Not figuratively. I think he was literally out at sea.
Q Did you call the other members on the board?
A I think those were the board members that I immediately called. I think I reached out to a couple of our other investors and advisers.
Q At the time you reached out to the board -- to the three members of the board, had you received any information from the outside that Goldman knew that this was a fake call from Samir or anybody?
A No, no, not at that point.
Q Right. So you said you reached out to some investors as well?
A Yeah.
Q Why did you want to reach out to investors?
A Just because this was a, you know, this was -- I probably don't have the perfect word for it, but it was a dramatic, difficult, you know, not good thing.
Q Do you remember who, which investors you reached out to?
A I think I reached out to David Drumond who was one of our

investors. I think probably -- I don't know if I spoke to her, but I think I probably -- I know at some point I reached out to a woman named Laurene Powell Jobs who was a large investor who had been on our board before.

Q All right. And when you reached out to those investors, had you been informed by anybody on the outside -- anybody other than Samir, period, about this call?

A No. No.

Q Okay. Now, did you and the board meet that day?

A We did. We had an emergency meeting I think -- I think that night.

Q And as a result of that meeting, did you decide to fire Samir?

A We did. We fired him -- so we did four things. The first thing is we fired him from the board. So we -- he had been on the board for a bit and we fired him from that and he peremptorily submitted his letter of resignation.

MR. SULLIVAN: Can you bring up Defense 599 for the witness only.

Q Mr. Watson, can you see Defense Exhibit 599?

A Yes.

Q Do you recognize it?

A Yes. This is where he resigned. Yup.

MR. SULLIVAN: Moving Defense 599 in evidence.

MR. SIEGEL: No objection.

THE COURT: Received.

(Defense Exhibit 599 was received in evidence.)

MR. SULLIVAN: We can show the jury.

Q And is -- maybe. There we go. So we're now looking at Defense Exhibit 599. Is this the letter that Samir Rao wrote to you after the board decided to fire him from the board?

A Yes.

Q It says: I hereby resign my position as a board member of OZY Media, Inc. I will continue to support the company in whatever capacity I can.

Did I read that correctly?

A You did.

Q And did you accept this resignation?

A We did. We did.

Q All right.

MR. SULLIVAN: You can take that down.

Q Now, you said the board did four things. First was fired him from the board. What else?

A Next, we -- well, before that, they wanted to check and make sure that he hadn't embezzled any money or done anything like that. So I reached out to our banks, checked our bank accounts and made sure that the money we thought was in there was there. So they wanted an update on that. And so that -- that, you know, I guess was number two.

Q And speaking, at least for yourself, why was that a

concern?
A Just because what he had done was so out of character and, immediately, I think it was Jens was worried if he had done this, what else had he done.
Q Okay. What else? Two more things.
A Then we had a debate at the board about whether or not we should fire him. Two of us originally were leaning towards firing him at the time from his capacity within the company, and then two of the board members and one in particular whose daughter had wrestled with some serious mental health issues had said that we should take a moment and have some compassion and -- and saw it at the moment as not who he was, but as an outlier.
Q And where did the board land on firing him altogether from the company?
A We decided to suspend him for a period of time subject to the various reviews, and I think that's why he wrote in the resignation letter because he knew that there was a meaningful possibility we are gonna fire him outright from the company.
MR. SIEGEL: Objection.
THE COURT: Sustained.
Q Okay. So and it's -- Mr. Watson, I know this is a foreign language for you --
A No problem.
Q -- you can't just talk about what may be in somebody

else's head.
A Sorry about that. I apologize.
Q No problem. Sometimes, we lawyers, speak a very different -- different language.
What was the fourth?
A So -- so, the fourth was we immediately kicked off the search for his replacement. So we hired two different recruiters to begin to look for his replace. So even if he ultimately was allowed to come back and regain, we understood that he couldn't be our longterm answer because the company, again, was taking off. We were securing bigger and bigger deals and we needed someone we had faith in that could handle literally hundreds of million dollars of revenue.
Q Now, I want to just drill in on the suspension. There was testimony that during the period of his suspension, he interacted with some clients. First question, was Mr. Rao actually suspended from OZY?
A He was. Definitely.
Q And do you remember how long he was on suspension?
A I think it was either three or four weeks.
Q And what were the conditions for him coming off of suspension?
A He had to meet with each boardmen individually and each individual board member Marc Lasry who at the time was the owner of the Milwaukee Bucks, Jens Mueffelman who was an

executive at one of Europe's largest media companies who owns Business Insider, Politico, and others. And then Michael Moe who had been an investor in Facebook and Spotify and Dropbox. He had to meet with each of them, explain what happened and convince them that he could be trusted to come back. And, sorry, he had to meet with one other person. He had to meet, even though he was no longer on the board, I insisted that he meet with Laurene Powell Jobs' right hand person, a gentleman named Steve McDermid.

Q All right. And did he ultimately do these things?

A He did. He did.

Q And was he ultimately reinstated?

A He ultimately was reinstated, yes.

Q Now, was there any time, to your knowledge, during that month-long period that Mr. Rao communicated with a client?

A I'm -- I'm sure he did. We were -- again, we very quickly went from having no clients to having over 200 clients, and when you're moving that quickly, you know, you can't just disappear overnight. And, so, I'm sure that there were questions he had to answer or there were things he had to hand off to other people or what have you. You -- in that kind of scenario, someone can't just literately just disappear overnight when we're in the middle. We probably, at that point, we were probably 35 new deals, so not deals we already had. So we were probably negotiating 35 new deals in that

window of Q1.
Q Would he have been in contact during the suspension of all 35 or just in necessity here and there?
A Just a couple, yeah.
Q Mr. Rao talked to you about his mental health issues that impacted his decision to impersonate Mr. Piper?
A He did. Yes, he did.
Q What did he tell you?
A He told me that he had wrestled with depression since college, that he had taken different medicine, that he had changed medicine four or five times in four or five years and he thought that was part of what -- that and his father's illness is what had caused him to break.
Q Did he talk to you about any other medical or mental health diagnoses that he said contributed to the call?
A I don't remember the exact language but he referenced bipolar disorder.
Q Now, after Mr. Rao satisfied the conditions of his suspension, did OZY call off the search for his replacement as functionally the CFO?
A No, no, no, we accelerated. As I said, we hired two different firms and we had to adjust it at some point. I had a difficult conversation with him after he got back because one of the recruiters said we had lost two good candidates.
MR. SIEGEL: Objection.

THE COURT: Sustained.

Q So you had the two -- you hired the two firms look?

A Right.

Q Even after suspension, did you keep looking?

A We kept looking and we ultimately hired a McKinsey partner, a former McKinsey partner and Harvard Business School grad named Chris Kurk.

Q Were you confident that Mr. Rao could do the work of CFO after the -- after he impersonated Mr. Piper?

A I didn't think he could do it. And, again, even in -- the good news, bad news was growing rapidly, literally every month. Every month, if you look at some of those decs that have been shown, and literally if you look at a dec in February, to a dec in April, to a dec in August, they weren't small wins, they were bigger wins. We were signing deals. One deal was bigger than all of the revenue we had just five years before and we were doing that over and over again and so the company was -- the company was growing really dramatically and so even if -- we clearly needed more help.

We clearly needed more help. It had to be someone who could handle that level of opportunity and who could build out the systems for a young company. And it's not that unusual for startups to have to say this person was the right person for this role in the first couple of years but now you need additional skill sets for phase two, you're gonna need

additional skill sets for phase three, and not just in that role but in other roles. So, yes, we knew we needed someone who had more skills and who was kind of more properly trained startup media CFO.
Q Right. Now, Mr. Watson, I'm gonna return to something we talked about -- that we talked about this morning. We looked at some -- a closing document for Series C and we looked at a couple paragraphs specifically there. Do you remember that?
A Yes, I do.
Q And then do you recall me asking you whether the same language is in other documents?
A Yes, I do.
Q For -- I'm sorry, other documents in other Series?
A Correct. Yes, yes.
Q Okay. So you weren't able to answer that question, so I'm gonna show you --
MR. SULLIVAN: Can we pull Defense 769. I'm going to ask them to scroll through and see if you recognize the document. This is just for the witness.
THE WITNESS: So it says financial states --
THE COURT: Hold on --
MR. SULLIVAN: Don't tell us yet.
THE WITNESS: Sorry. Can you just -- section four for a second.
MR. SIEGEL: Your Honor, can we have a sidebar?

THE COURT: Yes, briefly.

(Continued on the next page.)

(Sidebar conference.)

(The following occurred at sidebar.)

MR. SIEGEL: So, Your Honor, this is an exhibit I think was produced to us yesterday and we don't have a hard copy, and especially given the discussions about once it's in evidence, it can be read from --

THE COURT: Right. This was not produced until yesterday. It's excluded. End of story.

(End of sidebar conference.)

(Continued on the next page.)

(In open court; jury present.)

BY MR. SULLIVAN:

Q So, Mr. Watson, did all of your documents contain the same language?

MR. SIEGEL: Objection.

THE COURT: Sustained.

MR. SULLIVAN: All right. May I have a sidebar? Oh, I'm sorry, only the Government. Okay.

THE COURT: Come to the sidebar, please. Let the jury have a five-minute break here.

THE COURTROOM DEPUTY: All rise.

(Jury exits the courtroom.)

THE COURT: Please be seated, everyone.

MR. SULLIVAN: So the Government objects to me eliciting from Mr. Watson that all of the series have the same language and then turns around when I actually produce the document from other series and continues to object. It's the same -- it's the same language. They can't have it both -- both ways, Your Honor. I can't predict they're gonna make us waste time making us bringing in four different documents from four different series to read two sections. I'm not -- four point five to four point four.

THE COURT: Let me just say something. All of this relevance is questionable. I think I gave you a substantial amount of leeway even as to the first stock purchase agreement

by permitting you to elicit that. For example, it says these are speculative investments. It's far from clear that any of this is relevant in the first place. That's point one. Whether an investment is speculative or not speculative is really a separate question entirely from whether a scheme to defraud in that investment or not. Nevertheless, I permitted you that leeway you have that relevance issue I described.

And on top of that, you have now, the Government indicating and you not disputing that this document was produced for the first time yesterday which I don't have to say again is a violation of any number of prior orders in this case. The document is excluded.

Let's bring the jury back in.

MR. SULLIVAN: And while the jury is coming back, I would like to make a record that with respect --

THE COURT: You can make the record at the end of the day.

MR. SULLIVAN: -- something else --

THE COURT: Whatever it is, you Mr. Sullivan, please hold it for the end of the day. I don't want to have this kind of colloquy in front of jury. Thank you.

MR. SULLIVAN: I'm sorry, I didn't realize the jury was here.

THE COURT: They're on their way.

MR. SULLIVAN: Oh, I'm sorry, I thought you said you

didn't want to have it in front of the jury.

THE COURT: Just tell me what the subject is.

MR. SULLIVAN: The subject is the hearsay exception that -- to knowledge, intent. You didn't let us put in a document or section of this document, but with Ms. Thakur's letter, who said this is fraud, you gave the jury in limine instruction and you say that all goes to knowledge and intent.

THE COURT: All right. I just asked for the subject.

MR. SULLIVAN: That is the subject.

THE COURT: All right. Thank you.

MR. SULLIVAN: And we would just ask for the same consideration.

THE COURT: Put that in a letter tonight. I'm assuming, the way things are going, that Mr. Watson will still be on the stand tomorrow. Cite me a case and we will take it from there.

MR. SULLIVAN: A case that says that the Court should rule the same for the Government and the defense? I don't know one exists.

THE COURT: All the gratuitous insults. I don't know if you're trying to effect the outcome here or this is just an outburst for the sake of the audience or your client. It's not appropriate and it's not going to have any impact on me. All of the gratuitous insults are between you and others.

MR. SULLIVAN: I did not insult Your Honor. I'm asking you what case do you want --

THE COURT: You asked for a sidebar and I said the word "uh" and you said, oh, I'm sorry, sidebars are only for the Government. And if that doesn't fall into the category of gratuitous insults, I don't know what does. Conversation over. Let's wait for the jury.

MR. SIEGEL: Your Honor?

THE COURT: What's the question?

MR. SULLIVAN: Let's take this down.

MR. SIEGEL: I would just take an application that the Court order this to stop because it is going to prejudice us in front of the jury.

THE COURT: And what sanction would you have me impose if that order --

MR. SULLIVAN: So it's a conversation --

THE COURT: I'm sorry, I'm talking to the Government right now --

Just think about that and we'll take it up at the next break.

(Jury enters the courtroom.)

THE COURT: Please be seated, everyone.

Mr. Sullivan.

MR. SULLIVAN: Thank you.

BY MR. SULLIVAN:

Q So, Mr. Watson, did OZY prepare closing documents for your Series D?
A Yes, we did.
Q And did you require every customer, every investor to sign those documents?
A Yes.
Q All right. I'm gonna now ask you some questions about YouTube. So first just to get it out, right, did you produce cat videos on YouTube?
A Not that I know of.
Q Tell us what show you produced on YouTube?
A We produced several but the first significant one was The Carlos Watson Show which we launched in 2020.
Q All right. Now, there was a claim that OZY's financial papers had $5.7 million X advertising, meaning not advertising, from The Carlos Watson Show. Do you remember that?
A Yes, I remember that.
Q All right. Now, did OZY earn $5.7 million dollars from The Carlos Watson Show?
A Much more than that.
Q All right. Now, how should that have been booked?
A It should have been booked as coming from advertisers, not as coming from YouTube, so it should not have -- it should have just said T.V. not T.V. X advertising.

Q Now, were you the person who was typing that in your decs?

A No, Samir and Suzee did that.

Q All right. Why did you choose to do advertising income as oppose to -- I'm sorry, revenue, as opposed to revenue from the company?

A Because if YouTube pays you for a show, you'll make one to $3 million dollars. On The Carlos Watson Show, we probably generated north of $20 million dollars. So we had big deals. For example, with General Motors who themselves for the first season, spent $5 million dollars, American Family Insurance, just for the first season for a couple of months, spent $2 million dollars, Airbnb $2 million dollars, Discover, multiple billions of dollars.

So it was a much better business to not rely on YouTube in which case, as I said, you would only get $1- to 3 million dollars. So call it two as an average. Whereas, if you did it the way we did it and the way that's become very popular now on YouTube, if anyone follows Mr. Beast or Club Shay Shay or Meg and Kelly Show, all of those shows do what we were doing which is they go get their own advertisers and therefore they kept to keep all of it. It is way more profitable. It's a much better approach.

Q This five point seven number, Where it did it come from?

A I'm not sure. I assume Samir was speaking --

MR. SIEGEL: Objection.
THE COURT: Sustained.
Q So you don't know how he came up with five point seven?
A I don't specifically.
Q Was there anything, based on your knowledge, that would sum up to $5.7 million related to The Carlos Watson Show?
A Not only to 5.7, but it's possible that he --
MR. SIEGEL: Objection.
A It's possible that he -- it's possible that the document specifically was speaking --
MR. SIEGEL: Objection.
THE COURT: Sustained.
Q So don't tell us what the document --
A Okay.
Q Just in your knowledge, was there some $5.7 million-dollar revenue number?
A If it were part of a larger telling of the revenue story, yes.
Q And what does that mean?
A Meaning that if someone looked at the revenue that we made on the show for one particular season or for one particular window, let's say someone said what do you have for Q1 or maybe who do you have already booked for season three and so they asked a question like that, then that could -- that could square for that. But if someone were just asking

an overall question how much is The Carlos Watson Show generating, it would have been, at that point, it would have been, you know, orders of magnitude bigger than that.

Q Okay. And was the number of $150,000 production cost per episode in the ballpark?

A Yes. The way I remember her saying it, I think was $150,000 per week for the -- just for payroll alone, but we were committed to making this at a really high quality level both just because that's what we did but also because we had had experiences before with T.V. shows that if you made something really great for one network like PBS, if it was good enough, you could sell it a second time to the BBC and, therefore, you could get paid twice.

So, for example, with the show for Ms. Winfrey, we sold it to the Oprah Winfrey Network but it did so well that we signed a second deal with HBO Max and so we got paid more than one time for the same show.

Q So tell us how that works. What were you paid Oprah Winfrey Network?

A Again, there was about 20 -- there was $20 million in barter revenue. And across the two seasons, I think the deals added up to kind of somewhere in the $5 million dollar neighborhood.

Q For each?

A No, for two seasons. For season one and season two

together.
Q Got you. And then what about, for -- was it HBO Plus?
A HBO Max.
Q HBO Max?
A I don't know the specific numbers on that but it would be a smaller number.
Q Okay. I'm going to show you some e-mails that the Government introduced in evidence.
MR. SULLIVAN: Can we pull up 5034, please, and let's make it a little bigger.
Q All right. Mr. Watson, this is 5034. It's an email from Jonathan Siou, I may be pronouncing it wrong, from BuzzFeed. Do you know this person?
A I don't know him. I'm sorry.
MR. SULLIVAN: I'm sorry, Judge, they can't -- it's back. Okay. Everybody? Great.
Q Do you know who this Jonathan Siou is?
A Yeah. It might be "Siou."
Q Sorry.
A I know who he is. He was one of the top finance officials at one of our competitors, BuzzFeed and was very involved in them trying to buy us in 2019 and 2020.
Q And Suzee Han?
A I know Suzee, yes.
Q And she was what at OZY?

A She was the chief of staff reporting to Samir.
Q Okay. And we see in the CC line, two other people from BuzzFeed, Felicia DellaFortuna. Do you know that person?
A Felicia, at the time, was chief of staff to buzz BuzzFeed CEO and subsequently became their CFO. She became their chief financial officer. So she was helping drive this deal. She and Samir were kind of working closely together to kind of coordinate all of people. There were about 25 people involved in BuzzFeed's pursuit of OZY.
Q And then Hannah Bricker.
A Hannah Bricker was kind of -- Hannah Bricker was to Felicia is what Suzee was to Samir. Hannah was kind of Felicia's right hand.
Q Okay. And you see Samir -- Samir Rao is cc'd. I assume Samir and OZY is Samir Rao?
A Correct, yes.
Q You mentioned this is in reference to BuzzFeed's acquisition attempt at OZY; is that right?
A Correct. Yes.
Q Now, how many offers -- and let me -- are you anywhere on this email?
A No, I'm not.

(Continued on the following page.)

DIRECT EXAMINATION: (Continued.)

Q Now, you see an attachment, unnamed dash two dot PNG, right?

A Yes.

Q Not being on this email, is there any way you saw whatever is attached in this email?

A Probably not, no.

Q Now, is this the group of people that you would be dealing with or Samir or someone else?

A This is more diligent. So I would typically have a top conversation in the case of BuzzFeed, a guy named Ben Smith reached out to me in August of 2019 and asked me. And I subsequently met with him, who he effectively was number two, and with his boss, a guy named Jonah Peretti, who is the CEO.

So my conversations largely for the early part of their pursuit stayed with those two, and then once we had signed NDAs and agreed that we were going to engage in at least conversations about a potential acquisition, then Samir and Felicia kind of partnered. They had a working group of, I think, maybe 8 or 10 people who would meet pretty actively through September, October, November, December, and January of 2019 and 2020.

Q Is it accurate to say that you were not involved at this level of detail in the process?

A Correct. No, I could not, would not.

Q Now, let's go through each of these BuzzFeed offers. You can pull that down. Do you recall what the first offer was?
A The first offer was -- so after we had gotten to know them, Jonah wrote me a letter saying Ozy's move into TV and podcasts and festivals and awards is really --
MR. SIEGEL: Objection.
THE COURT: Sustained.
Q Lawyer speak. Something else.
A So we were offered a 125 million.
MR. SIEGEL: Objection.
THE COURT: Sustained.
Q How about the second offer?
MR. SIEGEL: Your Honor, objection.
A 170.
MR. SIEGEL: Objection to this entire line of questioning.
THE COURT: The objection to this line of questioning is sustained.
Q All right. So can I ask, did BuzzFeed made offers to acquire?
A They did.
THE COURT: Come to the sidebar.
(Sidebar; continued on next page.)

(Sidebar conference held on the record in the presence of the Court and counsel, out of the hearing of the jury.)

MR. SIEGEL: My objection is to talking up contents of written offers. He testified those came in a letter without admitting the written offers. If they want to admit them or show them, then that's fine, assuming that they've been produced.

MR. SULLIVAN: I don't know if they're written or oral.

MR. SIEGEL: He said it was a letter.

MR. SULLIVAN: I can ask him.

THE COURT: The first question, was it written or oral?

MR. SULLIVAN: Yes.

THE COURT: If he answers both, then where does that leave us?

MR. SULLIVAN: I'll ask him.

THE COURT: I'm asking the government that question.

MR. SIEGEL: He can ask what was the oral offer.

THE COURT: Okay.

(Sidebar concluded; continued on next page.)

BY MR. SULLIVAN:
Q Mr. Watson, just some foundational questions. You mentioned that you were in conversations with Ben Smith, right?
A Yes.
Q And who else?
A Ben Smith and Jonah Peretti were the two who kicked it off, and their general counsel, a woman named Rhonda Powell.
Q And Jonah Peretti was?
A Was the CEO.
Q Great. I was asking about offers. You had mentioned a letter, but I want to focus on whether you spoke, received any oral offers from either Ben Smith or Jonah Peretti or the general counsel?
A Yes. I received several oral offers.
Q Do you remember the first?
A The first was 125 million.
Q And did you agree to that?
A I discussed it with the board and we talked it through. I think the -- and ultimately thanked them but declined.
Q Was there -- I'm only talking about oral offers communicated to you before they were reduced to writing.
A Yes.
Q Did you come to receive another offer?
A I did. The second oral offer was for $170 million.

Q And did you accept that offer?
A Again, with every offer we got I made sure that we talked it through with the board and with our lawyers and ultimately I think I told them that we weren't going to go forward with it.
Q Did you receive any other oral offers?
A I did. Right before Thanksgiving of 2019, $225 million.
Q Same answer, you declined that one?
A Again, we talked about it over the Thanksgiving break and I told you that was one of the times my dad made that joke about we could start getting stake in Chipotle if we said yes, but we didn't do it.
Q Any other oral offers?
A The next one was $250 million.
Q And that was declined as well, you declined it as well?
A Discussed it as well. That one came closer to Christmas. That was the conversation over Christmas of 2019, over Christmas 2019 holidays.
Q Is there another offer you received?
A We did. $300 million.
Q Was that the final offer that you got?
A That was the final offer. I said to them, well, I discussed it with the board and with other investors and went back and forth. And because I didn't want to damage the relationship and I didn't want them to keep coming back with

more and more offers if we weren't likely to go forward, I both said thank you and also said, you know, I gave a little more clarity about why we weren't going to go forward with it to make it clear that even if they increased it again, unless they did something that I didn't think they could do, we weren't going to say yes.

Q So you personally -- first let me ask you. Were you one of the board members who did not want to accept the 300 million?

A Correct. I was willing to think about it because, you know, for some of my fellow investors it could be a good payday. Some of our fellow investors could make ten times their money so that's a good return on your money. And a lot of our employees, every full-time employee at Ozy got stock options.

And so a lot of people would have made anywhere from a half a million to some people would have made as much as a couple million dollars. So I did think about it longer because it would be, you know, for a lot of people it could be a home or it could be sending a kid to college, or something like that.

Q Now focusing on the final offer you got, the $300 million offer, did that give you any useful information in thinking about the value of Ozy Media at that time, 2019, 2020?

A It did. I mean, it confirmed what I had begun to

believe. Because in 2016 when we first began to consider diversifying and moving beyond digital, that was not something our competitors were doing. At first our board looked askance at the idea of moving into TV, like what do you guys know about TV, you're just going to waste money and mess that up, or how are you going to pull off a festival in Central Park, you're not even based in New York. You're in California. You haven't done a festival before. How are you guys going to do these podcast. So there was a lot of not even doubt but negativity in the boardroom.

And I told you before that we filmed those pilot episodes of our first TV show. We did it mainly to win over any potential TV buyers, but really its biggest value was in the boardroom because I think it was better to show them rather than tell them. So for those who didn't think we could put together something high quality when we walked into one of the board meetings and actually pressed play and they could actually watch a real episode, that was a game changer.

So they started to turn a little bit but by 2019, you know, I think they were starting to believe and, again, it wasn't just the BuzzFeed offer. It was working with Ms. Winfrey and getting, potentially, her that strong video. It was signed bigger and bigger deals. It was New York putting us on summer stage, not summer stage, but the Great Lawn.

All of that came together but, yes, that was a big

moment with a competitor that was worth a billion dollars saying Ozy is so valuable, we'll make not one, not two, but five offers.

MR. SULLIVAN: Can we pull up Government Exhibit 5777. Make it a little bigger. This is already in evidence.

Q Mr. Watson, you see this is an email from Samir Rao. First, are you copied at all?

A No, no, no, I'm not.

Q Do you recognize any of the names? They appear to be from Alnahdha. Do you recognize any of the names here?

A I do. I wasn't close to most of them, but kind of Samir's relationship but Apoorva, Aleem, Junaid, Abbas, and Samir.

Q And Abbas was your investment banker, right?

A We had four and he was one of our four.

Q My apologies. One of your four investment bankers. And there are a series of attachments here, yes?

A Yes. It looks like a lot, yes.

Q And you're not on this email. As you sit here today, do you know if you looked at them?

A Probably not.

Q All right. And they have a document list, Series D preferred stock, Series D amended and restated investor rights.

So just to give the jury a sense, what do these documents comprise?

A This is normally the kind of package you give to an investor. So I mentioned before that typically when someone invests, they have to sign kind of 6 to 10 documents, sometimes more than that. Depending. But these are the documents and there would be a similar set for Series C, Series D, or Series A.

Q So this is at the end of the process?

A Correct, yes.

Q We talked about your involvement in the beginning of the process meeting at a high level with your counterpart. What about at the end of the process when people are signing these documents, are you involved in that process or is that something that you delegate?

A No. That's -- I typically had the kick-off meeting to kind of introduce people to Ozy, show them our pitch dec. Obviously we played key videos like the one from Ms. Winfrey, and then I would hand that over to Samir or Samir and Suzee and they would run through it. In this particular case, I would have been less involved because this is an existing investor. So it's not a new investor. And I would have been yet even further removed because in this particular case Samir told me to stand down and let him work with Apoorva, Aleem, and Junaid.

Q Did you believe at the time that Mr. Rao was -- provided accurate documents to these investors?
A To do all investors, yes.
Q We could take that one down. Let's pull up 6566, government exhibit. It's already in evidence. So you see here, Mr. Watson, this is an email from David Chang to Samir Rao. Are you at all copied on this?
A No, no.
Q Now, who is David Chang?
A I did not know until this case started because I never met him, but it sounds like he worked for Sebastien Cuvelier. My French isn't great, but the gentleman at the Connor Group.
Q So you're familiar with the Connor Group?
A I am, yes.
Q What was the Connor Group doing with Ozy?
A We hired them in late 2020. Again, our books weren't in the strongest order which, again, is not unusual for a start up. We had gone through an audit and that kind of stuff. We didn't really have a trained media CFO, start up CFO.

So as we began to get bigger, the questions the investors asked us became more sophisticated. And so I knew that we needed more help. And so Samir had found these guys and so they were former Ernst & Young accountants. And their job was to kind of help make sure that something like NetSuite, which was incomplete at that time, that we tried to

put everything in properly.

MR. SIEGEL: Objection. Foundation.

THE COURT: Sustained.

MR. SIEGEL: Move to strike.

THE COURT: Granted.

BY MR. SULLIVAN:

Q Were you the chief executive officer of a company called Ozy Media, Inc.?

A Yes, yes, I was.

Q What was your accounting platform?

A We used several things, but NetSuite was one of the ones that we used.

Q Did you come -- and did you get reports about the contents of NetSuite?

A I didn't get reports about the content of NetSuite, but at our board meetings and sometimes at other points we would go through a summary of where we were financially.

Q And what was the basis of your opinion you articulated a couple minutes ago that the books of Ozy were incomplete?

MR. SIEGEL: Objection to the form of the question.

THE COURT: Sustained.

Q Did you believe that the books of Ozy were incomplete?

A I not only believed, I knew.

Q How?

A Because successive finance leaders had told me.

MR. SIEGEL: Objection. Move to strike this question and the prior question.

THE COURT: Sustained, and motion granted.

Q Without telling us what anyone said, what was the basis of your belief that the books, your belief in your mind that the books were incomplete?

MR. SIEGEL: Objection.

THE COURT: Sustained.

MR. SULLIVAN: May we have a sidebar, Your Honor?

THE COURT: We may.

Let's start a break right here. We'll regroup in ten minutes.

(Jury not present.)

THE COURT: The realtime feed at some point stopped updating.

(Pause.)

THE COURT: Mr. Sullivan.

MR. SULLIVAN: Hearsay is not every out of court statement. It's an out of court statement offered for the truth of the matter asserted. I'm not offering an out of court statement for the truth of the matter asserted. I am offering an out of court statement for the affect on the listener, that's Mr. Watson, as to why he decided to undertake certain actions, why he held certain beliefs, what his basis of knowledge was.

THE COURT: Why he held what beliefs, the belief that the -- I think what I heard was questions about who said what -- well, questions were elicited, whether they were intended to or not, testimony about who said what to Mr. Watson concerning the subject of whether NetSuite was complete or not complete, and then Mr. Watson testifying that based on that he formed the basis, he formed the opinion that NetSuite was incomplete, which sounds to me like it's offered for the truth.

MR. SULLIVAN: Absolutely not. I mean the government thinks that's not true, presumably. That's what the jury -- one of the facts that the jury will decide. It's only meant to establish Mr. Watson's state of mind; nothing more, nothing less, and no different from the "this is fraud letter" of Ms. Thakur coming in to establish her state of mind and not for the proposition that this is fraud. There are out of court statements.

THE COURT: That letter didn't come in for that purpose.

MR. SULLIVAN: That's what the --

THE COURT: It's a side issue, but I want to point out the premise is accurate.

MR. SULLIVAN: That is precisely what Your Honor said.

THE COURT: No, it didn't come in to show the state

of mind.

MR. SULLIVAN: Your Honor stated, on this exhibit and possibly in one more you may see Ms. Thakur makes or you may understand her to make various assertions about the legality, the legality of matters surrounded in Mr. Rao's email. As I mentioned in my preliminary instructions --

THE COURT: I remember the instruction. You said that it came in to describe the writer's state of mind, which you may have been misspeaking. It's neither here nor there.

MR. SULLIVAN: The declarant's state of mind.

THE COURT: No, the listener's state of mind.

MR. SULLIVAN: The declarant is the listener. But you say it's admitted for your consideration of the defendant's knowledge, intent, and good faith or the lack thereof only for knowledge, intent, and good faith or lack thereof. The only basis I'm trying to get any of this in, knowledge, intent, and good faith or the lack thereof.

It goes to his knowledge, his intent, his good faith, or lack thereof. They can cross-examine him on it but I'm not offering it for the truth, nor will I argue that this statement is true because somebody told Carlos it was true. I can only argue that Mr. Watson believed this statement to be true and he believed it to be true based on several things, the belief that NetSuite was incomplete based on several things and here is one of them. We just ask for --

THE COURT: Tell me what his belief that NetSuite was incomplete, that goes to what ultimate issue?

MR. SULLIVAN: That goes to what he believed the actual revenue of Ozy Media to be, which is the central issue here. They say it was X and we say it was more.

MR. SIEGEL: Your Honor, if I may.

THE COURT: Can somebody explain to me the import of the last line in Federal Rule of Evidence 803(3). We're not talking about 803(3) here at all, are we?

MR. SULLIVAN: No.

MR. SIEGEL: Your Honor?

THE COURT: Yes.

MR. SIEGEL: So I think before you got the 803 the question you asked is the key question. The defense, at least as I understand it, and I can be corrected, has taken two positions here.

It's one, Mr. Watson didn't know what was in NetSuite but whatever was in there he knew it was wrong. But if he didn't know it was in NetSuite, the fact that he thought it was wrong isn't relevant. The relevance of NetSuite, as we say these are the real numbers, if they want to say he didn't know about them, fine. If they want to say he knew about them but he felt they were wrong and should be higher, fine. But to say he didn't know what they were and he felt they were incomplete, it becomes irrelevant except to show they are

incomplete.

THE COURT: I think that may be a false dichotomy. There is a world in between where he doesn't know exactly what's in NetSuite, but he's been advised that whatever is in there there are missing entries and other ways in which --

MR. SIEGEL: What's the relevance of that?

THE COURT: That's my question. I think where the rubber meets the road here is in the analysis of whether this is being offered for its truth under the guise of the state of mind exception. I think there is case law on that subject I'm trying to find my way back to.

MR. SULLIVAN: Again, no, not being offered for its truth. It's being offered for Mr. Watson's knowledge and intent and good faith or lack thereof.

THE COURT: Do we have a foundation as to who told him this, which witness, what person?

MR. SULLIVAN: Which specifically?

THE COURT: Yes, who he heard it from.

MR. SULLIVAN: The foundation is that he would receive briefings at board meetings, I think he said quarterly, and on that basis he realized that things were missing from their accounting platform. We have testimony that throughout, from at least 2016 on, he had been trying to field -- field the -- I'm sorry.

THE COURT: Scenario A is the CEO goes to a board

meeting, watches the CFO, I guess, make a presentation to the board on contracts coming in, revenue progress, whatever, and the CEO realizes on his own that that presentation is incomplete.

Scenario B is the CFO goes to the CEO and says there are problems with NetSuite, we're not capturing everything we should capture. I thought we were talking about B, not A.

MR. SULLIVAN: Absolutely. We're talking about the former.

THE COURT: Who is the speaker?

MR. SULLIVAN: It would be whoever was in the position of CFO.

THE COURT: Can we have a name so I understand what we're talking about here?

MR. SULLIVAN: So --

THE COURT: Not from you.

THE WITNESS: So Samir Rao. And it was both A and B.

THE COURT: Okay. So Samir Rao, the chief operating officer, I guess is his title, cofounder, says to CEO there is data missing from our accounting system. And that is relevant not for its truth but to show good faith on the part of the CEO. Good faith as to what? That he reasonably believed there was more revenue than the accounting systems reflected, but how much more revenue, from what source?

MR. SIEGEL: There needs to be foundation that he knew what was in there.

THE COURT: I'm sorry?

MR. SIEGEL: In order to say well, I thought there needed to be more than what was in there, based on you're a scenario, he has to know what's in there.

MR. SULLIVAN: We just established that he was listening at board meetings. So A and B, I. Was talking about A. Mr. Watson goes out and negotiates five contracts for $10. He knows there should be about $50 in revenue coming in. He goes to a board meeting and they're talking about $40 of revenue.

THE COURT: There you have the 1002 problem or 1004 problem, that you're talking about a board dec we don't have.

MR. SULLIVAN: No, no, board meeting. Someone is talking at a board meeting, making a presentation, so it's oral as well. That's the A.

THE COURT: I thought there was a board dec for every --

MR. SULLIVAN: There may be, but my understanding of the meetings is they don't stick a board dec on the table and tell everybody read it. Someone is talking and they're having conversations, and that's where he's hearing these things and learning these things. Scenario B --

THE COURT: Can you walk through the testimony on

scenario A so I can understand what the facts are or what the testimony to be?

MR. SULLIVAN: Sure. How often did you have board meetings?

THE WITNESS: Roughly, quarterly.

MR. SULLIVAN: Was there a financial presentation at the board meetings?

THE WITNESS: There was.

MR. SULLIVAN: Turning your attention to in or about 2020, 2021, who presented the information on the -- I'm sorry -- on the financial information?

THE WITNESS: Samir Rao.

MR. SULLIVAN: Did he give an oral presentation?

THE WITNESS: He did.

MR. SULLIVAN: Would he talk about what revenue was at Ozy?

THE WITNESS: Yes, he would.

MR. SULLIVAN: Did his suggestion of what revenue was, did that strike you as inconsistent with what you had raised?

THE WITNESS: At times, yes.

THE COURT: How?

THE WITNESS: It was clear at times that he hadn't fully accounted for gross versus net. It was clear at times.

THE COURT: How was that clear?

THE WITNESS: Because I was involved in many of our largest deals and I could tell the numbers were off.

THE COURT: Was he giving revenue numbers on a deal by deal basis or aggregate revenue numbers?

THE WITNESS: It depended on the board meetings. Some board meetings are shorter and so sometimes it's more a summary. Some board meetings had greater depth and greater specificity.

THE COURT: Can you give me one example of how this works?

THE WITNESS: Imagine a two-hour board meeting.

THE COURT: Don't give me a hypothetical. I mean an actual example.

THE WITNESS: An actual example is him not including the NPR deal, which was a barter deal, and our thing and me pointing it out in an actual meeting.

THE COURT: Not including in our thing did you say?

THE WITNESS: Sorry. Not including it in the revenue numbers he shared, and me asking is the NPR partnership in there and him saying no, it's not, and me saying --

THE COURT: Wouldn't this have been -- I think we've had testimony already, and I would just imagine as a matter of common sense, to the extent you're reporting revenue to the board there would be a slide on that in the board dec?

THE WITNESS: Yes. If, again, Professor Sullivan is right that there are different kinds of board meetings and some have a dec and are very dec intensive and some are shorter and quick and people want to get a quick status.

For example, we often had our Q3 board meetings around Ozy Fest. Those tended to be way more oral than a board meeting where we didn't have that kind of pressure that was going on.

THE COURT: Okay. Do you remember what quarterly meeting it would have been that the NPR revenue should have been included but wasn't?

THE WITNESS: No. I could take some time later today and try to figure it out, if that's helpful.

THE COURT: Okay. Let's take a five-minute break here. I'll be back.

(Recess taken.)

(Continued on next page.)

(Continuing.)

MS. GILBERT: Your Honor, you had previously asked us to inform you per our sidebar earlier.

THE COURT: I am happy to have a sidebar now. I just wanted to sit out the five-minute break first. Let's come to the sidebar.

(The following sidebar took place outside the hearing of the jury.)

THE COURT: I will take the lead here and you tell me what I got wrong. The defense is asking that we excuse the current court reporter and substitute a new one.

Is that a correct statement or not a correct statement?

MS. GILBERT: Or, at a minimum, alert her to the faces that have been --

THE COURT: Is that sufficient for your purposes?

MS. FRISON: As long as it's not happening --

THE COURT: Not only to the Court reporter with us now, but to everyone, that there has been reported to me a qualm, I will say, rather than a complaint about people in the courtroom in general making, you know, facial reactions to testimony and that all of us who work in the courts should try to avoid that.

I would also like to add that the fact of my saying that does not mean that I am crediting or not crediting any

reports, you know, secondhand or whatever. I am simply saying that as a matter of caution. And if anybody has anything to say on this subject either now or later, I am happy to hear it.

MS. GILBERT: I'm satisfied with that.

MR. SIEGEL: Nothing from the Government. Thank you.

(Sidebar ends.)

THE COURT: I spent five minutes thinking about the objection. I am satisfied that this is offered for a non-hearsay purpose. I think the Government has a 403 objection of sorts. If I understand it correctly and tell me if I don't, the 403 objection is that --

Well, tell me what the 403 objection is.

MR. SIEGEL: Sure. The objection is that the information that -- well, it's shifted a little bit. Our original objection is to testimony.

THE COURT: Tell me what your current objection to the testimony is.

MR. SIEGEL: Our objection is to testimony that he was told that NetSuite was incomplete. The reason we're objecting to that is that it's clearly hearsay. To the extent it goes to his state of mind that NetSuite was incomplete, that's irrelevant because the state -- his position is that he's never seen what's in NetSuite. So, that state of mind is

irrelevant and then it risks a heavy amount of prejudice that the jury will take it as evidence that NetSuite is, in fact, incomplete.

As I understand it now, it's shifted a little bit, that instead it's I received a financial presentation. When I looked at it, I saw for myself it was incomplete.

THE COURT: That was my situation A. I think what I'm being told by the defense is that they have evidence that maps roughly onto both scenarios A and B. So, A, an episode in a board meeting where the CEO observes that a revenue presentation excludes one or more contracts. And, B, that the CEO hears directly from the COO that there are gaps in the financial entries in the accounting software.

MR. SIEGEL: So, A, we're not objecting to.

THE COURT: Okay. B?

MR. SIEGEL: B, we have our 403 objection. And the probative value, to the extent there is any probative value of it, it's also lessened in the face of the fact that there's this evidence of A.

THE COURT: I guess. I think I'm still where I was when I left, which is I'm not sure you're either/or framing is really either/or. I think I think if the testimony is I was not, on the one hand, privy firsthand to accounting entries in this accounting system, what was in and what was out, but I was told secondhand that there was stuff missing, I don't see

that as inconsistent.

MR. SIEGEL: No, they're not inconsistent, but -- it's the relevance of that point. I don't know what's in there.

THE COURT: Well, the proffered relevance is that it's -- so the standard for relevance is low and the relevance is it goes to a good-faith belief that the company was earning more revenue than what was reflected in the actual accounting books and records of the company. Maybe the relevance is limited, but it's not zero and if you want a limiting instruction, I will give it and we'll presume the jury follows instructions about receiving evidence for one purpose but not another.

MR. SIEGEL: Your Honor, just one moment.

(Pause in proceedings.)

MR. SIEGEL: That's fine, Your Honor. We're going to think of a limiting instruction, but we're fine going forward right now.

THE COURT: You don't want the limiting instruction to be -- then there's no point in giving a limiting instruction if it's going to come in hours or days after the testimony that we just concluded. I mean, I guess I'd have to refer to the testimony so the jury knows what I'm talking about, but think fast is what I'm saying.

MR. SIEGEL: Thank you, Your Honor.

THE COURT: Anything else, Mr. Sullivan, before we resume?

MR. SULLIVAN: I don't think so. But just to be clear I'm able to inquire in the area where we left off, that there were -- his understanding is that there were gaps.

THE COURT: To the extent that there's a foundation, yes. I don't think that foundation has been laid in front of the jury.

MR. SULLIVAN: Yes, yes.

THE COURT: But, yes.

All right, if the jury is ready for us which I assume they are, let's bring them back, please.

And everybody remembers that we're breaking at 4:40 or 4:45 today.

MS. GILBERT: What time tomorrow?

THE COURT: 9, 9:15.

MS. GILBERT: You mentioned that you wanted to end early tomorrow.

THE COURT: I was proposing if we wanted to use the end part of tomorrow for a jury charge conference we could let the jury go early, but I'm not confident that you all will have enough time as you deserve to read my proposed instructions. So, I think that that may be not a good idea.

(Jury enters.)

THE COURT: Everyone be seated. Ladies and

gentlemen, thank you for your patience.

Mr. Sullivan, please continue.

MR. SULLIVAN: Thank you very much, Your Honor.

BY MR. SULLIVAN:

Q Let's pick up where we were. So, in addition to being CEO of OZY, were you a member of the board as well?

A Yes, I was.

Q How frequently would the board meet?

A Say roughly quarterly. I talked to the board members a lot though. I probably talked to board members every week, but we had a more formal meeting quarterly.

Q And at those board meetings, did you receive reports from the various units?

A Yes.

Q Did that include your finance department?

A Yes.

Q And outside of the board meetings did you speak with their finance department as well?

A Yes.

Q Did you receive reports from them?

A Of some form, yes.

Q All right. Still in the '19. '20, '21 period, did you ever come to the conclusion --

Well, let me ask you, what is NetSuite?

A NetSuite is an accounting software, kind of like

Quickbooks, but with a little more scale.

Q And is that where you kept at least some of your financial records?

A Some, not all.

Q In this '19, '20, '21 period, did you ever form an opinion on the completeness of NetSuite?

A Yes.

Q On what basis?

A At board meetings when Samir would present the finances several times. One example being our NPR relationship. I realize that he wasn't properly counting that in the numbers and as we talked it through, he -- he said that NetSuite -- we might have outgrown it and that it was incomplete and he didn't have easy ways or he didn't know them to capture all the information there.

Q For the ladies and gentlemen of the jury, tell us with a little more specificity what happened with this -- NPR?

A NPR.

Q NPR situation.

A So we had a partnership with NPR around OZY Fest. We had several partnerships with them. But the one I'm thinking of is around OZY Fest where they agreed to run ads to encourage people to buy tickets at OZY Fest and, in return, they became a sponsor of OZY Fest. So it was a strategic partnership as we mentioned before. It was an in-kind or barter revenue and

as we were going through that -- as Samir was going through at one of the board meetings our revenue, I realized that he didn't include that in there and, so, I pointed that out. It led to a larger conversation. That's one example. It wasn't the only example. There were enough times even before then that it was just clear that as a young company we were just moving quickly and our focus wasn't on -- on finances. It was on content and partnerships.

Q And what conclusion did you reach with respect to the completeness of NetSuite?

A That it was incomplete and also that it was not properly organized. So, my understanding based on those discussions was that all of the revenue might get put in one line as opposed to breaking out podcasts, TV, festivals, awards, newsletters. And the same with expenses; that all the expenses might have been thrown in there as opposed to breaking them out or with some major expenses you amortize them so you spread them out over time.

And, for example, that practice wasn't happening which made our -- which could make your loss look bigger than it is. If it's done properly, then you get a more accurate view of your profit or loss.

Q Why was it important for you to break down the revenue by division, if that's the proper word, at OZY?

A Yeah. Because you want to know -- you know, if I have

only a little bit of money and a little bit of time, am I better off doing one more TV show with Hulu; am I better off doing three more podcasts with iHeart. Should I take Live Nation up on this offer.

Live Nation is saying not only could you do another OZY Fest, they're saying do you want to do eight next year and so do you really want to do eight and can you afford to do eight and if you can afford to do eight, do you have the team that has the ability to make sure that everyone is of great experience or is it the kind of thing where if you grow too quickly, they will fall off, and before you know it it will feel not that great.

So you want to understand what is working with each division and how big it could be. You also want to understand that because when you go out to raise money you might raise different kinds of money. If you have a good sense of what it's going to cost you to super size festivals than -- rather than raising $30 million in your Series D, you might come to the conclusion that we should really try to raise $50 million in your Series D.

So there could be a couple of good reasons why understanding what's working for you and what's not. I'm sorry, the opposite is true too. If something is not working you might make the decision to shut it down. One of the reasons we shut it down is there was a time in, like, 2018,

'19, 2020 in addition to these big deals that I'm telling you about, Samir was taking these little small deals with groups, like, if anybody has heard of Butcher Box that kind of sends meat or stuff like that or that sends wine in a box and it was a lot of work and we weren't making money on it, but it was taking a lot of everybody's time.

So I said are we better off doing these individual ones or should we try and make sure we do a good enough job for A&E or a good enough job for the History Channel or for Lifetime that they will place another multi-million dollar order and maybe that's a better way to spend our time versus doing these smaller things that won't make us money and, frankly, we won't thrill them. We won't be a good partner.

Q Thanks, and I can't tell from my paper if I asked you this, but are you the one physically in putting into NetSuite?

A No, I've never been into NetSuite.

Q Okay. Let's go back to the document that -- where we had started this. This is 6566.

(Exhibit published.)

Q So the Connor Group, what did you hire them for?

A They were former Ernst & Young accountants and they were to help upgrade our accounting because, again, things were in different places. They weren't all in one place and they weren't all separated out by division, as you called it, properly by group and on the expense side sometimes we just

counted everything in one year when, in fact, you should have broken that cost up over years or they call it amortizing. It was to try and upgrade the way we track our business.

Q That was a plight way to correct me. I'll call them groups from now on.

A That's okay.

Q Different groups at OZY.

A Okay.

Q Now, this was -- was this during a period of any diligence that OZY was in?

A Yes, this was during -- we had several offers on the table. So at this time we had offers from Goldman Sachs from J.P. Morgan, from WTI, from a group called Balance Point and Morgan Stanley. So we had offers from each of those.

Q So was this focused only on Goldman Sachs or on the others?

A Probably -- I assume that this work was meant to help with each of those.

MR. SIEGEL: Objection.

MR. SULLIVAN: If you know --

THE COURT: The objection is sustained.

Can we get a timeframe as well here?

MR. SULLIVAN: Yes this is --

BY MR. SULLIVAN:

Q What's the date on the memo?

A It's January 11, 2021.
Q And those companies you listed all had offers pending in or about that time?
A Yes, correct.
Q And you were using this to help with your diligence with all of them?
A With all of them and just to make sure overall that we kept getting -- we're not going to get to perfection, but you want to keep getting better and healthier and better infrastructure.
Q Now, there was some suggestion early in the trial that this group was hired to fool the Ernst & Young's -- the Ernst & Young accountants. Is that true?
A Again, that would be a bad idea since Sebastien worked at Ernst & Young and actually knew the Ernst & Young people that Goldman had hired.
MR. SIEGEL: Objection.
THE COURT: Sustained.
MR. SIEGEL: Move to strike.
THE COURT: Granted.
BY MR. SULLIVAN:
Q Do you know where Sebastien worked previously?
A I do.
MR. SIEGEL: Objection.
THE COURT: Sustained.

Q Did you interview for the people at Connor?
A I did.
Q Did you interview Sebastien?
A I did.
Q Did you learn about his prior work experience?
A Yes, I did.
Q Did you learn where he worked previously?
A Yes.
Q Where?
MR. SIEGEL: Objection.
A At Ernst & Young.
THE COURT: Sustained.
MR. SIEGEL: Move to strike, Your Honor.
THE COURT: The motion is granted.
BY MR. SULLIVAN:
Q You said that you did not hire them to fool Ernst & Young; right?
A Correct.
Q Would you hire someone from Ernst & Young to fool Ernst & Young?
MR. SIEGEL: Objection.
THE COURT: Come to the sidebar, please
(Sidebar held outside of the hearing of the jury.)
(Continued on next page.)

(The following sidebar took place outside the hearing of the jury.)

MR. SIEGEL: First of all, now we're asking about what he would have done had he known things and none of this has any relevance and it's by way of eliciting hearsay or getting around the fact that they can't elicit hearsay.

THE COURT: I don't understand this line of questioning.

MR. SULLIVAN: Rao and Han testified that they hired this group in order to fool the Ernst & Young people, the Ernst & Young accountants. One of them testified and I can't remember who as I stand here before you, that they wanted to be sure that the people they hired had no previous relationship with Ernst & Young to make sure that, you know, that what they were doing did not get back to Ernst & Young. I'm directly rebutting that part of the testimony.

THE COURT: By --

MR. SULLIVAN: By eliciting that the -- that he, in fact did, work at Ernst & Young and that reflects on the credibility of the statement that Rao or Han told this jury.

THE COURT: Okay. I don't remember that testimony.

MS. GILBERT: I do.

MR. SULLIVAN: I can find it.

MS. GILBERT: We can find it.

MR. SIEGEL: I believe that that was Ms. Han's

testimony.

THE COURT: That they looked for somebody that did not have ties to Ernst & Young.

MS. GILBERT: Yes.

THE COURT: I'll allow this.

MR. SIEGEL: It's still hearsay. They're trying to rebut that they got someone from Ernst & Young but the hearsay statement is that this person was from Ernst & Young.

THE COURT: But we're talking about his intent, right?

MR. SULLIVAN: Yes.

THE COURT: The testimony is what, that -- who picked the accounting firm? Because if --

MR. SULLIVAN: Mr. Watson.

MR. SIEGEL: I'm not sure that's --

THE COURT: Can we just get the testimony?

MR. SULLIVAN: He just testified --

THE COURT: No, what the prior testimony was.

MS. FRISON: You mean for Ms. Han?

THE COURT: Yes.

MR. SIEGEL: I remember that Ms. Han talked about it. I don't have the page.

MS. GILBERT: She testified that they specifically picked a firm that did not have -- that did not have ties Ernst & Young.

THE COURT: She said she did that?

MS. GILBERT: No, they, they.

THE COURT: Who is they.

MS. GILBERT: She constantly said Carlos Samir and I.

THE COURT: Get the testimony and we'll admit this.

MR. SULLIVAN: He said as well that he did. His testimony surely is as good as any other witnesses.

THE COURT: That he what?

MR. SULLIVAN: That he interviewed and hired -- he just testified Sebastien and I can't pronounce the last name.

MR. SIEGEL: That's a nuance I hadn't picked up. If his testimony is that he picked the Connor Group, then that's fine.

THE COURT: That is what I was asking from the beginning.

(Sidebar ends.)

(Continued on next page.)

THE COURT: The objection is overruled.

BY MR. SULLIVAN:

Q So, Mr. Watson -- and again, I apologize. The question was do you know where Sebastien Cuvelier had worked previously?

A I do. He worked at Ernst & Young.

Q Now, what did you understand Cuvelier's position to be within the Connor Group?

A Kind of a senior leader of some sort, the equivalent of a managing director.

Q Now, once you had done the hiring of Mr. Cuvulier and his team, did you participate in their day-to-day activities?

A I did not.

Q Who participated?

A Samir and Suzee.

Q And that's Samir Rau and Suzee Han?

A Samir Rao and Suzee Han; correct.

Q The attachment reads "General ledger 1.1-REC-1.1-17.5h.xlxs." So, again, I think before the break, I had asked you -- you're not on here; right?

A I am not, no.

Q So, now, did you provide the Connor Group personally any general ledgers from OZY?

A No, no.

Q And did you have any idea that Suzee Han and Samir Rao

were exporting information from the general ledger and changing that information?
A No. Unfortunately not.
Q Did anyone either of them e-mail to you that affect?
A If they did, we would have let them go.
Q Now, or a text message or communicate in any way?
A No, definitely not.
Q All right.
MR. SULLIVAN: We can pull that one down, please.
Let's do Government 6365 already in evidence.
(Exhibit published.)
MR. SULLIVAN: And if we can expand the very top there or scroll down.
BY MR. SULLIVAN:
Q Mr. Watson, this is an e-mail from Joseph O'Hare to -- from Samir Rao to Joseph O'Hare copying Suzee Han. Are you on this e-mail?
A I am not, no.
Q What's the date of this e-mail?
A It's February 17, 2021.
Q Who is Joseph O'Hara?
A Joe was here earlier. He was one of my former entertainment lawyers when I was doing talk shows back in the day and he had become the president of a small investment group called Lifeline in Los Angeles.

Q And this says "OZY Series C follow up - confidential" on the subject line; is that right?
A Correct, yes.
Q And for -- and then you see a number of attachments, yes?
A I do, yes.
Q And looking at the names of those attachments what do they appear to be?
A It looks like the documents to allow someone to invest in our Series C.
Q Now at this stage of the process are you involved in any of the details?
A I'm not. I think I met with Joe and his boss, the gentleman in Humboldt. I met with them probably four months prior to this. So I think it was October, November and kind of similar to most of them. I had a big-picture conversation, shared where we were going and then handed them off to Samir.
Q And once you handed it off to Samir, did you trust that Mr. Rao was providing accurate information to people who were interested in investing?
A I did. At the time I did.
Q Did you trust that in February of 2021 that Mr. Rao was providing accurate information to Mr. O'Hare?
A I did, yes.
Q Did you have any idea that Mr. Rao or Ms. Han were changing numbers?

A I did not, no.

MR. SULLIVAN: Okay, you can take that one down, please.

Let's look at Government Exhibit 6453. It's already in evidence. I'm sorry.

THE COURTROOM DEPUTY: Thank you.

(Exhibit published.)

Q So, this is an e-mail thread. The top one is from Chetan Bansal to Samir Rao. Who is Chetan Bansal.

A Chetan was here earlier. He's a partner and investor at a hedge fund called Antara Capital.

Q What deal does this regard?

A This regards our Series D. This is in May of 2021 so about three months later.

MR. SULLIVAN: And, if you scroll down for the witness.

Q Mr. Watson can you tell us if you are on any of these exchanges on this thread?

A No. It looks like Samir and Chetan and Chetan's top lawyer, a gentleman named Raeph Posner.

Q And is this an example of what you have described previously that you hand off these sorts of details to Samir Rao?

A Correct; in the same way that he's not with me when I'm hosting our TV shows or hosting our podcasts. I wouldn't be

with him on this.

MR. SULLIVAN: Thank you, you can take this one down.

Q And let's look at 5126, Government Exhibit.

(Exhibit published.)

Q So here is a Government Exhibit Mr. Watson from Suzee Han to Samir Rao. The subject is "NetSuite export of income statement." Did I read that correctly?

A Yes.

Q And it says "attachment, income statement" and some letters and numbers there but income statement attachment. Do you see that?

A I do, yes.

Q Now, once again, are you on this e-mail?

A I am not, I'm not. It's just those two.

Q Now, in terms of income or NetSuite exports, do you personally or have you ever personally exported anything from NetSuite?

A No, definitely not.

Q So when we were talking about NetSuite earlier and you noticed that there was something missing, not having been an export -- not having been in NetSuite and not having exported anything from NetSuite, how are you able to tell when things were missing?

A Again, via the conversations that we would have at the

board meetings and other meetings as well and it was -- it was clearly known. I mean, it was an assignment that I gave to each of the finance people we had. When I would interview finance leaders, one of the three or four key things that I said needed to be done was to go back and get a consolidated system similar to if I interviewed one of our tech candidates, you know, a lot of our data on our audience similarly wasn't stored in just one place. Some of it was stored in Google Analytics. Some of it was stored in e-mail servers. Some of it was stored in Facebook. Some of it was stored there.

And, so, there was a general need as a young company to consolidate and upgrade and make sure that you had a comprehensive picture of what you were doing. So --

MR. SULLIVAN: Okay. We can pull that one down, please.

BY MR. SULLIVAN:

Q Now, Mr. Watson, with apologies I forgot to ask you a question or two about the aftermath of the Goldman Sachs call that Samir Rao had made.

So, you had told us that you went back and had conversations with investors, with board members, board members first and investors. Did you actually have a call or go and meet with Goldman Sachs executives?

A I did. I had several conversations with probably a half a dozen people with Goldman in early February and they were

gracious. We -- obviously I had known them for a long time and a number of the top partners were individual investors in OZY and they were a regular advertiser and I had been an executive there.

And, so, you know, to their credit while they didn't move forward with this deal, a few weeks later they did a new deal on February 17th of 2021, so that two weeks after Samir's impersonation so that was a good sign --

Q Let me stop you there. So two weeks after, you're saying that you did a new deal with -- or a different deal with Goldman Sachs?

A Correct, yes.

MR. SULLIVAN: Can we pull up Defense 635, please, just for the witness.

(Exhibit published to witness, counsel and Court only.)

MR. SULLIVAN: And if you scroll so he can see it.

Q Do you recognize this?

A I do, yes.

Q Is this the deal -- you said February 17th. Is it on or about February 17th?

A Yeah, I think Ms. Lynch on their side signed on the 17th and I think Suzee signed the very next day on the 18th, so I probably should have said February 17th, 18th.

Q No problem. And is this a deal that you've negotiated with the Goldman Sachs people?

A Yes, yes. I was part of it.

MR. SULLIVAN: Your Honor, I move Defense Exhibit 635 in evidence.

MR. SIEGEL: No objection.

THE COURT: Received.

(Defense Exhibit 635 received in evidence.)

MR. SULLIVAN: We can publish for the jury, please.

(Exhibit published.)

BY MR. SULLIVAN:

Q Two weeks after the call, is this the -- two weeks after Samir Rao's call, is this the contract that you entered into with Goldman?

A I did. It was small, but it was a good way to reestablish the relationship and get going and I appreciated that vote of confidence.

Q Now what is Media Kitchen at the top?

A Remember I said that every one of these big companies has an ad agency kind of like -- I don't want to call them middlemen, but kind of their representative who vets the various options they have to work with. And, so, Media Kitchen -- who is part of a much larger agency. Media Kitchen is -- actually, Goldman has multiple agencies, but at the time Media Kitchen was the agency that Goldman used for what they considered their most cutting-edge partners.

MR. SIEGEL: Objection.

THE COURT: Sustained.

BY MR. SULLIVAN:

Q And where it says "advertiser client," what does it say?

A It says "Goldman Sachs."

MR. SULLIVAN: All right.

Q Can you see that, Mr. Watson?

A Yeah, yeah, I can see that.

Q And what was the amount?

A $30,000.

Q Great, all right. We can close that.

And then did you do any other deals with Goldman Sachs shortly after Mr. Rao's impersonation?

A I did. So we did a deal about ten times that size about ninety days later on July the 26th.

Q What kind of a deal was that, Mr. Watson?

A It was interestingly enough a specific deal for them to become a sponsor of the Carlos Watson Show on YouTube.

Q No cat videos?

A No cat videos, no. We hadn't made that evolution yet.

Q Okay. All right. Let me turn to a couple of other topics.

I want to talk to you about Google. So, at some point did you come into -- did you begin negotiations with Google that regarded an investment into OZY.

A Yeah. Google offered to invest in us twice. Once, the

first time well, I guess we had three sets of conversations with Google. So the first was oral. I think Sundar, the CEO, described this meeting a number of years before that overseas. So, we had conversations there and then they actually submitted a written term sheet in 2017 and then they approached me again in 2020 and this time they started by asking me if I'd be open to coming to join them.

Q All right. And what was the normal job title that you were talking to them about?

A Google does something interesting. Sometimes you have a title on the outside and you have a title on the inside. So, outside my title would have been president of news; and internally because of the way Google does certain things, I would be called VP of news. So, you have an external-facing title and an internal title, but then the president of news.

Q And I think we talked about this earlier, but the offer included a salary?

A It did.

Q And what else?

A It included about -- well, about $7 million a year for three years and then there was a $5 million initial added bit of compensation and then there was some other sweeteners in the -- in the offer.

Q Now, here I want to focus on the sweetener to OZY itself.

So, as part of that deal, how much would have gone

to OZY?
A $20 million to begin with.
Q So -- to begin with. Were there negotiations about more?
A Sundar and his deputy Don, who you met, said here is where I think you would start. If we did that -- and then we want to see how the first six months goes and then if you get to a place within that where you think that whatever going-forward strategy you have and get signed off on, suggests that we should do more or different, we're open to that.
Q Why was it that you, you, wanted to negotiate for something with OZY as well?
A To Don's credit, he was the first one to bring it up and his feeling was that if a young company is going to lose their CEO, we've got to somehow compensate them for it and stabilize them and, so, I think his hope was that Google's big brand name and the cash and then the understanding that I would remain as chairman of the company and then, you know, that we would work together to find my replacement as CEO. I think his hope was that that entire package would leave both sides better off.
Q Now, you told us before you ultimately did not take that package; is that right?
A Correct, yes.
Q Now, did you and Google, after the 2020 job offer, were

there any more discussions with Google with respect OZY?
A So, after 2020, 2021, I continued to stay in touch. At that point I was probably spending the most time with a woman named Susan Wojcicki, who at the time was the CEO of YouTube and at the time what we were doing, not as much today, but back in 2021, what we were doing with the Carlos Watson Show was very cutting edge. It was not very typical for someone to bring that high a quality show on YouTube and then to also bring your own advertisers.

Like I said, today people like Megan Kelly and Club Shay Shay and lots of other people are doing it, but at the time it -- that was unusual, and so she liked that.

MR. SIEGEL: Objection.

THE COURT: Sustained.

A I stayed in touch with her and they did several things after I turned them down. They -- they agreed to promote some of our most important interviews. And, so, there's a way that the Google algorithm works on YouTube where if they really like particular episodes, they can allow more people to see them. So we were grateful that that happened.

They assigned not one, but I think three point people to us, so they kind of assigned a whole team to work with us and to really make sure that we were having as much success and we were getting ready to do -- given that the Carlos Watson Show had worked well, we hired away one of the

BBC's biggest stars, a woman named Katty Kay, and we were going to develop a show around her and bring it to YouTube to start and we were talking about how to do it best.

And there was another woman named Sophia Chang. We were creating a show called Sophia's Salon that we were also going to bring to YouTube. So we were having lots of conversations with them about how to do it best and how to make it work, were there ways that we could do things that benefited not just one of OZY's shows on YouTube but all three of OZY's shows.

And then on the other side of it, again we were getting bigger and bigger ad deals and in particular Procter & Gamble was considering what would become our largest deal ever, and with a specific interest in doing it through our YouTube shows. So we started talking to Procter & Gamble about what if we don't just do these three, but what if we agree on a joint roadmap together for the next three years.

As result we had a cooking show called Mixed Plate that we were thinking about. And we had a travel show that we talked to them about. And, so, we were getting more and more committed, not only to YouTube, but we were going to do something similar to what we had done with PBS which is start with one show and then build enough of a relationship that you could get a second show, a third show, a fourth show and more. And, so, we would have a PBS, kind of, mini network. We would

have an A&E mini network. We would have an OWN mini network and we would have a YouTube mini network where we had multiple shows on each of those.

(Continued on the following page.)

BY MR. SULLIVAN: (Continuing.)
Q All right. And just to remind the jury because your answer toggled back and forth between Google and YouTube. What's the relationship between Google and YouTube?
A Google owns YouTube. Google bought YouTube years ago when it was young and had low revenue but a lot of promise.
Q Okay. Now, did there come a time when you discussed with someone at YouTube -- I'm sorry, I confused myself -- someone at Google purchasing OZY for $600 million dollars?
A Definitely not. Definitely not.
Q Did there come a time when anyone from Google approached you about buying OZY for 600 --
A One hundred percent not.
Q Let me finish the question so the court reporter can get it down.
Did anyone from Google ever approach you about buying OZY for $600 million dollars?
A No.
Q Now, did you ever tell anybody that Google was purchasing OZY for $600 million dollars?
A Absolutely not. No.
Q Did you ever tell anybody that Google was purchasing OZY for any amount?
A There's no way I can more strongly say this is insane. No.

Q And I just have to ask you specifically, Chetan Bansal, did you say anything suggestive of the fact that -- of the claim, rather, that Google was buying OZY?
A No. I had a very extensive text and email relationship with him. If something that significant had happened, I would have 50 texts from him.
Q And did you have any texts whatsoever?
A Zero. None. There's no way that I got a $600-million dollar offer and told him and he didn't send one text to me or 5 or 50 or 100. That's like an impossibility. How am I going to get an offer for half a billion dollars and I'm letting him invest for half of that and he's never going to text me once about it. He's not gonna say, hey, Carlos, let's have a meeting and you walk Himanshu through just what happened. There's, like, zero percent and I'm not even gonna tell my board. I'm just gonna tell this random dude over there. That's an impossibility. It could not happen. Zero percent chance. That's made up.
Q And what about -- did you recall a time where you called him on the phone and were crying about the dissolution of OZY?
A I had to tell my own nephew about that when I learned about it for the first time here. And many things are true about me and -- and -- but that's -- not only did that not happen, instead, as you talked about, we went to more pitch meetings, right. But that's just an impossibility. That

couldn't happen. That wouldn't happen. There's, like -- yeah, that's an impossibility. That could not happen.
Q All right. So I want to next ask you about these meetings. So there was a New York Times article about Mr. Rao's telephone call. When was that?
A That came out on a Sunday, on September 26th, in 2021.
Q And around that time, the day before, the day of, the day after, did Mr. Bansal go with you to any sort of meetings?
A He arranged three different meetings or probably, frankly, more. On the day of, I think on that Friday, he arranged a meeting. On that Sunday, which was a Sunday, he -- he rented a car service and drove the two of us out to Connecticut to pitch someone the very next morning. We met on the penthouse floor of JP Morgan to kick off the meeting with two of their top execs and I think we had another one that I'm leaving out.
Q So let's talk about the first meeting. That would have been the Friday before the article came out. Had you told him this article was coming out?
A Yes, or that it could come out. So he and I began talking about it I think Tuesday or Wednesday of that week.
Q What was this -- the Friday meeting about? Or who was it with first?
A So, Chetan -- again, as OZY was beginning to do better and better, Chetan felt like OZY --

MR. SIEGEL: Objection.
Q Well, without telling us what Chetan felt like --
THE COURT: Sustained.
A That's my mistake. That's my mistake. Sorry.
Q So what was this meeting about?
A So -- so that meeting was about a Series E. So we had done the Series D in May and they were apart of it. And, normally, as I shared with you before, you would wait another year or maybe two to do another round. You might even wait three years. But we had so many new wins that were happening, the show moving to Amazon Prime, Linkedin approached us about a big deal, we were talking to NBC about a 300 million-dollar deal with the president of NBC that he felt -- I'm sorry, we discussed that OZY was about to surpass all of the other new media companies and probably, much sooner than we thought, could have a chance to go public, and in order to get us ready for that, rather than wait another year or two to raise a Series E, that we should act while the iron's hot and so he approached me in late July, August and said let's go for Series E. Let me work with Samir to put together the dec for that and then let's interview even bigger investment bankers. He didn't feel like people like a boss had -- were a big enough group to do as big a series as he wanted to do. So he said let's talk to Goldman and to JP Morgan and maybe to one or two others. And, so, we began conversations with both

Goldman and JP Morgan about the possibility of guiding our Series E.

Q And, so, was the Friday meeting with one of those two or no?

A No, it was with another one, another big group, Blackstone, I believe, for the opportunity for them to invest, I think 50 or $100 million dollars in that round.

Q Now, the second meeting you said was on Sunday. Was that the same day the article came out?

A Very same day. He and I sat in the car together and were kind of of going through plans on it at the same time we were getting ready for the meeting.

Q So Mr. Bansal had possession of the article before you went into the meeting?

A No, but at that point he kind of knew at least what we expected him --

MR. SIEGEL: Objection.

THE COURT: Sustained.

Q What did you tell him about the article?

A At that point, I told him what I expected to be in it and what I had learned as best I could. And he was with me, I believe, while I talked to Ben Smith's editor because I was upset that he had tried to buy us and now was trying to ruin us, and I thought it was unethical. And he heard me have a very intense conversation with his editor saying that he was

breaching the New York Times own ethical standards given that he still had a $23 million-dollar interest in BuzzFeed and that BuzzFeed was trying to raise money at the same time we were and only one of us could. And, so, to the extent he wrote this article, he knew he was gonna knock us out of being able to raise a Series E and he was gonna be able to raise his money and he was gonna get paid $23 and a half million dollars. And I told her that that was wrong, that he hadn't disclosed it to her and it was wrong that she was allowing this to go forward given that most of what was in there was fundamentally untrue.

Q And this was a conversation you had in front of Mr. Bansal?

A Correct.

Q Now, notwithstanding that, did he still go to the Sunday meeting with you?

A Very much so. We actually had a very good meeting and I think he expected, and I expected after that meeting, that we now may have another person who might be open to investing in our Series E.

Q Who was the Sunday meeting with?

A I don't remember his exact name -- I'm sorry, I don't remember his last name. I believe his first name was Scott, and he essentially ran a -- an investment firm which he referred to as a hedge fund and they did a lot of business

with Antara.
Q Was this a pitch meeting or some other type of meeting?
A It was a pitch meeting. We were pitching together. At that point, Chetan and I were doing all of the pitching. Normally -- yeah, Chetan and I were doing all of the pitching together with the expectation that JP Morgan would start pitching with us as well.
Q So this Sunday meeting with Scott's hedge fund, did -- was a particular pitched for them?
A Chetan said to them that Antara expected to put $50 million dollars into the Series E and wanted Scott to match them and put in 50 as well and, so, Scott had more resources and so we talked about $50- to $100 million dollars potentially coming from him.
THE COURT: I'm sorry, just so I'm clear, what is the name of Scott's hedge fund?
THE WITNESS: I don't remember the name of it but I'm happy to provide it during one of the breaks.
Q And you don't remember Scott's last name right now?
A I don't but I can easily grab it during one of the breaks.
MR. SULLIVAN: It is that something the Court wanted?
THE COURT: I just wanted to make sure I hadn't missed it. No need to do anything on my account.

MR. SULLIVAN: Okay. Thank you.

BY MR. SULLIVAN:

Q Now -- so, the article was published on that same day; is that right?

A Yup -- yes.

Q Now, did you -- you said you had another meeting the following day after the article. Did I get that right?

A That morning we had -- we had -- we had had the kick off planned with JP Morgan --

Q When you say that morning, do you mean the day of or the day after?

A The day after. So the 27th. Monday the 27th.

Q So you met with JP Morgan?

A Yes.

Q Did Mr. Bansal come with you to that meeting?

A Yes, he organized the meeting.

Q Was that a pitch meeting or some other type of meeting?

A At that point, it was to coordinate the next set of pitches. So we had already been meeting with JP Morgan, at that point, probably for six to eight weeks. And they'd gone through their own due diligence process and they came back to us and said we think we can raise you $250 million dollars and value OZY at $2 billion dollars and, so, we agreed to work with them instead of working with others.

Q When you say working with, just so that the jury is clear, were they investors or were they helping you find

investments?
A Sometimes those folks will end up doing both and so to some extent it -- it was positioned as a conversation -- sorry, it was positioned as they were gonna be our bankers and they were gonna find other people but there were clear suggestions that they may want to invest themselves.
Q And you had mentioned that you were deciding between JP Morgan and Goldman. Was this for the same function to be bankers and maybe invest or it's something different?
A Same.
Q Okay.

THE COURT: Let's take our final break of the day here. Call it five minutes sharp. We'll try to make this one a little shorter. See you all shortly.

THE COURTROOM DEPUTY: All rise.

(Jury exits the courtroom.)

THE COURT: All right. Five minutes.

(Brief recess.)

(Jury enters the courtroom.)

THE COURT: Please be seated, everyone.

MR. SULLIVAN: Brief indulgence, Your Honor. My apologies.

BY MR. SULLIVAN:
Q Okay. Thank you, Mr. Watson. I'd like to switch gears now. Do you know a woman named Mimi Werdegar?
A I do. I do.

Q Who is she?
A A very talented young woman. Maurice's daughter. I knew her when she was a student at Stanford.
Q Remind us who Maurice is?
A Maurice was one of our lenders. He runs a group called Western Technology, WTI, and they loaned us about 11 and a half million dollars and we paid that back and then some.
Q When you say and then some, how much did you pay back?
A Two million dollars on top of that.

MR. SULLIVAN: Can we have Government Exhibit 3529, please, and go to page five.

Q Do you remember these text messages, Mr. Watson?
A Yes, from September of -- looks like September of 2020 I think.
Q All right. So -- and do these text messages regard Mimi?
A Mimi, and to some extent, Maurice.

MR. SULLIVAN: All right. So scroll to the earlier page just for a second, make sure we get everything. Yeah. So here we are.

Q So let's look at this text thread. Be careful what Mimi heard -- hears. This is from Suzee Han. Are you on this thread?
A I don't immediately see it from here, but maybe if we scroll up further -- right now I'm just seeing Suzee and Samir's. Was I somehow on this. I -- I think -- I think I

was. I think this was a text chain that -- that -- let me scroll down. Sorry. Can we freeze -- can you go back just -- just a minute. It says, other there --
Q If you don't remember being on it, that's fine.
A Okay. Okay. Sorry. I'm on the next one. I'm on the next one there. I can -- I can see my name there.
Q Okay. Let's go to this one.
A Yup.
Q All right. Assume he is listening.
That one is from you?
A That's from me. Yup.
Q Unequivocally say we are doing well?
A Yes. Correct.
MR. SULLIVAN: Scroll down.
Q Okay. Save Alex for next week.
That's something else?
A I believe -- yes, that's something different. Yeah.
Q All right. Do you recall what's going on in this text thread?
MR. SULLIVAN: You can take the thread down.
A Yeah. We -- so it's in the middle of Covid. You may remember, Covid started in March. This is September. We kept thinking, at the beginning, everyone said it was gonna be two weeks, four weeks, and you didn't know how long it was gonna be. And there were a lot of things that were in motion and,

so -- and, you know, for lots of people, unfortunately, had family members who were sick or they were sick themselves or what have you. So we tried to have more team meetings because we no longer had the ability to be in the office all together so we tried to -- although I know it's not exactly the same, we tried to create a little more, comradery's not the right word, but a little more togetherness, so we had more team meetings.

So this was one of the team meetings to check in on people, see how you are, to update people, to talk about kind of new programs and new projects that were about to happen.

Q All right. And drawing your attention specifically to the text thread about Mimi Werdegar. Was there a concern about what she was hearing?

A Not in the way that it's been portrayed. You know, when you're leading any kind of team -- and you see this with a lot of sports coaches, the conversation you have in the locker room with the team, even after the team won, you're going to point out the things that you did well but you're also probably going to go into greater detail about the things that you wish were different and you're going to have a very different conversation if anyone remembers Tom Coughlin who used to be the Giant's coach, you know, Coughlin would - you have a press conference, you're gonna --

THE COURT: Okay, let's leave aside the Giants

metaphors and can you just say the actual answer.

THE WITNESS: Sure.

A Yeah. So, I -- so, if it were just our team, I probably would go into more detail, not only about the things that we were doing well, but the things that I wanted to make sure that we got better at, and I might go into much more detail. Whereas if you have investors or other outsiders who are on the line, you know, you're not gonna go into that level of granularity especially because they might not have the background to understand it.

If you just dive into a critique, they may think, oh, well, he thinks the news letter are not going well when, in fact, that's not what I'm saying. I'm saying that I'm glad we've launched a new news letter. In order to make sure it catches up to the other three, here are the things that we need to do and we need everybody's's help and -- and let's -- and let's, you know, do a brainstorm session. So I would have a different conversation if it was only our team versus we -- if we had other people who were participating or listening in.

Q And were you concerned about -- I'll use her first name only so we can differentiate between Mimi and Maurice. Were you concerned about Mimi having access to confidential OZY information?

A Not at all. Mimi originally was gonna do a two month internship, so I twice agreed to extend it so she ultimately

almost spent a full year with us. I put her on our core marketing team which means she had access to lots of data about how things were going, is this T.V. show working, is this pod cast working, is this newsletter working, is this festival gonna work, which advertisers are gonna do what. So if I had fundamentally didn't want her to know how OZY was doing, that's not the place to put that person. That person has too much access and you certainly wouldn't extend her time from two months to almost a year. That wouldn't be -- that wouldn't be a smart thing to do.

Q Whose idea was it for these extensions? Maurice asked me. But she was doing a very good job. She's a very talented person and we were lucky to have her and I will always -- my mom started our internship program, I think as I mentioned, right out of the gate, even before we had launched the website. We had two really terrific people, Sonjay and Nick. And so we always had interns and I feel they always had really fresh idea they always pushed us to try new things they kept us limber and I was happy to have her and she was very, very good.

Q All right. Now, did you bring any other members of the Werdegar family to the inside of OZY?

A I did.

Q Who?

A I couple of different folks. Maurice's wife. Maurice

asked me to allow his wife to kind of consult and advise on The Carlos Watson Show, which she did, and I was happy to get her input on that. Maurice asked me to help his chairman secure a T.V. show, so I was very happy to do that. And then Maurice asked me to help him secure -- he was trying to secure one of our other investors as a keynote speaker both because he wanted her to be a speaker and because he wanted to get closer to her to get her help to get on the board, get on the particular board that he wanted to -- he wanted to join.

Q Now getting back to Maurice's wife, what's her name? If you recall.

A I apologize. I should know and I feel bad that I'm not remembering her name right now, but that's -- that doesn't represent anything other than I'm just not remembering, so.

Q Okay. So Ms. Werdegar.

A Yeah.

Q Were you at all concerned about her being on the inside of OZY?

A She wasn't deeply on the inside, but I -- you know, we had -- you know, Tom Franco's daughter was an intern, you know, I was -- I thought what we were doing was really strong. And I told you at the beginning, when choosing investors, I wanted people who actually cared about what we were doing, and no better way to have someone care than to have someone who they think is cool and smart whether it's their sister,

brother, daughter, son, not just come to OZY Fest for a day, but actually work with us and come back and say themselves, hey, I've been on the inside here, here's what I'm seeing, here's why I think they're about to break away from the pack, here's why I think BuzzFeed is trying to buy them, here's why I think, you know, they could really be a special place.

So that was -- I could tell you all I want to tell you but nothing is gonna be more compelling than someone you know and trust saying I'm working there every day and this is special, this is real, these guys are winning.

Q So in addition to Maurice's daughter and Tom Franco's -- did you say daughter?

A Tom Franco's daughter George Lee from Goldman.

Q I was gonna ask, do you have any other board members or investors on the inside of OZY?

A Yeah. George Lee's daughter started as an intern, did a fantastic job and we hired her full-time, so she was a full-time reporter. Another wonderful woman Tannah from A&E. She's one of the top execs at A&E. She asked me if her son, who's a talented guy, could work for us. And he's another person who started with a short internship and did a good enough job that we doubled his internship and we gave him a longer internship. And a number of other good folks.

We love talent and we love young tallent and to the extent that somebody was willing to help us get better, you

know, we always felt lucky to have them. And we always paid our interns. There were no free internships. We always paid our interns properly.

Q So the context of that email chain or text chain only regarded these sorts of pep talks that you described?

A Pep talks and updates. And, again, they're just -- there are times when you just would go into much greater detail then if it were just an inside meeting and I -- and, I guess, I should add, I didn't expect, originally, to lead that meeting and so I was caught off guard and I was asked to lead that meeting. Because I didn't always lead these meetings. I was asked to lead that meeting and so I was responding quickly while I was watching the screen fill up with 75 or 100 people.

Q Okay, great. If we can switch topics again and pull Government Exhibit 5031, and it's already in evidence.

(Continued on the following page.)

DIRECT EXAMINATION: (Continued.)

Q So, Mr. Watson, do you see 5031?

A Yes, I do.

Q This is an email from Suzee Han to Samir Rao. Are you on this email at all?

A No, I'm not.

Q It reads: Take a look. I made edits Carlos suggested. One, added Oprah plus more famous faces. Two, changed event slides to be only about Ozy Fest plus expansion. Three, reformatting financial slides.

Re: Financials, I don't know exactly what numbers to put. Carlos and I walked through some numbers but not sure how to back those up minus events. Projections.

Did you ever talk with Suzee about what you believed to be the proper revenue numbers?

A I did, definitely.

Q And in the course of those conversations did you ever ask her to make up numbers?

A A thousand percent not.

Q What did you ask Suzee to do with respect to what you knew and believed to be the proper revenue numbers for Ozy?

A Probably three things. One was, first of all, make sure that you were capturing all the right buckets, like don't leave out big buckets.

Secondly, you know, please triple check that

everything adds up properly, that it all kind of makes sense. And then third, you know, think about segmentations, because, again, this is 2019 and Ozy kind of is beginning to change and is really realizing that where once upon a time we thought of ourselves as kind of essentially a newsletter group that had these little side projects and TV and podcasts and festivals and awards, by 2019 we were realizing these aren't side projects.

When Oprah asks you to do a TV show, you have a TV business. When New York City asks you to host something on the Great Lawn, you no longer have a random festival. You have a festival business. When iHeart is signing a multi-year deal with you to do podcasts, you don't have a podcast, you have a podcast business.

So, you know, it can be hard for a young company to both keep growing that quickly and figure out how to properly explain yourself and describe yourself to someone new. And so I was trying to make sure that we did a good job of that and that we were, again, not perfect because we put pro forma, nobody was confused, but I wanted to make sure that we did a good enough job knowing that we had a very robust business, that we had real clients. At that point we had well over 100 clients.

Q Now the subject line reads: Updated BF dec. Do you have any idea what BF stands for?

A BuzzFeed.
Q Was this in or about the time you were in acquisition discussions with BuzzFeed?
A Yes. Ben Smith had reached out to me a little over a month before this, and he and Jonah Peretti had been fairly aggressive over the last month, over that first month, about, you know, trying to win us over and trying to convince us to come and be a part of BuzzFeed.
Q Are you aware of previous instances where Ms. Han did not understand something that you gave her and went to Mr. Rao, rather than coming back to you for clarity?
MR. SIEGEL: Objection.
THE COURT: I assume the objection is foundational at this point. Let's have a little bit more of a foundation.
Q So in or about the end of September of 2019, do you recall Ms. Rao coming back to you and saying Carlos -- you guys were on a first name basis I take it?
A We were. Yes, we were.
Q Carlos, I don't understand these revenue numbers. Can you explain to me how you got them?
A Yes. She didn't say it exactly that way and I guess just to clarify, it was incorrect when she said she reported to me. She never reported to me. She was Samir's right hand and that's who she worked for. And so it was very rare. The reason I remember this is it was very rare. I wouldn't have

this conversation with Suzee.

She works for Samir. She and Samir are in New York together. I'm in California. They work on projects together. I don't use Slack. They Slack back and forth. They text back and forth.

MR. SIEGEL: Objection. Foundation.

THE COURT: Sustained.

MR. SIEGEL: Move to strike.

THE COURT: Granted.

BY MR. SULLIVAN:

Q Let's finish and I'll ask that next question. Are you saying that Ms. Han was not one of your eight direct reports that you testified to earlier?

A A hundred percent not, a hundred percent not. Tracy in newsletters reported to me. Chris Runtamaki, who ran TV and at times other people ran TV, reported to me. Maeve and later Pam Lawrence, who ran podcast, reported to me. Aaron, who ran festivals, reported to me. Kendra, who ran marketing, reported to me. Stefan on sales reported to me.

Raj, who ran tech, reported to Samir. Whoever was in finance and Suzee at one point, a guy named Stan at one point, Tripti at one point reported to Samir.

Q So you were saying it was a rare occasion that she came to you?

A Correct. And not out of any bad thing, but it would be

like Tracy's deputy coming to me or it would be like Chris's deputy coming to me. It's not like that's not allowed, but that's not what the workflow would normally be. It would be atypical. It would be very, very atypical.

Q Did she ask you about this dec?

A She did, yes.

Q And what did she ask?

A I think she asked how are you thinking about -- I think she asked two questions, which is how are you thinking about how much detail to share with BuzzFeed because they clearly wanted to understand some of our secret sauce.

And even though we were much smaller than them, we secured more bigger deals than they were. They had been in it for a decade longer, but they didn't have a seven and a half million dollar deal with Univision or a $20 million deal with WPP.

Q Before you go on, just so the jury understands this notion of secret sauce, so BuzzFeed was wanting to acquire Ozy?

A Yes.

Q Can you give them really briefly what some of your potential concerns were about giving them too much proprietary or too much detailed information about how Ozy works?

A Yes. So BuzzFeed and the other kind of Brooklyn based new media companies, Vice, Vox, Mic, they all had gotten

started earlier and all had raised more money. But they had gotten into a rut and they were only able to do digital.

They hadn't really figured out how to do large number of TV shows, with the exception of Vice. But most of them hadn't figured out how to do that.

None of them had a big festival business. I don't think any of them really had a meaningful podcast business. They might have a podcast or two, but they didn't really have something robust, and I don't think any of them had any meaningful awards thing.

I think they looked -- so the conversation I had with them was that they liked the fact that in bringing Ozy aboard --

MR. SIEGEL: Objection.

THE COURT: Sustained.

Q Just what were you concerned about if you gave a competitor too much attention?

A Given that they had not succeeded in TV, podcast, festivals, or awards, that they would learn our secrets and be able to diversify. Even with digital, most of them had not taken newsletters seriously. They believed almost ideologically --

MR. SIEGEL: Objection.

THE COURT: Sustained. Before we remove that document, can I ask a quick question, if we could put it up

for a second.

You may have answered this question, and if you did already you don't have to repeat the answer, did you say what numbers, if any, you and Suzee walked through?

THE WITNESS: Yes, I believe I did. Podcast, TV, festivals, awards, digital.

THE COURT: Okay. Thank you.

MR. SULLIVAN: Apologies, Your Honor.

THE COURT: We're going to go about seven more minutes I would say.

MR. SULLIVAN: Okay. Thank you.

BY MR. SULLIVAN:

Q So in terms of -- did you have a plan, a system, an approach to how you apportioned what information you're willing to share and what information you're not willing to share?

A Yes. That's normal in my experience with -- I bought companies before and I inquired before, and so it's normal that you don't show everything at once because otherwise people could just find out everything and just go try it themselves.

And so you show a little bit, a little bit more, and a little bit more and you also expect them to show it to you. And to your point, I was also learning about them and it became clear that even though they were bigger that they were

declining and they were struggling.
Q So this was in context of the conversation Ms. Han had with you. So you can continue there. So she asked you what?
A So she asked me two questions. One is kind of roughly how much information, and then two, how to think about our revenue. And so I tried to give her some guidance on that. I didn't want her to show all of the TV shows that we were in negotiations on because that would be too good a roadmap for them.

I didn't want her to show them exactly what our biggest partners like Discover and JP Morgan were paying us for, because then they could go right to them and say hey, we will do the exact same thing. Whether or not they really could, we'll do the exact same thing for that amount.

So I wanted to be very -- I didn't want to take for granted that we had a relationship with BuzzFeed that we didn't, because I didn't know how they would use our information if we just immediately shared everything.
Q Okay. So after you had that discussion, what happened?
A After we had that, I think she and Samir continued to provide more information. I think they provided, my guess is probably a half a dozen different updates. I think they updated information they gave on our audience. They updated information on our various content.

I think they updated some information about our

revenues. I think they probably didn't, again, be too open kimono, as people said. And then we had a flare up because we got word that as we started sharing BuzzFeed more with our team, Ben Smith tried to poach one of my main editors. I had to call Jonah Peretti and say we're not going to continue any negotiations if you guys are going to abuse us and try to start trying to hire our people away.

MR. SULLIVAN: Your Honor, this is a breaking point before a new chapter.

THE COURT: Let's break here. Ladies and gentlemen, that is it for today. Thank you, as always, for your careful attention. We will see you tomorrow. The usual instructions are all in place. Have a great evening.

(Jury not present.)

THE COURT: Is there anything we need to take up before the start tomorrow such that I should plan to be in before 9:15?

MR. SIEGEL: I don't think so, Your Honor.

THE COURT: We're still working on the jury instructions. Mr. Sullivan, anything you want to take up?

MR. SULLIVAN: No. I couldn't hear what time to be here.

THE COURT: I told the jury to be here at 9:15. I think if you all would be here at 9:15, as well, we'll start shortly thereafter.

MR. SULLIVAN: Very well.

THE COURT: Thank you.

(Whereupon, proceedings adjourned at 4:40 p.m., to resume July 3, 2024, 9:15 a.m.)

**I N D E X**


| WITNESS | PAGE |
|---|---|
| **CARLOS WATSON** | |
| CONTINUED DIRECT EXAMINATION | |
| BY MR. SULLIVAN | 3090 |

**E X H I B I T S**

| | |
|---|---|
| **Defense Exhibit 627** | **3130** |
| **Defense Exhibit 626** | **3137** |
| **Government's Exhibit 2019** | **3140** |
| **Defense Exhibit 599** | **3182** |
| **Defense Exhibit 635** | **3245** |