THE LAW OFFICES OF ANDREW J. FRISCH, PLLC

January 23, 2025

The Honorable Eric R. Komitee
United States District Judge
225 Cadman Plaza East
Brooklyn, New York 11201

    Re: *United States v. Carlos Watson and OZY Media, Inc.*, 23-CR-0083 (EK)

Dear Judge Komitee:

    On behalf of Carlos Watson and OZY Media, Inc. in the above-referenced case, I respectfully submit this letter to respond to the government's letter of January 8, 2025 (Docket No. 373) and otherwise to address forfeiture and restitution as a supplement to the Defendants' letter of December 9, 2024 (Docket No. 357), incorporated by reference herein.

*Forfeiture Does Not Apply Under the Government's Theory of its Prosecution*

    The government dismisses out-of-hand Section 981(a)(2)'s distinction between proceeds from illegitimate and otherwise legitimate businesses, blithely claiming that the statute's distinction "does not apply to fraud cases like this one." Gov't Letter of Jan. 8, 2025 ("Gov't Letter") at 1 n. 1. The government cites no case that truly supports its view, and the defense is not aware of one. The government's unsupportable view is at odds with the letter and purpose of Section 981(a)(2).

    As to Section 981(a)(2)'s letter, its first subsection provides that gross gain, not net gain, constitutes forfeitable proceeds of illegitimate businesses but the subsection says nothing about otherwise legitimate businesses. If Congress intended to require forfeiture of gross gain for both illegitimate and otherwise legitimate businesses, it would and could have readily said so in the first subsection instead of authorizing forfeiture of gross gain for just illegitimate businesses. As for Section 981(a)(2)'s spirit, "forfeiture is based on the offender's gain," *see United States v. Contorinis*, 692 F.3d 136, 147 (2d Cir. 2012), "consistent with the purpose of criminal forfeiture, as endorsed by the House Judiciary Committee when recommending the Civil Asset Forfeiture Reform Act. H.R. Rep. No. 106-192, at 5 (1999) ("With the forfeiture laws, we can separate the criminal from his *profits* . . . thus removing the incentive others may have to commit similar crimes tomorrow.") (quoting Stefan Cassella, Assistant Chief, Asset Forfeiture and Money Laundering Section, Criminal Division, U.S. Department of Justice in testimony before the committee) (emphasis added). *See United States v. Milton*, No. 21-cr-00478, 2024 U.S. Dist. LEXIS 32501 (S.D.N.Y. Feb. 26, 2024) (Ramos, U.S.D.J.) ("§ 981(a)(2)(A) requires a defendant to forfeit the 'gross' proceeds of his crime, *without any*

*deduction for costs or losses*, whereas § 981(a)(2)(B) requires a defendant to forfeit only the crime's 'net' proceeds, after deducting 'direct costs'") (emphasis added).

The law on which the government purports to rely in claiming that the statute "does not apply to fraud cases like this one" does not appear to exist and, if it did, could not logically or reasonably hold that a legitimate business must forfeit gross rather than net gain. Even in determining which of Section 981's subdivisions applies on the facts of a particular case, one district judge within this Circuit noted that "[t]he case law interpreting these provisions is sparse," and "[t]he Courts of Appeals have reported very few precedential decisions on this issue. That judge resolved application of the statute to her case on facts bearing no real resemblance to OZY. *See United States v. Percoco,* No. 16-CR-776, 2019 U.S. Dist. LEXIS 64306 at *7, 10-11 (S.D.N.Y. Apr. 15, 2019) (Caproni, U.S.D.J.) *aff'd*, 13 F.4th 180 (2d Cir. 2021), *rev'd on other grounds*, 598 U.S. 319 (2023) (employee's salary was not an offset because she would not have been hired but for the scheme and because it was not paid by the defendant); *see also Milton*, 2024 U.S. Dist. LEXIS 32501 at *8-9 (explaining that Section 981(a)(2)(B) allows the defendant "to forfeit those gains net of any costs that he incurred in providing lawful goods and services," and rejecting the defendant's claimed set-off because he "bought the ranch using stock options whose value had been inflated by his own deception."). Even the Circuit's summary order in *United States v. Shkreli*, 779 Fed. Appx. 38 (2d Cir. 2019), triumphantly cited by the government, *see* Docket No. 354 at 73, ruled only that the defendant did not provide specifics of his proffered set-off, a large portion of which was disqualified because it was diverted to pay the defendant's personal debts. *See id* at 42.

Here, while the government disputed the legitimacy of OZY'S claimed revenue, the government did not dispute the value of OZY's expenses (or that its expenses exceeded the claimed forfeitable proceeds of $59 million). To the contrary, the government expressly *relied* on the fact of OZY's costs to explain why the Defendants made misrepresentations. Thus, the government's indictment alleged that OZY made misrepresentations about its revenues after expenses attendant its legitimate business had mounted. *See* Indictment at ¶ 9 ("By 2015, however, OZY's digital business was not succeeding"); ¶ 10 ("OZY's television and festival businesses were significantly more expensive to run than a digital business. As a result, by 2016, OZY was rapidly spending its available cash. OZY borrowed several million dollars in 2016, primarily from preexisting investors, but that cash began to run out in 2017"); ¶ 11 ("Beginning in 2018, OZY took on increasing debt in order to survive. Much of this debt was high-interest loans secured by OZY's accounts receivable. At times, OZY was paying tens of thousands of dollars a day in interest on these debts. To service that debt and to continue its operations, OZY took on even more debt and sought additional money from investors and potential investors"); ¶ 43 ("In or about December 2019, OZY was again on the verge of running out of money").

The government alleged in the indictment that OZY had more than $59M in expenses. As demonstrated in the summary below, the government laid out its view of OZY's revenue and loss per year from 2018-21, establishing that OZY had $81M in expenses between 2018-21 -- way more than that the $59M in forfeiture which the government improperly seeks:

2018

>Revenue: $11M (Indictment ¶ 18).

>Loss: Not specified in the Indictment but the government claimed throughout trial that OZY was not profitable.

>Implied Expenses: $11M.

2019

>Revenue: $13M (Indictment ¶ 50).

>Loss: -$6M (Indictment ¶ 53).

>Implied Expenses: $19M.

2020

>Revenue: $11M (Indictment ¶ 96)

>Loss: -$8M (Indictment ¶ 59)

>Implied Expenses: $19M

2021

>Revenue: $32M (Indictment ¶ 96)

>Loss: Not specified in the Indictment but the government repeatedly claimed throughout trial that OZY was not profitable

>Implied Expenses: $32M

Total Expenses per Indictment: $81M

    The government in summation pressed its theme of OZY's purported misrepresentations to secure investments to cover costs. *See, e.g.,* T. 4127 ("In reality, OZY can barely pay its rent. More than once, it didn't make payroll. The company had taken on extraordinary amounts of debt and owed vendors and lenders hundreds of thousands of dollars every single week and was losing millions of dollars every year.").

During trial, the defense proffered a financial analysis of OZY's revenue and expenses, prepared by Barry Pincus of Tech CXO, which showed total expenses of at least $88 million for just the period of the charged conspiracy, dwarfing the government's calculation of allegedly forfeitable gain of $59 million. *See* Exhibit A (Docket No. 142-2) at 1. During those years, OZY created more than 2,000 premium newsletters, more than 300 episodes of primetime television programming including for Hulu, Amazon and PBS, created more than 200 podcasts for iHeart, BBC and others, put on 4 world class festivals with more than 100 speakers and performers, served more than 200 top tier clients including Coke, Target and Walmart and hired about 1,000 full and part time workers. *See also* T. 1037, 2925 (OZY produced television shows, online content, and other media); T. 1364, 2925 (OZY won an Emmy award for in 2020 for Outstanding News Discussion and Analysis); T. 2983 (OZY produced content in partnership with other established news organizations, including PBS and the BBC, as well as its own content that was distributed through YouTube and other avenues).

The government challenged the report's analysis of revenue, and whether the defense could properly use the report at trial [*see, e.g.,* Docket 142], but the government did not (and could not persuasively) challenge the analysis of expenses, the scope of which was the predicate for the government's theory of its prosecution. We rely on the entirety of the transcript of the trial to show that OZY's expenses were not disputed and highlight below testimony of Samir Rao, the government' principal cooperator, to show that the government's theory was predicated on the fact of OZY's expenses:

> [C]arlos and I believed deeply in the company that we were building, and in order for it to be -- in order for it in many cases to survive, much less to be successful, we needed to have enough cash to run the business, to grow it, to have a chance to earn more revenue, to have a chance to make it profitable.

T. 198;

> [W]e started to spend a lot more money on marketing to try and grow our audience, and that became a bit of a drain on the company. In the first instance, in the spring of 2015 we had invested in a large media brand campaign where we were trying to introduce the OZY brand more forcefully to the world with advertisements and radio spots, magazine ads, newspaper ads, kind of a broader push to introduce OZY to the world, and it ended up being a big spend of money without a lot of benefit to us.

T. 307;

> And so we started to be in a place where we just needed to spend a lot more money to have our content reach a growing audience.

T. 308;

> So, TV was a business that was going to force us to put a lot of money. It was going to take a lot of money to actually create the stuff before we got paid for it, and events were similar.

> The way the events business worked is that you had to put pretty significant down payments on the space you were paying to use in Central Park, which cost significant money.
>
> You had to put -- you had to pay money to all of the talent for performers that you were booking. So if you were paying performers to do music sets or to speak, you had to pay significant money to those people to confirm they would even come. And you wouldn't get paid until you completed your work for advertisers or, you know, ticket buyers.
>
> So it stretched the company not only in terms of our people resources, but also in terms of our cash. It forced us to use more cash faster.
>
> Q. Did there come a time that you started to run out of money?
>
> A. We started to need money for the first time in the spring, summer of 2016, roughly.

T. 312;

> Q. Where did that leave OZY?
>
> A. It left us in the first of what ended up being many painful cash crunches. We reached a point in early January 2018 where we literally didn't have enough cash to make our payroll.

T. 318;

> [I]n the same way that our employees would been concerned about not receiving their payroll, our investors were extremely concerned about the fact that now out of money. Because if we were out of money and actually unable to grow the business and succeed, that have meant their investment would have been worthless.

T. 330;

> Well, in some sense the -- the core justification that Carlos and I had discussed was this notion that in order for us to ultimately be successful for investors at all, any investors, the company had to be alive and successful. First it had to survive, and then it had to succeed. And if we did not have enough cash to run the business, then it wasn't gonna survive. And so, therefore, it couldn't succeed.

T. 334;

> Well, you know, as I previously said, we were in an ongoing form of a cash crunch for the better part of 2018 and 2019, so almost at any period in that window we were not in a

position to wait two months or three months for money that might have been possibly available sooner. We just did not have the runway.

We had people screaming at us to pay bills that were unpaid. We had TV projects that we wanted to push forward that we were late on paying for. I mean, our entire business was constantly in a state of grind trying to move forward but without the benefit of the cash and liquidity needed to actually make those things happen.

T. 450-51;

Q. In particular, how much profit is this chart saying OZY was going to make in 2020?

A. $4 million.

Q. In November of 2020, did you think that you were going to make $4 million in profit?

A. No.

Q. Was OZY profitable at all in 2020?

A No.

T. 849;

Because Antara had wired us $20 million and after three-plus years of living at the edge of not having enough cash to know if you were going to make the next payroll, get through the next week, after dealing with, you know, weeks and weeks, months and years of vendors screaming at you for not paying bills, after years of chasing for cash from this lender or that person who owed you money or these other various equity investments just to make it through the next few days, we finally -- you finally had some measure of relief or a basis to take a breath and try to chart a fresh course forward. For a moment or in a moment we had stopped being completely poor as a business.

T. 878-79;

I remember that for nine years I gave this company absolutely everything I had and that outside of my family, it was the most important thing in my life. And that as a result I committed to trying to keep it alive and that that's the spirit with which I was doing things.

T. 943-44. The government's attempt to force the facts of this case into cases like *United States v. Viloski*, 814 F.3d 104 (2d Cir. 2016), based on a seven-year kickback scheme, stubbornly turns a blind eye to the reality of this case and the testimony of its own witnesses about the legitimacy of OZY, which continued to receive investments even after press reports about Mr. Rao's impersonation of a YouTube employee.

Apart from pressing gross gain for forfeiture in contravention of its own theory of the case, the government's proposed forfeiture is infirm in at least four additional ways. *First*, the jury found the Defendants guilty of conspiracy, not substantive fraud; the jury's verdict does not therefore itself warrant any order of forfeiture because it does not prove that the jury found causation between misrepresentations and investments. The court's instructions on the law permitted the jury to convict without a finding of such causation. *See* Docket No. 314.

*Second*, while *some* evidence of substantive fraud may have been introduced by the government at trial, *some* evidence does not constitute a preponderance where, as here, only a small number of investors support the government's theory, have advocated for forfeiture (and restitution), and the overwhelming majority of OZY's 75+ investors (including four of the five largest investors) have either declined to cooperate with the government's pursuit of financial remedies or affirmatively disavowed their right to advocate for any such remedy. All of the investors were distinctly sophisticated in matters of finance and were represented by highly competent financial and legal advisors. If there is another case where the government so urgently seeks to impose gargantuan financial penalties without the support of purportedly defrauded investors, we have not found it.

*Third*, the government presses its view that amounts loaned to OZY by WTI should be included in forfeiture even though WTI was fully repaid to its satisfaction plus more than $2 million in interest and fees. T. 2296-97. *See* Gov't Letter at 5 n. 5. But WTI's secured loans did not even qualify as loss under U.S.S.G. §2B1.1. *See* Application Note 3(D) (loss does not include monies returned at or before sentencing where collateral was pledged or had been provided by the Defendants).

*Fourth*, the government presses forfeiture against Mr. Watson when it is not disputed that Mr. Watson himself realized no personal gain or enrichment and, in fact, he and his family invested more than $20 million into OZY including wires and checks of approximately $5 million into OZY and delayed and forgone salary and stock options worth $15 million; the government acknowledges that OZY, not Mr. Watson, was the "beneficiary" of the alleged fraud. *See* Gov't Letter at 4. Under no circumstance does the record support an order of forfeiture against Mr. Watson. But if forfeiture is ordered, the Watson family should be first in line and receive $20 million off the top.

As for the government's short shrift about Mr. Watson's future prospects to earn a living, he is 55 years-old and was sentenced to a term of imprisonment of 116 months. *See* PSR at 31 (Having invested everything he has into OZY, Mr. Watson now has a negative net worth, a negative monthly cash flow, and no assets with which to satisfy any forfeiture award). Even without a multi-million-dollar judgment against him, any capacity to earn any kind of livelihood is severely compromised; any forfeiture, at all, much less forfeiture of $59 million for a

defendant (who invested $20 million of his own money without personal enrichment) will doom any future earning capacity for someone who will be approaching 70 years-old by the time supervised release is over. The Court should consider the impact on Mr. Watson's future earning capacity and 8th Amendment limitations against cruel and unusual punishment in addition to all the other reasons against imposing forfeiture.

Based on the government's theory that OZY's substantial expenses were the *sina qua non* of the charged crime and the testimony it elicited from Mr. Rao and others, the Defendants have amply met their burden of proving that OZY's costs exceeded revenue. But if the government can somehow successfully claim that the Defendants have not carried their burden of proof notwithstanding the government's own theory of its case, the Defendants stand ready to call a summary witness based on testimony and documents on the record or Claire Lightfoot Rudy, OZY's director of finance, to prove what is not in dispute.

*Restitution is not Supported by the Record*

"[A] district court cannot properly order restitution under the [Mandatory Victim Restitution Act] unless the victim's harm resulted from the offense of conviction[.]" *United States v. Reifler*, 446 F.3d 65, 135 (2d Cir. 2006). The victim "must have endured a financial loss that was 'directly and proximately' caused by a defendant's fraud." *United States v. Calderon*, 944 F.3d 72, 95 (2d Cir. 2011) (quoting *United States v. Paul*, 634 F.3d 668, 676 (2d Cir. 2011); *United States v. Gushlak*, 728 F.3d 184, 196 (2d Cir. 2013). Here, the government has not provided the requisite 'but-for' causation analysis demonstrating how each victim's financial outcome was specifically linked to the alleged conduct.

The jury found the Defendants guilty of conspiracy, not substantive fraud, and the Court's instructions permitted a conviction even if the Defendants did not cause actual harm. Meanwhile, only a fraction of OZY's 75+ investors testified and/or sought restitution, while others disavowed any interest in any financial remedy (e.g. Dr. Damian Rouson, Kosmo Kalliarekos, Beverly Watson, and others). All of the investors signed stock purchase agreements with the assistance of financial and/or legal advisors. *See, e.g.*, Exhibit B. The investors acknowledged in their agreements that OZY's financials were unaudited and subject to material revision (Section 3.5), the investments were speculative (Section 4.4), and that the investors were accredited and understood the risks inherent in investing in a startup (Section 4.6). In other words, they formally confirmed that they understood that complete loss was a possible outcome for their investment in OZY as with all startup investments.

Even after initial media coverage about Mr. Rao's call in September 2021, OZY successfully launched new podcasts, television shows, newsletters, and festivals, securing deals with blue-chip clients like Coca-Cola, DoorDash, AT&T, and P&G. From late 2021 through early 2023, sophisticated existing investors including Tom Franco, Kosmo Kalliarekos, Beverly Watson, and others continued to invest anew as well. During that window, OZY Board Chair Mike Moe wrote about OZY's impressive comeback in a note to OZY readers, clients, partners and investors. Indeed, the reality is that but for the government's atypical indictment of a company, OZY would likely have continued to bounce back, and no investor would have lost money. As investor Damian Rouson wrote in his impact statement, but for the prosecution, there

would have been no improper loss  The government's inability to summon Rouson and the lion's share of OZY's 75 sophisticated investors to buy into their theory of the case undermines the government's claim that a preponderance of the evidence sufficiently proves causation between the conspiracy and loss.

As to each of the proffered recipients of restitution identified by the government:

Antara conducted rigorous due diligence on both their behalf and Alex Rodriguez (their partner), producing a 35+ page detailed investment memo affirming OZY's strategic value and stating that their primary reasons for investing in OZY were its content, leadership, and genuine partnerships; as they learned more about OZY's continued growth and meaningful value during the summer of 2021, Antara invested a second tranche of $2.5M and persuaded their partner Alex Rodriguez to do the same; and even after press reports about Mr. Rao's call, Antara partner Chetan Bansal acknowledged at trial that he worked with Mr. Watson to pursue additional funding from J.P. Morgan and others.

WTI received full principal repayment of approximately $11.3 million plus more than $2 million in interest and fees. T. 2296-97. Hence there was no loss. Moreover, as to WTI's claim that they missed out on additional potential interest or warrant value, as acknowledged at trial and in his FBI interview, it was Mr. Werdegar who insisted on prepayment on September 26, 2021, and before there any investigation was known, and Mr. Watson agreed. Hence, WTI is not entitled to compensation for theoretical loss value. Indeed, overall, WTI wired OZY $11.3M in loans and $100K in investment to induce OZY to accept their loans for a total of $11.4M. OZY paid WTI back nearly $14M in just over a year. WTI plainly did not lose any money and are not entitled to a double payment.

Tom Franco is one of the world's most seasoned fundraisers for companies and investment funds having raised money for nearly 30 years for Clayton Dubilier Rice and other entities. As Franco and others testified, he personally drove most of OZY's Series C and D fundraising efforts including identifying potential investors, shaping the message, hiring four investment banks and personally recruiting more than 20 investors including Atinum, Al Nahdha, Richard Ossoff, Shawn Guttersen and Joon Oh (the latter three who are listed under restitution). Even after negative press coverage in 2021, Franco and his allies continued to invest in OZY and work with Mr. Watson and OZY evincing his belief in OZY's future; there was no improper loss.

Lifeline and its eight minor investors who filled out restitution forms (Erik R. Manuel, Terry Alan Crews, Anna M. Diop, Karrueche Tran, Lenard Mckelvey, Hannibal Buress, Josephine Aniobi, Joshua D. Martin and Carol E. Martin) sued OZY in civil court and failed to prove their claims under lower evidentiary standards; there was no improper loss.

Interlock Partners Fund LLP, which did not testify at trial, thoroughly evaluated OZY and considered it a valuable investment based on its own substantive due diligence including two detailed investor memos that cited OZY's content and vision as the principal reasons for their investment. Interlock's managing partner Harry Hawks continued to work with Mr. Watson and OZY on the comeback from late 2021 to 2023, helping strike new deals, hire new talent, secure

new partnerships and more. Hawks also advised on the financial analysis done by Tech CXO and others. He strongly believed in OZY's future and is not entitled to restitution.

Here, as with forfeiture, *some* evidence supporting the government's position does not require that the entirety of the circumstances be ignored so that financial penalties are imposed on a selected sliver of the facts. Mr. Watson respectfully requests a restitution hearing under 18 U.S.C. § 3664(d)(5) to allow for a fair determination of actual, compensable loss and proper crediting of value provided by OZY.

The government's improper effort to seek nearly $100M in financial penalties from Mr. Watson and OZY is wrong on every level. We ask that no forfeiture and no restitution be granted as to Watson or OZY. And again, if any is to be granted, that the Watson family's $20 million investment be properly included.

Respectfully submitted,

*/s/ Andrew J. Frisch*
Andrew J. Frisch

cc: Counsel of Record